# EXHIBIT A



| | | | |
|---|---|---|---|
| **ARIZONA DEPARTMENT OF CORRECTIONS** | **CHAPTER:  900**<br><br>**INMATE PROGRAMS AND SERVICES** | **OPR:**<br><br>OPS | |
| **DEPARTMENT ORDER MANUAL** | **DEPARTMENT ORDER:  914**<br><br>*INMATE MAIL* | **SUPERSEDES:**<br><br>DO 914 (5/1/08) | |
| | | **EFFECTIVE DATE:**<br><br>**FEBRUARY 26, 2010** | |
| | | **REPLACEMENT PAGE REVISION DATE:**<br><br>**JUNE 8, 2012** | |

# TABLE OF CONTENTS

**PROCEDURES**

914.01     MAIL GENERAL ............................................................................ 1

914.02     INCOMING MAIL............................................................................ 2

914.03     AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES .................. 7

914.04     INTER-RELATIONAL MAIL................................................................ 8

914.05     OUTGOING MAIL ......................................................................... 9

914.06     PUBLICATIONS............................................................................ 10

914.07     SEXUALLY EXPLICIT MATERIAL ....................................................... 12

914.08     UNAUTHORIZED PUBLICATIONS AND MATERIAL.................................... 13

914.09     PUBLICATION REVIEW PROCESS..................................................... 16

914.10     THE OFFICE OF PUBLICATION REVIEW ............................................. 16

          IMPLEMENTATION...................................................................... 17

          DEFINITIONS ............................................................................ 18

          AUTHORITY .............................................................................. 20

          ATTACHMENT

# PURPOSE

This Department Order establishes regulations, processes and procedures for inmates to send and receive mail, music, and individually reviewed publications. All mail is processed consistent with postal regulations and the security requirements of correctional facilities. Each publication is individually reviewed consistent with the Department's legitimate penological interest in maintaining the safety, security and orderly operations of the institutions.

# PROCEDURES

**914.01      MAIL GENERAL**

1.1      There is no limitation put on the amount of mail an inmate may receive regardless of custody or detention status, provided the incoming mail meets requirements, does not violate policy, and the mail is not between an inmate and any of the following:

1.1.1      Released offenders currently under community supervision by the Department, excluding members of the inmate's immediate family as defined in this Department Order.

1.1.2      An inmate confined in any local, state or federal correctional facility including, but not limited to county jails, detention centers, halfway houses, privately operated correctional facilities, and juvenile facilities, excluding an inmate's immediate family as defined in this Department Order.

1.1.2.1      Inter-relational mail shall be approved as outlined in section 914.04 of this Department Order.

1.1.3      Current or former Department/Contract Bed employees or current or former Department volunteers, without the Complex Warden's prior written approval.

1.1.4      Minors that are not the inmate's natural or adopted child or minors that do not have parents' or guardians' prior written approval.

1.1.5      Anyone who advises the Warden or Deputy Warden in writing that they do not wish to receive mail from a particular inmate. This request must be documented and filed in the inmate record and through an AIMS entry.

1.1.6      Victim(s) of a crime for which an inmate was convicted and/or their family members when the victim has requested for no communication on a Post-Conviction Notification request in accordance with Department Order #1001, Inmate Release System. Victims that have not formally made the "No Inmate Mail" request may communicate with the inmate or the inmate's family members with prior Warden or Deputy Warden written approval. This request must be documented and filed in the inmate record and through an AIMS entry.

1.1.6.1      Unit/Complex staff shall notify the inmate of the victim's request and that further contact with the victim or his/her family members identified by the victim will result in disciplinary action.

1.2      All outgoing domestic mail shall be sent by pre-stamped envelope only, unless otherwise indicated. Domestic postage stamps are not sold in inmate stores. Only stamps for international mail (i.e. Mexico, Canada) or airmail will be available in the commissary.

1.2.1    Indigent inmates shall be provided with pre-stamped envelopes, or applicable postage for Mexico or Canada, for five one-ounce pieces of first class mail per month. Inmates may receive additional credit for postage for Legal Mail as outlined Department Order #902, <u>Inmate Legal Access to Courts.</u>

1.2.2    All postage required beyond the limits cited in this Department Order and all postage for inmate groups and organizations shall be at the expense of the inmate, group or organization.

1.2.3    Postage stamps shall not be used as negotiable instruments or legal tender as payment for materials ordered from private vendors.

1.2.4    Inmates shall not barter, trade, sell, or exchange postage stamps for any goods or services.

1.2.5    Inmates are subject to the limits for possession of postage stamps as outlined in Attachment A of Department Order #909, <u>Inmate Property.</u>

1.3    Mail room staff shall maintain:

1.3.1    An itemized list of all incoming and outgoing registered, insured and certified mail.

1.3.2    Permanent logs that will be subject to periodic inspections shall consist of:

1.3.2.1    An itemized list of all incoming and outgoing packages, including the name and ADC number of each inmate who sends or receives a package.

1.3.2.2    The name and address of each sender and addressee for each package.

1.3.2.3    A detailed description of the contents of each. For incoming publications, this includes the name and dated information for each publication.

1.3.2.4    The amount of postage or the amount paid to the contract carrier for each outgoing package.

1.3.2.5    The date of the mailing or receipt of each package, expenses incurred in processing the mail, and the name of the staff member who recorded the information.

1.3.3    An electronic log of all incoming and outgoing legal mail to include the date received, inmate name and number, sender, and the date received by the inmate. All Incoming and Outgoing Legal Mail shall be processed as outlined in Department Order #902, <u>Inmate Legal Access to Courts.</u>

## 914.02    INCOMING MAIL

1.1    Upon arrival at a new Department/Contract Bed facility, staff shall provide each inmate with the correct mailing address. It shall be the responsibility of the inmate to notify correspondents of the correct mailing address.

1.2     Incoming Mail addressed to inmates shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated (unless legally changed), the inmate's correct ADC number, as well as the inmate's unit name and the appropriate Post Office (PO) Box.

1.3     Incoming Mail shall have a complete return address including the sender's name and the complete street address or PO Box. Mail without a complete return address shall be opened and read to inspect the contents to make a reasonable attempt to ascertain the identity of the sender. If the sender can be identified and the mail does not present any security concerns the mail may be delivered to the inmate. If the sender cannot be verified, the inmate shall receive a notice and the mail held for 90 days before it is destroyed.

1.4     It is the inmate's responsibility to notify correspondents of his/her mailing address, where local U.S. Postmaster practice permits, a U.S. Postal Service (USPS) change of address form shall be completed by the inmate and sent to the USPS. All Department/Contract Bed facilities shall make these forms available. Incoming mail shall be forwarded as follows:

      1.4.1     Mail that arrives without an inmate ADC number shall be stamped "Return to Sender," and returned.

      1.4.2     Mail that arrives for an inmate at an institution where the inmate is no longer housed shall be forwarded to the inmate's current institution.

      1.4.3     When possible, First Class mail belonging to an inmate who is temporarily confined at a hospital or local county jail shall be forwarded.

      1.4.4     Mail belonging to an inmate who is no longer in physical custody of the Department shall be forwarded up to 30 days after his/her release; provided a forwarding address is available. When no forwarding address is available, the mail shall be stamped "inmate is no longer in custody" and returned to the sender.

      1.4.5     All mail received for inmates on escape status shall be forwarded to the Criminal Investigation Unit (CIU) for evaluation and processing.

1.5     Designated staff at each unit/complex is authorized to open, inspect and read incoming mail to prevent criminal activity and prevent inmates from receiving contraband or any other material that may be detrimental to the safe and orderly operation of the institution.

      1.5.1     Upon inspection, incoming mail shall be withheld from an inmate if it meets one or more of the following criteria:

           1.5.1.1     Poses a direct and immediate threat to the security, safety or order of the institution.

           1.5.1.2     Substantially hinders efforts to treat or rehabilitate the inmate; however, legal mail will not be withheld for this purpose.

           1.5.1.3     Threatens the intended recipient.

1.5.1.4 Promotes, aids or abets criminal activity or violation of Department rules, including but not limited to rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages security threat groups.

1.5.1.5 Has content written in code or that contains hidden messages.

1.5.2 Mail meeting one or more of the criteria in 1.5.1 through 1.5.1.5 of this section shall be forwarded to CIU for review. CIU shall return the mail for delivery within 72 hours unless it is determined that an investigation is required, in which case the mail shall be held. If it is determined that the mail is not to be delivered, the inmate shall be notified unless notification would interfere with the investigation.

1.5.3 When an incoming envelope is stamped "Return to Sender" staff shall open and inspect it for contraband before returning it to the inmate.

1.5.4 Incoming legislative correspondence shall be opened in the presence of the inmate to whom it is addressed and may only be inspected to the extent necessary to establish the presence of contraband.

1.6 Inmates may only receive money orders, cashier's checks or certified checks for deposit into inmates' accounts, in accordance with Department Order #905, Inmate Banking/Money System. No other monetary instrument, including cash, coins or personal checks, shall be deposited into an inmate's account.

1.6.1 Money orders, cashier's checks or certified checks shall be made payable to "The Arizona Department of Corrections for the account of (Inmate's Name and ADC Number)."

1.6.2 Mail Room staff shall deliver a receipt to the inmate and forward all money orders, cashiers checks, cash and personal checks received to the Business Office for processing.

1.6.3 The Business Office/designated staff shall process the monetary instruments that meet the Department requirements and return those that do not meet Department requirements at the inmate recipient's expense.

1.6.4 The Business Office shall notify CIU of any received Internal Revenue Service (IRS) checks. CIU may notify the IRS if deemed appropriate.

1.6.5 Outgoing inmate/IRS correspondence shall contain a notation by staff on the envelope directing the correspondence to the Criminal Investigations Branch at the Service Center to which the correspondence is addressed.

1.7 Unauthorized property or material discovered in incoming mail shall be removed from incoming letters and held as contraband. An inmate Property/Contraband/Disposition, Form 909-6, and Notice to Sender of Rejection of Incoming Mail, Form 909-3, shall be completed and sent to the inmate. Inmates have 90 days to either have item(s) destroyed or returned to the sender. The Department shall not pay for the cost of notifying the sender of the inmate's contraband arrangements or its mailing cost.

1.7.1   The Department shall not pay for the cost of returning unauthorized property or material that includes, but is not limited to:

    1.7.1.1   Used or unused postage stamps.

    1.7.1.2   Stickers, labels, address labels or decorative stamps.

    1.7.1.3   Photos where the non-photo side can be separated (Polaroid's).

    1.7.1.4   Photos of other inmates.

    1.7.1.5   Unknown foreign substances and/or powders.

    1.7.1.6   Oils, perfumes, incense or personal property items.

    1.7.1.7   Lottery tickets or games of chance.

    1.7.1.8   Tax forms.

    1.7.1.9   Battery operated greeting cards, or greeting cards larger than 8 ½" by 11."

    1.7.1.10   Unused Greeting cards, stationary, pens/pencils and/or envelopes.

    1.7.1.11   Unused postcards.

    1.7.1.12   Bookmarks.

    1.7.1.13   Inspirational cards or medals.

    1.7.1.14   Candy, gum, or any food items.

    1.7.1.15   Art, crafts and hobby supplies.

    1.7.1.16   Road maps of Arizona, areas contiguous to Arizona, states that contain the contract prison facilities, and states contiguous to those states where contract prison facilities are located; Public Transportation maps of Arizona and states with contract prison facilities and/or descriptions or photos of Department or contract prison facilities. ("Contiguous", as used in this section, means states surrounding and bordering the subject state. In the example of Arizona, this would mean California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion thereof). Any publication containing maps as part of the material will be subject to all publication review requirements.

    1.7.1.17   Calendars.

    1.7.1.18   A printed individual item (not a supplement of an item such as a newspaper), specifically intended for the purpose of advertising or selling merchandise (catalog, circular) for any items that an inmate would not be permitted to receive.

        1.7.1.18.1   Catalogs for publications, compact discs, cassettes and other items inmates would be able to receive shall be processed according to the publication review requirements.

    1.7.1.19 Personal or professional/commercial photographs that feature nudity or sexually explicit acts, as detailed in the DEFINITION section. Photos of current or former Department/Contract Bed employees and/or Department volunteers.

1.8 Newspaper clippings, magazine articles, cartoons or copies of material from the internet may be enclosed within personal mail; however, the content is subject to the publication review process. Internet material containing information about staff or other inmates is unauthorized if it is determined to be a threat to the safe and orderly operation of an institution and/or a threat to the safety of any other person. Inmates are not authorized to receive items from the ADC Net website.

1.9 Inmates may be permitted to view crime scene and/or autopsy photographs in accordance with Department Order #909 Inmate Property.

1.10 Incoming third class/bulk mail and publications will be delivered provided the mail/publication content meets policy guidelines and:

  1.10.1 Is prepaid, as defined by this Department Order;

  1.10.2 Is addressed to a specific inmate or inmates with the correct name, ADC number and housing location.

1.11 Undeliverable Standard Mail shall be returned to the Post Office, if the Post Office will accept it. If the Post Office does not accept the undeliverable mail, it shall be documented in the appropriate log and destroyed/shredded and bagged by staff and placed in a dumpster or other trash container.

1.12 Incoming telegrams or similar urgent mail, including but not limited to, overnight mail shall be delivered within 12 hours unless circumstances make delivery impractical.

1.13 Excluding holidays and weekends, incoming mail shall not be held and shall be delivered within 24 hours unless circumstances make delivery impractical.

1.14 All mail and publications with metal bindings other than staples, including paper clips, binder clips, and other metal fasteners are prohibited. An inmate that receives a metal binding piece of mail and/or publication shall be informed of its arrival and will either decide to have the publication processed as contraband or give his/her written permission to have the binding removed prior to its release to the inmate. Staff shall make note of the removal in the inmate's property file.

  1.14.1 Staples in all mail and publications are prohibited in the following types of housing units:

    1.14.1.1 Death Row.

    1.14.1.2 Administrative or Disciplinary Confinement.

    1.14.1.3 Close Management.

    1.14.1.4 Maximum Management.

    1.14.1.5 Mental Health Treatment Units (Baker and Flamenco)

**914.03        AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES**

1.1     All compact discs (CD's) and/or cassettes received through the mail shall be new, clear or a cardboard container, in its original wrapper and packaging, and shall not be a re-recording of an original, and shall be consistent with copyright laws. Authorized mail order purchases for inmate in disciplinary detention may be held until inmate is released from detention.

1.2     Envelopes/packages containing incoming CD's and/or cassettes shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box. Incoming approved compact discs and/or cassette tapes for inmates in disciplinary detention may be held until the inmate is released from detention.

1.3     Incoming CD's and/or cassettes must come directly from a recognized publisher, distributor or authorized retailer. Family members or friends are not authorized to send CD's and/or cassettes directly to an inmate even if they include a verifiable packing list or invoice. Secondary markets also known as third party vendors, (for example, "eBay," and "Amazon Marketplace"), or any other auction sites are not authorized retailers or distributors for the purpose of this Department Order.

1.4     Cassette tapes and/or CD's commonly referred to as "Books on Tape" are subject to the publication review requirements, as outlined in section 914.09 of this Department Order and shall be included in the total possession limit amount for cassette tapes/discs as outlined in Attachment A of Department Order #909, Inmate Property.

1.5     Inmates may receive correspondence tapes with prior written approval of the unit Deputy Warden. Inmates shall only receive correspondence tapes from an individual on his/her approved visitation list.

    1.5.1   The requesting individual shall submit a written justification to the unit Deputy Warden requesting approval for correspondence tapes indicating that the inmate or visitor has a disability or literacy concern that prevents written correspondence.

    1.5.2   The inmate shall show in advance that he/she is in possession of an operational and authorized appliance with a cassette player.

    1.5.3   Correspondence tapes shall not contain sexually explicit language or any other unauthorized content that would be in violation of this Department Order.

    1.5.4   Correspondence tapes shall be screened at the Complex/Unit Level only and shall not be forwarded to Central Office Publication Review.

1.6     Religious oriented tapes and/or CD's sent through the mail to a specific inmate shall be commercially recorded. Tapes/CD's of religious services being donated by volunteers or outside groups for services or inmate listening shall be pre-screened by the Senior Chaplain to ensure that they are consistent with the guidelines within this Department Order. Volunteers are not authorized to directly provide inmates with recorded material.

1.7     Cash on delivery (COD) orders and contract purchases such as music clubs are prohibited and shall be returned to sender. The Department shall not be responsible for the cost of returning any unauthorized material.

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

## 914.04          INTER-RELATIONAL MAIL

1.1     Inmates that are immediate family members as defined in this Department Order and those that are the verified natural or legally adopted parents of a child are authorized to have inter-relational mail, provided the communication meets the criteria set forth in this Department Order.

1.2     In order to have inter-relational mail privileges, the natural or adoptive parents shall:

   1.2.1     Provide the child's birth certificate, and

   1.2.2     The relationship can be readily verified by staff, i.e. it is clear in the pre-sentence report or file.

1.3     Inter-relational communication shall not contain communications with or on behalf of any other inmates that do not have inter-relational mail approval.

1.4     Only letters, homemade greeting cards or greeting cards purchased through the inmate store are authorized for inter-relational mail. The transfer of funds and/or any other item is prohibited.

1.5     The sending unit/complex shall verify the inmate's relationship, and shall stamp the outgoing letter as "verified." Letters that have not been verified and approved shall be returned to the inmate sender.

1.6     All inter-relational mail privileges shall be pre-approved by both the requesting and receiving Warden or Deputy Warden. Approvals and denials are at the discretion of the Warden or Deputy Warden and may be revoked when it is in the best interest of institutional security.

1.7     The inmate shall pay postage. Indigent inmates may be provided postage as outlined in section 914.01 of this Department Order.

1.8     Inmates who wish to send mail to an incarcerated immediate family member shall submit the request to their assigned Correctional Officer III who shall verify the relationship.

1.9     The assigned Correctional Officer III or designated staff member at the requesting institution shall:

   1.9.1     Complete a Request to Communicate with an Incarcerated Family Member, Form 915-3, as outlined in Department Order #915, Inmate Phone Calls.

   1.9.2     Verify that an immediate family relationship exists between the inmates.

   1.9.3     Forward the application to the Warden or Deputy Warden for approval/disapproval.

   1.9.4     Forward copies of the approved applications to the respective Mail/Property rooms at the requesting and receiving institution.

   1.9.5     Advise inmate of disapproved applications, and note all approvals and denials on AIMS.

**914.05**      **OUTGOING MAIL**

1.1      All outgoing inmate mail shall include on the envelope the inmate's complete first and last name (the name under which he is incarcerated), ADC inmate number, and full return address, including the name of the complex, unit and bed location.

     1.1.1      Institution mailroom staff shall return mail lacking this information to the sending inmate, if known, for a correction.

     1.1.2      If the inmate sender is not known, the correspondence shall be opened to make a reasonable attempt to determine the identity of the inmate sender. If the identity cannot be determined, the mail shall be held in a "Dead Letter" repository for 90 days, pending claim. If no claim is made, the mail shall be processed as unclaimed property.

     1.1.3      Inmates shall seal outgoing mail and place it in locked mailboxes located throughout the institution or in other areas designated by the Warden or Deputy Warden. Mail shall be collected at approximately the same time each workday, except on weekends and holidays, and shall be delivered to the mail room for processing.

         1.1.3.1      Outgoing mail being sent to any elected government official shall be brought to the mailroom unsealed. Staff shall review the envelope for content, but shall not read the contents of the letter.

     1.1.4      **SECTION DELETED**

     1.1.5      Inmates shall not use the complex or unit address to fraudulently identify themselves as employees, agents, or representatives of the Department, complex, unit, or Contract Bed facility.

1.2      Staff who processes outgoing inmate mail may inspect it for contraband, but shall not read or censor mail being sent to:

     1.2.1      The inmate's attorney, a judge, or court.

     1.2.2      Publisher or editor of a newspaper, news magazine or periodical of general distribution, national or international news service or to the station manager of any radio or television stations.

     1.2.3      The Director, Deputy Director or Division Directors of the Department.

     1.2.4      Elected or appointed public officials.

1.3      Staff shall read up to 10% of outgoing mail. Mail may be returned to the inmate, retained by the institution, or removed from the mailing (the balance of which shall be mailed) when the contents or communications:

     1.3.1      Pose a direct and immediate threat to the security, safety or order of the institution.

     1.3.2      May substantially hinder efforts to treat or rehabilitate the inmate.

1.4      Staff shall not stamp or mark the contents of outgoing read mail, rather, the envelope or box shall be stamped or marked as having been inspected and resealed prior to mailing.

1.5     Outgoing inmate mail is subject to being opened and read by staff when there is a reasonable belief that the inmate is using the mail to further a crime or circumvent Department regulations or written instructions. Such mail may include, but is not limited to:

    1.5.1   Descriptions or encouragement of activities that may lead to the use of physical violence.

    1.5.2   Information that involves escape plans and/or activities that violate Department or institution regulations or written instructions.

    1.5.3   Threatens the intended recipient.

    1.5.4   Promotes, aids or abets criminal activity or violation of departmental rules, including but not limited to, rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages security threat groups.

    1.5.5   Mail written in code or provides instruction on code use.

1.6     Outgoing mail that is read by staff and is determined to be detrimental to the security or safe operation of the institution or that may impede the protection of the public or facilitate criminal activity shall be referred to the Criminal Investigations Unit for further action.

1.7     The Criminal Investigation Unit shall:

    1.7.1   Retain the censored portion of any outgoing mail during any investigation, and then return it to the sender.

    1.7.2   Stamp the uncensored portion of any censored mail to indicate that portions of the mail were censored, and mail it to the recipient unless doing so would interfere with an ongoing investigation.

    1.7.3   The Department may censor the item or determine not to mail the item.

1.8     Mail outlined in 1.7.2 of this section shall be sent within 72 hours, and unless it is determined that such mail is not to be sent. If the mail is not to be sent, the inmate shall be notified of such within 72 hours, unless doing so interferes with an ongoing investigation.

1.9     Excluding holidays and weekends, outgoing mail shall not be held and shall be delivered to the Post Office within 24 hours unless circumstances make delivery impractical.

## 914.06     PUBLICATIONS

1.1     All publications are subject to screening and review and shall meet standards and guidelines as detailed in this Department Order.

1.2     The envelope/container shall have the inmate's complete first and last name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box.

1.3     Publications shall come directly from a recognized publisher, distributor, or authorized retailer, be consistent with copyright laws and shall include a packing list/invoice with all shipments.

    1.3.1     Secondary markets (also known as Third Party Vendors) such as e-Bay and Amazon Marketplace are not authorized retailers or distributors.

    1.3.2     Used publications are authorized provided they meet all incoming publication requirements including coming from a recognized publisher, distributor or retailer or a verifiable organization that donates publications to inmates and are in good condition, free of highlighting, underlining, notes or other marks.

1.4     Non-English publications may be delayed due necessary translation.

1.5     Incoming publications shall be pre-paid. Cash on Delivery (COD) orders and contract purchases such as music or book clubs are prohibited and will be returned to the sender at the inmate's expense. Donated publications not coming in from a recognized publisher, distributor or retailer shall be processed as contraband or donated to an inmate library provided they meet Departmental policy requirements and publication review as set forth in this Department Order.

1.6     Publications shall be forwarded for a 90 day period if the inmate is in custody at a Department or Contract Bed facility, provided there is no state or other governing rules/regulations preventing the forwarding of the publication.

    1.6.1     The inmate shall be responsible for the change of address notifications.

    1.6.2     At the end of the 90-day period, the publications shall be subject to contraband policies and procedures and will no longer be forwarded.

1.7     Inmates are responsible for staying within publication possession limit requirements as outlined in Attachment A of Department Order #909, Inmate Property, and may be subject to disciplinary action for exceeding publication/property limits. Items over the established limit shall be considered contraband.

1.8     Authorization to withdraw funds from an inmate's account for the purchase of a publication does not constitute approval of the publication.

1.9     All publications, including those that are part of a title or series, are reviewed on an individualized basis. Rejection of several issues of any one publication is not sufficient reason to reject a subscription to a publication in its entirety; unless the publication regularly includes sexually explicit material as part or all of its content.

1.10     Unless there is a legitimate correctional concern relating to security, safety, criminal activity or a threat to the orderly operation of the institution, the contents of incoming publications or publications under review shall not be revealed to any non-Publications Review Staff. Only those staff approved to participate in publication review and who have received publication review training, shall be involved in processing, reading and reviewing publications.

1.11     No publication shall be excluded solely on the basis of its appeal to a particular ethnic, racial or religious group.

1.12    Staff shall not remove pages of any publication to make the publication acceptable. Removing pages alters the publication rendering it as contraband. Previously excluded publications that have been re-edited by removing pages or the blocking out of pictures or texts will remain excluded. Staff may remove stapled or perforated items including, but not limited to free product samples, calendars, advertising or promotional items provided that no damage is done to the publication in the removal process.

1.13    Previous decisions to exclude publications, regardless of any subsequent revisions in standards or criteria, remain final. Previously excluded Publications shall not be re-submitted for review or appeal under this Department Order.

1.14    Publications delivered to an inmate in error at any complex/unit prior to and contrary to a First or Second Review may be considered contraband upon official notice from Publication Review Office that the publication has been excluded. Inmates will be provided the options of sending out the material, placing it in long-term storage, or having it destroyed.

1.15    Approved incoming publications in disciplinary detention may be held until the inmate is released from detention.

## 914.07    SEXUALLY EXPLICIT MATERIAL

1.1    In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material. For the purpose of this Departmental Order, sexually explicit material is defined as publications that feature nudity and/or sexual behaviors/acts and/or the publication is promoted based on such depictions.

1.2    Prohibited publications include, but are not limited to:

1.2.1    Publications that contain photographs, drawings, cartoons, animations, pictorials or other facsimiles that show nudity of either gender. (For Nudity see Definitions.)

1.2.2    Publications that contain any of the following acts and behaviors either visually, written or in audio (non-lyric) form:

1.2.2.1    Physical contact by another person with a person's unclothed genitals, pubic area, buttocks or, if such person is a female, breast.

1.2.2.2    Sadomasochistic abuse.

1.2.2.3    Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy.

1.2.2.4    Masturbation, excretory functions, and lewd exhibition of the genitals.

1.2.2.5    Incestuous sexual activity.

1.2.2.6    Sexual activity involving an unwilling participant, or a participant who is the subject of coercion, or any sexual activity involving children.

1.3    Publications that contain nudity and/or sexual behaviors/acts for artistic, scientific, medical, educational, or anthropological purposes will be sent to the Office of Publication Review and may be approved on an individualized basis.

1.4     Personal letters are not subject to Publication Review.

1.5     Sexually Explicit Publications will be reviewed and processed as following:

   1.5.1   Within seven calendar days, unit/complex staff shall send the inmate the Complex Level Publications Review/Sexually Explicit Material, Form 914-7 stating that a sexually explicit publication has arrived and will be processed according to contraband policies and procedures, unless a second level review is requested within 20 calendar days of the inmate's actual receipt of the notice of exclusion.

   1.5.2   Inmates may give their request of a second level review to the Complex/Stand-Alone Unit Publication Review staff through Inmate Letter, Form 916-1 within 20 calendar days of the actual receipt of the notice of exclusion. If no second level review is requested within the 20 calendar days, the publication will be returned to sender at the inmate's expense. Publications under second level review will not be returned to sender pending disposition of the appeal.

      1.5.2.1   The Office of Publication Review is considered the second level review for sexually explicit material.

      1.5.2.2   **SECTION DELETED**

      1.5.2.3   Appeal decisions made by the Office of Publication Review are final and exhaust inmates' administrative remedies.

   1.5.3   A Division Director or Director's designee not in the same chain of command as the Office of Publication Review shall complete second level reviews for excluded publications that contain nudity and/or sexual behaviors/acts for artistic, scientific, medical, educational, or anthropological purposes.

**914.08**     **UNAUTHORIZED PUBLICATIONS AND MATERIAL** - Prohibited publications include those that by their nature or content threaten or are detrimental to the security, safety and orderly operation, or discipline of the facility, or inmate rehabilitation, or, are found to facilitate, encourage, incite, promote or instruct in criminal activity or unauthorized prison activity.

1.1     Prohibited publications include, but are not limited to:

   1.1.1   Depictions or descriptions that incite, aid, or abet riots, work stoppages, or means of resistance.

   1.1.2   Instructions or plans on the sending or receiving of prison contraband.

   1.1.3   Depictions or descriptions of street gangs and/or Security Threat Groups (STG), and related gang/STG paraphernalia, including, but not limited to, codes, signs, symbols, photographs, drawings, training material, and catalogs.

1.1.4   Pictures, descriptions and instructions regarding the function of locks and/or security devices (e.g. cameras, alarms) or how to bypass or defeat the security functions of these devices.

1.1.5   Depictions, descriptions, instructions on the use of hands, feet, or head as weapons, fighting weapons and techniques, self-defense and martial arts.

1.1.6   Depictions or descriptions, or promotion of drug paraphernalia or instructions for the brewing of alcoholic beverages or the manufacture or cultivation of drugs, narcotics or poisons.

1.1.7   Content that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another.

1.1.8   Depictions, descriptions or content that instructs on the sale, manufacture, concealment, or construction of ammunition, guns, rifles, bombs, explosives or any other type weaponry; displays, realistic pictures, or cutaway pictures of guns or knives suitable for use in making of reproduction weapons. The mere photograph of a gun or knife in a magazine or publication (e.g. Field and Stream) is not sufficient in and of itself to exclude the publication.

1.1.9   Detailed illustrations, explanations, and/or descriptions of computers/ communications systems or electronics.

1.1.10   Depictions, descriptions or content that promotes or instructs on identity theft.

1.1.11   Content that depicts, encourages, or describes methods of escape and/or eluding capture, or contains blueprints, drawings, road maps of Arizona, areas contiguous to Arizona, states that contain the contract prison facilities, and states contiguous to those states where contract prison facilities are located; Public Transportation maps of Arizona and states with contract prison facilities and/or descriptions or photos of Department or contract prison facilities. ("Contiguous", as used in this section, means states surrounding and bordering the subject state. In the example of Arizona, this would mean California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion there of.)

1.1.12   Content that contains survival skills that could be used as an aid in eluding capture following an escape.

1.1.13   Gambling strategies and other gambling-related instructional material.

1.1.14   Pictures, depictions, illustrations, explanations, instructions, and/or patterns for tattoos and/or skin modification equipment which would provide, at minimum, visual aids for inmates wishing to reproduce this type of body ornamentation and/or equipment.

1.1.15   Cipher or code or instruct on the usage of code.

1.1.16   Pictures, depictions, illustrations or text that promotes acts of violence, that cause or intends to cause serious criminal injury or harm.

1.1.17   Graphic violence that includes but is not limited to murder, rape, sexual assault, assault, amputation, decapitation, dismemberment, mutilation maiming, disfigurement or cruelty to animals.

1.1.18   Pictures, photographs, illustrations, text or other content that may encourage unacceptable sexual or hostile behaviors, or creates a hostile environment for volunteers including, but not limited to sexual representations of inmates, law enforcement, military, professional medical staff, teachers and Clergy.

1.1.19   Intelligence gathering instruction and/or investigative techniques that may impede the Department's investigative ability.

1.1.20   Military/strategy publications that may circumvent the Department's ability to monitor and control activities/behaviors that may be a violation of law and/or Departmental policy.

1.1.21   Medical publications that may lead to any or all of the following:

1.1.21.1   Harming of oneself or others;

1.1.21.2   Impacting clinical test results;

1.1.21.3   Preventing medical staff from accurately diagnosing medical issues and providing appropriate medical treatment and/or false concerns of a given diagnosis or medical treatment necessities.

1.1.22   Depictions/descriptions/textual content that may create a health and fire risk.

1.1.23   Crime scene/autopsy photos.

1.1.24   Depictions, descriptions or content that promotes and/or instructs on the facilitation of activity that is in violation of departmental policy and/or governmental laws.

1.1.25   Canine search procedures, techniques and scent discrimination.

1.1.26   Instruction on the making of incense.

1.1.27   Depictions, descriptions or content that instructs on the sale, manufacture, concealment, or the construction of tools.

2.1   A publication will not be rejected based upon inclusion of an advertisement promoting of the following if the publication is otherwise permissible and the advertisement is merely incidental to, rather than the focus of, the publication:

2.1.1   Three-way calling services;

2.1.2   Pen pal services;

2.1.3   The purchase of products and services with postage stamps;

2.1.4   The purchase of products and services that violate Departmental policy;

2.1.5   Conducting a business while incarcerated.

2.2   Publications that contain detailed content of any subjects listed above may be excluded.

**914.09**      **PUBLICATION REVIEW PROCESS**

   1.1      The Complex/Stand-Alone Unit Level Publication Review staff shall:

      1.1.1      Facilitate the processing of sexually explicit publications as contraband as outlined in section 914.07 of this Department Order.

      1.1.2      Forward publications that contain nudity and/or sexual behaviors/acts for artistic, scientific, medical, educational, or anthropological purposes to the Office of Publication Review for disposition.

      1.1.3      Approve/release publications that do not require additional review.

      1.1.4      Notify inmates of publications that are pending disposition by the Office of Publication Review.

      1.1.5      Process inmates' second level review request and notify inmates of their outcome or inform inmates if the request is not within timeframes. Second Review can be requested by inmates through Inmate Letter, Form 916-1 to the assigned Complex/Stand-Alone Unit Level Publication Review staff within 20 calendar days of the inmate's actual receipt of the notice of exclusion.

      1.1.6      Distribute copies of Office of Publication Review - Notice of Result, Form 914-6 and a Memorandum of Second Review to inmates affected by either the decision to exclude a publication or the referral for a Second Review. The distribution of these copies shall include inmates presently in possession of excluded publications, or who may in the future possess excluded publications. The excluded publication will be dealt using the same procedures as set forth in section 914.02, subsections 1.7 - 1.7.1 of this Department Order.

      1.1.7      Provide the Warden with a copy of any Memorandums of Second Review.

      1.1.8      Respond to Inmate Publication Review-Related Letters questions or concerns.

      1.1.9      Log all incoming publications that are included as part of Publication Review, noting the specific publication, inmate information, and disposition, and sending the monthly report to the Office of Publication Review.

      1.1.10     Maintain log information for a period of two years.

**914.10**      **THE OFFICE OF PUBLICATION REVIEW**

   1.1      The Office of Publication Review shall:

      1.1.1      Review, process, document and track publications forwarded by the Complex/Stand-Alone Unit Publication Review staff and determine whether to allow or exclude them.

      1.1.2      Notify all Wardens and Mail/Property rooms of the decision on each reviewed item.

      1.1.3      Complete the Office of Publication Review - Notice of Result form for all reviewed publications. Notices of Reviews for excluded publications must provide a reason for the exclusion.

1.1.4 Send completed Office of Publication Review - Notice of Result form to the Complex/Stand-Alone Unit Publication Review staff for distribution.

1.1.5 Act as second level review for publications that contain nudity or the sexually explicit material as outlined in section 914.07 of this Department Order.

1.1.6 Maintain copies of all Notices of Review for period of three years from the date of exclusion. Excluded publications shall be returned to the complex/unit mailroom within 90 days following the review unless a Second Review has been requested. One copy of an excluded publication will be retained for three years if a Second Review has been completed and the exclusion was upheld.

1.1.7 Compile a monthly list of all excluded publications, which shall be forwarded to all Complex/Stand-Alone Unit Level Publication Review staff and to all Wardens.

1.1.8 Notify all Wardens and Complex/Stand-Alone Unit Level Publication Review staff of pending and completed second reviews.

1.1.9 Prepare a Memorandum of Second Review and appeal packet for publications that inmates have requested a second level review that do not fall under the sexually explicit material as outlined in section 914.07, of this Department Order.

1.1.9.1 A Division Director or Director's designee not in the same chain of command as the Office of Publication Review shall complete the Memorandum of Second Review to affirm or reverse the original decision. The Memorandum shall be forwarded to all affected inmates through Complex/Stand-Alone Unit Level Publication Review staff. The decision of the Division Director or Director's Designee is final and exhausts inmates' administrative remedies.

1.1.9.2 Inmates may file grievances on Publication Review process procedural issues. Grievances shall be processed through the inmate's unit to the Central Office Appeals Unit. The appeal response shall only address procedural issues and will not re-consider any decisions to exclude publications.

1.1.10 Forward completed Memorandums of Second Review to Complex/Stand-Alone Unit Level Publications Review staff for distribution.

# IMPLEMENTATION

Within 90 days of the effective date of the Department Order:

- Each Warden shall provide direction for Inmate Mail addressing, at a minimum:

  - Outgoing and incoming mail.

  - Inter-relational mail.

  - Mail Room operations.

  - Mail contraband control.

- Wardens and Deputy Wardens shall update and issue the appropriate direction and Post Orders for mail procedures and processing all types and rates of mail consistent with current USPS requirements mail operations.

Section 914.07, Sexually Explicit Material is not effective until August 26, 2010:

- Until August 26, 2010 the previous Department Order 914, Inmate Mail, Section 914.07, Obscene Material dated May 1, 2008 remains in effect. (See Attachment A)

- Prior to this date inmates:

  - Shall cancel or allow to expire any current subscriptions to commercially published magazines or publications that feature nudity.

  - Shall mail out, destroy or request long-term storage for these publications or any other material that is in violation of this Department Order.

- Inmates may receive disciplinary action if found in the possession of unauthorized commercially published magazines or publications after August 26, 2010. All such items shall be considered contraband and will be subject to seizure.

# DEFINITIONS

**ALTERING** - To change or make different; modify.

**AUDIO BOOK -** A taped reading of a book or book condensation reproduced in audiocassette form.

**CENSOR** - To delete, ban, suppress or withhold portions of mail.

**CONTRABAND** – For the purpose of this Department Order, contraband is defined as any item considered to be a detriment to the safe and orderly operation of an institution or parole office. Contraband includes, but is not limited to:

- Any item that could be used as an aid to escape.

- Any item that could be used to disguise or alter an inmate's appearance.

- Any item of clothing or items for personal use or consumption that are not cleared first through security or the property room of the institution.

- Cameras, video, audio or related equipment, unless authorized by order of written instructions.

- The introduction and/or possession of any separate components that may aid in the use of wireless devices and/or multimedia storage devices. This includes, but may not be limited to:

  - Cell phone chargers.

  - Mobile chargers.

  - Cell phone batteries.

  - Any other item that staff reasonably determines may aid in the use of wireless devices and/or multimedia storage devices.

- Allowable items which are:

- Possessed without permission.

- Discovered in improper locations.

- Over set allowable amounts.

- Obtained in improper manners or methods.

- In altered forms or conditions.

