**Prison Legal News v. Charles L. Ryan, et al**
**USDC CV15-02245-PHX-ROS**

## DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Declaration of Carson McWilliams |
| B | Declaration of James Riggs |
| C | Declaration of Jamie Guzman |
| D | Declaration of Charles Ryan |
| E | Declaration of Jeffrey Hood |
| F | Declaration of Gail Rittenhouse |
| G | Declaration of Gary W. Deland with Exhibit 1 (Rule 26 Expert Report) |
| **ATTACHMENT** | **DESCRIPTION** |
| 1 | DO 914, *Inmate Mail*, Effective February 26, 2010 |
| 2 | DO 914, *Inmate Mail*, Effective March 4, 2016 |
| 3 | DO 914, *Inmate Mail*, Effective April 7, 2017 |
| 4 | Redacted *Prison Legal News*, October 2014 |
| 5 | Redacted *Prison Legal News*, April 2017 |
| 6 | Redacted *Prison Legal News*, May 2017 |
| 7 | Redacted *Prison Legal News*, June 2017 |
| 8 | Plaintiff's Second Amended Responses to Defendants' First Set of Interrogatories, dated January 24, 2018 |
| 9 | Plaintiff's Amended Objections and Responses to Defendants' Second Set of Interrogatories dated January 24, 2018 |
| 10 | Plaintiff's Rule 26(a)(1) Initial Disclosures – Fourth Supplemental Disclosures dated February 20, 2018 |
| 11 | Deposition Transcript of Brad Keogh, Taken on January 12, 2017, Pages 1, 71-75, 115, 116-120, 122-128, Correction Page dated February 14, 2017, 275 |
| 12 | Commercial television channel lists – programming available to inmates |

#6962148

# Exhibit A

1  Mark Brnovich
   Attorney General
2
   Michael E. Gottfried
3  State Bar No. 010623
   Assistant Attorney General
4  2005 N. Central Avenue
   Phoenix, Arizona 85004-1592
5  Telephone: (602) 542-1610
   Fax:  (602) 542-7670
6  E-mail:  michael.gottfried@azag.gov

7  *Attorneys for Defendants Ryan, Rittenhouse,*
   *Hood, Olson, Riggs and Guzman*
8

9                **IN THE UNITED STATES DISTRICT COURT**

10                    **FOR THE DISTRICT OF ARIZONA**

11 Prison Legal News, a project of the      No:  CV15-02245-PHX-ROS
   Human Rights Defense Center,
12                                          **DECLARATION OF CARSON**
                                            **MCWILLIAMS**
13                Plaintiff,

14 v.

   Charles L. Ryan, et al.,
15
                  Defendants.
16

17       I, CARSON MCWILLIAMS, hereby state, under the penalty of perjury, that the

18 following information is true to my knowledge, information, and belief:

19       1.    I have been employed by the Arizona Department of Corrections ("ADC")

20 from April 23, 1978, to the present.  I have held the position of Division Director of

21 Offender Operations since February 2014.

22       2.    I am competent to testify to the matters contained herein and make this

23 Declaration based on my own personal knowledge, as well as review of pertinent ADC

24 records.

25

26

3.      I have held numerous positions, in multiple ADC prison complexes, during my thirty-nine (39) years of employment with the ADC.  I began as a Correction Officer ("CO") and was subsequently promoted to numerous positions throughout the ADC.

4.      I held the position of Deputy Warden at the Arizona State Prison Complex ("ASPC")-Florence, East Unit from August 2002 to June 2004, and at the ASPC-Eyman, Browning Unit from June 2004 through February 2006.

5.      As a Deputy Warden, my duties included responsibility for unit security; supervising, monitoring, and advising employees assigned to the unit; supervising all aspects of security, custody, classification, control, movement, and programming; performing security and physical inspections and reviews of the units; developing and maintaining a budget for the unit; reviewing and evaluating reports on operation, budget, and expenditures, and developing appropriate responses; allocating manpower and resources to meet identified inmate and institutional needs; conducting unit staff meetings and attending institutional meetings; ensuring that Department Orders, Director's Instructions, procedures, and policies were implemented and followed; conducting evaluations of security, personnel, programs, health, and safety; and overseeing the safety and security of the staff and inmates in the unit.

6.      Thereafter, I was the Warden at the ASPC-Florence from March 2006 to May 2011.

7.      As a Warden, I was responsible for the operation of the entire Florence Complex, including the overall security and management of the institution and its inmates, personnel, volunteers, programs and activities, administrative functions, and ensuring that ADC policies were followed.  I directly supervised the Deputy Wardens of each of the units in the Complex, and delegated most day-to-day operations to each of the Deputy Wardens.  However, as Warden, I was responsible for the overall safety and security of the Complex which required that I keep apprised of any security incidents at the prison and

2

1    work to prevent similar incidents in the future.  I was also required to tour the individual

2    units on a regular basis in order to assess their operations, including security.

3         8.    Following my tenure as the Warden of the Florence Complex, I was

4    transferred to the ADC's Central Office in Phoenix, Arizona.  After short terms as ADC's

5    Southern Regional Director ("SROD") and Deputy Director, I was appointed the ADC's

6    Northern Region Operations Director ("NROD") in November 2011; a position I held until

7    February 2014.

8         9.    As the SROD I was responsible for overseeing the operations of the Douglas,

9    Perryville, Safford, Tucson, and Yuma prison complexes.  As the NROD I was responsible

10   for overseeing the operations of the Eyman, Florence, Lewis, Phoenix, and Winslow prison

11   complexes.

12        10.   As a Regional Operations Director, the Wardens from the complexes I

13   oversaw reported to me and regularly provided me with a variety of reports, including

14   reports related to prison security.  In this position I also received summary reports of

15   incidents that occurred at the prisons, which included incidents related to contraband,

16   weapons, and fights.  I would also go to the individual prison complexes as necessary to

17   evaluate their operations, which included evaluating security.

18        11.   As a Regional Operations Director I made security decisions based upon

19   policy, practice, and the knowledge and experience I have gained through my years of

20   employment with the ADC.  I have knowledge of the incoming/outgoing prisoner mail

21   procedures and notice policies at the ADC.

22        12.   The ADC incarcerates over 47,000 prisoners in ten prison complexes

23   throughout Arizona, as well as in private and contracted facilities.  On average, it houses

24   approximately 39,000 inmates.

25        13.   The prison setting is a uniquely dangerous environment that presents threats

26   to the safety of prisoners, correctional staff, and members of the public.  The dynamics of

3

1    the inmate population are a constant concern to ADC administrators and officials because

2    the prisons house violation offenders and the danger of eruptions of violence is very real.

3    Toward the goal of reducing the potential violence and injuries to inmates and staff, the

4    ADC has policies and procedures in place for virtually all inmate activities.

5        14.    The ADC has a penological interest in ensuring the safe, secure, and orderly

6    operations of the prison.

7        15.    Before 2010 ADC allowed inmates to receive virtually any type of sexually-

8    related photographs, magazines and writings, including those depicting nudity, as long as it

9    did not involve depictions of people in uniform or disrespect people in uniform.

10       16.    While this policy was in effect, ADC administrators would consistently

11   receive complaints from people involved in prison operations, particularly female

12   correction officers, female corrections staff, female volunteers, and female medical staff,

13   regarding the use of sexually explicit material by inmates.

14       17.    During this time period, people involved in prison operations, particularly

15   female officers, staff, volunteers and medical personnel were frequently harassed by

16   inmates making intimidating, demeaning and sexually explicit statements and conduct,

17   often while using sexually explicit pictures or text.

18       18.    The presence of sexually explicit material in the prison created a hostile

19   environment for inmates, staff, and volunteers.  Sexually explicit pictures and text were

20   used to harass other inmates, staff, and volunteers, both male and female.

21       19.    Inmate rehabilitation and treatment was also negatively impacted by the flow

22   of sexually explicit pictures and text into the prison. A core goal of inmate rehabilitation is

23   acceptance of society's norms and respect for rules and boundaries. The presence of such

24   content encouraged general disrespect, and specifically disrespect of females.   Sexual

25   images and writings are often intertwined with various levels of coercion and violence.

26   Such arguably positive depictions of coercion and violence are detrimental to the goals of

4

1    acceptance of society's norms and respect for rules and boundaries and detrimental to

2    inmate rehabilitation.

3        20.    While such material has a negative effect on rehabilitation for all inmates, it

4    is especially harmful for inmates convicted of sexual offenses.  Sexually explicit pictures

5    and text directly undermine the treatment and counselling given to inmates convicted of

6    sexually-related offenses.  For example, to be eligible for ADC's Sex Offender Treatment

7    Program, required under Arizona law, an inmate must agree to refrain from any

8    pornography.  DO 923.01-1.5.1.

9        21.    Based on ADC administrator's and staff experience, it was concluded that

10   there was a logical connection between the presence of sexually explicit photographs and

11   text into the prison and inmate behavior that was detrimental to staff safety and the orderly

12   operation of the prison.  Accordingly, it was decided in 2010 to regulate sexually explicit

13   material entering the prison.

14       22.    Due to the unacceptable effects of the sexually explicit content flowing

15   through the prison, in 2010 ADC issued regulations prohibiting nudity and explicit sexual

16   language in incoming inmate mail.

17       23.    Since those regulations were adopted, staff has reported that they generally

18   feel more comfortable, especially female staff, because they are not exposed to unwanted

19   images and text of graphic, explicit sexual content.

20       24.    Allowing sexually-explicit publications back into the prison system would

21   have a detrimental effect on staff safety, inmate rehabilitation, and the orderly operation of

22   the prison.  Rehabilitation would be undermined and the problems caused by sexually-

23   explicit material as described-above, include harassment of staff.

24       25.    The policy in effect at the time of Plaintiff PLN's four 2014 publications that

25   were the subject of its original and First Amended Complaint was governed by Department

26   Order ("DO") 914, *Inmate Mail*, eff. February 26, 2010, with replacement page revision

dated June 8, 2012.  DO 914 described procedures for mailing publications such as newspapers, magazines, books, and periodicals.  A copy of this policy is attached as Attachment 1.

26.     The procedure for receipt, screening and delivery of mail at ADC is set-out in DO 914.  ADC staff picks up the ADC mail from the post office and processes it at each of the prison complexes.

27.     There are ten state-run prison complexes in Arizona.  Each complex is made up of anywhere between two and nine housing units, with each housing unit consisting of between 200 and 2000 inmates.

28.     The mail is opened, inspected for contraband, and is presorted by complex unit.

29.     At each unit, the mail gets divided in the mailroom.  ADC staff then again sorts each piece of mail, this time by the inmate's name and number.  The inmate's number is verified, in case the inmate has moved or transferred to a different unit.

30.     Each prison complex receives hundreds of magazines and publications weekly.  Publication review staff at each complex inspects and reviews each magazine and/or publication and checks a statewide database to see if they are allowed or excluded by another complex.

31.     Because of the volume of magazines and publications received by inmates, it is impossible for one person to review this material to determine if it meets regulations. Accordingly, each complex designates staff to review incoming magazines and publications.  Publication review staff is periodically trained on what to look for in reviewing magazines and publications.

32.     Despite the fact that each complex has its own staff reviewing magazines and publications, all appeals are handled and decided by the Office of Publication Review.

1    The Office of Publication Review is staffed by an ADC administrator and seeks to provide

2    consistency in publication decisions.

3        33.    The Office of Publication Review is also consulted by publication review

4    staff about publication decisions and manages the publication review database.    The

5    publication review database is a statewide database containing information about all

6    publications allowed or rejected by mailroom staff.

7        34.    Only designated staff at each /complex opens, inspects and reads incoming

8    mail to prevent criminal activity and prevent inmates from receiving contraband.

9        35.    The statewide database contains information about the decisions of other

10   facilities throughout the ADC system.  If one facility withholds a magazine or periodical,

11   such action is recorded in the database and that magazine or periodical would be similarly

12   withheld from all ADC facilities.  Similarly, magazine or periodicals that are allowed are

13   entered into the database and thereby allowed in each ADC facility.

14       36.    The ADC prohibits correspondence containing contraband, which is defined

15   as:  "[A]ny item considered to be a detriment to the safe and orderly operation of an

16   institution or parole officer."  Attachment 1, DO 914.08, and DO 914, p. 18.

17       37.    All publications are subject to screening and review and must meet the

18   standards and guidelines detailed in DO 914.

19       38.    DO 914.07 deems certain publication content contrary to ADC's penological

20   interest to "assist with the rehabilitation and treatment objectives, reduce sexual

21   harassment and prevent a hostile work environment for inmates, staff and volunteers.

22   Attachment 1, DO 914.07-1.1.

23       39.    Inmates were able to appeal a decision to withhold a publication for having

24   sexually explicit material.  Upon receiving a notice of exclusion, an inmate had twenty

25   days to appeal the decision to the Office of Publication review.  Attachement 1 DO

26   914.07-1.5.2. These appeals are denominated "second level reviews.

1    40.    Unauthorized publications include those that by their nature or content

2    threaten or are detrimental to the security, safety and orderly operation, or discipline of the

3    facility, or inmate rehabilitation, or are found to facilitate, encourage, incite, promote or

4    instruct in criminal activity or unauthorized prison activity.  Attachment 1, DO 914.08.

5    41.    The four monthly *Prison Legal News* issues and the *Celling of America* book

6    were all subject to the policy in place effective February 26, 2010 ("Former Policy").

7    Attachment 1.

8    42.    The Former Policy did not provide for a formal notification and hearing

9    process for senders to appeal rejected materials.

10    43.    On March 4, 2016 ADC amended its Inmate Mail policy on publication

11    notification and required that publishers be given notice and the opportunity to

12    administratively appeal such decisions if their publications are excluded.

13    44.    DO 914.06, §1.17 provides that:

14/15/16/17/18/19
> The Department will provide notice to publishers via email of the decision to exclude a publication or part of a publication within seven calendar days following the decision to exclude. If no email address is available, the notice will be sent to the publisher's mailing address as specified within the publication.  Publishers will have the same opportunity to seek an appeal as an inmate under Department Order 914. The notice to the publisher shall include sufficient information to identify the specific publication and the reason(s) for the exclusion.

20    Department Order 914.08, § 1.2.1 provides that:

21/22/23
> The Office of Publication Review shall notify publishers within 14 calendar days when one of their publications or part of a publication is excluded.

24/25/26
> 1.2.1.1    Publishers may request an appeal by notifying the Office of Publication Review within 30 calendar days of the publisher's receipt of the exclusion.

26    (Attachment 2.)

8

45.     The current policy now in place offers an appeal process whereby inmates and/or publishers/ senders can appeal rejection of publications.   (Attachment 2, DO 914.08.)

46.     The ADC provides inmates access to reading materials through Resource Centers/libraries located at each of the prison units.   The centers generally provide materials which support academic and personal development programs including career education, substance and abuse prevention and life skills.  The Resource Centers/libraries also provides fiction, non-fiction, newspapers, magazines and general reference materials. *See generally* DO 919.

47.     Inmates at all custody levels have access to the fiction, non-fiction, newspapers, magazines and general reference materials located in their complex's Resource Center/library.  Depending on the custody level, inmates can browse through the material or have material delivered to their cell.

48.     The Resource Center/library located at each unit vary in size depending on the size of the unit, but each have a significant amount of reading material.  Due to time and personnel restraints, books are not read as part of publication review under DO 914 to determine if there is sexually-explicit content.  Books that have an obviously sexually-explicit orientation may be excluded under DO 914.

49.     Inmates also have access to commercial television programming, depending on their custody level.  Attached as Attachment 12 is a list of the available channels. These are all commercially available channels and many of these channels and programs have content that is sexually-related. ADC does not monitor or regulate the programming available to inmates on these channels.  That is, any program available on these channels is available to inmates.

50.     While the Department of Corrections strives to exclude all sexually explicit material pursuant to its regulations in order to promote the security, the safety, and the

9

1  orderly operation of the institution and to deter criminal activity, it is not perfect and

2  despite its best efforts does not keep out all sexually explicit material.

3      51.    DO 914 does not prohibit any and all sexually-related material in

4  publications, but only sexually explicit material.

