**Attachment 1**

| CORRECTIONS ADC ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER: 900 INMATE PROGRAMS AND SERVICES | OPR: OPS |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER:  914 *INMATE MAIL* | SUPERSEDES: DO 914 (5/1/08) |
| | | EFFECTIVE DATE: FEBRUARY 26, 2010 |
| | | REPLACEMENT PAGE REVISION DATE: N/A |

# TABLE OF CONTENTS

### PROCEDURES

914.01     MAIL GENERAL ................................................................................... 1

914.02     INCOMING MAIL ................................................................................. 2

914.03     AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES ..................... 7

914.04     INTER-RELATIONAL MAIL ...................................................................... 8

914.05     OUTGOING MAIL................................................................................... 9

914.06     PUBLICATIONS ................................................................................... 10

914.07     SEXUALLY EXPLICIT MATERIAL ............................................................ 12

914.08     UNAUTHORIZED PUBLICATIONS AND MATERIAL...................................... 13

914.09     PUBLICATION REVIEW PROCESS .......................................................... 16

914.10     THE OFFICE OF PUBLICATION REVIEW .................................................. 16

           IMPLEMENTATION ............................................................................... 17

           DEFINITIONS ...................................................................................... 18

           AUTHORITY ........................................................................................ 20

           ATTACHMENT

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

# PURPOSE

This Department Order establishes regulations, processes and procedures for inmates to send and receive mail, music, and individually reviewed publications.  All mail is processed consistent with postal regulations and the security requirements of correctional facilities. Each publication is individually reviewed consistent with the Department's legitimate penological interest in maintaining the safety, security and orderly operations of the institutions.

# PROCEDURES

**914.01**    **MAIL GENERAL**

1.1    There is no limitation put on the amount of mail an inmate may receive regardless of custody or detention status, provided the incoming mail meets requirements, does not violate policy, and the mail is not between an inmate and any of the following:

1.1.1    Released offenders currently under community supervision by the Department, excluding members of the inmate's immediate family as defined in this Department Order.

1.1.2    An inmate confined in any local, state or federal correctional facility including, but not limited to county jails, detention centers, halfway houses, privately operated correctional facilities, and juvenile facilities, excluding an inmate's immediate family as defined in this Department Order.

1.1.2.1    Inter-relational mail shall be approved as outlined in section 914.04 of this Department Order.

1.1.3    Current or former Department/Contract Bed employees or current or former Department volunteers, without the Complex Warden's prior written approval.

1.1.4    Minors that are not the inmate's natural or adopted child or minors that do not have parents' or guardians' prior written approval.

1.1.5    Anyone who advises the Warden or Deputy Warden in writing that they do not wish to receive mail from a particular inmate. This request must be documented and filed in the inmate record and through an AIMS entry.

1.1.6    Victim(s) of a crime for which an inmate was convicted and/or their family members when the victim has requested for no communication on a Post-Conviction Notification request in accordance with Department Order #1001, Inmate Release System. Victims that have not formally made the "No Inmate Mail" request may communicate with the inmate or the inmate's family members with prior Warden or Deputy Warden written approval. This request must be documented and filed in the inmate record and through an AIMS entry.

1.1.6.1    Unit/Complex staff shall notify the inmate of the victim's request and that further contact with the victim or his/her family members identified by the victim will result in disciplinary action.

1.2    Postage stamps are sold in inmate stores only.

1.2.1   Indigent inmates shall be provided with the minimum required postage, including postage rates for Mexico or Canada, for five one-ounce pieces of first class mail per month. Inmates may receive additional credit for postage for Legal Mail as outlined Department Order #902, Inmate Legal Access to Courts.

1.2.2   All postage required beyond the limits cited in this Department Order and all postage for inmate groups and organizations shall be at the expense of the inmate, group or organization.

1.2.3   Postage stamps shall not be used as negotiable instruments or legal tender as payment for materials ordered from private vendors.

1.2.4   Inmates shall not barter, trade, sell, or exchange postage stamps for any goods or services.

1.2.5   Inmates are subject to the limits for possession of postage stamps as outlined in Attachment A of Department Order #909, Inmate Property.

1.3   Mail room staff shall maintain:

1.3.1   An itemized list of all incoming and outgoing registered, insured and certified mail.

1.3.2   Permanent logs that will be subject to periodic inspections shall consist of:

1.3.2.1   An itemized list of all incoming and outgoing packages, including the name and ADC number of each inmate who sends or receives a package.

1.3.2.2   The name and address of each sender and addressee for each package.

1.3.2.3   A detailed description of the contents of each. For incoming publications, this includes the name and dated information for each publication.

1.3.2.4   The amount of postage or the amount paid to the contract carrier for each outgoing package.

1.3.2.5   The date of the mailing or receipt of each package, expenses incurred in processing the mail, and the name of the staff member who recorded the information.

1.3.3   An electronic log of all incoming and outgoing legal mail to include the date received, inmate name and number, sender, and the date received by the inmate. All Incoming and Outgoing Legal Mail shall be processed as outlined in Department Order #902, Inmate Legal Access to Courts.

## 914.02   INCOMING MAIL

1.1   Upon arrival at a new Department/Contract Bed facility, staff shall provide each inmate with the correct mailing address. It shall be the responsibility of the inmate to notify correspondents of the correct mailing address.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

1.2    Incoming Mail addressed to inmates shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated (unless legally changed), the inmate's correct ADC number, as well as the inmate's unit name and the appropriate Post Office (PO) Box.

1.3    Incoming Mail shall have a complete return address including the sender's name and the complete street address or PO Box. Mail without a complete return address shall be opened and read to inspect the contents to make a reasonable attempt to ascertain the identity of the sender. If the sender can be identified and the mail does not present any security concerns the mail may be delivered to the inmate. If the sender cannot be verified, the inmate shall receive a notice and the mail held for 90 days before it is destroyed.

1.4    It is the inmate's responsibility to notify correspondents of his/her mailing address, where local U.S. Postmaster practice permits, a U.S. Postal Service (USPS) change of address form shall be completed by the inmate and sent to the USPS. All Department/Contract Bed facilities shall make these forms available. Incoming mail shall be forwarded as follows:

    1.4.1    Mail that arrives without an inmate ADC number shall be stamped "Return to Sender," and returned.

    1.4.2    Mail that arrives for an inmate at an institution where the inmate is no longer housed shall be forwarded to the inmate's current institution.

    1.4.3    When possible, First Class mail belonging to an inmate who is temporarily confined at a hospital or local county jail shall be forwarded.

    1.4.4    Mail belonging to an inmate who is no longer in physical custody of the Department shall be forwarded up to 30 days after his/her release; provided a forwarding address is available. When no forwarding address is available, the mail shall be stamped "inmate is no longer in custody" and returned to the sender.

    1.4.5    All mail received for inmates on escape status shall be forwarded to the Criminal Investigation Unit (CIU) for evaluation and processing.

1.5    Designated staff at each unit/complex is authorized to open, inspect and read incoming mail to prevent criminal activity and prevent inmates from receiving contraband or any other material that may be detrimental to the safe and orderly operation of the institution.

    1.5.1    Upon inspection, incoming mail shall be withheld from an inmate if it meets one or more of the following criteria:

        1.5.1.1    Poses a direct and immediate threat to the security, safety or order of the institution.

        1.5.1.2    Substantially hinders efforts to treat or rehabilitate the inmate; however, legal mail will not be withheld for this purpose.

        1.5.1.3    Threatens the intended recipient.

1.5.1.4    Promotes, aids or abets criminal activity or violation of Department rules, including but not limited to rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages security threat groups.

1.5.1.5    Has content written in code or that contains hidden messages.

1.5.2    Mail meeting one or more of the criteria in 1.5.1 through 1.5.1.5 of this section shall be forwarded to CIU for review. CIU shall return the mail for delivery within 72 hours unless it is determined that an investigation is required, in which case the mail shall be held. If it is determined that the mail is not to be delivered, the inmate shall be notified unless notification would interfere with the investigation.

1.5.3    When an incoming envelope is stamped "Return to Sender" staff shall open and inspect it for contraband before returning it to the inmate.

1.5.4    Incoming legislative correspondence shall be opened in the presence of the inmate to whom it is addressed and may only be inspected to the extent necessary to establish the presence of contraband.

1.6    Inmates may only receive money orders, cashier's checks or certified checks for deposit into inmates' accounts, in accordance with Department Order #905, Inmate Banking/Money System. No other monetary instrument, including cash, coins or personal checks, shall be deposited into an inmate's account.

1.6.1    Money orders, cashier's checks or certified checks shall be made payable to "The Arizona Department of Corrections for the account of (Inmate's Name and ADC Number)."

1.6.2    Mail Room staff shall deliver a receipt to the inmate and forward all money orders, cashiers checks, cash and personal checks received to the Business Office for processing.

1.6.3    The Business Office/designated staff shall process the monetary instruments that meet the Department requirements and return those that do not meet Department requirements at the inmate recipient's expense.

1.6.4    The Business Office shall notify CIU of any received Internal Revenue Service (IRS) checks. CIU may notify the IRS if deemed appropriate.

1.6.5    Outgoing inmate/IRS correspondence shall contain a notation by staff on the envelope directing the correspondence to the Criminal Investigations Branch at the Service Center to which the correspondence is addressed.

1.7    Unauthorized property or material discovered in incoming mail shall be removed from incoming letters and held as contraband. An inmate Property/Contraband/Disposition, Form 909-6, and Notice to Sender of Rejection of Incoming Mail, Form 909-3, shall be completed and sent to the inmate. Inmates have 90 days to either have item(s) destroyed or returned to the sender. The Department shall not pay for the cost of notifying the sender of the inmate's contraband arrangements or its mailing cost.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

1.7.1    The Department shall not pay for the cost of returning unauthorized property or material that includes, but is not limited to:

    1.7.1.1    Used or unused postage stamps.

    1.7.1.2    Stickers, labels, address labels or decorative stamps.

    1.7.1.3    Photos where the non-photo side can be separated (Polaroid's).

    1.7.1.4    Photos of other inmates.

    1.7.1.5    Unknown foreign substances and/or powders.

    1.7.1.6    Oils, perfumes, incense or personal property items.

    1.7.1.7    Lottery tickets or games of chance.

    1.7.1.8    Tax forms.

    1.7.1.9    Battery operated greeting cards, or greeting cards larger than 8 ½" by 11."

    1.7.1.10    Unused Greeting cards, stationary, pens/pencils and/or envelopes.

    1.7.1.11    Unused postcards.

    1.7.1.12    Bookmarks.

    1.7.1.13    Inspirational cards or medals.

    1.7.1.14    Candy, gum, or any food items.

    1.7.1.15    Art, crafts and hobby supplies.

    1.7.1.16    Road maps of Arizona, areas contiguous to Arizona, states that contain the contract prison facilities, and states contiguous to those states where contract prison facilities are located; Public Transportation maps of Arizona and states with contract prison facilities and/or descriptions or photos of Department or contract prison facilities. ("Contiguous", as used in this section, means states surrounding and bordering the subject state. In the example of Arizona, this would mean California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion thereof). Any publication containing maps as part of the material will be subject to all publication review requirements.

    1.7.1.17    Calendars.

    1.7.1.18    A printed individual item (not a supplement of an item such as a newspaper), specifically intended for the purpose of advertising or selling merchandise (catalog, circular) for any items that an inmate would not be permitted to receive.

        1.7.1.18.1    Catalogs for publications, compact discs, cassettes and other items inmates would be able to receive shall be processed according to the publication review requirements.

   1.7.1.19  Personal or professional/commercial photographs that feature nudity or sexually explicit acts, as detailed in the DEFINITION section. Photos of current or former Department/Contract Bed employees and/or Department volunteers.

1.8  Newspaper clippings, magazine articles, cartoons or copies of material from the internet may be enclosed within personal mail; however, the content is subject to the publication review process. Internet material containing information about staff or other inmates is unauthorized if it is determined to be a threat to the safe and orderly operation of an institution and/or a threat to the safety of any other person. Inmates are not authorized to receive items from the ADC Net website.

1.9  Inmates may be permitted to view crime scene and/or autopsy photographs in accordance with Department Order #909 Inmate Property.

1.10  Incoming third class/bulk mail and publications will be delivered provided the mail/publication content meets policy guidelines and:

   1.10.1  Is prepaid, as defined by this Department Order;

   1.10.2  Is addressed to a specific inmate or inmates with the correct name, ADC number and housing location.

1.11  Undeliverable Standard Mail shall be returned to the Post Office, if the Post Office will accept it. If the Post Office does not accept the undeliverable mail, it shall be documented in the appropriate log and destroyed/shredded and bagged by staff and placed in a dumpster or other trash container.

1.12  Incoming telegrams or similar urgent mail, including but not limited to, overnight mail shall be delivered within 12 hours unless circumstances make delivery impractical.

1.13  Excluding holidays and weekends, incoming mail shall not be held and shall be delivered within 24 hours unless circumstances make delivery impractical.

1.14  All mail and publications with metal bindings other than staples, including paper clips, binder clips, and other metal fasteners are prohibited. An inmate that receives a metal binding piece of mail and/or publication shall be informed of its arrival and will either decide to have the publication processed as contraband or give his/her written permission to have the binding removed prior to its release to the inmate. Staff shall make note of the removal in the inmate's property file.

   1.14.1  Staples in all mail and publications are prohibited in the following types of housing units:

     1.14.1.1  Death Row.

     1.14.1.2  Administrative or Disciplinary Confinement.

     1.14.1.3  Close Management.

     1.14.1.4  Maximum Management.

     1.14.1.5  Mental Health Treatment Units (Baker and Flamenco)

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

**914.03      AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES**

1.1      All compact discs (CD's) and/or cassettes received through the mail shall be new, clear or a cardboard container, in its original wrapper and packaging, and shall not be a re-recording of an original, and shall be consistent with copyright laws. Authorized mail order purchases for inmate in disciplinary detention may be held until inmate is released from detention.

1.2      Envelopes/packages containing incoming CD's and/or cassettes shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box. Incoming approved compact discs and/or cassette tapes for inmates in disciplinary detention may be held until the inmate is released from detention.

1.3      Incoming CD's and/or cassettes must come directly from a recognized publisher, distributor or authorized retailer. Family members or friends are not authorized to send CD's and/or cassettes directly to an inmate even if they include a verifiable packing list or invoice. Secondary markets also known as third party vendors, (for example, "eBay," and "Amazon Marketplace"), or any other auction sites are not authorized retailers or distributors for the purpose of this Department Order.

1.4      Cassette tapes and/or CD's commonly referred to as "Books on Tape" are subject to the publication review requirements, as outlined in section 914.09 of this Department Order and shall be included in the total possession limit amount for cassette tapes/discs as outlined in Attachment A of Department Order #909, Inmate Property.

1.5      Inmates may receive correspondence tapes with prior written approval of the unit Deputy Warden. Inmates shall only receive correspondence tapes from an individual on his/her approved visitation list.

   1.5.1      The requesting individual shall submit a written justification to the unit Deputy Warden requesting approval for correspondence tapes indicating that the inmate or visitor has a disability or literacy concern that prevents written correspondence.

   1.5.2      The inmate shall show in advance that he/she is in possession of an operational and authorized appliance with a cassette player.

   1.5.3      Correspondence tapes shall not contain sexually explicit language or any other unauthorized content that would be in violation of this Department Order.

   1.5.4      Correspondence tapes shall be screened at the Complex/Unit Level only and shall not be forwarded to Central Office Publication Review.

1.6      Religious oriented tapes and/or CD's sent through the mail to a specific inmate shall be commercially recorded. Tapes/CD's of religious services being donated by volunteers or outside groups for services or inmate listening shall be pre-screened by the Senior Chaplain to ensure that they are consistent with the guidelines within this Department Order. Volunteers are not authorized to directly provide inmates with recorded material.

1.7      Cash on delivery (COD) orders and contract purchases such as music clubs are prohibited and shall be returned to sender. The Department shall not be responsible for the cost of returning any unauthorized material.

**914.04**  **INTER-RELATIONAL MAIL**

1.1  Inmates that are immediate family members as defined in this Department Order and those that are the verified natural or legally adopted parents of a child are authorized to have inter-relational mail, provided the communication meets the criteria set forth in this Department Order.

1.2  In order to have inter-relational mail privileges, the natural or adoptive parents shall:

1.2.1  Provide the child's birth certificate, and

1.2.2  The relationship can be readily verified by staff, i.e. it is clear in the pre-sentence report or file.

1.3  Inter-relational communication shall not contain communications with or on behalf of any other inmates that do not have inter-relational mail approval.

1.4  Only letters, homemade greeting cards or greeting cards purchased through the inmate store are authorized for inter-relational mail. The transfer of funds and/or any other item is prohibited.

1.5  The sending unit/complex shall verify the inmate's relationship, and shall stamp the outgoing letter as "verified." Letters that have not been verified and approved shall be returned to the inmate sender.

1.6  All inter-relational mail privileges shall be pre-approved by both the requesting and receiving Warden or Deputy Warden. Approvals and denials are at the discretion of the Warden or Deputy Warden and may be revoked when it is in the best interest of institutional security.

1.7  The inmate shall pay postage. Indigent inmates may be provided postage as outlined in section 914.01 of this Department Order.

1.8  Inmates who wish to send mail to an incarcerated immediate family member shall submit the request to their assigned Correctional Officer III who shall verify the relationship.

1.9  The assigned Correctional Officer III or designated staff member at the requesting institution shall:

1.9.1  Complete a Request to Communicate with an Incarcerated Family Member, Form 915-3, as outlined in Department Order #915, Inmate Phone Calls.

1.9.2  Verify that an immediate family relationship exists between the inmates.

1.9.3  Forward the application to the Warden or Deputy Warden for approval/disapproval.

1.9.4  Forward copies of the approved applications to the respective Mail/Property rooms at the requesting and receiving institution.

1.9.5  Advise inmate of disapproved applications, and note all approvals and denials on AIMS.

**914.05**      **OUTGOING MAIL**

1.1   All outgoing inmate mail shall include on the envelope the inmate's complete first and last name (the name under which he is incarcerated), ADC inmate number, and full return address, including the name of the complex, unit and bed location.

   1.1.1   Institution mailroom staff shall return mail lacking this information to the sending inmate, if known, for a correction.

   1.1.2   If the inmate sender is not known, the correspondence shall be opened to make a reasonable attempt to determine the identity of the inmate sender. If the identity cannot be determined, the mail shall be held in a "Dead Letter" repository for 90 days, pending claim. If no claim is made, the mail shall be processed as unclaimed property.

   1.1.3   Inmates shall seal outgoing mail and place it in locked mailboxes located throughout the institution or in other areas designated by the Warden or Deputy Warden. Mail shall be collected at approximately the same time each workday, except on weekends and holidays, and shall be delivered to the mail room for processing.

   1.1.4   All outgoing inmate mail shall be stamped on the front of the envelope with a commercial stamp reading "Inmate Mail Arizona Department of Corrections."

   1.1.5   Inmates shall not use the complex or unit address to fraudulently identify themselves as employees, agents, or representatives of the Department, complex, unit, or Contract Bed facility.

1.2   Staff who processes outgoing inmate mail may inspect it for contraband, but shall not read or censor mail being sent to:

   1.2.1   The inmate's attorney, a judge, or court.

   1.2.2   Publisher or editor of a newspaper, news magazine or periodical of general distribution, national or international news service or to the station manager of any radio or television stations.

   1.2.3   The Director, Deputy Director or Division Directors of the Department.

   1.2.4   Elected or appointed public officials.

1.3   Staff shall read up to 10% of outgoing mail. Mail may be returned to the inmate, retained by the institution, or removed from the mailing (the balance of which shall be mailed) when the contents or communications:

   1.3.1   Pose a direct and immediate threat to the security, safety or order of the institution.

   1.3.2   May substantially hinder efforts to treat or rehabilitate the inmate.

1.4   Staff shall not stamp or mark the contents of outgoing read mail, rather, the envelope or box shall be stamped or marked as having been inspected and resealed prior to mailing.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

1.5     Outgoing inmate mail is subject to being opened and read by staff when there is a reasonable belief that the inmate is using the mail to further a crime or circumvent Department regulations or written instructions. Such mail may include, but is not limited to:

   1.5.1   Descriptions or encouragement of activities that may lead to the use of physical violence.

   1.5.2   Information that involves escape plans and/or activities that violate Department or institution regulations or written instructions.

   1.5.3   Threatens the intended recipient.

   1.5.4   Promotes, aids or abets criminal activity or violation of departmental rules, including but not limited to, rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages security threat groups.

   1.5.5   Mail written in code or provides instruction on code use.

1.6     Outgoing mail that is read by staff and is determined to be detrimental to the security or safe operation of the institution or that may impede the protection of the public or facilitate criminal activity shall be referred to the Criminal Investigations Unit for further action.

1.7     The Criminal Investigation Unit shall:

   1.7.1   Retain the censored portion of any outgoing mail during any investigation, and then return it to the sender.

   1.7.2   Stamp the uncensored portion of any censored mail to indicate that portions of the mail were censored, and mail it to the recipient unless doing so would interfere with an ongoing investigation.

   1.7.3   The Department may censor the item or determine not to mail the item.

1.8     Mail outlined in 1.7.2 of this section shall be sent within 72 hours, and unless it is determined that such mail is not to be sent. If the mail is not to be sent, the inmate shall be notified of such within 72 hours, unless doing so interferes with an ongoing investigation.

1.9     Excluding holidays and weekends, outgoing mail shall not be held and shall be delivered to the Post Office within 24 hours unless circumstances make delivery impractical.

**914.06      PUBLICATIONS**

1.1     All publications are subject to screening and review and shall meet standards and guidelines as detailed in this Department Order.

1.2     The envelope/container shall have the inmate's complete first and last name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box.