**CORRESPONDENCE TAPES** - Cassette tapes sent or received by an inmate or visitor where there exists a disability or literacy concern that prevents written correspondence.

**CRIMINAL ACTIVITY** - Any activity that violates local, state and federal law, statutes, ordinances, or codes, and constitutes a criminal act under the law.

**CUNNILINGUS** - Oral stimulation of the clitoris or vulva.

**EXCRETORY FUNCTIONS** - The elimination of a body's waste products through defecation and urination.

**FEATURES** - The publication contains nudity on a routine or regular basis or promotes itself based upon such depictions in the case of an individual one-time issue.

**FELLATIO** - Oral stimulation of the penis.

# REST OF PAGE BLANK

**THIS PAGE BLANK**

**FIRST CLASS MAIL** - A class of mail including letters, postcards, and postal cards, all matter wholly or partially in writing or typewriting; includes but is not limited to anything mailable such as bills, invoices, personal correspondence, and some merchandise.

**GENITALIA** – Male and female sexual organs.

**IMMEDIATE FAMILY** - A legal spouse, natural or adopted parents, siblings, natural or adopted children, stepchildren, grandparents, or other verified person primarily responsible for the raising of the inmate in the absence of the inmate in the absence of a parent.

**INCESTUOUS ACTIVITY** - Sexual activity between family members who are forbidden to marry due to their close kinship.

**INFLAMMATORY** - Arousing passion or strong emotion, especially anger and belligerence.

**INTERCOURSE** - The act of having sex.

**INTER-RELATIONAL MAIL** - Letters deliverable by the United States Postal Service written by an inmate to an incarcerated immediate family member, clearly marked with the name and ADC number of the sending and receiving incarcerated immediate family member.

**ILLEGAL CONTRABAND** - Any item, the possession of which in the community or on prison grounds is a felony or misdemeanor, i.e., weapons, explosive devices, drugs, wireless communication devices, multimedia storage devices or other statutorily prohibited item(s).

**LEGISLATIVE CORRESPONDENCE** - Letters to or from a member of the Arizona State Legislature. Mail that is received in envelopes that are clearly marked as official envelopes used by the Arizona State Legislature is considered incoming legislative correspondence.

**MASTURBATION** - Touch or rubbing of sexual organs for the purpose of sexual pleasure. Excitation of one's own or another's genital organs, usually to orgasm, by manual contact or means other than sexual intercourse.

**NUDITY** - Nudity as defined by ARS 13-3501, the showing of the human male or female genitals, pubic area, female breast with less than a fully opaque covering of the nipple, or male or female buttocks with less than a full opaque covering of the anus (e,g., a thong). The anus does not need to be visible.

**PENOLOGICAL** - Relating to the theory and practice of prison management and criminal rehabilitation.

**PERIODICAL CLASS MAIL** - Mail that consists of magazines, newspapers and other publications.

**PREPAID PUBLICATIONS** – Are any type of publication sent to an inmate that has been paid for in advance of delivery to the inmate. Publications not paid for in advance will not be accepted and returned to the sender at the inmate's expense.

**PUBLICATION** - A book, booklet, pamphlet, (or similar document), or a single issue of a magazine, catalog, periodical, newsletter, audio (non music) tapes and CDs. Publication does not include personal letters and personal photographs.

**SADOMASOCHISTIC ABUSE** - As defined by ARS 13-3501 means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed, for the purpose or in the context of sexual gratification or abuse.

**SEXUALLY EXPLICIT MATERIAL** - Any publications, drawing, photograph, film, negative, motion picture, figure, object, novelty device, recording, transcription, or any book, leaflet, catalog, pamphlet, magazine, booklet or other item, the cover or contents of which pictorially depicts nudity of either gender, or that graphically depicts through text any sexually explicit homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion.

**STANDARD MAIL** - Advertising mail that includes advertisements, circulars, newsletters, magazines, small parcels and merchandise and weighs less than 16 ounces.

**STG** - An unofficial term used to denote any type of gang activity in prisons and correctional facilities. The official term for this is Security Threat Group.

**UNAUTHORIZED MATERIAL**- Material that by its nature or content threatens or is detrimental to the security, safety, good order or discipline of the facility, or inmate rehabilitation, or, that is found to facilitate, encourage, incite, promote or instruct in criminal activity or unauthorized prison activity.

**VIOLENCE** - Acts of aggression or abuse that causes or intends to cause criminal injury or harm. These acts include, but are not limited to, murder, rape, sexual assault, assault, and cruelty to animals. Graphic violence would include, but is not limited to, acts of violence that include amputation, decapitation, dismemberment, or mutilation maiming or disfigurement.

{Original Signature on File}

_____

Charles L. Ryan
Director

**ATTACHMENT**
Attachment A – Obscene Material

**FORMS LIST**
914-6, Office of Publication Review - Notices of Result
914-7, Complex Level Publications Review/Sexually Explicit Material

# AUTHORITY

A.R.S. 12-941 et seq, Disposal of Certain Unclaimed Property in Custody of State, City or Town Officers.
A.R.S. 13-2501, Definitions of Contraband.
A.R.S. 13-2505, Promoting Prison Contraband.
A.R.S. 13-3309, Seizure; Exception; Definition.
A.R.S. 13-3501, Obscene Material.
A.R.S. 13-3503, Seizure of Obscene Things; Disposition.
A.R.S. 13-4301 et seq, Forfeiture.
A.R.S. 13-4411.01, Notice of Right to Request Not to Receive Inmate Mail.
A.R.S. 13-4429, Return of Victim's Property; Release of Evidence.
A.R.S. 31-231, Unauthorized Communications.
A.R.S. 31-235, Prisoner correspondence: definitions.

**ATTACHMENT A**
**DEPARTMENT ORDER 914**

## OBSCENE MATERIAL

### (DEPARTMENT ORDER 914, INMATE MAIL, SECTION 914.07, DATED MAY 1, 2008)

**914.07      OBSCENE MATERIAL**

1.1      Publications that contain obscene material may be prohibited and includes material that by its nature or content poses a threat or is detrimental to inmate rehabilitation or is detrimental to the security, safety, good order and discipline of the facility.

1.2      Material may be deemed obscene under applicable constitutional standards. A publication is deemed obscene when ALL of the following apply:

1.2.1      The average person, applying contemporary state standards, would find that the publication, taken as a whole, appeals to the prurient interest.

1.2.2      The average person, applying contemporary state standards, would find that the publication depicts or describes, in a patently offensive way, sexual activity as defined in this written instruction.

1.2.3      The publication, taken as a whole, lacks serious literary, artistic, political or scientific value.

1.3      Prohibited publications include, but are not limited to:

1.3.1      Publications that contain portrayal of actual or simulated acts or threatened acts of force or violence in a sexual context, including, but not limited to forcible intercourse (rape) or acts of sadomasochism emphasizing the infliction of pain.

1.3.2      Publications that contain portrayal of actual or simulated acts or behaviors between a human being and an animal.

1.3.3      Publications that contain portrayal of actual or simulated acts or behaviors in which one of the participants is a minor, or appears to be under the age of 18.

1.3.4      Publications that include cartoons, animations, or other facsimiles of the above listed acts.

# EXHIBIT B

# Prison Legal News

VOL. 25  No. 3
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

**March 2014**

## Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare

### by Greg Dober

Corizon, the nation's largest for-profit medical services provider for prisons, jails and other detention facilities, was formed in June 2011 through the merger of Prison Health Services (PHS) and Correctional Medical Services (CMS).

In April 2013, the debt-rating agency Moody's downgraded Corizon's nearly $360 million worth of debt to a rating of B2 – an indication the company's debt is highly speculative and a high credit risk. According to Moody's, the rating downgrade was due to an "expectation of earnings volatility following recent contract losses, margin declines from competitive pricing pressure on new and renewed contracts, and Moody's belief that Valitás [Corizon's

parent corporation] will be unable to restore metrics to levels commensurate with the prior B1 rating over the near to intermediate term."

Valitás Health Services is majority owned by Beecken Petty O'Keefe & Company, a Chicago-based private equity management firm. Beecken's other holdings are primarily in the healthcare industry.

On September 23, 2013, Moody's again downgraded Corizon's debt rating and changed the company's rating outlook from "stable" to "negative." The following month Corizon announced that it had replaced CEO Rich Hallworth with Woodrow A. Myers, Jr., the former chief medical officer at WellPoint Health. Hallworth, who had been appointed Corizon's CEO in 2011, previously served as the president and CEO of PHS. At the same time that Hallworth was replaced, Corizon president Stuart Campbell also stepped down.

### Prison Medical Care for Profit

According to Corizon's website, the company provides healthcare services at over 530 correctional facilities serving approximately 378,000 prisoners in 28 states. In addition, Corizon employs around 14,000 staff members and contractors. The company's corporate headquarters is located in Brentwood, Tennessee and its operational headquarters is in St. Louis, Missouri.

The 2011 merger that created Corizon involved Valitás Health Services, the parent company of CMS, and America Service Group, the parent company of PHS. The *Nashville Business Journal* reported the deal was valued at $250 million.

"Corizon's vision is firmly centered around service – to our clients, our patients

and our employees," Campbell said at the time. "To that we add the insight of unparalleled experience assisting our client partners, and caring professionals serving the unique healthcare needs of [incarcerated] patients."

Corizon has around $1.5 billion in annual revenue and contracts to provide medical services for the prison systems in 13 states. The company also contracts with numerous cities and counties to provide healthcare to prisoners held in local jails; some of Corizon's larger municipal clients include Atlanta, Philadelphia and New York City (including the Rikers Island jail). Additionally, the company has its own in-house pharmacy division, PharmaCorr, Inc.

The prison healthcare market has flourished as state Departments of Corrections and local governments seek ways to save money and reduce exposure to litigation. [See: *PLN*, May 2012, p.22.] Only a few major companies dominate the industry. Corizon's competitors include Wexford Health Services, Armor Correctional Health Services, NaphCare, Correct Care Solutions and Centurion Managed Care – the latter being a joint venture of MHM Services and Centene Corporation. Around 20 states outsource all or some of the medical services in their prison systems.

As Corizon is privately held, there is little transparency with respect to its internal operations and financial information, including costs of litigation when prisoners (or their surviving family members) sue the company, often alleging inadequate medical care.

For example, when Corizon was questioned by the news media in Florida during

## INSIDE

| | |
|---|---|
| From the Editor | 18 |
| Private Prison Racial Disparities | 20 |
| When Victims Speak for Criminals | 24 |
| Texas Criminal Court Fees | 28 |
| CA Female Prisoners Sterilized | 32 |
| Michigan Parole Scrutinized | 42 |
| Introduction to the FTCA | 44 |
| Execution Drugs Hard to Find | 46 |
| A Look Inside Maine's Supermax | 48 |
| Video Visitation in Jails | 50 |
| UNICOR Faces Criticism | 52 |
| Oregon Jail Death Lawsuits | 54 |
| News in Brief | 56 |

# DON'T LET THE TIME DO YOU.
# STAY CONNECTED!

**Guaranteed savings of up to 90%** on your long distance, out-of-state, and international calls from Federal prisons, county jails and State prisons.

### Best Rates and Plans

Multi-number Friends & Family Package for as little as $10.00/month

More plans & more numbers than any operator -

### No Hidden Fees

**What We Say Is What You Pay** – NO additional "fees", "charges" or "surcharges"

International calls are billed only on call acceptance. No bogus rounding

### No Contracts, No Penalties, No Hassles

No long term commitments – Service is always month – to – month. Cancel at anytime with NO penalties and NO cancellation fees with just a phone call or an e-mail.

### Fast and EZ Setup

We **ALWAYS** have numbers and can set up instantaneously online or on the phone.

## Special Commitment, Civil Detention & Halfway House

$0.40 connection charge from payphones lowest in the business

Voice Mail and Call Recording options

Call, write, e-mail or have your loved ones check out our website for more information.

SP Telecom
1220 Broadway - # 801-A
New York, NY 10001
www.inmatefone.com
e-mail: clients@inmatefone.com
Español: soporte@inmatefone.com
Call:      1(845)326-5300   (Collect calls are NOT accepted)
Español: 1(845)342-8110    (Llamadas por cobrar no se aceptan)

Some restrictions apply. Plan availability depends on the Institution

# NO PERMITA QUE EL TIEMPO
# LE SEPARE DE SU FAMILIA!

**Garantizamos  ahorros de hasta el 90%** en sus llamadas de larga distancia,entre estados, y en las llamadas internacionales desde prisiones federales,estatales y locales.

### Los mejores Planes y Tarifas

Plan para familias y amigos con varios numeros por tan solo $10.00/ mes .

Mas planes y numerous que ningun otro operador .

### No hay letra pequeña

**Lo Que Ves Es Lo Que Pagas**, NO hay ningun otro cargo extra.

Las llamadas internacionales solo se facturan cuando es aceptada por el familiar al otro lado del hilo telefonico.

**No hay contrato , permanencia ni ningun tipo de travas** .

El servicio siempre se ofrece en base a un mes de duracion pudiendo renovar el mismo todo los meses sin ningun cargo por la terminacion del servicio  y lo puede solicitor con una simple llamada de telefono o con un correo electronico (E-MAIL)

### La solicitud se puede hacer rapida y muy facil .

Nosotros siempre tenemos numerous y podemos procesar to registro inmediatamente  en lines o por telefono.

**Detenidos civiles en carceles especiales y reclusos en camino a casas de medio camino le ofrecesmos los siguientes servicios.**

$0.40 de recarfo desde telefonos de prepago, la tarifa mas baja en el sector  .

Buzon de Voz  y la posibilidad de grabar las llamadas .

.



Inmatefone
Keeping You In Touch

# ◤◤ Prison Legal News

*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg,
Derek Gilna, Gary Hunter,
David Reutter, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel
Robert Jack—Staff Attorney

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index*.

## Privatized Healthcare Problems (cont.)

a contract renewal, the company initially tried to prevent the release of its litigation history, claiming it was a "trade secret."

In 2012, Corizon agreed to settle a lawsuit filed against PHS – one of its predecessor companies – by *Prison Legal News*, seeking records related to the resolution of legal claims against the firm in Vermont. Based on the records produced pursuant to that settlement, PHS paid out almost $1.8 million in just six cases involving Vermont prisoners from 2007 to 2011. [See: *PLN*, Dec. 2012, p.16].

Companies like Corizon provide healthcare in prisons and jails under the HMO model, with an emphasis on cutting costs – except that prisoners have no other options to obtain medical treatment except through the contractor.

### Arizona DOC

A former Corizon nurse had her license suspended and is currently under investigation by the Arizona State Board of Nursing for incompetence. In January 2014, nurse Patricia Talboy was accused of contaminating vials of insulin at three units at the ASPC-Lewis prison, potentially exposing two dozen prisoners to HIV or hepatitis.

Talboy reportedly used a needle to stick prisoners' fingers to check their blood sugar levels. She then used the same needle to draw insulin from vials of the medication utilized for multiple prisoners, possibly contaminating the insulin in the vials. After placing the vials back into inventory, other staff members may have unknowingly used them to dispense insulin.

"Every indication is that the incident is the result of the failure by one individual nurse to follow specific, standard and well-established nursing protocols when dispensing injected insulin to 24 inmates," Arizona Department of Corrections (ADC) director Charles L. Ryan said in a January 9, 2014 statement.

Talboy's failure to follow procedures was discovered after a prisoner told a different nurse about the issue. Corizon reportedly delayed three days before publicly reporting the incident; in a press release, the company admitted that one of its nurses had been involved in "improper procedures for injections." Talboy received her nursing

license in August 2012 and became an RN in June 2013; as a rookie nurse, Corizon likely paid her less than more experienced nurses.

Following the insulin-related incident, the company was ordered to develop a comprehensive plan that includes "supplemental training and competency testing procedures for blood glucose testing and administration of insulin," as well as "nurse-peer reporting education to ensure professional accountability" and "patient awareness education on injection protocols."

Granted, Corizon isn't alone with respect to such incidents. In August 2012, a nurse employed by the ADC's previous medical services contractor, Wexford Health Sources, contaminated the insulin supply at ASPC-Lewis through improper injection protocols, potentially exposing 112 prisoners to hepatitis C. [See: *PLN*, July 2013, p.1].

Corizon has a three-year, approximately $370 million contract to provide medical care in Arizona state prisons, which began in March 2013. The contract award generated controversy because former ADC director Terry Stewart was hired by Corizon as a consultant; current director Charles Ryan had previously worked under Stewart, raising a potential conflict of interest. Ryan denied any improprieties.

According to a report by the American Friends Service Committee released in October 2013, titled "Death Yards: Continuing Problems with Arizona's Correctional Health Care," medical services in Arizona prisons did not improve after Corizon replaced Wexford as the ADC's healthcare contractor. "Correspondence from prisoners; analysis of medical records, autopsy reports, and investigations; and interviews with anonymous prison staff and outside experts indicate that, if anything, things have gotten worse," the report stated.

### Florida DOC

In 2013, the Florida Department of Corrections (FDOC) awarded Corizon a five-year, $1.2 billion contract to provide medical services to state prisoners in north and central Florida. Wexford Health Sources was contracted to provide similar services in the southern region of the state for $240 million. [See: *PLN*, June 2013, p.24]. The wholesale privatization of healthcare in Florida's prison system followed a 2011 legislative decision to disband the state's

## Privatized Healthcare Problems (cont.)

Correctional Medical Authority, which had oversight over prison medical care. [See: *PLN*, May 2012, p.30].

The contracts were part of the Republican administration's initiative to expand privatization of government services, including prison management and healthcare, in spite of previous setbacks. In 2006, PHS withdrew two months into an almost $800 million contract to provide medical care to Florida prisoners; at that time, the company said the contract was not cost-effective and claimed it would lose money.

The 2013 contract awards to Corizon and Wexford followed a two-year legal fight. In 2011, AFSCME Florida and the Federation of Physicians and Dentists/Alliance of Healthcare and Professional Employees filed suit challenging the prison healthcare contracts, in an effort to protect the jobs of nearly 2,600 state workers.

On June 21, 2013 the First District Court of Appeals approved the privatization of medical care in FDOC facilities, overturning a ruling by the Leon County Circuit Court. The appellate court noted in its decision that "The LBC [Legislative Budget Committee] simply moved funds from different line items within the Department's Health Services' program, providing additional funds for contracts that the Department otherwise had the authority to enter." See: *Crews v. Florida Public Employers Council 79*, 113 So.3d 1063 (Fla. Dist. Ct. App. 1st Dist. 2013).

Under the terms of the FDOC's contract with Corizon, the company must provide medical care to Florida state prisoners for 7% less than it cost the FDOC in 2010. When entering into the contract, state officials apparently had few concerns about the numerous lawsuits previously filed against Corizon, and no hard feelings toward the company's predecessor, PHS, when it terminated its 2006 contract to provide medical services to Florida prisoners because it wasn't profitable.

"Most people feel, as long as they achieve their 7 percent savings who cares how they treat inmates?" noted Michael Hallett, a professor of criminology at the University of North Florida.

### Florida Counties

IN A SEPTEMBER 6, 2012 UNPUBLISHED ruling, the Eleventh Circuit Court of Appeals affirmed a $1.2 million Florida jury verdict that found Corizon – when it was operating as PHS – had a policy or custom of refusing to send prisoners to hospitals. The Court of Appeals held it was reasonable for jurors to conclude that PHS had delayed medical treatment in order to save money. See: *Fields v. Corizon Health*, 490 Fed.Appx. 174 (11th Cir. 2012).

The jury verdict resulted from a suit filed against Corizon by former prisoner Brett A. Fields, Jr. In July 2007, Fields was being held in the Lee County, Florida jail on two misdemeanor convictions. After notifying PHS staff for several weeks that an infection was not improving, even with antibiotics that had been prescribed, Fields was diagnosed with MRSA. PHS did not send him to a hospital despite escalating symptoms, including uncontrolled twitching, partial paralysis and his intestines protruding from his rectum. A subsequent MRI scan revealed that Fields had a severe spinal compression; he was left partly para-

## BETTER JOBS FASTER PAROLE

The only affordable 2-yr and 4-yr college programs available to inmates

New Freedom College is designed for inmates, so our 2-yr & 4-yr programs offer a wide range of classes & majors that can all be completed in prison. At only $33-$50/credit, NFC will save you over $20,000 compared to traditional schools like Adams State ($165/credit + books = about $25,000 for 120 cr).

New Freedom has:
• majors you want like Business & Psych
• multi-class & referral discounts
• lots of feedback
• flexibility to meet your needs & openness to your ideas
• low rates that include books, study guides, etc.

4-yr diploma as low as $3,960

We have a Certificate Program so everyone can participate, plus a monthly payment plan to best meet what you're able to afford.

... Write for info guide & enrollment form:

New Freedom College
1957 W. Burnside St. #1660
Portland, OR 97209
NewFreedomCollege.org

# BRANLETTES BEAUTIES

## OUR SIMPLE POLICIES:

SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP-FRIENDLY). DUE TO TREMENDOUS TIME AND COST ANSWERING LETTERS, UNLESS YOU ARE PLACING AN ORDER OR A QUESTION REGARDING YOUR ORDER, WE WILL NOT REPLY TO ANY OTHER QUESTIONS. SASE ARE REQUIRED FOR ANY INQUIRES OR CONCERNS!

YOU AND YOU ALONE ARE RESPONSIBLE FOR YOUR SELECTIONS BEING ALLOWED INTO YOUR FACILITY:
KNOW YOUR INSTITUTIONS POLICIES AS TO WHAT IMAGE CONTENT IS ALLOWED. RETURNED ORDERS ARE NON-REFUNDABLE. THEY WILL BE HELD FOR 14 CALENDAR DAYS IN ORDER FOR YOU TO SEND SELF-ADDRESSED STAMPED: 3 FIRST CLASS STAMPS PER ENVELOPE, WITH A STREET ADDRESS FOR EVERY 20 PICTURES. ALL RETURNED IMAGES HELD AFTER TWO WEEKS WILL BE RE-SOLD AND WE WILL RETURN TO OUR STOCK.

ALL PAYMENTS ARE BY INSTITUTIONAL CHEACKS OR U.S. POSTAL SERVICE OR WESTERN UNION MONEY ORDERS.

THESE PAYMENTS ARE PROCESSED IMMEDIATELY AND SHIPPED IN LESS THAN 3-4 WEEKS. ANY OTHER COMPANY MONEY ORDERS DELAY SHIPMENT 8-10 WEEKS OR UNTIL THAT MONEY CLEARS OUR BANK. YES, WE DEAL WITH PEOPLE THAT ARE, WHILE IN PRISON, STILL TRYING NICKEL AND DIME SCAMS...

ALL SALES ARE FINAL! EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM HIGH QUALITY PRINTS ON 4X6 GLOSSY PHOTO PAPER

### OUR PRICES ARE SIMPLE:

1-4999 PHOTOS = 0.45 CENTS EACH
5000+ PHOTOS = 20% DISCOUNT
1-9 CATALOGS : $3.00 EACH ( +SASE )
10 CATALOGS: $25.00+SASE (4 STAMPS )

### SHIPPING & HANDLING:

DUE TO VARIOUS PRISON POLICIES REGARDING HOW MANY PICTURES CAN BE SENT IN ONE ENVELOPE, OUR POLICY IS AS FOLLOWS:
01 - 5 PHOTOS----$1.00 PER ENVELOPE
06 - 15 PHOTOS--$1.50 PER ENVELOPE
16 -25 PHOTOS—$2.00 PER ENVELOPE

## BRANLETTES BEAUTIES

SELECT YOUR FAVORITE:
WHITE CATALOGS (60 VOLUMES)
BLACK CATALOGS (60 VOLUMES)
ASIAN&LATINO CATALOGS (60 VOLUMES)
PLEASE STATE WHAT STYLE PHOTO'S's:
PROVOCATIVE POSES OR NUDE

← FREE CATALOG??? →

YOU READ IT RIGHT!
JUST SEND US TWO U.S. FOREVER STAMPS AND A SELF ADDRESSED SELF ENVELOPE AND WE WILL SEND YOU ONE NUDE OR BOP-FRIENDLY SAMPLE CATALOG (1 PER CUSTOMER) WITH 84 GORGEOUS GIRLS IN FULL COLOR. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!

BRANLETTES
P.O.BOX 5765
BALTIMORE, MD
21282

BRANLETTES BREATHLESS BEAUTIES BAG A RANDOM SELECTION OF 50 OF THE RARE AND EXOTIC ***YES, FIFTY BEAUTIES ALL POSING JUST FOR YOU!***

PLUS TWO OF OUR FINEST COLOUR CATALOGS (ONLY $19.95) DID YOU READ THAT RIGHT?? ***YES. JUST $19.95!***

BREATHLESS BEAUTIES (PLEASE SPECIFY NUDE OR BOP-FRIENDLY) ++PLUS++ TWO OF OUR FINEST COLOUR CATALOGS FREE (YOU PICK A VOLUMES)

OUR REGULAR SHIPPING AND HANDLING POLICIES APPLY.

lyzed due to inadequate medical care.

The Eleventh Circuit wrote that PHS "enforced its restrictive policy against sending prisoners to the hospital," and noted that a PHS nurse who treated Fields at the jail "testified that, at monthly nurses' meetings, medical supervisors 'yelled a lot about nurses sending inmates to hospitals.'" Further, PHS "instructed nurses to be sure that the inmate had an emergency because it cost money to send inmates to the hospital."

At trial, the jury found that PHS had a custom or policy of deliberate indifference that violated Fields' constitutional right to be free from cruel and unusual punishment. The jurors concluded that Fields had a serious medical need, PHS was deliberately indifferent to that serious medical need, and the company's actions proximately caused Fields' injuries. The jury awarded him $700,000 in compensatory damages and $500,000 in punitive damages. [See: *PLN*, March 2013, p.54; Aug. 2011, p.24].

More recently, the estate of a 21-year-old prisoner who died at a jail in Manatee County, Florida filed a lawsuit in October 2013 against the Manatee County Sheriff's Office and Corizon, the jail's healthcare provider. The complaint accuses the defendants of deliberate indifference to the serious medical needs of Jovon Frazier and violating his rights under the Eighth Amendment.

In February 2009, Frazier was incarcerated at the Manatee County Jail; at the time of his medical intake screening, staff employed by Corizon, then operating as PHS, noted that his health was unremarkable. Frazier submitted a medical request form in July 2009, complaining of severe pain in his left shoulder and arm, and a PHS nurse gave him Tylenol.

Throughout August and September 2009, Frazier submitted five more medical requests seeking treatment for his arm and shoulder. "It really hurts! HELP!" he wrote in one of the requests. PHS employees saw him and recorded his vital signs. Despite the repeated complaints, Frazier was never referred to a doctor or physician assistant; on September 9, 2009 his treatment was documented as routine but he was placed on the "MD's list."

An X-ray was taken on September 17, 2009 to rule out a shoulder fracture.

The X-ray was negative for a fracture, and Frazier was not referred to a doctor. He submitted two more medical requests that month and five requests in October 2009 seeking treatment for his increasingly painful condition. The complaint alleges that in total, Frazier submitted 13 medical request forms related to pain over a period of three months; he was seen by a nurse each time but not examined by a physician.

On October 29, 2009, Frazier received an X-ray to determine if he had a tendon injury. An MRI was recommended and he was transported to a hospital where an MRI scan revealed a large soft tissue mass on his shoulder. A doctor at the hospital, concerned that the mass was cancerous, recommended additional tests.

After being diagnosed with osteosarcoma, a form of bone cancer, Frazier was returned to the jail and subsequently treated at the Moffitt Cancer Center, where he received chemotherapy, medication and surgery. Despite this aggressive treatment the cancer progressed and Frazier's left arm was amputated. The cancer continued to spread, however, and he was diagnosed with lung cancer in June 2011. He died



# William L Schmidt
## ATTORNEY at LAW, P.C.

**911CIVILRIGHTS@GMAIL.COM**

## 559.261.2222

**OCTOBER 2013, CALIFORNIA:**
- **$90,000 settlement with CDCR and LA Sheriff**
- **Confidential settlement with CDCR**
- **$600,000 injury recovery**
- **$150,000 bad faith settlement**
- **Federal action dismissed without penalty by agency**
- **Parole dates granted by BPH**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------**OUR CLIENTS GO HOME, HOW ABOUT YOU?** -----------------
*Please submit a single page summary of your case. Due to the volume, we cannot return documents or respond to all inquires. We are not a low cost or pro bono law firm, but if you want results, contact us.*

PO Box 25001
Fresno, CA
93729

**Privatized Healthcare Problems (cont.)**

within three months of that diagnosis, on September 18, 2011.

In a letter to the attorney representing Frazier's estate, Florida oncologist Howard R. Abel wrote that the lack of treatment provided by Corizon at the Manatee County Jail constituted "gross negligence and a reckless disregard to Mr. Frazier's right to timely and professionally appropriate medical care."

The lawsuit filed by Frazier's estate claims that Corizon was aware of his serious medical condition but failed to provide adequate treatment. In addition, the complaint contends the company has a widespread custom, policy and practice of discouraging medical staff from referring prisoners to outside medical practitioners and from providing expensive medical tests and procedures. Finally, the lawsuit states that "Corizon implemented these widespread customs, policies and practices for financial reasons and in deliberate indifference to [the] serious medical needs of Frazier and other inmates incarcerated at Manatee County Jail."

On January 10, 2014, U.S. District Court Judge James Moody denied Corizon's motion to dismiss the case. The company had argued that the allegations in the lawsuit failed to assert sufficient facts to establish deliberate indifference, amounted only to medical negligence and were insufficient to establish gross negligence, and

failed "to adequately allege a policy or custom that violated Frazier's rights." Judge Moody disagreed, finding the claims set forth in the complaint were "sufficient to establish a constitutional violation."

The Manatee County Sheriff's Office had better luck with its motion to dismiss. The Sheriff argued the complaint did not establish facts indicating that the jail had a similar practice – like Corizon – of providing deliberately indifferent medical care to prisoners. The court agreed and dismissed the claims against the Sheriff's Office; the claims against Corizon remain pending. See: *Jenkins v. Manatee County Sheriff*, U.S.D.C. (M.D. Fla.), Case No. 8:13-cv-02796-JSM-TGW.

### Idaho DOC

In February 2013, the Idaho Department of Corrections (IDOC) announced it had reached a one-year extended agreement with Corizon to provide medical care in the state's prison system. However, the *Idaho Business Review* reported that the extension also resulted in a rate increase. Then-Corizon president Stuart Campbell informed the IDOC Board of Correction that the company wouldn't sign an extension for less money, stating the current contract had become too costly. During the preceding three years of the contract the IDOC had incurred approximately 20% in cumulative rate increases.

Both sides agreed that the contract would run through December 2013 and the IDOC would pay an additional $250,000.

It seems odd that Idaho was willing to continue contracting with the company, though, as the relationship between the IDOC and Corizon has been a rocky one.

The quality of medical care at the Idaho State Correctional Institution (ISCI) in Boise has been an ongoing issue for nearly three decades. The prison was the focus of a class-action lawsuit filed on behalf of prisoners alleging a variety of problems, including inadequate healthcare. The lawsuit was known as the *Balla* litigation after plaintiff Walter Balla.

In July 2011, after new complaints were filed regarding medical care at ISCI, U.S District Court Judge B. Lynn Winmill appointed a special master, Dr. Marc F. Stern, to assess the situation at the facility. The court wanted Stern to confirm whether ISCI was in compliance with the temporary agreements established in the *Balla* case, and to investigate and report on "the constitutionality of healthcare" at the facility.

Dr. Stern, a former health services director for the Washington Department of Corrections who also had previously worked for CMS, one of Corizon's predecessor companies, issued a scathing report in February 2012. With the aid of psychiatrist Dr. Amanda Ruiz, Stern and his team reviewed ISCI over a six-day period and met with dozens of prisoners, administrators and Corizon employees.

Stern stated in the report's executive summary: "I found serious problems with the delivery of medical and mental health care. Many of these problems have either



**FreedomLine** ®

*We make it simple.*

**You reach your loved ones by calling a local number.**
That's a lot cheaper than calling long distance. *It's that simple!*

• We charge $2.50 per month for the number.
• For Calls to anywhere in the U.S., we charge you 5¢ per minute
• To Mexico - 15¢; to Canada - 11¢, to just about anywhere else in the world - 31¢
• No Contract, No Credit Check, No Setup Fee, No Cancellation Fee, No Early Termination Fee
• Cancel anytime; any money left on the account is refunded

*Any time you refer a new customer and they sign up, you both get 300 free minutes!*
Some restrictions apply. Details upon request.

Serving You with Excellence Since 2009

Tell Your Folks to Sign Up at www.freedomline.net
Or Mail: FreedomLine
PO Box 7 - SCA
Connersville, IN 47331

*Also see our long-running Classified Ad in this and every issue*

FCC Reg. No. 0021217047

resulted or risk resulting in serious harm to prisoners at ISCI. In multiple ways, these conditions violate the rights of prisoners at ISCI to be protected from cruel and unusual punishment. Since many of these problems are frequent, pervasive, long-standing, and authorities are or should have been aware of them, it is my opinion that authorities are deliberately indifferent to the serious health care needs of their charges."

The report found that prisoners who were terminally ill or in long-term care were sometimes left in soiled linens, given inadequate pain medication and went for long periods without food or water. The findings regarding sick call noted instances in which prisoners' requests either resulted in no care, delayed care or treatment that was deemed dangerous. Emergency care situations had insufficient oversight, delays or no response; inadequately trained medical staff operated independently during emergencies without oversight from an RN or physician. The report also found problems with the pharmacy and medication distribution at ISCI.

In one case, a prisoner with a "history of heart disease was inexplicably dropped from the rolls of the heart disease Chronic Care Clinic." As a result, medical staff stopped conducting regular check-ups and assessments related to the prisoner's heart condition. A few years later the prisoner went in for a routine visit, complaining of occasional chest pain. No evaluation or treatment was ordered and the prisoner died four days later due to a heart attack. In another case, Corizon staff failed to notify a prisoner for seven months that an X-ray indicated he might have cancer.

Dr. Stern's report not only reviewed processes but also staff competency and adequacy. The report cited allegations that a dialysis nurse at ISCI overtly did not like prisoners, and routinely "failed to provide food and water to patients during dialysis, prematurely aborted dialysis sessions or simply did not provide them [dialysis] at all and failed to provide ordered medications resulting in patients becoming anemic." Stern concluded that prison officials were aware of this issue and the danger it presented to prisoners, but "unduly delayed taking action."

The mental health care provided by Corizon at ISCI was found to be deficient by Dr. Ruiz, who conducted the psychiatric portion of the court-ordered review. The report noted that the facility had 1) inadequate "screening of and evaluating prisoners to identify those in need of mental health care," 2) "significant deficiencies in the treatment program at ISCI" which was "violative of patients' constitutional right to health care," 3) an "insufficient number of psychiatric practitioners at ISCI," 4) incomplete or inaccurate treatment records, 5) problems with psychotropic medications, which were prescribed with no face-to-face visits or follow-up visits with prisoners and 6) inadequate suicide prevention training.

The report concluded: "The state of guiding documents, the inmate grievance system, death reviews and a mental health CQI [continuous quality improvement] system at ISCI is poor. While not in and of themselves unconstitutional, it is important for the court to be aware of this and its possible contribution to other unconstitutional events."

In March 2012, shortly after Dr. Stern's report was released over the objection of state officials, Corizon disagreed with its findings. The company retained



**Help From Outside, For Humanity Inside.**

*Offering basic services on the outside.*

SOCIAL NETWORKING

$ FINANCE & BUSINESS

PARALEGAL

ADMINISTRATIVE

**HFO**
**HELP FROM OUTSIDE**

INFORMATION

PHONE

CREATIVE

Help From Outside understands what you're going through. We can help you accomplish the things you need to get done but can't.

We offer:
- High standards & ethics
- Timely & professional services
- Personal touch

"HFO has excellent business etiquette and ethics."
- T. Brown

"I like that you sent a personal letter. HFO is more personable than your competitors."
- A. Mitchell

**WE'VE MOVED! PLEASE CONTACT US AT OUR NEW ADDRESS:**

For a brochure and application please send a SASE to:
Help From Outside | 2620 Bellevue Way NE #200 | Bellevue, WA 98004
206.486.6042 | www.helpfromoutside.com

**Learn The Law!**

**It's a POWERFUL influence in your life.**

Choose education to help yourself and others. Blackstone's Independent Study Paralegal Program offers you the opportunity to be productive while serving time.

- Learn Civil & Criminal Law
- Learn Legal Research
- 110 Years of Legal Training Experience
- Study in Your Spare Time
- Affordable Tuition, Easy Payment Plan

Only **$30.00** Per Month

☐ **Yes!** I'd like to learn more    ☐ Paralegal Course
*Please rush me FREE course information.*

Name _____ Doc# _____

Address _____

_____

City _____ State _____ Zip _____

**Blackstone Career Institute**
SINCE 1890

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.

**P.O. Box 3717 • Allentown, PA 18106**

**Privatized Healthcare Problems (cont.)**

the National Commission on Correctional Health Care (NCCHC) to review the report. Corizon described the review as an "independent assessment," even though it was paying NCCHC accreditation fees.

The NCCHC review consisted of a three-person team assessing the facility over a two-day period in April 2012. Unlike Stern's assessment of medical and mental health care, the NCCHC team did not interview prisoners or include a psychiatrist. Regardless, the agency concluded that "The basic structure of health services delivery at ISCI meets NCCHC's standards."

Corizon stated in a press release that Dr. Stern's report was "incomplete, mislead-ing and erroneous," and then-CEO Rich Hallworth appeared in a video defending the company. The NCCHC had previously accredited Corizon's healthcare services at ISCI, thus in essence the NCCHC's review was self-validating the organization's prior accreditation findings. Also, according to NCCHC's website, two Corizon officials sit on the agency's health professionals certification board of trustees.

Corizon's criticism of Dr. Stern's report is just one example where the company has objected to an independent, third-party assessment of its medical services. The *Balla* case settled in May 2012 after 30 years of litigation. [See: *PLN*, Feb. 2013, p.40].

### Indiana DOC

Following a competitive bidding process, Corizon was selected to continue providing medical care to Indiana state prisoners under a three-year contract effective January 1, 2014. The contract has a cap of $293 million, based on a per diem fee of $9.41 per prisoner.

Three weeks later, a lawsuit filed in federal court named Corizon and the Indiana Department of Correction as defendants in connection with the wrongful death of prisoner Rachel Wood. Wood, 26, a first-time drug offender, died in April 2012; the suit, filed on behalf of her family, claims she was transferred from prison to prison and denied care for her serious medical conditions, which included lupus and a blood clotting disorder.