5  //

6  //

7  //

8  //

9  //

10  //

11  //

12  //

13  //

14

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

1    I declare under penalty of perjury that the foregoing is true and correct.

2                  Executed this ⁄⁄ day of April, 2018.

Carson McWilliams

#6910726

11

# Exhibit B

1  Mark Brnovich
   Attorney General
2
   Michael E. Gottfried
3  State Bar No. 010623
   Assistant Attorney General
4  2005 North Central Avenue
   Phoenix, Arizona 85004-1592
5  Telephone: (602) 542-7693
   Fax:  (602) 542-7670
6  E-mail:  michael.gottfried@azag.gov

7  *Attorneys for Defendants Ryan, Rittenhouse,*
   *Hood, Olson, Riggs and Guzman*
8

9              **IN THE UNITED STATES DISTRICT COURT**

10                **FOR THE DISTRICT OF ARIZONA**

11
   Prison Legal News, a project of the        No:  CV15-02245-PHX-ROS
12 Human Rights Defense Center,
                                              **DECLARATION OF JAMES RIGGS**
13            Plaintiff,

14 v.

15 Charles L. Ryan, et al.,

16            Defendants.

17        I, JAMES RIGGS, hereby state under penalty of perjury, that the following

18 information is true to the best of my knowledge:

19        1.      I have been employed by the Arizona Department of Corrections ("ADC")

20 since July 2012.  I worked in the Office of Publication Review ("OPR") as the Quality

21 Assurance Coordinator from July 2012 until early May 2016.  My current official title is

22 Administrative Services Officer III, Special Projects Administrator.

23        2.      My duties within the OPR as the Quality Assurance Coordinator, were to

24 review publications that were sent to me from complexes, provide training opportunities

25 for complex publication review staff, and act as the second-level review staff.  Alf Olson

26 also worked in the OPR and had similar duties.

3.     I am competent to testify as to the matters contained herein and make this Declaration based upon my own personal knowledge, as well as review of pertinent ADC records maintained in the ordinary course of business.

4.     Prior to assuming my position as the Quality Assurance Coordinator within OPR, I received three weeks of training from the predecessor Quality Assurance Coordinator.

5.     I also received overall guidance and direction from other people in the complexes, including Sgt. Frame and Sgt. McClincy.

6.     The policy in effect at the time of the March, April, July, or October 2014 issues of *Prison Legal News* that were the subject of its original and First Amended Complaint was governed by Department Order ("DO") 914, *Inmate Mail*, eff. February 26, 2010, with replacement page revision dated June 8, 2012.  DO 914 described procedures for, among other things, reviewing publications such as newspapers, magazines, books, and periodicals.  The same policy also described notice provisions (DO 914, 914.02- 1.7). A copy of this policy is attached as Attachment 1.

7.     I did not review or make any final decisions with regards to the March, April, July, or October 2014 issues of *Prison Legal News* that were the subject of its original and First Amended Complaint.

8.     Department Order 914.07 (effective February 10, 2010)[1] is titled "Sexually Explicit Material" and provides that inmates are not permitted to "send, receive or possess sexually explicit material."  (Attachment 1.)

9.     DO 914.07 explains that certain sexually explicit material is contrary to ADC's penological interest to "assist with the rehabilitation and treatment objectives,

---

[1] All references to DO 914 in this Declaration refer to the version effective February 26, 2010, attached as Attachment 1, unless otherwise indicated.

2

reduce sexual harassment and prevent a hostile work environment for inmates, staff and volunteers."

10.    The February 26, 2010 version of DO 914 prohibited publications that by their nature or content "threaten or are detrimental to the security, safety and orderly operation, or discipline of the facility...."

11.    ADC mail is delivered from the post office and it is processed at each of the prison complexes.

12.    There are ten state-run prison complexes in Arizona. Each complex is made up of anywhere between three and nine housing units, with each housing unit consisting of between 200 and 2000 inmates.

13.    Prior to the mail being opened, it is reviewed for a complete return address, including the sender's name, the inmates' complete first and last name, and the inmates correct ADC number, as well as the inmate's unit name and appropriate Post Office Box.

14.    Publication review is done at the complex level. The mail is opened, inspected and reviewed for contraband and publication review. Each complex receives hundreds of magazines and publications a week. Staff inspects and reviews each magazine and/or publication and checks a statewide database to see if they are allowed or excluded by another complex.

15.    The mail gets placed in a bucket, presorted by complex unit, and then delivered to the housing unit.

16.    At each housing unit, the mail gets divided in the unit property room. ADC staff then again sorts each piece of mail, this time by the inmate's name and number. The inmate's number is verified, in case the inmate has moved or transferred to a different unit.

17.    Because of the volume of magazines and publications received by inmates, it is impossible for one person to review this material to determine if it meets regulations. Accordingly, each unit/complex designates staff to review incoming magazines and

3

1    publications.   Publication-review staff was periodically trained on what to look for in

2    reviewing magazines and publications.

3        18.    Because of the volume of magazines and publications received by inmates,

4    some arguably graphic, explicit publications are missed by publication-review staff and

5    some arguably non-graphic, explicit publications are excluded by publication-review staff.

6    In light of the countless variations involved with sexually-related text, the Arizona

7    Department of Corrections and the Office of publication review strives to be as consistent

8    as possible with its publication policy.

9        19.    Inmates were able to appeal a decision to withhold a publication for having

10   sexually explicit material.  Upon receiving a notice of exclusion, an inmate had twenty

11   days to appeal the decision to the Office of Publication review.  DO 914.07-1.5.2 (eff.

12   February 26, 2010).   (Attachment 1.)   These appeals are denominated "second level

13   reviews."

14       20.    Under the version of DO 914 in effect in 2014, any exclusions under DO

15   914.08 had to be done by the OPR.  Inmate appeals, that is requests for second-level

16   review, were done by a Division Director or the Director's designee.  DO 914,10-1.1.9

17   (eff. February 26, 2010).  (Attachment 1.)  In 2014, this review was typically done by

18   Deputy Director Jeff Hood.

19       21.    Complex-level publication-review staff reviewed publication for sexually-

20   explicit material under DO 914.07 (eff. February 26, 2010). (Attachment 1.)  Second level

21   reviews of excluded publications that contained nudity and/or sexual behaviors/acts for

22   artistic, scientific, medical, educational or anthropological purposes were done by a

23   Division Director or the Director's designee. DO 914.07-1.5. 3 (eff. February 26, 2010).

24   (Attachment 1.)  Otherwise, the OPR conducted second-level reviews of these decisions if

25   appealed.914.10-1.1.5 (eff. February 26, 2010).  (Attachment 1.)

26

4

22.   Publications review staff would often ask the OPR to make the initial decision if publications review staff were unclear or unsure about whether a publication should be allowed.  DO 914.10-1.1.1 (eff. February 26, 2010). (Attachment 1.)

23.   Alf Olson of the OPR excluded the March 2014 and April 2014 issues of *Prison Legal News* under DO 914.08-1.1.18 (eff. February 26, 2010).  (Attachment 1.) The July 2014 issue of *Prison Legal News* was excluded by Complex-level staff under DO 914.07 (eff. February 26, 2010) (Attachment 1) and affirmed by Alf Olson at OPR upon second-level review. The October 2014 issue of *Prison Legal News* was excluded by Alf Olson under DO 914.07 (eff. February 26, 2010).   (Attachment 1.)   None of these decisions were appealed to Deputy Director Hood

24.   The 2010 version of DO 914 did not provide for a formal notification and hearing process for senders or publishers to appeal excluded materials.  (Attachment 1.)

25.   Nonetheless, the publisher of *Prison Legal News* was notified that the March 2014, April 2014, and July 2014 issues were being excluded and contacted ADC to raise its concerns.

26.   Based on these communications, the Office of Publication Review reversed the March 2014, April 2014, and July 2014 *Prison Legal News* exclusion decisions.

27.   The March 2014, April 2014, and July 2014 *Prison Legal News* issues were delivered to all ADC subscribers.

28.   Without any communication from the publisher of Prison Legal News, or its agents, the Office of Publication Review reversed the October 2014 *Prison Legal News* exclusion decision, but redacted two paragraphs from the publication, upon advice of legal counsel.

29.   The October 2014 *Prison Legal News* issue was delivered to all ADC subscribers with the redaction.

1       30.    Until these 2014 exclusions, no previous issues of the *Prison Legal News*

2    have been excluded by ADC.

3       31.    When a publication is excluded, publication review staff enters the

4    information on the PRD.

5       32.    Once a publication is allowed or excluded it is entered into the PRD.  All

6    future identical publications will be similarly allowed or excluded as the original decision is

7    not revisited unless changed upon appeal.  The first exclusion or allowance decision entered

8    into the PRD is the controlling decision unless changed by appeal.

9       33.    In 2011 a PLN-distributed book *The Celling of America* was excluded by

10    ADC.  Based upon this 2011 exclusion, *The Celling of America* was excluded in 2015.  DO

11    914.06-1.13 (eff. February 26, 2010).  (Attachment 1.)

12       34.    Due to time and personnel restraints, books are not read in their entirety as

13    part of publication review under DO 914 to determine if there is sexually-explicit

14    content.  Books that have an obviously sexually-explicit orientation may be excluded under

15    DO 914.  As such, ADC libraries may contain books with sexually-explicit content.

16       35.    I was given excerpts of books located in the Resource Center/Library at the

17    Dakota Unit, ASPC-Yuma, which is representative of the libraries at ADC housing units of

18    similar size.  The Dakota library has over 5,000 books. The books excerpts I reviewed

19    were from Hannibal by Thomas Harris, Nightfall by Nelson DeMille, Four to Score by

20    Janet Evanovich., and The Scarecrow by Michael Connolly.  Each of these books is

21    located in the Dakota unit library, available to inmates , and the excerpts from these books

22    contained sexually–related text.

23       36.    The purpose of the Office of Publication Review and its enforcement of the

24    relevant provisions of DO 914 is to exclude graphic sexually-explicit and other potentially

25    harmful material from the prison system.  This purpose supports the overall goal of the

26    Arizona Department of Corrections to promote the safe, secure, and orderly operation of the

1    prison system by assisting with inmate rehabilitation and treatment objectives, reducing

2    sexual harassment, and preventing a hostile environment for inmates, staff, and

3    volunteers.  Material that is merely sexually-related or involves sexuality is not summarily

4    excluded or redacted simply because it is sexually-related or involves sexuality.

5    … …

6    … …

7    … …

8    … …

9    … …

10    … …

11    … …

12    … …

13    … …

14    … …

15    … …

16    … …

17    … …

18    … …

19    … …

20    … …

21    … …

22    … …

23    … …

24    … …

25    … …

26    … …

1   ... ...

2         I declare under penalty of perjury that the foregoing is true and correct.

3                            Executed this _12_ day of April, 2018.

4

5

6                            James Riggs

7

8 #6960231

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

7

# Exhibit C

1  Mark Brnovich
   Attorney General
2
3  Michael E. Gottfried
   State Bar No. 010623
   Assistant Attorney General
4  2005 North Central Avenue
   Phoenix, Arizona 85004-1592
5  Telephone: (602) 542-7693
   Fax:  (602) 542-7670
6  E-mail:  michael.gottfried@azag.gov

7  *Attorneys for Defendants Ryan, Rittenhouse,*
   *Hood, Olson, Riggs and Guzman*
8

9          **IN THE UNITED STATES DISTRICT COURT**

10            **FOR THE DISTRICT OF ARIZONA**

11 | Prison Legal News, a project of the    No:  CV15-02245-PHX-ROS
12 | Human Rights Defense Center,
                                           **DECLARATION OF JAMIE GUZMAN**
13 |            Plaintiff,

14 | v.

15 | Charles L. Ryan, et al.,

16 |            Defendants.

17      I, JAMIE GUZMAN, hereby state under penalty of perjury, that the following

18 information is true to the best of my knowledge:

19      1.    I was employed by the Arizona Department of Corrections ("ADC").   I

20 worked in the Office of Publication Review ("OPR") as the Legal Support Unit Supervisor

21 within ADC's Legal Services from July 1, 2016 to October 13, 2017.

22      2.    As the Legal Support Unit Supervisor in OPR, my duties included, among

23 other things, reviewing publications as the second-level review when inmates or publishers

24 appealed an exclusion decision, providing training opportunities for complex publication

25 review staff, and acting as a resource for questions and advice for publication review staff.

26

3.     I am competent to testify as to the matters contained herein and make this Declaration based upon my own personal knowledge, as well as review of pertinent ADC records maintained in the ordinary course of business.

4.     I was trained for this position by my OPR predecessor, Jim Riggs; ADC General Counsel, Brad Keogh; Deputy General Counsel, Courtney Glynn; and through my legal and non-legal education, training, background, and experience.

5.     ADC staff processes prisoner mail at each of the prison complexes pursuant to Department Orders 902 (legal mail) and 914 (Inmate Mail).  More specifically, the mail is opened, inspected, reviewed, and processed at each complex applying these Department Orders.

6.     There are ten state-run prison complexes in Arizona.  Each complex is made up of anywhere between three and nine housing units, with each housing unit consisting of between 200 and 2000 inmates.

7.     Each housing unit receives hundreds of magazines and publications a week. Publication Review staff inspects and reviews each magazine and/or publication and checks a statewide database to see if they are allowed or excluded by another complex.

8.     The volume of magazines and publications received by inmates requires numerous staff members to review this material to determine if it meets Departmental policy.  Accordingly, each unit/complex designates staff to review incoming magazines and publications.  Publication-review staff is periodically trained on what to look for in reviewing magazines and publications pursuant to DO 914.06-1.11.

9.     Because of the volume of magazines and publications received by inmates and because humans are applying Departmental policy on what is deemed Unauthorized Content, it is possible that some arguably graphic, explicit publications are missed by publication-review staff and some arguably non-graphic, explicit publications are excluded by publication-review staff.  In light of the countless variations involved with sexually-

2

1  related text, the Arizona Department of Corrections and the Office of publication review

2  strives to be as consistent as possible with its publication policy and its application.

3       10.     In regards to publications containing sexual content, under DO 914 ADC

4  staff is not looking to exclude any and all sexual content within a publication, but only

5  explicit sexual content.

6       11.     Department Order 914.07 (effective February 10, 2010) is titled "Sexually

7  Explicit Material" and provides that inmates are not permitted to "send, receive or possess

8  sexually explicit material." Attachment 1.

9       12.     Department Orders 914.07 (effective March 4, 2016 and April 7, 2017) are

10  both titled "Unauthorized Content" and each provide that inmates are not permitted to

11  "send, receive or possess sexually explicit material." Attachment 2 (DO 914.07 (effective

12  March 4, 2016)); Attachment 3 (DO 914.07 (effective April 7, 2017)).

13       13.     Although each unit/complex has its own staff reviewing magazines and

14  publications, all appeals are processed and decided by the Office of Publication Review.

15  The Office of Publication Review is staffed by an ADC administrator and seeks to provide

16  consistency in publication decisions.

17       14.     The Office of Publication Review is also consulted by mailroom staff about

18  publication decisions and manages the publication review database ("PRD"). The PRD is

19  a statewide database containing information about publications allowed or rejected by

20  ADC.

21       15.     The statewide database contains information about the decisions of other

22  facilities throughout the ADC system. If one facility withholds a magazine or periodical,

23  such action is recorded in the database and that magazine or periodical would be similarly

24  withheld from all ADC facilities. Similarly, magazine or periodicals that are allowed are

25  entered into the database and thereby allowed in each ADC facility.

26

16.     All publications are subject to screening and review and under DO 914.[1]

17.     DO 914.07 explains that certain explicit material is contrary to ADC's penological interest to "assist with the rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile work environment for inmates, staff and volunteers."

18.     The publications prohibited by the February 26, 2010 version of DO 914 include those that by their nature or content "threaten or are detrimental to the security, safety and orderly operation, or discipline of the facility...."

19.     The March 4, 2016 and current April 7, 2017 versions of DO 914.07 also made clear that explicit materials, including sexually explicit materials, are "detrimental to the safe, secure, and orderly operation of the facility." (DO 914.07-1.1, eff. March 4, 2016 (Attachment 2) and April 7, 2017 (Attachment 3.))

20.     Prohibited publications are considered contraband. Contraband is defined as: "[A]ny item considered to be a detriment to the safe and orderly operation of an institution or parole officer." (Definitions, DO 914) (Attachment 2, 3.)

21.     Inmates may appeal a decision to withhold a publication for having explicit, unauthorized material. Upon receiving a notice of exclusion, an inmate has thirty days to appeal the decision to the Office of Publication review. DO 914.08-1.2. Under the version of DO 914 effective February 26, 2010 (Attachment 1) inmates had twenty days to appeal an exclusion decision. DO 914.07-1.5.2 (eff. February 26, 2010) (Attachment 1). These appeals are denominated "second level reviews."