1.3 Publications shall come directly from a recognized publisher, distributor, or authorized retailer, be consistent with copyright laws and shall include a packing list/invoice with all shipments.

    1.3.1 Secondary markets (also known as Third Party Vendors) such as e-Bay and Amazon Marketplace are not authorized retailers or distributors.

    1.3.2 Used publications are authorized provided they meet all incoming publication requirements including coming from a recognized publisher, distributor or retailer or a verifiable organization that donates publications to inmates and are in good condition, free of highlighting, underlining, notes or other marks.

1.4 Non-English publications may be delayed due necessary translation.

1.5 Incoming publications shall be pre-paid. Cash on Delivery (COD) orders and contract purchases such as music or book clubs are prohibited and will be returned to the sender at the inmate's expense. Donated publications not coming in from a recognized publisher, distributor or retailer shall be processed as contraband or donated to an inmate library provided they meet Departmental policy requirements and publication review as set forth in this Department Order.

1.6 Publications shall be forwarded for a 90 day period if the inmate is in custody at a Department or Contract Bed facility, provided there is no state or other governing rules/regulations preventing the forwarding of the publication.

    1.6.1 The inmate shall be responsible for the change of address notifications.

    1.6.2 At the end of the 90-day period, the publications shall be subject to contraband policies and procedures and will no longer be forwarded.

1.7 Inmates are responsible for staying within publication possession limit requirements as outlined in Attachment A of Department Order #909, Inmate Property, and may be subject to disciplinary action for exceeding publication/property limits. Items over the established limit shall be considered contraband.

1.8 Authorization to withdraw funds from an inmate's account for the purchase of a publication does not constitute approval of the publication.

1.9 All publications, including those that are part of a title or series, are reviewed on an individualized basis. Rejection of several issues of any one publication is not sufficient reason to reject a subscription to a publication in its entirety; unless the publication regularly includes sexually explicit material as part or all of its content.

1.10 Unless there is a legitimate correctional concern relating to security, safety, criminal activity or a threat to the orderly operation of the institution, the contents of incoming publications or publications under review shall not be revealed to any non-Publications Review Staff. Only those staff approved to participate in publication review and who have received publication review training, shall be involved in processing, reading and reviewing publications.

1.11 No publication shall be excluded solely on the basis of its appeal to a particular ethnic, racial or religious group.

1.12    Staff shall not remove pages of any publication to make the publication acceptable. Removing pages alters the publication rendering it as contraband. Previously excluded publications that have been re-edited by removing pages or the blocking out of pictures or texts will remain excluded. Staff may remove stapled or perforated items including, but not limited to free product samples, calendars, advertising or promotional items provided that no damage is done to the publication in the removal process.

1.13    Previous decisions to exclude publications, regardless of any subsequent revisions in standards or criteria, remain final. Previously excluded Publications shall not be re-submitted for review or appeal under this Department Order.

1.14    Publications delivered to an inmate in error at any complex/unit prior to and contrary to a First or Second Review may be considered contraband upon official notice from Publication Review Office that the publication has been excluded. Inmates will be provided the options of sending out the material, placing it in long-term storage, or having it destroyed.

1.15    Approved incoming publications in disciplinary detention may be held until the inmate is released from detention.

## 914.07    SEXUALLY EXPLICIT MATERIAL

1.1     In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material. For the purpose of this Departmental Order, sexually explicit material is defined as publications that feature nudity and/or the publication is promoted based on such depictions and/or the intent of the publication is sexual arousal or gratification.

1.2     Prohibited publications include, but are not limited to:

1.2.1   Publications that contain photographs, drawings, cartoons, animations, pictorials or other facsimiles that show nudity of either gender. (For Nudity see Definitions.)

1.2.2   Publications that contain any of the following acts and behaviors either visually, written or in audio (non-lyric) form:

1.2.2.1     Physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person is a female, breast.

1.2.2.2     Sadomasochistic abuse.

1.2.2.3     Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy.

1.2.2.4     Masturbation, excretory functions, sadomasochistic abuse and lewd exhibition of the genitals.

1.3     Publications that contain nudity and/or sexual behaviors/acts for artistic, medical, educational, or anthropological purposes that are not intended for sexual arousal or gratification purposes will be sent to the Office of Publications Review and may be approved on an individualized basis.

1.4     Personal letters are not subject to Publication Review.

1.5     Sexually Explicit Publications not already on the excluded publications list will be reviewed and processed as following:

    1.5.1     Within three work days, unit/complex staff shall send the inmate the Complex Level Publications Review/Sexually Explicit Material, Form 914-7 stating that a sexually explicit publication has arrived and will be processed according to contraband policies and procedures, unless a second level review is requested within 15 work days of the inmate's actual receipt of the notice of exclusion.

    1.5.2     Inmates may give their request of a second level review to the Complex/Stand-Alone Unit Publication Review staff either in person or through Inmate Letter within 15 working days of the actual receipt of the notice of exclusion. If no second level review is requested within the 15 working days, the publication will be returned to sender at the inmate's expense. Publications under second level review will not be returned to sender pending disposition of the appeal.

        1.5.2.1     The Office of Publication Review is considered the second level review for sexually explicit material.

        1.5.2.2     The only issue considered for the second level review is if the publication contains nudity or the sexually explicit material as outlined in 1.1 through 1.2.2.4 of this section. No other issues will be considered.

        1.5.2.3     Appeal decisions made by the Office of Publication Review are final and exhaust inmates' administrative remedies.

    1.5.3     A Division Director or Director's designee not in the same chain of command as the Office of Publication Review shall complete second level reviews for excluded publications that contain nudity and/or sexual behaviors/acts for artistic, scientific, medical, educational, or anthropological purposes that are not intended for sexual arousal or gratification purposes.

914.08     **UNAUTHORIZED PUBLICATIONS AND MATERIAL** - Prohibited publications include those that by their nature or content threaten or are detrimental to the security, safety and orderly operation, or discipline of the facility, or inmate rehabilitation, or, are found to facilitate, encourage, incite, promote or instruct in criminal activity or unauthorized prison activity.

    1.1     Prohibited publications include, but are not limited to:

        1.1.1     Depictions or descriptions that incite, aid, or abet riots, work stoppages, or means of resistance.

        1.1.2     Instructions or plans on the sending or receiving of prison contraband.

        1.1.3     Depictions or descriptions of street gangs and/or Security Threat Groups (STG), and related gang/STG paraphernalia, including, but not limited to, codes, signs, symbols, photographs, drawings, training material, and catalogs.

1.1.4     Pictures, descriptions and instructions regarding the function of locks and/or security devices (e.g. cameras, alarms) or how to bypass or defeat the security functions of these devices.

1.1.5     Depictions, descriptions, instructions on the use of hands, feet, or head as weapons, fighting weapons and techniques, self-defense and martial arts.

1.1.6     Depictions or descriptions, or promotion of drug paraphernalia or instructions for the brewing of alcoholic beverages or the manufacture or cultivation of drugs, narcotics or poisons.

1.1.7     Content that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another.

1.1.8     Depictions, descriptions or content that instructs on the sale, manufacture, concealment, or construction of ammunition, guns, rifles, bombs, explosives or any other type weaponry; displays, realistic pictures, or cutaway pictures of guns or knives suitable for use in making of reproduction weapons. The mere photograph of a gun or knife in a magazine or publication (e.g. Field and Stream) is not sufficient in and of itself to exclude the publication.

1.1.9     Detailed illustrations, explanations, and/or descriptions of computers/ communications systems or electronics.

1.1.10     Depictions, descriptions or content that promotes or instructs on identity theft.

1.1.11     Content that depicts, encourages, or describes methods of escape and/or eluding capture, or contains blueprints, drawings, road maps of Arizona, areas contiguous to Arizona, states that contain the contract prison facilities, and states contiguous to those states where contract prison facilities are located; Public Transportation maps of Arizona and states with contract prison facilities and/or descriptions or photos of Department or contract prison facilities. ("Contiguous", as used in this section, means states surrounding and bordering the subject state. In the example of Arizona, this would mean California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion there of.)

1.1.12     Content that contains survival skills that could be used as an aid in eluding capture following an escape.

1.1.13     Gambling strategies and other gambling-related instructional material.

1.1.14     Pictures, depictions, illustrations, explanations, instructions, and/or patterns for tattoos and/or skin modification equipment which would provide, at minimum, visual aids for inmates wishing to reproduce this type of body ornamentation and/or equipment.

1.1.15     Cipher or code or instruct on the usage of code.

1.1.16     Pictures, depictions, illustrations or text that promotes acts of violence, that cause or intends to cause serious criminal injury or harm.

1.1.17     Graphic violence that includes but is not limited to murder, rape, sexual assault, assault, amputation, decapitation, dismemberment, mutilation maiming, disfigurement or cruelty to animals.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

1.1.18    Pictures, photographs, illustrations, text or other content that may encourage unacceptable sexual or hostile behaviors, or creates a hostile environment for volunteers including, but not limited to sexual representations of inmates, law enforcement, military, professional medical staff, teachers and Clergy.

1.1.19    Intelligence gathering instruction and/or investigative techniques that may impede the Department's investigative ability.

1.1.20    Military/strategy publications that may circumvent the Department's ability to monitor and control activities/behaviors that may be a violation of law and/or Departmental policy.

1.1.21    Medical publications that may lead to any or all of the following:

    1.1.21.1    Harming of oneself or others;

    1.1.21.2    Impacting clinical test results;

    1.1.21.3    Preventing medical staff from accurately diagnosing medical issues and providing appropriate medical treatment and/or false concerns of a given diagnosis or medical treatment necessities.

1.1.22    Depictions/descriptions/textual content that may create a health and fire risk.

1.1.23    Crime scene/autopsy photos.

1.1.24    Depictions, descriptions or content that promotes and/or instructs on the facilitation of activity that is in violation of departmental policy and/or governmental laws.

1.1.25    Canine search procedures, techniques and scent discrimination.

1.1.26    Instruction on the making of incense.

1.1.27    Depictions, descriptions or content that instructs on the sale, manufacture, concealment, or the construction of tools.

2.1    A publication will not be rejected based upon inclusion of an advertisement promoting of the following if the publication is otherwise permissible and the advertisement is merely incidental to, rather than the focus of, the publication:

2.1.1    Three-way calling services;

2.1.2    Pen pal services;

2.1.3    The purchase of products and services with postage stamps;

2.1.4    The purchase of products and services that violate Departmental policy;

2.1.5    Conducting a business while incarcerated.

2.2    Publications that contain detailed content of any subjects listed above may be excluded.

**914.09**        **PUBLICATION REVIEW PROCESS**

1.1    The Complex/Stand-Alone Unit Level Publication Review staff shall:

1.1.1    Facilitate the processing of sexually explicit publications as contraband as outlined in section 914.07 of this Department Order.

1.1.2    Forward publications that contain nudity for artistic, medical, educational, or anthropological purposes that are not intended for sexual arousal or gratification purposes to the Office of Publications Review for disposition.

1.1.3    Approve/release publications that do not require additional review.

1.1.4    Notify inmates of publications that are pending disposition by the Office of Publication Review.

1.1.5    Process inmates' second level review request and notify inmates of their outcome or inform inmates if the request is not within timeframes. Second Review can be requested by inmates either verbally or written to the assigned Complex/Stand-Alone Unit Level Publication Review staff within 15 work days of the inmate's actual receipt of the notice of exclusion.

1.1.6    Distribute copies of Office of Publications Review - Notice of Result, Form 914-6 and a Memorandum of Second Review to inmates affected by either the decision to exclude a publication or the referral for a Second Review. The distribution of these copies shall include inmates presently in possession of excluded publications, or who may in the future possess excluded publications. The excluded publication will be dealt using the same procedures as set forth in section 914.02, subsections 1.7 - 1.7.1 of this Department Order.

1.1.7    Provide the Warden with a copy of any Memorandums of Second Review.

1.1.8    Respond to Inmate Publication Review-Related Letters questions or concerns.

1.1.9    Log all incoming publications that are included as part of Publication Review, noting the specific publication, inmate information, rating and disposition, and sending the monthly report to the Office of Publication Review.

1.1.10    Maintain log information for a period of two years.

**914.10**        **THE OFFICE OF PUBLICATION REVIEW**

1.1    The Office of Publication Review shall:

1.1.1    Review, process, document and track publications forwarded by the Complex/Stand-Alone Unit Publication Review staff and determine whether to allow or exclude them.

1.1.2    Notify all Wardens and Mail/Property rooms of the decision on each reviewed item.

1.1.3    Complete the Office of Publications Review - Notice of Result form for all reviewed publications. Notices of Reviews for excluded publications must provide a reason for the exclusion.

1.1.4    Send completed Office of Publications Review - Notice of Result form to the Complex/Stand-Alone Unit Publication Review staff for distribution.

1.1.5    Act as second level review for publications that contain nudity or the sexually explicit material as outlined in section 914.07 of this Department Order.

1.1.6    Maintain copies of all Notices of Review for period of three years from the date of exclusion. Excluded publications shall be returned to the complex/unit mailroom within 90 days following the review unless a Second Review has been requested. One copy of an excluded publication will be retained for three years if a Second Review has been completed and the exclusion was upheld.

1.1.7    Compile a monthly list of all excluded publications, which shall be forwarded to all Complex/Stand-Alone Unit Level Publication Review staff and to all Wardens.

1.1.8    Notify all Wardens and Complex/Stand-Alone Unit Level Publication Review staff of pending and completed second reviews.

1.1.9    Prepare a Memorandum of Second Review and appeal packet for publications that inmates have requested a second level review that do not fall under the sexually explicit material as outlined in section 914.07, of this Department Order.

    1.1.9.1    A Division Director or Director's designee not in the same chain of command as the Office of Publication Review shall complete the Memorandum of Second Review to affirm or reverse the original decision. The Memorandum shall be forwarded to all affected inmates through Complex/Stand-Alone Unit Level Publication Review staff. The decision of the Division Director or Director's Designee is final and exhausts inmates' administrative remedies.

    1.1.9.2    Inmates may file grievances on Publication Review process procedural issues. Grievances shall be processed through the inmate's unit to the Central Office Appeals Unit. The appeal response shall only address procedural issues and will not reconsider any decisions to exclude publications.

1.1.10   Forward completed Memorandums of Second Review to Complex/Stand-Alone Unit Level Publications Review staff for distribution.

## IMPLEMENTATION

Within 90 days of the effective date of the Department Order:

- Each Warden shall update and issue the appropriate Institution Orders For Inmate Mail addressing, at a minimum:

  - Outgoing and incoming mail.

  - Inter-relational mail.

  - Mail Room operations.

  - Mail contraband control.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

- Wardens and Deputy Wardens shall update and issue the appropriate Institution Orders and Post Orders for mail procedures and processing all types and rates of mail consistent with current USPS requirements mail operations.

Section 914.07, Sexually Explicit Material is not effective until August 26, 2010:

- Until August 26, 2010 the previous Department Order 914, Inmate Mail, Section 914.07, Obscene Material dated May 1, 2008 remains in effect. (See Attachment A)

- Prior to this date inmates:

  - Shall cancel or allow to expire any current subscriptions to commercially published magazines or publications that feature nudity.

  - Shall mail out, destroy or request long-term storage for these publications or any other material that is in violation of this Department Order.

- Inmates may receive disciplinary action if found in the possession of unauthorized commercially published magazines or publications after August 26, 2010. All such items shall be considered contraband and will be subject to seizure.

# DEFINITIONS

**ALTERING** - To change or make different; modify.

**AUDIO BOOK** - A taped reading of a book or book condensation reproduced in audiocassette form.

**CENSOR** - To delete, ban, suppress or withhold portions of mail.

**CONTRABAND** - Any item not permitted by law, or any item that is expressly prohibited by ADC policy; Items possessed by an inmate which, by their nature, use, or intended use, pose a threat to the security or safety of inmates, staff or public, or disrupt, the orderly operation of the facility; Items possessed by an inmate without permission and (a) the location in which these items are discovered is improper or (b) the quantities in which an allowable item is possessed is prohibited or (c) the manner or method by which the item is obtained was improper or (d) an allowable item is possessed by an inmate in an altered form or condition.

**CORRESPONDENCE TAPES** - Cassette tapes sent or received by an inmate or visitor where there exists a disability or literacy concern that prevents written correspondence.

**CRIMINAL ACTIVITY** - Any activity that violates local, state and federal law, statutes, ordinances, or codes, and constitutes a criminal act under the law.

**CUNNILINGUS** - Oral stimulation of the clitoris or vulva.

**EXCRETORY FUNCTIONS** - The elimination of a body's waste products through defecation and urination.

**FEATURES** - The publication contains nudity on a routine or regular basis or promotes itself based upon such depictions in the case of an individual one-time issue.

**FELLATIO** - Oral stimulation of the penis.

**FIRST CLASS MAIL** - A class of mail including letters, postcards, and postal cards, all matter wholly or partially in writing or typewriting; includes but is not limited to anything mailable such as bills, invoices, personal correspondence, and some merchandise.

**GENITALIA** - The outer sexual organs, especially the penis or vulva.

**IMMEDIATE FAMILY** - A legal spouse, natural or adopted parents, siblings, natural or adopted children, stepchildren, grandparents, or other verified person primarily responsible for the raising of the inmate in the absence of the inmate in the absence of a parent.

**INCESTUOUS ACTIVITY** - Sexual activity between family members who are forbidden to marry due to their close kinship.

**INFLAMMATORY** - Arousing passion or strong emotion, especially anger and belligerence.

**INTERCOURSE** - The act of having sex.

**INTER-RELATIONAL MAIL** - Letters deliverable by the United States Postal Service written by an inmate to an incarcerated immediate family member, clearly marked with the name and ADC number of the sending and receiving incarcerated immediate family member.

**LEGISLATIVE CORRESPONDENCE** - Letters to or from a member of the Arizona State Legislature. Mail that is received in envelopes that are clearly marked as official envelopes used by the Arizona State Legislature is considered incoming legislative correspondence.

**MASTURBATION** - Touch or rubbing of sexual organs for the purpose of sexual pleasure. Excitation of one's own or another's genital organs, usually to orgasm, by manual contact or means other than sexual intercourse.

**NUDITY** - Nudity as defined by ARS 13-3501, the showing of the human male or female genitals, pubic area, female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or male or female buttocks with less than a full opaque covering, or the depiction of covered male genitals in a discernibly turgid state.

**PENOLOGICAL** - Relating to the theory and practice of prison management and criminal rehabilitation.

**PERIODICAL CLASS MAIL** - Mail that consists of magazines, newspapers and other publications.

**PREPAID PUBLICATIONS** – Are any type of publication sent to an inmate that has been paid for in advance of delivery to the inmate. Publications not paid for in advance will not be accepted and returned to the sender at the inmate's expense.

**PUBLICATION** - A book, booklet, pamphlet, (or similar document), or a single issue of a magazine, catalog, periodical, newsletter, audio (non music) tapes and CDs. Publication does not include personal letters and personal photographs.

**SADOMASOCHISTIC ABUSE** - As defined by ARS 13-3501means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed, for the purpose or in the context of sexual gratification or abuse.

**SEXUALLY EXPLICIT MATERIAL** - Any publications, drawing, photograph, film, negative, motion picture, figure, object, novelty device, recording, transcription, or any book, leaflet, catalog, pamphlet, magazine, booklet or other item, the cover or contents of which pictorially depicts nudity of either gender, or that graphically depicts through text any sexually explicit homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion.

**STANDARD MAIL** - Advertising mail that includes advertisements, circulars, newsletters, magazines, small parcels and merchandise and weighs less than 16 ounces.

**STG** - An unofficial term used to denote any type of gang activity in prisons and correctional facilities. The official term for this is Security Threat Group.

**UNAUTHORIZED MATERIAL**- Material that by its nature or content threatens or is detrimental to the security, safety, good order or discipline of the facility, or inmate rehabilitation, or, that is found to facilitate, encourage, incite, promote or instruct in criminal activity or unauthorized prison activity.

**VIOLENCE** - Acts of aggression or abuse that causes or intends to cause criminal injury or harm. These acts include, but are not limited to, murder, rape, sexual assault, assault, and cruelty to animals. Graphic violence would include, but is not limited to, acts of violence that include amputation, decapitation, dismemberment, or mutilation maiming or disfigurement.


{Original Signature on File}

_____

Charles L. Ryan
Director


**ATTACHMENT**
**Attachment A – Obscene Material**

**FORMS LIST**
914-6, Office of Publications Review - Notices of Result
914-7, Complex Level Publications Review/Sexually Explicit Material

# AUTHORITY

A.R.S. 12-941 et seq, Disposal of Certain Unclaimed Property in Custody of State, City or Town Officers.
A.R.S. 13-2501, Definitions of Contraband.
A.R.S. 13-2505, Promoting Prison Contraband.
A.R.S. 13-3309, Seizure; Exception; Definition.
A.R.S. 13-3501, Obscene Material.
A.R.S. 13-3503, Seizure of Obscene Things; Disposition.
A.R.S. 13-4301 et seq, Forfeiture.
A.R.S. 13-4411.01, Notice of Right to Request Not to Receive Inmate Mail.
A.R.S. 13-4429, Return of Victim's Property; Release of Evidence.
A.R.S. 31-231, Unauthorized Communications.
A.R.S. 31-235, Prisoner correspondence: definitions.

ATTACHMENT A
DEPARTMENT ORDER 914

OBSCENE MATERIAL

(DEPARTMENT ORDER 914, INMATE MAIL, SECTION 914.07, DATED MAY 1, 2008)

914.07      OBSCENE MATERIAL

1.1      Publications that contain obscene material may be prohibited and includes material that by its nature or content poses a threat or is detrimental to inmate rehabilitation or is detrimental to the security, safety, good order and discipline of the facility.

1.2      Material may be deemed obscene under applicable constitutional standards. A publication is deemed obscene when ALL of the following apply:

1.2.1      The average person, applying contemporary state standards, would find that the publication, taken as a whole, appeals to the prurient interest.