"Notwithstanding the duty of the prison medical staff to provide adequate medical care to Rachel and to treat her very serious life threatening conditions, prison medical staff willfully and callously disregarded her condition, and allowed Rachel to deteriorate and die," the complaint stated.

"That is just the attitude of these guys, is saving money rather than providing health care," said Michael K. Sutherlin, the attorney representing Wood's family.

Prison officials reportedly moved Wood among several different prisons and hospitals, and at one point lost track of her and claimed she had escaped even though she was still incarcerated.

"She died a horrible death and she died alone," stated her father, Claude Wood. The lawsuit remains pending. See: *Williams v. Indiana DOC*, Marion County Superior Court (IN), Case No. 49D05-1401-CT-001478.

### Maine DOC

In an October 2013 *Bangor Daily News* article, Steve Lewicki, coordinator of the Maine Prisoner Advocacy Coalition, discussed the state of healthcare in Maine's prison system. "Complaints by prisoners are less," he said, noting that while medical services provided to prisoners are better than in the past, there are still concerns. This relative improvement coincided with the end of the state's contract with Corizon. The contract, valued at approximately $19.5 million, was awarded to another company in 2012.

A year earlier, the Maine legislature's Office of Program Evaluation and Government Accountability (OPEGA) completed a review of medical services in state prisons. The agency contracted with an independent consultant, MGT of America, to conduct most of the fieldwork, and the review included services provided under Corizon's predecessor company, CMS.

The OPEGA report, issued in November 2011, cited various deficiencies in medical care at Maine prisons – including medications not always being properly

# Corcoran Sun

Full Color Prison Yard Monthly
News ♦ Entertainment ♦ Resources

**3 Month Special Subscription**

## $5 or 1 Book of FCS



**COLOR NEW 16 PAGES**

Expanded full color format with exciting episodes of thrilling novels and sexy pics. Many how-to articles on writing, art and health. Filled with entertainment: puzzles, trivia, jokes, poetry... Submit your writing, art, poetry etc. See your submission, name and contact info in print.

**Special 6-Issue Subscription ($10 or 2 Books FCS)**
**Special Full Year Subscription ($20 or 4 Books FCS)**

Payments to: Freebird Publishers
Box 541– Dept.  BK, North Dighton, MA 02764
*www.FreebirdPublishers.com*
*Diane@FreebirdPublishers.com*

## MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

### Certified Criminal Law and Appellate Law Specialist

*If you have a California case you need a California lawyer!*

**(213) 489-7715**



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

administered and recorded by CMS staff. Although the company was notified of the problem, no corrective action was taken. CMS employees did not follow policies related to medical intake and medical records; OPEGA reported that 38% of prisoners' medical files had inadequate or inaccurate documentation regarding annual physical assessments, and that files were not complete or consistently maintained. The report found 11% of sick calls reviewed were either not resolved timely or had no documented resolution. OPEGA also criticized CMS for inadequate staff training.

At a January 2012 legislative committee hearing, state Senator Roger Katz asked Corizon regional vice president Larry Amberger, "My question to you is in light of this history, why should the state seriously be considering any proposal your company might make to get this contract back again?"

In response, Amberger criticized the methodology used by MGT during the assessment and said he believed Corizon provided quality medical care. Questioning and challenging the findings of an independent reviewer is the same tactic the company used in Idaho. Regardless, Corizon's contract to provide medical care to Maine state prisoners is now a part of history.

### Louisville, Kentucky

While some jurisdictions, like Maine, have chosen not to renew their contracts with Corizon due to performance-related problems, in 2013 the Metro Department of Corrections in Louisville, Kentucky (LMC) offered the company a chance to rebid for its $5.5 million contract to provide medical care at the LMC jail. This time, however, it was Corizon that said "no thanks."

The rebid offer was made even though seven healthcare-related prisoner deaths occurred in a seven-month period in 2012 during Corizon's prior contract, which expired in February 2013. Nevertheless, LMC and Corizon agreed to extend the contract through July 30, 2013 on a month-to-month basis pending a formal rebid.

After the expiration of the month-to-month contract extension, Corizon notified LMC that it was no longer interested in providing services to the corrections department and would not seek to rebid the contract. LMC director Mark Bolton told the *Courier Journal* he was "surprised" by the company's decision. What seems more surprising is that LMC wanted to continue contracting with Corizon to provide medical services in spite of the number of prisoner deaths.

In April 2012, Savannah Sparks, 27, a heroin addict and mother of three, was arrested and held on shoplifting charges at the LMC jail. While withdrawing from heroin she vomited, sweat profusely, could not sit up, could not eat or drink, and defecated and urinated on herself. Six days later she was dead. According to the medical examiner, her death was due to "complications of chronic substance abuse with withdrawal."

A subsequent wrongful death suit alleged that Corizon and LMC employees were negligent in failing to provide treatment for Sparks' opiate addiction and withdrawal. Corizon settled the suit under confidential terms. See: *May v. Corizon*, Jefferson County Circuit Court (KY), Case No. 13-CI-001848.

Four months after Sparks' death, on August 8, 2012, another LMC prisoner, Samantha George, died. A lawsuit filed in Jefferson County Circuit Court claimed that George was moved from the Bullitt County Jail to the LMC facility on a charge of buying a stolen computer. According to the complaint, she told a Corizon nurse that she was a severe diabetic, needed insulin, and was feverish and in pain from a MRSA infection.

The nurse notified an on-call Corizon physician, who was not located at the facility and thus could not examine George in person, to decide if she should be taken to an emergency room. The doctor recommended monitoring George and indicated he would see her the next day. George's condition rapidly deteriorated while she was monitored by staff at the jail; she was found unresponsive a few hours after being admitted to the facility and pronounced dead a short time later.

An autopsy concluded that George died due to complications from a severe form of diabetes compounded by heart disease. According to the lawsuit, the Corizon doctor never saw George; among other defendants, the suit named Corizon and LMC director Mark Bolton as defendants.

---



LAW OFFICES OF
## ELMER ROBERT KEACH, III
A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Washington Avenue Extension
Albany, NY 12205-5531
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration*
*Medical Indifference Cases • Corrections and Police Brutality*
*Sexual Abuse and Assault • Illegal Strip Searches*
*Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals,
Post-Conviction Relief, Habeas Corpus

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED,
YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages.
DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS.
Make sure to exhaust your administrative remedies and comply with state law notice
requirements, if applicable, to preserve state law intentional tort/negligence claims.

**Privatized Healthcare Problems (cont.)**

The case was removed to federal court, then remanded to the county circuit court in October 2013. See: *George v. Corizon*, U.S.D.C. (W.D. Ky.), Case No. 3:13-cv-00822-JHM-JDM.

A few weeks after George's death, Kenneth Cross was booked into the LMC jail on a warrant for drug possession. According to a subsequent lawsuit, upon Cross' arrival at the jail a nurse documented that he had slurred speech and fell asleep numerous times during the medical interview. Several hours later he was found unconscious, then died shortly thereafter due to a drug overdose. The lawsuit filed by Cross' estate alleged that employees at the LMC jail were deficient in recognizing and treating prisoners' substance abuse problems and that the facility was inadequately staffed for such medical care.

After the deaths of Sparks, George, Cross and four other prisoners in 2012, LMC director Bolton said he believed Corizon took too long to evaluate and treat prisoners at the jail. According to the *Courier-Journal*, Bolton sent an email to his staff in December 2012 regarding the prisoners' deaths, stating, "Mistakes were made by Corizon personnel and their corporation has acknowledged such missteps." He further indicated that Corizon employees – not LMC staff members – were responsible for the care of the prisoners who died. Six Corizon employees at the LMC jail resigned in December 2012 during an internal investigation; they were not identified.

Bolton's criticism was too little, too late to prevent the deaths of the seven LMC prisoners, though the jail has since made improvements to its medical services, including a full-time detox nurse and new protocols for prisoners experiencing withdrawal. One could speculate that LMC's critique of Corizon might be a litigation tactic, to deflect responsibility. The fact remains that seven deaths occurred under Corizon's watch and, notwithstanding those deaths, LMC was willing to renew its contract with the company.

In January 2014, the Louisville Metro Police's Public Integrity Unit concluded investigations into three of the deaths at the jail, and criticized both Corizon and LMC. The Commonwealth Attorney's Office found that Sparks' and George's deaths were preventable; however, no criminal charges were filed. Dr. William Smock, a forensic examiner who served as a consultant during the investigations, stated with respect to George's death: "There is compelling evidence of a significant deviation from the standard of care and medical negligence on the part of the medical providers."

"I'm glad to see that the government's investigation matches exactly what our investigation showed, which is that her death and others like hers is easily preventable," said Chad McCoy, the attorney representing George's estate.

### Minnesota DOC

After providing medical care to Minnesota state prisoners for 15 years, Corizon was not selected when the contract was rebid in 2013 – despite having submitted the lowest bid. Instead, competitor Centurion Managed Care was to begin providing healthcare services in Minnesota's prison system effective January 1, 2014 under a two-year, $67.5 million contract.

Corrections Commissioner Tom Roy said the contract with Centurion was expected to "deliver significant savings to taxpayers while improving the quality of care for offenders."

According to the *Star-Tribune*, nine prisoners died and another 21 suffered serious or critical injuries in Minnesota correctional facilities due to delay or denial of medical care under the state's previous contract, which had been held by Corizon or its predecessor, CMS, since 1998.

That contract was for a fixed annual flat fee of $28 million. A flat fee contract provides an incentive for the contractor to tightly control costs, as a reduction in expenses results in an increase in profit. The *Star-Tribune* found that many of the staffing arrangements negotiated in the contract played a role in the deaths and injuries. For example, the contract allowed Corizon physicians to leave at 4:00pm daily and did not require them to work weekends. During off-hours there was only one doctor on call to serve the state's entire prison system, and many of the off-hour consultations were done telephonically without the benefit of the prisoner's medical chart. Under the

## TYPING

### SERVICES
Provided since 1998

Specifically designed, with special rates for the incarcerated person.

Black / Color Printing and Copying

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

Special Offer: $2.00 off first order.
Special offer void after: 12/31/2013



**INMATE SHOPPER**

**2014 READERS CHOICE RESULTS**

OVER

PAL WINS ★ Best Popular

NEW

PRISONER RESOURCES

Get Published TODAY

FREE ADS

LGBT Resources

100 ORGS in Espanol

**EVERY ISSUE CONTAINS:**

- Zero Pen Pal Resources
- 400 Businesses Serving Prisoners
- 200 Non Profit Orgs for Prisoners
- 80 Designer Gift Stores
- Free Ad Space to Sell Your Stuff
- 15 Magazine Sellers
- 32 Sexy Photo Sellers
- and lots of ladies, too, BOP cool.
- Typist & Publishing Services

**America's Largest Up-To-Date Resources For Prisoners**

$14.98 FREE Shipping

Bonus! 100 Orgs en Espanol!

**The Best 500**

NON PROFIT ORGanizations
For Prisoners & Their Families

THIS IS AMERICA'S ONLY UP TO DATE
COMPREHENSIVE, PRINT RESOURCE OF NON PROFIT ORGS
SPECIFICALLY FOR PRISONERS

Indexed by State, Name of Org and Subject
Find the help and info you need Fast!

amazon.com

Pay to: Inmate Shopper
P.O. Box 231 • Edna, TX 77957
PRICE: $17.99 + S6 Priority Mail with Tracking #.

Corrlinks:
info@inmateshopper.com

contract, Corizon was not required to staff most facilities overnight.

The Minnesota Department of Corrections was held liable for nearly $1.8 million in wrongful death and medical negligence cases during the period when the state contracted with Corizon or CMS.

In October 2012, a jury in Washington County awarded Minnesota prisoner Stanley Riley more than $1 million after finding a Corizon contract physician, Stephen J. Craane, was negligent in providing medical treatment. The *Star-Tribune* reported that Riley suffered from what turned out to be cancer and had written a series of pleading notes to prison officials. One read, "I assure you that I am not a malingerer. I only want to be healthy again."

In May 2013, the state paid $400,000 to settle a lawsuit over the death of a 27-year-old prisoner at MCF-Rush City. Xavius Scullark-Johnson, a schizophrenic, suffered at least seven seizures in his cell on June 28, 2010. Nurses and guards didn't provide him with medical care for nearly eight hours. According to documents obtained by the *Star-Tribune*, Scullark-Johnson was found "soaked in urine on the floor of his cell"

and was "coiled in a fetal position and in an altered state of consciousness that suggested he had suffered a seizure." An ambulance was called several hours later but a nurse at the prison turned it away, apparently due to protocols to cut costs. Corizon settled the lawsuit for an undisclosed sum in June 2013. See: *Scullark v. Garin*, U.S.D.C. (D. Minn.), Case No. 0:12-cv-01505-RHK-FLN.

### Philadelphia, Pennsylvania

IN PHILADELPHIA, MAYOR MICHAEL A. Nutter has been accused of being too loyal to his campaign contributors, including Corizon. The company donated $1,000 to Nutter's 2012 campaign committee several months before the city renewed Corizon's contract to provide medical care to 9,000 prisoners in Philadelphia's prison system. Further, PHS donated $5,000 to Nutter's mayoral campaign in 2008.

The contract renewal would have been routine except for the fact that Corizon's performance in Philadelphia has been far less than stellar. In July 2012 the company agreed to pay the city $1.85 million following an investigation that found Corizon was using a minority-owned subcontractor that did no work, which was a sham to meet the city's requirements for contracting with minority-owned businesses.

The renewed year-to-year Corizon contract, worth $42 million, began in March 2013. Nutter's administration was accused of using the year-to-year arrangement to avoid having the contract scrutinized by the city council; the city's Home Rule Charter requires all contracts of more than one year to be reviewed by





**Privatized Healthcare Problems (cont.)**

the council. Further infuriating opponents of the contract, Corizon was not the lowest bidder. Correctional Medical Care (CMC), a competitor, submitted a bid that would have cost the city $3.5 million less per year than Corizon. Philadelphia Prison Commissioner Louis Giorla defended the city's decision to award the contract to Corizon at a council hearing; however, he declined to answer questions as to why the administration considered Corizon's level of care to be superior to that provided by CMC.

Three union contracts with Corizon covering 270 of the company's workers in Philadelphia's prison system expired on November 26, 2013. Corizon demanded benefit cuts, including changes in employee healthcare programs, to offset wage increases promised under the company's contract with the city. A strike was averted in December 2013 when the mayor's office intervened and both sides reached a settlement. The *Philadelphia Daily News* reported that the new union contracts provide wage increases but also include a less-generous health insurance plan for Corizon employees.

Since 1995, Corizon and its predecessor, PHS, have received $196 million in city contracts. The company's contract was terminated for several months in 2002 as a result of complaints that a diabetic prisoner had died after failing to receive insulin. The city renewed the contract anyway, cit-

ing affordability and pledging increased oversight. The city's law department estimates that Philadelphia has paid over $1 million to settle lawsuits involving claims of deficient prison healthcare; the largest settlement to date is $300,000, paid to a prisoner who did not receive eye surgery and is now partially blind.

Based upon the number of lawsuits filed against Corizon alleging inadequate medical care, its use of a sham subcontractor and the company's treatment of its own employees, it appears that maintaining the status quo – not best practices – may be the controlling factor in Philadelphia's continued relationship with Corizon.

### Allegheny County, Pennsylvania

On September 30, 2013, a prisoner jumped from the top tier of a pod at the Allegheny County Jail. Following an investigation, authorities refused to make public their findings and declined to disclose the prisoner's injuries, citing medical privacy laws. The prisoner, Milan Karan, 38, was not transported to the hospital until the following day.

A spokesperson for Corizon, which provides medical care at the 2,500-bed jail, defended the nearly 24-hour delay by noting the prisoner "was under observation" before being sent to a hospital.

In December 2013, the *Pittsburgh Post-Gazette* reported that Corizon was having difficulty staffing the Allegheny County Jail. When the newspaper requested a comment from Corizon vice president

Lee Harrington, Harrington claimed he had no knowledge of staffing problems – despite having previously received emails from the facility's warden about that exact issue.

The staffing problems resulted in prisoners not receiving their medication in a timely manner. In emails obtained by the *Post-Gazette*, Warden Orlando Harper wrote to Harrington in October 2013, noting, "We are continuing to experience issues pertaining to the following: 1. Staffing, 2. Medication distribution." Also, on November 17, 2013, Deputy Warden Monica Long sent an email to Corizon and jail staff. "I was just informed by the Captain on shift, the majority of the jail has not received medication AT ALL," she stated, adding, "Staffing is at a crisis."

That crisis had been ongoing since Corizon assumed the medical services contract at the facility on September 1, 2013. Before the $62.55 million, five-year contract was awarded, Corizon vice president Mary Silva wrote in an email that it was imperative the jail have "adequate staffing on ALL shifts." That promise was made despite Corizon laying off many of the former employees of Allegheny Correctional Health Services, the jail's previous healthcare provider.

Allegheny Correctional had provided four full-time and one part-time physician during its contract tenure. Corizon reduced the number of doctors to one full-time and one part-time physician. Allegheny Correctional also employed three psychiatrists and one psychologist. Corizon's contract

## Support Prison Legal News with these beautiful gifts!

CALL **561-360-2523,** MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/

### Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

requires that it provide one full-time psychiatrist and a part-time psychologist.

In January 2014, the United Steelworkers union (USW) filed a petition with the National Labor Relations Board to unionize Corizon employees at the Allegheny County Jail, including nurse practitioners, RNs, physician assistants and psychiatric nurses. USW representative Randa Ruge indicated that the Corizon workers had approached the union for representation due to intolerable working conditions.

"Our folks [Corizon employees] are in danger of losing their licenses to practice by some of the things that the company has them doing," she said. Ruge told the *Post-Gazette* that the jail had run out of insulin for more than a week and Corizon supervisors had "countermanded doctors' orders."

Several weeks after the USW filed the labor petition, a Catholic nun who worked as an RN at the jail was fired by Corizon, allegedly for union organizing activities. Sister Barbara Finch was dismissed after she openly expressed concerns about staffing, patient care and safety at the facility. The USW filed an unfair labor complaint against Corizon regarding Finch's dismissal, claiming she was terminated in retaliation for her union activities.

"This is a clear case of intimidation and union-busting at its worst," said USW President Leo W. Gerard. "Sister Barbara has been an outspoken advocate of change for these courageous workers and their patients, and this kind of illegal and unjust action, unfortunately, is par for the course with Corizon."

On February 14, 2014, Corizon employees at the Allegheny County Jail voted overwhelmingly to unionize. "The next step is getting to the bargaining table and getting Corizon to bargain in good faith and get some changes made in the health system at the jail," said Ruge.

The previous week, Allegheny County Controller Chelsa Wagner stated she had "grave and serious concerns" about medical care at the facility, including issues related to staffing and treatment for prisoners with certain mental health conditions. "I regard the current situation as intolerable and outrageous, and I fully expect necessary changes to be urgently implemented," she wrote in a letter to Corizon.

### Polk County, Iowa

On August 29, 2013, Ieasha Lenise Meyers, incarcerated at the jail in Polk County, Iowa on a probation violation, gave birth on a mattress on the floor of her cell. Her cellmates assisted with the delivery. Earlier, when Meyers, 25, had complained of contractions, a Corizon nurse called an offsite medical supervisor and was told to monitor the contractions and check for water breaking.

Despite Meyers having been twice sent to a hospital earlier the same day, and pleading that she was about to give birth, the nurse did rounds in other parts of the jail. Guards reportedly did not check on Meyers as required, even though the birth could be seen on a nearby security monitor. Only after the baby was born was medical care provided. Sheriff Bill McCarthy defended the actions of jail staff.

### Corizon Employee Misconduct

Like most private contractors that provide prison-related services, Corizon tends to cut costs in terms of staffing and operational expenses. As noted above, this includes paying lower wages, providing fewer or inferior benefits and hiring less qualified workers who can be paid less. Sometimes, however, these practices result in employees more like to engage in misconduct.

At the Pendleton Correctional Facility in Indiana, a Corizon nurse was arrested and charged with sexual misconduct, a Class C felony. The *Herald Bulletin* reported that in April 2013, when Colette Ficklin was working as a contract nurse for Corizon, she convinced a prisoner to fake chest pains so they could be alone in an exam room. A guard told internal affairs officers that she witnessed Ficklin and the prisoner engaging in sex acts in the prison's infirmary. [See: *PLN*, Sept. 2013, p.17].

In March 2013 at the Indiana State Prison in Michigan City, a Corizon practical nurse was charged with drug trafficking and possession with intent to distribute. Phyllis Ungerank, 41, was arrested and booked into the LaPort County Jail after attempting to smuggle marijuana into the facility. [See: *PLN*, July 2012, p.50].

A Corizon nurse at the Volusia County Branch Jail in Daytona Beach, Florida



**FREE!** **12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription!
Quarterly drawing **WINS $100! (Void in New York)**
(Last Quarter's winner from **Somers, CT.**)
**TELL YOUR FRIENDS!   ACT NOW!!**

**PO Box 2063 • Fort Walton Beach FL. 32549**
www.InmateMagazineService.com

**Inmate Magazine Service Inc.**

**Privatized Healthcare Problems (cont.)**

was fired after officials learned she was having sex with and giving money to a prisoner. Valerie Konieczny was terminated on December 18, 2012 when the jail was contacted by the brother of prisoner Randy Joe Schimp, who had written in a letter that a nurse was having sex with him and depositing money into his jail account. Investigators determined that Konieczny was the nurse who had sex with Schimp at both the Volusia County facility and another branch jail in 2011.

In New Mexico, Corizon physician Mark Walden was accused of fondling prisoners' genitals and performing prostrate exams that were "excessive and inappropriate in terms of length and method." At times, Walden reportedly did not wear gloves during the prostate exams. He was accused of sexually abusing 25 or more male prisoners while employed as a doctor at two privately-operated facilities, the Guadalupe County Correctional Facility in Santa Rosa and Northeast New Mexico Detention Facility in Clayton.

Lawsuits were filed against Walden, Corizon and private prison operator GEO Group, and Walden's medical license was suspended in December 2013. The suits claim that Corizon allowed Dr. Walden to work at the Clayton prison "despite knowing of the risk of sexual abuse and having the ability to know that [he] was repeatedly sexually abusing patients" at the Santa Rosa facility. [See: *PLN*, Sept. 2013, p.47].

**The Privatization Model**

Economics professors Kelly Bedard and H.E Frech III at the University of California at Santa Barbara examined the privatization of correctional medical services in their research study, "Prison Health Care: Is Contracting Out Healthy?," published in *Health Economics* in November 2009.

They concluded: "We find no evidence to support the positive rhetoric regarding the impact of prison health care contracting out on inmate health, at least as measured by mortality. Our findings of higher inmate mortality rates under contracting out are more consistent with recent editorials raising concerns about this method of delivering health care to inmates."

Today, five years after the Bedard-Frech report was published, it has the benefit of hindsight. Since the report was written, its findings and conclusions have been reaffirmed in prisons and jails across the nation that have contracted with private companies to provide medical care to prisoners. Cost reductions in the provision of correctional healthcare tend to result in greater inefficiencies that lead to poorer outcomes. Consequently, for-profit medical contractors may actually be increasing morbidity and mortality in prison and jail populations.

Many governmental entities are willing to outsource correctional healthcare to private companies; reasons for doing so include cutting costs, risk management and removing healthcare duties from corrections departments. If Corizon's record with respect to providing medical care to prisoners seems dismal, the company can always defend its actions by stating it does what it has been hired to do: Cut costs for its customers. And those costs have been rising due to an increasingly aging, and thus medically-needy, prison population. [See: *PLN*, Nov. 2012, p.22; Dec. 2010, p.1].

With respect to risk management, litigation is not a compelling issue within the prison healthcare industry and Corizon views lawsuits as simply a cost of doing business. "We get sued a lot, but 95% or 97% of cases were self-represented cases," ex-CEO Rich Hallworth was quoted in an August 2013 article. He added that most lawsuits settle for an average of less than $50. Of course it is difficult for prisoners to obtain representation to pursue litigation – unless it's a wrongful death case, and then usually their family or estate is doing the suing.

Nor are the public agencies that contract with private medical providers greatly concerned about their litigation records. In fact, when Florida contracted with Corizon and Wexford Health Sources to provide medical care for the state's entire prison system, the Florida Department of Corrections didn't ask the companies about their litigation histories – such as lawsuits raising claims of deliberate indifference, negligence and medical malpractice.

"What really troubles me about this is the fact that the department didn't ask these very basic, elemental questions any system would ask," observed ACLU National Prison Project staff attorney Eric Balaban. "These two vendors were taking

- **Post-Conviction Specialists (Habeas Corpus/Coram Nobis/PRP/ Certiorari/SVP/Sentence Modification/DNA and more)**

- **We Cover all 50 States and D.C., Federal District Courts, Federal Courts of Appeal, and Supreme Court**

- **Comprehensive investigative services available**

- **Experts and specialists available**

- **Staff attorney with over 40 years litigation experience**

- **Professional legal staff with extensive post conviction experience**

- **Multi-lingual services available**

- **FREE initial consultation**

- **Payment plans available**

## Legal Insights Inc.

**25602 Alicia Parkway Suite 323
Laguna Hills, CA 92653**
**714-941-0578**
info@legalinsights.org
www.legalinsights.org

501(c)(3) Non-Profit Organization

over Florida's massive health care system and you'd think they would have asked hard questions to determine if these companies can provide these services within constitutional requirements."

Even worse, the downgrading of Corizon's debt rating by Moody's in 2013 creates a potential problem for the company's service delivery model. The majority of Corizon's revenue is derived from contracts with state and local agencies that are trying to reduce their budgetary expenses. Given those fiscal pressures and competition from Wexford, Armor, Centurion and other prison healthcare companies, Corizon cannot easily increase its revenue through contractual price increases. But the company's expenses are largely within its control.

Unfortunately for prisoners, in order to reduce costs Corizon will likely have to curtail the quality or quantity of healthcare services it provides. As noted above, this can be done by reducing employee wages or benefits; the company can also cut costs through understaffing and by limiting prescription medications or providing fewer referrals to hospitals and specialists. A growing trend is to use off-site medical staff who consult with prisoners through tele-medicine. [See: *PLN*, Dec. 2013, p.34].

The correctional healthcare industry, comprised of only a few large companies, is highly competitive. When one company loses a contract, another is more than will-

ing to step in and submit a bid. What really matters for most government agencies and policymakers is the bottom line cost.

According to Dr. Marc Stern, the court-appointed special master in Idaho, "whoever delivers prison healthcare is doing it on less than adequate funding because that's how much municipalities, state legislatures and county commissions are allocating." He noted that privatization can be good in some cases and bad in others, depending on the level of oversight by the contracting public agency.

When Corizon compromises medical care to save money, such as curtailing the use of ambulances for emergency transports, reducing the number of on-site doctors or sending fewer prisoners to outside hospitals for needed treatment, government officials typically fail to take corrective action and deny responsibility for the resultant deaths and injuries. Indeed, as with the Idaho Department of Corrections and LMC in Kentucky, they sometimes want to reward the company with renewed contracts.

Why? Because continuity maintains



**PASS**

Prisoner Assistance Scholastic Service provides educational materials nationally to prisoners in state and federal prisons and jails.

Prisoners who successfully complete the PASS program earn a degree in Personal Psychological Development which can be used as evidence of rehabilitation before parole boards and with prison officials.

$500 for the entire course of study and degree.

◆ Victim Awareness
◆ Anger Management
◆ Addiction/Substance Abuse
◆ Domestic Violence
◆ Gang Diversion
◆ Conflict Resolution
◆ Parenting
◆ Non-violent Communication
◆ Re-entry in Society
◆ Living With Purpose

**10 COURSES**
**2 SEMESTERS**

Graded study - completed through the mail.

**FOR MORE INFO**

**1-888-670-7277**
**www.passprogram.org**
pass@passprogram.org
PASS Program, PO BOX 2009, San Francisco, CA, 94126

cost control, which is the driving force behind privatization of prison and jail medical services.

### Conclusion

THE INTENT OF THIS ARTICLE WAS TO REVIEW Corizon's performance and practices based on publicly-available information, including news reports and court records. Although the company was formed in June 2011, its two predecessor firms, PHS and CMS, littered the news and judicial dockets over the years with lawsuits and articles involving cases of inadequate healthcare. Thus, the sins of Corizon's parents, CMS and PHS, are forever linked with the progeny of their merger.

Such past misdeeds could be explained away had Corizon adopted a new, post-merger culture that was removed from prior practices under PHS and CMS. However, many of Corizon's mid-level and top executives – including ex-CEO Rich Hallworth, former president Stuart Campbell, chairman Richard H. Miles and a number of vice presidents – were previously executives with PHS or CMS. It was during their tenure at those companies that numerous cases involving deficient medical care occurred.

The corporate culture of Corizon, as well as its business model, appears to be largely the same as those of its predecessors. Therefore, the only thing that may have changed as a result of the merger that created Corizon is the company's name. ◼

*Gregory Dober is a freelance writer in healthcare and ethics. He has been a contributing writer for PLN since 2007 and co-authored*

Against Their Will: The Secret History of Medical Experimentation on Children in Cold War America, *published by Palgrave in 2013. [See: PLN, Nov. 2013, p.36].*

Sources: *Bloomberg News, Forbes, www. businessweek.com, Philadelphia Inquirer, Philadelphia Daily News, The American Independent, Pittsburgh Tribune-Review, St. Louis Business Journal, www.browardbulldog.org, Miami Herald, WHAS-TV, The Tennessean, Courier-Journal, Idaho Business Review, Associated Press, The Arizona Republic, Maine Public Broadcasting Network, Bangor Daily News, WANE-TV, Raton Range, Des Moines Register, Star-Tribune, The Nation, The Florida Current, www.usw. org, KPHO-TV, WANE-TV, Tucson Citizen, WCAV-TV, www.wdrb.com, www.modernhealthcare.com, www.cochs.org, www.wndu. com, www.afsc.org, www.americanownews. com*

# Florida County Agrees to Pay $4 Million to Deceased Prisoner's Estate

### *by Derek Gilna*

NICHOLAS T. CHRISTIE, INCARCERATED at the Lee County jail in Ft. Myers, Florida, died on March 31, 2009 after being repeatedly pepper sprayed by deputies while strapped to a restraint chair. Following three years of litigation, Lee County officials agreed in May 2013 to pay a record settlement of $4 million to Christie's estate.

The jail's for-profit medical contractor, Prison Health Services (PHS), now known as Corizon, was named as a defendant in the federal lawsuit and included in the settlement agreement.

The § 1983 suit raised claims related to Christie's death under the "Fourth, Eighth and/or Fourteenth Amendments to the United States Constitution, the laws of the United States, and the laws of the State of Florida."

The complaint alleged that Christie was "restrained to a chair with a hood over his head and face for several hours in the custody of the Lee County Sheriff, while being detained on a misdemeanor trespass

charge," and that medical staff at the jail failed to provide him with adequate care after he showed signs of respiratory distress during and after that incident. Medical personnel, the lawsuit stated, "acted willfully, wantonly, maliciously, and with reckless and callous disregard for and deliberate indifference to the serious medical and mental health needs of Nick Christie, and in a manner that shocks the conscience and offends traditional notions of decency, all of which led to his wrongful and untimely death."

According to the complaint, prior to and during his placement in the restraint chair, Christie disclosed to jail staff that he had "certain serious medical conditions..., including, but not limited to, Chronic Obstructive Pulmonary Disease (COPD), a heart condition, cardiovascular disease, atrial fibrillation, obesity, gout, back pain, constipation, and umbilical hernia, all of which was recorded and documented in Mr. Christie's PHS medical chart/record."

# EXECUTIVE  CLEMENCY

**For Info.  On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT**
**3907 N. Federal Highway, # 151**
**Pompano Beach, FL 33064**
**954-271-2304**

BBB
ACCREDITED
BUSINESS

**(35-Years of Clemency & Parole Assistance)**
**(Transfers Under The Int'l Prisoner Treaty)**

## Alexander Byrd Optics

Single Vision Transitions eyeglasses

**$119.95** + S&H

with Lifetime Frame Warranty

To receive order form and details write to:

2150 Wise St. #4769
Charlottesville, VA 22905

or have someone go to:

abyrdoptics@gmail.com
www.abyrdoptics.com

Further, Christie's wife had contacted jail officials to advise them of her husband's medical conditions and to inform them he had not been taking his medication regularly, which often caused him to act in an erratic manner. When Christie was booked into the jail, officials confiscated the medications he had with him and failed to refer him for a proper medical intake evaluation that would have resulted in the jail reissuing his prescribed medications to replace those that were taken.

A report by Florida's state medical examiner found the cause of Christie's death was "hypoxic encephalopathy, following resuscitation for cardiac arrest, due to or as a consequence of cardiogenic shock with congestive heart failure, due to or as a consequence of physiologic stress, following restraint and noxious effects of Oleoresin Capsicum" – i.e., the pepper spray used by sheriff's deputies.

The often excessive and abusive use of "restraint chairs" by corrections officials has been criticized by prisoners' rights groups and has resulted in litigation in other jurisdictions as well. Unfortunately for Christie, the failure of Lee County jail staff to follow proper procedures and the failure of PHS employees to provide adequate medical care led to his death. And unfortunately for the county and PHS, those failures resulted in a $4 million settlement to resolve the subsequent lawsuit filed by Christie's estate. See: *Christie v. Scott*, U.S.D.C. (M.D. Fla.), Case No. 2:10-cv-00420-UA-DNF. ◼

# Seventh Circuit Upholds Removal of Prisoner's Dreadlocks

THE SEVENTH CIRCUIT COURT OF Appeals has held that an Illinois prisoner's religious rights were not violated when prison officials required him to cut off his dreadlocks to be transported to a court hearing.

Peter A. Lewis, incarcerated at the Dixon Correctional Center, is a member of a religious sect called the African Hebrew Israelites of Jerusalem. Consistent with the requirements of his faith, Lewis took the voluntary Nazirith vow, which, among other things, committed him to not cut his hair. He had previously filed suit against prison officials, claiming that they infringed his religious freedom by refusing to let him have visits unless he agreed to cut his hair. A 2003 settlement in that lawsuit allowed Lewis to have visitors if he permitted guards to search his dreadlocks for contraband before and after each visit.

Prison officials gave Lewis a choice in January 2004, when he was scheduled to appear in federal court. He could either get a haircut or go to segregation as punishment for eluding (by refusing a haircut) his scheduled court hearing. Lewis chose the haircut, then claimed prison officials knew his court date had been postponed, depriving them of a security concern that justified cutting his hair.

A dispute existed as to what prison officials knew about the court date, and when. It was undisputed, however, that Lewis was transported to court shortly after the originally-scheduled court hearing. The Seventh Circuit wrote, "it is obvious that transporting prisoners and placing them in courtrooms presents significant security concerns, warranting protective measures."

The appellate court held that prison officials' discretion relative to security-related matters extends to a determination that a particular prisoner's dreadlocks are too thick or dense to be readily searchable on a certain occasion, such as a visit to federal court. There was no evidence that Lewis was treated differently than other similarly situated prisoners, nor that the prison's security concerns were outweighed by his interest in engaging in a sincere religious observance.

The district court's order granting summary judgment to the defendant prison officials was therefore affirmed, and the U.S. Supreme Court denied Lewis' petition for writ of certiorari on October 7, 2013. See: *Lewis v. Sternes*, 712 F.3d 1083 (7th Cir. 2013), *cert. denied*.

The Seventh Circuit had previously held that an Illinois prison guard violated a prisoner's First Amendment rights by ordering his dreadlocks to be forcibly cut, and that the guard was not entitled to qualified immunity. However, the appellate court noted that the facts in that case involved "outright arbitrary discrimination rather than a failure merely to 'accommodate' religious rights." [See: *PLN*, April 2013, p.44]. ◼

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**561-360-2523**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

# From the Editor

*by Paul Wright*

THIS MONTH'S COVER STORY ON CORIZON, the company formed by the merger of Prison Health Services and Correctional Medical Services, is our most recent reporting on an issue that has been ongoing for the past several decades. Namely, the prison HMO model whereby corrections agencies contract with for-profit companies to provide medical services to prisoners, while the companies' business model requires that they delay or deny treatment in order to make a profit. Not surprisingly this results in a pattern of deaths, injuries and pain suffered by prisoners who have no other options for obtaining medical care.

What is interesting is that despite decades of abuse, corruption and fraud, the government entities that contract with for-profit prison medical providers still fail to adequately monitor and audit their performance. Even after repeated contractual violations, if one company's contract is canceled or expires, the government typically awards the contract to another corporation with similar performance problems. Besides Corizon, other prison medical care companies include Wexford Health Sources, Centurion, NaphCare, Armor Correctional Health Services, Correct Care Solutions and Conmed Health Management.

The notion that such companies should actually be required to provide the medical services for which they are being paid with taxpayer dollars seems alien to the government officials who enter into these contracts. If anyone has information on services that are being contracted by corrections agencies but not being performed by medical care providers or other private prison companies, please contact us with details.

PLN's website has over 20,000 articles related to prisons and jails, over 7,000 legal documents in our brief bank and more than 5,000 documents in our publications library, and receives over 100,000 visitors a month.

We are in the process of redesigning our websites for Prison Legal News, the Human Rights Defense Center and the Campaign for Prison Phone Justice, to make them easier to use and navigate and to incorporate all the technological updates that have occurred since our last website design. The new sites should be online within the next several months.

As we move into 2014, our goal is to increase our circulation by adding another 1,000 print subscribers. You can help by encouraging others to subscribe or giving someone a gift subscription. Please consider doing both, and enjoy this issue of PLN. ◼

# Second Circuit Vacates Magistrate's Judgment Entered without Consent

ON MARCH 6, 2013, THE SECOND Circuit Court of Appeals vacated the summary judgment dismissal of a New York prisoner's lawsuit, finding he had not consented to having the case decided by a magistrate judge.

Willie James Yeldon filed suit in federal court against numerous New York and Wyoming prison and community-based doctors under 42 U.S.C. § 1983.

Although he expressly declined to consent to the appointment of a magistrate judge, the district court entered a February 8, 2008 order referring the case to a magistrate pursuant to 28 U.S.C. § 636(c). The magistrate judge then granted summary judgment to the defendants on all of Yeldon's claims.

On appeal, the Second Circuit noted it had previously held in *N.Y. Chinese TV Programs, Inc. v. U.E. Enterprises*, 996 F.2d 21 (2d Cir. 1993) that consent to appoint a magistrate judge must be "truly voluntary," and "consent of all parties must be clear and express or the requirement would mean little."

Recognizing that Yeldon had expressly refused to consent to a magistrate, the Court of Appeals could not find on the record before it that he gave implied consent by failing to object to the district court's February 2008 order.