22.     The four monthly Prison Legal News issues and the Celling of America book were all subject to the policy in place effective February 26, 2010 ("Former Policy").

---

[1] Unless otherwise indicated, references to DO 914 include all three versions involved in this case, attached as Attachments 1, 2, 3.

1   23. The Former Policy did not provide for a formal notification and hearing

2 process for senders to appeal rejected materials.

3   24. Despite the absence of a formal notice and hearing procedure, PLN had

4 actual notice that four of its publications were excluded.  PLN raised its concerns with

5 ADC and it was successful in reversing three of four decisions to withhold its publications.

6 The fourth publication was delivered with a two-paragraph redaction.

7   25. Shortly after PLN's initial Complaint was filed, ADC voluntarily adopted

8 and implemented an administrative regulation requiring that publishers be given notice if

9 their publication(s) are excluded.  This change was initiated and in-process well-before

10 PLN filed this lawsuit.

11   26. On March 4, 2016 ADC amended its Inmate Mail policy on publication

12 notification requiring that publishers be given notice and the opportunity to

13 administratively appeal such decisions if their publications are excluded.

14   27. The March 4, 2016 and current April 7, 2017 versions of DO 914.06, §1.17

15 provide that:

> The Department will provide notice to publishers via email of the decision to exclude a publication or part of a publication within seven calendar days following the decision to exclude. If no email address is available, the notice will be sent to the publisher's mailing address as specified within the publication.  Publishers will have the same opportunity to seek an appeal as an inmate under Department Order 914. The notice to the publisher shall include sufficient information to identify the specific publication and the reason(s) for the exclusion.

The current April 7, 2017 version of DO 914.08, § 1.2.1 provides that:

> The Office of Publication Review shall notify publishers within 14 calendar days when one of their publications or part of a publication is excluded.

1.2.1.1     Publishers may request an appeal by notifying the Office of Publication Review within 30 calendar days of the publisher's receipt of the exclusion.

The March 4, 2016 version of DO 914.08, § 1.2.1 is identical to the current version except that publishers were to be notified within seven days of an exclusion. Given the amount of work done by the Office of Publication Review, a seven-day notice period was problematic. (Attachments 2, 3.)

28.     When a publication is excluded, property-room staff enter the information into the PRD and the Office of Publication Review sends notice of the exclusion to publishers. Property-room staff notify inmates when a publication sent to him or her is excluded.

29.     The Office of Publication Review periodically informally reviews unit-level exclusion decisions.

30.     Since adoption in March 2016 of the notice-to-publishers provision, hundreds of exclusion notices have been sent to publishers.

31.     On or about March 18, 2016, a unit-level decision was made to exclude the March 2016 issue of *Prison Legal News*. Notice was inadvertently not given to the publisher. The Office of Publication Review reversed the exclusion decision on May 4, 2016 and all issues were delivered to subscribers.

32.     On or about April 12, 2016, a unit-level decision was made to exclude the April 2016 issue of *Prison Legal News*. Notice was inadvertently not given to the publisher. The Office of Publication Review reversed the exclusion decision on May 2, 2016 and all issues were delivered to subscribers.

33.     ADC redacted a portion of the April 2017 *Prison Legal News* issue. Notice was given to the publisher who did not appeal.

34.     ADC redacted a portion of the May 2017 Prison Legal News issue. Notice was given to the publisher who did not appeal.

1    35. ADC redacted a portion of the June 2017 Prison Legal News issue.  Notice

2 was given to the publisher who did not appeal.

3    36. The redacted April, May, and June 2017 issues of *Prison Legal News* were

4 delivered to inmates who appealed the exclusion.  (Attachments 5, 6, 7.)

5    37. Due to time and personnel restraints, books not obviously containing

6 sexually-explicit or other unauthorized content are generally scanned for the same and not

7 read cover-to-cover as part of publication review under DO 914.  Books that have an

8 obviously sexually-explicit orientation may be excluded under DO 914.  As such, ADC

9 libraries may contain books with sexually-explicit content.

10    38. The goal of the Office of Publication Review is to exclude explicit,

11 unauthorized material.  Simply being sexually-related or involving sexuality was and is not

12 now a reason to exclude or redact a publication.

13 … …

14 … …

15 … …

16 … …

17 … …

18 … …

19 … …

20 … …

21 … …

22 … …

23 … …

24 … …

25 … …

26 … …

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed this ⟨1⟩th day of April, 2018.

3

4

Jamie Guzman

5

6    #6941173v.2

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# Exhibit D

1   Mark Brnovich
    Attorney General

2

3   Michael E. Gottfried
    State Bar No. 010623
4   Assistant Attorney General
    2005 North Central Avenue
    Phoenix, Arizona 85004-1592
5   Telephone: (602) 542-7693
    Fax:  (602) 542-7670
6   E-mail:  michael.gottfried@azag.gov

7   *Attorneys for Defendants Ryan, Rittenhouse,*
    *Hood, Olson, Riggs and Guzman*

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF ARIZONA

11   Prison Legal News, a project of the        No: CV15-02245-PHX-ROS
     Human Rights Defense Center,
12                                               **DECLARATION OF CHARLES L. RYAN**
13              Plaintiff,

14   v.

15   Charles L. Ryan, et al.,

16              Defendants.

17          I, CHARLES L. RYAN, hereby state, under penalty of perjury, that the following

18   information is true to my knowledge, information, and belief:

19          1.      I am employed by the Arizona Department of Corrections.  I have served as

20   the Director of the Arizona Department of Corrections since January 30, 2009.

21          2.      I am competent to testify as to the matters contained herein and make this

22   Declaration based upon my own personal knowledge, as well as review of pertinent

23   Arizona Department of Corrections' records maintained in the ordinary course of business.

24          3.      Pursuant to A.R.S.  §  41-1604(B)(2)(d), the Director may delegate to

25   appropriate personnel the administrative functions, powers or duties that the Director

26   believes can be competently, efficiently and properly performed.

1    4.    The operation of publication review is delegated to the Office of Public

2  Review.

3    5.    I had no involvement with or had knowledge of the publication review or

4  withholding of any issues of *Prison Legal News* or the *Celling of America* involved in this

5  lawsuit.

6    I declare, under penalty of perjury, that the foregoing is true and correct to the best

7  of my knowledge, information, and belief.

8    Executed this 11th day of April, 2018.

9

10    _____

11    Charles L. Ryan

12  #6953414

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

# Exhibit E

1  Mark Brnovich
   Attorney General
2
   Michael E. Gottfried
3  State Bar No. 010623
   Assistant Attorney General
4  2005 North Central Avenue
   Phoenix, Arizona 85004-1592
5  Telephone: (602) 542-7693
   Fax: (602) 542-7670
6  E-mail: michael.gottfried@azag.gov

7  *Attorneys for Defendants Ryan, Rittenhouse,
   Hood, Olson, Riggs and Guzman*

8

9              IN THE UNITED STATES DISTRICT COURT

10               FOR THE DISTRICT OF ARIZONA

11
   Prison Legal News, a project of the        No: CV15-02245-PHX-ROS
12 Human Rights Defense Center,
                                              **DECLARATION OF JEFFREY HOOD**
13            Plaintiff,

14 v.

15 Charles L. Ryan, et al.,

16            Defendants.

17         I, JEFFREY HOOD, declare under penalty of perjury that the following information

18 is true to the best of my information, knowledge, and belief:

19         1.    I was employed by the Arizona Department of Corrections ("ADC") as

20 Deputy Director from 2011 through September 2016 when I was appointed as Interim

21 Director of the Arizona Department of Juvenile Corrections. I was appointed as Director

22 of the Arizona Department of Juvenile Corrections in January 2018.

23         2.    As the ADC Deputy Director my duties and responsibilities included, but

24 were not limited to, broadly administering policies and procedures, supervising the work of

25 others, custody, discipline and welfare of inmates.

26

3.     I am competent to testify to the matters contained herein, am over the age of 18 years of age, and this Declaration is made of my personal knowledge, experience, and review of pertinent ADC documents.

4.     Under the version of DO 914 in effect in 2014, any exclusions under DO 914.08 had to be done by the OPR.  Inmate appeals, that is requests for second-level review, were done by a Division Director or the Director's designee.  DO 914,10-1.1.9 (eff. February 26, 2010).  In 2014, this review was typically done by me.

5.     Complex-level publication-review staff reviewed publication for sexually-explicit material under DO 914.07 (eff. February 26, 2010).  Second level reviews of excluded publications that contained nudity and/or sexual behaviors/acts for artistic, scientific, medical, educational or anthropological purposes were done by a Division Director or the Director's designee.  DO 914.07-1.5.3 (eff. February 26, 2010).  Otherwise, the OPR conducted second-level reviews of these decisions if appealed.  DO 914.10-1.1.5 (eff. February 26, 2010).

6.     Before March 2016, different people at different times, including myself, were designated to complete this second-level publication review.

7.     As of March 4, 2016, this provision under DO 914 was removed and the Division Director or the Director's designee are no longer involved in the publication review process.  Beginning in March 2016 the Office of Publication Review handled all second-level reviews.

8.     I had no involvement with or knowledge of the publication review or withholding, or redaction of any issues of the *Prison Legal News* involved in this lawsuit.

9.     On October 18, 2012 I was involved in the second-level review of a publication called *The Celling of America*, which I am now advised is a publication distributed by the Plaintiff in this case.  This review affirmed the exclusion of *The Celling of America* under DO 914.

2

1      I declare under penalty of perjury that the foregoing is true and correct.

2                                 Executed this 17th day of April, 2018.

Jeffrey Hood

#6941225v.2

# Exhibit F

1  Mark Brnovich
   Attorney General
2
   Michael E. Gottfried
3  State Bar No. 010623
   Assistant Attorney General
4  2005 North Central Avenue
   Phoenix, Arizona 85004-1592
5  Telephone: (602) 542-7693
   Fax: (602) 542-7670
6  E-mail:  michael.gottfried@azag.gov

7  *Attorneys for Defendants Ryan, Rittenhouse,*
   *Hood, Olson, Riggs and Guzman*
8

9                    **IN THE UNITED STATES DISTRICT COURT**
10                      **FOR THE DISTRICT OF ARIZONA**
11
   Prison Legal News, a project of the          No:  CV15-02245-PHX-ROS
12 Human Rights Defense Center,
                                                 **DECLARATION OF GAIL**
13                 Plaintiff,                     **RITTENHOUSE**
14 v.
   Charles L. Ryan, et al.,
15
                   Defendants.
16

17       I, GAIL RITTENHOUSE, hereby state under penalty of perjury, that the following

18 information is true to the best of my knowledge:

19       1.      I was employed by the Arizona Department of Corrections ("ADC") as the

20 Division Director for Support Services from May 2012 to March 17, 2017.

21       2.      As the Division Director for Support Services, I oversaw Human Resources,

22 Staff Development and Training, and Inmate Programs, including education, pastoral

23 services, inmate work programs and counseling and treatment.

24       3.      I am competent to testify as to the matters contained herein and make this

25 Declaration based upon my own personal knowledge, as well as review of pertinent ADC

26 records maintained in the ordinary course of business.

1   4.  I did not have a supervisory role in the Office of Publication Review

2 ("OPR").  I therefore did not work on or decide any OPR publication review decisions.

3   5.  I had no involvement with or knowledge of the publication review or

4 withholding of any issues of *Prison Legal News* or the *Celling of America* involved in this

5 lawsuit.

6   I declare under penalty of perjury that the foregoing is true and correct.

7   Executed this 11ᵗʰ day of April, 2018.

8

9              Gail Rittenhouse

10             Gail Rittenhouse

11

12 #6941445

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# Exhibit G

1   Mark Brnovich
    Attorney General
2
    Michael E. Gottfried
3   State Bar No. 010623
    Assistant Attorney General
4   2005 North Central Avenue
    Phoenix, Arizona 85004-1592
5   Telephone: (602) 542-7693
    Fax: (602) 542-7670
6   E-mail: michael.gottfried@azag.gov

7   *Attorneys for Defendants Ryan, Rittenhouse,*
    *Hood, Olson, Riggs and Guzman*
8

9                   **IN THE UNITED STATES DISTRICT COURT**

10                  **FOR THE DISTRICT OF ARIZONA**

11  | Prison Legal News, a project of the | No: CV15-02245-PHX-ROS |
12  | Human Rights Defense Center, | |
    | | **DECLARATION OF GARY W. DELAND** |
13  |        Plaintiff, | |

14  v.

15  Charles L. Ryan, et al.,

16         Defendants.

17          I, GARY W. DELAND, hereby state, under penalty of perjury, that the following

18  information is true to the best of my knowledge and information:

19          1.      On or about July 1, 2016, I was retained as an expert witness to evaluate the

20  above-captioned case on behalf of the Defendant State of Arizona.

21          2.      My professional opinions are stated in a Rule 26 Expert Report dated

22  December 15, 2016 (Expert Report), attached hereto as Exhibit 1.

23          3.      I acknowledge that to the best of my knowledge and belief, the information

24  provided in the Expert Report is true and accurate.

25

26

1        4.    I believe that I am qualified to offer the opinions expressed in the report,

2    based upon my education, training, knowledge, experience, and review of records

3    referenced at page 20 of the Expert Report (Exhibit A), provided by Defendant's counsel.

4        I declare under penalty of perjury that the foregoing is true and correct.

5                     Executed this 11^ day of April, 2018.

6

7                     GARY W. DELAND

8    #6953260

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit 1**

IN THE UNITED STATES COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Prison Legal News**, a project of the Human Rights )<br>Defense Center, )<br>                 Plaintiffs, )<br> )<br>         v. )<br> )<br>**Charles L. Ryan**, in his official capacity as )<br>Director of the Arizona Department of Corrections )<br>and in his individual capacity; **Gail Rittenhouse**, )<br>in her official capacity as Division Director, )<br>Support Services of the Arizona Department of )<br>Corrections and in her individual capacity; **Jeff** )<br>**Hood**, in his official capacity as Deputy Director of )<br>the Arizona Department of Corrections and in his )<br>individual capacity; **Alf Olson**, in his official )<br>capacity as an employee of the Office of )<br>Publication Review of the Arizona Department of )<br>Corrections and in his individual capacity; and )<br>Does 1 to 20, inclusive, )<br> )<br>             Defendants. )  | Case 2:15-cv-02245-ROS<br><br>**Expert Report of**<br>**Gary W. DeLand** |

---

## Part One
## Introduction

A.    I was contacted July 1, 2016, by **Michael E. Gottfried**, Assistant Attorney General, Office of the Attorney General, State of Arizona, Liability Management Section, requesting my services as an expert witness in the instant case. I agreed to review the case and determine whether I could serve as an expert witness. After my initial review, I determined that I would be able to render opinions regarding the instant case.

B.    In preparation for serving as an expert witness in this case, I am relying on:

    1.    File documents received from the Attorney General's Office;

    2.    More than four decades of corrections-related experience, including, but not

limited to:

- Executive Director, **Utah State Department of Corrections** (1985-1992);
- Jail administration, **Salt Lake County Jail** (1973-1979; Jail Commander 1978-1979);
- Executive Director, **Utah Sheriffs' Association** (1994-2013) (Administration, conference planning, manage training program, fund-raising duties, updating the Utah Jail Standards, administer the Association's jail audit program).
- Jail Operations Director, **Utah Sheriffs' Association** (2013-present) (Administer the Jail Standards and Audit Program, administer and train in the Jail Commander Certification Academy, and provide technical assistance to Sheriffs and jail officials regarding jail operations);
- Technical assistance provider and/or trainer for the **National Institute for Jail Operations, National Institute of Corrections, National Sheriffs' Association, American Jail Association, American Correctional Association, Americans for Effective Law Enforcement, National Indian Police Academy, Fred House Corrections Academy (State of Utah), Utah Sheriffs' Association's Advanced Management Training Institute, Utah Sheriffs' Association's Jail Commander Certification Academy, the Iraqi Ministry of Justice, Iraqi Correctional Services,** numerous local jurisdictions, and various private corrections companies;
- Conducting training seminars and speaking at National conferences across the United States (from Florida and Washington D.C. in the East to California and Hawai'i in the West) and for the Iraqi Correctional Services Academy, in Baghdad, Iraq);
- Conducting jail and prison audits, inspections, and litigation vulnerability assessments;
- Served as Editor-in-Chief and Executive Editor, **Corrections Managers' Report**, a professional journal published by Civic Research Institute, Inc., New Jersey; and
- Serving on various corrections planning groups, advisory boards, and committees established to provide assistance to corrections officials and professional organizations;

3.  Ongoing professional interaction with various state, county, municipal, and private corrections officials; criminal justice researchers and writers; and other corrections and criminal justice experts and officials; and

4.  Developing and/or assisting in the development of corrections training academies and other pre-service and in-service training programs.