1.2.2      The average person, applying contemporary state standards, would find that the publication depicts or describes, in a patently offensive way, sexual activity as defined in this written instruction.

1.2.3      The publication, taken as a whole, lacks serious literary, artistic, political or scientific value.

1.3      Prohibited publications include, but are not limited to:

1.3.1      Publications that contain portrayal of actual or simulated acts or threatened acts of force or violence in a sexual context, including, but not limited to forcible intercourse (rape) or acts of sadomasochism emphasizing the infliction of pain.

1.3.2      Publications that contain portrayal of actual or simulated acts or behaviors between a human being and an animal.

1.3.3      Publications that contain portrayal of actual or simulated acts or behaviors in which one of the participants is a minor, or appears to be under the age of 18.

1.3.4      Publications that include cartoons, animations, or other facsimiles of the above listed acts.

**Attachment 2**



| ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER: 900<br><br>INMATE PROGRAMS AND SERVICES | OPR:<br><br>OPS |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER: 914<br><br>***INMATE MAIL*** | SUPERSEDES:<br><br>DO 914 (2/26/10)<br>DI 322 (10/15/14)<br>DI 340 (12/5/15) |
| | | EFFECTIVE DATE:<br><br>MARCH 4, 2016 |
| | | REPLACEMENT PAGE REVISION DATE:<br><br>N/A |

# TABLE OF CONTENTS

PURPOSE

PROCEDURES                                                                                   PAGE

914.01     MAIL GENERAL ................................................................................ 1

914.02     INCOMING MAIL ............................................................................. 3

914.03     AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES........................ 7

914.04     INTER-RELATIONAL MAIL ................................................................. 8

914.05     OUTGOING MAIL ............................................................................. 9

914.06     PUBLICATIONS ...............................................................................11

914.07     UNAUTHORIZED CONTENT...............................................................13

914.08     PUBLICATION REVIEW PROCESS.......................................................15

           DEFINITIONS....................................................................................17

           CROSS-REFERENCE INDEX ...............................................................20

           AUTHORITY.......................................................................................21

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

# PURPOSE

This Department Order establishes regulations, processes and procedures for inmates to send and receive mail, music, and individually reviewed publications.  All mail is processed consistent with postal regulations and the security requirements of correctional facilities. Each publication is individually reviewed consistent with the Department's legitimate penological interest in maintaining the safety, security and orderly operations of the institutions.

# PROCEDURES

**914.01       MAIL GENERAL**

1.1      There is no limitation put on the amount of mail an inmate may receive regardless of custody or detention status, provided the incoming mail meets requirements, does not violate policy, and the mail is not between an inmate and any of the following:

1.1.1    Released offenders currently under Community Supervision by the Department, excluding members of their immediate family as defined in this Department Order.

1.1.2    An inmate confined in any local, state or federal correctional facility including, but not limited to county jails, detention centers, halfway houses, privately operated correctional facilities, and juvenile facilities, excluding an inmate's immediate family as defined in this Department Order.

1.1.2.1     Inter-relational mail shall be approved as outlined in section 914.04 of this Department Order.

1.1.3    Current or former Department/private prison employees and/or current or former Department volunteers. This will be for a period of two years from the separation of employment or volunteer commitment, except when the inmate is immediate family. Exceptions to this rule can only occur with the Warden's prior written approval.

1.1.4    Minors that are not the inmate's natural or adopted child or minors that do not have parents' or guardians' prior written approval.

1.1.5    Anyone who advises the Warden or Deputy Warden in writing that they do not wish to receive mail from a particular inmate. This request must be documented through an Adult Information Management System (AIMS) entry and filed in the inmate's Master Record File, and the Mail and Property File.

1.1.6    Victim(s) of a crime for which an inmate was convicted and/or their family members when the victim has requested for no communication on a Post-Conviction Notification request in accordance with Department Order #1001, Inmate Release System. Victims that have not formally made the "No Inmate Mail" request may communicate with the inmate or the inmate's family members with prior Warden or Deputy Warden written approval. This request must be documented and filed in the inmate record and through an AIMS entry.

1.1.6.1     Unit/Complex staff shall notify the inmate of the victim's request and that further contact with the victim or his/her family members identified by the victim will result in disciplinary action.

1.2    All outgoing domestic mail shall be sent by pre-stamped envelope only, unless otherwise indicated. Domestic postage stamps are <u>not</u> sold in Inmate Stores. Only Global stamps for International mail will be available through the Inmate Store.

    1.2.1    Health and Welfare Indigent inmates shall be provided with pre-printed envelopes for five one-ounce pieces of "free" first class mail per month. Legal Indigent inmates may receive additional credit for postage for Legal Mail as outlined Department Order #902, <u>Inmate Legal Access to Courts</u>.

    1.2.2    All postage required beyond the limits cited in this Department Order and all postage for inmate groups and organizations shall be at the expense of the inmate, group or organization.

    1.2.3    Postage stamps shall not be used as negotiable instruments or legal tender as payment for materials ordered from private vendors.

    1.2.4    Inmates shall not barter, trade, sell, or exchange postage stamps for any goods or services.

    1.2.5    Inmates are subject to the limits for possession of postage stamps as outlined in Attachment A of Department Order #909, <u>Inmate Property</u>.

1.3    Mail room staff shall maintain:

    1.3.1    An itemized list of all incoming and outgoing registered, insured and certified mail.

    1.3.2    Permanent logs that will be subject to periodic inspections shall consist of:

        1.3.2.1    An itemized list of all incoming and outgoing packages, including the name and Arizona Deparment of Corrections (ADC) number of each inmate who sends or receives a package.

        1.3.2.2    The name and address of each sender and addressee for each package.

        1.3.2.3    A detailed description of the contents of each. For incoming publications, this includes the name and dated information for each publication.

        1.3.2.4    The amount of postage for each outgoing package.

        1.3.2.5    The date of the mailing or receipt of each package, and the name of the staff who recorded the information.

    1.3.3    An electronic log of all incoming and outgoing Legal Mail to include the date received, inmate name and number, sender, and the date received by the inmate. All Incoming and Outgoing Legal Mail shall be processed as outlined in Department Order #902, <u>Inmate Legal Access to Courts</u>.

    1.3.4    A running tally of outgoing indigent envelopes to account for each qualifying indigent inmate's monthly limit of five "free" mailings.

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

**914.02        INCOMING MAIL**

1.1     Upon arrival at a new Department/private prison facility, staff shall provide each inmate with the correct mailing address. It shall be the responsibility of the inmate to notify correspondents of the correct mailing address.

1.2     Incoming Mail addressed to inmates shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated (unless legally changed), the inmate's correct ADC number, as well as the inmate's unit name and the appropriate Post Office (PO) Box.

1.3     Incoming Mail shall have a complete return address including the sender's name and the complete street address or PO Box. Mail without a complete return address shall be opened and read to inspect the contents to make a reasonable attempt to ascertain the identity of the sender. If the sender can be identified and the mail does not present any security concerns the mail may be delivered to the inmate. If the sender cannot be verified, the inmate shall receive a notice and the mail held for 90 calendar days before it is destroyed.

1.4     It is the inmate's responsibility to notify correspondents of his/her mailing address, where local U.S. Postmaster practice permits, a U.S. Postal Service (USPS) change of address form shall be completed by the inmate and sent to the USPS. All Department/private prison facilities shall make these forms available. Incoming mail shall be forwarded as follows:

1.4.1     Mail that arrives without an inmate ADC number shall be stamped "Return to Sender," and returned.

1.4.2     Mail that arrives for an inmate at an institution where the inmate is no longer housed shall be forwarded to the inmate's current institution.

1.4.3     When possible, First Class mail belonging to an inmate who is temporarily confined at a hospital or local county jail shall be forwarded.

1.4.3.1     For county jails (i.e., Maricopa and Yuma) that accept only post cards, any other First Class mail will be returned to the sender. First Class mail in this situation will not be held until the inmate returns.

1.4.4     Mail belonging to an inmate who is no longer in physical custody of the Department shall be forwarded up to 90 calendar days after his/her release; provided a forwarding address is available. When no forwarding address is available, the mail shall be stamped "inmate is no longer in custody" and returned to the sender.

1.4.5     All mail received for inmates on escape status shall be forwarded to the Criminal Investigation Unit (CIU) for evaluation and processing.

1.5     Designated staff at each unit/complex is authorized to open, inspect and read incoming mail to prevent criminal activity and prevent inmates from receiving contraband or any other material that may be detrimental to the safe and orderly operation of the institution.

1.5.1   Upon inspection, incoming mail shall be withheld from an inmate if it meets one or more of the following criteria:

    1.5.1.1   Poses a direct and immediate threat to the security, safety or order of the institution.

    1.5.1.2   Substantially hinders efforts to treat or rehabilitate the inmate; however, Legal Mail will not be withheld for this purpose.

    1.5.1.3   Threatens the intended recipient.

    1.5.1.4   Promotes, aids or abets criminal activity or violation of Department rules, including but not limited to rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages Security Threat Groups (STG) and/or Criminal Street Gangs.

    1.5.1.5   Has content written in code or that contains hidden messages.

1.5.2   Mail meeting one or more of the criteria in 1.5.1 through 1.5.1.5 of this section shall be forwarded to CIU for review. CIU shall return the mail for delivery within 72 hours unless it is determined that an investigation is required, in which case the mail shall be held. If it is determined that the mail is not to be delivered, the inmate shall be notified unless notification would interfere with the investigation.

1.5.3   When an incoming envelope is stamped "Return to Sender" staff shall open and inspect it for contraband before returning it to the inmate.

1.5.4   Incoming legislative correspondence shall be opened in the presence of the inmate to whom it is addressed and may only be inspected to the extent necessary to establish the presence of contraband.

1.6   Inmates may only receive funds for deposit into inmates' accounts, in accordance with Department Order #905, Inmate Banking/Money System. No other monetary instrument, shall be deposited into an inmate's account unless authorized in Department Order #905, Inmate Banking/Money System.

    1.6.1   The Business Office/designated staff shall process the monetary instruments that meet the Department requirements and return those that do not meet Department requirements at the Department's expense.

    1.6.2   The Business Office shall notify CIU of any received Internal Revenue Service (IRS) checks. CIU may notify the IRS if deemed appropriate.

    1.6.3   Outgoing inmate/IRS correspondence shall contain a notation by staff on the envelope directing the correspondence to the Criminal Investigations Branch at the Service Center to which the correspondence is addressed.

1.7   Unauthorized property or material discovered in incoming mail shall be removed from incoming letters and held as contraband. An inmate Property/Contraband/Disposition, Form 909-6, and Notice to Sender of Rejection of Incoming Mail/Property, Form 909-3, shall be completed and sent to the inmate. Inmates have 90 calendar days to either have item(s) destroyed or returned to the sender. The Department shall not pay for the cost of notifying the sender of the inmate's contraband arrangements or its mailing cost.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

1.7.1   The Department shall not pay for the cost of returning unauthorized property or material that includes, but is not limited to:

1.7.1.1   Used or unused postage stamps.

1.7.1.2   Stickers, labels, address labels or decorative stamps.

1.7.1.3   Photos where the non-photo side can be separated (Polaroids).

1.7.1.4   Photos of other inmates.

1.7.1.5   Unknown foreign substances and/or powders.

1.7.1.6   Oils, perfumes, incense or personal property items.

1.7.1.7   Lottery tickets or games of chance.

1.7.1.8   Tax forms and Publications, unless in accordance with Department Order #919, Inmate Resource Center/Library Services.

1.7.1.9   Battery operated greeting cards, or greeting cards larger than 8 ½" by 11".

1.7.1.10   Unused Greeting cards, stationary, and/or envelopes.

1.7.1.11   Unused postcards.

1.7.1.12   Writing instruments; any type or kind.

1.7.1.13   Bookmarks.

1.7.1.14   Inspirational cards, medals or medallions.

1.7.1.15   Candy, gum, or any food items.

1.7.1.16   Art, crafts and hobby supplies.

1.7.1.17   Content that depicts, encourages, or describes methods of escape and/or eluding capture. This includes materials that contain blueprints, drawings, descriptions or photos of Arizona prison facilities or private prison facilities, Public Transportation maps, road maps of Arizona or states contiguous to Arizona. ("Contiguous", as used in this section, means states surrounding and bordering Arizona, i.e., California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion thereof.)

1.7.1.18   Calendars.

1.7.1.19   A printed individual item (not a supplement of an item such as a newspaper), specifically intended for the purpose of advertising or selling merchandise (catalog, circular) for any items that an inmate would not be permitted to receive.

              1.7.1.19.1      Catalogs for publications, compact discs, cassettes and other items inmates would be able to receive shall be processed according to the Publication Review requirements.

       1.7.1.20     Credit Reports.

       1.7.1.21     Personal or professional/commercial photographs that feature nudity or sexually explicit acts, as detailed in the DEFINITION section. Photos of current or former Department/private prison employees and/or Department volunteers, unless they are immediate family.

1.8     Newspaper clippings, magazine articles, cartoons or copies of material from the internet may be enclosed within personal mail; however, the content is subject to the Publication Review process. Internet material containing information about staff or other inmates is unauthorized if it is determined to be a threat to the safe and orderly operation of an institution and/or a threat to the safety of any other person. Inmates are not authorized to receive items from the ADC Net website.

1.9     Inmates may be permitted to view crime scene and/or autopsy photographs in accordance with Department Order #909 Inmate Property.

1.10    Incoming third class/bulk mail and publications will be delivered provided the mail/publication content meets policy guidelines and:

      1.10.1    Is prepaid, as defined by this Department Order;

      1.10.2    Is addressed to a specific inmate or inmates with the correct name, ADC number and housing location.

1.11    Undeliverable Standard Mail shall be returned to the Post Office, if the Post Office will accept it. If the Post Office does not accept the undeliverable mail, it shall be documented in the appropriate log and destroyed/shredded and bagged by staff and placed in a dumpster or other trash container.

1.12    Incoming telegrams or similar urgent mail, including but not limited to, overnight mail shall be delivered within 12 hours unless circumstances make delivery impractical.

1.13    Excluding holidays and weekends, incoming mail shall not be held and shall be delivered within 24 hours unless circumstances make delivery impractical.

1.14    All mail and publications with metal bindings other than staples, including paper clips, binder clips, and other metal fasteners are prohibited. An inmate that receives a metal binding piece of mail and/or publication shall be informed of its arrival and will either decide to have the publication processed as contraband or give his/her written permission to have the binding removed prior to its release to the inmate. Staff shall make note of the removal in the inmate's property file.

      1.14.1    Staples in all mail and publications are prohibited in the following types of housing units:

      1.14.1.1     Death Row.

      1.14.1.2     Administrative or Disciplinary Confinement.

      1.14.1.3     Close Custody.

      1.14.1.4     Maximum Custody.

      1.14.1.5     Mental Health Treatment Units (Baker and Flamenco).

**914.03**      **AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES**

1.1     All compact discs (CD's) and/or cassettes received through the mail shall be new, clear or a cardboard container, in its original wrapper and packaging, and shall not be a re-recording of an original, and shall be consistent with copyright laws. Authorized mail order purchases for inmate in disciplinary detention may be held until inmate is released from detention.

1.2     Envelopes/packages containing incoming CD's and/or cassettes shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box. Incoming approved compact discs and/or cassette tapes for inmates in disciplinary detention may be held until the inmate is released from detention.

1.3     Incoming CD's and/or cassettes must come directly from a recognized publisher, distributor or authorized retailer. No individuals shall be authorized to send CD's and/or cassettes directly to an inmate even if they include a verifiable packing list or invoice. Secondary markets also known as Third Party Vendors (i.e., Amazon.com, Amazon Marketplace, Barnes and Noble, e-Bay, and Craig's List), or any other auction sites are not authorized retailers or distributors for the purpose of this Department Order. These sources are offered as examples only and do not represent a definitive list of secondary markets.

     1.3.1     The Department may deem a vendor as Third Party Vendor at its discretion.

     1.3.2     Mail room staff confirm the sender is not a Third Party Vendor prior to opening CDs and/or cassettes.

1.4     Cassette tapes and/or CD's commonly referred to as "Books on Tape" are subject to the Publication Review requirements, as outlined in section 914.09 of this Department Order and shall be included in the total possession limit amount for cassette tapes/discs as outlined in Attachment A of Department Order #909, Inmate Property.

1.5     Inmates may receive correspondence tapes with prior written approval of the unit Deputy Warden. Inmates shall only receive correspondence tapes from an individual on his/her approved visitation list.

     1.5.1     The requesting individual shall submit a written justification to the unit Deputy Warden requesting approval for correspondence tapes indicating that the inmate or visitor has a disability or literacy concern that prevents written correspondence.

    1.5.2    The inmate shall show in advance that he/she is in possession of an operational and authorized appliance with a cassette player.

    1.5.3    Correspondence tapes shall not contain sexually explicit language or any other unauthorized content that would be in violation of this Department Order.

    1.5.4    Correspondence tapes shall be screened at the Complex/Unit Level only and shall not be forwarded to Central Office Publication Review.

1.6    Religious oriented tapes and/or CD's sent through the mail to a specific inmate shall be commercially recorded. Tapes/CD's of religious services being donated by volunteers or outside groups for services or inmate listening shall be pre-screened by the Senior Chaplain to ensure that they are consistent with the guidelines within this Department Order. Volunteers are not authorized to directly provide inmates with recorded material.

1.7    Cash on delivery (COD) orders and contract purchases such as music clubs are prohibited and shall be returned to sender. The Department shall not be responsible for the cost of returning any unauthorized material.

## 914.04    INTER-RELATIONAL MAIL

1.1    Inmates that are immediate family as defined in this Department Order and those that are the verified natural or legally adopted parents of a child are authorized to have inter-relational mail, provided the communication meets the criteria set forth in this Department Order.

1.2    In order to have inter-relational mail privileges, the natural or adoptive parents shall:

    1.2.1    Provide the child's birth certificate, and

    1.2.2    The relationship can be readily verified by staff, i.e. it is clear in the pre-sentence report or file.

1.3    Inter-relational communication shall not contain communications with or on behalf of any other inmates that do not have inter-relational mail approval.

1.4    Only letters, homemade greeting cards or greeting cards purchased through the Inmate Store are authorized for inter-relational mail. The transfer of funds and/or any other item is prohibited.

1.5    The sending unit/complex shall verify the inmate's relationship, and shall stamp the outgoing letter as "verified." Letters that have not been verified and approved shall be returned to the inmate sender.

1.6    All inter-relational mail privileges shall be pre-approved by both the requesting and receiving Warden or Deputy Warden. Approvals and denials are at the discretion of the Warden or Deputy Warden and may be revoked when it is in the best interest of institutional security.

1.7    The inmate shall pay postage. Health and Welfare Indigent inmates may be provided postage as outlined in section 914.01 of this Department Order.

CHAPTER: 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 914 - INMATE MAIL

1.8    Inmates who wish to send mail to an incarcerated immediate family member shall submit the request to their assigned Correctional Officer III who shall verify the relationship.

1.9    The assigned Correctional Officer III or designated staff at the requesting institution shall:

    1.9.1    Complete a Request to Communicate with an Incarcerated Family Member, Form 915-3, as outlined in Department Order #915, Inmate Phone Calls.

    1.9.2    Verify that an immediate family relationship exists between the inmates.

    1.9.3    Forward the application to the Warden or Deputy Warden for approval/disapproval.

    1.9.4    Forward copies of the approved applications to the respective Mail/Property rooms at the requesting and receiving institution.

    1.9.5    Advise inmate of disapproved applications, and note all approvals and denials on AIMS.

## 914.05    OUTGOING MAIL

1.1    All outgoing inmate mail shall include on the envelope the inmate's complete first and last name (the name under which he is incarcerated), ADC inmate number, and full return address, including the name of the complex, unit and bed location.

    1.1.1    Institution mail room staff shall return mail lacking this information to the sending inmate, if known, for a correction.

    1.1.2    If the inmate sender is not known, the correspondence shall be opened to make a reasonable attempt to determine the identity of the inmate sender. If the identity cannot be determined, the mail shall be held in a "Dead Letter" repository for 90 calendar days, pending claim. If no claim is made, the mail shall be processed as unclaimed property.

    1.1.3    Inmates shall seal outgoing mail and place it in locked mailboxes located throughout the institution or in other areas designated by the Warden or Deputy Warden. Mail shall be collected at approximately the same time each workday, except on weekends and holidays, and shall be delivered to the mail room for processing.

    1.1.4    Inmates shall not use the complex or unit address to fraudulently identify themselves as employees, agents, or representatives of the Department, complex, unit, or private prison facility.

1.2    Unsealed outgoing mail, for the below listed recipients, shall be brought to the mail room for inspection and processing. Mail room staff shall inspect the unsealed envelope for contraband, but shall not read the content of the enclosed correspondence.

    1.2.1    The inmate's attorney, a judge, or court.

    1.2.2    Publisher or editor of a newspaper, news magazine or periodical of general distribution, national or international news service or to the station manager of any radio or television stations.

1.2.3    The Director, Deputy Director, Division Directors or Assistant Director of the Department.

1.2.4    Elected or appointed public officials.

1.3    Staff shall read up to 10% of outgoing mail. Mail may be returned to the inmate, retained by the institution, or removed from the mailing (the balance of which shall be mailed) when the contents or communications:

1.3.1    Pose a direct and immediate threat to the security, safety or order of the institution.

1.3.2    May substantially hinder efforts to treat or rehabilitate the inmate.

1.4    Staff shall not stamp or mark the contents of outgoing read mail, rather, the envelope or box shall be stamped or marked as having been inspected and resealed prior to mailing.

1.5    Outgoing inmate mail is subject to being opened and read by staff when there is a reasonable belief that the inmate is using the mail to further a crime or circumvent Department regulations or written instructions. Such mail may include, but is not limited to:

1.5.1    Descriptions or encouragement of activities that may lead to the use of physical violence.

1.5.2    Information that involves escape plans and/or activities that violate Department or institution regulations or written instructions.