"As a pro se litigant, he may not have appreciated that participating in proceedings before the Magistrate Judge could impugn the effectiveness of his written refusal to consent," the appellate court wrote.

Since "the lack of consent is a jurisdictional defect that cannot be waived," the Court of Appeals found the magistrate lacked authority to enter final judgment under 28 U.S.C. § 636(c)(1), and that the Court consequently lacked jurisdiction to review that judgment. The Second Circuit therefore vacated the judgment, holding that Yeldon had not consented to the appointment of a magistrate judge. See: *Yeldon v. Fisher*, 710 F.3d 452 (2d Cir. 2013). ◼



# See Their Problem

Contraband Danger

## The Answer:
## Is ⌂ CLEAR Electronic Cigarettes

LOCK-UPS

LOCK-UPS

- If They can't Inspect they Must Reject
- End $100 a Pack Black Market

Ask the Warden for LOCK-UPS

Clearly the Safer Option

# State of Washington
# Prison Phone Justice Campaign!

## *Prison Phone Justice Project needs your help for statewide campaign!*

**W**hile much progress has been made in reducing the costs of long distance prison calls, we are still fighting to reduce the high costs of in-state prison and jail calls at the local level. In January 2014, the Human Rights Defense Center (HRDC), the parent organization of Prison Legal News, reopened its Seattle office to launch the Washington Prison Phone Justice Campaign.

This is our first statewide phone justice campaign, and we're excited to have people involved on both the local and national levels who are dedicated to ending the exorbitant phone rates and kickbacks associated with the prison phone industry. David Ganim, HRDC's national Prison Phone Justice Director, has already been obtaining the phone contracts and rates for all 39 county jails in Washington, as well as data from the Washington Department of Corrections.

We recently hired a local campaign director, Carrie Wilkinson, who will manage our office in Seattle and coordinate the statewide campaign. Washington prisoners and their families pay some of the highest phone rates in the nation, and we need your help to win this battle!

Here's how you can help – first, please visit the Washington campaign website:

## www.wappj.org

There you can see all the ways you can make a difference. The site allows you to sign up for the campaign and upload videos and share blog entries about how high prison phone rates make it difficult for you to stay in touch with your incarcerated loved ones. You can also upload an audio message, and even call in your story to **1-877-410-4863**, toll-free 24 hours a day, seven days a week! We need to hear how you and your family have been affected by high prison phone rates. If you don't have Internet access, you can mail us a letter describing your experiences and we'll post it. Send letters to HRDC's main office at: **HRDC, Attn: WA Phone Justice Campaign, P.O. Box 1151, Lake Worth, FL 33460.** Washington state prisoners can mail us letters and send a copy of this notice to their family members so they can get involved.

By choosing to participate in the Washington Prison Phone Justice Campaign, you will be playing a key role in ending the unfair phone rates that prisoners' families have to pay. We cannot win this battle without your help, so please visit the campaign website and share your experiences! Donations are also welcome and greatly appreciated, and can be mailed to the above address or made online via the campaign site. Thank you for your support!

# Why There's an Even Larger Racial Disparity in Private Prisons Than in Public Ones

*by Katie Rose Quandt*

It's well known that people of color are vastly overrepresented in U.S. prisons. African-Americans and Latinos constitute 30 percent of the U.S. population and 60 percent of its prisoners. But a new study by University of California-Berkeley researcher Christopher Petrella addresses a fact of equal concern. Once sentenced, people of color are more likely than their white counterparts to serve time in private prisons, which have higher levels of violence and recidivism and provide less sufficient health care and educational programming than equivalent public facilities. [See: *PLN*, March 2013, p.16].

The study compares the percentage of prisoners identifying as black or Hispanic in public prisons and private prisons in nine states. It finds that there are higher rates of people of color in private facilities than public facilities in all nine states studied, ranging from 3 percent in Arizona and Georgia to 13 percent in California and Oklahoma. According to Petrella, this disparity casts doubt on cost-efficiency claims made by the private prison industry and demonstrates how ostensibly "colorblind" policies can have a very real effect on people of color.

The study points out an important link between prisoner age and race. Not only do private prisons house high rates of people of color, they also house low rates of individuals over the age of 50 – a subset that is more likely to be white than the general prison population. According to the study, "the states in which the private versus public racial disparities are the most pronounced also happen to be the states in which the private versus public age disparities are most salient." (California, Mississippi and Tennessee did not report data on prisoner age).

Private prisons have consistently lower rates of older prisoners because they often contractually exempt themselves from housing medically expensive – which often means older – individuals, which helps them keep costs low and profits high. This is just another example of the growing private prison industry's prioritization of profit over rehabilitation, which activists

say leads to inferior prison conditions and quotas requiring high levels of incarceration even as crime levels drop. The number of state and federal prisoners housed in private prisons grew by 37 percent from 2002 to 2009, reaching 8 percent of all prisoners in 2010.

The high rate of incarceration among young people of color is partly due to the war on drugs, which introduced strict sentencing policies and mandatory minimums that have disproportionately affected non-white communities for the past 40 years. As a result, Bureau of Justice Statistics data shows that in 2009, only 33.2 percent of prisoners under 50 reported as white, as opposed to 44.2 percent of prisoners aged 50 and older.

So when private prisons avoid housing older prisoners, they indirectly avoid housing white prisoners as well. This may explain how private facilities end up with "a prisoner profile that is far younger and far 'darker' ... than in select counterpart public facilities."

Private prisons claim to have more efficient practices, and thus lower operating costs, than public facilities. But the data suggest that private prisons don't save money through efficiency, but by cherry-picking healthy prisoners. According to a 2012 ACLU report, it costs $34,135 to house an "average" prisoner and $68,270 to house an individual 50 or older. In Oklahoma, for example, the percentage of individuals over 50 in minimum- and medium-security public prisons is 3.3 times that of equivalent private facilities.

"Given the data, it's difficult for private prisons to make the claim that they can incarcerate individuals more efficiently than their public counterparts," Petrella tells *Mother Jones*. "We need to be comparing apples to apples. If we're looking at different prisoner profiles, there is no basis to make the claim that private prisons are more efficient than publics."

He compared private prisons to charter schools that accept only well-performing students and boast of their success relative to public schools.

David Shapiro, former staff attorney at the ACLU National Prison Project, agrees. "The study is an example of the many ways in which for-profit prisons create an illusion of fiscal responsibility even though the actual evidence of cost savings, when apples are compared to apples, is doubtful



## People of Color in Public vs. Private Prisons

In every state studied, the rate of black and Hispanic inmates is higher within private prisons

- % of public prison population
- % of private prison population

Source: Radical Criminology

Mother Jones

at best," he says. "Privatization gimmicks are a distraction from the serious business of addressing our addiction to mass incarceration."

But in addition to casting doubt on the efficacy of private prison companies, Petrella says his results "shed light on the ways in which ostensibly colorblind policies and attitudes can actually have very racially explicit outcomes. Racial discrimination cannot exist legally, yet still manifests itself."

Alex Friedmann, managing editor of *Prison Legal News,* calls the study a "compelling case" for a link between age disparities and race disparities in public and private prison facilities. "The modern private prison industry has its origins in the convict lease system that developed during the Reconstruction Era following the Civil War, as a means of incarcerating freed slaves and leasing them to private companies," he says. "Sadly, Mr. Petrella's research indicates that the exploitation of minority prisoners continues, with convict chain gangs being replaced by privately-operated prisons and jails." 

* The study draws on data from nine states – Arizona, California, Colorado, Georgia, Mississippi, Ohio, Oklahoma, Tennessee and Texas – selected because they house at least 3,000 individuals in private minimum- and medium-security facilities. 

*Katie Rose Quandt is an online editorial fellow at Mother Jones. This article was originally published by Mother Jones (www.motherjones.com) on February 17, 2014; it is reprinted with permission, including the accompanying charts.*



## People Over 50 in Public vs. Private Prisons

In every state studied, the rate of inmates over 50 is lower within private prisons

- % of public prison population
- % of private prison population

Source: Radical Criminology

Mother Jones

### ~ THE SENZA COLLECTION ~

SENZA SPECIALIZES IN PROVIDING YOU SEVERAL CHOICES
ALL NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY  – OR – NON NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY
WE HAVE DIVIDED OUR CATALOGS INTO THESE CATEGORIES:
**CAUCASIN/AFRICAN–AMERICAN/HISPANIC/ASIAN/MIXED HOTTIES**
EACH PAGE OF OUR CATALOGS HAS 99 GLORIOUSLY SEDUCTIVE LADIES POSING JUST FOR YOUR ENJOYMENT.
OVER 250 CATALOGS TO COLLECT AT JUST $2.50 PER CATALOG
HERE'S A LITTLE FREEBIE FROM SENZA TO YOU!!!
ORDER YOUR FREE SENZA "99 HOTTIES" SAMPLE CATALOG
*JUST SEND US TWO U.S. FOREVER OR FIRST CLASS STAMPS AND A SELF ADDRESSED STAMPED ENVELOPE TO:*
**SENZA**
FREE CATALOG OFFER
**P.O. BOX 5840**
**BALTIMORE, MD 21282**
**AND FOR THOSE THAT JUST CANNOT WAIT...TAKE ADVANTAGE OF THIS LIMITED TIME OFFER**
**SENZA'S INTRODUCTORY SPECIAL   \*\*\*DIRTY DOZEN\*\*\***
$19.99 GETS YOU ALL THIS + FREE SHIPPING AND HANDLING
12 EYE POPPING CATALOGS! EACH CATALOG HAS 99 PICS TO CHOOSE FROM ON EACH PAGE
PLUS
12 4X6 PRINTS FROM OUR MIXED HOTTIES SELECTION TO SHOW OFF SENZA'S 4X6'S PRINT QUALITY.
**ALL FOR JUST $19.99**
**REMEMBER YOU MUST: SPECIFY NUDE OR NON–NUDE ON YOUR ORDER**
**SPECIFY YOUR INSTITUTIONS RESTRICTIONS AS TO THE NUMBER OF PRINTS ALLOWED IN ONE ENVELOPE.**
**SENZA  CORPORATE POLICIES – PLEASE REVIEW THEM CAREFULLY**
**ALL SENZA COLLECTION IMAGES ARE SOLD AT A FLAT PRICE OF 0.35 CENTS EACH.**
ANYONE WISHING TO PURCHASE 1000 + PRINTS AT ONE TIME WILL BE GIVEN A FLAT PRICE OF 0.30 CENTS PER IMAGE.
**SENZA HAS A MINIMUM ORDER REQUIREMENT OF:  $15.00 THIS DOESN'T INCLUDE S&H CHARGES.**
**SHIPPING AND HANDLING CHARGES ARE AS FOLLOWS:**
**1 – 5 4x6 PRINTS – $1.00 PER ENVELOPE / 6 – 15 4x6 PRINTS – $1.50 PER ENVELOPE /16 – 25 4x6 PRINTS – $2.00 PER ENVELOPE**
YOU MUST NOTIFY SENZA ON THE ORDER FORM, THE MAXIMUM NUMBER OF PRINTS YOUR INSTITUTION WILL PERMIT IN EACH ENVELOPE
**SENZA WILL ACCEPT U.S. FIRST CLASS POSTAGE STAMPS AT THE RATE OF $5.00 FOR EACH BRAND NEW FLAT BOOK OF 20 STAMPS.**
YOU ARE REQUIRED TO KNOW  YOUR INSTITUTIONS POLICIES REGARDING WHAT IMAGES ARE ACCEPTABLE INTO YOUR FACILITY INSTITUTION.  THERE ARE NO EXCEPTIONS TO THIS POLICY. RETURNED/REJECTED MAIL – YOU WILL HAVE 15 BUSINESS DAYS TO SEND US A  SASE WITH A STREET ADDRESS IN WHICH TO MAIL YOUR RETURNED/REJECTED PRINTS.
AFTER 15 DAYS THE PRINTS ARE RETURNED TO OUR INVENTORY.
ALL SALES ARE FINAL/NO REFUNDS OR EXCHANGES

# *Arrest-Proof Yourself,* by Dale Carson and Wes Denham
## (Chicago Review Press, 2007). 282 pages (paperback), $14.95.

*Book review by John E. Dannenberg*

In short, *Arrest-Proof Yourself* is a colorfully-written manual on how to avoid being arrested. The book's principal thesis is a hypothetical "electronic plantation" where all persons who are arrested – even if later exonerated – must serve an irrevocable life sentence of being blacklisted from future employment, socially ostracized, etc. as a result of their arrest record. The book is written in street language to garner the attention of younger people who, statistically, are more likely to face arrest. The authors emphatically counsel the reader, wherever possible, to simply avoid being seen by the police; but if stopped, they provide advice on how to act and, more importantly, how *not* to act.

Authors Carson and Denham speak from years of experience: Carson was a former police officer in both state and federal jurisdictions while Denham is a private investigator. Carson, now a defense attorney, today defends the very people who, in *Arrest-Proof Yourself,* he tries to prevent from needing his services. Throughout the book the authors speak about how police officers love to arrest people, which not only makes them happy but also improves their job performance reviews. Accordingly, police are not motivated to help little old ladies cross the street but rather to arrest as many people as they can. The means by which people are targeted for arrest, and whether they are arrested following a police stop, are the central topics of *Arrest-Proof Yourself.*

Those targeted for arrest are not the rich and famous, who have good attorneys and money to influence prosecution decisions, but rather the average person who is less educated and lacks street smarts. Those are the people who comprise the millions arrested each year for misdemeanors, traffic violations and petty crimes – mostly non-violent offenses. *Arrest-Proof Yourself* examines why they are even stopped by police officers, let alone arrested.

Most people are not arrested for something they do in plain view of the police but for incidental things during the course of a routine stop and search. This commonly occurs when people are pulled over in vehicle stops – such as for a defective brake light – and an incidental search reveals drugs, weapons or stolen property in plain sight. If the suspect doesn't have a good attitude, can't produce ID, registration or insurance, is in the "wrong neighborhood," has outstanding unpaid tickets or warrants, or has medication without a copy of the doctor's prescription, then he or she is likely to be arrested rather than receive a citation. And that arrest record, standing alone, will destroy the person's otherwise clean record for all time due to the ubiquitous online data that follows everyone wherever they go; those once upstanding citizens are consigned forever to the "electronic plantation."

*Arrest-Proof Yourself* is written in an arrogant style, demonstrating through the authors' experience the nature of police officers to arrest as many people as possible. The treatment of suspects is described as demeaning, revealing an unfair and biased arrest process that primarily targets the less fortunate and impoverished. Although published in 2007, this book provides information that remains timely today and is a sobering wake-up call. *Arrest-Proof Yourself* is available in PLN's bookstore on page 62 of this issue.



**STRENGTH STACK 52**

**114 BODYWEIGHT EXERCISE CARDS INSIDE!**

STRENGTH STACK 52
BODYWEIGHT FITNESS GAMES

**JUST $21.95!***
(shipping included)

**Experience the Game of Fit!**

*Send money orders or institutional checks made payable to:*
Prisoner Assistant
Po Box 704
Lake Harmony PA 18624

**Features:**
-Soft cover book with perforated-card stock for playing cards.
-Many fitness games available.
-Effective NEW bodyweight training system.
-Exercise your entire body with no equipment.

Introducing **THE BUZZ REPORT!** Subscribe today, and get all of your sports scores and lines delivered conveniently to your email inbox, every day! Add **info@sportzzbuzz.com** to your Corrlinks email subscription list for info. on how to get The Buzz!

# WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

**TENS OF THOUSANDS OF THE HOTTEST AND MOST SCANDALOUS BABES&DUDES FOUND ON THE PLANET.**
**EACH CATALOG PAGE HAS 120 BEAUTIFUL GIRLS OR BOYS POSING JUST FOR YOU!**
**ORDER ONE CATALOG PAGE FOR ONLY $4.50 OR FOR 10 U.S. FOREVER STAMPS WITH AN SASE ENCLOSED.**
**WE WILL SEND YOU VOLUME ONE.  EACH ADDITIONAL VOLUME THE SAME PRICE!**
**HELP US TO HELP YOU!**
**WE ARE MORE THAN HAPPY TO ANSWER E-MAIL INQUIRES HOWEVER, DUE TO MAILING COST AT $0.46 CENTS**
**A LETTER, PLEASE ENCLOSE AN SASE WITH YOUR QUESTIONS, OTHERWISE NO REPLIES!**
**WHAT ABOUT OUR PRICES AND POLICIES**
**COLOR PRINTS ON  4x6 GLOSSY PHOTO PAPER AS LOW AS $0.35 CENTS PER PRINT ON ORDERS OVER 500**
**SHIPPED ACCORDING TO POLICY: 25 PICTURES PER ENVELOPE EVERY 24 HOURS. S&H $2.00 PER ENVELOPE.**
**METHOD OF PAYMENT/CONTACT INFORMATION**
**U.S. POSTAL SERVICE MONEY ORDERS-STATE & FEDERAL CORRECTIONAL INSTITUTIONAL CHECKS**
**PAYABLE ONLY TO: KRASNYA L.L.C.**
**EQUATION FOR FIRST CLASS U.S. FOREVER STAMPS**
**BRAND NEW FLAT BOOK FOR ALL ORDERS AT THE RATE OF $6.00 PER FLAT BOOK.**
**WE RESPOND TO OUR CLIENTS NEEDS AND TRY TO HELP THE BEST WE CAN.**
**OUR SEASONAL SPECIALS MEAN A KICKOFF OF SAVINGS!**

---

**COLOR CATALOG DISCOUNT SALE**
**ONE COLOR CATALOG OF 120 BABES**
**IN CLASSIC OR NUDE LINES $4.50**
**PLEASE INCLUDE**
**A SELF-ADDRESSED STAMPED**
**(2-FIRST CLASS STAMPS) ENVELOPE.**
**QUANTITY BUYS:**
5-14 CATALOGS =10% OFF OUR REGULAR PRICE
15 CATALOGS =15% OFF OUR REGULAR PRICE
20 CATALOGS =20% OFF OUR REGULAR PRICE
25 CATALOGS =25% OFF OUR REGULAR PRICE
30 CATALOGS =30% OFF OUR REGULAR PRICE
35 CATALOGS =35% OFF OUR REGULAR PRICE
40 CATALOGS =40% OFF OUR REGULAR PRICE
45 CATALOGS =45% OFF OUR REGULAR PRICE
50 CATALOGS =50% OFF OUR REGULAR PRICE
**BE SURE TO SPECIFY CLASSIC OR NUDE BABES!**

**150 VOL. OF KRASNYA BABES CLASSIC LINE**
**150 VOLUMES OF KRASNYA BABES NUDE LINE**

## $24.95  S&H FREE
**FOR GRAB BAG OF**
## 50 PHOTOS
**FROM ALL OUR CATALOGS**
**SPECIFY RACE AND MAIN**
**AREA OF YOUR INTERESTS**
**WE WILL PICK SELECTION**
**FOR YOU**
**BONUS 1 COLOR CATALOG**
**PAGE OF 120 BABES**

---

**LOOSE STAMPS FOR LOOSE BABES**
**KRASNYA LOOSE STAMP GRAB BAG SPECIAL**
10 LOOSE STAMPS.....................................30 STAMPS
25 LOOSE STAMPS.....................................75 STAMPS
50 LOOSE STAMPS...................................150 STAMPS
**ALL STAMPS MUST BE 1ST CLASS STAMPS**
**IN LIKE NEW CONDITION!**
**SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)**
**WE WILL PICK SELECTION FOR YOU**

**KRASNYA BABES HAS SPRUNG SALE!**
**FREE SAMPLE CATALOG FROM KRASNYA!**
**120 BABES IN EACH CATALOG**
**ENCLOSE ONE SASE WITH TWO FIRST**
**CLASS STAMPS! 1 CAT PER CUSTOMER**
**PLEASE SPECIFY MALE OR FEMALE BABES**
**NUDE OR BOP-FRIENDLY**

**3 BRAND NEW FLAT BOOKS OF FOREVER**
**STAMPS FOR GRAB BAG OF 45 PHOTOS**
**FROM ALL OUR CATALOGS, SPECIFY RACE**
**AND MAIN AREA OF YOUR INTERESTS**
**WE WILL PICK SELECTION FOR YOU**
**BONUS 1 COLOR CATALOG OF 120 BABES**
**PLEASE INCLUDE 6 FOREVER STAMPS**
**WITH YOUR ORDER FOR S&H**

**KRASNYA L.L.C.**
**P.O.BOX 32082**
**BALTIMORE, MD 21282**
**EMAIL AND CORRLINKS REQUESTS ACCEPTED AT:**
**KRASNYABABES@HOTMAIL.COM**

---

**WE'D LIKE TO START THE HOLIDAYS RIGHT THIS YEAR!**
**THE WAY TO DO THAT IS BY SENDING YOU INCREDIBLE VALUES**
**IT'S ONE THING TO TALK THE TALK, ANOTHER TO WALK THE TALK**

50   GREAT BABES 0.50 CENTS EACH—$25.00
100 GREAT BABES 0.45 CENTS EACH!—$45.00
200 GREAT BABES 0.40 CENTS EACH!—$80.00
300 GREAT BABES 0.40 CENTS EACH!-$120.00
500 GREAT BABES 0.35 CENTS EACH!-$175.00

**STANDARD TERMS & CONDITIONS APPLY – $2.00**
**PER ENVELOPE (25 PHOTO) FOR SHIPPING AND HANDLING!**

**WAIT!**
**YOU SAY YOU DON'T HAVE ENOUGH BABE CHOICES**
**OR CATALOGS? YOU NEED CATALOGS?**
**PREPAY YOUR ORDER AND WE WILL SEND YOU**
**FREE COLOR CATALOGS!**
**GREAT DEAL, BUT HOW MANY CATALOGS?**

**FOR EVERY 100 BABES WE'LL SEND YOU**
**240 BABES TO CHOOSE FROM!**

**ORDER**

50 BABES——————————ONE SINGLE CATALOG
100 BABES——————————ONE DOUBLE CATALOG
200 BABES——————————TWO DOUBLE CATALOGS
300 BABES——————THREE DOUBLE CATALOGS
500 BABES——————FIVE DOUBLE CATALOGS

---

KRASNYA IS PROUD TO INTRODUCE AT FANTASTIC INTRODUCTORY PRICES
THE CONNOISSEUR'S COUTURE "CACHE TWO-FIVE COLLECTION"
OF INTERNATIONAL ADULT FILM STARS
TWELVE PACKAGES OF 25 NUDE AND NON-NUDE POSES,
AVAILABLE ONLY IN OUR "CACHE TWO-FIVE" COLLECTION.
"CACHE TWO-FIVE"
"CACHE TWO-FIVE"  IS AVAILABLE IN TWELVE (12) SPECIALLY PRICED PACKAGES
OF 25 POSES IN NUDE AND NON-NUDE POSES.
PLEASE SPECIFY ON YOUR ORDERS IF YOU WANT NUDE OR NON-NUDE PACKAGES
AND WHAT COLLECTION NUMBER YOU'D LIKE.
COLLECTIONS ARE NUMBERED 01-12 FOR EXAMPLE ON YOUR ORDER YOU'D WRITE:
***NUDE CACHE TWO-FIVE PACKAGE 01 & 02***
REMEMBER THERE ARE TWELVE (12) COMPLETELY DIFFERENT PACKAGES OF 25 BABES,
THERE ARE NO DUPLICATES IN ANY OF THE 12 PACKAGES.
600 BEGUILING BEAUTIES, ALL BRAND NEW ADDITIONS TO OUR LINE AND AVAILABLE ONLY
IN OUR CACHE "TWO-FIVE" PACKAGES!  300 NUDES AND 300 NON-NUDE BEAUTIES
CAPTURE YOUR OWN COLLECTION OF KRASNYA'S "CACHE TWO-FIVE" SELECTIONS IN
INDIVIDUALIZED PACKAGING OF 25 RARE AND EXQUISITE BREATH-TAKING BEAUTIES.
THE CONNOISSEUR'S COUTURE COLLECTION OF "CACHE TWO-FIVE" BRINGS YOU
25 BEAUTIES IN EACH "CACHE TWO-FIVE" PACKAGE FOR ONLY $12.95 PER PACKAGE
LIMITED TIME SPECIAL ***** $59.95******
PLUS S&H FOR 6 "CACHE TWO-FIVE" PACKAGES OF THE NUDE OR NON-NUDE COLLECTIONS
150 BEAUTIES
IMAGINE 150 OF THESE EXCITING AND EXQUISITE BEAUTIES
FOR A RIDICULOUSLY LOW PRICE OF
*****$59.95***** PLUS $12.00 SHIPPING AND HANDLING CHARGE.
ADD $2.00 FOR SHIPPING AND HANDLING PER "CACHE TWO-FIVE" PACKAGE ORDERED.
YOU MUST SPECIFY NUDE OR NON-NUDE PACKAGES
IF NOT SPECIFIED NON-NUDE WILL BE SHIPPED AUTOMATICALLY
ALL OF OUR NORMAL POLICIES APPLY

---

**FOR KRASNYA CLIENTS WHO WORK THE YARDS;**
**HAVE WE GOT A GREAT OPPORTUNITY FOR YOU...GRAB BAG**
## MR. HUSTLE GRAB BAG BARGAIN DAY$
**ONLY $0.25 CENTS PER BABE**
**5 GRAB BAG MINIMUM PURCHASE REQUIRED**
**$2.00 SHIPPING AND HANDLING PER BAG**
**25 AWESOME BABES PER BAG AT ONLY $6.25 PER BAG**
**YOU MUST BUY AT LEAST 5 GRAB BAGS OR 50 GRAB BAGS.**
**THIS***GRAB BAG BARGAIN*** IS NOT GOING TO BE OFFERED**
**AGAIN THIS YEAR.    $O $TOCK $P NOW!**
**AS YOU KNOW YOU GET AN ARRAY OF 25 GORGEOUS BABES**
**YOU CAN ONLY CHOOSE EITHER MALES OR FEMALES,**
**ALL NUDES OR BOP SAFE...THE INDIVIDUAL SELECTIONS COME**
**FROM OUR BEST CATALOGS!!!**
**YOU MAY WANT TO SIT DOWN FOR THIS BONUS BARGAIN!**
**OUR BABES CATALOGS SPECIAL OF THE DECADE**
**—  5 COLOR CATALOGS FOR  $6.00  —**
**— 10 COLOR CATALOGS FOR  $12.00 —**
**— 15 COLOR CATALOGS FOR  $18.00 —**
**— 20 COLOR CATALOGS FOR  $24.00 —**
**OUR CATALOGS SPECIAL AVAILABLE WHEN YOU PURCHASE**
**THE 5 GRAB BAG MINIMUM!**
**THIS PRICE INCLUDES FREE SHIPPING ON THE CATALOGS**
**BECAUSE OF SHIPPING TERMS ALL CATALOGS SOLD IN**
**MULTIPLES OF 5 FOR $6.00 ONLY.**
**YOU CHOOSE EITHER MALE OR FEMALE CATALOGS**
**AND IF YOU WANT NUDE OR BOP SAFE!!**

# When Victims Speak Up in Court – in Defense of the Criminals

*by Andrew Cohen*

*A death penalty case in Colorado has generated an unusual fight between a district attorney and two parents who oppose capital punishment against the man who murdered their son.*

ONE OF THE MOST PROFOUND CHANGES in criminal justice over the past 40 years has been the rise of the victims' lobby. Essentially shut out of the core of the process until the 1970s, the victims' rights movement today can cite legislation from sea to sea, chapter and verse under both federal and state laws, that broadens the rights of victims to participate in the trials of those accused of harming them or their families. The Department of Justice's 2012 "Attorney General Guidelines for Victim and Witness Assistance," for example, totals 66 pages and barely scratches the surface of what similar state guidelines reveal.

The immutable trio that once existed in criminal cases – judge, prosecutor and defendant – now almost always resembles a quartet. Victims have a voice – and they use it. All 50 states now allow some form of "victim impact statement" at sentencing. Because such statements are often so compelling to jurors, defense attorneys frequently seek ways to blunt their impact. But these efforts almost always fail. Even judges who are sympathetic to the constitutional rights of defendants, who fret about the prejudicial impact of victim testimony, say they are bound by legislative declarations broadening the scope of victim participation in criminal cases.

But a pending Colorado case raises a profound question that few judges (or prosecutors or jurors) ever have to confront: What happens when the victims of violent crime seek to speak out on behalf of the defendant and not the state? What happens when the family members of a murder victim seek leave to beg jurors at sentencing to spare the life of the man who killed their son? What responsibility does the prosecutor have in that case? What obligations do the courts have? Do victims' rights sound only when they favor the government and the harshest sentence, or do they sound as well when they cry out for mercy?

So far, the prosecutor in the case, Arapahoe County District Attorney George Brauchler, has answered those questions clearly: He wants to block one couple's efforts to speak out against the death penalty for the man who murdered their child. Brauchler has filed a motion in a pending case seeking to bar Bob and Lola Autobee from participating in the sentencing phase of the trial of Edward Montour, their son's killer. The law only guarantees the rights of victims to "discuss the harm that resulted from the crime," Brauchler argues. But I haven't been able to find a single victims' right advocate who believes that's true.

## People of the State of Colorado v. Montour

THERE DOESN'T SEEM TO BE MUCH DOUBT, reasonable or otherwise, that Edward Montour killed Colorado corrections officer Eric Autobee in a prison kitchen on October 18, 2002. (Montour was in that kitchen, and in that prison, because he was serving a life sentence for killing his infant daughter). Less than one year after Autobee's death, Montour pleaded guilty to first-degree murder and was quickly sentenced to death by a Colorado judge. But that death sentence was overturned, in 2007, after the U.S. Supreme Court ruled in *Ring v. Arizona* that judges alone, without juries, could not impose death sentences.

Then, last year, a trial judge overturned Montour's conviction and allowed him to withdraw his initial guilty plea in the Autobee killing. Montour was not adequately defended by a lawyer at the time of that plea, the judge ruled, and had a documented history of mental illness. A new trial was ordered. Montour, through his attorney, said he would re-plead guilty to Autobee's murder if he could be spared the death penalty and receive a(nother) sentence of life in prison without the possibility of parole. The prosecutor, Brauchler, rejected the offer and went ahead instead with the now-pending capital case against Montour.

The last time Montour faced trial for Autobee's death, the victim's family supported the death penalty as an option. Not this time. This time, having educated themselves about capital punishment, and better understanding the nature of Montour's mental illness at the time of Eric's death, the Autobees have been vocally, stridently, ceaselessly against the imposition of death in this case. In January 2014, for example, as potential jurors in the Montour case were lined up outside the courthouse waiting to learn about the case for which they were summoned, the Autobees picketed the line and pleaded with Brauchler to spare their son's killer.

Episodes like this – and the media attention they inevitably generated – prompted Brauchler, the prosecutor in the Montour case, to remove the family from his preliminary list of witnesses to be called during the sentencing of the case. And that removal, in turn, has prompted Montour's attorneys to ask the trial judge in the case to allow the Autobees to testify during sentencing. That prompted an aggressive response from Brauchler, arguing that Colorado's victims' rights laws don't apply to "mitigating" factors during sentencing but only to "aggravating factors." And that is where we stand today.

## The Autobees

THE PARENTS OF THE VICTIM HAVE SPOKEN, and eloquently so, about the reasons why they have chosen to oppose the death penalty in this case. Below, from a court filing, is the essence of their claim:



**FULTON & WELCH**

TEXAS PAROLE ATTORNEYS

o AFFORDABLE
o PERSONALIZED PACKET
o 2 HEARINGS
o MEET WITH YOU & FAMILY

"LET US GET YOU HOME SOONER"

10701 Corporate Dr., Ste. 390,
Stafford, Texas 77477

"Bob would like any jury considering the appropriate penalty for Eric's killer to know who Eric truly was and how his loss has impacted the Autobees. The Autobees loved Eric deeply, and now remember him for his peace-loving nature, his love of the outdoors, and his innate desire to find moments of calm when hunting or fishing. Eric was a gentle soul who would hold Bob's hands even when he was in his 20's. Eric started his career in the culinary arts and then, like Bob, became a prison corrections officer.

"Despite the inhumanity he saw around him, Eric would not speak disdainfully of prisoners, but, instead, recognized their human dignity. Eric accomplished much in his short time on earth – he saved three lives before he died – but missed out on even more. It pains the Autobees to consider the many milestones in Eric's life that might have occurred were he still alive, including marriage, children, and career advancement.

"The crime affected the Autobees not just because of their beloved son's loss, but also because of who they became after this loss. After Eric's death, their warm feelings

of love that Eric always nurtured quickly turned into cold feelings of vengeance and violence. Originally, the Autobees fervently supported the prosecution's efforts to seek absolute retribution. Over time, however, and with reflection, they realized that Eric would not have wanted this for himself or for them; Eric would not have wanted someone killed in his name, nor would he have wanted his family to live in the darkness of hatred. The Autobees know this because they know how Eric lived: by loving life, saving lives, and extending mercy to the merciless.

"The effect of the crime on the Autobees cannot be separated from this ongoing death penalty prosecution. Bob and his family have found healing in the forgiveness that they have extended to their son's killer. However, the prosecution strives to forever undo this healing by seeking to avenge one killing with another, over the family's pleas for mercy. For the Autobee family, a death sentence and the accompanying years of litigation, all supposedly done in their son's name, would rob them of peace. For, in the eyes of society, their son's name forever would be associated with cruelty and violence, rather than the human dignity and

mercy he embodied in life."

## Call and Response

Brauchler surely has no moral answer for this, and the legal answer he has ginned up barely passes the straight-face test, but that has not stopped him from seeking to silence the Autobees' voice during the upcoming trial. "To permit testimony concerning the victims' general view of the death penalty or whether this particular defendant should be executed or given a life sentence invades the province of the jury and should not be permitted," prosecutors told the judge. Can you imagine them making that argument if the Autobees were still advocating *for* Montour's death?

Colorado law "only guarantees the right of the victims to discuss the harm that resulted from the crime," Brauchler argues, and this limits "evidence from the victims to the characteristics of the victim and the impact of the crime on the victim's family." It is "not the court process that can be attacked by the victims," prosecutors assert, before claiming that Montour's Eighth Amendment rights will be implicated if the Autobees speak out in his favor. You don't



### Complete GED Preparation
[Paperback]
Publisher: Steck-Vaughn; 2nd edition
*928 pages; $24.99; Item #: 1099*

Over 2,000 GED-style questions thoroughly prepare learners for test day. This single book offers thorough coverage of the revised GED Test with new test information, instruction, practice, and practice tests. Answer key included.

Order from: **Prison Legal News**
*(Add $6 shipping for orders under $50)*
**PO Box 1151
Lake Worth, FL 33460
Phone: (561) 360-2523
www.prisonlegalnews.org**

## New Titles Available in PLN's Bookstore


***Criminal Law in a Nutshell,*** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**


***Advanced Criminal Procedure in a Nutshell,*** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**


***Criminal Procedure: Constitutional Limitations,*** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**


***A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series),*** by Bryan A. Garner, 768 pages. **$33.95**

❏ *Criminal Law in a Nutshell*   ❏ *Advanced Criminal Procedures in a Nutshell*   ❏ *Criminal Procedure*
❏ *Dictionary of Criminal Law Terms*
Amount enclosed (add $6 S&H for orders under $50; free shipping over $50) _____
By ❏ check  ❏ new postage stamps  ❏ credit card  ❏ money order
Name _____
DOC/BOP Number _____
Institution/Agency _____
Address _____
City _____ State _____ Zip _____

**PRISON LEGAL NEWS**   PO Box 1151 • Lake Worth, FL 33460
Tel [561] 360-2523 • www.prisonlegalnews.org

## Victims Defend Criminals (cont.)

need to be a lawyer, or a juror, to understand that this is a terrible argument. And Brauchler cites no controlling Colorado law in support of it.

In their response, the Autobees' attorneys seem incredulous as they recite the provisions of Colorado law that support their view. "A crime victim," they told the court, has the "'right to appear, personally or with counsel, at the sentencing proceeding and to adequately and reasonably express his or her views' regarding *'the type of sentence which should be imposed by the court.'"* Under Colorado law, the Autobees added, "prosecutors are required to support – not oppose – this right by 'inform[ing] each victim of 'his or her 'right' to *'express an opinion at the sentencing hearing* or any sentence proposed to the court for consideration" (emphasis in original).

And then the Autobees shared with the trial judge what they really think is happening here. "Because the Autobee family's beliefs conflict with the prosecutions' agenda," the family's lawyers wrote, "the prosecution has relegated [them] to the status of second-class victims." Brauchler has it all wrong, the family asserts. Prosecutors should be heeding the wishes of the family members instead of putting their own priorities first. What the family really is saying, however, is that the world of victims' rights is far different than it was 40 years ago and that prosecutors can't always have things their own way.

### The Lobby

Although this conflict now is unfolding in Colorado, it has national implications. The Autobees are not the first family to seek mercy for someone who took the life of a loved one. And Brauchler isn't the first prosecutor to seek to block such a family from getting through to a jury. In fact, this sort of dispute happens more often than you might think. So I called around to a few national victims' rights organizations with a simple question: Does your organization support the families of victims who oppose the imposition of the death penalty in a particular case? Here are some of the responses I received.

From Kristy Dyroff, of the National Organization for Victim Assistance (NOVA):

"We support crime victims in seeking justice in the way they are comfortable. There are victims who seek capital punishment and those who strongly oppose it. Restorative Justice is the term used for this type of model. It focuses on addressing the needs of the victim, the offender and the community, not the justice system.

"It is definitely NOT for all victims/survivors but there is a significant contingent within the crime victim assistance network who support this model. At NOVA, our focus is always on assisting the crime victims and their families. We are very careful not to tell them what they need, or how to heal. We try to educate and support them in their choices.

"We support the crime victim in pursuing the justice they seek, regardless of the interests of the prosecutor, law enforcement or others. Yes, we have supported victims in the past who object to capital punishment. We also encourage all other participants in the process to support and respect the victims in their position."

And from Kate Lowenstein, the program director of the group Murder Victims' Families for Human Rights, whose own father was murdered:

"More people likely understand that you can't automatically assume that losing a loved one to murder will mean that you support the death penalty, nor does opposition to the death penalty mean you don't want the killer or killers brought to justice, and it does not necessarily mean you have forgiven the murderer. Murder and the justice system are complicated, as are the views and experiences of the victims and families who are affected by it. We must not try to simplify this, but allow victims their unique and complicated responses to the trauma and horror of having a family member murdered and the criminal justice process that occurs after that.

"Despite the wider cultural awareness of victim opposition to the death penalty, unequal treatment of victim family members by prosecutors in capital trials is still a problem, one that exists largely below the public radar, in District Attorneys offices across the country, where often victims' family members don't know their rights and there is no one around to step forward and advocate on their behalf.