DeLand XR - PLN v. Ryan - 2

C.    I will make a limited number of references to legal authority in instances when including such references will help explain the basis for – or illustrate a point or element of – one or more of my opinions.[1]

D.    Fee schedule.

    1.    Work done without travel more than 50 miles from my office:

        $   300.00    Hourly rate for file review, report writing, and other work done which does not require travel.

        $ 2,400.00    Rate for each day or part of a day during which I am required to travel more then 50 miles from my office to provide onsite inspections, conduct onsite interviews, meet with Defendants' counsel, and/or provide court testimony (plus travel-related expenses).

    2.    For depositions:

        $ 2,400.00    Rate for each day of onsite and travel (plus travel-related expenses with deposition fees to be paid on the day of the deposition).

    If I do not have to travel more than 50 miles, depositions will be billed at a rate of:

        $ 600.00      for 120 minutes or less from scheduled start of deposition
        $ 1,200.00    for 121 minutes to 4 hours from scheduled time of deposition
        $ 1,800.00    for 4 to 6 hours from scheduled time of deposition
        $ 2,100.00    for 6 to 7 hours from scheduled time of deposition
        $ 2,400.00    for more than 7 hours from scheduled time of deposition

    3.    For trial testimony:

        $ 2,400.00    Rate for each day of onsite and travel (plus travel-related expenses with deposition fees to be paid on the day of the deposition).

---

[1] Any reference I make to case law or statues in this report will be provided only when my layman's understanding of the case law and/or statutes was a factor in forming or explaining any of my opinions. **None of the references to statutes or case law are provided with the intent of presuming to interpret the law for the court.** Obviously, that is the function of the court; however, where any of my opinions are influenced to some degree by my understanding of legal authority or can be better illustrated by such references, referencing the legal authority will more fully disclose all bases for my opinions.

DeLand XR - PLN v. Ryan - 3

## Part Two
## Qualifications and Expertise:  Gary W. DeLand

This section of my report provides a synopsis of key elements of my qualifications and expertise to serve as an expert witness in the above captioned case.

A.   **Criminal Justice Work and Experience**

**1975-present** **DeLand and Associates, Inc.,** Criminal Justice Consulting – President, Senior Consultant, and Trainer.

**1995-present** **National Sheriffs' Association,** Member and serve on the following committees:
**Legal Advisors' Committee,** Member, 2006-present.
**Presidents and Executive Directors Committee,** Member, 1996-Present; President, 2004-2005; Vice President, 2002-2004; Secretary, 2001-2002; Immediate-Past President, 2005-2006).
I have also served on the following subcommittees:
**Mentoring Program Subcommittee**
**Training Subcommittee**

**1995-present** **Utah Sheriffs' Association**  Executive Director, (1995-2013); Jail Operations Director and NSA Liaison, (2013-present).

**2012-present** **National Institute for Jail Operations,**  Member, Executive Advisor, and Senior Instructor.

**2011-2014** **Columbia Southern University,** Center for Public Safety – Online training instructor.

**2001-2010** **Civic Research Institute, Inc.,** *Corrections Managers' Report,* (a profession journal), Editor-in-Chief, 1994-2001; Executive Editor, 2001-2010).

**2003** **Iraq Ministry of Justice, Department of Prisons** (renamed the **Iraqi Correctional Services**),[2] Senior Advisor.

---

[2] I served in Iraq in June, July, and August of 2003, during which time I helped establish the Iraqi Correctional Services Training Academy and together with other members of our team helped the Iraqi Ministry of Justice to establish the Iraqi Correctional Services; renovated and opened several detention and prison facilities; and organized the creation of a personnel system to facilitate the recruiting, hiring, and staffing of the detention and prison facilities.  One of the facilities was the Abu Ghraib Prison complex a month or more **following our team's departure from Iraq,** the Brigadier General for the 800th MP Brigade turned over to a U.S. Army military intelligence unit parts of the facilities that we had originally stood up and put into service for the Iraq Ministry of Justice.  Subsequently, the Abu Ghraib facility went from being a major

| | |
|---|---|
| **1999-2001** | **Dixie State College** (St. George, Utah) Adjunct Professor (Taught Corrections Process at undergraduate level). |
| **1988-1994** | **University of Utah,** (Salt Lake City, Utah) Adjunct Professor (Taught Corrections Law and Corrections Administration in the Master of Public Administration program). |
| **1985-1992** | **Utah State Department of Corrections,** Executive Director. |
| **1963-1980** | **Salt Lake County Sheriff's Office,** final rank: Captain. Served in Dispatch Office, Juvenile Division, Detective Division, Intelligence Division, Planning and Research Unit, Administrative Division, Patrol Division, and Jail Division. |

B.    <u>Cases In Which I Have Testified As An Expert Witness During the Past Four Years</u>

    1.    **At Trial**

        **Favlovic v. Arpaio** (Federal Court, Arizona, 12/2012)
        **McConnell v. Dupnik** (State Court, Arizona, 03/2016)

    2.    **At Deposition Only**

        **Hughes v. Judd** (Federal Court, Florida, 02/2013)
        **PLN v. Chapman** (Federal Court, Georgia, 10/2014)
        **Nunuha v. State of Hawaii** (Federal Court, Hawaii, 11/2014)
        **Ten Boden v. Maricopa County** (Federal Court, Arizona, 11/2014)
        **Clemons v. CCA** (Federal Court, Tennessee, 11/2014)
        **Hill v. Las Vegas Metro Police Department** (Federal Court, Nevada, 08/2015)
        **Otero v. Dart** (Federal Court, Illinois, 10/2015)

C.    <u>Consulting and Training Experience</u>

My consulting and training experience includes:

    1.    Providing instruction for more than 350 **legal issues seminars** in 36 states and the District of Columbia (corrections law, probation and parole law, civil rights litigation);

    2.    Providing instruction for more than 40 jail **operations/management training programs** in 14 states (mostly in conjunction with the National Institute of Corrections);

---

accomplishment under difficult and dangerous circumstances to a stain on the reputation of the United States and its military and the civilian personnel who did the hard work, but had left Iraq well before the infamous events at Abu Ghraib occurred.

3.    Handling more than 80 **technical assistance** projects in 27 states (primarily in conjunction with the National Institute of Corrections), evaluating jail and prison operations, policies, procedures, and practices and making recommendations to resolve problems and improve operations;

4.    Writing, instruction and/or technical assistance in the development of **jail/prison standards**, including:

   a.    Technical assistance to 14 states, the National Institute of Corrections (instructor in standards writing training), the National Sheriffs' Association, and the American Correctional Association (review and evaluation, 1980); and

   b.    Writing all or major portions of the **Utah Jail Standards, Oregon Jail Standards, Alabama Jail Standards, Michigan Sheriffs' Association's Legal-Based Jail Standards, Hawai'i Legal-Based Corrections Standards, Ohio Legal-Based Standards, Colorado Jail Standards,** and **Arizona Detention Guidelines.** Also, currently working on standards for participating sheriffs in four other states.

5.    Writing 13 **policy and procedure** manuals for jails and prisons and parts of other manuals in four states and providing training and/or technical assistance for other jurisdictions concerning how to outline, format, write, and validate policy and procedure manuals;

6.    **Pre-architectural, architectural, and correctional systems planning and assistance** on more than 20 projects in 7 states; plus, Provence of Nova Scotia, Canada (1997); the Barberton APOPS Youth Detention Center, Republic of South Africa (1997); and the Iraq Ministry of Justice (2003);

7.    More than 50 workshops/presentations **at national criminal justice conferences** over the last 25 years; and

8.    Training and/or technical assistance for several federal agencies (National Institute of Corrections, U.S. Bureau of Prisons, U.S. Marshals Service, Bureau of Justice Administration, Bureau of Indian Affairs, National Indian Police Academy, Federal Bureau of Investigation, U.S. State Department, and National Parks Service).

D.    <u>**Education**</u>

**Master of Public Administration,**    1985,   University of Utah
**Bachelor of Arts,**                        1969,   University of Utah, Sociology (Criminal
                                              justice emphasis)

DeLand XR - PLN v. Ryan - 6

Bachelor of Science,          1964,   University of Utah, Physical education
                              (Corrective therapy certificate)

E.    **Sample of Awards Received**

**President's Award**, National Sheriffs' Association, 2013
**Professional Development Award**, Utah Jail Commanders' Association, 2003
**Fugitive Task Force Award**, 1992
**Commission on Criminal and Juvenile Justice** , Service Award, 1991
**Career Service Award**, Utah State Department of Public Safety, 1990

I have also received various other awards and recognition from various criminal justice
agencies and organizations.

F.    **Published Material:   Books**

**Chapter Written**

*The State of Corrections, 2006,* "The Prison Litigation Reform Act: A Powerful
Tool in Fighting Prisoner Litigation," American Correctional Association,
Annapolis, Maryland (2007)

G.    **Published Material:   Magazines, Journals, Periodicals**

**Articles in** *Corrections Today*
American Correctional Association: Lanham, Maryland

DeLand, Gary W., **"Rethinking the Value of Accreditation,"** 1998

**Articles in ACA's** *Point Counterpoint: Correctional Issues*
American Correctional Association: Lanham, Maryland

DeLand, Gary W., **"Counterpoint: Rethinking the Value of Accreditation,"**
(Vol. 59, No. 5, August, 1997)

**Articles in** *Congressional Quarterly Researcher*
CQ Press: Washington, D.C.

DeLand, Gary W., **"Should Solitary Confinement Be Limited to One Year?"**
(Vol. 22, No. 32, September 14, 2012.)

**Articles in** *Correctional Health Care Report*
Civic Research Inc.: Kingston, New Jersey

DeLand XR - PLN v. Ryan - 7

DeLand Gary W., **"Standards and Liability: The Effect of Professional Standards On Litigation,"**   (Vol. III, No. 5, July/August, 2002)

### Articles in *Corrections Managers' Report*
Civic Research Inc.: Kingston, New Jersey

DeLand, Gary W., **"Developing A 'Rationale' For Administrative Policies and Practices: The Key To Thriving In A Litigious Environment,"**   (Vol. I, No. 1, June/July, 1995)

DeLand, Gary W:, **"Negotiating The Hazards Of State-Created Liberty Interests: Hitting A Moving Target While Avoiding Self-Inflicted Injury,"**   (Vol. I, No. 3, October/November, 1995)

McCotter, O. Lane, Frank D. Mylar, and Gary W. DeLand, **"STOP Restores Rightful Separation Of Powers in Managing Corrections Facilities,"**   (Vol. I, No. 5, February/March, 1996)

DeLand, Gary W., **"Preventing And Defending Administrator Liability: A Proactive Approach,"**   (Vol. I, No. 6, April/May, 1996)

DeLand Gary W., **"Cross-Gender Searches and Supervision: A Clash Between Female Employment Rights and Prisoner Privacy Interests,"**   (Vol. II, No. 1, June/July 1996)

DeLand, Gary W., Sandbaken-Hill, Carrie, **"Rule 68e Offer of Judgment: A Defense Tool in Corrections Litigation,"**   (Vol. II, No. 1, June/July 1996)

DeLand, Gary W., **"Standards and Liability: The Effect of Professional Standards Litigation,"**   (Vol. II, No. 3, October/November, 1996)

DeLand, Gary W., **"Race As a Factor in Classifying Prisoners: Can it Ever Be a Constitutional Practice,"**   (Vol. II, No. 5, February/March, 1997)

DeLand, Gary W., **"Strip Searches of Arrestees in Jails,"**   (Vol. II, No. 5, February/March, 1997)

DeLand, Gary W., **"Classification: A Key Tool for Safely and Securely Managing Prisoners,"**   (Vol. II, No. 6, April/May, 1997)

DeLand, Gary W., **"Access to Courts in the Wake of *Lewis v. Casey*,"**   (Vol. III, No. 3, October/November, 1997)

DeLand, Gary W., **"Probation and Parole Searches: Special Law Enforcement Powers,"** (Vol. III, No. 4, December/January, 1998)

DeLand, Gary W., **"Jail Contracting: Utah's New Twist in 'Privatized' Corrections,"** (Vol. III, No. 5, February/March, 1998)

DeLand, Gary W., **"Prisoner Recreation: Right or Privilege,"** (Vol. III, No. 6, April/May, 1998)

DeLand, Gary W., and Richard A. Billings, **"Use of Force in Corrections Facilities,"** (Vol. IV, No. 1, June/July, 1998)

DeLand, Gary W., **"ADA Applies to Prisoners, Supreme Court Says,"** (Vol. IV, No. 2, August September, 1998)

DeLand, Gary W., **"Exclusionary Rule Not Applicable at Probation or Parole Revocation Hearings,"** (Vol. IV, No. 2, August September, 1998)

DeLand, Gary W., **"Civil Liability for Prisoner Suicides,"** (Vol. IV, No. 4, December/January, 1999)

DeLand, Gary W., "**Assessing The Benefits And Limitations of Intake Screening to Identify Suicide Risks"** (Vol. IV, No. 5, February/March, 1999)

DeLand, Gary W., **"Prisoners' Rights to Free Exercise of Religion in the Post-RFRA Period,"** (Vol. IV, No. 6, April/May, 1999)

DeLand, Gary W., **"Testifying in Prisoner Litigation, Part I: Effective Preparation,"** (Vol. V, No. 1, June/July, 1999)

DeLand, Gary W., **"Internal Audits and Vulnerability Assessments,"** (Vol. V, No. 2, August/September, 1999)

DeLand, Gary W., **"Testifying in Prisoner Litigation, Part II: Providing Effective Testimony,"** (Vol. V, No. 3, October/November, 1999)

DeLand, Gary W., **"Hard Times for Soft Porn,"** (Vol. V, No. 3, October/November, 1999)

DeLand, Gary W., **"Rational Policies are Key to Restricting Prisoners' Access to Pornography,"** (Vol. V, No. 4, December/January, 2000)

DeLand, Gary W., **"Staff Safety: A Top Priority in Corrections Management,"**

(Vol. V, No. 6, April/May, 2000)

DeLand, Gary W., *"Jordan v. City of New London*: **Too Intelligent to Be a Cop,"**  (Vol. V, No. 6, April/May, 2000)

DeLand, Gary W., **"Liability Defenses in Litigation Against Privatized Corrections Facilities,"**  (Vol. VI, No. 1, June/July, 2000)

DeLand, Gary W., *"Price v. County of San Diego*: **Re-Evaluating Positional Asphyxia in Use of Force and Restraint Cases,"**  (Vol. VI, No. 2, August/September, 2000)

DeLand, Gary W., **"Restraint Chairs, Part I: Reasonable Control Aid or the 'Devil's Chair',"**  (Vol. VI, No. 3, October/November, 2000)

Sampson, Stephen, Dr. and Gary W. DeLand, **"How Expert is Your Expert: Part I: Evaluating Experts and Their Opinions,"**  (Vol. VI, No. 4, December/January, 2001)

DeLand, Gary W., **"Managing Known Suicide Risks,"**  (Vol. VI, No. 5, February/March, 2001)

DeLand, Gary W., **"Restraint Chairs, Part II: Tools Not Punishment,"**  (Vol. VI, No. 6, April/May, 2001)

DeLand, Gary W., **"Oleoresin Capsicum: Effective and Nonlethal,"**  (Vol. VII, No. 1, June/July, 2001)

DeLand, Gary W., **"E-Training: The Smart Choice for Training in the 21st Century,"**  (Vol. VII, No. 2, August/September, 2001)

DeLand, Gary W., **"Cell Searches: No Right to Privacy for Prisoners,"**  (Vol. VII, No. 3, October/November, 2001)

DeLand, Gary W., **"A Primer on the Basic Provisions of the Prison Litigation Reform Act,"**  (Vol. VII, No. 4, December/January, 2002)

DeLand, Gary W., **"In-Custody Death Investigations,"**  (Vol. VII, No. 5, February/March, 2002)