1.5.3    Threatens the intended recipient.

1.5.4    Promotes, aids or abets criminal activity or violation of departmental rules, including but not limited to, rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages STG.

1.5.5    Mail written in code or provides instruction on code use.

1.6    Outgoing mail that is read by staff and is determined to be detrimental to the security or safe operation of the institution or that may impede the protection of the public or facilitate criminal activity shall be referred to the Criminal Investigations Unit for further action.

1.7    The Criminal Investigation Unit shall:

1.7.1    Retain the redacted portion of any outgoing mail during any investigation, and then return it to the sender.

1.7.2    Stamp the unredacted portion of any redacted mail to indicate that portions of the mail were redacted, and mail it to the recipient unless doing so would interfere with an ongoing investigation.

1.7.3    The Department may redact the item or determine not to mail the item.

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

1.8    Mail outlined in 1.7.2 of this section shall be sent within 72 hours, and unless it is determined that such mail is not to be sent. If the mail is not to be sent, the inmate shall be notified of such within 72 hours, unless doing so interferes with an ongoing investigation.

1.9    Excluding holidays and weekends, outgoing mail shall not be held and shall be delivered to the Post Office within 24 hours unless circumstances make delivery impractical.

## 914.06    PUBLICATIONS

1.1    Personal letters are not subject to Publication Review.

1.2    All publications are subject to screening and review and shall meet standards and guidelines as detailed in this Department Order.

1.3    The envelope/container shall have the inmate's complete first and last name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box.

1.4    Publications shall come directly from a recognized publisher, distributor, or authorized retailer and be consistent with copyright laws.

    1.4.1    Secondary markets (also known as Third Party Vendors) such as Amazon.com, Amazon Marketplace, Barnes and Noble Marketplace, e-Bay, and Craig's List are not authorized retailers or distributors. These sources are offered as examples only and do not represent a definitive list of secondary markets. The Department may deem a vendor as Third Party at its discretion.

        1.4.1.1    Mail room staff shall verify that an incoming publication is not from a Third Party Vendor prior to opening the publication.

    1.4.2    Used publications are authorized provided they meet all incoming publication requirements including coming from a recognized publisher, distributor or retailer or a verifiable organization that donates publications to inmates and are in good condition, free of highlighting, underlining, notes or other marks.

1.5    Non-English publications may be delayed due to necessary translation. If translators for a specific language are not available, the Department may reject a non-English language publication.

1.6    Incoming publications shall be pre-paid. Cash on Delivery (COD) orders and contract purchases such as music or book clubs are prohibited and will be returned to the sender at the inmate's expense. Donated publications not coming in from a recognized publisher, distributor or retailer shall be processed as contraband or donated to an inmate library provided they meet Departmental policy requirements and publication review as set forth in this Department Order.

1.7    Publications shall be forwarded for a 90 day period if the inmate is in custody at a Department or private prison facility, provided there is no state or other governing rules/regulations preventing the forwarding of the publication.

    1.7.1    The inmate shall be responsible for the change of address notifications.

1.7.2   At the end of the 90-day period, the publications shall be subject to contraband policies and procedures and will no longer be forwarded.

1.8   Inmates are responsible for staying within publication possession limit requirements as outlined in Attachment A of Department Order #909, Inmate Property, and may be subject to disciplinary action for exceeding publication/property limits. Items over the established limit shall be considered contraband.

1.9   Authorization to withdraw funds from an inmate's account for the purchase of a publication does not constitute approval of the publication.

1.10   All publications, including those that are part of a title or series, are reviewed on an individualized basis. Rejection of several issues of any one publication is not sufficient reason to reject a subscription to a publication in its entirety, unless the publication regularly includes sexually explicit material or other unauthorized material as defined in this Department Order as part or all of its content.

1.11   Unless there is a legitimate correctional concern relating to security, safety, criminal activity or a threat to the orderly operation of the institution, the contents of incoming publications or publications under review shall not be revealed to any non-Publications Review Staff. Only those staff approved to participate in publication review and who have received publication review training shall be involved in processing, reading, and reviewing publications.

1.12   No publication shall be excluded solely on the basis of its appeal to a particular ethnic, racial or religious group.

1.13   Only the Office of Publication Review may remove or redact content of any publication that may be in violation of section 914.07 to make the publication acceptable only upon an inmate or publisher appeal as defined within this policy. The Office of Publication Review may cease removing or redacting unauthorized content when the practice places an unreasonable burden on resources due to the volume of incoming mail, publications, the required redaction or removal of unauthorized content, and the dissemination thereof in redacted form. Complex mail and property staff may remove stapled or perforated items including, but not limited to, items that may be in violation of this Department Order provided that no damage is done to the publication in the removal process.

1.14   Previous decisions to exclude publications, regardless of any subsequent revisions in standards or criteria, remain final. Previously excluded Publications shall not be re-submitted for review or appeal under this Department Order.

1.15   Publications delivered to an inmate in error at any complex/unit prior to or contrary to an initial review or an appeal may be considered contraband upon official notice from the Office of Publication Review that the publication has been excluded. Inmates will be provided the options of mailing the publication out at their own expense, arranging for an approved visitor to pick up the publication, or having it destroyed.

1.16   Approved incoming publications for inmates in disciplinary detention may be held until the inmate is released from detention.

1.17    The Department will provide notice to publishers via email of the decision to exclude a publication or part of a publication within seven calendar days following the decision to exclude. If no email address is available, the notice will be sent to the publisher's mailing address as specified within the publication. Publishers will have the same opportunity to seek an appeal as an inmate under Department Order 914. The notice to the publisher shall include sufficient information to identify the specific publication and the reason(s) for the exclusion.

914.07    **UNAUTHORIZED CONTENT**

1.1    In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order.

1.2    Prohibited publications include, but are not limited to:

1.2.1    Publications that depict nudity of either gender. (For Nudity see Definitions.)

1.2.2    Publications that depict any of the following acts and behaviors in either visual, audio, or written form:

1.2.2.1    Physical contact by another person with a person's unclothed genitals, pubic area, buttocks or, if such person is a female, breast.

1.2.2.2    Sadomasochistic abuse.

1.2.2.3    Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy.

1.2.2.4    Masturbation, excretory functions, and lewd exhibition of the genitals.

1.2.2.5    Incestuous sexual activity.

1.2.2.6    Sexual activity involving an unwilling participant, or a participant who is the subject of coercion, or any sexual activity involving children.

1.2.3    Depictions or descriptions that incite, aid, or abet riots, work stoppages, means of resistance, or any other behaviors that may be detrimental to the safe, secure, and orderly operation of the institution.

1.2.4    Depictions or descriptions of street gangs and/or Security Threat Groups (STG), and related gang/STG paraphernalia, including, but not limited to, codes, signs, symbols, photographs, drawings, training material, and catalogs.

1.2.5    Depictions, descriptions and instructions regarding the function of locks and/or security devices (e.g. cameras, alarms) or how to bypass or defeat the security functions of these devices.

1.2.6   Depictions, descriptions, instructions on the use of hands, feet, or head as weapons, fighting weapons and techniques, self-defense and martial arts.

1.2.7   Depictions or descriptions, or promotion of drug paraphernalia or instructions for the brewing of alcoholic beverages or the manufacture or cultivation of drugs, narcotics or poisons.

1.2.8   Content that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another.

1.2.9   Depictions, descriptions or instructions regarding the sale, manufacture, concealment, or construction of ammunition, guns, rifles, bombs, explosives or any other type weaponry; displays, realistic pictures, or cutaway pictures of guns or knives suitable for use in making of reproduction weapons. The photograph of a gun or knife in a recognized magazine or publication (e.g. Field and Stream), standing alone, is not sufficient to exclude the publication.

1.2.10   Detailed illustrations, explanations, and/or descriptions of computers, communications systems or electronics.

1.2.11   Depictions, descriptions or content that promotes or instructs on identity theft.

1.2.12   Content that depicts, encourages, or describes methods of escape and/or eluding capture. This includes materials that contain blueprints, drawings, descriptions or photos of Arizona prison facilities or private prison facilities, Public Transportation maps, road maps of Arizona or states contiguous to Arizona. ("Contiguous", as used in this section, means states surrounding and bordering Arizona, i.e., California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion thereof.)

1.2.13   Content that contains survival skills that could be used as an aid in eluding capture following an escape.

1.2.14   Pictures, depictions, illustrations, explanations, instructions, and/or patterns for tattoos and/or skin modification equipment which would provide, at minimum, visual aids for inmates wishing to reproduce this type of body ornamentation and/or equipment.

1.2.15   Cipher or code or instruction on the usage of code.

1.2.16   Pictures, depictions or illustrations that promote acts of violence including, but not limited to, murder, rape, sexual assault, assault, amputation, decapitation, dismemberment, mutilation, maiming, disfigurement, crime scene/autopsy photographs, or cruelty to animals.

1.2.17   Content in publications, photographs, drawings, or in any type of image or text, that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy.

    1.2.18    Medical publications that may contain diagrams of the human anatomy and or instructions on harming oneself or others.

    1.2.19    Canine search procedures, techniques and scent discrimination.

    1.2.20    Any publication or part of a publication that, although not specifically set forth herein, may otherwise be detrimental to the safe, secure, and orderly operation of the institution.

1.3    A publication will not be rejected based solely upon inclusion of an advertisement promoting the following:

    1.3.1    Three-way calling services;

    1.3.2    Pen pal services;

    1.3.3    The purchase of products and services with postage stamps;

    1.3.4    The purchase of products and services that violate Departmental policy;

    1.3.5    Conducting a business while incarcerated.

**914.08    PUBLICATION REVIEW PROCESS**

1.1    Complex mail room supervisors shall act as the first level of review on all incoming publications and shall decide whether a publication is allowed or excluded from the complex.

    1.1.1    Complex mail room supervisors may consult with other complex mail room supervisors or with the Office of Publication Review prior to making a decision.

    1.1.2    A decision to allow or exclude a publication by one complex shall be binding on all other complexes.

1.2    Within seven calendar days of the decision to exclude a publication, complex mail room staff shall send the inmate the Office of Publication Review – Notice of Result, Form 914-6 informing the inmate of the decision and the opportunity to appeal the decision within 30 calendar days of the inmate's actual receipt of the notice of exclusion. Complex mail room staff will simultaneously inform the Office of Publication Review of the decision to exclude a publication.

    1.2.1    The Office of Publication Review shall notify publishers within seven calendar days when one of their publications or part of a publication is excluded.

        1.2.1.1    Publishers may request an appeal by notifying the Office of Publication Review within 30 calendar days of the publisher's receipt of the exclusion.

    1.2.2    The only publications to be sent to the Office of Publication Review are those for which an inmate has requested an appeal of the complex decision.

        1.2.2.1    Inmates may give their request for an appeal to the complex Publication Review staff through Inmate Letter, Form 916-1 within 30 calendar days of the actual receipt of the notice of exclusion.

1.2.2.1.1    When an inmate requests an appeal, complex staff shall inform the inmate the appeal may result in redaction of parts or exclusion of the entire publication.

1.2.2.2    If no appeal is requested within the 30 calendar days, the inmate shall be provided the options of mailing the publication out at the inmate's expense, arranging for an approved visitor to pick up the publication, or having it destroyed.

1.2.2.3    Publications under appeal will not be returned to sender pending disposition of the appeal.

1.2.2.4    The Office of Publication Review may consult with any person who may have information or insight to assist in making the correct appeal decision. An appeal decision by the Office of Publication Review, whether from an inmate or a publisher, may:

1.2.2.4.1    Allow the publication by redacting a limited amount of unauthorized content, subject to the limitations in section 914.06, 1.13, of this Department Order.

1.2.2.4.2    Overturn the complex exclusion and allow the publication in its entirety;

1.2.2.4.3    Uphold the complex exclusion and exclude the publication in its entirety.

1.2.2.5    Appeal decisions made by the Office of Publication Review are final and exhaust inmates' administrative remedies.

1.2.2.6    The Office of Publication Review shall log the page, paragraph and unauthorized content that is redacted and/or excluded in the Publication Review Database. An original version of the publication with the unauthorized content identified shall also be maintained by the Office of Publication Review.  Comments indicating the basis for  overturning the complex exclusion of unauthorized content shall be logged in the Publication Review Database.

1.3    The Complex/Stand-Alone Unit Level Publication Review staff shall:

1.3.1    Approve/release publications that do not require additional review.

1.3.2    Notify affected inmates when a publication is excluded and inform inmates of the appeal process.

1.3.3    Process inmates' appeal requests, notify affected inmates of the pending appeal, and notify inmates of the outcome or inform inmates if the requests are not within timeframes.

1.3.4    Update the Publication Review Database with the appropriate review decisions.

1.3.5     Inform affected inmates of the results of publication appeals.

1.3.6     Provide the Warden with a copy of any appeal decisions.

1.3.7     Respond to inmate publication review-related letters, questions, or concerns.

1.4     The Office of Publication Review shall:

1.4.1     Notify publishers within seven calendar days when one of their publications or part of a publication is excluded and inform them of the appeal process.

1.4.2     Act as the appeal level for appeals received from inmates or publishers. The Office of Publication Review shall:

1.4.2.1     Determine if the publication shall be allowed by redacting a limited amount of unauthorized material, completing the redaction, and providing redacted materials to the complexes, subject to section 914.06, 1.13, of this Department Order.

1.4.2.2     Overturn the complex exclusion and allow the publication in its entirety.

1.4.2.3     Uphold the complex exclusion and exclude the publication in its entirety.

1.4.3     Complete appeals within 30 calendar days and prepare and distribute the appeal decisions for inmate and publisher appeals.

1.5     Inmates may file grievances on Publication Review procedural issues. Grievances shall be processed through the inmate's unit to the Central Office Appeals Unit. The appeal response shall only address procedural issues and will not reconsider any decisions to exclude publications.

# DEFINITIONS

**ALTERING** - To change or make different; modify.

**AUDIO BOOK** - A taped reading of a book or book condensation reproduced in audiocassette or similar form.

**CONTRABAND** – For the purpose of this Department Order, contraband is defined as any item considered to be detrimental to the safe, secure, and orderly operation of an institution or parole office. Contraband includes, but is not limited to:

- Any item that could be used as an aid to escape.

- Any non-legal written correspondence or communication discovered as a result of scanning incoming or outgoing Legal Mail.

- Any item that could be used to disguise or alter an inmate's appearance.

- Any item of clothing or items for personal use or consumption that are not cleared first through security or the property room of the institution.

- Cameras, video, audio or related equipment, unless authorized by order of written instructions.

- The introduction and/or possession of any separate components that may aid in the use of wireless devices and/or multimedia storage devices. This includes, but may not be limited to:

  - Cell phone chargers.

  - Mobile chargers.

  - Cell phone batteries.

  - Any other item that staff reasonably determines may aid in the use of wireless devices and/or multimedia storage devices.

- Allowable items which are:

  - Possessed without permission.

  - Discovered in improper locations.

  - Over set allowable amounts.

  - Obtained in improper manners or methods.

  - In altered forms or conditions.

**CORRESPONDENCE TAPES** - Cassette tapes sent or received by an inmate or visitor where there exists a disability or literacy concern that prevents written correspondence.

**CRIMINAL ACTIVITY** - Any activity that violates local, state and federal law, statutes, ordinances, or codes, and constitutes a criminal act under the law.

**CUNNILINGUS** - Oral stimulation of the clitoris or vulva.

**EXCRETORY FUNCTIONS** - The elimination of a body's waste products through defecation and urination.

**FELLATIO** - Oral stimulation of the penis.

**FIRST CLASS MAIL** - A class of mail including letters, postcards, and postal cards, all matter wholly or partially in writing or typewriting; includes but is not limited to anything mailable such as bills, invoices, personal correspondence, and some merchandise.

**GENITALIA** – Male and female sexual organs.

**IMMEDIATE FAMILY** - An inmate's legal spouse, natural or adopted parents, siblings, natural or adopted children, stepchildren, grandparents, or person verified as being primarily responsible for raising the inmate in the absence of a parent.

**INCESTUOUS ACTIVITY** - Sexual activity between family members who are forbidden to marry due to their close kinship.

**INFLAMMATORY** - Arousing passion or strong emotion, especially anger and belligerence.

**INTERCOURSE** - The act of having sex.

**INTER-RELATIONAL MAIL** - Letters deliverable by the United States Postal Service written by an inmate to **other** incarcerated immediate family, clearly marked with the name and ADC number of the sending and receiving incarcerated immediate family.

**ILLEGAL CONTRABAND** - Any item, the possession of which in the community or on prison grounds is a felony or misdemeanor, i.e., weapons, explosive devices, drugs, wireless communication devices, multimedia storage devices or other statutorily prohibited item(s).

**LEGISLATIVE CORRESPONDENCE** - Letters to or from a member of the Arizona State Legislature. Mail that is received in envelopes that are clearly marked as official envelopes used by the Arizona State Legislature is considered incoming legislative correspondence.

**MASTURBATION** - Touch or rubbing of sexual organs for the purpose of sexual pleasure. Excitation of one's own or another's genital organs, usually to orgasm, by manual contact or means other than sexual intercourse.

**NUDITY** – Nudity, as defined by Arizona Revised Statutes (A.R.S.) § 13-3501, is the showing of the human male or female genitals, pubic area, female breast with less than a fully opaque covering of the nipple, or male or female buttocks with less than a full opaque covering of the anus (e.g., a thong). The anus does not need to be visible.

**PENOLOGICAL** - Relating to the theory and practice of prison management and criminal rehabilitation.

**PERIODICAL CLASS MAIL** - Mail that consists of magazines, newspapers and other publications.

**PREPAID PUBLICATIONS** – Are any type of publication sent to an inmate that has been paid for in advance of delivery to the inmate. Publications not paid for in advance will not be accepted and returned to the sender at the inmate's expense.

**PUBLICATION** - A book, photograph, drawing, booklet, pamphlet (or similar document), or a single issue of a magazine, catalog, periodical, newsletter, audio (non music) tape or CD, or any type of image or text. Publication includes personal photographs but does not include personal letters.

**REDACT** - To delete, ban, suppress or withhold portions of mail.

**SADOMASOCHISTIC ABUSE** - As defined by A.R.S. § 13-3501, means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed, for the purpose or in the context of sexual gratification or abuse.

**SEXUALLY EXPLICIT MATERIAL** - Any publication, drawing, photograph, film, negative, motion picture, figure, object, novelty device, recording, transcription, or any book, leaflet, catalog, pamphlet, magazine, booklet or other item, the cover or contents of which pictorially or textually depicts nudity of either gender, or homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion.

**STANDARD MAIL** - Advertising mail that includes advertisements, circulars, newsletters, magazines, small parcels and merchandise and weighs less than 16 ounces.

**STG** - Any organization, club, association or group of individuals, either formal or informal (including traditional prison gangs), that may have a common name or identifying sign or symbol, and whose members engage in activities that include, but are not limited to: planning, organizing, threatening, financing, soliciting, committing or attempting to commit unlawful acts or acts that violate the Department's written instructions, which detract from the safe and orderly operation of prisons. Such activities may include interaction with non-inmates. Examples include: family members, other relatives, former inmates and other "street" associates.

**UNAUTHORIZED MATERIAL** - Material that by its nature or content threatens or is detrimental to the security, safety, good order or discipline of the facility, or inmate rehabilitation, or, that is found to facilitate, encourage, incite, promote or instruct in criminal activity or unauthorized prison activity.

**VIOLENCE** - Acts of aggression or abuse that causes or intends to cause criminal injury or harm. These acts include, but are not limited to, murder, rape, sexual assault, assault, and cruelty to animals. Graphic violence would include, but is not limited to, acts of violence that include amputation, decapitation, dismemberment, or mutilation maiming or disfigurement.

{Original Signature on File}

Charles L. Ryan
Director

**FORMS LIST**
914-6, Office of Publication Review - Notices of Result

# CROSS-REFERENCE INDEX

Department Order #103, Correspondence/Records Control
Department Order #203, Research Projects
Department Order #207, Media Relations
Department Order #519, Employee Health - FMLA, ADA, Industrial Injury, FFD and Alternate Assignment
Department Order #524, Employee Assignments and Staffing
Department Order #704, Inmate Regulations
Department Order #802, Inmate Grievance Procedure
Department Order #803, Inmate Disciplinary Procedure
Department Order #804, Inmate Behavior Control
Department Order #806, Security Threat Groups (STGs)
Department Order #809, Earned Incentive Program
Department Order #901, Inmate Records Information and Court Action
Department Order #902, Inmate Legal Access to Courts
Department Order #904, Inmate Religious Activities/Marriage Requests
Department Order #905, Inmate Trust Account/Money System
Department Order #909, Inmate Property
Department Order #910, Inmate Education and Resource Center Services
Department Order #911, Inmate Visitation
Department Order #915, Inmate Phone Calls

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

Department Order #916, Staff - Inmate Communications
Department Order #919, Inmate Resource Center/Library Services
Department Order #1001, Inmate Release System

# AUTHORITY

A.R.S. § 12-940 et seq, Unclaimed Property in Hands of Public Agency
A.R.S. § 13-2501, Definitions
A.R.S. § 13-2505, Promoting Prison Contraband; Exceptions; X-Radiation; Classification
A.R.S. § 13-3309, Seizure; Exception; Definition
A.R.S. § 13-3501, Definitions
A.R.S. § 13-3503, Seizure of Obscene Things; Disposition
A.R.S. § 13-4301 et seq, Forfeiture
A.R.S. § 13-4411.01, Notice of Right to Request Not to Receive Inmate Mail
A.R.S. § 13-4429, Return of Victim's Property; Release of Evidence
A.R.S. § 31-231, Unauthorized Communication With Prisoner; Classification; Definition
A.R.S. § 31-235, Prisoner Correspondence; Definitions

**Attachment 3**



| <br>**CORRECTIONS**<br>**ADC**<br><br>ARIZONA DEPARTMENT OF CORRECTIONS<br><br>DEPARTMENT ORDER MANUAL | CHAPTER: 900<br><br>INMATE PROGRAMS AND SERVICES | OPR:<br><br>OPS |
|---|---|---|
| | DEPARTMENT ORDER: 914<br><br>*INMATE MAIL* | SUPERSEDES:<br><br>DO 914 (3/04/16) |
| | | EFFECTIVE DATE:<br><br>APRIL 7, 2017 |
| | | REPLACEMENT PAGE REVISION DATE:<br><br>N/A |

# TABLE OF CONTENTS

PURPOSE

PROCEDURES                                                                                          PAGE

914.01    MAIL GENERAL ............................................................................. 1

914.02    INCOMING MAIL ........................................................................... 3

914.03    AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES ......................... 7

914.04    INTER-RELATIONAL MAIL ................................................................ 8

914.05    OUTGOING MAIL ........................................................................... 9

914.06    PUBLICATIONS ............................................................................11

914.07    UNAUTHORIZED CONTENT ...............................................................14

914.08    PUBLICATION REVIEW PROCESS .......................................................16

          DEFINITIONS ...............................................................................18

          CROSS-REFERENCE INDEX ...............................................................21

          AUTHORITY ..................................................................................22

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

# PURPOSE

This Department Order establishes regulations, processes and procedures for inmates to send and receive mail, music, and individually reviewed publications.  All mail is processed consistent with postal regulations and the security requirements of correctional facilities. Each publication is individually reviewed consistent with the Department's legitimate penological interest in maintaining the safety, security and orderly operations of the institutions.