"It occurs, for example, that if two surviving family members want to give a victim impact statement during the sentencing phase of the trial, the prosecutor will allow the pro-death penalty survivor to speak but not the survivor who opposes the death penalty, regardless of the fact that no mention of the victims' views of what the sentence should be is allowed in Victim Impact Statements.

"The point is not that victims should get to determine sentencing. The point is that victims' rights should be granted to all victims, regardless of their position on the death penalty, or perceived 'cooperation' with the District Attorneys office. Disagreeing with the prosecutor – opposing the death penalty when the prosecutor is seeking a death sentence – should not mean that you are silenced, treated as 'part of the defense team' and not a 'real' victim, or denied the right to speak about the impact of the murder on you and your family."

It's not the Autobees who are the outliers here. It's the prosecutor. He can hardly purport to serve as the "conscience of the community," or claim he is following clear Colorado law by ignoring the wishes of the one family in the state that has earned the right to speak at the Montour trial. Victims' rights mean rights *for all victims* and not just those who toe the government's line. The jury in Edward Montour's case deserves to hear what the Autobees have to say, the family has a right to say it in court, and no lawman has the right to come between that vital communication.

A ruling from the trial judge is expected any day. ◪

*Andrew Cohen is a contributing editor at The Atlantic, 60 Minutes' first-ever legal analyst and a fellow at the Brennan Center for Justice. He is also chief analyst for CBS Radio News and has won a Murrow Award as one of the nation's leading legal journalists. This article was originally published in The Atlantic (www.theatlantic.com) on January 28, 2014; it is reprinted with permission.*



**SMITH'S GUIDE to HABEAS CORPUS RELIEF**
for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence.        380 pages.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail. Money orders, personal or institutional checks ONLY. Send $31.90 (til CA, $34.08) payable to Roberts Company

Send name, address, prisoner #, and payment to:
**Roberts Company**, 15412 Electronic Lane #101 **Huntington Beach, CA 92649**
Also available on Amazon.com

# States Renewing Their Prison Phone Contracts

*As state DOCs renew or rebid their prison phone contracts, you can help urge them to eliminate commission kickbacks and lower intrastate phone rates.*

The Campaign for Prison Phone Justice needs your help in

## ***** *Minnesota, Kentucky and Alaska!* *****

The Departments of Corrections in the above states are in the process of re-bidding or renewing their prison phone contracts. Most DOCs receive a commission (kickback) on revenue generated from calls made by prisoners, which results in excessively high phone rates. Although the FCC voted last year to cap the costs of interstate (long distance) prison calls, which went into effect on February 11, 2014, the order does not apply to intrastate (in-state) calls; an estimated 85% of prison phone calls are in-state. This is an opportunity to ask DOCs to forgo commissions and ensure their new prison phone contracts are based on the lowest cost to those who pay for the calls – mostly prisoners' families.

### Take Action NOW! Here's What YOU Can Do!

Ask your family members and friends to write, email, call and fax the DOC and the governor's office (addresses and contacts are listed below), requesting that the DOC: 1) forgo commission payments when re-bidding or renewing its prison phone contract, and 2) base the new contract on the lowest calling cost. Lower prison phone rates should apply not just to long distance calls but also to in-state calls. For a sample letter or to easily send an email, visit the Campaign for Prison Phone Justice's website and click on the "Take Action" tab:

## www.phonejustice.org

### Prison phone contract information & Contacts:

**Minnesota:** Receives a 59% kickback; existing contract expires on 3-31-2014. The DOC charges $6.45 for a 15-minute collect intrastate call and $1.75 for a collect local call. **Contacts:** Minnesota DOC, Commissioner Tom Roy, 1450 Energy Park Drive, Suite 200, St. Paul, MN 55108; ph: 651-361-7226 or 651-361-7200, fax: 651-642-0414, email: tom.roy@state.mn.us. Governor Mark Dayton, 130 State Capitol, 75 Rev. Dr. Martin Luther King Jr. Blvd., St. Paul, MN 55155; ph: 651-201-3400, fax: 651-797-1850, email: gmark@gov.state.mn.us or kathy.kostohryz@state.mn.us

**Kentucky:** Receives a 54% kickback; existing contract expires on 5-31-2014. The DOC charges $4.50 for a 15-minute collect intrastate call and $1.85 for a collect local call. **Contacts:** Kentucky DOC, Commissioner LaDonna Thompson, 275 East Main Street, Frankfort, KY 40602; ph: 502-564-4726, fax: 502-564-5037, email: ladonna.thompson@ky.gov. Governor Steve Beshear, 700 State Capitol, Frankfort, KY 40601; ph: 502-564-2611, fax: 502-564-2517, email: governor@ky.gov

**Alaska:** Receives a 7 to 32.1% kickback; existing contract expires on 6-30-2014. The DOC charges $2.63 to $7.61 for a 15-minute collect intrastate call (local calls are free). **Contacts:** Alaska DOC, Commissioner Joseph Schmidt, 550 W. 7th Ave., Suite 860, Anchorage, AK 99501; ph: 907-465-4652, fax: 907-465-3390, email: joseph.schmidt@alaska.gov. Governor Sean Parnell, State Capitol, P.O. Box 110001, Juneau, AK 99811; ph: 907-465-3500, fax: 907-465-3532, email: governor@alaska.gov

# Texas Criminal Court Fees are a Tax on Poor Defendants

*by Matt Clarke*

The Texas legislature has erected such a hodgepodge of criminal court fees that even the court administrators and clerks don't know how to apply them. These fees, which are frequently not used for their intended purposes, amount to a hidden tax on the poorest members of society ensnared in Texas' criminal justice system.

"Sometimes, I can't even tell my client what the bill is for," said Austin defense attorney David Gonzales.

He is not alone. The Texas Office of Court Administration (TOCA) receives "hundreds of calls from court officials about how to assess and prioritize fines, fees and surcharges in criminal cases," according to a report the agency published in 2009. "The sprawling number of state and local fees and court costs that state law prescribes as a result of a criminal conviction amounts to a nearly incomprehensible package."

The fee system is so complex that people convicted of identical crimes might be charged vastly different fees, possibly violating the constitutional guarantee of equal treatment under the law.

Nor is it always possible to determine how a particular fee is actually used; typical legislative practice includes the raiding of fee accounts to balance the budget or fund pet projects. Some fees, such as the $50 clerk's fee and $25 prosecutor's fee, go straight into a county's general fund where they can be used to pay for any budget item, court-related or not.

Every person convicted of a crime in Texas pays a "Consolidated Court Cost" fee of $40 for a Class C misdemeanor, $83 for Class A and B misdemeanors, and $133 for a felony. All criminal defendants are also charged at least six additional fees with titles such as "records management and preservation fee," "clerk's fee," "county and district court technology fund fee" and "courthouse security fee."

Those arrested with a warrant are charged a $50 fee; those without a warrant pay $5. Entering or leaving jail incurs a $5 fee, and DUI defendants are charged a "visual recording fee." A $30 "state traffic fine" is imposed on all traffic violations.

"We have a 'school crossing fee' that nobody – nobody – can tell me what comes of it," observed state Senator John Whitmire, who chairs the Senate Jurisprudence Committee.

The total bill can easily exceed $600. The cost for those placed on probation is much higher: $4,000 to $5,000, according to a 2009 TOCA survey.

Some of the fees go to the state's Compensation to Victims of Crime (CVC) Fund, administered by the Office of the Attorney General. The CVC receives revenue from Consolidated Court Cost fees, restitution installment fees and parole administration fees, among other sources. From 2004 to 2012, the CVC received approximately $100 million per year, mostly from Consolidated Court Cost funds.

Criminal court fees aren't necessarily fair. Defendants convicted of sex crimes pay a $250 "DNA testing fee" plus an additional "DNA collection fee" regardless of whether DNA was collected or tested in their cases. Some of the fees for DNA testing actually end up in a state highway fund.

"Breath alcohol testing fees" in DUI cases don't necessarily go to pay for breath alcohol testing any more than DNA fees necessarily pay for DNA testing. Texas judicial administrators estimate that of every three dollars collected in fees, one will be spent for something unrelated to the court system.

For example, court fees have paid for rehabilitative services for people with brain injuries and an obesity study of minority children in the Houston area. They also fund the salaries of state game wardens. Two million dollars in court fees went to pay a private company to install Internet cameras along the Mexican border so people could view them online and report illegal border crossings.

Court-imposed fees are also raided to balance the budget. In 2011, Texas legislators took $20 million in fees to pay for state employee pensions, and moved $135 million from the Fugitive Apprehension Fee account, intended to help apprehend parolees who abscond, to the state's general fund where it can be used for any purpose.

Another questionable method of using fees to balance the budget on paper is to let them remain uncollected, so they appear as a large amount of "accounts receivable." That may be why almost $5 billion in uncollected

**WINNING HABEAS CORPUS &
POST CONVICTION RELIEF**
Revised 4th Ed. 2012
Main subject: Ineffective Assistance of Counsel-"IAC"

Atty Kent Russel writes: "Simply the best source for a quick
study on major subjects in the criminal process."
<> A virtual law library in a book, major constitutional issues
<> 6th Amendment & IAC, Duty to investigate
<> Forensics, Plea IAC, Jury Instructions
<> Major const. claims
<> §2254 & 2254 Procedure, Clearly established law

**POST COVICTION RELIEF FOR
WASH. STATE - Personal Restraint Petition**
The only book for Wash. State prisoners who seek collateral
review by PRP or CrR 7.8 motion. Covers all aspects of
preparing a PRP, time bar, facial invalidity, Plea bargain,
sentencing, incl. case law & rules.

**ORDER: (price incl. tax, plus S&H)**
[ ] Winning Habeas Corpus…          $ 59.50
[ ] Post Conviction Relief for Wash.   $ 45.50
[ ] Both Books                      $ 95.00
**To: FAST LAW PUBLISHING**
Box 577, Upland CA 91785  On-line www.fastlaw.org

**Roget's Thesaurus**
Can't think of the right word?
Let Roget's help you! Over 11,000
words listed alphabetically.
See page 61 for more information.


inmateMAGS.com formerly MyMagstore.com

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **60+ Page Full Catalog** ($3 Discount Coupon Included)

inmateMAGS.com                    www.inmateMAGS.com
4208 University Way NE            Info@inmatemags.com
Seattle, WA 98105                        206-322-6397

fees is included in designated accounts that can be used to appear to "balance" budgets over and over again.

"The budget is far too much based on diversion and deception," according to state Senator Kirk Watson. "When people are told their money is going to be spent for something specific, a promise is made: If we collect this tax from you, we will spend it for this practice."

"If we're not going to use a fee for a particular purpose, we shouldn't collect it," added Jim Allison of the County Judges & Commissioners Association of Texas.

In fact, collecting fees that are not used for their intended purpose and are in effect general taxes may be unconstitutional. Further, the fees impose an onerous and often unjustified burden on people who are already among society's poorest – criminal defendants.

"We're trying to squeeze more money from people who have a hard time getting jobs because they have a criminal record, or have mental illness problems or substance abuse problems," stated Ana Yáñez-Correa, executive director of the Texas Criminal Justice Policy Coalition. "These fees are a

tax on the poor," she concluded.

Poor defendants who can't pay the fees up front face the additional burden of fees on fees. There is a $25 fee to set up a schedule by which to pay fees. It costs another $12 for a "restitution installment fee" to pay off court-ordered restitution over time, and a $2 "transaction fee" each time a payment is made.

Although lawmakers are aware of the absurdity of the criminal court fee system, they don't want to butcher their cash cow. The Consolidated Court Cost fees alone bring in almost $200 million annually. In 2009 and 2011, the Texas Judicial Council – the policy-making body for the state's courts – unsuccessfully urged the legislature to simplify the costs and fees.

There is, however, one positive precedent from a different type of fee. When the legislature attempted in 2011 to empty the System Benefit Fund account, which is funded by fees on telephone bills and intended to help the elderly and poor pay their utility costs during the summer, state Rep. Sylvester Turner raised the issue publicly, causing lawmakers to back down. Unfortunately, people who have been convicted of crimes

elicit much less sympathy, so the myriad of criminal court fees and their misuses will most likely continue unabated.

"Lawmakers are like anybody else – they do what they can," noted former Texas chief deputy comptroller Billy Hamilton. "And nobody's ever going to question it if they raise fees on criminals."

Sources: *Austin American-Statesman; "Compensation to Victims of Crime Fund," Legislative Budget Board Staff (Issue Brief, February 2013)*

---

## TEXAS ONLY

Post-conviction State and Federal Habeas Corpus

Parole Representation

Family Law

**Ashley Burleson**
Attorney and Counselor at Law
1001 Texas Avenue, Suite 1400
Houston, Texas  77002



**NEW FRIENDS, HIGHER EDUCATION, AND EMPLOYMENT & HOUSING UPON RELEASE THROUGH WRITEAPRISONER.COM PROFILES**

*Contact WriteAPrisoner.com & Start Looking Forward To Mail Call!*

AS SEEN ON
CNN, 20/20, Fox News, Dr. Phil, O Magazine, E! True Hollywood, and hundreds more!

**WriteAPrisoner.com...**
Simply the largest, highest ranked, & most visited website of its kind!

- Pen-pal Profiles are affordably priced at $40 for the first year, $30 for renewing year
- Features a comprehensive search that allows viewers to find your profile by age, race, location, keywords, & more - 32 search options in all
- Your new friends can email their first message to you along with a photo
- Advertises non-stop on every major search engine with thousands of websites linking back to us
- Offers free Reintegration Profiles for inmates seeking employment and housing upon release and education during incarceration
- Translated into 51 languages & geared for international search engines
- Viewers can "subscribe" to your profile to be notified when your profile is updated, blog is added, artwork is posted, poetry is added, your release is near & much more
- Pen-pals have the option of helping you with a broad range of topics using WriteAPrisoner.com's free Self-Help Series

**Get Started Today!**
Friends & family can submit your entire 250 word profile, photo, and payment for you online by visiting
**www.writeaprisoner.com/post**

Or for a FREE Brochure, Send a S.A.S.E. to:
WriteAPrisoner.com
PO Box 10- PLN
Edgewater, FL  32132 USA

WriteAPrisoner.com
We'll see you at mail call!

Proud member of the Better Business Bureau of Central Florida & the Southeast Volusia Chamber of Commerce.
*Our website traffic can be independently verified at www.quantcast.com/writeaprisoner.com



**msp | LAW**

**Michael Soukup**
Licensed in Wisconsin and Illinois

**Matthew Pinix***
Licensed in Wisconsin

## Appealing a Conviction?
## Hire an Appellate Attorney.

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, attorneys with more than 10-years' combined experience handling **criminal appeals** in **Wisconsin** and **Illinois**.

**Law Office of Matthew S. Pinix, LLC**
1200 East Capitol Drive, Suite 220
Milwaukee, Wisconsin 53211
(414) 963-6164
www.pinixlawoffice.com

» Rated by Super Lawyers*
» Rated by avvo.com
» Better Business Bureau accredited

# Oregon Jail Guard Quits, Divorces Wife for Former Prisoner

"I CRUSHED A DUDE'S EYE SOCKET FROM repeatedly punching him in it, then I charged him with menacing and harassment," bragged Multnomah County, Oregon jail guard David B. Thompson in one of more than 1,700 messages he posted on an Internet gaming site over an eight-month period while at work in 2007.

"Seeing someone get Tasered is second only to pulling the trigger," Thompson wrote in another post. "That is money – puts a smile on your face."

As previously reported in *PLN*, Thompson, who had been employed as a veteran guard at the Multnomah County Detention Center (MCDC), was merely suspended without pay for 11 days rather than terminated or prosecuted for misuse of jail computers or using excessive force against prisoners. [See: *PLN*, March 2009, p.25].

The suspension did little to get Thompson's attention, apparently. He faced complaints for injuring a male prisoner in March 2009, for an undocumented use of force on a female prisoner in September 2010 and for an inappropriate conversation with another female prisoner in November 2011.

While assaulting prisoners is seemingly okay, falling in love with them evidently crosses the line in the eyes of Thompson's MCDC co-workers. When he confided in two other guards that he intended to divorce his wife to pursue a relationship with an exotic dancer shortly after her release from jail, they ratted him out.

Thompson also sent an email to a captain, confirming that he was in a relationship with a former prisoner but claiming he did not know if she was still on parole – a fact that his wife's divorce attorney later exposed. A formal investigation began in February 2012, according to Chief Deputy Mike Shults.

The former prisoner at the center of the scandal, Melissa M. Crawn, 31, was in custody at the Inverness Jail from August to December 2011 for violating her parole on a 2008 identity theft conviction. It was her fifth jail stay that year for parole violations and an intoxicated driving conviction.

On March 20, 2012, investigators confirmed that Crawn and Thompson were living together. The following day, Thompson was placed on administrative leave when investigators pulled him over and found Crawn in his vehicle.

In separate interviews, Thompson and Crawn both admitted that they began a personal relationship while she was incarcerated. Crawn told investigators that she thought Thompson was attractive, a good listener and treated her better than other jailers. He even helped her file a harassment complaint against another male guard.

Just a week after her December 2011 release from jail, Crawn called Thompson at work. They continued their relationship by phone until Thompson visited her in January 2012. Thompson later left his wife and child for Crawn, who was still legally married but separated from the father of her children.

"I wonder if it's because he was in this relationship with her for so long and it was boring and I'm a little bit crazier," Crawn surmised in response to investigators' questions about why Thompson had left his wife and child for her. After all, she is "that foul-mouthed, tatted up country girl your momma warned you about," according to her Facebook page.

Crawn told investigators that her mother was a prison guard at the Eastern Oregon Correctional Institution when she met and eventually married Crawn's father, who was a prisoner at the facility.

The MCDC internal investigation found no evidence that Thompson and Crawn were intimate while she was in custody, said Multnomah County Sheriff's Lt. Mark Matsushima. Their relationship did, however, violate agency policy because it became physical after her release, according to Chief Deputy Shults.

Thompson finally resigned. "We had

---

## WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS

### STATE AND FEDERAL POST-CONVICTION AND APPEALS

Licensed since 1995, hundreds of appellate briefs and habeas petitions,
capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas,
Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment.
Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**

---

# Earn an Adams State University Degree via Correspondence Courses



**Now Available:  Bachelors Degree in English/Liberal Arts**

- Correspondence Courses via mail    • No internet access required
- Degree options available — Associate of Arts or Science, Bachelors degrees in English, Business Administration, Government, History, Interdisciplinary Studies, Sociology, Paralegal Certificate Program, Masters Degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 16+ years of experience serving incarcerated students
- Veteran friendly
- FREE unofficial evaluation of previously earned credits



ADAMS STATE UNIVERSITY
C O L O R A D O®
*Great Stories Begin Here*
EXTENDED STUDIES

Call or write to receive additional
information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd.  Alamosa, CO 81101
www.adams.edu

---

to make sure we had all the facts before we took any definitive action," said Shults. "But there's no mistaking it, this is a case of extremely bad judgment that happened here."

The Multnomah County District Attorney's Office was investigating possible computer crimes related to Thompson's use of the state's Law Enforcement Data System to access information about Crawn for personal reasons after her release from jail.

Meanwhile, Crawn was sentenced to serve 15 days in the Clackamas County Jail for driving while intoxicated and with a suspended license, after she plowed into a fire hydrant in July 2011, just days after a stint in jail on a DUI conviction.

Thompson attended Crawn's sentencing hearing and the two held hands and kissed in court. Apparently the now-former guard and former prisoner were meant for each other.

Sources: *The Oregonian, www.kptv.com, Portland Tribune*

# South Dakota Parole Board Improperly Enhanced Prisoner's Parole Date

THE SOUTH DAKOTA SUPREME COURT has held that the state Board of Pardons and Paroles (Board) exceeded its authority when it calculated a prisoner's initial parole release date by treating Class 4 felonies as Class 2 felonies.

Lloyd Rowley was convicted of two Class 4 felonies on October 12, 2007. His sentence was enhanced two levels – to the equivalent of Class 2 felonies – because he was a habitual offender, and he received 21 years in prison for both convictions.

Pursuant to SDCL 24-15A-32, defendants convicted of Class 4 felonies must serve 40 percent of their sentences before parole eligibility while those convicted of Class 2 felonies have to serve 50 percent of their sentences.

Since his sentence had been enhanced, the Department of Corrections (DOC) calculated Rowley's initial parole date using the Class 2 percentage rather than the Class 4 percentage. The Board subsequently affirmed the DOC's initial parole date calculation; Rowley filed an appeal in circuit court, which upheld the Board's decision.

The South Dakota Supreme Court reversed, finding that the plain language of the habitual offender statute, SDCL 22-7-8.1, "indicates that the sentence is enhanced, not the principal felony."

The Court concluded: "By its plain language, SDCL 22-7-8.1 does not substantively change the principal felony nor does the reference to SDCL 24-15A-32 in the last sentence of SDCL 22-7-8.1 demonstrate legislative intent to enhance the felony class when determining an inmate's parole eligibility date pursuant to SDCL 24-15A-32." Therefore, "the Board acted without authority in determining that Rowley was a Class 2 felon when calculating his initial parole date."

Justice Glen Severson issued a dissenting opinion. See: *Rowley v. South Dakota Board of Pardons & Paroles*, 2013 SD 6, 826 N.W.2d 360 (S.D. 2013).





# *Gold Star Fragrances*

**4 West 37th St**
**New York, New York 10018**
**Tel. 212.279.4474; Tel. 212.279.4470**
**Fax. 212.279.4471**
**email: gstarfragrances@gmail.com**
**website: goldstarfragrances.com**

We are the original distributer and importer of the finest perfume oils.

We carry over 1000 of the original and best perfume oils, soaps, incenses, body lotions, shower gels, body massage, bottles and more.

All of our oils are shipped in plastic bottles.

Catering to correctional facilities since 1976.

# California Female Prisoners Sterilized

**M**ORE THAN 130 FEMALE PRISONERS at two California facilities were sterilized over a four-year period without required state approval, and some of the women have claimed they were pressured, harassed and even tricked into signing forms agreeing to the sterilizations. The procedure, known as tubal ligation, involves severing a woman's fallopian tubes to prevent eggs from reaching the uterus; the operation requires general anesthesia and is considered permanent.

The surgeries were performed from 2006 to 2010 at outside medical facilities by doctors under contract with the California Department of Corrections and Rehabilitation (CDCR). Joyce Hayhoe, a spokeswoman for California Correctional Health Care Services – the federal court-appointed receiver over CDCR medical care – said the procedures violated state regulations that restrict tubal ligations not deemed medically necessary. They did not, however, violate state law.

According to public records, doctors were paid $147,460 to perform the sterilizations on female prisoners from the California Institution for Women and Valley State Prison in Chowchilla. The Center for Investigative Reporting (CIR), which first reported the story on July 7, 2013, initially identified 148 prisoners who were sterilized from 2006 to 2010, but that number was later revised downward to 132 after a further review indicated some of the women had been counted twice. "Perhaps 100 more" prisoners were reportedly sterilized between 1997 and 2006.

Although they signed consent forms, several of the women complained they were pressured into agreeing to the procedures by medical staff and doctors, especially the OB-GYN at Valley State Prison, Dr. James Heinrich.

"As soon as he found out that I had five kids, he suggested that I look into getting it done," said Christina Cordero, 34, who was incarcerated at Valley State. "The closer I got to my due date, the more he talked about it. He made me feel like a bad mother if I didn't do it," she stated. "Today, I wish I would have never had it done."

Former prisoner Kimberly Jeffrey, who gave birth to a son while at Valley State, said she "went into a straight panic" when confronted with sterilization while she was sedated and on an operating table for a caesarean section. She said her doctor tried to use the operation to perform a tubal ligation even though she had twice refused the procedure during earlier visits.

"As I was laying on the operating table, moments before I went into surgery, [the doctor] had made a statement that, 'Okay, we're going to do this tubal ligation, right?' And I'm like, 'tubal ligation? What are you talking about? I don't want any procedure. I just want to have my baby.'"

"Our physicians were not following the proper procedures," Hayhoe admitted. "The first priority we had was to stop it from taking place, which we did in 2010." Heinrich and other doctors involved in the sterilizations "are no longer employed" by the CDCR, she added.

Extensive media coverage prompted state lawmakers to order investigations by the Medical Board of California and California State Auditor.

In a letter addressed to the federal receiver, the 31-member California Legislative Women's Caucus wrote: "Pressuring a vulnerable population – including at least one documented instance of a patient under sedation – to undergo these extreme procedures erodes the ban on eugenics." The letter continued, "In our view, such practice violates constitutional protections against cruel and unusual punishment; protections that you were appointed to enforce."

"We've been assured that this practice hasn't occurred since [2010], but the question of course is why was this occurring?" asked state Senator Hannah-Beth Jackson. "We want to make absolutely sure – whether we have to do legislation or what – this procedure never becomes the practice it had in the past."

In a July 10, 2013 letter to the Medical Board of California, state Senator Ted Lieu singled out Dr. Heinrich for criticism; Heinrich had told CIR that the $147,460 paid to doctors who performed the sterilizations was not a large amount compared to what the state would save in welfare costs.

"Particularly troubling was a statement by Dr. James Heinrich, ... who made a reference that tubal ligations on inmates save in welfare paying for these unwanted children – as they procreated more," wrote Senator Lieu. "Whether a surgical procedure would have any hypothetical effect on welfare rolls should never, ever play a part in a doctor's decision."

"We also want to find out, who are the women who have been sterilized while in prison? Let's break them down by race, by economic situation, by age, by number of children they have," added Senator Jackson. "One could argue, almost by definition, that being incarcerated takes away your ability to voluntarily consent."

Former Valley State prisoner Crystal Nguyen, 28, who worked in the prison's infirmary in 1997, said she frequently heard medical staff asking female prisoners to agree to sterilization.

According to CIR, Nguyen told investigators, "I was like, 'Oh my God, that's not right.' Do they think they're animals, and they don't want them to breed anymore?"

Dr. Heinrich retired in 2011 but was rehired and continued working at Valley State Prison until December 2012. He has been linked to arranging 378 other sterilizations between 2006 and 2012, including hysterectomies, the removal of ovaries and a procedure called endometrial ablation, which destroys the lining of the uterus.

Dr. Ricki Barnett with the federal receiver's office said such procedures are not banned in California prisons, but the sheer number attributed to Heinrich caused officials to take notice. Dr. Heinrich declined to comment on the sterilizations; according to news reports, he had settled a number of lawsuits related to medical care before being hired by the CDCR.

Justice Now, a prisoner advocacy group, reported that at least 10 women have alleged they were sterilized improperly, including one who underwent an operation to remove cysts on her ovaries. Kelli Thomas, a prisoner at Valley State, told the *Los Angeles Times* that she gave the doctor permission to remove her ovaries only if cancer was discovered. Her medical records indicated that no cancer was found but her ovaries were removed anyway, leaving her sterile.

"I feel like I was tricked," she said. "I gave permission to do it based on a [cancer] diagnosis, and the diagnosis wasn't there." ◼

Sources: *Los Angeles Times, www.foxnews. com, www.theguardian.com, www.npr.org, New York Daily News, www.sacbee.com, www.jnow.org*

# FREE LOCAL NUMBER WITH SENTEL

*Get a local Number & Save up to 85% on Prison Calls with Sentel.*

*Save on International Calls with Sentel*

Below is a summary of the Great plans we offer:

| FREE USA PLAN | USA -100 | USA UNLIMITED | INTERNATIONAL |
|---|---|---|---|
| **Features:** | **Features:** | **Features:** | Features: |
| Price: $0.00<br>20 Free Minutes<br>Risk Free Sign Up<br>Additional Minutes @ 6 cent | Price: $4.99<br>100 Minutes<br>Additional lines @ $2.5<br>Additional Minutes @ 5 cents | Price: $9.99<br>Unlimited USA<br>Fair Minute Usage<br>Limited Time offer Only<br>Hurry Up !!!<br>You have it You keep it | Price for 1st line: $1<br>Add a line: 50 cents<br>Rates Based Upon Destination<br>Calls as low as 10 cents/mn<br>Guaranteed lowest rates |

# NÚMERO LOCAL GRATIS CON SENTEL

Obtenga un número de locales y ahorra hasta un 85% en la prisión de llamadas con Sentel.

*Ahorra en llamadas internacionales con Sentel*

A continuación se muestra un resumen de los Grandes planes que ofrecemos:

| GRATIS EE.UU. PLAN | EE.UU. -100 | EE.UU. ILIMITADO | INTERNACIONAL |
|---|---|---|---|
| Características: | Características: | Características: | Características: |
| Precio: $ 0.00<br>20 minutos gratis<br>Riesgo Inscribirse<br>Minutos adicionales @ 6 cents | Precio: $ 4.99<br>100 Minutos<br>Las líneas adicionales @ $ 2,5<br>Minutos adicionales @ 5 cents | Precio: $ 9.99<br>Ilimitado EE.UU.<br>Uso de minutos Fair | Precio para 1 ª línea: $ 1<br>Agregue una línea: 50 cents de dólar<br>Precios basados en la Destino<br>Las llamadas de tan solo 10 cents<br>Garantizado los mejores precios |

**We accept debit and credit card payments, institutional checks, bank deposits and paypal**

**Sentel, Sentel**
**9550 S. Eastern Ave Ste 253**
**Las Vegas, NV 89123**
**Ph: 702-430-9445**
**Email:      sentel.nv@gmail.com**
**Website:   www.sentelinmatecall.com**

# Kentucky Supreme Court: Probation Cannot be Extended for Sex Offender Treatment

The Supreme Court of Kentucky has held that a probationer's period of probation cannot be extended to require completion of a sex offender treatment program.

Elmer David Miller was originally charged with felony first-degree unlawful transaction with a minor. He entered into a plea agreement for a misdemeanor charge of criminal attempt to commit first-degree unlawful transaction with a minor, because the victim was over the age of sixteen. The plea agreement included two years of probation and required Miller to "[a]ttend any counseling recommended by probation and parole."

Following the recommendation of the Division of Probation and Parole, Miller enrolled in the state's sex offender treatment program. Shortly before his period of probation ended, his probation officer informed the trial court that Miller would be unable to complete the program before the expiration of his probation term. The court then held a hearing and extended Miller's probation until he finished the three-year sex offender treatment program.

Miller challenged the trial court's order and the Court of Appeals reversed, holding that he had not agreed to the extension of his probation and, in fact, had opposed it at the hearing. The appellate court remanded the case for a determination of whether Miller's term of probation should have been allowed to expire or should have been revoked for his failure to complete the treatment program. See: *Miller v. Commonwealth of Kentucky*, 2010 Ky. App. Unpub. LEXIS 1001 (Ky. Ct. App. 2010).

On discretionary review by the Kentucky Supreme Court, the state agreed that the Court of Appeals was correct in concluding Miller's term of probation could not be extended. The Court concurred, stating the statutory two-year period for misdemeanors is an "absolute limit, absent some overriding statute or waiver by the defendant," neither of which applied in this case.

The Supreme Court further found that Miller had not been convicted of a sex crime, because under state law criminal attempt is a "separate, inchoate offense." As such, the Division of Probation and Parole incorrectly believed Miller had to complete a sex offender treatment program. That program, the Court held, only applies to felony sex offenses and thus was not applicable to Miller, who was convicted of a misdemeanor.

Finally, the Court found that a term of probation cannot be extended beyond the limit set by statute to facilitate completion of a sex offender treatment program. Combining that legal principle with precedent that a trial court must hold a hearing and revoke probation before the period of probation ends, the trial court was without jurisdiction to act in Miller's case as its order extending his probation was entered months after his probationary term was over.

Consequently, the case was remanded to discharge Miller from probation. See: *Miller v. Commonwealth of Kentucky*, 391 S.W.3d 801 (Ky. 2013). ◤

# Former Detainee Alleges Unconstitutional Conditions at Illinois Jail, Accepts $7,501 Judgment

On April 24, 2013, the Seventh Circuit Court of Appeals held that a former pretrial detainee at the Edgar County Jail (ECJ) in Illinois stated a claim concerning unconstitutional conditions of confinement at the facility. The appellate court also affirmed the dismissal of a claim alleging deliberate indifference to the detainee's medical needs.

Over a period of two-and-a-half years, Richard D. Budd served three stints at ECJ as a pretrial detainee. He initially spent 45 days at the jail following a 2009 arrest. During that time he was confined with eight other detainees in an area of the facility intended for three; he had to sleep on the floor alongside broken windows and damaged toilets.

After another arrest two years later, Budd was placed in a section of the ECJ where overcrowded conditions again forced him and other prisoners to sleep on the floor amid water from a shower leak. The cells had broken windows, exposed wiring, extensive rust, sinks without running water, toilets covered in mold and spider webs, and a broken heating system. ECJ staff did not provide prisoners with cleaning supplies.

Four months later, Budd was again arrested and had to sleep on the floor in an ECJ cellblock. The cell's vents were blocked, the heating and air conditioning systems did not work, and detainees were denied recreation. While living in these conditions, something scratched or bit Budd's leg, resulting in an infection and swelling. He was taken to a local hospital for treatment after contacting the Sheriff.

Budd's civil rights complaint alleged that conditions at ECJ fell below constitutional standards and that jailers were deliberately indifferent to his medical needs. The district court dismissed the suit for failure to state a cause of action.

On appeal, the Seventh Circuit held the complaint stated a claim as to the conditions at ECJ. The appellate court noted that Budd had attached two newspaper articles to his complaint in which Edgar County Sheriff Edward Motley was quoted describing the jail as not "livable" and violating "acceptable standards." The Court of Appeals said the unhygienic conditions described in Budd's complaint had been held to state a claim in other cases under the Fourteenth Amendment, as he was a pretrial detainee. Moreover, three doctors had told Budd that his infection was caused by unsanitary conditions at the jail, so the harm was not speculative. He also alleged the conditions at ECJ had traumatized him, and the Seventh Circuit found Budd's "exposure to psychological harm or a heightened risk of future injury" from being held at the jail was itself actionable.

Further, jails must meet minimal standards of habitability, such as adequate bedding and protection from cold. Allegations of overcrowding, lack of recreation and poor air circulation in combination likewise contribute to a conditions of confinement

claim. Having found that Budd stated such a claim, the appellate court concluded the lawsuit named the Sheriff in his official capacity and thus should be allowed to proceed.

Budd's medical claim, however, failed. The Court of Appeals noted that he was seen by a nurse as soon as he complained about his leg injury. He was also promptly taken to a hospital after contacting the Sheriff. Therefore, the district court's order was vacated in part and affirmed in part, and on remand the lower court was ordered to rule on Budd's motion for appointment of counsel. See: *Budd v. Motley*, 711 F.3d 840 (7th Cir. 2013).

Following remand, on September 4, 2013 the district court denied the defendants' Fed.R.Civ.P. 12(f) motion to strike portions of Budd's amended complaint. Those portions included "facts which tend to show that the Defendants were well aware of the deplorable conditions at the Edgar County Jail before, during, and after Plaintiff's injuries, but exhibited deliberate indifference to the jail's deplorable conditions." In denying the motion, the court found that the challenged portions of the amended complaint were relevant to Budd's claims against the county. See: *Budd v. Edgar County Sheriff's Office*, 2013 U.S. Dist. LEXIS 125823 (C.D. Ill. 2013).

On January 3, 2014, Budd accepted a Fed.R.Civ.P. Rule 68 offer of judgment by Edgar County and resolved his lawsuit for $7,501 in damages plus taxable court costs and attorney's fees. ◣

# Seventh Circuit Upholds FTCA Venue Transfer

The Seventh Circuit Court of Appeals has upheld the transfer of a former federal prisoner's negligence action from Illinois to Kansas.

Daniel Hudson relocated to Illinois following his release from a federal prison in Kansas. He filed a Federal Tort Claims Act (FTCA) suit in U.S. District Court in Illinois, alleging that Kansas medical staff had negligently misdiagnosed a blood clot in his leg.

The district court granted the defendants' motion to transfer the case to a federal court in Kansas pursuant to 28 U.S.C. § 1404(a), because the principal witnesses were located in Kansas and the per-judge caseload in that state was lighter than the caseload in Illinois.

Hudson then filed a mandamus petition with the Seventh Circuit, seeking to return venue to Illinois. He argued that he and five of his witnesses – including three treating physicians – resided in Illinois.

The Court of Appeals agreed that mandamus was the proper method to challenge the district court's transfer order: "The grant of the government's motion to transfer the case was an unappealable interlocutory order, but an unappealable order can in exceptional circumstances be reviewed by a mandamus proceeding. The grant of a motion to transfer is an appealing candidate for such review."

The appellate court found that "Although the question of transfer in this case is a close one, we cannot say that the district judge committed a clear error in holding that the defendants had made the required showing: More than two-thirds of the potential witnesses (12 out of 17) are either in Kansas, just across the border in Missouri, elsewhere in Missouri, or in California, which is closer to Kansas than it is to Illinois."

The Seventh Circuit further noted that "in our age of advanced electronic communication ... changes of venue motivated by concerns with travel inconvenience should be fewer than in the past." However, Hudson did "not argue against the transfer on the ground that the electronic revolution has erased the advantages that the Kansas venue would once undoubtedly have had under the facts of this case." Therefore, his mandamus petition was denied. See: *In re Hudson*, 710 F.3d 716 (7th Cir. 2013). ◣

### *Writing to Win*

Need to write better? *Writing to Win* will teach you the basics of how to compose clear and convincing written and oral legal arguments! 270 pages packed with solid, practical advice and tips.

$19.95 from PLN's Book Store!
See page 61 for more information.

## CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks. State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum). Free persons: $90.

*CLN,* PO Box 277, Rancho Cordova, CA 95741

**Incarcerated Entrepreneur Freight Agent Training Course 12 Module Training course takes you**  **through everything you will need to graduate and be a certified freight agent moving freight for commision.**
**Toll Free 1-877-238-9185**
**S.A.S.E. For more informationTo:**
**Lone Wolf Institute**
**1015 Townsend Dr. Pocahontas, AR 72455**
**Payment plans available from $25.00**
**lonewolfofarkansas@gmail.com**

# Alabama Sheriff Made Party on Counterclaim Alleging Prisoners Subjected to Sexual Abuse

THE ALABAMA SUPREME COURT HAS held that a third party to a lawsuit may be made a party when a counterclaim is filed. The Court also held a sheriff named as a defendant was not entitled to qualified immunity on a federal claim in her individual capacity, but was entitled to immunity on a federal official capacity claim and state law claims.