DeLand, Gary W., **"Searches of Visitors in Jails and Prisons,"**  (Vol. VIII, No. 1, June/July, 2002)

DeLand, Gary W., "Ruiz v. Johnson (Estelle) Dies on 30th Birthday,"  (Vol. VIII, No. 2, August/ September, 2002)

DeLand Gary W., "Narrative Writing Following Use of Force Incidents," (Vol. VIII, No. 4, December/January, 2003)

DeLand, Gary W., "Bazzetta v. McGinnis, Part I: Authority to Regulate and Restrict Prisoner Visits,"  (Vol. VIII, No. 6, April/May, 2003)

DeLand, Gary W., "Bazzetta v. McGinnis, Part II: First Amendment Visitation Issues,"  (Vol. IX, No. 1, June/July, 2003)

DeLand, Gary W., "Prisoner Discipline, Part I: The Foundation for an Effective Discipline System,"  (Vol. IX, No. 5, February/March, 2004)

DeLand, Gary W., "Rebuilding the Iraqi Correctional Service,"  (Vol. IX, No. 5, February/March, 2004

DeLand, Gary W., "Prisoner Discipline, Part II: Pre-Hearing Administrative Segregation,"  (Vol. IX, No. 6, April/May, 2004)

DeLand, Gary W., "Prisoner Discipline, Part III: Initiating Disciplinary Action,"  (Vol. X, No. 6, December/January, 2005)

DeLand, Gary W., "Prisoner Discipline, Part IV: Conducting Due Process Hearings,"  (Vol. XI, No. 1, December/January, 2005)

DeLand, Gary W., "Prisoner Discipline, Part V: Self-Incriminating Testimony by Prisoners,"  (Vol. XI, No. 2, August/September, 2005)

DeLand, Gary W., "Rebuilding Iraqi Corrections: Boots on the Ground," (Vol. XI, No. 2, August/September, 2005)

DeLand, Gary W., "Staff Training and Prisoner Litigation,"  (Vol. XI, No. 3, October/November, 2005)

DeLand, Gary W., "Rebuilding Iraqi Corrections, Part III: Infrastructure Assessment,"  (Vol. XI, No. 4 December/January, 2006)

DeLand, Gary W., "Duty to Protect, Deliberate Indifference, and Administrator Liability,"  (Vol. XI, No. 6 April/May, 2006)

DeLand, Gary W., "Internal Audits and Vulnerability Assessments, Part II:

Finding the Balance Between Cost and Quality," (Vol. XII, No. 2, August/September, 2006)

DeLand, Gary W., **"Prisoner Newspaper Subscriptions, Part I, Framing the Issues"** (Vol. XII, No. 2, August/September, 2006)

DeLand, Gary W., **"Prisoner Newspaper Subscriptions, Part II, Free Standing Right?"** (Vol. XII, No. 3, October/November, 2006)

DeLand, Gary W., **"Searching Prisoner Clothing and Property"** (Vol. XII, No. 5, February/March, 2007)

DeLand, Gary W., **"Adopting Proactive Management Practices to Recognize and Manage the Threat of Suicides: Pt. I, Screening"** (Vol. XIII, No. 1, June/July, 2007)

DeLand, Gary W., **"Policies and Procedures and Litigation"** (Vol. XIII, No. 4, December/January, 2008)

DeLand, Gary W., **"Prisoner Discipline, Part VI: Witnesses at Prisoner Disciplinary Hearings,"** (Vol. XIII, No. 5, February/March, 2008)

**Articles in National Institute for Jail Operations (NIJO)**
www.jailtraining.org/blog

DeLand, Gary W., **"What Sheriffs Need to Know to Protect Against Inadequate Training Litigation,"** www.jailtraining.org/node/19

DeLand, Gary W., **"Involuntary Administration of Anti-Psychotic Medication in Jails,"** www.jailtraining.org/node/93

DeLand, Gary W., **"Prisoner Discipline, Part 1: The Foundation for an Effective Discipline System,"** www.jailtraining.org/node/181

DeLand, Gary W., **"Jail Strip Searches: The Light at the End of the Tunnel Was Not a Train,"** www.jailtraining.org/node/255

DeLand, Gary W., **"In-Custody Death in Jails, Part 1: Overview and Investigations,"** www.jailtraining.org/node/388

DeLand, Gary W., **"The Debate Over Solitary Confinement,"** www.jailtraining.org/node/671

DeLand, Gary W., **"Philosophy-Based Versus Legal-Based Standards and Guidelines,"** www.jailtraining.org/node/735

DeLand, Gary W., **"PREA Standards: Federal Recommendations or Binding Law,"** www.jailtraining.org/node/1200

DeLand, Gary W., **"Haas v. Burlington County: Exceptions to the Florence Strip Search Decision?"** www.jailtraining.org/node/1368

DeLand, Gary W., **"The Passing of a Paladin: Lynn J. Lund,"** www.jailtraining.org/node/2677

DeLand, Gary W., **"Prison Discipline, Part 2: Pre-Hearing Segregation,"** www.jailtraining.org/node/3121

DeLand, Gary W., **"Solitary Confinement: Essential Management Tool or Cruel Punishment,"** www.jailtraining.org/node/3291

DeLand, Gary W., **"Effective Preparation to Provide Sworn Testimony,"** www.jailtraining.org/node/3574

DeLand, Gary W., **"Staff Training and Prisoner Litigation,"** www.jailtraining.org/node/3837

DeLand, Gary W., **"Prisoner Recreation: Right or Privilege?",** www.jailtraining.org/node/4175

DeLand, Gary W., **"Free Exercise of Religion, Part 1: Evolution of Prisoner Rights,"** jailtraining.org/2016/11/22/free-exercise-of-religion-part-1/

**Articles in *Utah Peace Officer***
Utah Peace Officers' Association: Taylorsville, Utah

DeLand, Gary W., **"Law Enforcement/Corrections Training and Administrator Liability,"** (Vol. 83, No. 2, Summer 2006)

DeLand, Gary W., **"How Effective and Safe Are Pepper-Based Weapons?,"** (Vol. 83, No. 3, Fall 2006)

DeLand, Gary W., **"Effective Preparation to Provide Sworn Testimony,"** (Vol. 84, No. 1, Spring 2007)

DeLand, Gary W., **"Protecting and Preserving the Office of Sheriff,"** (Vol.

87, No. 3, Winter  2010)

DeLand, Gary W., "Recent Supreme Court Rulings on Second Amendment Rights," (Vol. 87, No. 3, Winter  2010)

<u>Articles in *The Sheriff Magazine*</u>
National Sheriffs' Association: Alexandria, Virginia

DeLand, Gary W., "What Sheriffs Need to Know to Protect Against Inadequate Training Litigation, Part I," (Vol. 61, No. 2, March/April 2009)

DeLand, Gary W., "What Sheriffs Need to Know to Protect Against Inadequate Training Litigation, Part II," (Vol. 61, No. 3, May/June 2009)

DeLand, Gary W., "The Positional Asphyxia Hypothesis, Part One: Fact or Fiction," (Vol. 62, No. 6, September/October 2010)

DeLand, Gary W., "The Theory of Positional Asphyxia, Part Two: Lessons Learned and Possible Challenges," (Vol. 63, No. 1, January/February 2011)

DeLand, Gary W., "Involuntary Administration of Anti-Psychotic Medication in Jails," (Vol. 63, No. 7, November/December, 2011)

DeLand, Gary W., "Jail Strip Searches: The Light at the End of the Tunnel Was Not a Train," (Vol. 64, No. 3, May, 2012)

DeLand, Gary W., "In-Custody Death in Jails, Part 1: Overview and Investigations," (Vol. 64, No. 4, July/August, 2012)

DeLand, Gary W., "Philosophy- Versus Legal-Based Guidelines," (Vol. 65, No. 1, January/February, 2013)

DeLand, Gary W., "PREA Standards: Federal Recommendations or Binding Law," (Vol. 65, No. 3, May/June, 2013)

DeLand, Gary W., "Haas v. Burington County: Exceptions to the Florence Search Decision?" (Vol. 65, No. 4, July/August, 2013)

DeLand, Gary W., "Communication Between Prisoners and News Media," (Vol. 66, No. 4, July/August, 2014)

DeLand, Gary W., "Administrative Discretion Versus Judicial Intervention in Day-to-Day Jail Operations," (Vol. 66, No. 5, September/October, 2014)

DeLand, Gary W., **"Prisoner Discipline, Part 2: Pre-Hearing Segregation,"** (Vol. 67, No. 3, May/June, 2015)

H.      **Standards**

*Model Standards for Prison Management*, 1994 (unpublished)

*Standards for the Operation and Construction of Utah Jails (Utah Jail Standards)*, 1995

*Oregon Jail Standards*, (provided Oregon jail officials a set of model standards that I had written as the base for their standards, then trained writing teams, and provided technical assistance), 1999

*Arizona Detention Guidelines*, (wrote standards as a joint project for the Arizona Detention Association, Arizona Sheriffs' Association, and the Arizona Counties Insurance Pool), 2009

*Alabama Jail Standards* (wrote standards as a project for the Alabama Sheriffs' Association), 2010.

*Colorado Legal-Based Guidelines* (for participating Sheriffs' Offices, 2014)

*Michigan Jail Standards* (wrote standards as a project for the Michigan Sheriffs' Association and MMRMA), 2011-2012.

*Hawai'i Legal-Based Corrections Standards* (wrote standards for the Hawai'i Department of Public Safety, 2014-2015)

*Ohio Legal-Based Guidelines* (currently writing for participating County Sheriffs' Offices, 2014-2015)

*Texas Legal-Based Guidelines* (currently writing for participating County Sheriffs' Offices, 2014-2015)

*Louisiana Legal-Based Guidelines* (currently writing for participating Parish Sheriffs' Offices, 2014-2015)

H.      **Operations Manuals Written**

Arizona      *Arizona Model Detention Guidelines* (written for the Arizona Detention Association, Arizona Sheriffs' Association, and the Arizona Counties Insurance Pool) (2008)

DeLand XR - PLN v. Ryan - 15

| | |
|---|---|
| **California** | *Sonoma County Jail Policies and Procedures Manual* (1983) |
| **Montana** | Wrote selected chapters for Montana State Prison, Deer Lodge, to achieve compliance with requirements in settlement agreements resolving ***Langford v. Racicot*** and ***U.S. v. Montana*** (1997) |
| **Utah** | *Salt Lake County Jail Manual*  (1971) |

*Salt Lake County Jail Manual*  (1971)
*Salt Lake County Sheriff's Office Operations Manual* (1972)
*Salt Lake County Jail Policies and Procedures Manual* (1973)
*Iron County/Utah State Corrections Facility Policies and Procedures Manual* (combined state/county facility) (1982)
*Promontory Correctional Facility Policies and Procedures Manual* (1995)
*Purgatory Correctional Facility Operations Manual* (Washington County) (1997)
*Summit County Jail Policies and Procedures Manual* (1997)
*Cache County Jail Policies and Procedures Manual* (2002)
*Millard County Jail Policies and Procedures Manual* (2007-2011)
*Uintah County Jail Policies and Procedures Manual* (2007-2011)
*Iron County Jail Policies and Procedures Manual* (2008-2011)

Utah State Department of Corrections (UDC) manual system (1985-1992), including:

1. *Utah State Department of Corrections Policies and Procedures Manual.*
2. *Utah State Department of Corrections Administrative Services Policies and Procedures Manual.*
3. *Utah State Department of Corrections Adult Probation and Parole Policies and Procedures Manual.*
4. *Utah State Department of Corrections Community Corrections Centers Policies and Procedures Manual.*
5. *Utah State Department of Corrections  Personnel and Training Division Policies and Procedures Manual.*
6. *Utah State Department of Corrections Institutional Operations Division Policies and Procedures Manual.*
7. *Utah Correctional Industries Policies and Procedures Manual.*

For the UDC manual system I designed the format, trained the writers, reviewed and evaluated all written materials, corrected copy, and over the first three years that I was Executive Director did much of the original writing.

I.   **Experience in Training and Developing Corrections Training Systems**

DeLand XR - PLN v. Ryan - 16

| | | |
|---|---|---|
| **Utah** | **2011-present** | **National Institute for Jail Operations**, Executive Advisor and instructor |
| | **2009-Present** | **Utah Sheriffs' Association's Jail Commander Certification Academy**, Director and instructor. |
| | **1996-2013** | **Utah Sheriffs' Association's Advanced Management Training Institute**, Director and instructor. |
| | **2000-2001** | **Planning and Development Committee, Utah Law Enforcement Command College**, Member. |
| | **1985-1998** | **Fred House Corrections Academy**, As Executive Director of the Utah Department of Corrections, I established the Academy and served as an instructor. The **Fred House Corrections Academy** was a system-wide, state-wide corrections academy. My role included designing a full-service training facility and developing comprehensive pre-service and in-service training courses for jail, prison, probation and parole, and private corrections officers, supervisors, managers, and administrators. Pre-service courses ranged from 7 to 14 weeks depending on which types of officers were being trained and certified. |
| | **1996-1997** | **Utah Law Enforcement Training Study Committee**, Chairman, studied and evaluated training and certification requirements for Utah law enforcement, adult corrections, youth corrections, county corrections, and private corrections officers; recommended curriculum revisions; and participated in writing model legislation. |
| | **1973-1992** | **Utah Police Academy**, Instructor. |
| | **1978-1983** | Provided **National Institute of Corrections** sponsored and funded two- and three-week jail officer training courses in several states, e.g., Nebraska, Iowa, Indiana, Mississippi, Alabama, Montana (Flathead Indian Reservation), South Dakota (Pine Ridge Indian Reservation), Washington (Yakima Indian Reservation), Oklahoma, Georgia, Kansas. |
| | **1980** | Coordinated the development of a jail officer training system for Iowa county jails (designed the training program, assisted in selecting and training instructors, set training objectives, and coordinated curriculum development) funded by a grant from the **National Institute of Corrections.** |
| | **1980** | Part of the NIC's Asilimar Classification Planning team, which developed a national classification training program for the **National Institute of Corrections.** I was subsequently selected as one of the trainers for that program. |

DeLand XR - PLN v. Ryan - 17

|  | 1973-1979 | Established, co-directed and provided instruction for the State of Utah's first state-wide jail training program – the **Utah Pre-Service Corrections Training School** (a three-week course of corrections instruction at Westminster College). |
|  | 1972-1979 | Established, directed, and instructed for the **Salt Lake County Jail Training Program**, first jail training program for **Salt Lake County Sheriff's Office**. |
| **California** | 1982-2012 | STC-certified in-service training instructor. |
|  | 1989-2002 | **Jail Managers' Training Program, Santa Rosa College Training Center**, instructor. |
|  | 1983-1995 | **Jail Managers' Training Program**, coordinated by **San Diego County Sheriff's Office** in conjunction with various area colleges, instructor. |
| **National** | 2011-present | **National Institute for Jail Operations**, Executive Advisor, instructor, and board member |
|  | 2010-present | **National Sheriffs' Association Jail Training Initiative**, Co-director |
|  | 1975-present | **DeLand and Associates, Inc.,** Training program designer and/or instructor for corrections and other criminal justice systems in more than 40 states. |
|  | 2002-2015 | **National Sheriffs' Association**, Instructor. |
|  | 2008-2015 | **National Sheriffs' Association**, Coordinator and instructor for a national jail training program.[3] |
|  | 2011-2014 | **Columbia Southern University, Center for Public Safety**, Instructor |
|  | 1996-2009 | **American Jail Association**, Instructor |
|  | 1996-2001 | **Americans for Effective Law Enforcement**, Instructor |
|  | 1977-2000 | **National Institute of Corrections**, Instructor |
|  | 1991 | **Law Enforcement Training Network** (national televised law enforcement and corrections training), Instructor. |

---

[3]Working with Tate McCotter, Director, National Institute for Jail Operations (NIJO), developed and launched a national jail training and consulting organization. NIJO provides on-site and training at various locations across the U.S., on-line jail management courses, certification programs for corrections executives, corrections supervisors, and corrections officers, and technical assistance. The NIJO training program utilizes a cadre of instructors drawn from across the U.S. to provide training and related services on a national level to Sheriffs, corrections officials, attorneys involved in defending prisoner litigation, and other persons needing corrections legal and management training.

| | 1981 | **National Institute of Corrections**, Participated in the design and implementation of a national training program for prisoner classification in jails. |
| | **1975-1978** | **National Indian Police Academy**, Instructor. |
| | **1977-1978** | **Bureau of Indian Affairs Outreach Training Program,** Provided **Bureau of Indian Affairs** funded two- and three-week jail officer training courses on several Native American reservations (e.g., Pine Ridge Reservation, South Dakota; Yakima Reservation, Washington; Navajo Reservation, Arizona; Flathead Reservation, Montana; Uintah-Ouray Reservation, Utah). |
| **Iraq** | **2003** | **Iraqi Ministry of Justice, Prisons Department**, Senior Advisor.  Created the **Iraqi Correctional Services** and the **Iraqi Correctional Services Training Academy.** Established the training and certification curriculum, supervised and assisted with the development of training objectives and outlines, and supervised the operation of the Academy. |

## Part Three
## Definitions

Part Three provides the definitions of acronyms, words, and phases that appear in this expert report.