# PROCEDURES

**914.01       MAIL GENERAL**

1.1     There is no limitation put on the amount of mail an inmate may receive regardless of custody or detention status, provided the incoming mail meets requirements, does not violate policy, and the mail is not between an inmate and any of the following:

1.1.1    Released offenders currently under Community Supervision by the Department, excluding members of their immediate family as defined in this Department Order.

1.1.2    An inmate confined in any local, state or federal correctional facility including, but not limited to county jails, detention centers, halfway houses, privately operated correctional facilities, and juvenile facilities, excluding an inmate's immediate family as defined in this Department Order.

1.1.2.1    Inter-relational mail shall be approved as outlined in section 914.04 of this Department Order.

1.1.3    Current or former Department/private prison employees and/or current or former Department volunteers. This will be for a period of two years from the separation of employment or volunteer commitment, except when the inmate is immediate family. Exceptions to this rule can only occur with the Warden's prior written approval.

1.1.4    Minors that are not the inmate's natural or adopted child or minors that do not have parents' or guardians' prior written approval.

1.1.5    Anyone who advises the Warden or Deputy Warden in writing that they do not wish to receive mail from a particular inmate. This request must be documented through an Adult Information Management System (AIMS) entry and filed in the inmate's Master Record File, and the Mail and Property File.

1.1.6    Victim(s) of a crime for which an inmate was convicted and/or their family members when the victim has requested for no communication on a Post-Conviction Notification request in accordance with Department Order #1001, Inmate Release System. Victims that have not formally made the "No Inmate Mail" request may communicate with the inmate or the inmate's family members with prior Warden or Deputy Warden written approval. This request must be documented and filed in the inmate record and through an AIMS entry.

1.1.6.1    Unit/Complex staff shall notify the inmate of the victim's request and that further contact with the victim or his/her family members identified by the victim will result in disciplinary action.

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

1.2     All outgoing domestic mail shall be sent by pre-stamped envelope only, unless otherwise indicated. Domestic postage stamps are <u>not</u> sold in inmate stores. Only Global stamps for International mail will be available through the inmate store.

   1.2.1   Health and Welfare Indigent inmates shall be provided with pre-printed envelopes for five one-ounce pieces of "free" first class mail per month. If additional postage is required, inmates may submit a request in accordance with Department Order #902, <u>Inmate Legal Access to Courts</u>.

   1.2.2   All postage required beyond the limits cited in this Department Order and all postage for inmate groups and organizations shall be at the expense of the inmate, group or organization.

   1.2.3   Postage stamps shall not be used as negotiable instruments or legal tender as payment for materials ordered from private vendors.

   1.2.4   Inmates shall not barter, trade, sell, or exchange postage stamps for any goods or services.

   1.2.5   Inmates are subject to the limits for possession of postage stamps as outlined in Attachment A of Department Order #909, <u>Inmate Property</u>.

1.3     Mail room staff shall maintain:

   1.3.1   An itemized list of all incoming and outgoing registered, insured and certified mail.

   1.3.2   Permanent logs that will be subject to periodic inspections shall consist of:

      1.3.2.1   An itemized list of all incoming and outgoing packages, including the name and Arizona Department of Corrections (ADC) number of each inmate who sends or receives a package.

      1.3.2.2   The name and address of each sender and addressee for each package.

      1.3.2.3   A detailed description of the contents of each. For incoming publications, this includes the name and dated information for each publication.

      1.3.2.4   The amount of postage for each outgoing package.

      1.3.2.5   The date of the mailing or receipt of each package, and the name of the staff who recorded the information.

   1.3.3   An electronic log of all incoming and outgoing legal mail to include the date received, inmate name and number, sender, and the date received by the inmate. All incoming and outgoing legal mail shall be processed as outlined in Department Order #902, <u>Inmate Legal Access to Courts</u>.

   1.3.4   A running tally of outgoing indigent envelopes to account for each qualifying indigent inmate's monthly limit of five "free" mailings.

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

**914.02**  **INCOMING MAIL**

1.1     Upon arrival at a new Department/private prison facility, staff shall provide each inmate with the correct mailing address. It shall be the responsibility of the inmate to notify correspondents of the correct mailing address.

1.2     Incoming mail addressed to inmates shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated (unless legally changed), the inmate's correct ADC number, as well as the inmate's unit name and the appropriate Post Office Box.

1.3     Incoming mail shall have a complete return address including the sender's name and the complete street address or Post Office Box. Mail without a complete return address shall be opened and read to inspect the contents to make a reasonable attempt to ascertain the identity of the sender. If the sender can be identified and the mail does not present any security concerns the mail may be delivered to the inmate. If the sender cannot be verified, the inmate shall receive a notice and the mail held for 90 calendar days before it is destroyed.

1.4     It is the inmate's responsibility to notify correspondents of his/her mailing address, where local U.S. Postmaster practice permits, a U.S. Postal Service (USPS) change of address form shall be completed by the inmate and sent to the USPS. All Department/private prison facilities shall make these forms available. Incoming mail shall be forwarded as follows:

     1.4.1     Mail that arrives without an inmate ADC number shall be stamped "Return to Sender," and returned.

     1.4.2     Mail that arrives for an inmate at an institution where the inmate is no longer housed shall be forwarded to the inmate's current institution.

     1.4.3     When possible, First Class mail belonging to an inmate who is temporarily confined at a hospital or local county jail shall be forwarded.

         1.4.3.1     For county jails (i.e., Maricopa and Yuma) that accept only post cards, any other First Class mail will be returned to the sender. First Class mail in this situation will not be held until the inmate returns.

     1.4.4     Mail belonging to an inmate who is no longer in physical custody of the Department shall be forwarded up to 90 calendar days after his/her release; provided a forwarding address is available. When no forwarding address is available, the mail shall be stamped "inmate is no longer in custody" and returned to the sender.

     1.4.5     All mail received for inmates on escape status shall be forwarded to the Criminal Investigation Unit for evaluation and processing.

1.5     Designated staff at each unit/complex is authorized to open, inspect and read incoming mail to prevent criminal activity and prevent inmates from receiving contraband or any other material that may be detrimental to the safe and orderly operation of the institution.

1.5.1 Upon inspection, incoming mail shall be withheld from an inmate if it meets one or more of the following criteria:

    1.5.1.1 Poses a direct and immediate threat to the security, safety or order of the institution.

    1.5.1.2 Substantially hinders efforts to treat or rehabilitate the inmate; however, legal mail will not be withheld for this purpose.

    1.5.1.3 Threatens the intended recipient.

    1.5.1.4 Promotes, aids or abets criminal activity or violation of Department rules, including but not limited to rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages Security Threat Groups (STG) and/or Criminal Street Gangs.

    1.5.1.5 Has content written in code or that contains hidden messages.

1.5.2 Mail meeting one or more of the criteria in 1.5.1 through 1.5.1.5 of this section shall be forwarded to the Criminal Investigation Unit for review. The Criminal Investigation Unit shall return the mail for delivery within 72 hours unless it is determined that an investigation is required, in which case the mail shall be held. If it is determined that the mail is not to be delivered, the inmate shall be notified unless notification would interfere with the investigation.

1.5.3 When an incoming envelope is stamped "Return to Sender" staff shall open and inspect it for contraband before returning it to the inmate.

1.5.4 Incoming legislative correspondence shall be opened in the presence of the inmate to whom it is addressed and may only be inspected to the extent necessary to establish the presence of contraband.

1.6 Inmates may only receive funds for deposit into inmates' accounts, in accordance with Department Order #905, Inmate Banking/Money System. No other monetary instrument shall be deposited into an inmate's account unless authorized in Department Order #905, Inmate Banking/Money System.

1.6.1 The Business Office/designated staff shall process the monetary instruments that meet the Department requirements and return those that do not meet Department requirements at the Department's expense.

1.6.2 The Business Office shall notify the Criminal Investigation Unit of any received Internal Revenue Service (IRS) checks. The Criminal Investigation Unit may notify the IRS if deemed appropriate.

1.6.3 Outgoing inmate/IRS correspondence shall contain a notation by staff on the envelope directing the correspondence to the Criminal Investigations Branch at the Service Center to which the correspondence is addressed.

1.7 Unauthorized property or material discovered in incoming mail shall be removed from incoming letters and held as contraband.

1.8    An inmate may not possess more than 40 photographs at a time; may not receive more than 40 photographs at a time within a 30 calendar day period; and may not exchange photographs previously held in the property room with photographs currently possessed by the inmate. Any incoming mail containing more than 40 photographs, and any incoming mail which, cumulative with other incoming mail within a 30 calendar day period would result in an inmate possessing more than 40 photographs at a time, will constitute contraband and the entirety of its contents will be processed in accordance with Department Order #909, Inmate Property.

1.9    An Inmate Property/Contraband/Disposition, Form 909-6, and Notice to Sender of Rejection of Incoming Mail/Property, Form 909-3, shall be completed and sent to the inmate. Inmates have 90 calendar days to either have item(s) destroyed or returned to the sender. The Department shall not pay for the cost of notifying the sender of the inmate's contraband arrangements or its mailing cost.

   1.9.1    The Department shall not pay for the cost of returning unauthorized property or material that includes, but is not limited to:

      1.9.1.1    Used or unused postage stamps.

      1.9.1.2    Stickers, labels, address labels or decorative stamps.

      1.9.1.3    Photos where the non-photo side can be separated (Polaroids).

      1.9.1.4    Photos of other inmates.

      1.9.1.5    Unknown foreign substances and/or powders.

      1.9.1.6    Oils, perfumes, incense or personal property items.

      1.9.1.7    Lottery tickets or games of chance.

      1.9.1.8    Tax forms and Publications, unless in accordance with Department Order #919, Inmate Resource Center/Library Services.

      1.9.1.9    Battery operated greeting cards, or greeting cards larger than 8 ½" by 11".

      1.9.1.10    Unused Greeting cards, stationary, and/or envelopes.

      1.9.1.11    Unused postcards.

      1.9.1.12    Writing instruments; any type or kind.

      1.9.1.13    Bookmarks.

      1.9.1.14    Laminated items.

      1.9.1.15    Inspirational cards, medals or medallions.

      1.9.1.16    Candy, gum, or any food items.

      1.9.1.17    Art, crafts and hobby supplies.

1.9.1.18    Content that depicts, encourages, or describes methods of escape and/or eluding capture. This includes materials that contain blueprints, drawings, descriptions or photos of Arizona prison facilities or private prison facilities, Public Transportation maps, road maps of Arizona or states contiguous to Arizona. ("Contiguous", as used in this section, means states surrounding and bordering Arizona, i.e., California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion thereof.)

1.9.1.19    Calendars.

1.9.1.20    A printed individual item (not a supplement of an item such as a newspaper), specifically intended for the purpose of advertising or selling merchandise (catalog, circular) for any items that an inmate would not be permitted to receive.

1.9.1.20.1    Catalogs for publications, compact discs (CDs), cassettes and other items inmates would be able to receive shall be processed according to the Publication Review requirements.

1.9.1.21    Credit Reports.

1.9.1.22    Personal or professional/commercial photographs that feature nudity or sexually explicit acts, as detailed in the Definition section. Photos of current or former Department/private prison employees and/or Department volunteers, unless they are immediate family.

1.10    Newspaper clippings, magazine articles, cartoons or copies of material from the internet may be enclosed within personal mail; however, the content is subject to the Publication Review process. Internet material containing information about staff or other inmates is unauthorized if it is determined to be a threat to the safe and orderly operation of an institution and/or a threat to the safety of any other person. Inmates are not authorized to receive items from the ADC Net website.

1.11    Inmates may be permitted to view crime scene and/or autopsy photographs in accordance with Department Order #909, Inmate Property.

1.12    Incoming third class/bulk mail and publications will be delivered provided the mail/publication content meets policy guidelines and:

1.12.1    Is prepaid, as defined by this Department Order;

1.12.2    Is addressed to a specific inmate or inmates with the correct name, ADC number and housing location.

1.13    Undeliverable Standard Mail shall be returned to the Post Office, if the Post Office will accept it. If the Post Office does not accept the undeliverable mail, it shall be documented in the appropriate log and destroyed/shredded and bagged by staff and placed in a dumpster or other trash container.

1.14     Incoming telegrams or similar urgent mail, including but not limited to, overnight mail shall be delivered within 12 hours unless circumstances make delivery impractical.

1.15     Excluding holidays and weekends, incoming mail shall not be held and shall be delivered within 24 hours unless circumstances make delivery impractical.

1.16     All mail and publications with metal bindings other than staples, including paper clips, binder clips, and other metal fasteners are prohibited. An inmate that receives a metal binding piece of mail and/or publication shall be informed of its arrival and will either decide to have the publication processed as contraband or give his/her written permission to have the binding removed prior to its release to the inmate. Staff shall make note of the removal in the inmate's property file.

    1.16.1     Staples in all mail and publications are prohibited in the following types of housing units:

        1.16.1.1     Death Row.

        1.16.1.2     Administrative or Disciplinary Confinement.

        1.16.1.3     Close Custody.

        1.16.1.4     Maximum Custody.

        1.16.1.5     Mental Health Treatment Units (Baker and Flamenco).

## 914.03     AUTHORIZATION OF COMPACT DISCS AND/OR CASSETTE TAPES

1.1     All CDs and/or cassettes received through the mail shall be new, clear or a cardboard container, in its original wrapper and packaging, and shall not be a re-recording of an original, and shall be consistent with copyright laws. Authorized mail order purchases for inmate in disciplinary detention may be held until inmate is released from detention.

1.2     Envelopes/packages containing incoming CDs and/or cassettes shall have the inmate's complete first and last name, the inmate's name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box. Incoming approved CDs and/or cassette tapes for inmates in disciplinary detention may be held until the inmate is released from detention.

1.3     Incoming CDs and/or cassettes must come directly from a Department authorized publisher, distributor, or retailer and be consistent with copyright laws. No individuals shall be authorized to send CDs and/or cassettes directly to an inmate even if they include a verifiable packing list or invoice. Secondary markets (also known as Third Party Vendors) such as Amazon.com, Amazon Marketplace, Barnes and Noble Marketplace, e-Bay, and Craig's List are not authorized retailers or distributors. These sources are offered as examples only and do not represent an exhaustive list of secondary markets.

    1.3.1     The Department may deem a vendor to be a Third Party Vendor at its discretion.

    1.3.2     Mail room staff shall confirm the sender is not a Third Party Vendor prior to opening CDs and/or cassettes.

1.4      Cassette tapes and/or CDs, including music and "Books on Tape", are subject to the Publication Review requirements outlined in section 914.07 of this Department Order and shall be included in the total possession limit amount for cassette tapes/discs as outlined in Attachment A of Department Order #909, <u>Inmate Property</u>.

1.5      Inmates may receive correspondence tapes with prior written approval of the unit Deputy Warden. Inmates shall only receive correspondence tapes from an individual on his/her approved visitation list.

     1.5.1      The requesting individual shall submit a written justification to the unit Deputy Warden requesting approval for correspondence tapes indicating that the inmate or visitor has a disability or literacy concern that prevents written correspondence.

     1.5.2      The inmate shall show in advance that he/she is in possession of an operational and authorized appliance with a cassette player.

     1.5.3      Correspondence tapes shall not contain sexually explicit language or any other unauthorized content that would be in violation of this Department Order.

     1.5.4      Correspondence tapes shall be screened at the complex/unit level only and shall not be forwarded to the Central Office Publication Review.

1.6      Religious oriented tapes and/or CDs sent through the mail to a specific inmate shall be commercially recorded. Tapes/CDs of religious services being donated by volunteers or outside groups for services or inmate listening shall be pre-screened by the senior chaplain to ensure that they are consistent with the guidelines within this Department Order. Volunteers are not authorized to directly provide inmates with recorded material. All religious oriented tapes and/or CDs shall be pre-screened by the senior chaplain to ensure that they are consistent with the guidelines within this Department Order.

1.7      Cash on delivery (COD) orders and contract purchases such as music clubs are prohibited and shall be returned to sender. The Department shall not be responsible for the cost of returning any unauthorized material.

## 914.04      INTER-RELATIONAL MAIL

1.1      Inmates that are immediate family as defined in this Department Order and those that are the verified natural or legally adopted parents of a child are authorized to have inter-relational mail, provided the communication meets the criteria set forth in this Department Order.

1.2      In order to have inter-relational mail privileges, the natural or adoptive parents shall:

     1.2.1      Provide the child's birth certificate, and

     1.2.2      The relationship can be readily verified by staff, i.e., it is clear in the pre-sentence report or file.

1.3      Inter-relational communication shall not contain communications with or on behalf of any other inmates that do not have inter-relational mail approval.

1.4     Only letters, homemade greeting cards or greeting cards purchased through the inmate store are authorized for inter-relational mail. The transfer of funds and/or any other item is prohibited.

1.5     The sending unit/complex shall verify the inmate's relationship, and shall stamp the outgoing letter as "verified." Letters that have not been verified and approved shall be returned to the inmate sender.

1.6     All inter-relational mail privileges shall be pre-approved by both the requesting and receiving Warden or Deputy Warden. Approvals and denials are at the discretion of the Warden or Deputy Warden and may be revoked when it is in the best interest of institutional security.

1.7     The inmate shall pay postage. Health and Welfare Indigent inmates may be provided postage as outlined in section 914.01 of this Department Order.

1.8     Inmates who wish to send mail to an incarcerated immediate family member shall submit the request to their assigned Correctional Officer III who shall verify the relationship.

1.9     The assigned Correctional Officer III or designated staff at the requesting institution shall:

    1.9.1     Complete a Request to Communicate with an Incarcerated Family Member, Form 915-3, as outlined in Department Order #915, <u>Inmate Phone Calls</u>.

    1.9.2     Verify that an immediate family relationship exists between the inmates.

    1.9.3     Forward the application to the Warden or Deputy Warden for approval/disapproval.

    1.9.4     Forward copies of the approved applications to the respective mail/property rooms at the requesting and receiving institution.

    1.9.5     Advise inmate of disapproved applications, and note all approvals and denials on AIMS.

## 914.05     OUTGOING MAIL

1.1     All outgoing inmate mail shall include on the envelope the inmate's complete first and last name (the name under which he is incarcerated), ADC inmate number, and full return address, including the name of the complex, unit and bed location.

    1.1.1     Institution mail room staff shall return mail lacking this information to the sending inmate, if known, for a correction.

    1.1.2     If the inmate sender is not known, the correspondence shall be opened to make a reasonable attempt to determine the identity of the inmate sender. If the identity cannot be determined, the mail shall be held in a "Dead Letter" repository for 90 calendar days, pending claim. If no claim is made, the mail shall be processed as unclaimed property.

  1.1.3  Inmates shall seal outgoing mail and place it in locked mailboxes located throughout the institution or in other areas designated by the Warden or Deputy Warden. Mail shall be collected at approximately the same time each workday, except on weekends and holidays, and shall be delivered to the mail room for processing.

  1.1.4  Inmates shall not use the complex or unit address to fraudulently identify themselves as employees, agents, or representatives of the Department, complex, unit, or private prison facility.

1.2  Unsealed outgoing mail, for the below listed recipients, shall be brought to the mail room for inspection and processing. Mail room staff shall inspect the unsealed envelope for contraband, but shall not read the content of the enclosed correspondence.

  1.2.1  The inmate's attorney, a judge, or court.

  1.2.2  Publisher or editor of a newspaper, news magazine or periodical of general distribution, national or international news service or to the station manager of any radio or television stations.

  1.2.3  The Director, Deputy Director, Division Directors or Assistant Director of the Department.

  1.2.4  Elected or appointed public officials.

1.3  Staff shall read up to 10% of outgoing mail. Mail may be returned to the inmate, retained by the institution, or removed from the mailing (the balance of which shall be mailed) when the contents or communications:

  1.3.1  Pose a direct and immediate threat to the security, safety or order of the institution.

  1.3.2  May substantially hinder efforts to treat or rehabilitate the inmate.

1.4  Staff shall not stamp or mark the contents of outgoing read mail, rather, the envelope or box shall be stamped or marked as having been inspected and resealed prior to mailing.