The case involved a lawsuit filed by Scott Cotney, an administrator at the Clay County Jail, against former jail guard Phillip E. Green and prisoners Anthony Haywood and Daniel Hall, alleging defamation, slander, libel, invasion of privacy, negligence and wantonness. The claims resulted from a report filed by Green, Haywood and Hall with the Alabama Department of Corrections, claiming that Cotney had used his position to sexually abuse or assault Haywood and Hall while they were held at the jail.

Haywood and Hall filed a counterclaim against Cotney for violations of their Fourth, Eighth and Fourteenth Amendment rights. They also filed counterclaims against the Clay County Commission and Sheriff Dorothy "Jean Dot" Alexander, in her official and individual capacities. They alleged Alexander "had knowledge of [Cotney's] unlawful acts ... and permitted the abuse to occur," and made the same claims against her as those against Cotney in addition to a claim of negligent supervision.

The counterclaims against the Commission were dismissed with Hall and Haywood's consent, and the circuit court granted Alexander's motion to dismiss without specifying its reasons for doing so. On appeal, the Alabama Supreme Court addressed the grounds in Sheriff Alexander's motion.

First, the Court held that Alexander could be made party to a counterclaim or cross-claim under Rules 13(h) and 20(a) of the Alabama Rules of Civil Procedure, and the circuit court's dismissal on that basis was error. Next, Haywood and Hall were convicted felons during at least part of the time the tortious conduct at the jail occurred, so dismissal of their Eighth Amendment claim also was erroneous.

The Supreme Court further found that Hall and Haywood alleged a causal connection between Sheriff Alexander and the deprivation of their Fourth Amendment rights related to strip searches, under a theory of supervisory liability; thus, she was not entitled to have the "claims against her dismissed on the basis that she cannot be held vicariously liable for the alleged violations."

Finally, the Court addressed immunity issues, holding that Alexander was entitled to immunity under Article I § 14 of the Alabama Constitution on state law claims in her individual and official capacities. It also held she was entitled to Eleventh Amendment sovereign immunity as to a federal official capacity claim.

However, Sheriff Alexander was not entitled to qualified immunity on a federal individual capacity claim at this stage of the proceedings, as Hall and Haywood had alleged sufficient facts to show her failure to act led to a violation of their rights. They also alleged the harm they suffered resulted from customs or policies attributable to Alexander.

The circuit court's order was therefore affirmed in part and reversed in part, and the case remanded. See: *Haywood v. Alexander,* 121 So.3d 972 (Ala. 2013). ◪

# Adverse Inference Instruction Required for New York Jail's Destruction of Video Evidence

THE NEW YORK COURT OF APPEALS has held that when a criminal defendant acts with due diligence to demand the preservation of evidence that is reasonably likely to be of material importance, and the evidence is destroyed by the state, the defendant is entitled to an adverse inference jury instruction.

Dayshawn P. Handy was charged with assaulting three deputy sheriffs at the Monroe County Jail. The first two assaults took place on November 8, 2006 and the third incident occurred on January 8, 2007. Handy was acquitted by a jury on counts one and three, but convicted on count two.

The count two assault charge involved an altercation with Deputy Brandon Saeva, who approached Handy in his cell after Handy returned from the shower. Saeva noticed that the boxers and sandals Handy was wearing were not "jail issue." According to Saeva, Handy refused to turn over the sandals and swung at him. They scuffled, and other deputies helped Saeva gain control of Handy.

Deputy Timothy Schiff testified that he assisted in subduing Handy after the altercation with Saeva. When he reached for Handy's right leg to control him, Schiff said Handy kicked back, injuring his thumb. Handy, however, testified that Saeva swung at him and then tackled him; he also claimed he never kicked at

the deputies. Handy was convicted of the assault charge involving Deputy Schiff, but not Saeva.

At issue was a video camera in the cell block that faced toward Handy's cell, but not "directly" toward it. Saeva viewed the video recorded on November 8. He said that since the camera showed "only a part of his doorway, but not much," the video captured a "very small part" of the incident. It was undisputed that the video was destroyed prior to trial.

Handy argued it was error for the trial court to refuse to charge the jury with an adverse inference instruction due to the missing video evidence with respect to the count two assault charge. The Court of Appeals agreed.

In response to the state's assertion that it was "merely speculative" that the video was exculpatory, the Court noted that such speculation was caused by the destruction of the video, and that requiring an adverse inference instruction would mitigate the harm to the defendant caused by the loss of evidence.

"We hold that when a defendant in a criminal case, acting with due diligence, demands evidence that is reasonably likely to be of material importance, and that evidence has been destroyed by the State, the defendant is entitled to an adverse inference charge," the Court wrote.

Moreover, the Court of Appeals said its ruling would increase the chances that prison and jail staff will take whatever steps are necessary to ensure that video evidence is not erased or destroyed when it is foreseeable an incident will lead to a criminal prosecution.

Accordingly, Handy's conviction was reversed and the case remanded for a new trial on the assault charge involving Deputy Schiff. See: *People v. Handy*, 20 N.Y.3d 663, 988 N.E.2d 879 (N.Y. 2013).

# Washington Jail Denied Good Time without Due Process; Rehearing Ordered

THE WASHINGTON COURT OF APPEALS held in an unpublished opinion that a prisoner was denied good time credits without adequate due process protections.

Allen Michael Knoll was held in the Skagit County jail between March 2011 and August 30, 2011, when he was transferred to the Washington Department of Corrections. One day prior to his transfer, jail officials notified Knoll that he would not receive any good time credits because he "had been the subject of over 40 incident reports and had been disciplined 10 times for both major and minor rule violations."

Knoll requested a hearing, contending that he had not been disciplined 10 times. The hearing was held five hours later and "the hearing officer upheld the denial of good time credit," finding that Knoll had been the subject of "43 reports, 10 disciplinary actions, and 2 instances of use of force" at the jail.

Knoll then filed a personal restraint petition, arguing that inadequate advance notice of the hearing and lack of specificity of the disciplinary actions deprived him of good time credits without due process.

The Court of Appeals accepted the state's concession that the jail's failure to provide Knoll with at least 24 hours to prepare for the hearing violated minimal due process requirements. The Court further found that "the notice provided only the number of incident reports and disciplinary actions. Without further identification or description of the disciplinary incidents at issue, the notice failed to provide sufficient information to enable Knoll to defend against the allegations."

However, following *In re PRP of Atwood*, 146 P.3d 1232 (Wash. Ct. App. 2006), the Court rejected Knoll's argument that restoration of good time credits was the proper remedy, as he had not lost previously-earned good time. Rather, he was only entitled to another hearing that comports with the minimal due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963 (1974).

"While it is true that Knoll is not entitled to litigate the underlying facts of his prior disciplinary incidents," the appellate court explained, "the existence of those disciplinary incidents must be established to support the denial of good time premised on the prior incidents." See: *In re PRP of Knoll*, 2013 Wash. App. LEXIS 498 (Wash. Ct. App. 2013) (unpublished).





# California County Not Liable for Misconduct of Jail Guard Not Acting within Scope of Employment

On April 3, 2013, the California Court of Appeal held that a county is not liable for damages arising out of the misconduct of one of its jail guards when such misconduct is deemed to be "purely personal" and thus not within the scope of the guard's employment.

In February 2005, Paul and Felicia Perry were injured in a car accident involving a vehicle owned by Alejandro Vital, who was then employed as a veteran jail guard by Fresno County. After the Perrys filed a personal injury suit against Vital, he became obligated to pay their medical bills resulting from the accident because his insurance company refused to cover those expenses.

Vital then embarked on a scheme designed to intimidate the Perrys into dropping their lawsuit. He accessed information about "dangerous inmates" through the jail's computer system, then sent them racially inflammatory and insulting letters in Paul Perry's name using his return address, hoping they would provoke the prisoners to retaliate against the Perrys.

Vital also wrote an anonymous letter to Fresno High School officials, accusing Perry, a coach, of once molesting a basketball player at the school.

An investigation led to Vital's eventual admission that he wrote the letters to the jail prisoners and to Fresno High School, as well as insulting letters to members of a street gang who, in response, said they would "do a drive-by" at the home of Paul Perry's 70-year-old mother.

Vital was fired by the county and criminally charged with identity theft, extortion and attempting to dissuade a witness from testifying. He entered a no contest plea to three felony counts and was sentenced in November 2006 to one year in jail. In court, he explained his actions by saying, "I just lost my mind."

The Perrys filed suit against Fresno County on the theory that under the doctrine of respondeat superior, an employer is liable for the torts of its employees when those torts are committed within the scope of their employment.

The trial court granted the county's motion for summary judgment, finding that Vital's actions were not within the scope of his duties as a jail guard.

The Court of Appeal affirmed, holding that although Vital's position at the jail gave him access to the information he needed to carry out his scheme, the act of writing and mailing fraudulent letters was "purely personal" and not within the scope of his employment. Thus, the county could not be held vicariously liable for his actions. See: *Perry v. County of Fresno*, 215 Cal.App.4th 94, 155 Cal.Rptr.3d 219 (Cal. App. 5th Dist. 2013), *rehearing denied, review denied.*

Additional source: *www.star-telegram.com*

# Texas Courts Examine Proof of Ability to Pay Probation Fees before Revocation

*by Matt Clarke*

In a November 14, 2012 opinion, the Texas Court of Criminal Appeals held prosecutors are not required to prove that a probationer was able to pay fees and fines when his probation was revoked due to nonpayment. The Court of Appeals reversed the probation revocation on remand, and the Court of Criminal Appeals granted discretionary review of that ruling in June 2013.

Raimond Kevon Gipson, who was serving a term of probation, failed to pay his fees and fines. He was required to pay a $500 fine, supervision fees, court costs, a pre-sentence investigation (PSI) fee, a $50 Crime Stoppers fee and $1,000 in attorney fees. [See article in this issue of *PLN* regarding Texas criminal court fees].

The state filed for revocation due to the nonpayment. Gipson pleaded "true" to failure to pay fees but contested other reasons for the revocation. At no time did the state claim he was able to pay the fees but willfully failed to do so; Gipson also did not raise the issue of inability to pay. The trial court revoked his probation and sentenced him to eight years in prison.

On appeal, Gipson claimed that the state's failure-to-pay statute, art. 42.12 § 21(c), Texas Code of Criminal Procedure, required the state to show that he was able to pay but willfully did not. He also claimed that *Bearden v. Georgia*, 461 U.S. 660 (1983) established a constitutional requirement that the state prove ability to pay before revoking his probation. The state maintained that by pleading true to the allegation, Gipson had waived any such claims.

Without addressing the state's procedural arguments the Court of Appeals reversed the trial court's order, holding that the failure-to-pay statute required the state to first prove ability to pay before revoking probation. The state petitioned the Texas Court of Criminal Appeals for discretionary review, which was granted.

The Court of Criminal Appeals held that the lower appellate court must first determine whether the alleged error had been preserved for review or waived by Gipson when he pleaded true to failure to pay fees. Because a plea of true normally waives any challenge to sufficiency of evidence of a probation revocation on appeal, this analysis must be performed within the framework of *Marlin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993), in which the Court of Criminal Appeals held that "certain requirements and prohibitions are absolute and ... certain rights must be implemented unless expressly waived."

Because it disagreed with the constitutional and statutory analysis of the appellate court, the Court of Criminal Appeals provided its own analysis.

The Court held that *Bearden* did not impose a duty on prosecutors to prove ability to pay; rather, it imposed a duty on the trial court to make an inquiry into ability to pay. The Court further held that the failure-to-pay statute did not cover two of the fees Gipson did not pay – the fees for Crime Stoppers and PSI. Therefore, if the Court of Appeals determines on remand that pleading true to failure to pay did not waive that issue for appellate review, it must decide whether Texas common law or the U.S. Constitution requires the prosecution to prove inability to pay prior to a probation revocation.

The judgment of the Court of Appeals was reversed and the case remanded to that court for further proceedings. See: *Gipson v. State*, 383 S.W.3d 152 (Tex. Crim. App. 2012).

Following remand, on March 13, 2013 the Court of Appeals again reversed the trial court's revocation of Gipson's probation. The appellate court found that "Generally, a defendant cannot challenge a revocation finding to which he pleaded 'true'"; however, "[i]n this case, the record is devoid of evidence showing that Gipson's failure to pay attorney's fees, community supervision fees, or court costs, including PSI and Crime Stoppers fees, was willful."

Therefore, the Court of Appeals held the trial court had abused its discretion by revoking Gipson's probation, which affected his substantial rights by subjecting him "to a prison sentence rather than continued community supervision." With respect to Gipson's argument that the trial court violated his due process rights, the appellate court found he had failed to preserve that issue for review because he did not raise it before the trial court. See: *Gipson v. State*, 395 S.W.3d 910 (Tex. App. 2013).

On June 26, 2013, the Texas Court of Criminal Appeals granted the state's petition for discretionary review, and a decision remains pending. 

# Second Circuit: Videoconference at Resentencing Violates Right to be Present

THE SECOND CIRCUIT COURT OF APPEALS has held that resentencing a defendant by videoconference violated his right to be present in court, and the government failed to satisfy its burden of establishing that the defendant knowingly and voluntarily waived his right to be present. Under the circumstances, however, the error was not prejudicial.

On November 1, 2000, alleged al Qaeda member Mamdouh Mahmud Salim was confined at the Metropolitan Correctional Center (MCC) in New York, awaiting trial on federal terrorism charges.

Salim and his cellmate, a co-defendant in the terrorism case, plotted "to take a guard's keys so that Salim could attack his lawyers in an attorney-inmate meeting room. Their goal was to force Salim's attorneys to withdraw their representation so that District Judge Sand, who was presiding over the terrorism case and previously had denied Salim's repeated requests for new lawyers, would have to grant substitute counsel."

As Salim was escorted to his cell from a meeting with his lawyers, under the guise of retrieving additional legal materials, Salim and his cellmate assaulted MCC guard Louis Pepe, stabbing him in the left eye with a sharpened plastic comb. Before he could attack his attorneys, however, Salim was overpowered by other guards.

"Pepe was severely injured. He lost his left eye, incurred reduced vision in his right eye, and suffered brain damage that left his right side partially paralyzed and interfered with other normal functions, including his ability to speak and write."

On April 3, 2002, Salim pleaded guilty to conspiracy to murder and attempted murder of a federal official for the attack on Pepe. He was initially sentenced to 384 months in prison, which was later reversed on appeal. See: *United States v. Salim*, 549 F.3d 67 (2d Cir. 2008), *cert. denied*.

The district court imposed the same sentence on remand and Salim again appealed. This time, the Second Circuit agreed with the government that a terrorism enhancement was appropriate, and thus vacated the sentence and remanded.

On August 31, 2010, the district court held a second resentencing hearing which Salim attended by videoconference. The court imposed a life sentence as a terrorism enhancement, and Salim appealed a third time. Among other issues, he argued that he had not voluntarily waived his right to be present at the hearing, because the waiver "was premised on his fear of abuse by correctional officers" who, he alleged, had previously beaten and spit on him when he was moved to another prison.

The Court of Appeals recognized that Salim had a right to be present at a sentencing hearing under "both the Constitution and Federal Rule of Criminal Procedure 43(a)(3)," which extended to resentencing. As a matter of first impression in that circuit, the appellate court held that the right to be present requires a defendant's physical presence and is not satisfied by appearing via videoconference.

The Second Circuit further found the district court had erred in determining that the government had satisfied its burden of proving that Salim knowingly and voluntarily waived his right to be present. The appellate court affirmed the district court's sentencing order, however, because "Salim has not explained why his absence might have altered his resentence, nor has he demonstrated that any error in his resentencing was so egregious as to warrant relief on plain error review." See: *United States v. Salim*, 690 F.3d 115 (2d Cir. 2012), *cert. denied*.

On January 9, 2014, Salim filed a motion to vacate under 28 U.S.C. 2255, which remains pending. 

---

## Law Office of
# TIMOTHY C. CHIANG-LIN, PLLC

Representing Individuals Sexually Abused in Washington State's Foster Care, Group Home, City, County Jail and Prison

**2155 112th Ave NE, Bellevue, WA 98004**

chiang-lin.com     **tim@chiang-lin.com**

# Pen Pals for Prisoners

Your ad on the Internet worldwide: One year for $9.95. Mail name & address for FREE order form or online:

**www.PrisonerPal.com**

PO Box 19689
Houston, TX 77224

# Eighth Circuit: Denial of Nominal Damages Jury Instruction was Improper

THE EIGHTH CIRCUIT COURT OF Appeals held on September 4, 2012 that a district court erred when it refused to give a nominal damages jury instruction in a lawsuit brought by a Missouri state prisoner. Another trial was held in June 2013 following remand, and the jury again ruled in favor of the defendant prison officials.

Missouri Department of Corrections (DOC) policy allows a prisoner to declare his cellmate an "enemy" and be removed from the cell if he fears for his safety. The prisoner is then placed on a restraint bench until a compatible cellmate is found, a single-person cell becomes available or the prisoner elects to return to the original cell. While on the restraint bench, bathroom breaks and small amounts of water are allowed but food is not provided per DOC policy.

Arthur E. Taylor, Jr., was confined at the maximum-security Jefferson County Correctional Center when he declared his cellmate an enemy and was removed from the cell on September 9, 2005.

Taylor was shackled to a metal restraint bench, where he remained until he was placed in a cell with a new cellmate on September 11. He was unable to sleep during the two days he was shackled to the restraint bench in an upright position. Therefore, once in the new cell, he slept through breakfast and lunch.

Later that day, Taylor declared his new cellmate an enemy and was returned to the bench. This time he remained on the restraint bench until the evening of September 14, 2005.

Again, pursuant to policy, Taylor was not fed while on the bench. He first ate again on the morning of September 15, 2005 after missing about twelve meals.

Taylor filed suit in federal court, alleging that the failure of prison officials to provide him with food violated the Eighth Amendment. The case proceeded to trial and the district court gave Taylor's requested excessive force jury instruction but refused to give his nominal damages instruction. The jury returned a verdict for the defendants, finding zero damages for Taylor.

The Eighth Circuit reversed, holding that "the district court abused its discretion in not submitting the requested nominal damages instruction to the jury."

The appellate court rejected the defendants' argument that the error was harmless, finding that "if the jury analyzed this element first and found no damages, it could not find excessive force." As such, "the lack of a nominal damages instruction had a probable effect on this verdict." Justice Kermit E. Bye issued a separate opinion that concurred in part and dissented in part. See: *Taylor v. Dormire*, 690 F.3d 898 (8th Cir. 2012).

Following remand, on May 14, 2013 the district court denied the defendants' motion for summary judgment in part and granted it in part, and denied Taylor's motion to amend his complaint to add a new defendant. See: *Taylor v. Dormire*, 2013 U.S. Dist. LEXIS 68062 (W.D. Mo. 2013).

The case went to another jury trial in June 2013, and the jury found in favor of the defendants on all counts. The district court denied Taylor's motion for a new trial and he filed an appeal, which remains pending. The Missouri DOC has since revised its policy related to feeding prisoners while they are on a restraint bench. ◀

# Taylor County, Texas Rarely Disciplines Jailers

COMPARED TO SCANDALS AT THE HARRIS County Jail in Houston – where guards have assaulted and had sex with prisoners, mistakenly released prisoners and abandoned their posts to play dominos [see: *PLN*, Sept. 2013, p.23] – problems at the Taylor County Jail in Abilene, Texas seem fairly tame.

According to news reports, 28 of 135 employees at the Taylor County jail were disciplined in the three years prior to 2012, but the disciplinary action was minor and the misconduct much less serious than at Harris County. None of the discipline resulted in termination.

Former Taylor County Sheriff Les Bruce had a three-tier approach to employee discipline. First, an employee was given a letter of counseling. If that didn't correct the problem, a letter of reprimand was issued. The last resort, termination, was reserved for when the letters did not have the desired effect of correcting errant behavior.

During the three-year period, two jail guards were reprimanded for "major booking errors." One received a letter of counseling after he was caught surfing the Internet on the job after having received repeated prior warnings.

Other deputies were reprimanded for sleeping while on the job or in connection with the escape of two prisoners. One received a letter of counseling after five incidents of verbally abusing prisoners within nine months. Another employee was reprimanded for making "several medication errors on numerous times."

One jailer didn't check on a noise coming from a cell block which turned out to be a prisoner banging his head against the walls and doors, injuring himself enough to bleed from a head wound. The same guard was later disciplined again for yelling at prisoners in a cell block who were threatening to riot if the air conditioner wasn't repaired, which allegedly caused the prisoners to become more aggressive.

Another jailer was reprimanded for releasing a prisoner a month early; the prisoner later turned himself in to complete his remaining sentence.

Repeated tardiness was also a problem among employees at the jail. Then-Sheriff Bruce noted that was a serious issue due to the need to maintain a mandatory guard-to-prisoner ratio at the facility.

"It's very important to have those jailers there to receive briefing notes during shift changes," he said. "They need to know what has been going on in that facility since they left."

So long as misconduct by Taylor County jail employees mainly involves yelling at prisoners, surfing the Internet and being late for work, though, such transgressions pale in comparison to problems at other jails where guards have sexually abused prisoners or beaten and tasered them – sometimes to death. ◀

Source: *www.correctionsone.com*

# D.C. Circuit Holds PLRA's Exhaustion Requirement Inapplicable to Former Prisoner

THE CIRCUIT COURT OF APPEALS FOR the District of Columbia has held that the administrative exhaustion requirement of the Prison Litigation Reform Act (PLRA) does not apply to suits filed by persons who are no longer incarcerated.

The lawsuit at issue, filed by former prisoner John B. Lesesne, alleged permanent, life-threatening injuries suffered while in the custody of the District of Columbia (D.C.) Department of Corrections (DOC). Lesesne was involved in an altercation on March 30, 2008 in which he was shot in the lower abdomen, causing neurological damage to his leg.

He was arrested and transported to a hospital where he remained in the custody of the D.C. Metropolitan Police for the next 48 hours. He was then taken into DOC custody but remained cuffed by his wrist and ankle to the hospital bed.

As a result of the injury to his leg, doctors prescribed physical and occupational therapies and directed Lesesne to walk in the hospital hallway. However, even after the doctors faxed their recommendations to the DOC, guards did not let Lesesne walk in the hallway and restrained movement of his injured leg.

When he was discharged from the hospital on April 8, 2008, guards forced Lesesne to walk to the transport vehicle in full restraints; he fell when guards attempted to lift him into the vehicle. Shortly after his arrival at the D.C. Jail infirmary, Lesesne was re-hospitalized due to signs of distress resulting from the transport.

He was diagnosed with having suffered a pulmonary embolism and placed in intensive care; once again, his leg was restrained to the bed. Lusesne was released from the hospital on April 21. Over the next four days, jail personnel failed to provide his prescribed medications, change his bandages or clean his gunshot wound and surgical incision. The failure to supply this medical care resulted in the wound becoming infected.

Lesesne was released from jail on April 25, 2008. Two years later he filed a pro se civil rights complaint, arguing that the DOC's failure to treat his medical needs resulted in permanent, life-threatening injuries which require expensive therapeutic care, prescription drugs and constant pain management, as well as pain, suffering and emotional distress.

The district court granted the District of Columbia's motion for summary judgment on grounds that Lesesne had failed to exhaust administrative remedies at the D.C. Jail as required by the PLRA. The D.C. Court of Appeals joined its sister circuits in holding that the PLRA's exhaustion requirement did not apply to Lesesne because he was not confined when he filed his lawsuit, even though he had failed to make that argument before the district court. See: *Lesesne v. Doe*, 712 F.3d 584 (D.C. Cir. 2013).



# *Stamps for* CASH!

*Great Goods will buy your stamps!*

**70%** of Face Value: *Complete books or sheets of Forever Stamps*

**65%** of Face Value: Complete books, sheets, or rolls of 45-cent stamps

**60%** of Face Value: Complete books or sheets of high denomination stamps above 45-cent

**Payment sent within 24 hours of receipt.**



WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor.  Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps.  • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

# GREAT GOODS

**PO Box 399, West Chesterfield NH 03466**
**www.greatgoods.org**

STAMPS © USPS. ALL RIGHTS RESERVED.

# Michigan Parole and Probation Supervision Scrutinized; Three Officials Fired

The failure to properly supervise parolees and probationers accused of committing high-profile murders has resulted in the firing of three Michigan Department of Corrections (MDOC) employees. The MDOC supervises around 20,000 parolees and 50,000 probationers.

"Our parole/probation staff performs critical functions that are vital to ensuring public safety," MDOC director Daniel H. Heyns said in a written statement to the *Detroit Free Press*. "The overwhelming majority of these employees do excellent work and help to make our communities safer."

The burden on those employees has increased in recent years as the MDOC overhauled its parole system to release more prisoners as a result of budget reductions. The changes resulted in a decreased prison population, saving the MDOC millions of dollars and allowing it to close several facilities. [See: *PLN*, June 2010, p.13; April 2009, p.1].

However, three incidents led to scrutiny as to how the MDOC is supervising parolees and probationers. The first involved the robbery and brutal murder of Nancy Dailey, 80, in her Royal Oak home on November 20, 2011. She was discovered with her hands bound and her throat slit.

Alan Wood, 49, and Tonia Watson, 40, were charged with first-degree murder for killing Dailey; both were on parole, and a condition of their parole prohibited them from associating with each other. A *Free Press* investigation found that MDOC employees had failed to violate their parole despite knowing they were associating with each other and were suspected of committing new crimes.

The parole agent supervising Wood was fired and the agent supervising Watson received a 30-day suspension. UAW, the union that represents Michigan state employees, blamed the parole agents' supervisors. "It was management who cut Alan Wood free," said UAW representative Rick Michael, a veteran probation officer. "No agent can send a probationer or parolee back to prison without management approval. This agent went to her supervisors, and they're the ones who said 'Set him free.'"

Wood went to trial in January 2013.

He was found guilty of first-degree murder, felony murder, larceny in a building and illegal use of a financial transaction device. He received a mandatory life sentence the following month, telling the judge to "just get on with the sentencing and stop your preaching." Tonia Watson pleaded guilty, testified against Wood and was sentenced to 23 to 80 years in prison.

The second incident involving supervision errors by MDOC officials was the January 31, 2012 murder of 12-year-old Kadejah Davis-Talton, who was shot through the door of her home as the result of an argument over a cell phone. Joshua Brown, 19, was charged with her murder.

In September 2010, Brown had been placed on probation for drug and home invasion convictions. The judge ordered him to wear an electronic monitor but his probation agent never activated the device. Four months before Davis-Talton's murder, Brown was a suspect in an armed home invasion; his probation agent was aware of the incident and wrote a report to the judge, but it was unclear whether the report was ever sent or received.

Brown's probation agent and the agent's supervisor were later fired. Michael said the agent was working to get Brown a landline phone when Davis-Talton was shot. "First of all, they have to have a telephone; we can't hook them up without one, and he was working on it," Michael stated. "He is a very good agent, and his supervisor was aware of what was going on."

On January 7, 2014, almost two years after fatally shooting Davis-Talton and following an initial mistrial, Brown was sentenced to 24 to 50 years for second-degree murder, 14 to 30 years for assault with intent to murder to be served concurrently, and two years for using a firearm during a felony.

The third incident involving MDOC officials occurred after Tucker Cipriano, 19, was placed on probation following his February 2012 release from jail on drug charges. Cipriano and a friend attacked his adoptive family with a baseball bat on April 16, 2012, bludgeoning his father to death and leaving his mother and brother in critical condition.

An MDOC probation agent was placed on paid leave for losing track of Cipriano after he failed to show up for an April 5 meeting with the agent. A *Free Press* source said MDOC officials had trouble keeping up with Cipriano, who claimed he was homeless and staying in motels.

Cipriano pleaded no contest to felony murder and was sentenced in July 2013 to life without parole for killing his adoptive father. His co-defendant, Mitchell Young, also received a sentence of life without parole.

Michael said the blame for inadequate monitoring of parolees and probationers falls upon the MDOC and its management. "I believe that the union will be able to prove that there is a double standard in MDOC and that management is not capable of policing themselves," he stated. "There is a double standard – one for the agent and one for the manager – and when something goes wrong due to some shortcoming with MDOC, the agents are always blamed."

The MDOC, in turn, said it was taking action to increase supervision of parolees and probationers.

"The governor has made it clear that the level of violence in southeast Michigan, Flint and Saginaw is unacceptable. The Michigan Department of Corrections has a role to play in reducing that violence," said MDOC director Heyns. "I am putting measures in place that will improve supervision of parolees and probationers throughout Michigan. The restructuring of Ryan Correctional Facility to provide more custody beds for parole violators, aggressively going after absconders, embedding parole officers into police departments and auditing case loads are examples of some changes we are making that I believe will enhance public safety."

Sources: *Detroit Free Press, www.theoaklandpress.com, Huffington Post*

***Hepatitis & Liver Disease: A Guide to Treating & Living with Hepatitis & Liver Disease***
Revised ed. By Dr. Melissa Palmer
See page 61 for more information.



**The Habeas Citebook: Ineffective Assistance of Counsel**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

**$49.95**

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



**Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition**
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

**$49.95**

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



**Prisoners' Self-Help Litigation Manual, 4th Edition**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

**$45.95**

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook,
Ineffective Assistance of Counsel
$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
(3rd edition)
$49.95

☐ Prisoners' Self-Help
Litigation Manual
(4th edition)
$45.95

*Shipping included in all prices*

**Order by mail, phone, or on-line.**   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State ___ ZIP _____

PUBLISHED BY
**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 1151 • Lake Worth, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

# The Federal Tort Claims Act: A Primer

*by Derek Gilna*

THE FEDERAL TORT CLAIMS ACT (FTCA) is outlined in various sections of Chapter 28 of the United States Code, which describe the steps necessary to file and maintain a tort action against the U.S. government.

The FTCA is the exclusive remedy for monetary damages for injuries "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

This means that the FTCA is only available to address acts or omissions by federal employees that constitute torts under state law. Constitutional violations are not actionable under the FTCA unless they are also torts. For example, deliberate indifference to serious medical needs, which is a constitutional violation under the Eighth Amendment, may also constitute the torts of medical malpractice or negligence.

The FTCA constitutes a limited waiver of the United States' sovereign immunity, allowing claimants to sue the federal government; however, the FTCA does not apply to acts by federal employees that are outside the scope of their employment.

FTCA suits should not be confused with § 1983 actions, commonly known as civil rights complaints, which apply to defendants acting under color of state – not federal – law. FTCA claims are also distinguishable from *Bivens* claims brought under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), which provides a private action for monetary damages against federal officials who commit constitutional violations.

Failure to follow the requirements for FTCA claims may lead to dismissal, with prejudice, at an early stage of the proceeding – thereby preventing any recovery even for serious personal injuries and financial losses.

The most significant hurdles to be cleared to prevent an early dismissal of an FTCA action include the exhaustion of administrative remedies and detailed notice requirements. The FTCA administrative process must be exhausted prior to filing an FTCA complaint, which is subject to dismissal on jurisdictional grounds if the claimant has failed to exhaust such remedies. See: *Plyler v. United States*, 900 F.2d 41 (4th Cir. 1990). Note that the administrative process, described below, is separate and distinct from the Bureau of Prisons' grievance procedure, and that filing a grievance (i.e., a Form BP-9) does not satisfy FTCA administrative exhaustion requirements.

FTCA claims involve an administrative process in which notice is presented to a federal agency, then a separate complaint (lawsuit) is filed in federal court if the agency fails to resolve the claim administratively.

According to the FTCA, notices must be written and directed to the appropriate federal agency that the claimant asserts is responsible for wrongdoing. U.S.C. § 2675(a). The notice must provide the agency with sufficient information so it can carry out an investigation to ascertain its potential liability. The usual form of notice is Standard Form 95 (SF-95), but claimants are not required to use that form.

The written notice does not have to assert all elements of the cause of action (i.e., all of the legal requirements for stating a claim), but a claimant's suit may be brought only on those facts and theories of liability raised in the administrative notice. See: *Williams v. United States*, 932 F.Supp. 357 (D.D.C. 1996). In other words, a claimant should err on the side of caution by including all facts and supporting information in the notice, to avoid possible dismissal of the complaint if the agency fails to settle the matter administratively. See: *Bembenista v. United States*, 866 F.2d 493 (D.C. Cir. 1989).

Claimants also must request a sum certain, and their potential for recovery will be limited to no more than the amount requested. 28 C.F.R. § 14.2(a). "Failure to have specified a sum certain at the administrative stage is a defect that deprives the court of subject matter jurisdiction over the action." See: *Ahmed v. United States*, 30 F.2d 514 (4th Cir. 1994); *Kokotis v. U.S. Postal Service*, 223 F.3d 275 (4th Cir. 2000); 28 U.S.C. § 2675(b). A sum certain means a specified dollar amount.

Claimants under the FTCA must sign their notices or have them signed by their attorneys or legal representatives. If someone signs in their representative capacity, "evidence of the representative's authority to sign ... must be shown." 28 C.F.R. § 14.3(e); *Kanar v. United States*, 118 F.3d 527 (11th Cir. 1997). For example, if the representative has a prisoner's power of attorney, a copy of the notarized power of attorney should be submitted with the notice. Failure to do so may result in dismissal of the claim, though some circuits are split on that issue.

The claimant must present written notice of the claim to the correct federal agency, such as on SF-95, and obtain proof that it was presented. 28 U.S.C. § 2675(a). Written notice is effective on the date it is received by the agency, not the date of mailing. 28 C.F.R. § 14.2(a). The claimant should attempt to ascertain the correct agency whose employees' acts or omissions were the proximate cause of his injuries, and submit the notice to that agency. However, if the claimant inadvertently notices the wrong agency, the agency that received the notice "must transfer the claim forthwith to the appropriate agency and notify the claimant of the transfer." 28 C.F.R. § 14.2(b)(1).

Further, the claimant bears the burden of presenting written notice of his claim prior to the expiration of the statute of limitations. FTCA claims will be barred if they are not presented in writing to the correct federal agency within two years of the accrual of the claimant's cause of action. 28 U.S.C. § 2401(b).

After the presentation of notice of the claim, the claimant cannot file an FTCA complaint in federal court until the agency receiving the notice has had the claim for six months, and the federal court lacks subject matter jurisdiction until the six-month period has expired or the agency has issued a final denial of the claim. See: *McNeil v. United States*, 113 S.Ct. 1980 (1993). If the agency denies the claim, the claimant must file a complaint in federal court within six months of the date of the denial.

With respect to venue for filing FTCA

complaints, the proper venue is the district where the claimant resides or where the act or omission occurred. 28 U.S.C. § 1402(b). The substantive law of the state in which the act or omission occurred is the controlling authority for FTCA claims, and the government's liability is "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 1346(b), 28 U.S.C. § 2674. In some cases, state law presuit notice or expert report requirements may apply, such as in medical malpractice or negligence cases.

If state law does not permit recovery for certain types of tort claims, an FTCA complaint filed in that jurisdiction likewise will be barred from recovery. Further, South Carolina attorney Joe Griffith has noted that district courts are increasingly enforcing state-imposed damages caps in FTCA cases.

When filing an FTCA complaint, the complaint and summons are served on both the Attorney General in Washington, D.C. and the U.S. Attorney's Office for the district in which the lawsuit is filed.

FTCA trials are held before a district court judge, not a jury; relief may only take the form of monetary damages, and equitable relief is not available. Damages may not exceed the sum certain specified in the administrative claim unless "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency." See: 28 U.S.C. § 2675(b); *Cole v. United States*, 861 F.2d 1261 (11th Cir. 1988). Punitive damages and prejudgment interest are not allowable under the FTCA. 28 U.S.C. § 2674.

The United States – not federal departments, agencies or individual employees – is the only proper defendant in an FTCA claim. 28 U.S.C. § 2679. The alleged tortfeasor must be a federal employee acting within the course and scope of his or her federal employment, and must not be an independent contractor. 28 U.S.C. § 1346(b) (1), 2675, 2672, 2679 and 2671. Thus, for example, federal prisoners held at a facility operated by a private contractor, such as CCA or GEO Group, cannot file an FTCA claim against the company or its employees, as they are not federal employees.

The Supreme Court has held that a suit against the United States under the FTCA is the exclusive remedy for claims arising from medical treatment and related func-

tions provided by Public Health Service (PHS) employees acting within the scope of their employment. See: *Hui v. Castaneda*, 559 U.S. 799 (2010) [*PLN*, Oct. 2010, p.44]. PHS employees provide medical care in some Bureau of Prisons and immigration detention facilities.

Further, compensation from the Federal Prison Industries Fund (18 U.S.C. § 4126) is the exclusive source of compensation available for an injury sustained by a prisoner in connection with work activities at a federal prison. See: *Vander v. U.S. Dept. of Justice*, 268 F.3d 661 (9th Cir. 2001).

FTCA claims concerning government policy decisions are barred by the discretionary function exception – i.e., acts or omissions of federal employees related to a "discretionary function or duty" – as are certain intentional torts. In general, only claims of negligence are covered by the FTCA rather than intentional misconduct. The discretionary function exception applies even when decisions are intentionally or negligently made, or the discretion is abused. See: *United States v. Gaubert*, 499 U.S. 315 (1911).

However, the intentional acts or omissions of an "investigative or law enforcement officer," including but not limited to assault, battery, false arrest, false imprisonment, abuse of process and malicious prosecution, are covered by the FTCA and may proceed. 28 U.S.C. § 2680(h); *Millbrook v. United States*, 133 S.Ct. 1441 (2013) (involving FTCA claims against Bureau of Prisons employees) [*PLN*, June 2013, p.28].

Lastly, attorneys are prohibited from receiving fees in FTCA cases that exceed 20% of an administrative settlement or 25% of a judgment or compromise settlement after a complaint is filed. 28 U.S.C. § 2678. ◼

*Editor's Note*: This article provides a brief introduction to the FTCA and FTCA claims. As the law is constantly changing, claimants who plan to file FTCA claims or complaints should research the most recent case law related to such actions. Special thanks to attorney John Boston for reviewing this article.

Sources: "*The Basics of the Federal Tort Claims Act*," by Joseph P. Griffith, Esq. (www.joegriffith.com); www.usphs.gov; www.justice.org; www.nolo.com; www.washingtonpost.com

## △△ NOLO



### Nolo's Plain-English Law Dictionary

$29.99

Order from

**Prison Legal News**

P.O. Box 1151
Lake Worth, FL 33460
561-360-2523
Add $6 shipping for orders under $50

**www.prisonlegalnews.org**



### Save on Prescription Eyeglasses & Shades

Send for a **FREE** Catalog
Money Back Guarantee

### Prism Optical, Inc.
**10954 NW 7th Ave**
**Dept: LN0314**
**Miami, FL 33168**

Inquiries from Friends
and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

# Psst! Hey Man, Need Some Execution Drugs?

Officials in Delaware and 31 other states that use lethal injection to execute prisoners are scrambling to find new drugs to carry out death sentences, and in some cases are procuring them through secret exchanges and confidential deals – and from questionable sources.