**ADC**      Arizona Department of Corrections

**BOP**      Federal Bureau of Prisons

**Clark**      **John L. Clark**, Plaintiff's expert witness

**PREA Standards**      *National Standards to Prevent, Detect, and Respond to Prison Rape,* published by the U.S. Department of Justice

**Complaint**      Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983

**FBOP**      Federal Bureau of Prisons

**HRDC**      Human Rights Defense Center

DeLand XR - PLN v. Ryan - 19

IXR        Initial Expert Report

PLN        Prison Legal News

**sexually explicit material**        Any publications, drawing, photograph, film, negative, motion picture, figure, object, novelty device, recording, transcription, or any book, leaflet, catalog, pamphlet, magazine, booklet or other item, the cover or contents of which pictorially depicts nudity of either gender, or that graphically depicts through text any sexually explicit homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion

## Part Four
## Documents Reviewed

1.   Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983
2.   Answer
3.   Defendants' Initial Disclosure Statement
4.   Plaintiff's Initial Disclosure Statement
5.   Plaintiff's First Supplemental Disclosure Statement
6.   Defendants' Offer of Judgment
7.   Expert Report of John L. Clark, Exhibits A through C
8.   Department Order 914, Effective February 26, 2010
9.   Department Order 914, Effective March 4, 2016
10.  Director's Instruction 322, Effective October 15, 2014
11.  Rejected March, 2014 article
12.  Rejected April, 2014 article
13.  Rejected July, 2014 article
14.  Rejected October, 2014 article
15.  First Amended Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983, including Exhibits A through J

## Part Five
## Brief Listing of Chronology of Events

**February 26, 2010**

The Arizona Department of Corrections (ADC) published Department Order 914, Inmate Mail.

DeLand XR - PLN v. Ryan - 20

**October 15, 2014**

The ADC issued Director's Instruction 322 which, among other changes, modified § 914.02 of the Inmate Mail policy.

**November 6, 2015**

**Prison Legal News**, a project of the Human Rights Defense Center filed a Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983.

**March 4, 2016**

The ADC modified and reissued Department Order 914, Department Order 914, Inmate Mail.

**October 24, 2016**

*Prison Legal News* filed a First Amended Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983.

**November 1, 2016**

Defendants file an Offer of Judgment in the amount of $ 500.00 in compensatory damages plus taxable costs and attorneys' fees incurred by Plaintiff prior to the date of the offer in an amount not to exceed $ 50,000.

# Part Six
# Professional Opinions

**Section A.     Administrative Liability Claims**

Plaintiff *Prison Legal News* (hereafter "PLN") in its First Amended Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983 (hereafter "Complaint") in addition to the mail policies and procedures raises numerous administrative issues (i.e., hiring, training, supervision, control, and staff discipline).  Section A will address the administrative liability issues.

**A-01   Delegation of Responsibility and Authority**

**Opinion A-01.01     Director Charles Ryan, Deputy Director Jeff Hood, and**

DeLand XR - PLN v. Ryan - 21

Support Services Division Director Gail Rittenhouse serve in administrative-level positions; thus, they do not engage in the basic line-level operational tasks and functions. Administrators must execute their duties by delegating responsibility and authority to subordinates.

### Discussion and Basis for Opinion

The Arizona Department of Corrections (ADC) employs approximately 9,500 staff and houses approximately 42,000 prisoners in 16 facilities – 10 state prisons and 6 private facilities.[4] No administrator in an organization the size of the ADC can personally direct and monitor the behavior of each staff member, supervise or monitor each and every transaction between each staff member, or have real-time knowledge – 24/7 – of every aspect of the day-to-day events and occurrences in the prison system. Administrators such as **Director Charles L. Ryan, Deputy Director Jeff Hood,** and **Support Services Director Gail Rittenhouse** must, therefore, manage by delegating to subordinates the operational responsibilities and the commensurate authority to execute their assigned responsibilities.

Opinion A-01.02  **Effective delegation necessitates administrators to establish a management system that provides adequate direction, training, supervision, and discipline of staff.**

### Discussion and Basis for Opinion

The effective measures which should be implemented include:

A. **Efficacious direction of staff** – adopting and implementing written policies and procedures;

B. **Adequate staff training** – at a minimum both pre-service and in-service;

C. **A system for supervising staff** – observation, mentoring, evaluating, and controlling staff; and

D. Enforcing policies, procedures, and code of conduct – implementing a staff discipline system to deal with staff misconduct and significant deviation from policy, rules, and regulations.

---

[4]https://corrections.az.gov.

DeLand XR - PLN v. Ryan - 22

It is my opinion that the current ADC policies, procedures, training, and staff supervision and discipline are adequate.  I will discuss each in subsequent opinions.

A-02   **Screening and Hiring of Employees**

> Opinion A-02.01     **Although Plaintiff's Complaint raises a screening and hiring issue, it failed to establish or even to allege any fault with the screening and hiring of ADC employees.**

**Discussion and Basis for Opinion**

According to Plaintiff, ""Each of Defendants DOES 1 through 20 is or was personally involved in the adoption and/or implementation of the ADC's mail policies for prisoners, and/or is or was responsible for the . . . training . . . of the ADC staff who interpret and implement these prisoner mail policies."[5]

A-03   **Written Policies and Procedures**

> Opinion A-03.01     **Plaintiff alleges that each and everyone of the named Defendants was responsible for the "promulgation and implementation" of the ADC's written policies and procedures. There is no basis for that claim.**

**Discussion and Basis for Opinion**

According to Plaintiff, "Defendant RYAN has **ultimate responsibility** for the promulgation and implementation of ADC policies, procedures, and practices and for the management of the ADC."[6]  Plaintiff also claims that Defendant's **Jeff Hood, Gail Rittenhouse, Alf Olson, James Riggs**, and Does 1 through 20 were each responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. However, Plaintiff fails to identify the basis for the claim that each of these individuals are responsible for *promulgating* the policies and procedures. "Promulgate" is defined as "make known to the public," "disseminate," "promote," or "proclaim."[7]

---

[5]Complaint, ¶ 12.

[6]Complaint, ¶ 7 (emphasis added).

[7]*DK Illustrated Oxford Dictionary*, DK Publishing, Inc. and Oxford University Press, Inc., (New York, 1998).

There is no mention of the specific involvement of any of the named Defendants in "promulgating" the policies and procedures and to whom they did so. Even if a broader definition of "authorized" the policies and procedures, it should be noted that Department Order 914, Effective February 26, 2010, Department Order 914, Effective March 4, 2016, and Director's Instruction 322, Effective October 15, 2014, were all authorized by **Director Ryan**. There is no signature line for **Deputy Director Hood, Division Director Rittenhouse, James Riggs, Alf Olson**, or any of the **Does 1 through 20**.

> **Opinion A-03.02**     **It is my opinion that the current policies and procedures and/or the Defendants' Offer of Judgment meet the requirements for receiving, screening, delivering, and/or denying inmate mail.**

### Discussion and Basis for Opinion

For a full discussion of my opinions related to the ADC policies and procedures and practices, see "Discussion and Basis for Opinion" found under each opinion rendered in Sections B, C, D, and E of this report.

## A-04     Staff Training

> **Opinion A-04.01**     **Although Plaintiff's Complaint raises a staff training issue, it failed to establish or even to allege any fault with the training of ADC employees.**

### Discussion and Basis for Opinion

According to Plaintiff, "Each of Defendants DOES 1 through 20 is or was personally . . . responsible for the . . . training . . . of the ADC staff who interpret and implement these prisoner mail policies."[8]

Neither Plaintiff's Complaint nor Clark's Expert Report make any specific claim:

A.     Any of the ADC Defendants – **Director Charles L. Ryan, Deputy Director Jeff Hood, Division Director Gail Rittenhouse, James Riggs, or Alf Olson** – were directly responsible for designing the staff training program;

B.     That the training program is constitutionally inadequate and, if so, what specific aspects of the training program were so flawed as to be deliberately indifferent; and/or

---

[8]Complaint, ¶¶ 11, 12.

C.      Any of the ADC Defendants – **Director Charles L. Ryan, Deputy Director Jeff Hood, Division Director Gail Rittenhouse, James Riggs, or Alf Olson** – served as training instructors to provide training to mail room staff.

**A-05     Staff Supervision, Control and Discipline**

Opinion A-05.01      **Although Plaintiff's Complaint raises staff supervision, discipline, and control issues, it failed to establish or even to allege any specific fault with the supervision, discipline, or control of ADC employees.**

**Discussion and Basis for Opinion**

According to Plaintiff, "Each of Defendants DOES 1 through 20 is or was personally . . . responsible for the . . . supervision, discipline, counseling, and/or control of the ADC staff who interpret and implement these prisoner mail policies."[9]

Neither Plaintiff's Complaint nor Clark's Expert Report make any specific claim that any of the ADC Defendants – **Director Charles L. Ryan, Deputy Director Jeff Hood, Division Director Gail Rittenhouse, James Riggs, or Alf Olson** – were indifferent to staff supervision, discipline, or control responsibilities.

**Section B.      Regulation and Restriction of Publications Claims**

Plaintiff *Prison Legal News* in its Complaint for Declaratory and Injunctive Relief and Damages Under the Civil Rights Act, 42 U.S.C. § 1983 raises constitutional infringement claims. Section B will address those claims.

**B-01     Content Neutral Criteria for Reviewing Incoming Publications**

Opinion B-01.01      **The written policies and procedures adopted by the ADC are written with the intent of providing a content neutral review of publications.**

**Discussion and Basis for Opinion**

It is my opinion that the ADC has written and adopted policies and procedures that base decisions regarding acceptance or rejection of incoming publication its understanding of the effect of the material being reviewed on the ADC's legitimate penological interests

---

[9]Complaint, ¶¶ 11, 12.

DeLand XR - PLN v. Ryan - 25

(e.g., safety, security, order, discipline, treatment goals).

For example, the 2010 Inmate Mail policy provides the following instruction.

> 1.5 Designated staff at each unit/complex is authorized to open, inspect and read incoming mail to **prevent criminal activity** and prevent inmates from receiving contraband or any other material that may be **detrimental to the safe** and **orderly** operation of the institution.
>
>> 1.5.1 Upon inspection, incoming mail shall be withheld from an inmate if it meets one or more of the following criteria:
>>
>>> 1.5.1.1 Poses a direct and immediate **threat to the security, safety or order** of the institution.
>>>
>>> 1.5.1.2 Substantially **hinders efforts to treat or rehabilitate** the inmate; however, legal mail will not be withheld for this purpose.
>>>
>>> 1.5.1.3 **Threatens** the intended recipient.[10]

Also, the 2010 Inmate Mail policy provides sexually explicit materials are prohibited, "In order to **assist with rehabilitation and treatment** objectives, **reduce sexual harassment** and **prevent a hostile environment** for inmates, staff and volunteers . . . ."[11]

Each of the bold-highlighted criteria (e.g., furthering security, safety, order, and contraband control; assisting with treatment and rehabilitation; preventing hostile environment) are legitimate penological interests. The mail policy does not authorize staff to reject mail or publications simply because they personally find the material shameful, objectionable, repugnant, or disagreeable. It is my understanding that policies and procedures should be *content neutral*; which means the policies in question must further an important or substantial governmental interest unrelated to the suppression of expression. It is my opinion that the criteria set forth in Department Order 914, § 914.02,1.5 and § 914.07, 1.1 were adopted to further penological interests unrelated to the suppression of expression.

---

[10]Department Order 914, Inmate Mail (February 20, 2010), § 914.02, Incoming Mail (emphasis added).

[11]Department Order 914, Inmate Mail (February 20, 2010), § 914.07, Sexually Explicit Material, § 1.1 (emphasis added).

**Opinion B-01.02**   **The ADC policies and procedures under the revised mail policies – Department Order 914, Inmate Mail (March 4, 2016) – also provide content neutral criteria for screening publications.**

<u>Discussion and Basis for Opinion</u>

See Department Order 914, Inmate Mail (March 4, 2016), § 914.02, 1.15, Incoming Mail; § 914.06, 1.11, Publications; § 914.06, 1.1, Unauthorized Material.

**B-02**   <u>Evaluation of Sexually Oriented Content</u>

**Opinion B-02.01**   **Rejecting sexually oriented material in publications is necessary if the material would undermine legitimate penological interests.**

<u>Discussion and Basis for Opinion</u>

See discussions under Opinions B-01.01, B-01.02, B-02.02, B-02.03, B-02.04, B-02.05, and B-02.06.

**Opinion B-02.03**   **Rehabilitation is a primary objective of sentencing inmates to prison and the Defendants are justified in taking steps to further that well-established interest.**

<u>Discussion and Basis for Opinion</u>

Before opining regarding the specific rejections of any sexually oriented material by the ADC, it is important to consider whether the ADC has a legitimate penological rehabilitation interest in excluding any or all sexually oriented material. Obviously, decisions to reject such material should be based on content neutral criteria intend to further legitimate corrections interests. Among the criteria considered by the ADC is the effect of the material on treatment and rehabilitation objectives. According to the 2010 ADC mail policies, "Upon inspection, incoming mail shall be withheld from an inmate if it . . . [s]ubstantially **hinders efforts to treat or rehabilitate the inmate** . . . ."[12]

It is well established that rehabilitation is a legitimate penological goal. It is also rational for the ADC Defendants to be concerned about the potential negative consequences of sexually oriented material on the inmates for whom they provide, care, supervision, protection, and rehabilitation efforts. The objective is clearly the thrust of the ADC

---

[12]Department Order 914, Inmate Mail (February 20, 2010), § 914.02, Incoming Mail, § 1.5.1.2. Also see, Department Order 914, Inmate Mail (March 4, 2016), § 914.02, 1.5.1.2.

DeLand XR - PLN v. Ryan - 27

policies and procedures. Nothing in the ADC criteria authorize rejection of materials based simply of officials' moral or personal judgments or prejudices.

Since the inception of prisons in the U.S., rehabilitation (i.e., diminishing the probability that in the future offenders would continue to engage in criminal misconduct) has been an obvious goal. It is beyond dispute that one of the primary functions of sentencing offenders to prison is to attempt to change the unlawful behavior of prisoners and to alter negative character traits and behaviors. While there is disagreement about how much rehabilitation actually occurs in prison, it is clear that the efforts to rehabilitate are an essential function of the prison experience.

Opinion B-02.04    **Sexually oriented material in the possession of inmates has the potential of undermining the ADC's legitimate interest in treating and rehabilitating convicted inmates.**

### Discussion and Basis for Opinion

There is no shortage of information that could reasonably justify the inference that pornography has been a catalyst or contributing factor to sexual crime. In my years working in various capacities in corrections and law enforcement, I have seen situations in which sex offenders have been avid consumers of pornographic materials and in which a reasonable conclusion could be drawn that some of those offenders were, indeed, influenced to a significant degree by what they experienced as a result of their exposure to sexually oriented materials.

Though I have a degree in the behavioral sciences, it has been my experience in the criminal justice system that has influenced my opinions. As a criminal investigator for the Salt Lake County Sheriff's Office I investigated many sex crimes; interviewed and arrested; and discovered during the course of numerous investigations the collections of sexually oriented materials possessed by the offenders. Working in the corrections field, there were a number of incidents in which inmates attempted to gain access to materials that fed their sexual interests.