1.5  Outgoing inmate mail is subject to being opened and read by staff when there is a reasonable belief that the inmate is using the mail to further a crime or circumvent Department regulations or written instructions. Such mail may include, but is not limited to:

  1.5.1  Descriptions or encouragement of activities that may lead to the use of physical violence.

  1.5.2  Information that involves escape plans and/or activities that violate Department or institution regulations or written instructions.

  1.5.3  Threatens the intended recipient.

1.5.4 Promotes, aids or abets criminal activity or violation of departmental rules, including but not limited to, rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages STG.

1.5.5 Mail written in code or provides instruction on code use.

1.6 Outgoing mail that is read by staff and is determined to be detrimental to the security or safe operation of the institution or that may impede the protection of the public or facilitate criminal activity shall be referred to the Criminal Investigations Unit for further action.

1.7 The Criminal Investigation Unit shall:

1.7.1 Retain the redacted portion of any outgoing mail during any investigation, and then return it to the sender.

1.7.2 Stamp the unredacted portion of any redacted mail to indicate that portions of the mail were redacted, and mail it to the recipient unless doing so would interfere with an ongoing investigation.

1.7.3 The Department may redact the item or determine not to mail the item.

1.8 Mail outlined in 1.7.2 of this section shall be sent within 72 hours; unless it is determined that such mail is not to be sent. If the mail is not to be sent, the inmate shall be notified of such within 72 hours, unless doing so interferes with an ongoing investigation.

1.9 Excluding holidays and weekends, outgoing mail shall not be held and shall be delivered to the Post Office within 24 hours unless circumstances make delivery impractical.

**914.06    PUBLICATIONS**

1.1 Personal letters are not subject to Publication Review.

1.2 All publications are subject to screening and review and shall meet standards and guidelines as detailed in this Department Order.

1.3 The envelope/container shall have the inmate's complete first and last name under which he/she is incarcerated unless legally changed, the correct ADC number, institution and unit, and the appropriate Post Office Box.

1.4 Publications shall come directly from a Department authorized publisher, distributor, or retailer and be consistent with copyright laws.

1.4.1 Department authorized publishers may directly sell or donate their new or used publications to individual inmates provided the content of the publications meets standards and guidelines outlined in this Department Order. Used publications must be in good condition, free of highlighting, underlining, notes, or other marks.

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

  1.4.2  Department authorized distributors and/or retailers may sell or donate new publications to individual inmates provided the content of the publications meets standards and guidelines outlined in this Department Order. Secondary markets (also known as Third Party Vendors) such as Amazon.com, Amazon Marketplace, Barnes and Noble Marketplace, e-Bay, and Craig's List are not authorized retailers or distributors. These sources are offered as examples only and do not represent an exhaustive list of secondary markets. The Department may deem a vendor to be a Third Party at its discretion.

  1.4.3  All other individuals and/or entities may not sell or donate publications to individual inmates, but may donate new or used publications to a Department facility generally provided the content of the publications meets standards and guidelines as outlined in this Department Order. Used publications must also be in good condition, free of highlighting, underlining, notes, or other marks.

    1.4.3.1  Mail room staff shall verify that an incoming publication is from a Department authorized publisher, distributor, or retailer and not from a Third Party Vendor prior to opening the publication.

1.5  Non-English publications may be delayed due to necessary translation. If translators for a specific language are not available, the Department may reject a non-English language publication.

1.6  Incoming publications shall be pre-paid. Cash on Delivery (COD) orders and contract purchases such as music or book clubs are prohibited and will be returned to the sender at the inmate's expense. Donated publications not coming in from a recognized publisher, distributor or retailer shall be processed as contraband or donated to an inmate library provided they meet Departmental policy requirements and publication review as set forth in this Department Order.

1.7  Publications shall be forwarded for a 90-day period if the inmate is in custody at a Department or private prison facility, provided there is no state or other governing rules/regulations preventing the forwarding of the publication.

  1.7.1  The inmate shall be responsible for the change of address notifications.

  1.7.2  At the end of the 90-day period, the publications shall be subject to contraband policies and procedures and will no longer be forwarded.

1.8  Inmates are responsible for staying within publication possession limit requirements as outlined in Attachment A of Department Order #909, Inmate Property, and may be subject to disciplinary action for exceeding publication/property limits. Items over the established limit shall be considered contraband.

1.9  Authorization to withdraw funds from an inmate's account for the purchase of a publication does not constitute approval of the publication.

1.10  All publications, including those that are part of a title or series, are reviewed on an individualized basis. Rejection of several issues of any one publication is not sufficient reason to reject a subscription to a publication in its entirety, unless the publication regularly includes sexually explicit material or other unauthorized material as defined in this Department Order as part or all of its content.

1.11   Unless there is a legitimate correctional concern relating to security, safety, criminal activity or a threat to the orderly operation of the institution, the contents of incoming publications or publications under review shall not be revealed to any non-Publications Review Staff. Only those staff approved to participate in publication review and who have received publication review training shall be involved in processing, reading, and reviewing publications.

1.12   No publication shall be excluded solely on the basis of its appeal to a particular ethnic, racial or religious group.

1.13   Only the Office of Publication Review may remove or redact content of any publication that may be in violation of section 914.07 of this Department Order to make the publication acceptable only upon an inmate or publisher appeal as defined within this policy. The Office of Publication Review may cease removing or redacting unauthorized content when the practice places an unreasonable burden on resources due to the volume of incoming mail, publications, the required redaction or removal of unauthorized content, and the dissemination thereof in redacted form. Complex mail and property staff may remove stapled or perforated items including, but not limited to, items that may be in violation of this Department Order provided that no damage is done to the publication in the removal process.

1.14   Previous decisions to exclude publications, regardless of any subsequent revisions in standards or criteria, remain final. Previously excluded Publications shall not be re-submitted for review or appeal under this Department Order.

1.15   Publications delivered to an inmate in error at any complex/unit prior to or contrary to an initial review or an appeal may be considered contraband upon official notice from the Office of Publication Review that the publication has been excluded. Inmates will be provided the options of mailing the publication out at their own expense, arranging for an approved visitor to pick up the publication, or having it destroyed.

1.16   Approved incoming publications for inmates in disciplinary detention may be held until the inmate is released from detention.

1.17   The Department will provide notice to publishers via email of the decision to exclude a publication or part of a publication within seven calendar days following the decision to exclude. If no email address is available, the notice will be sent to the publisher's mailing address as specified within the publication. Publishers will have the same opportunity to seek an appeal as an inmate under Department Order 914. The notice to the publisher shall include sufficient information to identify the specific publication and the reason(s) for the exclusion.

1.18   A legal publication that contains unauthorized content that is either (a) directly quoted from a trial or appellate court's decision, opinion, or order, or (b) otherwise taken from a court case, government publication, or news wire service (such as the Associated Press), shall not be withheld if the unauthorized content is reasonably necessary to understand the fundamental legal issue or legal principle of the legal publication.

1.19   Publications that contain nudity and/or descriptions of sexual behaviors/acts, or violent acts, shall not be withheld if such unauthorized content is within a publication commonly considered to constitute a well-known and widely recognized religious work (such as the Bible, the Koran, the Book of Mormon) or literary work (such as Shakespeare).

914.07       **UNAUTHORIZED CONTENT**

1.1      In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order.

1.2      Prohibited publications include, but are not limited to:

1.2.1    Publications that depict nudity of either gender. (For nudity see Definitions.)

1.2.2    Publications that depict any of the following acts and behaviors in either visual, audio, or written form:

1.2.2.1    Physical contact by another person with a person's unclothed genitals, pubic area, buttocks or, if such person is a female, breast.

1.2.2.2    Sadomasochistic abuse.

1.2.2.3    Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy.

1.2.2.4    Masturbation, excretory functions, and lewd exhibition of the genitals.

1.2.2.5    Incestuous sexual activity.

1.2.2.6    Sexual activity involving an unwilling participant, or a participant who is the subject of coercion, or any sexual activity involving children.

1.2.3    Depictions or descriptions that incite, aid, or abet riots, work stoppages, means of resistance, or any other behaviors that may be detrimental to the safe, secure, and orderly operation of the institution.

1.2.4    Depictions or descriptions of street gangs and/or Security Threat Groups (STG), and related gang/STG paraphernalia, including, but not limited to, codes, signs, symbols, photographs, drawings, training material, and catalogs.

1.2.5    Depictions, descriptions and instructions regarding the function of locks and/or security devices (e.g., cameras, alarms) or how to bypass or defeat the security functions of these devices.

1.2.6    Depictions, descriptions, instructions on the use of hands, feet, or head as weapons, fighting weapons and techniques, self-defense and martial arts.

1.2.7    Depictions or descriptions, or promotion of drug paraphernalia or instructions for the brewing of alcoholic beverages or the manufacture or cultivation of drugs, narcotics or poisons.

1.2.8   Content that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another.

1.2.9   Depictions, descriptions or instructions regarding the sale, manufacture, concealment, or construction of ammunition, guns, rifles, bombs, explosives or any other type weaponry; displays, realistic pictures, or cutaway pictures of guns or knives suitable for use in making of reproduction weapons. The photograph of a gun or knife in a recognized magazine or publication (e.g., Field and Stream), standing alone, is not sufficient to exclude the publication.

1.2.10   Detailed illustrations, explanations, and/or descriptions of computers, communications systems or electronics.

1.2.11   Depictions, descriptions or content that promotes or instructs on identity theft.

1.2.12   Content that depicts, encourages, or describes methods of escape and/or eluding capture. This includes materials that contain blueprints, drawings, descriptions or photos of Arizona prison facilities or private prison facilities, Public Transportation maps, road maps of Arizona or states contiguous to Arizona. ("Contiguous", as used in this section, means states surrounding and bordering Arizona, i.e., California, Nevada, Utah, New Mexico, Colorado, and Mexico, or any portion thereof.)

1.2.13   Content that contains survival skills that could be used as an aid in eluding capture following an escape.

1.2.14   Pictures, depictions, illustrations, explanations, instructions, and/or patterns for tattoos and/or skin modification equipment which would provide, at minimum, visual aids for inmates wishing to reproduce this type of body ornamentation and/or equipment.

1.2.15   Cipher or code or instruction on the usage of code.

1.2.16   Pictures, depictions or illustrations that promote acts of violence including, but not limited to, murder, rape, sexual assault, assault, amputation, decapitation, dismemberment, mutilation, maiming, disfigurement, crime scene/autopsy photographs, or cruelty to animals.

1.2.17   Content in publications, photographs, drawings, or in any type of image or text, that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy.

1.2.18   Medical publications that may contain diagrams of the human anatomy and or instructions on harming oneself or others.

1.2.19   Canine search procedures, techniques and scent discrimination.

> 1.2.20   Any publication or part of a publication that, although not specifically set forth herein, may otherwise be detrimental to the safe, secure, and orderly operation of the institution.

1.3   A publication will not be rejected based solely upon inclusion of an advertisement promoting the following:

> 1.3.1   Three-way calling services;
>
> 1.3.2   Pen pal services;
>
> 1.3.3   The purchase of products and services with postage stamps;
>
> 1.3.4   The purchase of products and services that violate Departmental policy;
>
> 1.3.5   Conducting a business while incarcerated.

## 914.08   PUBLICATION REVIEW PROCESS

1.1   Complex mail room supervisors shall act as the first level of review on all incoming publications and shall decide whether a publication is allowed or excluded from the complex.

> 1.1.1   Complex mail room supervisors may consult with other complex mail room supervisors or with the Office of Publication Review prior to making a decision.
>
> 1.1.2   A decision to allow or exclude a publication by one complex shall be binding on all other complexes.

1.2   Within 14 calendar days of the decision to exclude a publication, complex mail room staff shall send the inmate the Office of Publication Review – Notice of Result, Form   914-6, informing the inmate of the decision and the opportunity to appeal the decision within 30 calendar days of the inmate's actual receipt of the notice of exclusion.  Complex mail room staff will simultaneously inform the Office of Publication Review of the decision to exclude a publication.

> 1.2.1   The Office of Publication Review shall notify publishers within 14 calendar days when one of their publications or part of a publication is excluded.
>
> > 1.2.1.1   Publishers may request an appeal by notifying the Office of Publication Review within 30 calendar days of the publisher's receipt of the exclusion.
>
> 1.2.2   The only publications to be sent to the Office of Publication Review are those for which an inmate or a publisher has requested an appeal of the complex decision.
>
> > 1.2.2.1   Inmates may give their request for an appeal to the complex Publication Review staff through Inmate Letter, Form 916-1, within 30 calendar days of the actual receipt of the notice of exclusion.

1.2.2.1.1      When an inmate requests an appeal, complex staff shall inform the inmate the appeal may result in redaction of parts or exclusion of the entire publication.

1.2.2.2      If no appeal is requested within the 30 calendar days, the inmate shall be provided the options of mailing the publication out at the inmate's expense, arranging for an approved visitor to pick up the publication, or having it destroyed.

1.2.2.3      Publications under appeal will not be processed pursuant to the options provided to inmates outlined in 1.2.2.2 of this section, until final disposition of the appeal. All excluded publications shall be held for 60 calendar days to allow timely appeals to be received and processed by the Office of Publication Review. An inmate may opt out of the holding periods provided in this section through Inmate Letter, Form 916-1 to complex Publication Review staff.

1.2.2.4      The Office of Publication Review may consult with any person who may have information or insight to assist in making the correct appeal decision. An appeal decision by the Office of Publication Review, whether from an inmate or a publisher, may:

1.2.2.4.1      Allow the publication by redacting a limited amount of unauthorized content, subject to the limitations in section 914.06, 1.13, of this Department Order;

1.2.2.4.2      Overturn the complex exclusion and allow the publication in its entirety;

1.2.2.4.3      Uphold the complex exclusion and exclude the publication in its entirety.

1.2.2.5      Appeal decisions made by the Office of Publication Review are final and exhaust inmates' administrative remedies.

1.2.2.6      The Office of Publication Review shall log the page, paragraph and unauthorized content that is redacted and/or excluded in the Publication Review Database. An unredacted version of the redacted portions of the publication with the unauthorized content identified shall also be maintained by the Office of Publication Review. Comments indicating the basis for overturning the complex exclusion of unauthorized content shall be logged in the Publication Review Database.

1.3      The complex level Publication Review staff shall:

1.3.1      Approve/release publications that do not require additional review.

1.3.2      Notify affected inmates when a publication is excluded and inform inmates of the appeal process.

1.3.3   Process inmates' appeal requests, notify affected inmates of the pending appeal, and notify inmates of the outcome or inform inmates if the requests are not within timeframes.

1.3.4   Update the Publication Review Database with the appropriate review decisions.

1.3.5   Inform affected inmates of the results of publication appeals.

1.3.6   Provide the Warden with a copy of any appeal decisions.

1.3.7   Respond to inmate publication review-related letters, questions, or concerns.

1.4   The Office of Publication Review shall:

1.4.1   Notify publishers within 14 calendar days when one of their publications or part of a publication is excluded and inform them of the appeal process.

1.4.2   Act as the appeal level for appeals received from inmates or publishers. The Office of Publication Review shall:

1.4.2.1   Determine if the publication shall be allowed by redacting a limited amount of unauthorized material, completing the redaction, and providing redacted materials to the complexes, subject to section 914.06, 1.13, of this Department Order;

1.4.2.2   Overturn the complex exclusion and allow the publication in its entirety;

1.4.2.3   Uphold the complex exclusion and exclude the publication in its entirety.

1.4.3   Complete appeals within 60 calendar days and prepare and distribute the appeal decisions for inmate and publisher appeals.

1.5   Inmates may file grievances on Publication Review procedural issues. Grievances shall be processed through the inmate's unit to the Central Office Appeals Unit. The appeal response shall only address procedural issues and will not reconsider any decisions to exclude publications.

# DEFINITIONS

**ALTERING** - To change or make different; modify.

**AUDIO BOOK** - A taped reading of a book or book condensation reproduced in audiocassette or similar form.

**CONTRABAND** – For the purpose of this Department Order, contraband is defined as any item considered to be detrimental to the safe, secure, and orderly operation of an institution or parole office. Contraband includes, but is not limited to:

•   Any item that could be used as an aid to escape.

- Any non-legal written correspondence or communication discovered as a result of scanning incoming or outgoing legal mail.

- Any item that could be used to disguise or alter an inmate's appearance.

- Any item of clothing or items for personal use or consumption that are not cleared first through security or the property room of the institution.

- Cameras, video, audio or related equipment, unless authorized by order of written instructions.

- The introduction and/or possession of any separate components that may aid in the use of wireless devices and/or multimedia storage devices. This includes, but may not be limited to:

  - Cell phone chargers.

  - Mobile chargers.

  - Cell phone batteries.

  - Any other item that staff reasonably determines may aid in the use of wireless devices and/or multimedia storage devices.

- Allowable items which are:

  - Possessed without permission.

  - Discovered in improper locations.

  - Over set allowable amounts.

  - Obtained in improper manners or methods.

  - In altered forms or conditions. Altered forms or conditions does not include a determination by complex mail room staff, the Office of Publication Review, or other designated staff to separate allowable content from unauthorized content and/or contraband, if separable, so that allowable content may be delivered to inmates and unauthorized content and/or contraband may be excluded pursuant to this Department Order.

**CORRESPONDENCE TAPES** - Cassette tapes sent or received by an inmate or visitor where there exists a disability or literacy concern that prevents written correspondence.

**CRIMINAL ACTIVITY** - Any activity that violates local, state and federal law, statutes, ordinances, or codes, and constitutes a criminal act under the law.

**CUNNILINGUS** - Oral stimulation of the clitoris or vulva.

**EXCRETORY FUNCTIONS** - The elimination of a body's waste products through defecation and urination.

**FELLATIO** - Oral stimulation of the penis.

**FIRST CLASS MAIL** - A class of mail including letters, postcards, and postal cards, all matter wholly or partially in writing or typewriting; includes but is not limited to anything mailable such as bills, invoices, personal correspondence, and some merchandise.

**GENITALIA** – Male and female sexual organs.

**IMMEDIATE FAMILY** - An inmate's legal spouse, natural or adopted parents, siblings, natural or adopted children, stepchildren, grandparents, or person verified as being primarily responsible for raising the inmate in the absence of a parent.

**INCESTUOUS ACTIVITY** - Sexual activity between family members who are forbidden to marry due to their close kinship.

**INFLAMMATORY** - Arousing passion or strong emotion, especially anger and belligerence.

**INTERCOURSE** - The act of having sex.

**INTER-RELATIONAL MAIL** - Letters deliverable by the United States Postal Service written by an inmate to other incarcerated immediate family, clearly marked with the name and ADC number of the sending and receiving incarcerated immediate family.

**ILLEGAL CONTRABAND** - Any item, the possession of which in the community or on prison grounds is a felony or misdemeanor, i.e., weapons, explosive devices, drugs, wireless communication devices, multimedia storage devices or other statutorily prohibited item(s).

**LEGISLATIVE CORRESPONDENCE** - Letters to or from a member of the Arizona State Legislature. Mail that is received in envelopes that are clearly marked as official envelopes used by the Arizona State Legislature is considered incoming legislative correspondence.

**MASTURBATION** - Touch or rubbing of sexual organs for the purpose of sexual pleasure. Excitation of one's own or another's genital organs, usually to orgasm, by manual contact or means other than sexual intercourse.

**NUDITY** – Nudity, as defined by Arizona Revised Statutes (A.R.S.) § 13-3501, is the showing of the human male or female genitals, pubic area, female breast with less than a fully opaque covering of the nipple, or male or female buttocks with less than a full opaque covering of the anus (e.g., a thong). The anus does not need to be visible.

**PENOLOGICAL** - Relating to the theory and practice of prison management and criminal rehabilitation.

**PERIODICAL CLASS MAIL** - Mail that consists of magazines, newspapers and other publications.

**PREPAID PUBLICATIONS** – Are any type of publication sent to an inmate that has been paid for in advance of delivery to the inmate. Publications not paid for in advance will not be accepted and returned to the sender at the inmate's expense.

**PUBLICATION** - A book, photograph, drawing, booklet, pamphlet (or similar document), or a single issue of a magazine, catalog, periodical, newsletter, audio (**music and** non-music) tape or CD, or any type of image or text. Publication includes personal photographs but does not include personal letters.

**REDACT** - To delete, ban, suppress or withhold portions of mail.

**SADOMASOCHISTIC ABUSE** - As defined by A.R.S. § 13-3501, means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed, for the purpose or in the context of sexual gratification or abuse.

**SEXUALLY EXPLICIT MATERIAL** - Any publication, drawing, photograph, film, negative, motion picture, figure, object, novelty device, recording, transcription, or any book, leaflet, catalog, pamphlet, magazine, booklet or other item, the cover or contents of which pictorially or textually depicts nudity of either gender, or homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion.

**STANDARD MAIL** - Advertising mail that includes advertisements, circulars, newsletters, magazines, small parcels and merchandise and weighs less than 16 ounces.

**STG** - Any organization, club, association or group of individuals, either formal or informal (including traditional prison gangs), that may have a common name or identifying sign or symbol, and whose members engage in activities that include, but are not limited to: planning, organizing, threatening, financing, soliciting, committing or attempting to commit unlawful acts or acts that violate the Department's written instructions, which detract from the safe and orderly operation of prisons. Such activities may include interaction with non-inmates. Examples include: family members, other relatives, former inmates and other "street" associates.

**UNAUTHORIZED MATERIAL** - Material that by its nature or content threatens or is detrimental to the security, safety, good order or discipline of the facility, or inmate rehabilitation, or, that is found to facilitate, encourage, incite, promote or instruct in criminal activity or unauthorized prison activity.

**VIOLENCE** - Acts of aggression or abuse that causes or intends to cause criminal injury or harm. These acts include, but are not limited to, murder, rape, sexual assault, assault, and cruelty to animals. Graphic violence would include, but is not limited to, acts of violence that include amputation, decapitation, dismemberment, or mutilation maiming or disfigurement.