Emails obtained by the Associated Press (AP) revealed how the head of Delaware's Department of Correction enlisted a drugstore owner-turned-bureaucrat to acquire pentobarbital, the sedative component of the state's new three-drug execution protocol since production of sodium thiopental ceased in the U.S. in early 2011. [See: *PLN*, June 2011, p.1].

Delaware DOC Commissioner Carl Danberg reached out to Alan Levin, the state's economic development director, knowing that Levin used to own the Happy Harry's drugstore chain, which he sold in 2006 before becoming a state official. Aware that Levin had spent more than a decade cultivating connections in the pharmaceutical industry, Danberg asked him to make a few calls.

According to the emails obtained by the AP, in May 2011, Levin contacted Mike Kaufmann, CEO of the pharmaceutical division of Cardinal Health, one of the largest wholesale distributors of prescription drugs in the United States.

"While I know this is a bit of a political issue, since Cardinal is not located in Delaware, I believed it may be easier for Cardinal to do this," Levin wrote to Kaufmann. "Is [pentobarbital] something that Cardinal would be interested in selling to the state of Delaware? If not, do you have any recommendations who else we can pursue?"

Once Levin hooked up Danberg with his connection at Cardinal, "things fell into place," Danberg told the AP.

Officials said the drugs that Cardinal shipped to the Delaware DOC in June 2011 – including pentobarbital, pancuronium bromide and potassium chloride – were enough to last for several executions, beginning with Shannon Johnson, a convicted murderer who was put to death by lethal injection in April 2012.

Levin told the AP that he was "happy to help facilitate" the process of acquiring the drugs, but that he, Danberg and other state officials worked hard to conceal the process so as not to jeopardize the possibil-ity of getting more drugs in the future.

"I did not want it getting outside the smallest number of people as possible how we were pursuing the chemicals because I wanted to make sure we had a supply of the chemicals first," Danberg said, candidly. "I did not want the supplier of the chemicals to go public, to be publicly known, simply because I did not want that source to dry up."

Executions in many states have been halted or postponed due to concerns that replacement execution drugs do not meet the constitutional prohibition against cruel and unusual punishment, as they may result in pain and suffering. In addition, death row prisoners and advocacy groups have filed a flurry of lawsuits stemming from states' efforts to find alternative sources for the drugs.

Some states have turned to compounding pharmacies to obtain execution drugs that are no longer available from manufacturers. Compounding pharmacies typically custom blend small amounts of specific drugs, but are not regulated by the federal government and the safety or effectiveness of the drugs is not verified by the U.S. Food and Drug Administration. A compounding pharmacy in Massachusetts was linked to an outbreak of fungal meningitis in October 2012 that resulted in over 60 deaths due to contaminated medication.

Three death row prisoners in Texas, the state with the highest number of executions, are challenging the state's plan to use a drug obtained from a compounding pharmacy.

"Use of compounded pentobarbital would constitute a significant change in the lethal injection protocol, a change that adds an unacceptable risk of pain, suffering and harm to the plaintiffs if and when they are executed," their lawsuit contends.

Medical experts note that compounded drugs carry a high risk of contamination and could subject prisoners to excruciating pain, which one expert compared to rubbing sandpaper on an open wound.

Further, a separate civil complaint filed in federal court in October 2013 alleges that officials with the Texas Department of Criminal Justice (TDCJ) submitted falsified prescriptions for pentobarbital to Woodlands Pharmacy, a compounding pharmacy in Houston, and used an individual employee's credit card to buy the drug instead of a state purchasing order.

Prison officials had previously tried to obtain pentobarbital using the name of the "Huntsville Unit Hospital," even though the Huntsville Unit, which houses the state's execution chamber, hasn't had a functional hospital for more than two decades.

"We believe that TDCJ's purchase of compounded pentobarbital from Woodlands Pharmacy violates numerous state laws," said Maurie Levin, one of the attorneys representing death row prisoners in the lawsuit. "The vast majority of compounded drugs can only be mixed or sold pursuant to a doctor's prescription. TDCJ did not get a prescription for its purchase of compounded drugs. There are exceptions to the requirement, but TDCJ's purchase does not qualify for any of them."

The pharmacy demanded that state officials return the pentobarbital, but they refused.

"The states are scrambling to find the drugs," noted Richard Dieter, who heads the Death Penalty Information Center. "They want to carry out these executions that they have scheduled, but they don't have the drugs and they're changing and trying new procedures never used before in the history of executions."

As a result, unpredictable things can happen with new, largely untested lethal injection drugs. One example was the October 15, 2013 execution of Florida prisoner William Happ, who was put to death for the 1986 rape and murder of 21-year-old Angela Crowley. Happ was injected with the sedative midazolam hydrochloride, the first-ever use of that drug to execute a prisoner in the United States. The drug, known commercially as Versed, was part of a three-drug protocol.

According to the Associated Press, Happ's execution lasted twice as long as it would have had pentobarbital been used; it took 16 minutes before Happ was declared dead, and he "remained conscious longer and made more body movements than other people executed recently by lethal injection."

The execution prompted seven Florida death row prisoners to file a federal lawsuit challenging the "Midazolam Protocol" used by the Florida Department of Corrections.

"We don't even know if the new drug

[midazolam] is working or not," said Dieter. "Everything is a bit of an experiment with a human subject. If this were ordinary medicine, that would not be allowed, but this is the death penalty and that's how it goes."

As another example, when Michael Lee Wilson, 38, was executed in Oklahoma on January 9, 2014 by lethal injection, which included pentobarbital and a combination of other drugs, his final words were: "I feel my whole body burning."

In Ohio, the planned November 2013 execution of Ronald Phillips was put on hold due to concerns about the use of a combination of midazolam and hydromorphone, a powerful painkiller.

"We really don't know what the effect of using this drug cocktail will be, and that's the really scary thing," said Mike Brickner of the American Civil Liberties Union of Ohio. "What we are proposing is basically experimenting on human beings."

This was the third time Ohio prison officials had changed their lethal injection drugs since 2009; previously, the state had used sodium thiopental and then pentobarbital when the former drug was no longer available.

"We don't know how these drugs are going to react because they've never been used to kill someone," said Fordham University law professor Deborah Denno, an expert on lethal injections. "It's like when you wonder what you're going to be eating tonight and you go home and root through your refrigerator to see what's there. That's what these departments of corrections are doing with these drugs."

"You're basically relying on the toxic side effects to kill people while guessing at what levels that occurs," explained Professor Jonathan Groner at the Ohio State University College of Medicine. He said there are no guidelines for giving a lethal dose of hydromorphone because the drug is not designed to kill. An overdose could cause the prisoner to experience symptoms such as an extreme burning sensation, muscle pain or spasms, seizures, hallucination and vomiting, Groner said.

Ohio prisoner Dennis McGuire, 53, was executed on January 16, 2014 with an injection of midazolam and hydromorphone. According to news reports it took McGuire around 25 minutes to die; he struggled to breath, tensed his body and made snoring sounds. His family has since filed a lawsuit in federal court over his prolonged death, while prison officials claimed that McGuire's attorney coached him to fake that he was suffocating during the execution.

Hospira, Inc., the manufacturer that produces midazolam and hydromorphone, announced in February 2014 that it opposes using the drugs in lethal injections. "Hospira makes its products to enhance and save the lives of the patients we serve, and, therefore, we have always publicly objected to the use of any of our products in capital punishment," the company stated. Ohio prison officials had obtained the drugs produced by Hospira from McKesson, a pharmaceutical distributor based in San Francisco.

Legal challenges have halted scheduled executions in several states, including California, Missouri, Georgia, North Carolina, Pennsylvania and Colorado.

In October 2013, Missouri announced that it would use pentobarbital obtained from a compounding pharmacy. That announcement followed the Missouri DOC's decision to return vials of propofol it had planned to use for lethal injections to Morris & Dickson, the company that had supplied the drug. Morris & Dickson had sold the propofol to the DOC in violation of its agreement with the German manufacturer, Fresenius Kabi, which prohibits the drug's use in executions.

At least one execution in Missouri was postponed pending the switch to pentobarbital, and in February 2014 a compounding pharmacy in Oklahoma, the Apothecary Shoppe, agreed to not sell the drug to the Missouri DOC. Previously, prison officials had paid the pharmacy $8,000 in cash for each dose of pentobarbital.

California abandoned plans to use a three-drug execution protocol in July 2013, and instead indicated it would use a single-drug method. The state has not had an execution since 2006, largely due to legal challenges to its lethal injection procedures.

Oklahoma prison officials reportedly used petty cash accounts to buy lethal injection drugs, including an account used to purchase bus tickets for released prisoners, in order to minimize the paper trail and avoid identifying the supplier of the drugs. Other states likewise have tried to prevent the disclosure of their sources for obtaining execution drugs.

"There is absolute chaos among the states," said Professor Denno. "So, every few months it seems we see a different state using a different type of drug, or types of drugs."

"Recent restrictions imposed by pharmaceutical companies and the Food and Drug Administration make procuring these drugs challenging. We must ensure that individuals facing the death penalty are afforded certain guaranteed rights of due process before a state proceeds with an execution," stated Colorado Governor John Hickenlooper.

The Denmark-based drug manufacturer Lundbeck, which holds the sole license to produce pentobarbital for the United States, told prison officials as early as January 2011 that the drug was not intended for lethal injections and asked for its use in executions to cease.

Many states then turned to propofol instead, but the European Union, which opposes the death penalty, threatened to restrict shipments of the drug to the U.S. if it was used in executions. Propofol is a common anesthetic widely used by hospitals, and import restrictions would potentially impact patient health and safety.

"Our system is completely broken, and I don't know how to say it more bluntly than that," said Arkansas Attorney General Dustin McDaniel. "It's a complete impossibility. I can no more flap my arms and fly across the state than I can carry out an execution."

Some states have considered abandoning lethal injection and returning to more traditional forms of capital punishment. For example, a bill to permit firing squads was introduced in Wyoming, though the state senate voted on February 11, 2014 not to consider the legislation. A similar bill has been introduced in Missouri, while lawmakers in several other states, including Virginia, Louisiana and Tennessee, have proposed reinstating the use of the electric chair.

Sources: *Associated Press, www.delawareonline.com, www.deathpenaltyinfo.org, www.allgov.com, www.correctionsone.com, www.correctionalnews.com, www.motherjones.com, The Gainesville Sun, New York Times, CNN, National Journal, Los Angeles Times, KUOW Radio, The Raleigh News & Observer, www.cleveland.com, TIME, www.abcnews.go.com, www.mercurynews.com, Washington Post, www.nola.com*

# A Rare Look Inside the Maine State Prison's "Supermax"
## An almost-clean version of hell

### by Lance Tapley

THERE WAS A STAIN OF WHAT LOOKED like blood on the floor of the otherwise shiny-clean, empty Mental Health Unit isolation cell. "It's Kool-Aid," said my minder, a deputy warden. He smiled. But, as the saying goes, I hadn't drunk the Kool-Aid.

The cell faintly stank of shit. Mentally ill prisoners and those made mentally ill by prolonged solitary confinement are driven to cut themselves and to try to throw their feces at guards.

In one of the Administrative Segregation cellblocks – pure solitary confinement – I heard undulating cries and saw shadowy faces behind the steel doors' tiny windows.

The Maine State Prison "supermax," or Special Management Unit, is an ugly place. Are my photos ugly enough? Trying to fit form to content, I used an old film camera and grainy-image-producing 400-speed, black-and-white film shot usually without a flash under fluorescent lights. There were big limitations. I was not supposed to photograph prisoners, and my tour was rapid. That said, I was, possibly, the first journalist to visit and photograph the supermax – after eight years of writing about it.

Super-harsh supermax (super-maximum-security) prisons and their central feature of solitary confinement became a correctional craze 30 years ago. They became dumping grounds for the mentally ill and others who couldn't follow prison rules or who simply irritated guards. At least 80,000 human beings are held in them nationwide. Maine opened its supermax in the coastal town of Warren in 1992. Ten years later it built the new state prison around it.

The supermax's unforgiving conditions are not helpful, to put it mildly, in improving prisoner behavior. The evidence is overwhelming, in fact, that protracted solitary confinement damages or destroys prisoners' minds. Human rights groups consider it torture. And it costs taxpayers twice as much as "general population" incarceration.

Maine corrections commissioner Jo-seph Ponte has reduced the typical number of prisoners in isolation from close to 100 to 40 or so in a 900-man prison. Of the supermax's four cellblocks or "pods," two, of Administrative Segregation, have 50 cells each, and one is now empty. The Mental Health Unit, where solitary confinement has never been total, has two pods of 16 cells each, one for "acute" prisoners, one for "stabilization." Together they held 17 men the day I was there.

Stays in the supermax also are much shorter now, and there's a lot less prisoner "cutting up" and fewer brutal cell "extractions" by guards to tie prisoners into the restraint chair. For his reforms, Ponte has deservedly received national attention, helping fuel a still-weak movement to limit solitary confinement.

But the Maine supermax is still there, and it's still grim. While 40 prisoners may not sound like many, it's the total, according to one report, that England and Wales, with 56 million inhabitants, keep in isolation – isolation less severe than in American supermaxes.

And the supermax is part of a prison from which I receive constant reports of guard cruelty, inadequate medical care, understaffing, deliberate mixing of predators and the vulnerable, and – currently – turmoil because scores more men are being forced to double-bunk. Corrections says the double-bunking is being done for proper "classification" of prisoners. Critics suspect it's being done to save money.

It's hard to uncover the truth of what goes on in prisons. Prisoners are always unhappy, prisons are rumor mills and corrections officials are tight-lipped. But the reports I get are consistent.

I wasn't supposed to interview prisoners, but in the Mental Health Unit a short, meek-looking prisoner, James Brensinger, handed me a typed essay describing his incessant cutting up (he showed me deep scars on his arms), suicide attempts, hallucinations and the medical staff's failure to deal with his condition. It ends: "I am begging someone to please hear my pleas and cries."

In the other part of the unit, seven prisoners, some seemingly heavily doped, watched a TV high on a wall. I asked an alert young man how prisoners occupied themselves there. He silently pointed to the TV. Then, he remarked, referring to the cellblock: "Our mental health unit without mental health."

Here – to the supermax's Mental Health Unit – is where Republican Governor Paul LePage and the Democratic legislature recently decided to send violence-prone patients from the state's chief psychiatric hospital, Riverview, in Augusta. Unconvicted jail prisoners whom the courts have concluded should be examined for their sanity – people presumably innocent until proven guilty – will also be sent to this prison unit. Twenty more cells will be opened.

There's individual insanity, and there's social insanity. The writer Hannah Arendt famously coined the phrase "the banality of evil" to describe Nazi bureaucrat Adolf Eichmann, a "normal" man who sat at his desk and calmly signed papers that sent millions of Jews to their death.

The Maine State Prison's supermax, with its polished floors only a little stained with blood and, while I was there, with its tranquility only occasionally interrupted by a prisoner's muffled cries, is, to me, a physical manifestation of the banality of evil. "A clean version of hell," as a former prison warden described another supermax.

To be more compassionate toward its creators, however – to be less like those who defend this uniquely American form of mass torture – I should discard a word like "evil" and describe the supermax as a manifestation of social insanity, of a sick society.

"It's just crazy, this whole place," the young man in the Mental Health Unit told me.

*This article was originally published by The Portland Phoenix (http://portland.thephoenix.com) on November 8, 2013; it is reprinted with permission of the author.*

*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - ONLY $20!

+ $3.99 p&h

"BEST DEAL ON THE POUND!"

Check your **5** magazines
and underline three backup choices (in case of unavailability)

☐ 4 WHEEL DRIVE & SPORT UTILITY (12)
☐ ALLURE (12)
☐ AMERICAN PHOTO (6)
☐ ARTHRITIS TODAY (6)
☐ AUTOMOBILE (12)
☐ BACKPACKER (9)
☐ BETTER HOMES & GARDENS (12)
☐ BICYCLING (11)
☐ BLACK ENTERPRISE (12)
☐ BOATING (10)
☐ BON APPETIT (12)
☐ BOWHUNT AMERICA (6)
☐ BOWHUNTING WORLD (9)
☐ BRIDAL GUIDE (6)
☐ CABELA'S OUTFITTER JOURNAL (6)
☐ CAR & DRIVER (12)
☐ CAR CRAFT (12)
☐ CBS WATCH! MAGAZINE (6)
☐ CHARISMA (12)
☐ CHEVY HIGH PERFORMANCE (12)
☐ CIRCLE TRACK (12)
☐ COMPLEX MAGAZINE (6)
☐ CONDE NAST TRAVELER (12)
☐ CRUISING WORLD (12)
☐ CYCLE WORLD (12)
☐ DETAILS - FASHION (10)
☐ DETROIT HOME (6)
☐ DIGITAL PHOTO (7)
☐ DIRT RIDER (12)
☐ EBONY (11)
☐ ELLE DECOR (10)
☐ ENTREPRENEUR (12)
☐ ESPN MAGAZINE (26)
☐ ESQUIRE (11)
☐ EVERY DAY WITH RACHAEL RAY (10)
☐ FAMILY CIRCLE (12)
☐ FAMILY FUN (10)
☐ FAST COMPANY (10)
☐ FIELD & STREAM (12)
☐ FITNESS (10)

☐ FLEX (12)
☐ FLORIDA SPORT FISHING (6)
☐ FLYING (12)
☐ FOUR WHEEL & OFF ROAD (12)
☐ FOUR WHEELER (12)
☐ FREESKIER (6)
☐ GLAMOUR (12)
☐ GOLF DIGEST (12)
☐ GOLF TIPS (7)
☐ GOLFWEEK (40)
☐ HARPERS BAZAAR (10)
☐ HOT BIKE (12)
☐ HOT ROD (12)
☐ HOUR DETROIT (12)
☐ HOUSE BEAUTIFUL (10)
☐ INC (12)
☐ INSTRUCTOR K - 8 (6)
☐ ISLANDS MAGAZINE (8)
☐ JET (20)
☐ LADIES HOME JOURNAL (10)
☐ LATINA (10)
☐ LOG HOME LIVING (9)
☐ LUCKY (10)
☐ MARIE CLAIRE (12)
☐ MEN'S FITNESS (10)
☐ MEN'S JOURNAL (12)
☐ MIDWEST LIVING (6)
☐ MINISTRY TODAY (6)
☐ MORE (10)
☐ MOTOR TREND (12)
☐ MOTORCYCLIST (12)
☐ MUSCLE & FITNESS (12)
☐ MUSCLE MUSTANGS & FAST FORDS (12)
☐ NYLON GUYS (6)
☐ NYLON MAGAZINE (10)
☐ OLD HOUSE JOURNAL (6)
☐ OUTDOOR LIFE (12)
☐ OUTDOOR PHOTOGRAPHER (11) NR*
☐ OUTSIDE (12)
☐ PARENTS (12)

☐ PLANE & PILOT (12) NR*
☐ POPULAR PHOTOGRAPHY (12)
☐ POPULAR SCIENCE (12)
☐ PREDATOR EXTREME (6)
☐ PREVENTION (12)
☐ RED BULLETIN MAGAZINE (12)
☐ REDBOOK (12)
☐ ROAD & TRACK (10)
☐ SAVEUR (9)
☐ PARENT & CHILD (8)
☐ SELF (12)
☐ SEVENTEEN (10)
☐ SHAPE (12)
☐ SIEMPRE MUJER (6)
☐ SKI MAGAZINE (6)
☐ SLAM (10)
☐ SNOWBOARD (4)
☐ SNOWBOARDER (6)
☐ SPORT RIDER (10)
☐ SUPER CHEVY (12)
☐ SURFER (12)
☐ TAMPA BAY MAGAZINE (6)
☐ TEEN VOGUE (10)
☐ TENNIS (6)
☐ THE ATLANTIC MONTHLY (10)
☐ TIMBER HOME LIVING (6)
☐ TRANSWORLD MOTOCROSS (12)
☐ TRANSWORLD SKATEBOARDING (12)
☐ TRANSWORLD SNOWBOARDING (8)
☐ TRUCKIN (13)
☐ UPTOWN (6)
☐ UPTOWN MAGAZINE (6)
☐ W MAGAZINE (10)
☐ WATERFOWL & RETRIEVER (2)
☐ WEIGHT WATCHERS (6)
☐ WHITETAIL JOURNAL (6)
☐ WIRED (12)
☐ WORKING MOTHER (6)
☐ YOGA JOURNAL (9)

## *"Tell your Friends and Families!"*

### Send as many "5 for $20" orders as you like!

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or *order online* and use credit card or PayPal.

| Name and Inmate # (please print, maximum 24 characters): | | |
|---|---|---|
| Address: | | |
| City: | State: | Zip: |

* No Renewal


**Inmate Magazine Service**

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

OK to Copy!

# Video Visitation a Growing Trend, but Concerns Remain

A GROWING TREND TOWARD THE USE of video visitation at jails across the country is drawing the praise of corrections officials and prisoners' family members alike, though some advocacy groups worry that video visits could pose an undue financial hardship on those least able to afford it and possibly lead to the elimination of in-person visits.

"I think it's the way of the future," said Kane County, Illinois police commander Corey Hunger. "In the next 20 years, I think everyone will have it."

At some jails, visitors can use video screens to communicate with prisoners in another part of the facility. Other systems allow people to conduct visits via the Internet from a remote location, including their own homes. Prisoners typically use video monitors set up in cell blocks or other designated areas; the visits are monitored and recorded. [See: *PLN*, July 2013, p.44; Sept. 2012, p.42; Nov. 2011, p.37; Jan. 2010, p.22].

But in Kane County and other jails, the installation of video systems spelled the end of in-person visits. Hunger said not having to screen visitors and escort them through the jail frees up guards to perform other duties. Officials also claim that doing away with face-to-face visits reduces confrontations among prisoners and the risk that visitors will smuggle in contraband.

"[F]rom the standpoint of safety and security, it's a huge improvement," stated St. Clair County, Illinois Sheriff Rick Watson. "Every pod has a video monitor and the prisoners don't have to be moved for visits, which saves on staff time. And if you cut down on movement of prisoners, you cut down on dangerous incidents."

Eliminating face-to-face visits worries some prisoner advocacy groups.

"It's a fundamental right to have meaningful visits with loved ones," said John Maki, executive director of the John Howard Association of Illinois, a Chicago-based organization. "If it's to supplement in-person visits, that's great. I think the danger in video visitation is using it to replace in-person visits," he added.

"I hate not being able to see him face-to-face when I come to the jail," stated Sherry McCullough, whose son is incarcerated at the St. Clair County Jail. "I want to get a good look at him, to tell him

to stand up and turn around so I can see that he's getting enough to eat and that he hasn't been hurt. Instead, I have to see his cellmates marching around behind him in their underwear."

However, other family members have complained about problems with in-person visits, including long wait times, searches and non-contact visits conducted through a window using telephones.

"A lot of times you're trying to talk to your loved one and the phone on their end doesn't work," said Marilyn Murphy. "I don't like it. I like it when you can physically see them," she added. However, Murphy said visiting her son remotely through a home computer would be welcome. "To sit in the privacy of your home and visit a loved one?" she said. "Oh, yes."

Critics complain that video visits are sometimes used to financially exploit prisoners and their families, and that service providers often return a percentage of the video visitation fees to correctional facilities.

Paul Wright, director of the Human Rights Defense Center, the parent organization of *Prison Legal News*, described the practice as a kickback. "They're using this as another revenue stream from people who have the least ability to do anything about it," he said, comparing it to the "commission" model prevalent in the prison phone industry. [See: *PLN*, Dec. 2013, p.1]. He also noted that online video conferencing for non-prisoners, such as Skype, is usually free.

The largest provider of video visits, Securus, charges $1.00 per minute for the service. Securus CEO Richard Smith said the company anticipates adding another 100 video visitation sites by the end of 2014. According to the company's website, Securus already provides phone service to about 2,200 correctional facilities housing more than 850,000 prisoners in 45 states, as well as 81 video visitation systems.

Global Tel*Link, the nation's largest provider of phone services in prisons and jails, also offers video visitation – which is typically fee-based, with prisoners' families paying the cost of the visits.

For example, the Del Valle jail in Travis County, Texas ended in-person visitation in 2013 except for attorney visits. Instead, Securus installed a video system and charges

a $20 fee for a 20-minute visit. The county gets a $4.60 cut from each fee.

At the Lake County, Illinois jail, a 30-minute video visit costs $25.95 and the county receives 20% of the revenue generated from visitation fees. The Shawnee County Jail in Kansas eliminated in-person visits in January 2014 and now charges $20 for a 20-minute video visit. Other jails that have recently adopted video visitation, charging fees that typically range from $.40 to $1.00 per minute, include those in Alachua County, Florida; Hamilton County, Tennessee; Cumberland County, New Jersey; Chippewa County, Wisconsin; and Maricopa County, Arizona.

While the cost of video visitation may seem steep, when prisoners' family members can visit over the Internet from their homes it eliminates the time and expense of traveling to the jail, plus allows them to accommodate work or school schedules.

The non-profit Prison Policy Initiative has urged the Federal Communications Commission (FCC) to regulate the fees for video visits in the same way it has regulated prison phone rates. The Massachusetts-based organization warned in a December 20, 2013 comment filed with the FCC that video visitation fees shared with corrections officials provide "perverse incentives" to eliminate in-person visits.

"The bottom line is that prison visits are a basic right that needs to be disconnected from a profit motive, both for private companies and the jails," stated John Maki.

Despite such concerns, video visitation has gained support from both jailers and prisoners' family members.

"I liked it because the privacy is better, said Karla Maldonado, who visits her brother at the Cook County jail. "Now you can hear what he's saying."

The Cook County jail complex eliminated in-person visits at a new building following the installation of a $1 million video visitation system, though face-to-face visits are still allowed in older units at the complex.

All 25 Illinois state prisons are scheduled to begin using video visitation this spring, officials said, with an estimated cost of $30 per visit. But Illinois Department of Corrections spokesman Tom Shaer stressed the state will not use the system, provided by Global Tel*Link, as a revenue source.

"Any money that comes to us will be applied to offset our costs," he noted. "There is no profit motive for us. But we have so many families wishing to do this we may need more staff hours to make the service available."

Shaer said the state also has no plans to eliminate in-person visits. "I can't imagine the scenario in which someone would travel to a prison and then wish to communicate through a video screen rather than see a prisoner face-to-face," he said. "All research shows in-person visits absolutely benefit the mental health of both parties; video can't match that."

Certainly, free or reasonably-priced video visitation offered in conjunction with in-person visits can benefit prisoners' families who must travel long distances or otherwise have difficulty participating in face-to-face visits. But eliminating in-person visits and charging for video visitation is just another way to monetize the corrections system and financially exploit prisoners and their family members.

"With proper regulation and oversight, prison and jail video communication has the potential to offer additional avenues for critical family communication. But if left unregulated, this market could follow the trajectory of the infamously broken prison telephone industry, dominated by the same corporations," warned Prison Policy Initiative executive director Peter Wagner. "In that market, companies compete not based on price or service, but rather on who can charge families the most and kick back the largest share of the revenue to the facility that awarded the monopoly contract." ◼

Sources: *Chicago Tribune, South Jersey Times, Chicago Sun-Times, https://securustech.net, St. Louis Post-Dispatch, Arizona Republic, Phoenix New Times, www.wcjb.com, www.cjonline.com*

# Online Gaming Accounts of New York Registered Sex Offenders Restricted or Closed

According to New York Attorney General Eric T. Scheiderman, around 5,600 online gaming accounts belonging to sex offenders registered with the State of New York have been restricted or canceled. Gaming companies Microsoft, Sony, Blizzard, Electronic Arts, Warner Brothers, Disney, Funcom, THQ, Gaia Online, NCSoft and Apple all cooperated in "Operation: Game Over," resulting in the closure of sex offenders' gaming accounts or revocation of their online communications privileges. The move was an initiative of the Entertainment Software Association.

New York requires registered sex offenders to list all of their email addresses, screen names and similar online identifiers in order to limit their access to certain websites such as Facebook. Scheiderman said sexual predators had been using the voice and text chat features in online games to identify and lure potential victims.

"The Internet is the crime scene of the 21st century, and we must ensure that online video game platforms do not become a digital playground for dangerous predators," he said. "That means doing everything possible to block sex offenders from using gaming systems as a vehicle to prey on underage victims."

As one example, Richard J. Kretovic, a 19-year-old resident of Monroe County, New York, pleaded guilty to sexually abusing a 12-year-old boy he met online on XBox Live in 2011. He lured the boy to his house, where the abuse occurred. Kretovic was sentenced to a six-month jail term and 10 years' probation in May 2012.

The logic of banning registered sex offenders from online gaming forums is hard to understand, though, as it does not affect *unregistered* offenders and will drive sexual predators to open accounts using pseudonyms and anonymous email addresses. Meanwhile, sex offenders who were not abusing their online gaming account privileges – including those whose offenses did not involve children – are being collectively punished by having their accounts restricted or canceled. ◼

Sources: *New York Times, CBS6 Albany, www.gamespot.com*

# PLRA Does Not Permit Waiver of Court-ordered Answer

An Illinois federal district court has condemned a practice employed by the Illinois Attorney General when representing defendants in lawsuits brought by prisoners. The district court concluded that a motion for leave to waive an answer is unnecessary, and that the assertion of affirmative defenses in a pleading purporting to be a "waiver" of the defendants' obligation to file an answer is not permitted by statute or rule.

In the case at issue, the defendants' motion for leave to waive an answer was filed in response to the court's order that they answer the complaint. The motion relied upon the language of 42 U.S.C. § 1997c(g)(1). The district court noted that that provision of the Prison Litigation Reform Act (PLRA) "allows defendants to conserve resources by waiving their right to reply to potentially frivolous or meritless claims." It does not require the defendants to request a waiver to file an answer unless ordered to do so by the court upon a finding the claim has a reasonable chance of prevailing on the merits.

Once a district court orders an answer from the defendants they must comply, and the PLRA does not provide that their answer may deviate from the Federal Rules of Civil Procedure. Moreover, the PLRA states the court may not grant relief to a prisoner-plaintiff until the defendants file an answer, making the answer essential to the litigation.

The district court noted the defendants may generally deny the allegations in a complaint under Rule 8(b)(3), but may not respond by continuing to waive their answer "while simultaneously purporting to plead affirmative defenses." The defendants' motion, the court held, failed to comply with its order to answer the complaint.

The district court gave the defendants one week to file an answer and said failure to do so would result in their having "admitted the allegations of the amended complaint." See: *Boclair v. Hardy*, U.S.D.C. (N.D. Ill.), Case No. 11-cv-05217; 2013 U.S. Dist. LEXIS 14278. ◼

# New Hampshire Prisoners Suspected of Breaching Prison Computer System

New Hampshire officials are investigating a suspected "breach" of the Department of Corrections (DOC) computer system at the State Prison for Men in Concord. The investigation began when a staff member noticed a cable linking a computer used by prisoners to a staff computer with access to the DOC's data system.

"I'm told an inmate, or inmates, were able to hack into the CORIS system," said Mark Jordan, a former president of the guards' union. "Once they are in there, they could have access to parole dates, sentencing information, programming schedules for inmates, staff information. And they could change any of that. They could delete [detainer] information from other states."

The Corrections Information System (CORIS) was installed in 2008 by Abilis New England. "CORIS connects relevant stakeholders through a single electronic offender record and centralized database, thereby providing a holistic view of the offender's status, history, and risk profile," a news release stated when CORIS was installed.

When the cable was noticed on August 24, 2012, the DOC called the State Police to assist in the investigation. "It's a really complex investigation," said DOC spokesman Jeffrey Lyons. "We don't know whether any data was compromised. Maybe none was."

Officials did not have many details about the breach. "We don't know for certain when it occurred. We don't know how long ago it may have occurred," Lyons said. "We don't know how it occurred."

He added, "CORIS is password protected and only certain staff have the ability to add to or otherwise change the data that is maintained there. Most other data on the DOC network is password protected and anyone who attempted to access that would be blocked unless they had the appropriate password. Appropriate disciplinary action will be taken when all of the facts are gathered at the conclusion of the investigation." The breach occurred in an area of the Correctional Industries program, which employs about 200 prisoners in a furniture-making shop, printing shop, license plate shop, woodworking shop and sign-making shop. Prisoner workers in the industries program use about two dozen computers in a closed network to track contracts and billing.

The investigation includes a forensic computer crimes investigator. According to DOC spokesman Lyons, contacted by *PLN* on March 4, 2014, "This is still an ongoing investigation that is being handled by the NH State Police Major Crimes Unit." 🖌

Sources: *Associated Press, New Hampshire Union Leader*

# Businesses, Members of Congress Not Happy with UNICOR

*by Derek Gilna*

When a powerful U.S. Senator takes interest in an issue, even a bureaucratic government agency like the Bureau of Prisons (BOP) pays attention.

Kurt Wilson, an executive with American Apparel, Inc., an Alabama company that makes military uniforms, and Michael Marsh of Kentucky-based Ashland Sales and Service Co., found that out after they learned that UNICOR, which runs prison industry programs for the BOP, was considering bidding on contracts for business that their companies already had. A public statement from U.S. Senator Mitch McConnell, who sits on the Senate Appropriations Committee, led UNICOR to change its mind.

Like many other initiatives of the federal government, UNICOR, formally known as Federal Prison Industries, Inc., started off as well-intentioned. Prisoners earning from $.23 to $1.15 an hour are trained to work in factories supervised by BOP staff, where in theory they learn job skills that will help them find employment following their release. However, UNICOR has become not only a job training program but a manufacturing behemoth that employs some 12,300 prisoners and made approximately $606 million in gross revenue in fiscal year 2012 – yet still reported a net loss of $28 million. [See: *PLN*, Nov. 2013, p.52].

With that kind of size, purchasing power and cheap prisoner labor, it is almost impossible for small businesses to compete. Indeed, several companies have lost federal contracts due to competition from UNICOR, resulting in job losses among freeworld workers. [See: *PLN*, Feb. 2013, p.42]. This has made some business owners nervous – and angry.

American Apparel has to compete head-to-head with UNICOR on almost all of its contracts with the federal government, and the company said unfair competition from low-paid prisoner labor forced it to close a plant in May 2012 and lay off 175 workers. "We pay employees $9 on average," Wilson stated. "They get full medical insurance, 401(k) plans and paid vacation. Yet we're competing against a federal program that doesn't pay any of that."

Ashland Sales and Service Co. has been making windbreakers for the U.S. Air Force for 14 years, according to Marsh, and competition from UNICOR is endangering 100 jobs at the company, which is the largest employer in Olive Hill, Kentucky. "That's 100 people buying groceries. We use trucking companies in the town; buy parts and light bulbs there every day. That's all lost when prisons take away contracts."

UNICOR has 81 factories in BOP facilities around the country and does far more than supply products and services for prisons and prisoners' needs. It manufactures goods in six industry categories – clothing and textiles, electronics, fleet and industrial products, office furniture, recycling, and data entry and other services – with clothing being its mainstay.

In the past, legislation gave UNICOR an advantage in obtaining various federal contracts, but the law was amended by Congress from 2002 to 2005, and again through Section 827 of the National Defense Authorization Act of 2008, to limit that preferential advantage.

Kurt Courtney, director of governmental relations at the American Apparel and Footwear Association, said UNICOR

is "a federal program [that is] tanking our industry.... The only way for workers to get jobs back is to go to prison. There's got to be a better way to do this."

U.S. Representative Bill Huizenga sponsored a bill in 2011 to do just that – HR 3634, the Prison Industries Competition in Contracting Act. "This is a threat to not just established industries; it's a threat to emerging industries," Rep. Huizenga stated at the time. "We know that in the [economic] recovery, many new jobs are coming out of small businesses, and it makes no sense to strangle them in the cradle."

Manufacturing in America has changed over the decades but UNICOR does not use state-of-the-art manufacturing techniques because it has no need or motivation to do so – even though this means prisoners employed in UNICOR programs don't receive modern job training that will help them obtain post-release employment.

As for quality, when UNICOR steps outside of its comfort zone and attempts to compete in areas other than prisoner goods and services, it sometimes falls flat. Even though it landed a federal contract to supply helmets for the U.S. military based upon a preferential bidding process, 44,000 of the helmets were recalled in 2010 due to quality issues. UNICOR then won a no-bid contract the following year to produce body armor to be supplied to Pakistan's military. [See: *PLN*, Sept. 2011, p.46; Jan. 2011, p.20].

Although the BOP has cited statistics claiming that UNICOR workers have lower recidivism rates, such data has been questioned. In 2013, the Congressional Research Service noted that "... questions about the methodology used in most evaluations of correctional industries means that there is no definitive conclusion about the ability of correctional industries to reduce recidivism."

John Palatiello, president of the Business Coalition for Fair Competition, said his organization comprised of businesses and taxpayer groups is sympathetic to the BOP's goals of providing job training to prisoners and reducing recidivism, but that such goals should not be accomplished at the expense of small businesses and their employees who face unfair competition from UNICOR.

HR 3634 failed to pass and was reintro-duced on May 22, 2013 as HR 2098, which has 15 cosponsors and is currently pending in committee. Among other provisions, the legislation would require UNICOR to compete for its contracts, "minimizing its unfair competition with private sector firms and their non-inmate workers and empowering Federal agencies to get the best value for taxpayers' dollars."

HR 2098 would further require UNI-COR's board of directors to, "not later than September 30, 2014, increase the maximum wage rate for inmates performing work for or through Federal Prison Industries to an amount equal to 50 percent of the minimum wage," and "not later than September 30, 2019, increase such maximum wage rate to an amount equal to such minimum wage." However, the bill also provides that up to 80% of prisoners' gross wages may be deducted for taxes, fines, restitution, family support, a savings fund or other purposes.

Sources: *www.money.cnn.com; www.gov-track.us; www.businessinsider.com; "Federal Prison Industries: Overview and Legislative History," by Nathan James, Congressional Research Service (Jan. 9, 2013)*



# INMATE TOLL BUSTERS
## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*

**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours:  888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.

VISA   MasterCard   DISCOVER

# Ninth Circuit Holds Staff Sexual Abuse Presumed Coercive; State Bears Burden of Rebutting Presumption

THE NINTH CIRCUIT COURT OF APPEALS has held that a district court erred when finding a prisoner could not state an Eighth Amendment sex abuse claim because he "consented" to a relationship with a prison guard.

In 2002, Idaho prisoner Lance Wood and guard Sandra De Martin began a romantic, but not sexual, relationship. Within a few months, however, Wood heard "rumors that Martin had gotten married." She denied being married but Wood said he wanted to end the relationship.

Shortly thereafter, Martin entered Wood's cell and "cupped her hand on [his] groin ... enough to excite [him]." Wood pushed her away and said "you need to back off on this."