For example while I was Executive Director, we discovered that a Utah State Prison inmate had request a friend to utilize legal documents enclosed in an envelope displaying the name and address of a law office to try to smuggle in pictures of young children. He specifically requested pictures of little girls fully dressed, dressed only in underwear, and fully nude. He also was very specific regarding how the children should be posed. The sexually oriented materials were so essential to him, that he was willing to accept the reality that being caught result in a significant delay in his parole date. There were other many incidents of possession of and attempts to gain access to both commercially produced sexual materials and sexually posed photos of wives and girlfriends.

DeLand XR - PLN v. Ryan - 28

I have interviewed some offenders during my time as an investigator and later as a corrections official who appeared to have been desensitized and influenced by sexually oriented materials. One high school student I arrested for burglarizing houses to steal soiled panties blamed his actions to a significant degree on becoming so aroused at looking pictures of female genitalia that it caused him become obsessed with having the intimate items of female apparel. Congress was sufficiently concerned about the impact of sexually oriented materials on prisoners, that it passed the Ensign Amendment, barring the Federal Bureau of Prisons to use its funds to distribute to inmates publications featuring sexually explicit materials, including nudity. Omnibus Consolidated Appropriations Act of 1997.[13] In his last interview before he was executed, serial killer **Ted Bundy** discussed the influence of sexually oriented materials in his criminal evolution.

> Bundy emphasized his full accountability for the murders, but made clear that his addiction to pornography ignited and fueled the crimes that otherwise would never have happened. He also insisted that, of others he met who had a similar tendency to violence, "without exception, every one of them was deeply involved in pornography."

**Opinion B-02.05**    **There are differences of opinion among those who have studied or surveyed the effects of sexually oriented materials. But, regardless of how influential sexually oriented materials actually may be on inmates generally, or on inmates who are predisposed toward criminal sexual actions, there reasonable for corrections officials to be concerned and to err on the side of caution.**

### Discussion and Basis for Opinion

It is not necessary to absolutely prove and precisely measure the extent to which sexually oriented materials cause or influence sexual crime; it should enough that officials reasonably believe the prohibition of sexually oriented materials is rational. Quite frankly, there are many routinely utilized rehabilitation programs that could not be used if there was a prerequisite that officials must first approve that rehabilitation would occur.

According to the Court of Appeals for the District of Columbia, "there is a significant body of research showing that long-term exposure to pornography, particularly pornography containing scenes of "aggressive sexuality," can make its (male) audience more aggressive, more tolerant of violence against women, and more susceptible to myths

---

[13]Omnibus Consolidated Appropriations Act of 1997.

DeLand XR - PLN v. Ryan - 29

about rape, such as the notion that women can enjoy being raped.[14]

Regardless of degree of validity of the various studies in evaluating the full effects of sexually oriented materials, in the end it is the inferences drawn by responsible officials that drive the development and adoption of corrections policies and procedures. And, officials must rely on their experience, the experience of others, and there own critical judgments in making informed policy decisions. That decision-making process is the backbone of prison management and, in my judgment, need only be rational – not absolutely foolproof. It is difficult to say exactly how much harm may result or what the percentage of prisoners is who would be harmed by allowing sexually oriented materials; however, regardless of the amount, it is reasonable for officials to act to try to prevent any such harm from occurring. Officials should not be indifferent to inferences they may draw about potential adverse consequences related to sexually oriented materials.

**Opinion B-02.06**   **Criminals often objectify their victims. Sexually oriented material in the possession of inmates has the potential of encouraging such objectification of others; thus, undermining the ADC's Defendants' efforts to the contrary.**

**Discussion and Basis for Opinion**

There can be no debate that pornography – whether softcore or hardcore – presents women simply as sex objects; targets of male sexual gratification. If altering offenders predisposition or inclination to objectify victims is a rehabilitation goal, it would seem counterproductive to reinforce that tendency by providing or permitting inmates such materials. Undoubtedly, there are substantial differences among inmates regarding the potential for sexual violence or other detrimental effects on rehabilitation.

Prison officials can rationally infer it will not aid in the treatment goals of helping prisoners regain self-control and acquire respect for others by permitting them to spend their time immersed in the studying materials which glorify sexual objectification and sexual gratification.

**Opinion B-02.07**   **It should be noted that corrections officials were not the only persons concerned about allowing sexually oriented materials. The U.S. Congress passed legislation prevented the public funds in the Federal Bureau of Prisons budge to distribute to its prisoners sexually oriented materials.**

---

[14] **Amatel v. Reno**, 156 F.3d 190, 200 (CADC 1998), citing Neil Malamuth, "Aggression against Women: Cultural and Individual Causes," in Malamuth & Donnerstein, 19, 32-39; and Mike Allen et al., "Exposure to Pornography and Acceptance of Rape Myths," 45 J. Communication 5 (1995).

### Discussion and Basis for Opinion

In 1996 the U.S. Congress amended the Congress Omnibus Consolidated Appropriations Act of 1997[15] to prevent the Federal Bureau of Prisons from expending public funds to distribute commercial material which featured nudity or other sexually explicit material. According to then-**Senator John Ensign**:

> Congress should not be fueling the sexual appetites of offenders, especially those who have been convicted of despicable sex offenses against women and children. Magazines that portray and exploit sex acts have no place in the rehabilitative environment of prisons, nor should we pay Bureau of Prison[s] staff to distribute them.[16]

**Opinion B-02.08**    **Even assuming that there are some inmates for whom sexually oriented materials would be no more than a pleasant diversion from the vexing routine of incarceration, there is no accurate means of ensuring consistently accurate foresight.**

### Discussion and Basis for Opinion

While proponents of allowing distribution of allowing sexually oriented materials might argue that officials could identify prisoner for whom there would be no adverse consequences, it would be difficult -- if not impossible -- to accurately identify which inmates could have access to sexually oriented materials without negative consequences. It is my opinion there is no means of accurately making such assessments. However, even if for the sake of argument it is possible to evaluate each prisoner's susceptibility to such materials and identify the types of pornography each prisoner could safely be exposed to, the process for such a review would be inordinately and unreasonably expensive. Such an approach would amount to an administrative burden far exceeding any potential benefit to the system.

And even if such a burden were deemed acceptable, new problems would then be created, because even if arguendo it is possible to identify each inmate for whom sexually oriented materials would not lead to illegal or prohibited sexual conduct or whose rehabilitation would be effected, it would not be possible to guarantee that the materials would not at some point find their way into the hands of other prisoners more susceptible to the ill effects of sexually oriented materials. Anyone familiar with the realities of prison management is familiar with the capabilities of prisoners to traffic in contraband; to find

---

[15]The Ensign Amendment.

[16]See **Amatel v. Reno**, 156 F.3d 190,196 (CADC 1996), citing 142 Cong. Rec. H8262 (daily ed. July 24, 1996).

DeLand XR - PLN v. Ryan - 31

ways to defeat security in movement of contraband from one location to another. Thus, even if sexually oriented materials were allowed for inmates deem not to be at risk, it would be wishful thinking, at best, to assume the materials could never reach the inmates most a risk regarding their treatment, rehabilitation, and safety.

**B-03    Safety, Security, and Hostile Work Environment Issues**

> **Opinion B-03.01**    **Sexually oriented material in the possession of inmates has the potential of undermining the ADC's legitimate interest in inmate and staff safety, security, order, and discipline.**

**Discussion and Basis for Opinion**

There are a number of safety and security problems which can result when inmates have access to sexually oriented materials.

A.    **Influence of Materials on Prisoner Behavior.**    Increasing prisoners' sexual arousal in a restrictive environment such as a prison which offers no acceptable outlets for that arousal can result in frustration and involvement in prohibited, even criminal, actions. Various groups have done surveys and studies to determine the prevalence of sexual victimization in prisons. The U.S. Department of Justice published a report[17] in which estimated 4.0 percent of prison inmates and 3.2 percent of jail inmates had experienced sexual victimization. It should be noted that the study has be criticized because the survey reported claims – not verified incidents – of sexual victimization. However, even if for the sake of argument the manner in which the survey was done inflated the actual number of events, even a somewhat reduced number of incidents is still a significant problem.

The concern over reported sexual violence in the nation's prisons resulted in the enactment of the Prison Rape Elimination Act of 2003, and in 2012 the issuing of the U.S. Department of Justice's *National Standards to Prevent, Detect, and Respond to Prison Rape*[18] (PREA Standards).

In light of the reported survey results and the aggressive action by Congress and the Department of Justice, it would seem to be counterintuitive to inject sexually oriented materials into the prison environment. The impact of loosening access to such materials could exacerbate the problem of victimization.

---

[17] *Sexual Victimization in Prisons and Jails Reported by Inmates.*

[18] Public Law 108-79; 28 CFR 115.

B.    **Increasing Contraband Control Problems**.    Introducing sexually oriented materials to any portion of the inmate population introduces into the prison environment a class of materials which even though permitted by some inmates would be contraband sought after by others.  Such materials – like any scare commodity – would become a form of currency; thus, it would likely lead to the unauthorized bartering and spreading of the sexually explicit materials.

C.    **Increasing Theft, Fighting, and Assaults.**    In an environment such as a prison, inmates often result in theft, reprisals against the thief, intimidation, and various types of physical violence (fights and assaults) to possess things that are illegal, unauthorized, too expensive, or otherwise unavailable.  Such tactics to obtain the property or possessions of a fellow inmate would not be unlike tactics which may have led to their incarceration in the first place.  It should be obvious that disputes over sexually oriented materials could lead to theft, strong-arming, and/or various forms of violence.

**Opinion B-03.02**    **Sexually oriented material in the possession of inmates has the potential of undermining the ADC's legitimate interest in preventing the creation of a hostile work environment for staff and other prisoners.**

**Discussion and Basis for Opinion**

Staff members are generally prohibited from bringing sexually oriented magazines, calendars, and other such materials to the workplace to avoid offending and creating a hostile work environment for other employees.

- "Specific acts that may consitute sexual harassment include but are not limited to . . . [m]aterials of a sexual nature."[19]

- "Offensive conduct may include but is not limited to . . . **offensive objects or pictures** . . . ."[20]

- ". . . a condition of employment or creating sexually intimidating, hostile, or

---

[19]Department Order 501, Employee Professionalism, Ethics, and Conduct, p. 18 (emphasis added); Department Order 527, Employment Discrimination and Harassment, § 527.02, p. 8.

[20]Department Order 527, Employment Discrimination and Harassment, § 527.02, p. 8 (emphasis added).

offensive work environment."[21]

It should be obvious that the same staff members who must be protected from exposure to sexual materials by other staff, could be exposed to sexually oriented inmates sexually oriented materials while handling inmate mail, conducting cell shakedowns, or conducting supervision rounds if inmates are permitted to receive and possess such materials.  If staff members are not allowed to bring "materials of a sexual nature" to work, what is there about having been sentenced to prison after having been convicted of a felony that elevates a prisoner's right to receive and/or possess materials in the facility beyond what is permitted for ADC staff.

**Opinion B-03.03**     **It is more than a theoretical possibility that sexually oriented materials possessed by inmates can be a catalyst to sexual harassment and intimidation of staff by inmates.  Female staff are often the targets of such efforts by prisoners.**

<u>**Discussion and Basis for Opinion**</u>

During the time I served as Executive Director for the Utah State Department of Corrections it was necessary to discipline inmates from time to time for sexual misconduct, including instances where female officers were the targets of sexual harassment, including openly masturbating to harass or intimidate female officers. Conversation with other corrections professionals indicated this was not an unusual problem.  It defies commonsense to provide inmates with materials intended to create sexual arousal, objectify women, and perpetuate various abusive sexual fantasies and then expect that the inmates will never act on the resulting sexual impulses.

An excellent example of inmate sexual harassment involving sexually oriented material is discussed the 9th Circuit Court of Appeals in **Mauro v. Arpaio**.[22]  Although, I am familiar with the case as a result of conversation with one of the defense team, to ensure that I accurately recount the facts, I will quote key passages from the court ruling.[23]

---

[21]Department Order 527, Employment Discrimination and Harassment, § 527.02, p. 8.

[22]188 F.3d 1054, 1057 (CA9 1999) (en banc).

[23]As stated previously in my report, any reference I make to case law in this report will be provided only when my layman's understanding of the case law and/or statutes was a factor in forming or explaining any of my opinions.  **None of the references to statutes or case law are provided with the intent of presuming to interpret the law for the court.**  Obviously, that is the function of the court; however, where any of my opinions are influenced to some degree by my understanding of legal authority or can be better illustrated by such references, referencing the legal authority will more fully disclose all bases for my opinions.

Maricopa (Arizona) County **Sheriff Joseph Arpaio** faced with a recurring problems of sexual harassment of female staff by inmates often utilizing sexually oriented materials. As a result, the Maricopa County Jail adopted a policy restricting possession of sexually explicit materials. Two years after the adoption of the policy, Sheriff Arpaio was sued by **Jonathan D. Mauro** after his request to receive Playboy Magazine was denied pursuant to the policy.

> Prior to adoption of the policy challenged by Mauro, female detention officers were faced with situations in which male inmates compared the officers' anatomy to that of nude women depicted in various publications, often Playboy magazine centerfolds. The officers would be invited to look at the breasts on these nude models, or asked their opinion about shaved genitalia. The officers would also encounter inmates who were openly masturbating while looking at sexually explicit pictures. **One inmate told an officer that he was mentally having anal intercourse with Miss July, and when he was done, he was going to do the same to the officer. The officers were confronted with this type of behavior often, ranging from several times daily to several times a week.**[24]

> The relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy – sexual harassment of female officers, jail security and rehabilitation of inmates – is clear. In the past, **inmates have used nude photographs to draw anatomical comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights and disturbances by the inmates and created a security risk for both inmates and jail employees; to draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers.**[25]

It cannot be seriously argued that the ADC Defendants lack a legitimate interest in furthering officer safety. It is my opinion that sexual harassment is related to officer safety. "Implementation of the policy resulted in a sharp decrease in the number of problems encountered by the female officers. The officers reported that the situations declined to only happening to them occasionally, if at all."[26]

------

[24]**Mauro v. Arpaio**, 188 F.3d 1054, 1057 (CA9 1999) (en banc) (emphasis added).

[25]**Mauro v. Arpaio**, 188 F.3d 1054, 1060 (CA9 1999) (en banc) (emphasis added).

[26]**Mauro v. Arpaio**, 188 F.3d 1054, 1057 (CA9 1999) (en banc).

**B-04** **Review of Rejected PLN Articles**

ADC's 2010 mail policies in place at the time the PLN issues were rejected states, "Prohibited publications include, but are not limited to . . . . Pictures, photographs, illustrations, text or other content that may **encourage unacceptable sexual or hostile behaviors, or creates a hostile environment** for volunteers including, but not limited to sexual representations of inmates, law enforcement, military, professional medical staff, teachers and Clergy."[27]

The 2010 policy also directed:

1.1     In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material. For the purpose of this Departmental Order, sexually explicit material is defined as publications that feature nudity and/or the publication is promoted based on such depictions and/or the intent of the publication is sexual arousal or gratification.

1.2     Prohibited publications include, but are not limited to:

1.2.1     Publications that contain photographs, drawings, cartoons, animations, pictorials or other facsimiles that show nudity of either gender. (For Nudity see Definitions.)

1.2.2     Publications that contain any of the following acts and behaviors either visually, written or in audio (non-lyric) form:

1.2.2.1     Physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person is a female, breast.

1.2.2.2     Sadomasochistic abuse.

1.2.2.3     Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy.

1.2.2.4     Masturbation, excretory functions, sadomasochistic abuse and lewd exhibition of the genitals.[28]

The ADC revised its mail policies March 4, 2016. The revised policies:

1.2     Prohibited publications include, but are not limited to:

---

[27]Department Order 914.08, § 1.1; § 1.1.18.

[28]Department Order 914, Inmate Mail, § 914.07, Sexually Explicit Material.

1.2.1   Publications that depict nudity of either gender. (For Nudity see Definitions.)

1.2.2   Publications that depict any of the following acts and behaviors in either visual, audio, or written form:

1.2.2.1   Physical contact by another person with a person's unclothed genitals, pubic area, buttocks or, if such person is a female, breast.

1.2.2.2   Sadomasochistic abuse.

1.2.2.3   Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy.