{Original Signature on File}

_____

Charles L. Ryan
Director

FORMS LIST
914-6, Office of Publication Review - Notices of Result

# CROSS-REFERENCE INDEX

Department Order #103, Correspondence/Records Control
Department Order #203, Research Projects
Department Order #207, Media Relations
Department Order #524, Employee Assignments and Staffing
Department Order #704, Inmate Regulations
Department Order #802, Inmate Grievance Procedure
Department Order #803, Inmate Disciplinary Procedure
Department Order #804, Inmate Behavior Control
Department Order #806, Security Threat Groups (STGs)

CHAPTER:  900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  914 - INMATE MAIL

Department Order #809, Earned Incentive Program
Department Order #901, Inmate Records Information and Court Action
Department Order #902, Inmate Legal Access to Courts
Department Order #904, Inmate Religious Activities/Marriage Requests
Department Order #905, Inmate Trust Account/Money System
Department Order #909, Inmate Property
Department Order #911, Inmate Visitation
Department Order #915, Inmate Phone Calls
Department Order #916, Staff - Inmate Communications
Department Order #919, Inmate Resource Center/Library Services
Department Order #1001, Inmate Release System

# AUTHORITY

A.R.S. § 12-940 et seq, Unclaimed Property in Hands of Public Agency
A.R.S. §  13-2501, Definitions
A.R.S. § 13-2505, Promoting Prison Contraband; Exceptions; X-Radiation; Classification
A.R.S. § 13-3309, Seizure; Exception; Definition
A.R.S. § 13-3501, Definitions
A.R.S. § 13-3503, Seizure of Obscene Things; Disposition
A.R.S. § 13-4301 et seq, Forfeiture
A.R.S. § 13-4411.01, Notice of Right to Request Not to Receive Inmate Mail
A.R.S. § 13-4429, Return of Victim's Property; Release of Evidence
A.R.S. § 31-231, Unauthorized Communication With Prisoner; Classification; Definition
A.R.S. §  31-235, Prisoner Correspondence; Definitions

**Attachment 4**

# $8.15 Million Jury Award for Prisoner's Death at New York Jail

### by David Reutter

A NEW YORK CITY JURY AWARDED $8.15 million to the estate of a prisoner who died after being denied access to medical care.

While incarcerated in 1996 at the Vernon C. Bain Correctional Center, part of the Rikers Island complex, Jose Santiago, 25, told a guard he was experiencing symptoms that included a rapid heartbeat, profuse perspiration and difficulty breathing. The guard dismissed Santiago's request for treatment at the facility's clinic.

Just 30 minutes later, moments before he collapsed, Santiago again approached the same guard who again refused to help him. Santiago's pulse could not be detected when medical staff arrived, so they started CPR and summoned emergency medical technicians. The emergency responders did not arrive until 30 minutes later, and pronounced Santiago dead after their life-saving efforts failed.

Following his October 24, 1996 death, Santiago's estate, represented by a public administrator, sued the City of New York and the city's Department of Correction.

The estate's emergency medical expert, Rachael L. Waldron, opined that Santiago's symptoms were caused by atrial fibrillation. She said his symptoms indicated he was receiving insufficient oxygen and his heart could have been stabilized with simple defibrillation, which was available in the jail's clinic but not utilized.

Waldron also opined that medical staff failed to properly administer CPR and delayed treatment by not directing the emergency technicians to Santiago's location. She concluded that Santiago's death was due to lack of proper medical care.

During the litigation, the trial court sanctioned the defendants for failing to exchange information in discovery.

Santiago's death left his 4-year-old son and 2-year-old daughter without a father. The case went to trial in June 2013, and after ten days the jury unanimously found that employees at the jail were negligent.

The jurors awarded $150,000 for past loss of household services and $200,000 for economic losses; $4 million was awarded to Santiago's daughter and $3.8 million to his son for loss of parental guidance. The estate was represented by attorney Michael J. Kuharski. See: *Rodriguez v. City of New York*, Bronx Supreme Court (NY), Case No. 24068/98.

# Tenth Circuit Holds "Consensual" Sex Defeats Prisoner's Eighth Amendment Claim

### by Mark Wilson

THE TENTH CIRCUIT COURT OF APPEALS has held that a female prisoner's "consensual" sex with two guards did not violate the Eighth Amendment.

Stacey Graham was housed in solitary confinement at a jail in Logan County, Oklahoma. Between July and October 2009, jail guard Rahmel Jefferies began talking to Graham over the intercom and their discussions soon became sexual. They also exchanged sexually explicit notes.

On October 7, 2009, another jailer, Alexander Mendez, called Graham over the intercom, "asked about her sexual fantasies" and told her about his.

During the early morning hours of October 9, 2009, Jefferies and Mendez entered Graham's cell.

Another prisoner later alerted the assistant jail administrator that something was going on between Graham and the guards. Graham eventually admitted to having consensual sex with Mendez and Jefferies, but said she "didn't really want Mendez there."

Both guards were immediately terminated after they admitted to the sex acts. Graham was transferred to a different facility, where she told a psychologist that two guards had raped her. She "had a history of bipolar disorder and sexual abuse," but neither Jefferies nor Mendez was aware of her mental health issues.

Graham filed suit in federal court, alleging that the sexual encounter with Mendez and Jefferies violated her rights under the Eighth Amendment. The district court granted summary judgment to the defendants, "holding that 'in light of the consensual sexual activity at issue in this case,' there was no Eighth Amendment violation."

The Tenth Circuit affirmed on December 20, 2013, noting that Graham, unsurprisingly, focused "not on whether she consented as a factual matter but on whether a prisoner can legally consent to sex with one of her custodians." The Court of Appeals declined to hold that consensual sex in this context violates the Eighth Amendment.

The Court observed that "it is a matter of first impression in this circuit whether consent can be a defense to an Eighth Amendment claim based on sexual acts." It then noted that other courts had split on the issue, and the Ninth Circuit had recently "adopted a middle ground in *Wood v. Beauclair*, 692 F.3d 1041 (9th Cir. 2012)," creating "a rebuttable presumption of nonconsent." [See: *PLN*, March 2014, p.54].

"Even were we to adopt the same presumption as the Ninth Circuit," the appellate court wrote, in Graham's case "the presumption against consent would be overcome by the overwhelming evidence of consent." See: *Graham v. Sheriff of Logan County*, 741 F.3d 1118 (10th Cir. 2013).

**Attachment 5**



# ARIZONA DEPARTMENT OF CORRECTIONS

## Office of Publication Review – Appeal Decision

| PUBLICATION INFORMATION | |
|---|---|
| Publication Title | Prison Legal News |
| ISBN or Volume/Nbr | v28n4 |
| Publication Date | April 2017 |
| **INITIAL DISPOSITION** | |
| Complex/Unit | Tucson |
| Disposition Date | 05/09/2017 |
| Reason(s) for Exclusion | DO 914.07 1.2.16 |
| **APPEAL DISPOSITION** | |
| Appeal Request Date | 05/15/2017 |
| Appeal Request By | ☒ Inmate<br>☐ Publisher |
| Appeal Disposition Date | 06/06/2017 |
| Appeal Disposition | ☐ Uphold Initial Decision, EXCLUDE PUBLICATION IN ITS ENTIRETY<br>☐ Overturn Initial Decision, ALLOW PUBLICATION IN ITS ENTIRETY<br>☒ REDACT AND ALLOW PUBLICATION WITH REDACTION(S) |
| Reason(s) for Exclusion on Appeal | |
| **If REDACTED AND ALLOWED WITH REDACTION, describe material to be redacted.** | Allow with redaction per DO 914.07 1.1, 1.2.2.2, 1.2.2.3, 1.2.2.6, 1.2.3, 1.2.16, 1.2.17, 1.2.20 - pg. 56 |

ELECTRONICALLY SENT

J Guzman
_____
Original Signature on File

# Site of Gruesome Prison Riot Becomes New Mexico Tourist Attraction

## by Joe Watson

NEW MEXICO CORRECTIONS OFFICIALS said "the possibilities are endless" for a dilapidated prison that has become a tourist attraction and occasional movie studio 35 years after it was the site of one of the most violent riots in U.S. history.

In February 1980, dozens of state prisoners were brutally murdered at the "Old Main" Penitentiary of New Mexico, 15 miles south of Santa Fe, after a group of convicts – reportedly "drunk on hooch and high on prescription meds" –

A day and a half later the National Guard took control of the bloody scene, where 33 prisoners were killed – many of them tortured and dismembered – and over 100 others were seriously injured or had overdosed on drugs stolen from the prison pharmacy.

A New Mexico attorney general's investigation into the riot later concluded that it was caused by prison overcrowding, understaffing, poor training and a so-called "snitch game," in which guards "would sometimes put a snitch jacket on a prisoner just because they didn't like them ... to get even," according to an investigative report. During the riot, those so-called "snitches" were targeted by fellow prisoners

as recalled by criminal defense attorney Gary Nelson, who was serving time in the prison by charging when the disturbance occurred.

The response by the New Mexico Corrections Department (NMCD) in the aftermath of the riot was to shift to a "security and containment approach" designed primarily "to control and to limit inmate movement as much as permitted," Jerry Roark, NMCD's Supervisor of Adult Prisons, explained to Al Jazeera during a 2015 interview.

Today a state-of-the-art production studio sits across the road, and six film projects were planned for Old Main in 2015 alone. The NMCD is capitalizing on Hollywood's interest in the prison by charging voyeurs $16.50 each for a two-hour guided tour – a practice that began in 2012.

Once visitors finish touring the infamous Cell Block 4, the protective custody unit –

they can hop over to the gift shop and pose for fake mug shots.

prison guard and tour guide Trinidad Lucero tells visitors as they ogle the macabre site where 33 men suffered brutal deaths due to the NMCD's incompetence and misconduct.

Movies filmed at the facility, which closed in 1998, have included the Adam Sandler remake of *The Longest Yard* and scenes from *Zero Dark Thirty*.

The NMCD has even allowed "ghost tours" of the prison, and there are future plans to turn Old Main into a virtual amusement park, complete with "barbershops with inmates cutting hair" and "a prisoner-run restaurant," according to NMCD public affairs director Alex Tomlin.

"Many think there is not much to celebrate about prisons," Tomlin stated. "But this is something we thought might be interesting to people."

While the NMCD's plans may be disrespectful to the prisoners who died during the riot and their families, and to the prison guards who were taken hostage and injured, the state's desire to financially exploit the facility apparently outweighs such concerns. ▪

Sources: *www.thedailybeast.com, www. aljazeera.com*

# Pennsylvania: Compassionate Release Reforms Fail to Achieve Aim

## by David M. Reutter

DESPITE A 2008 CHANGE IN STATE LAW intended to make it easier for Pennsylvania prisoners to be granted compassionate release, it is still rare for such releases to be granted.

In 1971, shortly after turning 18, Leon Jesse James was involved in a fatal shooting and sentenced to life without parole (LWOP). Such sentences effectively impose a living death penalty. Advocates of LWOP call it justice for victims, while critics assert that life without parole sentences are overbearing and result in unnecessary punishment that imposes substantial costs on taxpayers when prisoners grow old behind bars. It costs an estimated $872,036 to incarcerate each Pennsylvania lifer over their lifetime – an average of 23.4 years.

Lawmakers revised the state's compassionate release law, 42 Pa. C.S. § 9777, almost a decade ago as part of a broader criminal justice bill. Julie Hall, a criminologist and gerontologist at Drexel University, believes the change actually made compassionate release more difficult.

The law currently allows prisoners to be released to an outside hospital or nursing facility if their petition is granted by a judge who considers strict criteria; a prisoner must show that he or she is seriously ill and expected by a treating doctor to die within a year, and that treatment in prison is not as good as a hospital or long-term nursing facility.

Release to outside hospice care, including to a prisoner's home in some cases, requires a showing that he or she is terminally ill and expected to die in the "near future"; that he or she is "not ambulatory," an undefined term that is interpreted as being unable to walk, or more strictly, bedridden; and that a licensed hospice can provide more appropriate care.

In November 2013, after serving over 40 years, James was diagnosed with pancreatic cancer that quickly spread to his bones, stomach and colon. Despite surgery and chemotherapy, James knew he was dying; he filed a petition for compassionate release in late June 2014 with the assistance of Peter Goldberger, his family's attorney.

A Court of Common Pleas judge

**Attachment 6**



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Office of Publication Review – Appeal Decision**

| PUBLICATION INFORMATION | |
|---|---|
| Publication Title | Prison Legal News |
| ISBN or Volume/Nbr | V. 28 N. 5 |
| Publication Date | May 2017 |
| **INITIAL DISPOSITION** | |
| Complex/Unit | Tucson |
| Disposition Date | 05/31/2017 |
| Reason(s) for Exclusion | DO 914.06 1.2.2.6, 1.2.16 |

| APPEAL DISPOSITION | |
|---|---|
| Appeal Request Date | 06/05/2017 |
| Appeal Request By | ☒ Inmate<br>☐ Publisher |
| Appeal Disposition Date | 07/07/2017 |
| Appeal Disposition | ☐ Uphold Initial Decision, EXCLUDE PUBLICATION IN ITS ENTIRETY<br>☐ Overturn Initial Decision, ALLOW PUBLICATION IN ITS ENTIRETY<br>☒ REDACT AND ALLOW PUBLICATION WITH REDACTION(S) |
| Reason(s) for Exclusion on Appeal | |
| **If REDACTED AND ALLOWED WITH REDACTION, describe material to be redacted.** | Redact pages 3-4, 8, 30-31, 59-60 per DO 914.07 1.1, 1.2.2.1, 1.2.2.3, 1.2.2.4, 1.2.2.6, 1.2.16, 1.2.17, 1.2.20. |

**ELECTRONICALLY SENT**

J. Guzman

Original Signature on File

# Prison Legal News

*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright
**MANAGING EDITOR**
Alex Friedmann
**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu-Jamal
**CONTRIBUTING WRITERS**
Lonnie Burton, Matthew Clarke,
John Dannenberg, Derek Gilna,
Gary Hunter, David Reutter,
Joe Watson, Mark Wilson,
Christopher Zoukis
**ADVERTISING DIRECTOR**
Susan Schwartzkopf
**ADVERTISING COORDINATOR**
Judith Cohen
**LAYOUT**
Lansing Scott
**HRDC LITIGATION PROJECT**
Sabarish Neelakanta – *General Counsel*
Daniel Marshall, Masimba Mutamba
– *Staff Attorneys*

*PLN* is a monthly publication.

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts credit card orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**561-360-2523**
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## Sex Offender Costs (cont.)

victimized by someone their parents know.

Pedophiles, Lehrer noted, seldom kidnap their victims despite suggestions to the contrary in movies and novels. "The Polly Klaas Foundation estimates that fewer than 100 children are kidnapped by strangers each year in the manner that Jacob Wetterling was," Lehrer wrote in a recent study entitled "Rethinking Sex-Offender Registries," published in the quarterly journal *National Affairs*.

"Many of these 'stranger kidnappings' involve children who were sitting in the back seats of stolen vehicles or interrupted another crime in progress. Parents wanting to protect their own children should worry much more about their own friends and relatives than random strangers."

Fifty-three-year-old Danny James Heinrich, who killed Jacob Wetterling, was an exception. But he became the poster boy for child sex predators. His highly-publicized case helped inflame the belief that strangers were the ones children should fear most rather than people they were close to. Further, Heinrich had gotten away with his crime – until he confessed in 2016, almost 27 years later.

A massive search followed, to no avail. Neither the abductor nor Jacob's remains were found. Police told the boy's mother, Patty Wetterling, that they really didn't know where to start looking for suspects. It would help, they said, if they had a list of local sexual predators to question.

Within two years they did, after Patty

led a campaign that resulted in the state legislature passing a law to register sex offenders in Minnesota.

California had approved the forerunner of such laws in 1947, requiring sex offenders to provide their residential addresses to police. While Patty Wetterling was crusading in Minnesota, Ida Ballasiotes was winding up a campaign in honor of her daughter, seeking similar legislation in Washington state.

"It was the particulars that made Diane Ballasiotes' death especially disturbing," reporter Barry Siegel recounted in a 1990 *Los Angeles Times* story. "She'd left her job at a downtown Seattle advertising agency one evening at 5:30 and just disappeared. The missing-person posters her friends nailed everywhere described her as 5 feet-5 inches, 110 pounds, 29 years old, with curly shoulder-length auburn hair. Last seen, the poster said, leaving the 1st and Yesler area of Pioneer Square, heading toward the 3rd and Yesler U-Park garage, dressed in a navy skirt and tennis sweater. A Park Department employee had found the body a week later, while looking for garbage being dumped in another part of town, along Cheasty Boulevard South."

Her killer, Gene Raymond Kane, Jr., 33, was later caught. He had attacked two other women 13 years previously, did a stretch in prison and was sent to a work release facility in Seattle in 1988. He had been there just two months when he murdered Ballasiotes. Convicted in 1989, he returned to prison with a life sentence. Ballasiotes' family received a $260,000 settlement from the Washington Department of Corrections, which had failed to properly monitor Kane while he was on work release.

Diane Ballasiotes' murder, standing alone, would not have resulted in calls for a new law, Siegel noted. Even when a group called Friends of Diane began staging rallies and circulating petitions, the response by state officials was muted. Then came two more violent sexual assaults.

The assailant was Gary Minnix, who'd been charged with four vicious knife-related rapes in 1986 and linked by Seattle police to 22 other such cases."

But mentally retarded and with an IQ

## Sex Offender Costs (cont.)

as low as 48, Minnix was incompetent to stand trial. He ended up at Western State Hospital for the mentally ill. Since he was not a convicted criminal, he received weekend furloughs – and was on his sixth weekend leave when he assaulted the woman.

Shriner had a lengthy record of assaults on children, dating back to his involvement in the murder of a schoolmate when he was 16. Mentally retarded, he had spent his youth in juvenile facilities, schools for the disabled and a mental institution.

He had previously kidnapped and assaulted two teenagers and was imprisoned 10 years for that crime, Siegal reported. Shriner was denied parole and served his entire sentence. By law the state couldn't commit a dangerous person who wasn't mentally ill, so he was released –

In July 1989, Ida Ballasiotes' support group, Friends of Diane, and a second organization, the Tennis Shoe Brigade, marched on the state legislature in Olympia, unfurling a list of crimes by sex offenders and demanding new laws to protect women and children.

In response, Governor Booth Gardner, a Democrat, neutralized the debate by appointing a trusted public servant to head a task force review: Republican King County prosecutor Norm Maleng, who had been Gardner's losing opponent in the last gubernatorial race.

Public hearings were held, 150 victims spoke about the need for a new law, and the task force – which included Ida Ballasiotes (who went on to become a five-term Republican state legislator) and Helen Harlow (Ryan Hade's mother) – wrote the nation's first sexual predator registration bill. It was passed into law on July 1, 1990.

The statute increased prison sentences for sex crimes, created a civil commitment procedure to confine offenders in secure treatment centers until they are "cured," allowed police to notify the public when sex offenders were released, expanded treatment for victims and juvenile offenders, and created a central registry – including photographs and fingerprints – of released sex offenders.

Minnesota passed a similar law in 1991, and other states began to follow. In 1994, President Bill Clinton extended sex offender-related restrictions nationwide. He signed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act that would eventually require every state to create registries to track offenders by name, age, addresses and other relevant details. Under subsequent statutes, that data was expanded to include Social Security number, employer's address, vehicle license plate and vehicle description. Much of that information – except Social Security numbers – is accessible by the public via the Internet.

"From now on," Clinton said, "every state in the country will be required by law to tell a community when a danger-

---

# LEGAL INSIGHTS IS ON YOUR SIDE
## FOR EFFECTIVE POST-CONVICTION RELIEF



**Randy & CJ**

Legal Insights dedicated 5 years to CJ's fight and was successful in winning his release from a life sentence. "So if you are in need of some help with your post conviction issues, I recommend Randy Soderstrom and Legal Insights Inc. He helped me tremendously. He has been on that side and understands."

**EARLY RELEASE**
**LEGAL INSIGHTS SUCCESS STORIES**



**Nick & Randy**

Legal Insights' post-conviction work resulted in an 8-year sentence reduction and Nick's immediate release. "The court took 8 years off and now am a free man. Thank you Legal Insight and my good friend Randy for helping me. This feeling is like winning the lottery but instead of money, its for a new life, a new beginning and that to me is a blessing."

- National Post-Conviction Specialists with over 30+ years combined experience
- We specialize in all Habeas Corpus/2254/2255/AEDPA/Procedural Bars/PCR/PRP/Parole/Sentence Modification/DNA/Actual Innocence/Immigration Services and more...
- All 50 States and Federal convictions, all state and federal courts
- Special rates for Veterans & PLN subscribers
- Payment plans available (SASE)
- Experienced Attorneys & Post-Conviction Specialists on staff
- All work done under the supervision of licensed attorneys
- Se habla Español.



**CONTACT US FOR INFORMATION**
(949) 716-5051 (English)
(714) 728-0152 (Español)
INFO@LEGALINSIGHTS.ORG
WWW.LEGALINSIGHTS.ORG
LEGAL INSIGHTS INC.
25602 ALICIA PARKWAY, SUITE 323
LAGUNA HILLS, CA 92653

A 501(c)(3) Non-Profit Organization
Results vary on a case-by-case basis.



## Sex Offender Costs (cont.)

decided to take another look at Heinrich and other suspects. They found his DNA on a sweatshirt belonging to a boy who was sexually assaulted nine months prior to Jacob's abduction and murder.

After serving a search warrant at Heinrich's home, investigators discovered a collection of child pornography and he was arrested. In August 2016, after continued questioning, he confessed to the earlier sex assault and to killing Jacob.