Wood again tried to end the relationship but Martin pursued him and subjected him to "aggressive pat searches" on several occasions. Wood went so far as to ask another guard for help, but Martin continued to pursue him.

After Wood ended the relationship, Martin again entered his cell and "grabbed ahold of [his] penis and started to stroke it."

Martin continued to harass Wood after that incident, but he did not initially report her due to fear of retaliation. Eventually he did report Martin and was transferred to a different prison the next day.

Wood then filed suit in federal court, alleging sexual harassment, retaliation and failure to protect claims. The district court granted summary judgment to the defendant prison officials on Wood's retaliation claim and his claims that Martin had entered his cell, cupped his groin and stroked his penis.

The district court relied on *Ault v. Freitas*, 109 F.3d 1335 (8th Cir. 1997) to hold that "welcome and voluntary sexual interactions, no matter how inappropriate, cannot as a matter of law constitute 'pain' as contemplated by the Eighth Amendment." Under that standard, the court concluded that Wood could not establish an Eighth Amendment violation.

The Ninth Circuit disagreed, first recognizing the indisputable proposition that a guard's sexual harassment or abuse of a prisoner violates the Eighth Amendment.

Noting that whether a prisoner can consent to a relationship with a guard was a matter of first impression, the appellate court observed that "because of the enormous power imbalance between prisoners and prison guards, labeling a prisoner's decision to engage in sexual conduct in prison as 'consent' is a dubious proposition."

The Court of Appeals declined to follow *Ault* because it "utterly failed to recognize the factors which make it inherently difficult to discern consent from coercion in the prison environment."

While the Ninth Circuit was "concerned about the implications of removing consent as a defense for Eighth Amendment claims," it found that "allowing consent as a defense may permit courts to ignore the power dynamics between a prisoner and a guard and to characterize the relationship as consensual when coercion is clearly involved."

Ultimately, the Court of Appeals adopted a bright-line rule that establishes a presumption that alleged sexual misconduct by prison staff is not consensual. While declining to exhaustively define coercive factors, the Court noted that obvious factors include "explicit assertions or manifestations of non-consent" and "favors, privileges, or any type of exchange for sex."

The appellate court held that the state bears the burden of rebutting "this presumption by showing that the conduct involved no coercive factors.... Unless the state carries its burden, the prisoner is deemed to have established the fact of non-consent."

Applying this rule, the Ninth Circuit held Wood had established non-consent for purposes of surviving summary judgment, because his "objective conduct demonstrates non-consent and the state cannot overcome its burden." See: *Wood v. Beauclair*, 692 F.3d 1041 (9th Cir. 2012).

Following remand, a jury trial was held in December 2012, resulting in a mistrial. On April 8, 2013 the district court denied Wood's motion to hold the defendants in contempt for "allegedly recording his attorney phone calls, monitoring his attorney visits, and opening and reviewing his legal mail," finding they had legitimate security reasons for doing so. The court also denied his motion for a protective order and for appointment of counsel. See: *Wood v. Martin*, 2013 U.S. Dist. LEXIS 52305 (D. Idaho 2013). ◾

# Lawsuits filed over Oregon Jail Death

THE MOTHER OF A DECEASED PRISONER has sued jail and hospital officials over the death of her son at the Marion County Jail (MCJ) in Salem, Oregon.

On June 14, 2010, Robert Haws was arrested for several criminal offenses and a probation violation, according to court records. He was held at the MCJ pending trial.

A month later, Haws was playing basketball with other prisoners at 9:30 a.m. During an argument, fellow prisoner Robert Dailey punched Haws in the jaw, knocking him unconscious and causing his head to hit the concrete floor. Dailey and the other prisoners fled.

Guards did not witness the altercation or see Haws lying unconscious on the basketball court. Approximately fifteen minutes later, Dailey and a few other prisoners returned to check on him.

They dragged Haws to the edge of the court and propped him up. He was barely conscious, vomiting and urinating on himself and bleeding from the nose. Unbeknownst to guards, one prisoner made several trips to the laundry room to replace Haws' bloody clothing.

Guards did not notice Haws on the video monitor until 10:40 a.m. When they finally responded, he was disoriented, unresponsive and exhibiting signs of delusion, according to a federal lawsuit filed by his mother, Diane Bernard. See: *Bernard v. Myers*, U.S.D.C. (D. Ore.), Case No. 11-cv-00608-HZ.

Haws was handcuffed and taken to segregation by wheelchair. Guards later placed him in leg restraints, even as he continued to vomit and bleed from his mouth and nose. Jail officials finally called 911 sometime after 11:15 a.m., and paramedics arrived fifteen minutes later.

"Security officers and medical staff present said that Haws probably had a seizure and conducted no medical exam for evidence of trauma or other causes," the suit alleged.

A jail nurse told paramedics that Haws may have suffered a seizure, and a guard who rode in the ambulance falsely informed paramedics that Haws had been suicidal two days prior to the incident and "had lots of access to over-the-counter drugs." His medical history and symptoms did not support those claims, and the possibility of head trauma was never discussed.

Haws finally reached the emergency room at Salem Health about 12:00 p.m. but his condition was not classified as a true emergency. Doctors treated Haws "as if he were an overdose patient despite the rather ample evidence of head trauma," according to court records.

In a separate state court suit, Bernard alleged that hospital employees were negligent in diagnosing and treating her son. She claimed, for example, that Haws remained chained to a gurney, without a head scan, from noon until evening.

"A critical factor in overall outcome from acute subdural hematoma is the timing of operative intervention," the lawsuit stated. "Those operated on within four hours of injury may have mortality rates as low as 30 percent. Those operated on after four hours of sustaining the injury have mortality rates around 90 percent."

"The hospital allowed him to languish for about nine hours in the ER," said Michelle Burrows, a longtime prisoners' rights attorney who represents Bernard. "That is somewhat inexplicable by the hospital."

When an X-ray was finally performed at about 7:00 p.m., it revealed that Haws had a subdural hematoma. He was rushed into emergency brain surgery but emerged five hours later in a coma; he remained on life support for four days and died a week after the surgery.

"Defendants failed to adequately evaluate and diagnose [Haws] by assuming facts not present and treating [him with] less than the standard of care, because [he] was an inmate," the suit filed by his mother alleged.

When Haws was admitted, hospital staff misidentified him as having come from the Oregon State Penitentiary, according to court documents. While such a mistake may seem innocuous, the evidence suggested that the lack of adequate care provided to Haws was the result of prisoner bias and mistreatment by hospital staff. A jail nurse admitted during her deposition testimony that she had debated sending Haws to a different hospital because she had "so many long-term concerns with Salem Health and the way they treat prisoners."

Bernard is suing the hospital and its staff for medical malpractice, wrongful death and civil rights violations for the delay in providing adequate medical care. She said she filed separate actions because she did not want to sue the Marion County Sheriff's Office in Marion County Circuit Court, and wasn't sure if a suit against the hospital and staff could be brought in federal court.

A jury trial has been requested in both cases. Unsurprisingly, both hospital spokesman Mark Glyzewski and sheriff's office spokesman Don Thomson declined to comment, citing the pending litigation.

The case in federal court was remanded to the Marion County Circuit Court in May 2013, where it remains pending with a status hearing scheduled for June 3, 2014. See: *Bernard v. Salem Health*, Marion County Circuit Court (OR), Case No. 12C18741.

Robert Dailey ultimately pleaded guilty to criminally negligent homicide for causing Haws' death, and was sentenced to five years in prison. ◾

Source: *Statesman Journal*

# LET US HELP GET YOU HOME!

D&D Worldwide Services LLC, is an Inmate Service Provider. We create detailed parole plans and provide parole plan documentation services worldwide. We are a team of Christian Professional Consultants with over 14 years' experience with the prison system. Our services are intended to guide Pro-Se Clients in the "Right Direction" while assisting them during the parole review process. When building your case, we focus on showing the Parole Board a real person, the positive outcome of incarceration, and you to be a favorable candidate for the privilege of parole!

**Full Service (Texas Only)** - Our office will collaborate the details of your case, create into a personalized parole plan with an Interview Request. We will also provide you with the updates of the major occurrences of your file when in review. Services are provided UNTIL an approval is granted or you are released from prison. Effective March 1, 2014 Service fee is $800.00

**Standard Service (Worldwide)** - Our standard parole plan is approved in ALL STATES where parole is available. Our office will verify your supporters, build your support system, and create into a personalized standard parole plan. Send SASE for a processing form. Effective March 1, 2014 Service fee is $200.00

*Although the Prison system may only see Prison Numbers...*
*We see "Faces" with "Names" with "Loving families" – "We See People"!*

## D&D Worldwide Services, LLC
12337 Jones Rd # 408 Houston, TX 77070
P.O. Box 40081; Houston, TX 77240
Office: (281) 580-8844
Website: www.myparole.info

*Se Habla Español.*

# News in Brief

**Arizona**: Two prisoners at the Yavapai County Jail have been sentenced for their involvement in a fraudulent tax refund scheme. James Borboa pleaded guilty and on September 8, 2013 received an additional term of 18.5 years in prison for using other prisoners' IDs to file tax returns for 2010, 2011 and 2012. Justin Eugene Shaw Young, who also participated in the scheme, pleaded guilty in August 2013 and received a mitigated sentence of 6 years. Borboa and Young offered kickbacks of about $1,000 to each prisoner whose ID was used in the tax scam.

**California**: On August 23, 2013, Robert Eugene Vasquez, 36, was sentenced to life in prison without the possibility of parole for the stabbing death of his neighbor, Bobby Ray Rainwater, Jr. Vasquez had been told by his mother that Rainwater was a child molester, though actually he had been required to register as a sex offender for an offense that did not involve a child. Vasquez attacked Rainwater in their mobile home park, punched him in the back of the head and then stabbed him until he was nearly decapitated.

**California**: A veteran prison guard at the California Men's Colony was sentenced to 30 days in jail in August 2013 for accepting bribes. Kevin Jon Venema, 50, was confronted by internal affairs officers who accused him of selling tobacco and cell phones to prisoners. Venema, initially charged with three felonies, pleaded no contest to one count of accepting a bribe as a correctional officer. His sentence included three years of probation in addition to the jail term.

**California**: Santa Barbara County jail guards Robert Kirsch and Christopher Johnson pleaded not guilty on August 30, 2013 to charges of assaulting a prisoner. They were released on their own recognizance and had no comment after their arraignment. "Our agency does not tolerate the unnecessary or excessive use of force. I am saddened by these allegations," Sheriff Bill Brown said in a statement.

**Colorado**: In a 400-page report, the Colorado Bureau of Investigation concluded that wrongdoing by jail officials was not responsible for the in-custody death of Zackary Dean Moffitt, 33, who suffered a cardiac arrest during a confrontation with deputies at the Summit County Jail. As a result of the report, the 5th Judicial District Attorney's Office issued a declination letter on August 26, 2013, confirming that they would not pursue criminal charges related to Moffitt's death.

**Florida**: A Pasco County Jail nurse's assistant was fired and arrested on August 27, 2013 after she used her agency laptop to hack into the email accounts of Sheriff Chris Nocco and other top jail staff. Diedre Devonne Fitzgerald, 24, was released on $15,000 bail after she admitted to unlocking passwords and using the hacked accounts to obtain confidential material. She had worked at the jail for almost two years.

**Georgia**: On September 9, 2013, Georgia state prisoner Jesse Barrett Mainor was charged with impersonating a police officer in connection with a telephone scam. Mainor had made phone calls to at least nine Alabama residents, claimed they had outstanding warrants and attempted to get them to send him money on Green Dot Moneypak cards. A grand jury will decide whether Mainor, who also has outstanding charges in Florida, will face trial on eight other charges related to the phone scam.

**Georgia**: At a hearing in Bibb County Superior Court on August 26, 2013, former jail guard Nazon Eo'ne Johnson, 22, was sentenced to four years' probation for bringing alcohol into Central State Prison and violating his oath of office. Another guard, Paris Dewayne Watson, who pleaded guilty to the same charges, admitted the alcohol was for consumption while on duty. Both guards were sentenced as first-time offenders, and must surrender their Peace Officer Standards and Training certification and pay fines and attorney fees in addition to their terms of probation.

**Illinois**: Kenneth Conley, who escaped from the Metropolitan Correctional Center in December 2012 while facing federal bank robbery charges, was sentenced to a prison term of 41 months on February 24, 2014. Conley, 40, and fellow prisoner Joseph Banks had used bed sheets and dental floss to rappel 17 stories from a window at the high-rise jail; they then escaped in a cab. Banks was caught two days later while Conley remained on the run for 18 days. At his sentencing hearing, while the judge was explaining the 41-month sentence for the escape charge, Conley told him, "You can take your analogy and shove it right up your ass."

**India**: On September 2, 2013, Jai Shankar, also known as "Psycho Killer Shankar," a convicted murderer and rapist, escaped from the high-security Parappana Agrahara jail with the help of a duplicate key and a bed sheet, which he used to climb down a wall. Shankar also allegedly scaled two 15-foot walls and wore a police uniform when he absconded. Eleven jail employees were suspended in connection with the escape.

**Indiana**: Michael Snow, a shift supervisor at the Marion County Jail, was bitten by prisoner Deondre Langston on August 22, 2013. Guards were trying to transfer Langston to the medical unit for a psychological evaluation when he resisted and charged at Snow with his head down. He then wrapped his arms around Snow's legs and bit him on the thigh. Snow was treated for the bite wound, which broke the skin and caused bruising; he plans to file charges against Langston.

**Indiana**: On July 30, 2013, Marcus Crenshaw, a guard at the Indiana State Prison, was caught bringing three-quarters of a pound of marijuana into the facility. He was suspended without pay and charged with trafficking with an offender, a Class C felony. Crenshaw was stopped and searched at the start of his shift and found to be in possession of approximately 343 grams of marijuana that DOC officials said was



PENACON.com

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see.  Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLNSOFF
FOR $5 OFF

intended for delivery to a prisoner.

**Indiana**: Two unnamed Indiana State Prison guards were hospitalized following an August 22, 2013 incident in which they were stabbed by prisoner Terrance Swann. One was injured so severely that he had to be airlifted to Wishard Memorial Hospital in Indianapolis; the other guard was treated at a Michigan City hospital and returned to work later that same day. The prison was placed on lockdown after the attacks and Swann was transferred to the Westville Correctional Facility.

**Kentucky**: A contract food service worker was charged with rape and promoting contraband at the Henderson County Detention Center on September 11, 2013. Britanny L. Murch, 26, was jailed on two felony counts of third-degree rape and two felony counts of first-degree promoting contraband. State police said Murch had sex with a prisoner and brought him methamphetamine and alcohol. She pleaded guilty to the charges and was sentenced on February 25, 2014 to concurrent terms of 12 months on each count of rape and three years on each contraband charge.

**Louisiana**: As a result of a joint investigation involving the Louisiana State Police and Lincoln Parish Sheriff's Office, prison guard Danny Henshaw was charged with using excessive force against a prisoner during a disturbance at the Lincoln Parish Detention Center. Henshaw resigned from the Sheriff's Office and turned himself in on August 22, 2013. The prisoner was examined by medical staff at the facility but did not report any injuries as a result of the incident.

**Maryland**: Prince George's County deputy sheriff Lamar McIntyre pleaded guilty on August 15, 2013 to two counts of sexual misconduct. He was initially charged with rape, but the charges were reduced after the female prisoner he had been accused of assaulting told investigators the sex was consensual. A $15 million lawsuit was filed against the former deputy by the 34-year-old prisoner, who said the incident occurred inside a holding cell while she awaited a court hearing.

**Mexico**: A prison in the Mexican town of Nuevo Laredo, across the border from Laredo, Texas, was the site of yet more violence in Mexico's overcrowded prison system. On August 29, 2013, eight prisoners were murdered with homemade knives after being transferred to the facility; it was unclear whether the killings were gang-related. In October 2013, *PLN* reported a violent disturbance at a prison in the central Mexican state of San Luis Potosi that left 11 prisoners dead and more than 65 injured.

**Michigan**: Derreck White, also known as Abraham Pearson, attacked Deputy Harrison Tolliver in a holding cell near a Detroit courtroom on September 9, 2013. Using a sharpened comb to stab the guard three times in the neck, White handcuffed Tolliver and left the courthouse wearing his uniform; he then carjacked a minivan and escaped. White was captured later the same night while walking along I-94. Harrison was treated at a local hospital and released.

**Mississippi**: Tyler Smith, 20, beat fellow prisoner Clifton Majors, 35, to death at the Central Mississippi Correctional Facility on September 1, 2013, because he feared that Majors and other prisoners planned to harm him. MDOC Commissioner Christopher Epps said "breaches in security" in the maximum-security area of the prison allowed the deadly assault to occur. Investigators said there was no indication Smith had used a weapon in the attack.

**Mississippi**: As many as 90 prisoners were released from their cells on August 24, 2013 after an altercation between a guard and a prisoner resulted in the prisoner gaining control of the keys to many of the pods in C Building at the Lauderdale County Jail. Sheriff Billy Sollie said six prisoners were charged with arson, escape, simple assault and aiding escape in connection with the disturbance. Surveillance video helped investigators identify the prisoners involved in the incident.

**Nevada**: There's the Mile High Club, then there's the 2.9 Mile Drive Club. That's the distance between the Clark County Detention Center (CCDC) and the city jail, which provided prisoners Carlisa Brookins and Alexis Garcia enough time to engage in oral sex while they were being transported in a jail van on August 8, 2013. After the tryst was discovered, Brookins and Garcia were returned to the CCDC where they were charged with voluntary sex with an inmate. Brookins said she performed the act to "make the guys in the back of the bus jealous."

**Nevada**: Michael Marcel Law pleaded

# FREE 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription!
Quarterly drawing **WINS $100! (Void in New York)**
(Last Quarter's winner from **Airway Heights, WA.**)
TELL YOUR FRIENDS!   ACT NOW!!

**PO Box 2063 • Fort Walton Beach FL. 32549**
www.InmateMagazineService.com

# Inmate Magazine Service Inc.

**News In Brief (cont.)**

guilty on January 7, 2014 to felony battery charges stemming from an incident at the Clark County Detention Center. Law walked into the jail with an aluminum baseball bat in September 2013 and proceeded to attack jail guard Darren McCray, who was the first officer he encountered. Law told detectives he was seeking revenge against the police for failing to conduct a proper investigation after he was robbed. He was sentenced to 3–10 years on March 3, 2014.

**New Hampshire**: On September 4, 2013, the New Hampshire Executive Council rejected a pardon request from Thomas Schoolcraft, a former Cheshire County jail guard who was convicted in 2004 for a series of home burglaries. The Council voted 3-2 to deny the pardon, with Councilmember Christopher Sununu stating that Schoolcraft's crimes were still "fresh in the minds" of his victims. Schoolcraft is currently pursuing a master's degree in criminology and had hoped a pardon would allow him to resume working in law enforcement.

**New York**: While incarcerated at the St. Lawrence County Correctional Facility, Joshua Henderson entered another prisoner's cell, pushed him down and allegedly reached into the victim's pants and grabbed his genitals. Henderson, 24, was charged with forcible touching and second-degree harassment in connection with the August 30, 2013 incident.

**New York**: On August 25, 2013, Robert Smalls, an off-duty prison guard, shot his 17-year-old son. There were conflicting accounts regarding what happened. Smalls told investigators he thought there was an intruder and felt he was in immediate danger; his son, Quasaun, told police the two had been arguing. Quasaun fled the hospital before being treated for the gunshot wound, and his father was charged with felony assault and criminal possession of a weapon.

**North Dakota**: New Castle Correctional Facility prisoner Michael Howard Hunter mailed a threatening letter to federal judge Rodney Webb on December 12, 2012. He was charged with sending the letter even though Judge Webb had died more than three years earlier, and pleaded guilty on September 2, 2013. He faces up to 10 years in federal prison.

**Ohio**: On August 16, 2013, federal prosecutors filed charges against Marlon Tayor, a former guard at the Lorain County Jail, for repeatedly striking a prisoner and causing him bodily injury. The Lorain County Sheriff's Office had previously released surveillance video of the incident. [See: *PLN*, Jan. 2013, p.50]. Tayor was charged with one count of deprivation of rights under color of law.

**Ohio**: Death row prisoner Billy Slagle's August 4, 2013 suicide was accomplished with an "item of permissible property," according to Department of Rehabilitation and Correction spokeswoman JoEllen Smith. Slagle killed himself hours before he was scheduled to be placed on 24-hour suicide watch in advance of his execution for the 1988 stabbing death of Mari Anne Pope during a burglary. Officials at the Chillicothe Correctional Institution would not say what the item was and did not provide details regarding the manner of Slagle's death.

**Ohio**: According to Richland County Assistant Prosecutor Brent Robinson, on August 12, 2013, Robert A. Picklesimer, 54, a food service supervisor at the Mansfield Correctional Institution, was indicted on one count of sexual battery, one count of theft in office and two counts of bribery. "He was permitting these inmates to have

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇
## PLN Classifieds
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare
Manuscripts for Self-Publishing
Reasonable Rates!-Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how
to receive Voices.Con monthly, send
SASE to: PO Box 361, King City, CA 93930.
On the web at: VoicesDotCon.org;
Email: Publisher@VoicesDotCon.org

**Help from Beyond the Walls**
New Services and Fast Turnaround
Pictures, publications, phone
services and more. Write today
for free brochure. P.O. Box 185,
Springvale, ME 04083

**Want Quality Pictures of**
Quality Babes? 4x6 High Res pics
Send self addressed stamped
envelope for free catalog!
PHOTO TRYST
PO Box 103
Chapmansboro TN 37035

**Free Facebook & Instagram setup**
People searches, release shopping
Amazon books, book editing, photo
Duplications, flower & gift, drivers
License & state case legal research.
Vipprisonersservices@gmail.com
P.O. Box 584609, Kissimmee, FL 34749
for info or email.

**Ibrahim Books & Gifts**
PO Box 4141, Phila, PA 19144
Ph.267-586-3309 ibrahimbooks.com
*Islamic Gift Baskets*CD's*DVD's
Quality Service*Affordable Rates
Write for FREE catalog
Your resource for authentic books
According to The Qur'aan&Sunnah

**NON NUDE FLIX CATALOG $2 + SASE**
M and M Publications PO Box 1127
Roanoke, TX 76262

**CHRISTIAN PRISON PEN PALS/
OUTLAWS ONLINE,** PO Box 333,
Inverness, Florida 34451. Checks/M.O.
payable to Inmate Services Request Information Photo, Desc., 400 word bio $25

**PUZZLE BOOKS & EYE GLASSES**
Brochure & Free Gifts
Send 2 Forever Stamps or $1.00
Mara Worldwide
115 W. California Blvd Ste 424-R
Pasadena, CA 91105

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet
& People Searches, Amazon Books,
Erotic Photos, PenPals, Special
Requests and More. Send SASE to:
Elite Paralegal & Prisoner Services
PO Box 1717, Appleton, WI 54912

food in exchange for allowing him to touch them in sexual ways," Robinson stated.

**Oklahoma**: Prison officials said Donald Lee Grayson, 61, gained access to a laptop from his prison cell and filed false tax returns using the names and bank accounts of fellow prisoners. In August 2013, Grayson received concurrent sentences of 18 months for each of three counts of filing false returns, and will be required to pay restitution. A guard discovered the scheme after noticing a power cord in Grayson's cell. Investigators said he received fraudulent tax refunds in the amount of $14,226.

**Oklahoma**: A lawsuit filed on August 13, 2013 claims that prisoner Philip Thomas Burris, Jr. was forced to have sex with female prison employee Kasey McDonald "50 to 100" times at the Joseph Harp Correctional Center. McDonald was arrested and charged with engaging in sexual misconduct – the fifth such case involving a Joseph Harp employee since 2008. The lawsuit also alleges that Burris' former case manager supplied him with cell phones and marijuana. "These things happen," said Corrections Department spokesman Jerry Massie.

**Oklahoma**: Mark Gregory Valadez faces additional charges after he was booked into the Oklahoma County jail on September 1, 2013 with a loaded derringer concealed in his rectum. He managed to avoid a metal detector and was only caught after bragging to other prisoners about smuggling the weapon into the facility. Valadez was hospitalized to have the pistol removed and now faces felony charges of possession of contraband in a penal institution.

**Pennsylvania**: On September 12, 2013, a jury acquitted former veteran federal prison guard Lamont Lucas of having sex with a female prisoner after the defense argued that the prisoner was a habitual liar. [See: *PLN*, Sept. 2013, p.17]. The jury rejected the prisoner's story and was presented with powerful character evidence in support of Lucas. An attorney for the defense said Lucas, who had been suspended without pay following the accusations, was unlikely to return to his job with the Bureau of Prisons.

**Tennessee**: A dietitian at the Unicoi County Jail was arrested on September 6, 2013 and charged with introducing drugs into a penal facility. Faith A. Smith allegedly met with a prisoner's family member who provided the drugs that she brought into the jail.

**Texas**: Justin P. MacDonald, 29, was in the Dallas County Jail on a probation violation and just wanted some fresh air. He walked out the front doors of the facility while taking out the trash on July 26, 2013, which prompted a lockdown. MacDonald was spotted walking outside in jail-issued pants with no shirt, and quickly captured. He now faces a felony escape charge. "The investigation is ongoing to determine how the inmate made it to the outside of the facility," said sheriff's department spokesman Raul Reyna.

**Tunisia**: On September 2, 2013, police and soldiers searched for 49 prisoners who had escaped from a facility in the southern coastal town of Gabes. Colonel Hicham Ouni, security director for Tunisia's prisons, told the Associated Press that the prisoners were mostly young and none were incarcerated for terrorism-related crimes. Tunisia's prison system is at more than triple capacity, with around 22,000 prisoners.

**Utah**: Christopher Stein Epperson, a former Wasatch County sheriff's deputy, was charged with taking advantage of his position as a jail guard to physically abuse two female prisoners. [See: *PLN*, April 2012, p.1]. He pleaded guilty to the federal charges on August 29, 2013, and faces up to

**MIDNIGHT EXPRESS BOOKS**
THE PREFERRED & ONLY FULL TIME company helping inmate authors publish books for 10+ years.
PO Box 69, Dept PLN
Berryville, AR 72616
Midnightexpressbooks.com
Corrlinks: MEBooks1@yahoo.com

**FREE BOOK CATALOG & PRAYER CARD**
Send $1 for S&H or
SASE w/2 (two) US Forever Stamps
Fiction, Nonfiction, Dictionary,
Pastimes & Religious books
English & Spanish.
Jaguar Books 6881 Stanton Ave #F
Buena Park CA 90621

**Education Behind Bars Newsletter**
Free electronic newsletter
For prisoners viaCorrLinks.
Add news@prisonlawblog.com
to subscribe.The content
is curated specifically
for prisoners.

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games.  We Sell Photos of Sexy Women, Gifts for Loved Ones, Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**Prisonerinmatefamilyservice.com**
Send a SASE for a free catalog;
PO Box 1852 Pismo Beach,Ca 93448
We buy stamps- 7.50 a book;
Single stamps .25 cents; Amazon Orders, copies of photos/artwork And SO much more!
FamilyInmateSev@aol.com

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**A DEGREE/ORDINATION FROM PRISON**
Correspondence Courses via mail
INT'L CHRISTIAN COLLEGE&SEMINARY
PO BOX 530212 Debary, FL 32753-0212
Associates thru PhD credit for
Life Experience *ACCREDITED*
Tuition as Low as $19.95 a month
Send SASE for a Free Evaluation

**Celebrity Photos For Sale:**
Send self addressed stamped
envelope for lists. Name stars
you would like to order photos of.
Start your collection today!
Photoworld-PLN
PO Box 401016
Las Vegas, Nv. 89140

**#1 PHOTO FORWARDING SERVICE**
**SPECIAL** $25.00 for 60 Photos!
Email & Text your photos 2 us
We Print & Mail them 2 YOU!
www.Infolincs.com (4 more info)
Email: infolincs@centurylink.net
Check/$$ Order: InfoLINCS, LLC
PO Box 644, Shady Cove, OR 97539

**News In Brief (cont.)**

10 years in prison for each of two counts of deprivation of rights under color of law.

**Virginia**: Former Augusta Correctional Center guard Brian Peduto was three months into serving a suspended sentence for attempting to have sex with a 12-year-old girl when he began having a sexual relationship with a minor. He was not spared prison the second time, and received a three-year sentence on August 26, 2013. Peduto apologized before he was sentenced,

saying, "It's time for me to stay away from girls in general."

**Washington**: A riot broke out at the Pend Oreille County Jail on July 7, 2013, and ten prisoners now face additional charges as a result. Two cells were flooded during the disturbance, which caused water damage in an adjoining courtroom. Although no serious injuries were reported, one prisoner allegedly attacked a guard, another intimidated a witness and there were two prisoner-on-prisoner assaults. The jail was locked down for several hours following the riot.

**Washington**: Sarah Brooks, a prison therapist specializing in sexual deviancy treatment, was charged with engaging in sexual activity with a sex offender. [See: *PLN*, Sept. 2013, p.17]. Brooks pleaded guilty on August 20, 2013 to a lesser offense and was sentenced to 24 months on probation. As part of the plea deal she must also complete alcohol treatment and mental health counseling. According to prosecutors, Brooks developed a sexual relationship with a male prisoner; however, he did not want to press charges, which resulted in the reduced charge and plea deal. ◼

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Centurion Ministries

Works to exonerate the wrongfully convicted, in both cases involving DNA evidence and those that do not. Centurion only takes 1-2 new cases a year involving actual innocence. They do not consider accidental death or self-defense murder cases, he said/she said rape cases, or child abuse or child sex abuse cases unless there is physical evidence. All case inquiries must be from the prisoner involved, in writing. Contact: Centurion Ministries, 221 Witherspoon Street, Princeton, NJ 08542 (609) 921-0334. www.centurionministries.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612  (510) 444-0484. www.criticalresistance.org

### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046  (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006  (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101  (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013  (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: JDI, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010  (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168  (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013  (202) 789-2126. www.curenational.org

### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114  (509) 684-1550. www.november.org

### Prison Activist Resource Center

PARC is a prison abolitionist group committed to exposing and challenging all forms of institutionalized racism, sexism, able-ism, heterosexism and classism, specifically within the Prison Industrial Complex. PARC produces a free resource directory for prisoners, and supports activists working to expose and end the abuses of the Prison Industrial Complex and mass incarceration. Contact: PARC, P.O. Box 70447, Oakland, CA 94612 (510) 893-4648. www.prisonactivist.org

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING** on all book / index orders OVER $50 (effective 9-1-2013 until further notice). **$6.00** S/H applies to all other book orders.

**SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!**
1. **SIX (6) FREE ISSUES FOR 54 TOTAL!** OR
2. **PRISON PROFITEERS (A $24.95 VALUE!)** OR
3. **WITH LIBERTY FOR SOME (AN $18.95 VALUE!)**

**Prison Profiteers**, edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News antholo-gies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how.                   1063

**With Liberty for Some: 500 Years of Imprisonment in America**, by Scott Chris-tianson, Northeastern University Press, 372 pages. **$18.95**. The best overall history of the American prison system from 1492 through the 20th Century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years.                   1026

**Prison Nation: The Warehousing of America's Poor**, edited by Tara Herivel and Paul Wright, 332 pages. **$35.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.                   1041

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.                   1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada**, updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95**. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, para-legal and college courses by mail.                   1071

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentenc-ing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.                   1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.                   1037

**Law Dictionary**, Random House Webster's, 525 pages. **$19.95**. Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.                   1036

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 110 pag-es. **$14.95**. A guide to grammar and punctuation by an ed-ucator with experience teaching English to prisoners.                   1046

**Legal Research: How to Find and Understand the Law**, by Stephen Elias and Susan Levinkind, 568 pages. **$49.99**. Comprehensive and easy to under-stand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.                   1059

**Deposition Handbook**, by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed.                   1054

**Criminal Law in a Nutshell**, by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**. Provides an overview of criminal law, including pun-ishment, specific crimes, defenses & burden of proof.                   1086

**SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!**
1. **FOUR (4) FREE ISSUES FOR 40 TOTAL!** OR
2. **PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)**

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.                   1060

**Spanish-English/English-Spanish Dictionary**, 2nd ed. Random House. **$15.95**. Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.                   1034a

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95**. Explains the writing of effective com-plaints, responses, briefs, motions and other legal papers.                   1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right**, updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer; 403 pages. **$16.00**. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.                   1030

**Webster's English Dictionary**, Newly revised and updated, Random House. **$8.95**. 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms.                   1033

**Everyday Letters for Busy People**, by Debra Hart May, 287 pages. **$18.99**. Hundreds of sample letters that can be adapted for most any pur-pose, including letters to government agencies and officials. Has numerous tips for writing effective letters.                   1048

**Roget's Thesaurus**, 717 pages. **$8.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identi-fies informal and slang words.                   1045

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95**. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.                   1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95**. In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.                   1073

**The Habeas Citebook: Ineffective Assistance of Counsel**, by Brandon Sample, PLN Publishing, 200 pages. **$49.95**. This is PLN's second pub-lished book, written by federal prisoner Brandon Sample, which covers ineffective assistance of counsel issues in federal habeas petitions. Includes hundreds of case citations!                   1078

**Complete GED Preparation**, by Steck-Vaughn, 922 pages. **$24.99**. This useful handbook contains over 2,000 GED-style questions to thoroughly prepare students for taking the GED test. It offers complete coverage of the revised GED test with new testing information, instruc-tions and a practice test.                   1099

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95**. Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.                    1031

**Arrested: What to Do When Your Loved One's in Jail**, by Wes Denham, 240 pages. **$16.95**. Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.                    1084

**Prisoners' Self-Help Litigation Manual**, updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!                    1077

**How to Win Your Personal Injury Claim**, by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.                    1075

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits**, by Lewis Laska, 336 pages. **$39.95**. Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners.                    1079

**Advanced Criminal Procedure in a Nutshell**, by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**. This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication.                    1090

**Our Bodies, Ourselves,** by The Boston Women's Health Book Collective, 944 pages. **$26.00**. This book about women's health and sexuality has been called "America's best-selling book on all aspects of women's health," and is a great resource for women of all ages.    1082

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95**. This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.                    1083

**Nolo's Plain-English Law Dictionary,** by Gerald N. Hill and Kathleen T. Hill, 496 pages. **$29.99**. Find terms you can use to understand and access the law. Contains 3,800 easy-to-read definitions for common (and not so common) legal terms.                    3001

**Criminal Procedure: Constitutional Limitations**, by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**. Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure.  1085

**A Dictionary of Criminal Law Terms** (Black's Law Dictionary® Series), by Bryan A. Garner, 768 pages. **$33.95**. This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to help navigate your way through the maze of legal language in criminal cases.                    1088

**PLN Cumulative Index**. **$22.50 each**. PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

---

### Subscription Rates

|  | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** | $90 | $180 | $270 | $360 |
| (Attorneys, agencies, libraries) | | | | |

### Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 61

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 61

(All subscription rates and bonus offers are valid as of 9-1-2013)

---

VISA   MasterCard   Purchase with Visa, MasterCard, AmEx or Discover by phone: **561-360-2523**   AmEx   DISCOVER
Or buy books and subscriptions online: **www.prisonlegalnews.org**

---

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 1151
Lake Worth, FL 33460

**All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by institutional policies.***

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News**                    **$ Amount**

6 month subscription (prisoners only) - $18                    _____
1 yr subscription (12 issues)                    _____
2 yr subscription (2 bonus issues for 26 total!)                    _____
3 yr sub (*write below which FREE book you want*)                    _____
         or 4 bonus issues for 40 issues total!
4 yr sub (*write below which FREE book you want*)                    _____
         or 6 bonus issues for 54 issues total!
Random sample issue of **PLN** - $3.50 each                    _____

**Books or Index Orders** (No S/H charge on
3 & 4-year sub free books OR book orders OVER $50!)    **Qty.**

_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____

**Add $6.00** S/H to Book Orders **UNDER $50**                    _____
FL residents ONLY add 6% to Total Book Cost                    _____
**Total Amount Enclosed:**                    _____

***\* No refunds on PLN subscription or book / index orders after orders have been placed \****



# 3RD STRIKE? WRONGLY CONVICTED? ?ERRORS?

**ATTENTION!!   CA 3RD STRIKERS DON'T BE LEFT OUT OR WAIT FOR THE SYSTEM.  WE CAN HELP!**

## INMATE LEGAL HELP 411 FREEDOM ANGELS

Brian P – "They helped me remove 4 life sentences
"Big" D McGwen – Back into Court.. And SET FREE
Tyron S. – 38 years deducted.. FREE NOW!

### PERSONALIZED & REASONABLY PRICED
**ADVANCED LEGAL SERVICES
SUCCESSFUL WINNING STRATEGIES
EVEN YOUR ODDS**



We find the MISSING
facts & information that
were never considered
or heard in your case
originally.

**OUR GOAL= Evidentiary Hearing for YOU!**

### MAKE FREEDOM A PRIORITY?
**HAVE FAMILY / FRIENDS CALL NOW**
PLANHELP@411FreedomANGELS.com
HABEAS Booklet ~ $20 PayPal or Stamps
www.411FreedomANGELS.com

*You are in our thoughts and prayers*

## WRITS~MOTIONS~BRIEFS
**3RD STRIKERS GO to TOP of the List**
- **Post Conviction Relief Assistance**
- **Writ Of Habeas Corpus**-State / Federal
- **Sentence Modifications**
- **Pre-Post Parole Board**
- **In House Legal Investigators**
- **Resolve Warrants on pending cases**
- **MANY Other Legal Services**

**AGGRESSIVE REPRESENTATION to PROTECT YOUR RIGHTS**
**JACKSON & ASSOCIATES LAW CENTERS**
402 W. Broadway POB 81609 San Diego, CA 92138
24/7 call NOW! 1*855*411*ANGELS (2643)

# Great Self-Help Book Deals
## From Prison Legal News!



### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer



The Criminal Law Handbook
$39.99



Represent Yourself in Court
$39.99



Legal Research
$49.99



Nolo's Deposition Handbook
$34.99

**Order from Prison Legal News**
Add $6 shipping for orders under $50

Prison Legal News
PO Box 1151
Lake Worth, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org



**NOLO**
**YOUR LEGAL COMPANION**



## Prison Legal News
PO Box 1151
Lake Worth FL 33460

**Change Service Requested**

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

### Subscription Renewal
Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2015 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 03/2014** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



## PRISONLEGALNEWS.org
### Dedicated to Protecting Human Rights
>>FREE Data Search |

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**I**f you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

**Sign up for PLN's FREE listserv** to receive prison and jail news and court rulings by e-mail.

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org