1.2.2.4   Masturbation, excretory functions, and lewd exhibition of the genitals.

1.2.2.5   Incestuous sexual activity.

1.2.2.6   Sexual activity involving an unwilling participant, or a participant who is the subject of coercion, or any sexual activity involving children.[29]

Based on the 2010 Inmate Mail policy, the ADC rejected the March, April, July, and October 2014 issues of PLN. Plaintiff claims, rejecting the four PLN issues was a violation of Plaintiff's rights under the First Amendment to the United States Constitution through 42 U.S.C. § 1983, and have caused and will continue to cause damages and irreparable injury to Plaintiff.[30] That claim is supported by **John Clark** in his expert report, who wrote:

> In my expert opinion, Prison Legal News' publication items were denied delivery to ADC inmates for **no legitimate penological reason**, as they posed **no legitimate threat to the safety and good order of the facility and have no likelihood of increasing criminal activity in ADC facilities.**[31]

**Opinion B-04.01**   **It is my opinion that ADC officials who were involved in developing, adopting, and implementing the inmate mail policies could rationally have inferred that sexually explicit materials could threaten or undermine legitimate penological goals, including but not limited to:**

---

[29]Department Order 914, Inmate Mail, § 914.07, Unauthorized Content.

[30]Complaint, ¶ 100.

[31]Expert Report of John L. Clark, p. 5 (emphasis added).

A.   Protecting inmate and staff safety;

B.   Preventing a hostile environment for staff and inmates;

C.   Preserving facility security; and

D.   Maintaining order and discipline; and/or

E.   Furthering treatment and rehabilitation objectives.

**Discussion and Basis for Opinion**

This issue should not be decided based on the personal preferences or judgments PLN, views of the expert witness retained by the Plaintiffs and Defendants, or the policies adopted by other prison systems.  Obviously, the Federal Bureau of Prisons (offered by **John Clark** as significantly better than those adopted by the ADC) and other jail and prison officials will to some degree evaluate penological needs differently.

**Clark**, however, goes so far as to brand the ADC as an "outlier" in adopting prisoner mail policies.  "ADC is an outlier, at odds with the policies and practices of other similar correctional systems and the BOP."[32]  **Clark** then fails to explain how and when he surveyed the nation's prison systems to complete a comparative analysis of the policies of the various systems for processing publications which contain sexually explicit material. While it might be useful fully review the policy variations and other findings of his survey, ultimately, it is the ADC that is responsible for the care, supervision, safety, security, discipline, control, and efforts to rehabilitate the convicted prisoners who are incarcerated by the ADC.  It is also the ADC Defendants who are most familiar with the characteristics and demographics of the prisoners they incarcerate.

Persons and organizations that do not bear any responsibility or face the consequences when staff or inmates suffer harm are free to challenge, second-guess, and disagree with the policies and actions of the responsible ADC officials.  And, there are no consequence faced by those who would insist ADC officials change their policies if the changes result in harm to staff or inmates.

Even if – for the sake of argument – PLN, **John Clark**, or **Gary DeLand** could modify and improve the inmate mail policies, that would not invalidate the existing policies.  The question should be whether it is rational for the ADC policy and decision makers to belief their policies and procedures best further the ADC's legitimate penological interests.

---

[32]Expert Report of John L. Clark, p. 5.

DeLand XR - PLN v. Ryan - 38

facilities.[33]

Opinion B-04.02    **It is imprudent to evaluate the effect of the sexually explicit material found in the rejected PLN issues on members of society generally. The ADC officials must consider the effects of the material on the particular demographic which it incarcerates.**

### Discussion and Basis for Opinion

The prisoner ADC incarcerates were not sentence to prison as a reward for exceptional compliance with criminal law and respect for the safety and welfare of other members of society.  Among the prisoners incarcerated by the ADC Defendants are:

A.    Convicted sex offenders (i.e., rapists, child molesters).

B.    Prisoners whose crimes demonstrate the tendency to see others as objects to be victimized or exploited for personal gratification – with no regard to the harm that results.

C.    Prisoners who engage is efforts to intimidate, frighten, and threaten correctional officers[34] and other prisoners.

D.    Prisoners who would draw mistake conclusions from the articles that staff generally welcome or are especially vulnerable to sexual interactions with prisoners.

E.    Prisoners for whom the descriptions of explicit sexual misconduct between staff and prisoners would be sufficiently titillating to provoke acts of sexual misconduct.

F.    Prisoners who are skilled at detecting weakness in staff members and exploiting those weaknesses through manipulation.

It is my opinion, it is rational for the ADC Defendants to be concerned that explicit sexual content in the rejected articles[35] has the potential of acting as a catalyst to prisoner misconduct of the type discussed above.  Whether **John Clark** or **Gary DeLand** or PLN

---

[33] Expert Report of John L. Clark, p. 5 (emphasis added).

[34] Refer to the discussion under Opinion B-03.03 of this Expert Report.

[35] See Opinion B-04.03 for examples of the content which could trigger misconduct among some prisoners.

officials would write the policies exactly the same as the ADC has is not particularly important. The better question is whether the ADC officials who adopted the policies were engaged in a rational evaluation of the issues and whether they believed that the restrictions would best further the ADC's legitimate penological interests.

**Opinion B-04.03**    **Considering the variety of prisoners who could gain access to the material contained in the rejected PLN issues if it had been accepted, it is my opinion that it was not irrational for ADC officials to have some concerns.**

### Discussion and Basis for Opinion

I have reviewed the information in four rejected articles. Below are examples of text which could justify some apprehension by ADC officials concerning possible negative effects on some types of prisoners.

A.    **March 2014 Issue – Ninth Circuit Holds Staff Sexual Abuse Presumed Coercive; State Bears Burden of Rebutting Presumption.**

The article discusses sexual contact between inmate **Lance Wood** and **Officer Sandra De Martin** in an Idaho prison

- Officer "**Martin** entered [inmate] **Wood**'s cell and "cupped her hand on [his] groin . . . enough to excite [him]."

- "**Wood** pushed her away and said 'you need to back off on this.' **Wood** again tried to end the relationship but Martin pursued him and subjected him to 'aggressive pat searches' on several occasions. **Wood** went so far as to ask another guard for help, but **Martin** continued to pursue him."

- "After **Wood** ended the relationship, **Martin** again entered his cell and "grabbed a hold of [his] penis and started to stroke it."

B.    **April 2014 Issue – Kitchen Supervisor Gets Prison Time for Sexually Abusing Two Prisoners**

"**Carl David Evans**, the kitchen supervisor at FCI-Phoenix, traded packs of cigarettes for oral sex with two male prisoners identified only as 'J.I.' and 'E.D.' **Evans** was charged with two counts of sexual abuse of a ward and one count of providing contraband."

- "Prison officials learned in June 2012 that **Evans** was "engaged in a sexual relationship" with at least one prisoner, according to **FBI Agent**

DeLand XR - PLN v. Ryan - 40

**Tyler Woods**. Investigators hid a video camera in the food storage area in the kitchen where the alleged sex acts were taking place, and recorded **Evans'** work shifts for an entire week."

- "**Woods** then reviewed the video and discovered footage showing **Evans**, **J.I.** and **E.D.** entering the storage area. **E.D.** was heard asking **Evans** and **J.I.** if they were 'ready to suck some dick.' **Evans** locked the door, and the trio then had mutual fellatio on top of some food sacks."

- "**E.D.**, who worked as a cook, told FBI investigators that beginning in April 2012, **Evans** gave him a pack of cigarettes every two weeks that he sold to other prisoners for as much as $150 each. **Evans** exacerbated the relationship when he became "aggressive physically," according to **E.D.**, asking him to take off his shirt and then proceeding to play with his nipples."

- "**J.I.** told investigators that he engaged in oral sex with **Evans** and **E.D.** three times, only because he knew that **E.D.** had access to food and "benefitted from his relationship with **Evans**," according to the complaint."

C.     **July 2014 Issue – New York Jail Guard Sentenced for Sexually Abusing Seven Prisoners**

"A former guard at the Monroe County Correctional Facility in Rochester, New York received six months in jail plus 10 years' probation and was required to register as a sex offender after he pleaded guilty in April 2013 to sexually abusing seven female prisoners. Former **Sgt. Robert Wilson**, 41, was sentenced after entering the plea to a 21-count indictment that accused him of engaging in criminal sexual contact with the prisoners for two years, from 2010 to July 2012. The charges included rape, sexual abuse and official misconduct."

- "The prisoners' lawsuits allege numerous sexual encounters involving **Wilson**. One of the victims said **Wilson** encouraged her 'to strip tease in her cell while he watched,' then later directed her to perform oral sex. In another case, the victim claimed **Wilson** called her away from her cell for 'unscheduled medical appointments' and led her into an office where he engaged 'in personal, flirtatious and sexually explicit conversation.'"

- "The same victim's lawsuit also alleges that **Wilson** told her to 'write sexually explicit letters to him, which she did,' and '**Wilson** wrote a sexually explicit letter' back. She also claims that after she was released from jail, **Wilson** took her to his apartment and 'tried to force' her to have

sex "but allowed her to give him oral sex instead.'"

- "Another of the prisoners said **Wilson** came to her cell, sat on her bunk and 'directed her to show him her breasts.' The lawsuit filed by a fourth victim alleges that **Wilson** took her to a private room for sex after calling her into a hallway with the excuse that he had cleaning chores for her to do."

D.   **October 2014 Issue – Tenth Circuit Holds "Consensual" Sex Defeats Prisoner's Eighth Amendment Claim**

"The Tenth Circuit Court of Appeals has held that a female prisoner's 'consensual' sex with two guards did not violate the Eighth Amendment."

- "**Stacey Graham** was housed in solitary confinement at a jail in Logan County, Oklahoma. Between July and October 2009, jail guard **Rahmel Jefferies** began talking to **Graham** over the intercom and their discussions soon became sexual."

- They also exchanged sexually explicit notes. 'I look forward to fucking you,' **Graham** wrote in one note. 'Damn, just the thought of that gets my nipples hard. I'm such a nympho!' She also flashed her breasts at **Jefferies** 'for the hell of it.'"

- "On October 7, 2009, another jailer, **Alexander Mendez**, called **Graham** over the intercom, 'asked about her sexual fantasies' and told her about his. 'She responded that her fantasy was to 'be with two men at the same time.' . . . He asked who she would like him to bring. She said, 'Bring **Jefferies**.' **Graham** then agreed to allow **Mendez** to see her naked when he came by her cell."

- "During the early morning hours of October 9, 2009, **Jefferies** and **Mendez** entered **Graham**'s cell. She 'was wearing just her T-shirt. **Mendez** took it off and Ms. **Graham** kissed **Jefferies** . . . . it was then 'back and forth' between the two men, and both had their hands on her. **Jefferies** began to have intercourse with Ms. **Graham** while she simultaneously performed oral sex on **Mendez**. The two men then switched positions . . . ."

By way of summary, the four articles discussed included, among other things:

- "cupped her hand on [his] groin . . . enough to excite [him] . . . "grabbed a hold of [his] penis and started to stroke it."

- "ready to suck some dick."

- "the trio then had mutual fellatio on top of some food sacks."

- "proceeding to play with his nipples."

- "strip tease in her cell while he watched . . . perform oral sex . . . sexually explicit conversation."

- "sexually explicit letters to him . . . 'tried to force' her to have sex 'but allowed her to give him oral sex instead.'"

- "show him her breasts."

- "'I look forward to fucking you,' [inmate] wrote . . . 'Damn, just the thought of that gets my nipples hard. I'm such a nympho!' . . . flashed her breasts at [officer] 'for the hell of it.'"

- "[Officer] began to have intercourse with [inmate] while she simultaneously performed oral sex on [other officer]. The two men then switched positions . . . ."

- "**Evans** gave him a pack of cigarettes every two weeks that he sold to other prisoners for as much as $150 each" and "engaged in oral sex with **Evans** and **E.D.** . . . only because he knew that **E.D.** had access to food and "benefitted from his relationship with **Evans**." (illicit sex as a financial enterprise)

I am mildy surprised that PLN can claim that none of the articles contained "salacious" descriptions of the reported sexual misconduct.[36] But find it much more surprising that **Clark** would opine that the ADC officials' rejection of the materials was "unjustified by any legitimate corrections concerns." It is one thing to say that you would do it differently or that despite such concerns procedures could be put in place to minimize the threat; however, to dismiss "any legitimate corrections concerns" that any prisoners would be effected is very much a different matter. **Clark** appears to believe that none of the inmates – sex offenders – or others could find anything in the materials that would be sexually arousing or titillating, would encourage harassment of female staff, would cause inmates to think staff is more likely vulnerable to sexual offers that previously believed, or cause arousal to lead to sexual acts with other inmates.

If the prisoners incarcerated by the Federal Bureau of Prisons are not vulnerable to the effects of sexually oriented materials, it would certainly indicate to me that the FBOP

---

[36]Complaint, ¶¶ 1, 28,37, 47, 60, 73, 89, 90.

houses an unique demographic of prisoners.  Because **Clark** holds up the FBOP policies as the model through which the ADC is to be judged, I believe it justifies commenting on an aspect of the FBOP policies he has not discussed.  Also, in light of his dismissive opinions regarding sexually oriented materials it is worth asking (at least rhetorically), "If sexually explicit materials are so benign, why the Court of Appeals for the District of Columbia upheld the FBOP's own restrictive policies on sexually oriented material.[37]  The FBOP adopted policies disallowing the use of public funds to distribute sexually explicit materials to comply with the Ensign Amendment.[38]

According to the **Amatel** court:

- "[R]ehabilitation, and such character-moulding as may be implicit therein, constitute legitimate and neutral goals . . . ."[39]

- "The legislative judgment is that pornography adversely affects rehabilitation. It does not matter whether we agree with the legislature, only whether we find its judgment rational."[40]

- "The supposition that exclusion of pornography from prisons will have much of an impact in this direction may be optimistic, but it is not irrational."[41]

**Opinion B-04.04**      **There is another potential effect of the PLN articles which were rejected – copycat actions.**

**Discussion and Basis for Opinion**

Law enforcement often deals with persons who see a high profile criminal or terrorist act and seek to copy the acts.  In some cases, an event, an article, a comment from an associate, or other factor may become the catalyst to an action that would otherwise no have occurred.

Materials which may ordinarily seem inconsequential or benign may have potential implication or significance to persons confined in prisons.

---

[37]See **Amatel v. Reno**, 156 F.3d 192 (CADC 1998).

[38]The Ensign Amendment and FBOP restrictions dealt with pictorial depictions.

[39]**Amatel v. Reno**, 156 F.3d 192, 194 (CADC 1998).

[40]**Amatel v. Reno**, 156 F.3d 192, 199 (CADC 1998).

[41]**Amatel v. Reno**, 156 F.3d 192, 199 (CADC 1998)

**Opinion B-04.05**     **It would appear because the sexually oriented material is found in a publication which does not ordinarily feature sexually oriented material, rather than a publication that routinely feature sexually oriented material the effect on prisoners would be eliminated.**

### Discussion and Basis for Opinion

That distinction may be lost on prisoners who are susceptible to the sexual content of material. Would identical content be more titillating if it appeared in Playboy or Penthouse than if it appeared in a publication which did not ordinarily feature sexual content?

The ADC Defendants have, however, offered a reasonable accommodation regarding such information pursuant to Rule 68, FRCP, in the form of Defendants' Offer of Judgment.

> A legal publication that contains unauthorized content that is either (a) directly quoted from a trial or appellate court's decision, opinion, or order; or (b) otherwise taken from a court case, government publication, or news wire service . . . shall not be withheld if the unauthorized content is reasonable necessary to understand the fundamental issue or legal principle of the legal publication.

**Opinion B-04.06**     **The policy change in Defendants' Offer of Judgment makes the policy less restrictive, though not enough to satisfy Plaintiff or Clark. However, basing the legitimacy of ADC's policies for screening publications on whether someone can conceive of a less restrictive policy is a flawed approach.**

### Discussion and Basis for Opinion

According to John Clark, he was asked to determine, among other things:

> Whether a less restrictive policy could achieve ADC's legitimate penological interests, what such a less restrictive policy might look like, and whether such a less restrictive policy would be more resource-intensive than strict enforcement of the current policy.

I doubt that any policy exists for which someone could not think of a less restrictive way to do things. Also, I am aware of no legal requirement that the least restrictive policy of one prison becomes the lowest common denominator for all prisons on that issue. Each prison system must determine for itself in writing and adopting policies what best suits its

needs, so long as the policies and procedures are rationally related to legitimate penological interests and do not violate clearly established law.

The opinions which I have provided in this Expert Report are based on my file review to the present time. If additional information is provided in the future, I reserve the option of amending my report prior to deposition.

Gary W. DeLand
December 15, 2016