Minnesota prosecutors agreed not to charge him with the murder if he would reveal where Jacob's remains were buried, which he did. "I am truly sorry for my evil acts that I have done against victims and their family, and the shame I brought on myself and my family," Heinrich said in court. He was sentenced to 20 years on federal child porn charges; however, once he nears his release date, authorities can petition to have him civilly committed as a sexual predator and held indefinitely.

"There was a little sense of accomplishment, we got answers," Jerry Wetterling told KSTP-TV, "but it was overridden by this huge sadness, that, okay, this is for real, Jake's not coming home."

Nonetheless, the case had helped launch a cottage industry of sex offender registration and tracking that has since grown into a global governmental enter-prise: Sex offenders are required to register and report their whereabouts, and in the process reveal their personal information and criminal convictions to anyone who wants to check online registries. The number of registered sex offenders has grown from around 541,000 in 2006 to just over 805,000 a decade later, and will continue to increase as new offenders are added to those already required to register.

In August 2016, Luis C. deBaca, director of the Justice Department's SMART office, established by the Adam Walsh Act, praised the registry system and his office's progress on its tenth anniversary.

"We've come a long way," he said, "in meeting the complex challenges of sex offender management and building a comprehensive sex offender registration and notification system." He described how, as legislation grew from the Jacob Wetterling law to the Adam Walsh Act, "the national standards for sex offender registration and notification were strengthened, and sex offenders were no longer able to evade registration requirements or the consequences of registration violations."

Even so, it's still a work in progress, he added. All states have some form of sex offender registries but they're not uniform nor fully implemented. In fact, as of April 2017, only 17 states had "substantially implemented" SORNA requirements according to the SMART office.

"While not every jurisdiction is SORNA-compliant," deBaca acknowledged, "many have aspects of the law in place and are on the path to achieving substantial implementation."

To a degree, Eli Lehrer, president of the R Street Institute, agreed. "The registries have, in an important sense, worked: Patty Wetterling's successful crusade correlate with improvements in public safety."

There has been a 30 percent drop i reported rapes from 1995 to today, Lehr noted. And while the U.S. population ha grown about 13 percent from 1999 to 201. the number of child sex abuse cases tumble from 88,000 to 61,000 during that perio

"While these numbers and any othe associated with sex crimes are probabl best considered as relative measures sinc so many sexual offenses go unreported Lehrer said, "they reflect a significant dro in the offenses that registries are intende to prevent."

However, in a study recently complete for *National Affairs*, he took a closer look a sex offender registration and discovered more nuanced and disturbing story.

His report, entitled "Rethinking Sex Offender Registries," concluded that today' registries don't work as well as they coul are too inclusive, overly restrictive and en up hurting some of the people they're in tended to help.

"Life on a registry imposes many bur dens on those required to take part," Lehre wrote. "Individuals included on registrie must inform police or other public-safety officials of their places of residence anc work. Failure to register in a timely fashior can result in additional felony charges. They must obtain permission to move and, often to travel. Most have their names posted in publicly accessible Internet databases. A number of states – including Florida, Oklahoma, Tennessee, and Nevada – require some classes of sex offender to have special state ID cards or driver's licenses identifying them as such."

Additionally, many jurisdictions forbid sex offenders from living near schools,

## MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization
**Certified Criminal Law *and* Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(626) 564-1136



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**
**31 years of success**
595 East Colorado Blvd
Suite 324
Pasadena, CA 91101
marileemarshallandassociates.com

# Vigilantes Assault, Rob and Murder Registered Sex Offenders

*by Matt Clarke*

As REPEATEDLY REPORTED IN *Prison Legal News*, for over a decade registered sex offenders have been targeted by vigilantes and assaulted, robbed and murdered due to their past crimes. And as noted in this issue's cover story, that is part of the dark side of sex offender registries, which allow public access to offenders' residential addresses and other personal information. Such information not only endangers registered sex offenders but also those who live with them and, in at least one case in Dallas, Texas, an innocent victim. That Dallas man, who was beaten with a baseball bat, had simply moved into an apartment recently vacated by a sex offender.

*PLN* believes these incidents are more widespread and occur with greater frequency than reported in the mainstream media. [See, e.g.: *PLN*, Sept. 2016, p.49; June 2015, p.63; Feb. 2013, p.50; April 2007, p.18].

In one of the earliest cases of registry vigilantism, two registered sex offenders who were living in the same home in Bellingham, Washington were murdered in 2005 by a man who gained access to their residence by claiming to be an FBI agent investigating threats made against sex offenders. Hank Eisses, 49, and Victor Vasquez, 68, were gunned down by Michael Anthony Mullen, who later confessed to the crime. Mullen was convicted and sentenced to 44 years; he died in prison.

Stephen A. Marshall, 20, a Canadian citizen, used information from online registries to locate two sex offenders in Maine, killing them in separate incidents in April 2006. William Elliot, 24, and Joseph Gray, 57, were shot to death. Marshall killed himself as police closed in while he was on a bus. Following the murders, Maine officials stated they did not intend to make any changes to the state's sex offender registry.

In August 2011, John Joseph Huffmaster, 29, of Hazelwood, Missouri, was charged with assaulting his 74-year-old neighbor with a hammer because the neighbor was on a sex offender registry. Huffmaster, who called police after the attack to claim he was "doing God's work."

Patrick Drum was sentenced to life in prison in September 2012 for killing two registered sex offenders in Washington state. His victims were Gary Lee Blanton, 28, and Jerry Wayne Ray, 57, who were fatally shot in June 2012. Drum reportedly admitted that he was targeting sex offenders and planned to continue killing them until he was caught.

On July 21, 2013, Jeremy and Christine Moody, husband and wife, murdered Charles "Butch" Parker, 59, and Gretchen Parker, 51, in South Carolina. Charles was a registered sex offender; both he and Gretchen had been shot and stabbed multiple times. The Moodys were identified from the Parkers' home surveillance video. The video recorded Jeremy Moody telling Charles, "I'm not here to rob you. I'm here to kill you because you're a child molester."

Christine Moody told TV reporters that Charles Parker was a "pedophile" and a "demon." Jeremy Moody confessed to deputies that he had killed Charles because he was a registered sex offender, and murdered Gretchen because she lived with him. He admitted to targeting other registered sex offenders and said he would have killed another on his "hit list" a few days later had he not been arrested. The Moodys pleaded guilty and received consecutive life sentences.

David Ray Mills, 36, his 16-year-old daughter and Andre Edwin Dickerson, 20, were charged in a January 2013 attack on Miguel Esteban Cruz, 21, whom the daughter accused of raping her. They allegedly lured Cruz to a park in Temecula, California, where Dickerson beat him with a baseball bat while the others watched.

The three assailants were charged with attempted murder and mayhem, and held on $1 million bail each.

In July 2015, Nebraska registered sex offender Phillip McDaniel lost his appeal seeking workers compensation for an attack that had occurred two years earlier at the Western Sugar Cooperative, when a co-worker assaulted him with a brass hammer while calling him a "chimo" – slang for "child molester."

The co-worker, Jason Bates, had become enraged after discovering that McDaniel was a registered sex offender. McDaniel suffered injuries to his nose, clavicle and left shoulder. He applied for workers compensation but was denied; after he appealed, the Nebraska Court of Appeals upheld the denial, finding that the attack was due to personal reasons even if the only relationship between the two was as co-workers. See: *McDaniel v. Western Sugar Coop.*, 23 Neb. App. 35, 867 N.W.2d 302 (Neb. Ct. App. 2015).

On June 25, 2016, Anchorage, Alaska police arrested Jason Vukovich, 41, for assaulting three registered sex offenders. The first victim, Charles Albee, told police a man with "shoulder-length hair and a black leather jacket" broke into his apartment, assaulted him and robbed him. The man knew his name and told him he was there because Albee was on the registry. He also showed Albee a notebook with a list of additional potential victims.

Two days later, a man matching the same description and carrying a hammer attacked registered sex offender Andres Barbosa. Barbosa said two women accompanied the man, who said he was there because of Barbosa's "past crimes."

Then on June 29, 2016, Wesley Demarest and Stanley Brown reported a man had broken into their home and attacked Demarest with a hammer, severely injuring him.

Vukovich was arrested after a traffic stop near the last crime scene. Police discovered a notebook with other victims' names and items stolen from their homes in his car; he was charged with multiple felonies and faces up to 35 years in prison.

Vukovich fled and Brown called 911. Weeks later, Demarest was still recovering from a fractured skull and unable to return to work.

Multiple studies have shown registries to be ineffective at reducing sex offender recidivism, which is extremely low – in fact only murderers have lower recidivism rates. Instead registries often serve a more sinister purpose, including as vehicles for public vengeance.

Alaska's Sex Offender Registration law was enacted in 1994 after Megan Kanka, a 7-year-old New Jersey girl, was raped and killed by a man who had previously sexually assaulted two other young girls.

But in a 2008 report, the Alaska Justice Forum (AJF) questioned the law's premise "that sex offenders will inevitably reoffend and ... are not receptive to treatment."

As a result of similar legislative efforts across the country, registries make little attempt to distinguish between types of sex offenders. Under Alaska's system, an 18-year-old who has consensual sex with a 14-year-old faces the same registration requirements as someone convicted of a violent rape and murder: 15 years on the registry after getting out of prison.

"The myth of the incorrigible sex offender, all but guaranteed to reoffend,

has been largely refuted," wrote Deborah Periman, who authored the AJF report. "A study by the Alaska Justice Statistical Analysis Center of sex offenders released from Alaska corrections facilities in 2001 found that non-sex offenders were more likely to be rearrested than sex offenders."

The Alaska Civil Liberties Union also thinks the current registry is flawed because "it can lead to vigilante behavior like [Vukovich] allegedly did," said executive director Joshua Decker.

However, Keeley Olson, director of Standing Together Against Rape, does not believe the registry fails entirely as a deterrent, and contends it is worthwhile despite its shortcomings.

"Perhaps people should think about [the risks] before they become sexual predators and harm children," she noted.

In January 2017, police in Macon County, Illinois finally caught up with Samuel Henson, 19, who is a suspect in the 2015 beating of a 53-year-old registered sex offender. Henson, who was a student at Lincoln College of Technology in Indianapolis, is accused of committing the assault with two other teenagers. His bond was set at $10,000.

"He acknowledged knowing that the [victim] was a sex offender," police said, "and that the three subjects involved had discussed battering him when they saw him walking down the street."

Even absent registration as a sex offender or even a conviction, the mere accusation of a sex offense is sometimes used to justify acts of violence.

In Great Falls, Montana, Tracy Lynn Bossie was charged with one count of assault with a weapon, a felony, for the 2016 stabbing of relative Wallace Bossie, Jr., who had been charged with four felony sex crimes involving other relatives, all minors. Police reported multiple confrontations between the two adult Bossies in the weeks before the stabbing.

And earlier this year, a Bay City, Michigan court sentenced 34-year-old Justin R. Aikens to three years' probation for a July 2016 incident in which he tried to drive over a 40-year-old man because, according to Aikens, he was "a child molester [and] children need someone to defend them." Yet the National Sex Offender Registry did not list the victim as being a sex offender.

It is doubtful that any lawmakers would publicly support the assaults and murders of registered sex offenders, yet few have objected to those negative consequences of registries, nor do they typically try to curtail registration requirements or include protections for sex offenders whose publicly-posted information puts them at risk of vigilante attacks.

The examples cited above are the tip of a much larger iceberg of violence faced by registered sex offenders, the scope of which is largely unreported and thus unknown. ▉

Sources: www.adn.com, www.ktva.com, www.stltoday.com, www.businessinsurance.com, www.mirror.co.uk, www.losangeles.cbslocal.com, www.seattletimes.com, www.foxcarolina.com, https://on-vigilantism.blogspot.com, www.nydailynews.com, www.nypost.com

### A Jailhouse Lawyer's Manual

A Jailhouse Lawyer's Manual ("the JLM") publishes three books designed to explain your rights and help you navigate the justice system.

The JLM 10th Edition (2014) ($30 for prisoners) is the main volume of the JLM. It is a 1288 page book that can help you learn about:
- Researching the law
- Appealing your conviction or sentence
- Receiving medical care
- Protecting your civil liberties
- And more

The Immigration Supplement (2011) ($5 for prisoners) is a 116 page supplement to the main JLM containing information about immigration and the rights of non-citizens.

The Texas Supplement (2014) ($20 for prisoners) is a 408 page supplement to the main JLM containing information specific to Texas state prisoners.

To order the JLM, send a check or money order (no credit cards or stamps accepted) and your shipping information to: A Jailhouse Lawyer's Manual, 435 West 116th Street, New York, NY 10027.

For institutional prices or questions, contact jlm.board.mail@gmail.com.

## WELCOME TO KRASNYA BABES & STUDS WORLD

TENS OF THOUSANDS OF THE HOTTEST AND MOST SCANDALOUS BABES & DUDES FOUND ON THE PLANET. EACH CATALOG PAGE HAS 120 BEAUTIFUL GIRLS OR BOYS POSING JUST FOR YOU! ORDER 1 CATALOG PAGE FOR ONLY $4.50 OR FOR 10 U.S. FOREVER STAMPS WITH AN SASE WHAT ABOUT OUR PRICES AND POLICIES COLOR PRINTS ON 4x6 GLOSSY PHOTO PAPER AS LOW AS $0.35 CENTS PER PRINT ON ORDERS OVER 500 SHIPPED ACCORDING TO POLICY:
25 PICTURES PER ENVELOPE EVERY 24 HOURS.
S&H $2.00 PER ENVELOPE.
METHOD OF PAYMENT
U.S.P.S. MONEY ORDERS - STATE & FEDERAL CORRECTIONAL INSTITUTIONAL CHECKS PAYABLE ONLY TO: KRASNYA L.L.C.
OUR SEASONAL SPECIALS MEAN A KICKOFF OF SAVINGS!

KRASNYA BABES HAS SPRUNG SALE! FREE SAMPLE CATALOG FROM KRASNYA! 120 BABES IN EACH CATALOG ENCLOSE ONE SASE WITH TWO FIRST CLASS STAMPS! ONE CATALOG PER CUSTOMER PLEASE SPECIFY MALE OR FEMALE BABES NUDE OR BOP-FRIENDLY

KRASNYA L.L.C.   P.O.BOX 32082, BALTIMORE, MD 21282
CORRLINKS REQUESTS: KRASNYABABES@HOTMAIL.COM

policy had caused Montano's death. Both parties appealed.

The Fifth Circuit upheld the award for pain and suffering and reversed the district court's order granting JMOL on the wrongful death claim, reinstating the $917,000 jury award. The Court of Appeals noted that the county had denied Montano medical care "with the expectation that he would heal himself," disregarding state standards and ignoring the fact he was neither eating nor drinking while held in the bubble.

In its closing arguments at trial, the county had admitted that Montano died of "medical negligence" in the jail's custody, and that his death was on the county's hands. That admission was binding, even if it was part of an argument intended to shift blame to the nurses. See: *Montano v. Orange County, Texas*, 842 F.3d 865 (5th Cir. 2016). 

## Four Prisoners Murdered at South Carolina Facility

ON APRIL 7, 2017, FOUR MINIMUM-security prisoners at the Kirkland Correctional Institution in Columbia, South Carolina were found dead in a cell. A South Carolina Law Enforcement Division investigation revealed that John King, 52; Jason Kelley, 35; Jimmy Ham, 56; and William Scruggs, 44 were strangled after being lured into the cell by fellow prisoners Denver Simmons and Jacob Philip.

The attacks were partially captured on surveillance video.

Simmons, 35, and Philip, 25, were charged with four counts of murder; each was already serving a life sentence for unrelated double homicides, and both may now face the death penalty. Authorities were unclear as to the motive for the killings or how Simmons and Philip tricked the men into entering the cell. The Department of Corrections will conduct an internal investigation into the murders after the criminal investigation is finished, DOC Director Bryan Stirling told the Associated Press

The Kirkland facility operates a specialized housing unit for prisoners considered the state's most dangerous, as well as an assessment and classification unit, and a 24-bed infirmary. In 2015 the prison was the scene of previous violence when two prisoners held a pair of nurses hostage for seven hours;

And last year, three Kirkland guards were fired after they were accused of plotting to kill a prisoner, stabbing him while he was handcuffed. They were charged with attempted murder and misconduct in office.

Sources: *www.nypost.com, www.reuters.com, www.wiat.com*

---

### *Actual Innocence*

Explains how the innocent are convicted by faulty eyewitness testimonies, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$17.99 from PLN's Book Store!
See page 69 for more information.

---

### Newest addition to PLN Book Store!

# Cell Workout

### by L. J. Flanders

*Cell Workout*, written by a former prisoner, is a bodyweight training guide designed for use in a prison cell without the need for actual weights. This program is suitable for any age, ability and fitness level and promises results for everyone who tries it. There are step-by-step instructions of how to do the exercises, photographs and sample workouts to follow. The aim of this book is to benefit the physical and mental health of people in prison and outside. Get the body you want — **Inside & Out!**

CELL WORKOUT

L. J. FLANDERS

**215 pages, $35 (S&H included)**
*Order by mail, phone, or online.*

Amount enclosed for *Cell Workout* _____ By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____ DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

Prison Legal News • PO Box 1151, Lake Worth, FL 33460
Tel. 561-360-2523 • www.prisonlegalnews.org

---

# The Sentencing Project Explores Impact of Race and Ethnicity on U.S. Prison System

*by Derek Gilna*

A June 2016 report by The Sentencing Project found that blacks are incarcerated in state prisons at much higher rates than whites – up to ten times the incarceration rate in five states. The report offered recommended solutions to what is clearly a national problem.

Fueled by "America's failed experiment with mass incarceration," the U.S. prison population has increased over 500% in the past forty years. Fortunately, states like New Jersey, New York, Rhode Island and California have adopted meaningful reforms that reduced their incarceration rates by 20-30%, while still driving down crime rates. Sadly, despite reforms in various states, the disparity of incarceration rates of blacks and Hispanics compared to those of whites is still shocking.

The Sentencing Project describes the harsh reality: "African Americans are incarcerated in state prisons at a rate that is 5.1 times the imprisonment of whites. In five states (Iowa, Minnesota, New Jersey, Vermont, and Wisconsin), the disparity is more than 10 to 1." Additionally, according to the report, "In twelve states, more than half of the prison population is black: Alabama, Delaware, Georgia, Illinois, Louisiana, Maryland, Michigan, Mississippi, New Jersey, North Carolina, South Carolina, and Virginia." The racial disparity is greatest in Maryland, where blacks comprise 72% of the state's prison population.

This breathtaking reality is a statistical indictment of the U.S. criminal justice system, considering that, on average, only 13% of the nation's population is African American. With respect to Hispanics, the prison population in New Mexico is 61% Hispanic while it's over 40% in both Arizona and California – significantly higher than the 17% of the national population that is comprised of people of Hispanic descent.

Statistics from the U.S. Department of Justice indicate that on average, for every 100,000 state residents, 1,408 blacks, 378 Hispanics and 275 whites are incarcerated. In Vermont, 1 in 14 state prisoners is black despite the fact that the African American population in that state is exceedingly low.

According to the report, there are three recurrent explanations for such racial disparities: "policies and practices that drive disparity; the role of implicit bias and stereotypes in decision making; and structural disadvantages in communities of color which are associated with high rates of offending and arrest." These factors largely result from harsh drug laws, the study continued, since although blacks and whites use drugs at around the same rate, from "1995 to 2005, African Americans comprised approximately 13 percent of drug users but 36% of drug arrests and 46% of those convicted of drug offenses."

Finally, The Sentencing Project stated there is much progress to be made in reducing "implicit bias," where "people of color are frequently given harsher sanctions because they are perceived as imposing a greater threat to public safety and are therefore deserving of greater social control and punishment." The report concludes by noting that although many states have made progress in reducing mass incarceration, there should be more "attention to the chronic racial disparities that pervade state prisons," and state officials need to embrace "serious, sustainable reforms ... needed to dismantle the current system of mass incarceration." ◾

Sources: *"The Color of Justice: Racial and Ethnic Disparity in State Prisons," The Sentencing Project (June 2016); www.sentencingproject.org*

# $25,000 Federal Jury Award in Suit over Teenager Raped in Oklahoma Jail

*by Matt Clarke*

On March 2, 2016, a federal jury awarded $25,000 to a woman who had been repeatedly sexually assaulted by a Tulsa, Oklahoma jailer when she was a minor held at the Tulsa County jail.

LaDona A. Poore was 17 years old when she was incarcerated at the David L. Moss Criminal Justice Center. The year was 2010, and she eventually received a deferred sentence for the assault charge that resulted in her being jailed.

Minor females were kept in isolation in the medical unit where they were, at times, overseen by male guards, including Seth Bowers. After Poore was released, she complained that Bowers had sexually abused her multiple times.

The Sheriff's Department investigation substantiated her claims and recommended prosecution, but the district attorney declined to press charges and Bowers was allowed to resign.

With the assistance of Tulsa attorneys Louis W. Bullock, Patricia W. Bullock, Robert M. Blackmore, Daniel E. Smolen, Donald E. Smolen II, Lauren G. Lambright, Miranda R. Russell and Thomas A. Mortensen, Poore filed a federal civil rights suit under 42 U.S.C. § 1983 against Bowers and Tulsa County Sheriff Stanley Glanz. She alleged Glanz's policies at the jail had allowed Bowers to have unobserved access to isolated minor females, which violated Oklahoma Jail Standards under OAC § 310:670. In her lawsuit, she claimed she was sexually assaulted and raped,

The jury found in Poore's favor, awarding her $25,000 in actual damages against Glanz. Before returning a verdict following the eight-day trial, the six jurors deliberated more than nine hours.

Sheriff Glanz has been named as a defendant in at least 21 other civil rights lawsuits. [See: *PLN*, March 2017, p.42; Oct. 2016, p.46; April 2015, p.46]. One of those cases alleged the rape of another detainee held in the same medical unit at the same time as Poore.

Glanz was forced to resign from office in November 2015 after being indicted by a grand