**Attachment 7**



# ARIZONA DEPARTMENT OF CORRECTIONS

## Office of Publication Review – Appeal Decision

| PUBLICATION INFORMATION | |
|---|---|
| Publication Title | Prison Legal News |
| ISBN or Volume/Nbr | V 28 No. 6 |
| Publication Date | June 2017 |
| **INITIAL DISPOSITION** | |
| Complex/Unit | Tucson |
| Disposition Date | 07/07/2017 |
| Reason(s) for Exclusion | 914.07 1.1, 1.2.2.4, 1.2.2.5, 1.2.2.6 |

| APPEAL DISPOSITION | |
|---|---|
| Appeal Request Date | 07/10/2017 |
| Appeal Request By | ☒ Inmate<br>☐ Publisher |
| Appeal Disposition Date | |
| Appeal Disposition | ☐ Uphold Initial Decision, EXCLUDE PUBLICATION IN ITS ENTIRETY<br>☐ Overturn Initial Decision, ALLOW PUBLICATION IN ITS ENTIRETY<br>☒ REDACT AND ALLOW PUBLICATION WITH REDACTION(S) |
| Reason(s) for Exclusion on Appeal | |
| **If REDACTED AND ALLOWED WITH REDACTION, describe material to be redacted.** | Redact pages 3, 52, 62, 63, 65 per DO 914.07 1.1, 1.2.2.1, 1.2.2.3, 1.2.2.4, 1.2.2.5, 1.2.2.6, 1.2.3, 1.2.7, 1.2.12, 1.2.16, 1.2.17, 1.2.20. |

**ELECTRONICALLY SENT**

J. Guzman

Original Signature on File

914-8(e)
3/22/16

# ᛗᚩ Prison Legal News
*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu-Jamal

**CONTRIBUTING WRITERS**
Lonnie Burton, Matthew Clarke,
John Dannenberg, Derek Gilna,
Gary Hunter, David Reutter,
Joe Watson, Mark Wilson,
Christopher Zoukis

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**ADVERTISING COORDINATOR**
Judith Cohen

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Sabarish Neelakanta – *General Counsel*
Daniel Marshall, Masimba Mutamba
– *Staff Attorneys*

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts credit card orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## Affluenza in Justice System (cont.)

medical journal. Miller stated that Couch should not be held responsible for his actions because he was never disciplined by his rich parents for his reckless behavior.

On the night of the fatal accident, surveillance cameras caught Couch stealing beer from a local Wal-Mart before going to a party. The wreck occurred around three hours later. Basically, the defense contended that Couch had not been taught that the rules applied to him, thus he should not be held criminally responsive for the deaths and injuries he caused. Prosecutors sought a 20-year prison term for four counts of manslaughter.

On February 5, 2014, Couch was sentenced to complete a rehab program at a residential treatment facility. Even before the sentencing hearing, it was determined that he would receive a sentence of 10 years' probation. A firestorm erupted over the lenient sentence, and the defense's description of Couch as the product of privileged and irresponsible parents who let him do whatever he wanted without discipline made the term "affluenza" a household word.

State District Judge Jean Boyd, who presided over the case, said the affluenza defense was "not a basis for her decision" to sentence Couch to probation and treatment.

Defense attorney Scott Brown defended Boyd's decision. "There is nothing the judge could have done to lessen the suffering of any of those families. [She] fashioned a sentence that is going to keep Ethan under the thumb of the justice system for the next 10 years. And if Ethan doesn't do what he's supposed to do, if he has one misstep at all, then this judge, or an adult judge when he's transferred, can then incarcerate him."

Another attorney who represented Couch, Reagan Wynn, agreed. "She [the judge] heard all the evidence and made what she thought was the appropriate disposition," he said.

But in the minds of many average citizens, Couch's paltry sentence merely shifted the anger over his affluenza defense from his attorneys and parents to the criminal justice system that permitted such a lenient punishment.

"Let's face it.... There needs to be some justice here," said Eric Boyles, whose wife and daughter were killed by Couch. "There are absolutely no consequences for what occurred that day."

Suniya Luthar, a psychology professor at Arizona State University, asked, "if you have a child who grew up in the inner city, and the parents abused crack, and [the child] was abused all along and grew up at the age of 16 and ran over four people, how likely is it that public or culture would say, 'you must understand, what the child did was a result of his upbringing'? It's hard to justify such vastly different approaches taken toward inner-city children versus those in affluence."

However, Boyles noted that "had [Couch] not had money to have the defense there, to also have the experts testify, and also offered to pay for the treatment, I think the results would have been different."

To add insult to injury, the court also held that Couch's parents only had to pay a small amount of the cost for their son's rehab treatment. The pricey treatment center at the North Texas State Hospital usually costs $20,000 a month, but the Couches had to pay only $1,170 per month. Judge Boyd decided the state would pay the balance, amounting to over $150,000.

The families of three of Couch's victims settled lawsuits against him in 2014 for undisclosed amounts. Another suit, filed on behalf of Sergio Molina, one of the passengers in Couch's truck who was left unable to speak or move, resulted in a $2 million settlement in May 2014.

Sometimes the only justice that victims receive from wealthy defendants is financial compensation, rather than seeing them go to prison to face the consequences of their actions.

## Rich Defendant Rapes Child, Receives Probation

AFTER ADMITTING THAT HE HAD MOLESTED his three-year-old daughter, Robert H. Richards IV was sentenced to probation in 2009 by a Delaware superior court judge who reasoned that Richards would "not fare well" in prison. Wrapped in a veil of secrecy, Richard's case did not become public until March 2014 when his ex-wife, Tracy, filed a civil lawsuit seeking damages.

According to New Castle County police detective JoAnna Burton, Richards' daughter later told her grandmother that she didn't want "my daddy touching me anymore." When Richards was confronted

# Texas Leads the Nation in Exonerations, Costing More than $93 Million

*by Christopher Zoukis*

On March 13, 1997, 41-year-old Dahn Clary, Jr. of Texarkana, Texas was arrested and charged with the aggravated sexual assault of his best friend's 11-year-old son.

Clary was convicted and served 10 years in prison.

The only problem was that he was innocent.

In June 2013, the then-adult "victim" signed a sworn statement that he had made up the allegations because he was angry at Clary for spending less time with him.

"I did not understand the consequences of my actions at the time I fabricated the story," he said.

Clary was formally exonerated in June 2016.

The National Registry of Exonerations (NRE) tracks wrongful convictions, and has tallied 2,040 cases since 1989. But 2016 saw a record number of exonerations like Clary's; nationwide, the NRE reported 166 wrongful convictions that year. Texas continued to lead the way, with the exoneration of 58 men and women who were actually innocent. Most came from Harris County, which includes the city of Houston.

In 2014, a newspaper reporter noticed that in some Harris County drug cases the results of lab tests were not coming back until after a guilty plea had already been entered for the defendant. That got the attention of the county's Conviction Review Section, which discovered that many of the tests revealed no drugs had been found on the defendants.

In an interview, Harris County District Attorney Kim Ogg said a total of 317 such cases had been identified, in which lab tests detected no drugs but a guilty plea was entered anyway. Of those, 156 cases were dismissed. For the rest, county investigators have been trying to locate defendants who have not yet filed appeals.

Thus far the on-going investigation has exonerated 126 defendants convicted of drug crimes. That accounts for most of Harris County's exonerations since 2014, with "no doubt more to come," Ogg said.

Most of the wrongful drug convictions in Harris County involved minorities – 62 percent were African-American, a group that makes up just 20 percent of the county's population. Since many were also poor, they were unable to post bail when arrested for low-level drug offenses and pleaded guilty to avoid languishing in jail to fight the charges. Combined with a back-logged crime lab that took months or even years to return test results, it was "frighteningly easy" for so many innocent people to end up behind bars, noted Samuel Gross, a University of Michigan law professor who runs the NRE.

Jay Jenkins, an attorney with the Texas Criminal Justice Coalition who worked in Harris County for nearly three years, agreed that defendants often plead guilty to drug charges to avoid staying in jail because they can't post bonds.

"A lot of those folks plead guilty before the lab has even gotten the test back to the court," he said. "Low-income defendants have very little options."

Jenkins commended Harris County officials for testing drug evidence in criminal cases even after defendants had pleaded guilty, but said there's more work to be done in the way law enforcement officials treat the black community.

"The way that these communities are policed and the way that these individuals are prosecuted – it really is different than how they'd police a white person from a rich neighborhood," he explained. "They almost get an entirely separate criminal justice system from what is used to police and prosecute low-income communities here in Houston."

Gross, with the NRE, agreed there must be an underlying discrepancy that explains why "African-Americans [are] so overrepresented when it comes to people who are falsely arrested for drug possession" – especially since the rate of illegal drug use is roughly the same among both whites and blacks.

Then there are the financial costs of wrongful convictions, which are mostly extracted from the pockets of taxpayers. In Texas, statutes specify the compensation payable to people who have been incarcerated and later declared actually innocent by a court.

The compensation system was named after Tim Cole, a former Texas Tech University student wrongfully convicted of aggravated sexual assault, who died in prison in 1999. [See: *PLN*, Dec. 2009, p.26; July 2009, p.12]. According to data from the state comptroller's office, Texas has paid out $93.6 million in compensation to exonerees over the past 25 years.

Texas' compensation system is one of the most generous in the nation – which is fortunate, since it is also the state with the most wrongful convictions. [See: *PLN*, Oct. 2015, p.40]. Exonerees receive a lump-sum amount based on how much time they served and are also eligible for monthly annuity payments, free tuition at public colleges, health insurance and other benefits.

The lump-sum payments are typically based on $80,000 per year of incarceration. Since 1991, Texas has paid out lump sums of $100,000 or less on 34 occasions. During the same time period the state paid more than $2 million in eight cases.

A report published by the NRE on March 7, 2017 found that prisoners exonerated in 2016 who were convicted in murder cases had served an average 21 years behind bars. It also found that official misconduct was involved in 70 exonerations in 2016, and in 74 cases the defendants had pleaded guilty despite being innocent.

Additionally, the report noted that more than half of exonerations by Conviction Integrity Units from 2003 to 2016 came from Harris County – partly due to the recent crime lab drug testing scandal.

"Harris County is extremely valuable for our research because it's an unusual example of something you wouldn't otherwise see," said Gross, noting that the county is "the biggest single focal point of exonerations in the country, this past year, and the year before, and the year before that."

Of course, other Texas counties also have poor track records with respect to wrongful convictions.

One of the most recent exonerations in Texas occurred in Nueces County in April

# Michigan Prisoner's Suicide Under Investigation; Lawsuit Filed

*by David M. Reutter*

A MICHIGAN PRISON GUARD HAS been criminally charged following an investigation into her role in a prisoner's suicide – an investigation that also resulted in a federal lawsuit and an admission of misconduct from the Michigan Department of Corrections (MDOC).

Janika Edmond, 25, was serving a sentence of 17 months to 4 years at the Women's Huron Valley Correctional Facility near Ann Arbor. Her sentence was imposed after a probation violation for failing a drug test and an assault on a jail guard following her arrest.

While in prison, Edmond experienced a marked increase in disruptive behavior, ranging from insolence to fighting and creating disturbances. She had one high-level incident between May and September 2013; 11 between September 2013 and June 2014; and 28 from June 2014 to June 2015. Her probation violation report predicted that such behavior would occur.

"She does not feel incarceration is appropriate because it just makes her more hostile and therefore, more assaultive," the report stated.

Prison medical staff treated Edmond's mental health issues with Zoloft and Seroquel, medications used for major depression, schizophrenia and bipolar disorder. She repeatedly tried to harm herself and was put on suicide watch multiple times. After a broken razor was found in her cell in 2015, she told officials she was "tired of being here" and hearing voices. She was placed in a segregation shower area on November 2, 2015, where she requested a suicide prevention vest, also known as a "bam-bam."

MDOC policy requires staff to respond immediately to life-threatening suicidal behavior and treat it as a medical emergency. A prisoner who engages in or threatens suicidal behavior must be placed on unrestricted face-to-face visual observation in an observation room, the policy states. Also, their clothing must be taken away and replaced with a tear-resistant suicide prevention garment or vest.

"She not only did not receive one, but the guard made light of the request," said Detroit attorney David S. Steingold, who represents Edmond's family.

Reports obtained from the Michigan State Police (MSP) by the *Ann Arbor News* stated that prison guard Dianna Callahan made "a bet, jokingly, with another guard" – identified as Kory Moore – that Edmond would ask for the suicide prevention vest. The bet was reportedly for a Subway sandwich. The MSP report added that Callahan may have "pumped her fist" and said "somebody owes me lunch" in response to Edmond's request for the vest. [See: *PLN*, Dec. 2016, p. 19].

Pursuant to MDOC policy, Edmond should have been referred to a qualified mental health professional no later than the end of the workday. But shortly after she was placed in the shower, she was found "laying [sic] on her back with two torn pieces of fabric tied around her neck and blood at the back of her head," stated an internal prison report. The torn fabric . . . which she had used to hang herself, and guards had apparently ignored choking sounds coming from the shower area. She was transported to a hospital where she was pronounced brain dead several days later.

After Edmond's death, Callahan and Moore were placed on "stop order," according to MDOC spokesperson Chris Gautz. That meant they were not allowed in the prison but remained on paid suspension pending an internal investigation.

The MDOC completed its review in March 2016 and fired both Callahan and Moore. The Michigan State Police then opened its own investigation into Edmond's death and, as a result, Callahan was arraigned in December 2016 on charges of involuntary manslaughter and willful neglect of duty.

However, Moore was reinstated that same month after a successful union arbitration process. Washtenaw County Chief Deputy Assistant Prosecutor Steve Hiller said no charges were being pursued against Moore.

If convicted of involuntary manslaughter, a felony, Callahan faces a maximum of 15 years in prison and a $7,500 fine, and up to one year and a $1,000 fine for the misdemeanor charge. She would be eligible for probation on both counts.

Callahan was allowed to post a personal bond of $5,000, according to court records. Her attorney, William Hatchett, said she will fight the charges.

The MDOC has since admitted it was wrong for failing to immediately notify the State Police of Edmond's death. In fact, MSP reports indicate the police did not learn about the suicide until they were contacted by the office of the Washtenaw County Medical Examiner, which assumed – incorrectly – that MSP had already been informed and a trooper was assigned to the case. In the ensuing bureaucratic mix-up, MSP was delayed in starting its investigation by four months.

"We think it's clear that the referral [to MSP] should have been made," said MDOC spokesperson Gautz, adding that the department would be reviewing its policies.

Meanwhile, Steingold and another Detroit attorney, Cary McGehee, filed a wrongful death lawsuit against the MDOC on behalf of Edmond's family on February 17, 2017. The suit names as defendants the department and 14 current or former prison officials, including Warden Anthony Stewart, and alleges violations of Edmond's constitutional rights, failure to train and supervise, and failure to provide accommodations under the Americans with Disabilities Act.

"Notwithstanding the obvious criminal implications," and contrary to MDOC policy, the complaint also notes that prison officials did not promptly notify the MSP about Edmond's death. Further, they "intentionally engaged in behavior intended to obstruct the MSP investigation" by failing to promptly provide the police and medical examiner with a "critical incident report," by failing to preserve the potential crime scene and evidence, and by "refusing to cooperate with the MSP's efforts to obtain evidence, requiring it to obtain a search warrant."

Both the criminal charges against Callahan and the wrongful death suit remain pending. See: *Clark v. MDOC,* U.S.D.C. (E.D. Mich.), Case No. 2:17-cv-10528-RHC-DRG.

Sources: *www.mlive.com, Detroit Free Press, www.thedailybeast.com*

# News in Brief

**Arizona:** On January 19, 2017, Estrella Jail guard Roy Eugene Ramey III was fired by the Maricopa County Sheriff's Office. Ramey, who had been arrested in September 2016, was placed on administrative leave pending disposition of charges that he engaged in sexual activity with a female prisoner. He was indicted on four state felony counts of unlawful sexual contact.

**Arkansas:** Police responded to the scene of a single-car accident on January 21, 2017 and found Dallas County sheriff's investigator Chance Dodson, 42, and Dallas County jail prisoner Jason Poole, 38, inside Dodson's personal vehicle. Both were intoxicated. At the time of the incident, Dodson had "checked out" Poole from the jail for a work-release assignment. Police believe Dodson was too drunk to drive and asked Poole to drive for him; the vehicle veered into a ditch and crashed into a fence. Dodson was charged with disorderly conduct and resigned from the sheriff's department, while Poole was charged with DUI.

**Australia:** A prisoner at the Port Phillip Prison in Victoria died after a balloon filled with drugs burst in his stomach. Cain Hutchinson, 21, conspired with his girlfriend to smuggle in methylamphetamine.

According to a January 11, 2017 coroner's report, Hutchinson swallowed the balloon but the knot came untied, causing a fatal overdose. Two days after his death, his girlfriend contacted prison officials and confessed to supplying Hutchinson with the drugs. Following an internal review and policy change, when visitors use the bathroom the visit will then proceed as a non-contact visit.

**California:** On January 29, 2017, shortly after 91 friends and family members left Folsom State Prison's visitation room, a riot broke out among the 78 prisoners who remained in the area. Prison officials said not all of the prisoners participated in the fight, which was quelled with chemical agents. No staff members or visitors were injured, though one prisoner was hospitalized with a cut on his head. Movement at the facility was limited after the brawl and three prisoners were placed in administrative segregation.

**California:** A former supervising cook at Avenal State Prison was charged with

receiving bribes, bringing narcotics into a prison, bringing a controlled substance into a prison, having sex with a prisoner, delivering a cellphone to a prisoner and selling a controlled substance to a prisoner. Mary Ann Cano, 46, was arrested on January 15, 2017 after allegedly engaging in sex with two prisoners and smuggling contraband in exchange for cash. She has pleaded not guilty.

**Dubai:** On January 2, 2017, the Interior Ministry issued a statement saying an attack had been launched against the Jaw prison by "a terrorist cell of four to six members armed with automatic rifles and pistols." According to the statement, prison guard Abdulsalam Saif Ahmed died in the gunfire and another guard received "moderate wounds." Ten terror suspects escaped during the melee. Activists, including imprisoned human rights advocate Nabeel Rajab, claim that prisoners have been abused at the Jaw facility.

**Florida:** Dade Correctional Institution guard Detrick Lamar Hussey, 35, was arrested on December 15, 2016 after he took a 15-year-old girl out for dinner, drinks and "consensual" sex. Hussey was charged with lewd and lascivious battery on a child. Homestead police questioned him after the girl picked his photo from a lineup, and he admitted to the sexual tryst. Florida Department of Corrections spokeswoman Michelle Glady said the department was in the process of firing Hussey from his $34,707-a-year job.

**Florida:** A majority of prisoners at the Leon County Jail are pre-trial detainees and have not been convicted of a crime. "We're not in the business of punishing individuals that are on pre-trial, that's not our job," said Leon County Sheriff's Office spokesman Lt. Grady Jordan. "Our job is to care for them, try to control them, and keep them in custody." He was commenting on the January 5, 2017 arrest of LCSO sergeant Derrick Adams, a jail employee since 2004, for an excessive use of force incident. Adams, accused of using a Taser on a restrained prisoner, was charged with battery and fired.

**Georgia:** In a January 19, 2017 news release, U.S. Attorney G.F. Peterman III said former Stewart County Detention Center guard James Royal, 43, had been sentenced to six months in prison for smuggling marijuana into the facility. Peterman's

office wrote that Royal was also prohibited from working in law enforcement in the future. The news release said various prisoners arranged to pay Royal for the contraband through Western Union money transfers. The detention center is operated by CoreCivic, previously known as CCA.

**Georgia:** Senior Assistant District Attorney Christopher Quinn, a Gwinnett County prosecutor, turned himself in to Dunwoody Police on January 18, 2017 after being caught in a prostitution sting. Quinn's attorney, Noah Pines, said his client's charges of felony racketeering and misdemeanor pandering were an "overreach" by law enforcement. "If you talk to other DAs, I think you'd be hard-pressed to find another case where a [sex for pay] customer was charged with RICO," said Pines. "This is, at best, a prostitution case." A total of 56 people were arrested in connection with two prostitution businesses during the sting operation.

**Idaho:** Prisoner Ryan Michael Tone escaped from Canyon County's minimum-security tent jail on December 28, 2016. He climbed over an interior wall into the kitchen area, then broke through a door leading outside. Caldwell police said Tone ditched his jail clothing as he ran from the facility in 12-degree weather. He was captured almost immediately. The attempted escape from the tent jail was the sixth such incident since December 2015.

**Illinois:** Cook County Jail prisoner Jimmie Smith was allowed access to a laptop while representing himself in an upcoming attempted murder and sexual assault trial. Smith, who had been imprisoned at the jail for seven years, instead used the computer to broadcast a talk show called "My Back's Against the Wall." A search of the laptop also found lewd photos of Smith. According to surveillance video released by the Cook County Sheriff's Office on December 18, 2016, when confronted about his misuse of the computer Smith lashed out at a female guard, striking her in the face. He has since been charged with aggravated battery against correctional staff.

**Illinois:** The Illinois Appellate Court's First District held on December 27, 2016 that a homeless man's 12-year sentence for stealing $44 in quarters from a vending machine was an excessive punishment. "A paltry crime for a paltry sum does not

times. Normin McKenny, 26, who was facing robbery, assault and weapon possession charges, allegedly bragged in the video, "This is what [we] do behind g wall." The video was subsequently seen by a guard online. A search of McKenny's cell turned up two cell phones, one charger, four SIM cards, one blade and a handmade shank. "This incident remains under investigation," NYC Department of Correction spokesman Peter Thorne said on January 4, 2017. McKenny and three other prisoners who appeared in the video were moved to the Rikers Island jail complex.

**New York:** A civilian New York City Department of Correction worker assigned to the Federal Narcotics Task Force was making $75,000 a year as a community coordinator, but was "immediately suspended" and "is being terminated," according to DOC spokesman Peter Thorne. Geliesha Smith was caught in a sting operation moonlighting as a Backpage.com prostitute. She allegedly offered sex to an undercover cop for a fee of $120, and was arrested on January 12, 2017. Smith was still a probationary DOC employee when she was busted.

**North Carolina:** Gregory Dustin Gouldman, 33, was sentenced on January 31, 2017 to five years in federal prison for extortion. According to prosecutors, the Polk Correctional Institution guard had been smuggling contraband cell phones, tobacco and drugs into the facility for years, in exchange for bribes. Gouldman's contraband scheme was first discovered in 2014 when prisoner Kelvin Melton used an illegal cell phone to orchestrate the kidnapping of a lo-

cal district attorney's father. [See: *PLN*, Dec. 2014, p.56]. Melton was convicted and is serving life without parole in ADX Florence, the federal supermax prison in Colorado.

**Ohio:** On January 18, 2017, Cleveland.com reported that prisoners at the Cuyahoga County Jail were no longer eating with plastic forks and spoons

Instead, meals are served with rubber spoons and prisoners are no longer allowed to have spoons in their cells.

A new rule now requires guards to verify that cell doors lock properly every time they are opened or closed; previously, cell door checks were conducted only at the end of each shift.

**Oklahoma:** An alert guard spotted prisoner Marcus Mitchell walking through a common area at the Dick Conner Correctional Center with a large bag on December 25, 2016.

Prison officials recovered 39 cell phones, three MP3 players, a Bluetooth earpiece, nine cellphone chargers, 20 USB cords, five packages of rolling papers, four cigars and 9.5 pounds of tobacco. Security footage taken around the time of the incident showed unidentified accomplices tossing packages over a perimeter fence.

**Pennsylvania:** In February 2016, three SCI-Greene prison guards were charged

with trading contraband for confidential information; the contraband ranged from televisions and other electronic items to a six-inch shank. [See: *PLN*, July 2016, p.63]. John C. Smith, Jr., who received only a written reprimand from the Department of Corrections, and Andrew Schneider, Jr., who received a one-day suspension, were acquitted on January 27, 2017 of all charges associated with the scheme. However, the third guard, Michael S. Berry, collapsed when the jury announced a guilty verdict on two counts of unlawful use of a computer and one count of reckless endangerment. Berry was freed on an unsecured bond until his sentencing hearing.

**Pennsylvania:** Former Allegheny County jail guard Joshua Reber said he made "some very regrettable choices" after admitting in court that he had coerced two female prisoners into sexual acts. On January 5, 2017, Reber was sentenced to six to 20 months behind bars plus two years of probation after entering a guilty plea to two counts of official oppression; the plea agreement reduced his initial charges of institutional sexual assault to misdemeanors. Both of Reber's victims accused him of fondling them in their cells and in a cleaning supply closet. He also faces lawsuits filed by the women.

**Peru:** Alexander Jeferson Delgado Herrera, 27, was serving a 16-year sentence for robbery and sexual assault when he escaped by

walking out of the maximum-security Piedras Gordas prison. Herrera's brother, Giancarlo Steven Delgado Herrera, claimed he knew nothing about the



**FREE!**

# 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! (Void in New York)
(Last Quarter's winner from Livingston, TX.)
TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

## Inmate Magazine Service

# Attachment 8

Lisa Ells – Cal. Bar No. 243657*
Krista Stone-Manista – Cal. Bar No. 269083*
Andrew G. Spore – Cal. Bar No. 308756*
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone: (415) 433-6830
lells@rbgg.com
kstone-manista@rbgg.com
aspore@rbgg.com

Sabarish Neelakanta – Fla. Bar No. 26623*
Daniel Marshall – Fla. Bar No. 617210*
Masimba Mutamba – Fla. Bar No. 102772*
HUMAN RIGHTS DEFENSE CENTER
Post Office Box 1151
Lake Worth, Florida  33460-1151
Telephone: (561) 360-2523
sneelakanta@hrdc-law.org
dmarshall@hrdc-law.org
mmutamba@hrdc-law.org

David J. Bodney – Ariz. Bar No. 006065
Michael A. DiGiacomo – Ariz. Bar No. 032251
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona  85004-2555
Telephone:   (602) 798-5400
bodneyd@ballardspahr.com
digiacomom@ballardspahr.com

* Admitted *Pro Hac Vice*


Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Prison Legal News, a project of the Human Rights Defense Center,<br><br>Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>Defendants. | No. CV15-02245-PHX-ROS<br><br>**PLAINTIFF'S SECOND AMENDED RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

[3217590.2]

## PLAINTIFF'S SECOND AMENDED RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Prison Legal News ("PLN"), a project of the Human Rights Defense Center ("Plaintiff") hereby amends its responses to Defendants' First Set of Interrogatories as follows:

### PRELIMINARY STATEMENT

No incidental or implied admissions are intended in these responses. Plaintiff's responses to all or any part of the Interrogatories should not be taken as an admission that: (1) Plaintiff accepts or admits the existence of any fact(s) set forth or assumed by that Interrogatory or (2) Plaintiff's response constitutes admissible evidence. Plaintiff's response to all or any part of an Interrogatory is not intended to be, and shall not be, a waiver by Plaintiff of all or any part of his objection(s) to that Interrogatory. In addition, each of Plaintiff's answers to an Interrogatory or part of any Interrogatory is not a waiver of part or all of any objection Plaintiff might make to that form of Interrogatory. Plaintiff asserts these objections without waiving or intending to waive any objections as to competency, relevancy, materiality or privilege.

The responses herein are based solely on the investigation and discovery conducted in this litigation.

Plaintiff's responses are provided solely for the purpose of litigation in the matter of *Prison Legal News v. Charles L. Ryan; et al, CV-15-02245-PHX-ROS,* and may not be used for any other purpose. Subject to this Preliminary Statement, Plaintiff responds as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1:**

State all facts supporting your claim that PLN is unable to recruit new donors, writers and supporters, and has lost inmate subscriptions, as a result of Defendants' alleged violation of the First and Fourteenth Amendment.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates by reference its preliminary statement and general objections set forth above. Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be impossible to compile a list of all facts supporting PLN's claims. Plaintiff objects that this Interrogatory is compound. Plaintiff's investigation and discovery is ongoing. Subject to and without waiving these objections, Plaintiff responds as follows: Defendant's overbroad censorship practices hinder PLN's ability to communicate with potential donors and have chilled PLN's ability to communicate its speech to its target audience of potential subscribers, writers and supporters in ADC prisons. According to PLN's records and communication from ADC prisoners, PLN has lost and will continue to lose subscribers as a result of Defendants' violation of the First and Fourteenth Amendment.

**AMENDED RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be impossible to compile a list of all facts supporting PLN's claims. Moreover, PLN's editor, Paul Wright, has provided deposition testimony as to each of the facts supporting PLN's claim that it is unable to recruit new donors, writers and supporters, and has lost inmate subscriptions because of Defendants' censorship of Prison Legal News into its facilities.

Plaintiff further objects that this Interrogatory because it is compound and Plaintiff's investigation and discovery is ongoing.

1    Subject to and without waiving these objections, Plaintiff responds as follows:

2  Defendants' overbroad censorship practices hinder PLN's ability to communicate with

3  potential donors and have chilled PLN's ability to communicate its speech to its target

4  audience of potential subscribers, writers, and supporters in ADC prisons. According to

5  PLN's records and communication from ADC prisoners, PLN has lost and will continue to

6  lose subscribers as a result of Defendants' violation of the First and Fourteenth

7  Amendment.  For example Bates No. 0015 of PLN's document disclosure evidences a

8  PLN subscriber at the ADC who will not be subscribing any longer due to Defendants'

9  censorship policies.  *See* generally, Prisoner Letters; Year-by-year subscriber lists provided

10  in response to Defendants' First Request for Production.

11  **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 1:**

12    Plaintiff incorporates by reference its preliminary statement set forth above.

13    Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would

14  be impossible to compile a list of all facts supporting PLN's claims.  Moreover, PLN's

15  editor, Paul Wright, has provided deposition testimony as to each of the facts supporting

16  PLN's claim that it is unable to recruit new donors, writers and supporters, and has lost

17  inmate subscriptions because of Defendants' censorship of Prison Legal News into its

18  facilities. Plaintiff further objects that this Interrogatory because it is compound.

19    Subject to and without waiving these objections, Plaintiff responds as follows:

20  Defendants' overbroad censorship practices hinder PLN's ability to communicate with

21  potential donors and have chilled PLN's ability to communicate its speech to its target

22  audience of potential subscribers, writers, and supporters in ADC prisons. According to

23  PLN's records and communication from ADC prisoners, PLN has lost and will continue to

24  lose subscribers as a result of Defendants' violations of the First and Fourteenth

25  Amendments.  For example Bates No. 0015 of PLN's document disclosure evidences a

26  PLN subscriber at the ADC who will not be subscribing any longer due to Defendants'

censorship policies.  *See* generally, Prisoner Letters; Year-by-year subscriber lists provided

in response to Defendants' First Request for Production.

[3217590.2]                                    4

1  <u>**INTERROGATORY NO. 2:**</u>

2    State all facts supporting your claim that PLN [sic] "mission has been frustrated"

3  (inability to communicate its message of education and advocacy) including but not

4  limited to how a delay in delivering publications frustrates PLN's mission.

5  <u>**RESPONSE TO INTERROGATORY NO. 2:**</u>

6    Plaintiff incorporates by reference its preliminary statement set forth above.

7  Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

8  impossible to compile a list of all facts supporting PLN's claims. Plaintiff's investigation

9  and discovery is ongoing.  Subject to and without waiving these objections, Plaintiff

10 responds as follows: A delay in delivering publications affects the timeliness of the news

11 and people do not want to read newspapers that are a week old. If the magazine is not

12 delivered, prisoners have no way of being involved with PLN's mission.

13 <u>**AMENDED RESPONSE TO INTERROGATORY NO. 2:**</u>

14    Plaintiff incorporates by reference its preliminary statement set forth above.

15 Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

16 impossible to compile a list of all facts supporting PLN's claims. Subject to and without

17 waiving this objection, Plaintiff responds as follows: A delay in delivering publications

18 affects the timeliness of the news and people do not want to read newspapers that are

19 months old. If the magazine is not delivered, prisoners have no way of being involved with

20 PLN's mission.

21

22 <u>**INTERROGATORY NO. 3:**</u>

23    State all facts supporting your claim that PLN diverted its resources to address

24 censorship.

25 <u>**RESPONSE TO INTERROGATORY NO. 3:**</u>

26    Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

impossible to compile a list of all facts supporting PLN's claims. Plaintiff's investigation

[3217590.2]                                              5

1   and discovery is ongoing.  Subject to and without waiving these objections, Plaintiff

2   responds as follows: PLN staff members are forced to spend time responding to customer

3   inquiries and complaints about non-delivery of their subscription issues. They must also

4   spend time investigating the reasons for non-delivery and whether or not PLN was

5   notified. Finally, PLN staff must spend time communicating with lawyers about ways to

6   correct ADC's illegal practices. I have spent dozens of hours on this case.

7   **AMENDED RESPONSE TO INTERROGATORY NO. 3:**

8        Plaintiff incorporates by reference its preliminary statement set forth above.

9   Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

10  impossible to compile a list of all facts supporting PLN's claims. Subject to and without

11  waiving this objection, Plaintiff responds as follows: PLN staff members are forced to

12  spend time responding to customer inquiries and complaints about non-delivery of their

13  subscription issues. They must also spend time investigating the reasons for non-delivery

14  and whether or not PLN was notified. Finally, PLN staff must spend time communicating

15  with lawyers about ways to correct ADC's illegal practices. I have spent dozens of hours

16  on this case.

17

18  **INTERROGATORY NO. 4:**

19       Damages must be based on an actual injury.  *See Memphis Community Sch. Dist. v.*

20  *Stachura*, 477 U.S. 299, 308 (1986) ("[*Carey v. Piphus*, 435 U.S. 247 (1978)] thus makes

21  clear that the abstract value of a constitutional right may not form the basis for § 1983

22  damages.") "[C]ompensatory damages may include not only out-of-pocket loss and other

23  monetary harms, but also such injuries as 'impairment of reputation, … , personal

24  humiliation, and mental anguish and suffering.'" *Id.* at 307.  *See also Farrar v. Hobby*, 506

25  U.S. 103, 113 (1992) (interpreting *Carey* and *Stachura* to mean that "no compensatory

26  damages may be awarded in a § 1983 suit absent proof of actual injury.").

         What is the amount of PLN's compensatory damages and describe completely how

such damages were calculated?  Specifically itemize and show how you calculate any

1   economic damages claimed by you in this action, and describe any non-economic damages

2   claimed.  Separate damages by categories or types and describe completely how each

3   category or type of compensatory damages was calculated.

4   **RESPONSE TO INTERROGATORY NO. 4:**

5          Plaintiff incorporates by reference its preliminary statement set forth above.

6   Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

7   impossible to compile a list of all facts supporting PLN's claims. Plaintiff further objects

8   to this Interrogatory to the extent that it is compound in that it asks more than one question.

9   Plaintiff's investigation and discovery is ongoing.  Subject to and without waiving these

10  objections, Plaintiff responds as follows: PLN will ask for damages under 42 U.S.C. §

11  1983 in an amount to be determined by the jury at trial. PLN is entitled to damages for

12  each and every act of censorship of its written speech, including: Damages related to the

13  loss of the right to disseminate PLN's views, to distribute literature to people in

14  Defendants' custody, to recruit new subscribers, supporters and writers among prisoners in

15  Defendants' custody and among their supporters, and other lost First Amendment rights;

16  Damages related to lost income and harm to professional reputation; and Damages related

17  to the diversion of organizational resources. PLN anticipates that damages will be at least

18  $1000 per act of censorship but only a jury can decide.

19  **AMENDED RESPONSE TO INTERROGATORY NO. 4:**

20         Plaintiff incorporates by reference its preliminary statement set forth above.

21         Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would

22  be impossible to compile a list of all facts supporting PLN's claims.  Moreover, PLN's

23  editor, Paul Wright, has provided deposition testimony as to each of the facts supporting

24  PLN's claim for economic and non-economic damages.

25         Plaintiff further objects to this Interrogatory to the extent that it is compound in that

26  it asks more than one question, and the fact that Plaintiff's investigation and discovery is

ongoing.

       Subject to and without waiving these objections, Plaintiff responds as follows:

1    PLN will seek damages under 42 U.S.C. § 1983 in an amount to be determined by

2  the jury at trial.  PLN calculates, and will present to the jury, that it is entitled to damages

3  for each and every act of censorship of its written speech, including: Damages related to

4  the loss of the right to disseminate PLN's views, to distribute literature to people in

5  Defendants' custody, to recruit new subscribers, supporters and writers among prisoners in

6  Defendants' custody and among their supporters, and other lost First Amendment rights;

7  Damages related to lost income and harm to professional reputation; and Damages related

8  to the diversion of organizational resources.  Economic damages are calculated from the

9  above-enumerated damages.

10 Lost Opportunity to Communicate with Audience:

11    PLN has suffered compensable injury because it was unable to communicate its

12 message to its intended audience of prisoners.  Without this ability to communicate with its

13 intended audience while they are in prison, PLN may never be able to reach these

14 individuals, and certainly cannot reach them at the time they most need the information.

15 This harm is compensable.  For instance, in *City of Watseka v. Illinois Public Action*

16 *Council*, damages were awarded for violation of a non-profit organization's First

17 Amendment rights where the organization was prohibited from disseminating its views and

18 encouraging citizens to support the organization's positions.  796 F.2d 1547, 1558-59 (7th

19 Cir. 1986), aff'd, 479 U.S. 1048 (1987).  That such harm is difficult to measure does not

20 preclude recovery of damages for the harm.  *See Memphis Community School Dist. v.*

21 *Stachura*, 477 U.S. 299, 311 (1986) (noting that compensatory damages may be awarded

22 through "presumed damages [that] may roughly approximate the harm that the plaintiff

23 suffered and thereby compensate for harms that may be impossible to measure.").

24    Furthermore, juries have awarded between $500 and $1,500 for each piece of mail

25 unlawfully blocked by jails.  *See Nichols v. Knowles*, 1985 WL 17644 (D. Mass. May 29,

26 1985) ($1,500 per item); *Milligan v Matthews*, 166 Fed. Appx. 335 (10th Cir. 2006)

($1,250 per); *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003) ($1,000 per); *Williams v.*

*Brimeyer*, 116 F.3d 351 (8th Cir. 1997) ($501 per).

[3217590.2]                                    8

Diversion of Resources:

Defendants' actions have caused PLN to divert time and resources to investigate the extent and nature of Defendants' policies and censorship practices. PLN's damages include time spent by PLN staff investigating the mail policies and censorship at the jails, and sending materials to inmates to attempt to determine what the jails' policies and practices were. These damages also include the cost of materials and postage for the materials that were sent but not received. Damage awards for the diversion of resources for non-profit organizations have been well established. *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905-06 (9th Cir. 2002); *see also United States v. Balistrieri*, 981 F.2d 916, 933 (7th Cir. 1992); *Tsombanidis v. City of W. Haven*, 180 F. Supp. 2d 262, 295-296 (D. Conn. 2001), aff'd 352 F.3d 565, 580-81 (2d Cir. 2003).

PLN's damages for losses in staff time and resources are also compensable under basic tort law principles. *See Carey v. Piphus*, 435 U.S. 247, 257-59 (1980).  In tort actions, "reimbursement for expenses incurred because of a tort is commonly included as an element of damages." 22 AM. JUR. 2D DAMAGES § 427.

Frustration of Mission:

Even if there was a completely constitutional policy in place, the frustration of Plaintiff's mission will continue unless PLN takes specific steps to remedy the harm.  For example, inmates who were aware of the prisons' prior policies may now still believe that they are unable to order materials from PLN.  Future expenditures, including outreach, education, and testing, will therefore be necessary to counter the adverse effects of Defendants' unconstitutional actions. These types of damages are awarded in several analogous contexts. *See Combs*, 285 F.3d at 905; *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1996). PLN's expenses to remedy the harm Defendants have caused include the time and expense to send letters to prisoners regarding the prisons' mail policy, to publish advertisements, and to perform further testing and monitoring of Defendants' mail practices for compliance with the Constitution and any Court order or consent decree.

1  Without such efforts, a change in written policy is not likely to remedy the harms that were

2  inflicted.

3        However, PLN submits that the jury will ultimately calculate the damages to PLN

4  in this case.

5  **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 4:**

6        Plaintiff incorporates by reference its preliminary statement set forth above.

7        Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would

8  be impossible to compile a list of all facts supporting PLN's claims.  Moreover, PLN's

9  editor, Paul Wright, has provided deposition testimony as to each of the facts supporting

10  PLN's claim for economic and non-economic damages.

11        Plaintiff further objects to this Interrogatory to the extent that it is compound in that

12  it asks more than one question.

13        Subject to and without waiving these objections, Plaintiff responds as follows:

14        PLN will seek damages under 42 U.S.C. § 1983 in an amount to be determined by

15  the jury at trial.  PLN calculates, and will present to the jury, that it is entitled to damages

16  for each and every act of censorship of its written speech, including: Damages related to

17  the loss of the right to disseminate PLN's views, to distribute literature to people in

18  Defendants' custody, to recruit new subscribers, supporters and writers among prisoners in

19  Defendants' custody and among their supporters, and other lost First Amendment rights;

20  Damages related to lost income and harm to professional reputation; and Damages related

21  to the diversion of organizational resources.  Economic damages are calculated from the

22  above-enumerated damages.

23  Lost Opportunity to Communicate with Audience:

24        PLN has suffered compensable injury because it is unable to communicate its

25  message to its intended audience of prisoners.  Without this ability to communicate with its

26  intended audience while they are in prison, PLN may never be able to reach these

individuals, and certainly cannot reach them at the time they most need the information.

This harm is compensable.  For instance, in *City of Watseka v. Illinois Public Action*

1   *Council*, damages were awarded for violation of a non-profit organization's First

2   Amendment rights where the organization was prohibited from disseminating its views and

3   encouraging citizens to support the organization's positions.  796 F.2d 1547, 1558-59 (7th

4   Cir. 1986), aff'd, 479 U.S. 1048 (1987).  That such harm is difficult to measure does not

5   preclude recovery of damages for the harm.  *See Memphis Community School Dist. v.*

6   *Stachura*, 477 U.S. 299, 311 (1986) (noting that compensatory damages may be awarded

7   through "presumed damages [that] may roughly approximate the harm that the plaintiff

8   suffered and thereby compensate for harms that may be impossible to measure.").

9        Furthermore, juries have awarded between $500 and $1,500 for each piece of mail

10   unlawfully blocked by jails.  *See Nichols v. Knowles*, 1985 WL 17644 (D. Mass. May 29,

11   1985) ($1,500 per item); *Milligan v Matthews*, 166 Fed. Appx. 335 (10th Cir. 2006)

12   ($1,250 per); *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003) ($1,000 per); *Williams v.*

13   *Brimeyer*, 116 F.3d 351 (8th Cir. 1997) ($501 per).

14   Diversion of Resources:

15        Defendants' actions have caused PLN to divert time and resources to investigate the

16   extent and nature of Defendants' policies and censorship practices.  PLN's damages include

17   time spent by PLN staff investigating the mail policies and censorship at the jails,

18   including whether PLN was ever notified of such censorship, and sending materials to

19   inmates to attempt to determine what the jails' policies and practices were.  These damages

20   also include the cost of materials and postage for the materials that were sent but not

21   received. Damage awards for the diversion of resources for non-profit organizations have

22   been well established.  *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905-06 (9th Cir.

23   2002); *see also United States v. Balistrieri*, 981 F.2d 916, 933 (7th Cir. 1992);

24   *Tsombanidis v. City of W. Haven*, 180 F. Supp. 2d 262, 295-296 (D. Conn. 2001), aff'd

25   352 F.3d 565, 580-81 (2d Cir. 2003).

26        PLN's damages for losses in staff time and resources are also compensable under

basic tort law principles.  *See Carey v. Piphus*, 435 U.S. 247, 257-59 (1980).  In tort

1  actions, "reimbursement for expenses incurred because of a tort is commonly included as

2  an element of damages." 22 AM. JUR. 2D DAMAGES § 427.

3  <u>Frustration of Mission:</u>

4         Even if there was a completely constitutional policy in place, the frustration of

5  Plaintiff's mission will continue unless PLN takes specific steps to remedy the harm.  For

6  example, inmates who were aware of the prisons' prior policies may now still believe that

7  they are unable to order materials from PLN.  Future expenditures, including outreach,

8  education, and testing, will therefore be necessary to counter the adverse effects of

9  Defendants' unconstitutional actions. These types of damages are awarded in several

10 analogous contexts.  *See Combs*, 285 F.3d at 905; *Adray v. Adry-Mart, Inc.*, 76 F.3d 984,

11 988 (9th Cir. 1996). PLN's expenses to remedy the harm Defendants have caused include

12 the time and expense to send letters to prisoners regarding the prisons' mail policy, to

13 publish advertisements, and to perform further testing and monitoring of Defendants' mail

14 practices for compliance with the Constitution and any Court order or consent decree.

15 Without such efforts, a change in written policy is not likely to remedy the harms that were

16 inflicted.

17 However, PLN submits that the jury will ultimately calculate the damages to PLN in this

18 case.

19

20 **INTERROGATORY NO. 5:**

21        Is Plaintiff claiming that the delay in delivering the four monthly publications at

22 issue in this lawsuit to inmate-subscribers caused compensable damage?  If so, state all

23 facts and describe all documents that support such claim.

24 **RESPONSE TO INTERROGATORY NO. 5:**

25        Plaintiff incorporates by reference its preliminary statement set forth above.

26 Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

   impossible to compile a list of all facts supporting PLN's claims. Plaintiff's investigation

   and discovery is ongoing.  Subject to and without waiving these objections Plaintiff

[3217590.2]                                12

1  responds as follows: Yes. News has a shelf life and is a timely commodity and therefore a

2  delay in the delivery of written speech causes damage to both the speaker and the

3  audience.

4  **AMENDED RESPONSE TO INTERROGATORY NO. 5:**

5         Plaintiff incorporates by reference its preliminary statement set forth above.

6  Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

7  impossible to compile a list of all facts supporting PLN's claims. Subject to and without

8  waiving this objection, Plaintiff responds as follows: Yes. News has a shelf life and is a

9  timely commodity and therefore a delay in the delivery of written speech causes damage to

10  both the speaker and the audience. Additionally, information that is useful to a prisoner

11  while they are incarcerated may not be so once they are released. Moreover, Plaintiff

12  seeks damages for the additional monthly publications that were either censored, redacted,

13  or undelivered or whose delivery was unconstitutionally delayed subsequent to the filing of

14  this lawsuit.

15

16  **INTERROGATORY NO. 6:**

17         Is Plaintiff claiming that any of the four monthly publications at issue in this lawsuit

18  were not eventually delivered to inmate-subscribers? If so, state all facts and describe all

19  documents that support such claim, including but not limited to the names of all inmates

20  that Plaintiff claims did not receive a copy of any of the four monthly publications at issue

21  in this lawsuit and a description of the publication allegedly not received.

22  **RESPONSE TO INTERROGATORY NO. 6:**

23         Plaintiff incorporates by reference its preliminary statement set forth above.

24  Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be

25  impossible to compile a list of all facts supporting PLN's claims. Plaintiff's investigation

26  and discovery is ongoing. Subject to and without waiving these objections Plaintiff

responds as follows: Yes. As of the date of this response, PLN has not yet completed its

itemization of the facts related to undelivered copies of its monthly publication. Plaintiff is

[3217590.2]

13

relying on information obtained from its subscribers who were in Defendants' custody at the time that the acts of censorship occurred as well as information obtained from Defendants in discovery. The documents relied on are letters, and other communications from prisoners and their supporters, PLN's monthly list of subscribers, notices of censorship, Defendants publication review database, grievances, requests to staff and other documents written by prisoner subscribers.

**AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be impossible to compile a list of all facts supporting PLN's claims. Moreover, PLN's editor, Paul Wright, has provided deposition testimony as to each the facts relied upon by PLN concerning the non-delivery of PLN's monthly journal.

Plaintiff further objects on grounds that this information to a large extent is within Defendants' control, and plaintiff's investigation and discovery is ongoing.

Subject to and without waiving these objections Plaintiff responds as follows:

Yes. Please refer to the prisoner letters produced in response to Defendants' Request for Production of Documents wherein prisoners who were in Defendants' custody at the time that the acts of censorship occurred identify themselves to Plaintiff and indicate to Plaintiff the non-delivery of issues of *Prison Legal News*. PLN did not itself receive notification of censorship of the monthly issues at the time that the acts of censorship occurred. In addition, please refer to the year-by-year breakdown of PLN's subscriber lists provided separately providing the names of prisoner subscribers.

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be impossible to compile a list of all facts supporting PLN's claims. Moreover, PLN's editor, Paul Wright, has provided deposition testimony as to each the facts relied upon by PLN concerning the non-delivery of PLN's monthly journal.

1    Plaintiff further objects on grounds that this information to a large extent is within

2 Defendants' control.

3    Subject to and without waiving these objections Plaintiff responds as follows:

4 Yes. Please refer to the prisoner letters produced in response to Defendants' Request for

5 Production of Documents wherein prisoners who were in Defendants' custody at the time

6 that the acts of censorship occurred identify themselves to Plaintiff and indicate to Plaintiff

7 the non-delivery of issues of *Prison Legal News*. PLN did not itself receive notification of

8 censorship of the monthly issues at the time that the acts of censorship occurred. In

9 addition, please refer to the year-by-year breakdown of PLN's subscriber lists, provided in

10 response to Defendants' First Request for Production, for the names of prisoner

11 subscribers.

12

13 **INTERROGATORY NO. 7:**

14    List by month the amount of all bills and invoices for attorneys' fees, legal work,

15 law-firm work and legal expenses of any type received by Plaintiff in any way related to

16 this lawsuit or to the claims asserted in this lawsuit, and identify the person or entity that

17 sent the bill or invoice.

18 **RESPONSE TO INTERROGATORY NO. 7:**

19    Plaintiff incorporates by reference its preliminary statement set forth above.

20 Plaintiff objects to the extent that this Request seeks information protected from

21 production pursuant to the attorney-client privilege, the work product doctrine or any other

22 applicable privilege or doctrine. Plaintiff objects to this Request to the extent that it is

23 irrelevant and not calculated to lead to the discovery of admissible evidence. Plaintiff's

24 investigation and discovery, and this litigation, is ongoing.

25 **AMENDED RESPONSE TO INTERROGATORY NO. 7:**

26    Plaintiff incorporates by reference its preliminary statement set forth above.

[3217590.2]

1     Plaintiff objects to the extent that this Request seeks information protected from

2   production pursuant to the attorney-client privilege, the work product doctrine or any other

3   applicable privilege or doctrine.

4     Plaintiff further objects to this Request to the extent that it is irrelevant and not

5   calculated to lead to the discovery of admissible evidence.  Prior cases filed by PLN are

6   fact-specific, and while parallels may be drawn regarding the legal claims, the manner and

7   scope of the censorship, as here, varies.

8     Further, Plaintiff's investigation and discovery, and this litigation, is ongoing.

9     Subject to and without waiving these objections Plaintiff responds as follows:

10   PLN's attorneys' fees through December 31, 2016 are $749,370. *See* Deposition of Paul

11   Wright dated Feb. 10, 2017, at pp. 214-217.  The additional monthly fees expended from

12   January 2017 to March 2017 are noted below along with a monthly breakdown of the total

13   attorneys' fees per month from January 2015.

| MONTH | TOTAL ATTORNEYS' FEES |
|---|---|
| January 2015 | $0 |
| February 2015 | $0 |
| March 2015 | $775 |
| April 2015 | $5,938.50 |
| May 2015 | $2,031 |
| June 2015 | $3,952 |
| July 2015 | $14,418 |
| August 2015 | $15,653.50 |
| September 2015 | $11,294 |
| October 2015 | $21,249.50 |
| November 2015 | $22,586.50 |
| December 2015 | $5,426 |
| January 2016 | $14,378.50 |
| February 2016 | $25,957.50 |

| March 2016 | $49,339.50 |
|---|---|
| April 2016 | $63,464 |
| May 2016 | $49,412.50 |
| June 2016 | $36,245 |
| July 2016 | $31,941.50 |
| August 2016 | $58,795 |
| September 2016 | $82,731 |
| October 2016 | $70,266.50 |
| November 2016 | $100,546 |
| December 2016 | $81,273.50 |
| January 2017 | $74,957 |
| February 2017 | Will supplement |
| March 2017 | Will supplement |

## SECOND AMENDED RESPONSE TO INTERROGATORY NO. 7:

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to the extent that this Request seeks information protected from production pursuant to the attorney-client privilege, the work product doctrine or any other applicable privilege or doctrine.

Plaintiff further objects to this Request to the extent that it is irrelevant and not calculated to lead to the discovery of admissible evidence. Prior cases filed by PLN are fact-specific, and while parallels may be drawn regarding the legal claims, the manner and scope of the censorship, as here, varies.

Furthermore, this litigation remains ongoing. Any award of fees and costs would not be determined until after judgment on the merits, pursuant to Fed. R. Civ. P. 54(d); accordingly, such fees and costs are not discoverable. *Abels v. JBC Legal Group, P.C.,* 233 F.R.D. 645 (N.D.Cal. 2006).

Subject to and without waiving these objections Plaintiff responds as follows: PLN's attorneys' fees through December 31, 2016 are $749,370. *See* Deposition of Paul Wright dated Feb. 10, 2017, at pp. 214-217. The additional monthly fees expended from January 2017 to December 2017 are noted below along with a monthly breakdown of the total attorneys' fees per month from January 2015.

| MONTH | TOTAL ATTORNEYS' FEES |
|---|---|
| January 2015 | $0 |
| February 2015 | $0 |
| March 2015 | $775 |
| April 2015 | $5,938.50 |
| May 2015 | $2,031 |
| June 2015 | $3,952 |
| July 2015 | $14,418 |
| August 2015 | $15,653.50 |
| September 2015 | $11,294 |
| October 2015 | $21,249.50 |
| November 2015 | $22,586.50 |
| December 2015 | $5,426 |
| January 2016 | $14,378.50 |
| February 2016 | $25,957.50 |
| March 2016 | $49,339.50 |
| April 2016 | $63,464 |
| May 2016 | $49,412.50 |
| June 2016 | $36,245 |
| July 2016 | $31,941.50 |
| August 2016 | $58,795 |
| September 2016 | $82,731 |

[3217590.2]

| | |
|---|---|
| October 2016 | $70,266.50 |
| November 2016 | $100,546 |
| December 2016 | $81,273.50 |
| January 2017 | $74,957 |
| February 2017 | $55,308.50 |
| March 2017 | $37,355.75 |
| April 2017 | $25,649.50 |
| May 2017 | $5,155.00 |
| June 2017 | $5,089.50 |
| July 2017 | $13,432.00 |
| August 2017 | $56,949.00 |
| September 2017 | $28,619.50 |
| October 2017 | $75,044.50 |
| November 2017 | $31,339.50 |
| December 2017 | $3,267.00 |

**INTERROGATORY NO. 8:**

State the case number, court, jurisdiction and name of any lawsuit filed by Plaintiff in the previous ten years where damages were claimed for the censorship of Plaintiff's publications or for violation of the First or Fourteenth Amendments to the U.S. Constitution and state the outcome of each such lawsuit.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates by reference its preliminary statement set forth above. Plaintiff objects to this Interrogatory to the extent that it is overly burdensome and it seeks information that is irrelevant to the claims or defenses in this litigation. Plaintiff objects to this Interrogatory to the extent it is overbroad and seeks information that is irrelevant to the subject matter of this litigation. Plaintiff further objects to the extent that it seeks

information for a geographic area that far exceeds the scope of this litigation. Subject to and without waiving these objections, Plaintiff responds as follows: This information is available publicly at www.pacer.gov. It is also available in Plaintiff's annual reports, all of which are available on Plaintiff's websites.

**AMENDED RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overly burdensome, irrelevant to the claims or defenses in this litigation, and overbroad.  Specifically, the interrogatory seeks information for a geographic area that far exceeds the scope of this litigation.

Subject to and without waiving these objections, Plaintiff responds as follows:

Please refer to portions of HRDC's 2014 and 2015 Annual Reports for litigated cases covering those years produced in PLN's responses to document requests.  With respect to cases from 2016 onward, see below:

| Case | Outcome |
|---|---|
| *Prison Legal News v. Management and Training Corporation* (1:16-CV-01174) | Pending |
| *Prison Legal News v. Cook County* (1:16-cv-06862) | Pending |
| *Prison Legal News v. Cleveland County* (CIV-16-0198-HE) | Closed; Entry of Consent Decree |

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overly burdensome, irrelevant to the claims or defenses in this litigation, and overbroad.  Specifically, the interrogatory seeks information for a geographic area that far exceeds the scope of this litigation.

Subject to and without waiving these objections, Plaintiff responds as follows:

[3217590.2]

Please refer to portions of HRDC's 2014, 2015, and 2016 Annual Reports for litigated cases covering those years produced in PLN's responses to document requests. With respect to cases from 2017 onward, see below:

| Case | Outcome |
|------|---------|
| *Human Rights Center v. Los Angeles County, et al* (C.D. Cal. case no. 2:17-cv-04883) | Pending |
| *Human Rights Defense Center v. Rodney Ballard, et al* (E.D. Ky. case no. 3:17-cv-00057) | Pending |
| *Human Rights Defense Center v. Lewis Hatcher, et al* (E.D. N.C. case no. 7:17-cv-00164) | Closed; entry of judgment against Defendants |
| *Human Rights Defense Center v. Baxter County, et al* (W.D. Ark. case no. 3:17-cv-03070) | Pending |
| *Human Rights Defense Center v. Union County, et al* (W.D. Ark. case no. 1:17-cv-01064) | Pending |
| *Human Rights Defense Center v. Greene County, et al* (S.D. Ohio case no. 1:17-cv-00730) | Pending |
| *Human Rights Defense Center v. Management and Training Corporation et al,* (N.D. Ohio case no. 3:17-cv-01082) | Closed; settlement agreement |
| *Prison Legal News v. Management and Training Corporation* (D. N.M. case no. 1:16-CV-01174) | Closed; settlement agreement |

**INTERROGATORY NO. 9:**

Identify each and every specific fact which supports your claim that PLN is entitled to punitive damages.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be impossible to compile a list of all facts supporting PLN's claims. Plaintiff's investigation and discovery is ongoing.   Subject to and without waiving these conditions, Plaintiff responds as follows: PLN has been singled out for censorship by ADC based on

1 the fact that it reports on rights of prisoners and because we quote from Federal Court
2 Opinions. Defendant Ryan took a system of providing notice to senders of censored mail
3 and abandoned it.

**AMENDED RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is overbroad and it would be impossible to compile a list of all facts supporting PLN's claims. Moreover, PLN's editor, Paul Wright, has provided deposition testimony as to each of the facts supporting PLN's claim for punitive damages.

Subject to and without waiving these conditions, Plaintiff responds as follows:

PLN has been singled out for censorship by ADC based on the fact that it reports on rights of prisoners and because we quote from Federal Court opinions. Plaintiff is entitled to punitive damages in light of Defendant's censorship of entire issues of *Prison Legal News* despite the fact that the censorship fails to advance any legitimate penological interest. Defendants further failed to provide any notice of the censorship or opportunity to appeal the decision to PLN (the sender) in contradiction to well-established law. Defendants' actions give rise to punitive damages, which are appropriate when conduct is "malicious, wanton or oppressive" or in reckless disregard of a plaintiff's rights. *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). The law is well established that correctional facilities cannot impose restrictions on speech that are not rationally related to a penological purpose, and that if delivery of a publication is barred, the publisher must be provided with due process. The ADC policies blatantly violating these established rights show oppressive conduct in reckless disregard for PLN's rights, sufficient to support an award of punitive damages.

In civil rights cases like this one, where important public policy interests are concerned, Courts have approved high ratios of punitives-to-compensatory damages. *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (en banc) (300,000-to-1 ratio);

1  *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1121 (9th Cir. 2008) (ratio of 2,500-to-

2  1).

3

4  **INTERROGATORY NO. 10:**

5      Identify all witnesses that Plaintiff will have testify at trial.

6  **RESPONSE TO INTERROGATORY NO. 10:**

7      Plaintiff incorporates by reference its preliminary statement set forth above.

8  Plaintiff objects to this Interrogatory to the extent Defendants are requesting Plaintiff to

9  provide information that is privileged or protected from production pursuant to the

10  attorney-client privilege, the work product doctrine or any other applicable privilege or

11  doctrine. Plaintiff objects to this Request because the Court's Scheduling Order requires

12  Plaintiff's witness list to be disclosed on or before March 6, 2017 and, therefore, this

13  Request is premature. Plaintiff's investigation and discovery is ongoing. Subject to and

14  without waiving these objections, Plaintiff responds as follows: Paul Wright, Rachel

15  Stevens and Robert Pew, Post Office Box 1151, Lake Worth, Florida 33460. These

16  witnesses must be contacted via Plaintiff's counsel.

17      PLN's current and/or former ADC prisoner subscribers, all named Defendants, and

18  all ADC staff persons deposed by Plaintiff in this case. Defendants have superior access to

19  the information regarding the last known and current addresses and phone numbers for

20  these individuals.

21  **AMENDED RESPONSE TO INTERROGATORY NO. 10:**

22      Plaintiff incorporates by reference its preliminary statement set forth above.

23      Plaintiff objects to this Interrogatory to the extent Defendants are requesting

24  Plaintiff to provide information that is privileged or protected from production pursuant to

25  the attorney-client privilege, the work product doctrine or any other applicable privilege or

26  doctrine.

     Subject to and without waiving these objections, Plaintiff responds as follows:

     - Paul Wright,

1        • Rachel Stevens

2        • Robert Pew

3        • John L. Clark (expert)

4    These witnesses must be contacted via Plaintiff's counsel.

5        Plaintiff may also call PLN's current and/or former ADC prisoner subscribers, all

6    named Defendants, all ADC staff persons deposed by Plaintiff in this case, or otherwise

7    listed as a witness by Defendants. Defendants have superior access to the information

8    regarding the last known and current addresses and phone numbers for these individuals.

9

10   **INTERROGATORY NO. 11:**

11       Only Paul Wright has been disclosed as an "individual likely to have discoverable

12   information." State the job descriptions of Alex Friedman and Lance Weber, state why

13   they have no discoverable information in this case, and identify any and all activities that

14   they have, or will, perform that are part of the damages sought by Plaintiff.

15   **RESPONSE TO INTERROGATORY NO. 11:**

16       Plaintiff incorporates by reference its preliminary statement set forth above.

17   Plaintiff objects to this Interrogatory to the extent Defendants are requesting Plaintiff to

18   provide information that is privileged or protected from production pursuant to the

19   attorney-client privilege and/or the work product doctrine. Plaintiff further objects to this

20   Request to the extent that it seeks information that is immaterial and irrelevant to the

21   claims or defenses in this litigation. Subject to and without waiving these objections

22   Plaintiff responds as follows: Alex Friedman is the Associate Director of Plaintiff's

23   organization as well as the managing editor of *Prison Legal News*. Lance Weber is the

24   organization's General Counsel.

25   **AMENDED RESPONSE TO INTERROGATORY NO. 11:**

26       Plaintiff incorporates by reference its preliminary statement set forth above.

1    Plaintiff objects to this Interrogatory to the extent Defendants are requesting

2 Plaintiff to provide information that is privileged or protected from production pursuant to

3 the attorney-client privilege and/or the work product doctrine.

4    Plaintiff further objects to this Request to the extent that it seeks information that is

5 immaterial and irrelevant to the claims or defenses in this litigation because any and all

6 actions performed by Lance Weber were based solely upon his representation of HRDC as

7 the in-house general counsel. Such time would be compensable as attorneys' fees and do

8 not account for damages. Alex Friedmann is the Associate Director of Plaintiff's

9 organization as well as the managing editor of *Prison Legal News*. While Mr. Friedmann

10 would be involved in any outreach programs with the community as well as have an

11 understanding of the publication process and the effect that censorship will have on this

12 process as to time and expense, such testimony would be cumulative of testimony already

13 submitted by Mr. Paul Wright, and as evidenced by PLN's discovery responses to

14 interrogatories and document requests.

15

16 **INTERROGATORY NO. 12:**

17    Identify each person, other than a person intended to be called as an expert witness

18 at trial, having discoverable information that tends to support a position that you have

19 taken or intend to take in this action, including any claim for damages, and state the subject

20 matter of the information possessed by that person.

21 **RESPONSE TO INTERROGATORY NO. 12:**

22    Plaintiff incorporates by reference its preliminary statement set forth above.

23 Plaintiff objects to this Interrogatory to the extent Defendants are requesting Plaintiff to

24 provide information that is privileged or protected from production pursuant to the

25 attorney-client privilege, the work product doctrine or any other applicable privilege or

26 doctrine.  Plaintiff further objects to this Request because the Court's Scheduling Order

requires Plaintiff's witness list to be disclosed on or before March 6, 2017 and, therefore,

this Interrogatory is premature. Plaintiff's investigation and discovery is ongoing.  Subject

[3217590.2]

1  to and without waiving these objections, Plaintiff responds as follows: See Response to

2  Interrogatory No. 10.

3  **AMENDED RESPONSE TO INTERROGATORY NO. 12:**

4      Plaintiff incorporates by reference its preliminary statement set forth above.

5      Plaintiff objects to this Interrogatory to the extent Defendants are requesting

6  Plaintiff to provide information that is privileged or protected from production pursuant to

7  the attorney-client privilege, the work product doctrine or any other applicable privilege or

8  doctrine.

9      Subject to and without waiving these objections, Plaintiff responds as follows:

10     ○ Paul Wright can speak to the discovery and the general process of

11        investigation of the censorship of Plaintiff's publication by Defendants.  He

12        can also speak to the damages sustained by Plaintiff.

13     ○ Rachel Stevens and Robert Pew can speak to the specifics of the

14        investigation of the censorship by Defendants.  They possess knowledge of

15        the process by which PLN handles its mail from subscribers, returned or

16        censored mail, lack of notice to PLN, as well the processing of mail received

17        from the prisoners and prisons.

18

19  **INTERROGATORY NO. 13:**

20      If you intend to rely upon any documents or other tangible things to support a claim

21  or position that you have taken or intend to take in the action, including any claim for

22  damages, provide a brief description, by category and location, of all such documents and

23  other tangible things, and identify all persons having possession, custody or control of

24  them.

25  **RESPONSE TO INTERROGATORY NO. 13:**

26      Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff's investigation and discovery is ongoing.  Subject to and without waiving any

objections, Plaintiff responds as follows: See Response to Interrogatory No. 6.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates by reference its preliminary statement set forth above. Subject to and without waiving any objections, Plaintiff responds as follows: See Response to Interrogatory No. 6; see also Plaintiff's Rule 26(A)(1) Initial Disclosures – Third Supplemental Disclosures.

**INTERROGATORY NO. 14:**

For each and every named Defendant, specifically detail what they each allegedly did to subject themselves to damages under 42 U.S.C. § 1983.

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates by reference its preliminary statement set forth above. Plaintiff's investigation and discovery is ongoing.  Subject to and without waiving any objections, Plaintiff responds as follows: Defendant Ryan has ultimate responsibility for the promulgation and implementation of ADC policies, procedures, and practices and for the management of the ADC. Defendant Rittenhouse is responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. Defendant Hood is responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. Defendant Olson was responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. Defendant Riggs is Quality Assurance Administrator of the Office of Publication Review and is responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. Each Defendant refused to deliver PLN's publications in a timely manner (or at all, in some instances) and refused to provide PLN with Notice of the censorship.

**AMENDED RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Subject to and without waiving any objections, Plaintiff responds as follows:

1       • Defendant Ryan has ultimate responsibility for the promulgation and

2          implementation of ADC policies, procedures, and practices and for the

3          management of the ADC.

4       • While Defendants' counsel has made a verbal representation that Ms. Gail

5          Rittenhouse did not have any direct or indirect responsibility for the

6          promulgation and implementation of policies, procedures, and practices at

7          the ADC, there has been no specific stipulation or affirmation to that effect,

8          and therefore PLN cannot confirm the same.

9       • Defendant Jeff Hood is responsible for the promulgation and implementation

10         of policies, procedures, and practices at the ADC.

11      • Defendant Alf Olson was responsible for the promulgation and

12         implementation of policies, procedures, and practices at the ADC.

13      • Defendant Jim Riggs held the position of Quality Assurance Coordinator

14         from approximately 2012 to 2013. He was solely in charge of reviewing

15         publications from the complex level.  From 2013 to May 2016, Mr. Riggs

16         held the position of Quality Assurance Manager, and acted as a supervisor to

17         Mr. Alf Olson who later assumed Mr. Rigg's previous position.

18       Each Defendant refused to deliver PLN's publications in a timely manner (or at all,

19  in some instances) and refused to provide PLN with Notice of the censorship. Each

20  Defendant's malicious and/or reckless disregard in the failure to permit delivery of PLN's

21  publications and, failing that, to provide PLN notice and an opportunity to be heard

22  regarding the censorship – despite the clear and long-standing First and Fourteenth

23  Amendment Constitutional rights afforded to publishers in PLN's position – subjects each

24  Defendant to damages under 42 U.S.C. § 1983.

25  **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 14:**

26       Plaintiff incorporates by reference its preliminary statement set forth above.

     Subject to and without waiving any objections, Plaintiff responds as follows:

[3217590.2]

28

- Defendant Ryan has ultimate responsibility for the promulgation and implementation of ADC policies, procedures, and practices and for the management of the ADC. Each ADC policy, procedure, or practice challenged by Plaintiff was promulgated, enacted, and implemented during Defendant Ryan's tenure as Director of the ADC. Defendant Ryan has ultimate responsibility for each of these policies, and possesses unilateral authority to enact new policies, or to modify or repeal existing policies.

- Defendant Rittenhouse, in her role as Division Director of Support Services of the ADC, has at all relevant times supervised the operations of the Office of Publication Review, which was involved in the censorship of Plaintiff's publication. While Defendants' counsel has made a verbal representation that Defendant Rittenhouse did not have any direct or indirect responsibility for the promulgation and implementation of policies, procedures, and practices at the ADC, there has been no specific stipulation or affirmation to that effect, and therefore PLN cannot confirm the same.

- Defendant Jeff Hood is responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. Under Department Order 914, effective February 26, 2010, until March 4, 2016, Defendant Hood had an official duty to perform publication review. Pursuant to this duty, Defendant Hood personally participated in the review of the October 2014 issue of *Prison Legal News*, and personally participated in the decision to redact that issue. Pursuant to this duty, Defendant Hood supervised the Office of Publication Review and its employees and provided training to its employees, including Defendant Riggs, as to publication review duties and expectations.

- Defendant Alf Olson was responsible for the promulgation and implementation of policies, procedures, and practices at the ADC. Defendant Olson participated in each act of censorship of PLN and failure to

provide process to PLN that occurred before May 31, 2016, including by
personally reviewing each issue of *Prison Legal News* that was censored
herein before May 31, 2016.

○ Defendant Jim Riggs held the position of Quality Assurance Coordinator
from approximately 2012 to 2013. He was solely in charge of reviewing
publications from the complex level. From 2013 to May 2016, Defendant
Riggs held the position of Quality Assurance Manager, and acted as a
supervisor to Defendant Olson who later assumed Defendant Rigg's previous
position. Before May 31, 2016, Defendant Riggs participated in the
operations of the Office of Publication Review and was personally
responsible for the censorship decisions of the Office of Publication Review,
including decisions to redact content from publications. Before May 31,
2016, Defendant Riggs personally performed publication review and
personally assisted the publication review duties of Defendant Olson,
including review of *Prison Legal News*. Defendant Riggs personally
participated in the decision to redact the October 2014 issue of *Prison Legal
News*, including by overseeing distribution, if any, of unauthorized redacted
versions of the issue within all ADC facilities.

○ Defendant Jamie Guzman is or was the head of the Office of Publication
Review. Since Defendant Olson's retirement, she is or was and has been
personally responsible for the censorship decisions of the Office of
Publication Review, including decisions to redact content from publications.
Defendant Guzman personally participated in ADC's decision to censor the
April, May, and June 2017 issues of Prison Legal News, including by
reviewing these issues, by overseeing and executing any redactions made to
these issues, and by overseeing and executing the distribution, if any, of
unauthorized redacted versions of these issues within all ADC facilities.
Defendant Guzman directly oversaw the notice and appeal process provided

[3217590.2]

30

1    to Plaintiff in relationship to the censorship of the April, May, and June 2017

2    issues of *Prison Legal News*, including the provision of email notifications

3    which failed to identify the pages or articles containing the allegedly

4    objectionable material, requiring Plaintiff to consent to redaction of any

5    allegedly unauthorized content in Plaintiff's publication as a condition of any

6    appeal, and failing to provide copies of the redactions to Plaintiff either

7    before or after redacting the publications in order to enable Plaintiff to appeal

8    the additional censorship.  Defendants' counsel has represented that

9    Defendant  Guzman is no longer employed by the ADC; however, there has

10   been no specific stipulation or affirmation to that effect, and therefore PLN

11   cannot confirm the same.

12   Each Defendant refused to deliver PLN's publications in a timely manner (or at all, in

13   some instances) and refused to provide PLN with notice of the censorship. Each

14   Defendant's malicious and/or reckless disregard in the failure to permit delivery of PLN's

15   publications and, failing that, to provide PLN notice and an opportunity to be heard

16   regarding the censorship – despite the clear and long-standing First and Fourteenth

17   Amendment Constitutional rights afforded to publishers in PLN's position – subjects each

18   Defendant to damages under 42 U.S.C. § 1983.

19

20   **INTERROGATORY NO. 15:**

21        Explain in detail all specific facts and legal theories supporting your claim that any

22   part of any Arizona Department of Corrections Department Order is unconstitutional on its

23   face, including the number and effective date of all specific Department Orders claimed to

24   be unconstitutional on their face.

25   **RESPONSE TO INTERROGATORY NO. 15:**

26        Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is vague, overbroad, and calls for

a legal conclusion. Plaintiff's investigation and discovery is ongoing.

## AMENDED RESPONSE TO INTERROGATORY NO. 15:

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is vague and calls for a legal conclusion.

Subject to and without waiving any objections, Plaintiff responds as follows:

- Arizona Department of Corrections (ADC) policies, effective February 28, 2010, do not provide for any notice to be given to the publisher or sender when a publication or mailing is censored by ADC staff. ADC DO 914.02, Policy Number 1.7 specifies that "[u]nauthorized property or material discovered in incoming mail shall be removed," and a "Notice to Sender of Rejection of Incoming Mail, Form 909-3, shall be completed and sent to the inmate." The policy is explicit that the ADC "shall not pay for the cost of notifying the sender." ADC DO 914.02, Policy Number 1.7 violates constitutional requirements regarding notice to senders of mail to prison prisoners.

- Although ADC policy was changed as of March 4, 2016, it remains constitutionally invalid and Defendants fail to comply with the policy as changed. Under the changed policy, Defendants censored *Prison Legal News*'s March 2016 and April 2016 issues without providing any notice to PLN. PLN did not receive any notice from Defendants that the March 2016 issue, or any article in it, would not be delivered or was not delivered to the addressed recipients. PLN did not receive any notice from Defendants that the April 2016 issue, or any article in it, would not be delivered or was not delivered to the addressed recipients. At no time did Defendants provide an opportunity for PLN to appeal the rejection of its mail.

- Moreover, ADC policies explicitly prohibit appeals of "decisions to exclude publications" from ADC facilities. ADC DO 914.06, Policy Number 1.13 states that "[p]reviously excluded Publications shall not be re-submitted for

1    review or appeal under this Department Order." ADC DO 914.06, Policy

2    Number 1.13 violates constitutional requirements regarding due process for

3    senders of mail to prison prisoners.

4    • Similarly, while ADC DO 914.07, Policy Number 1.5 provides an

5    opportunity for a *prisoner recipient* of a publication deemed to contain

6    "Sexually Explicit Material" to request second-level review of ADC staff's

7    decision to exclude the publication, it has no such provision for the publisher

8    or sender to request a second-level review. ADC DO 914.07, Policy Number

9    1.5 violates constitutional requirements regarding due process for senders of

10   mail to prison prisoners.

11   • Defendants' policies prohibiting distribution of publications with sexual

12   content do not contain any exception for discussion of sexual acts in a non-

13   salacious manner for the purpose of discussing the facts underlying a

14   reported decision or legal proceeding, and are therefore overbroad.

15   • Finally, ADC D.O. 914.08 pertaining to "Unauthorized Publications and

16   Material" has no provision regarding providing notice to senders and an

17   opportunity to be heard and therefore violates constitutional requirements

18   regarding due process for senders of mail to prison prisoners. ADC D.O.

19   914.08 Policy Number 2.2 indicating that "Publications that contain detailed

20   content of any subjects listed above may be excluded" does not contain any

21   exception for the purpose of discussing the facts underlying a reported

22   decision or legal proceeding, and is therefore overbroad. Defendants

23   excluded *The Celling of America* from ADC facilities pursuant to DO

24   914.08, "Unauthorized Publications and Material," because of "Riots/Work

25   Stoppages/Resistance," under Policy Numbers 1.1.1. Defendants, however,

26   do not specify which page(s) of *The Celling of America* purportedly violated

     that policy. There are no materials in *The Celling of America* which "incite,

     aid, or abet riots, work stoppages, or means of resistance."

1    **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 15:**

2        Plaintiff incorporates by reference its preliminary statement set forth above.

3        Plaintiff objects to this Interrogatory to the extent that it is vague and calls for a

4    legal conclusion.

5        Subject to and without waiving any objections, Plaintiff responds as follows:

6        • Arizona Department of Corrections (ADC) Department Order 914, effective

7          February 26, 2010, did not provide for any notice to be given to the publisher

8          or sender when a publication or mailing is censored by ADC staff.  ADC DO

9          914.02, Policy Number 1.7 specifies that "[u]nauthorized property or

10         material discovered in incoming mail shall be removed," and a "Notice to

11         Sender of Rejection of Incoming Mail, Form 909-3, shall be completed and

12         sent to the inmate."  The policy is explicit that the ADC "shall not pay for

13         the cost of notifying the sender."  ADC DO 914.02, Policy Number 1.7

14         violates constitutional requirements regarding notice to senders of mail to

15         prison prisoners.

16       • Moreover, ADC policies explicitly prohibit appeals of "decisions to exclude

17         publications" from ADC facilities.  ADC DO 914.06, Policy Number 1.13

18         states that "[p]reviously excluded Publications shall not be re-submitted for

19         review or appeal under this Department Order."  ADC DO 914.06, Policy

20         Number 1.13 violates constitutional requirements regarding due process for

21         senders of mail to prison prisoners.

22       • Similarly, while ADC DO 914.07, Policy Number 1.5 provides an

23         opportunity for a *prisoner recipient* of a publication deemed to contain

24         "Sexually Explicit Material" to request second-level review of ADC staff's

25         decision to exclude the publication, it has no such provision for the publisher

26         or sender to request a second-level review.  ADC DO 914.07, Policy Number

      1.5 violates constitutional requirements regarding due process for senders of

      mail to prison prisoners.

- Defendants' policies prohibiting distribution of publications with sexual content do not contain any exception for discussion of sexual acts in a non-salacious manner for the purpose of discussing the facts underlying a reported decision or legal proceeding, and are therefore overbroad.

- Finally, ADC D.O. 914.08 pertaining to "Unauthorized Publications and Material" has no provision regarding providing notice to senders and an opportunity to be heard and therefore violates constitutional requirements regarding due process for senders of mail to prison prisoners. ADC D.O. 914.08 Policy Number 2.2 indicating that "Publications that contain detailed content of any subjects listed above may be excluded" does not contain any exception for the purpose of discussing the facts underlying a reported decision or legal proceeding, and is therefore overbroad. Defendants excluded *The Celling of America* from ADC facilities pursuant to DO 914.08, "Unauthorized Publications and Material," because of "Riots/Work Stoppages/Resistance," under Policy Numbers 1.1.1. Defendants, however, do not specify which page(s) of *The Celling of America* purportedly violated that policy. There are no materials in *The Celling of America* which "incite, aid, or abet riots, work stoppages, or means of resistance."

- Although ADC DO 914 was amended as of March 4, 2016, it remains constitutionally invalid and Defendants fail to comply with the policy as changed. Under the changed policy, Defendants censored *Prison Legal News*'s March 2016 and April 2016 issues without providing any notice to PLN. PLN did not receive any notice from Defendants that the March 2016 issue, or any article in it, would not be delivered or was not delivered to the addressed recipients. PLN did not receive any notice from Defendants that the March 2016 and April 2016 issues, or any article in them, would not be delivered or was not delivered to the addressed recipients. At no time did

Defendants provide an opportunity for PLN to appeal the rejection of its mail.

- Despite once again revising ADC D.O. 914 as of April 7, 2017, the policy remains constitutionally invalid on its face under the First and Fourteenth Amendments.

- The revised policy continues to be unconstitutional under the First Amendment. The revised policy creates an exception for otherwise unauthorized content contained within so-called "legal publication[s]" in certain circumstances. ADC DO 914.06, Policy Number 1.18 ("A legal publication that contains unauthorized content that is either (a) directly quoted from a trial or appellate court's decision, opinion, or order, or (b) otherwise taken from a court case, government publication, or news wire service (such as the Associated Press), shall not be withheld if the unauthorized content is reasonably necessary to understand the fundamental legal issue or legal principle of the legal publication.")

- The revised policy also creates an exception for sexual content contained in so-called "well-known and widely recognized" religious or literary works. Policy Number 1.19 ("Publications that contain nudity and/or descriptions of sexual behaviors/acts, or violent acts, shall not be withheld if such unauthorized content is within a publication commonly considered to constitute a well-known and widely recognized religious work (such as the Bible, the Koran, the Book of Mormon) or literary work (such as Shakespeare).").

- As drafted, these exceptions do not define their key terms or lay out any standard to be applied. DO 914 does not define "legal publication" or "well known and widely recognized." DO 914 does not offer guidance as to what content "is reasonably necessary to understand the fundamental legal issue or legal principle of the legal publication." Defendants have failed to apply

[3217590.2]

36

these exceptions to ostensibly deserving publications.  In practice, the amended DO 914 continues to contain no exception for the discussion of sexual acts in a non-salacious manner for journalistic purposes.  ADC's changed policy remains unconstitutionally overbroad, void for vagueness, and serves no legitimate penological interest.

- The April 7, 2017 D.O. 914 policy also continues to be unconstitutional under the Fourteenth Amendment.
- ADC DO 914.06, Policy Number 1.17's email notice is not a constitutionally adequate alternative to notice by U.S. mail because it is not sufficiently reliable to ensure notice. The email notification provided by Defendants to censored publishers fails to identify the pages or articles containing the allegedly objectionable material. The email notification provided by Defendants to censored publishers also requires a publisher to consent to Defendants' redaction of any allegedly unauthorized content, as a condition of any appeal. Further, Defendants fail to provide censored publishers with their redactions, before or after redacting a publication, which impedes any meaningful appeal of that additional act of censorship.

**INTERROGATORY NO. 16:**

Explain in detail all specific facts and legal theories supporting your claim that any part of any Arizona Department of Corrections Department Order is unconstitutional as applied, including the number and effective date of all specific Department Orders claimed to be unconstitutional as applied and the specific publications to which they were allegedly unconstitutionally applied.

**RESPONSE TO INTERROGATORY NO. 16**

Plaintiff incorporates by reference its preliminary statement set forth above. Plaintiff objects to this Interrogatory to the extent that it is vague, overbroad, and calls for a legal conclusion. Plaintiff's investigation and discovery is ongoing.

[3217590.2]

37

**AMENDED RESPONSE TO INTERROGATORY NO. 16**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is vague and calls for a legal conclusion.

Subject to and without waiving any objections, Plaintiff responds as follows:

- Defendants' decision to censor the March 2014 issue of *Prison Legal News* because of "Riots/Work Stoppages/Resistance," and "Unacceptable Sexual or Hostile Behaviors," on the basis of D.O. 914.08, Policy Numbers 1.1.1 and 1.1.18 is unconstitutional as applied to PLN because it censored the entirety of that issue of the publication: (i) without a valid, rational connection between the content of that issue and the legitimate penological interest in safety and security represented by D.O. 914.08, Policy Numbers 1.1.1 and 1.1.18; (ii) without a reasonable alternative means for PLN to exercise its First Amendment right to communicate with prisoners; (iii) despite the fact that permitting PLN to communicate to prisoners through its March 2014 issue would not have had an impact on guards and other inmates, and on the allocation of prison resources generally; and (iv) despite the fact that allowing the delivery of the March 2014 issue of *Prisoner Legal News* to prisoners, as other Departments of Correction did, was a ready alternative to Defendants' censorship decision. Moreover, Defendants' decision was unconstitutional as applied to PLN in that it did not specify which article(s) or page(s) of the March 2014 issue of *Prison Legal News* purportedly violated those policies, nor did it provide PLN adequate notice and an opportunity to be heard – having only been communicated to PLN after Defendants had already censored that issue.

- Defendants' decision to censor the April 2014 issue of *Prison Legal News* because of "Unacceptable Sexual or Hostile Behaviors," on the basis of D.O. 914.08, Policy Number 1.1.18 is unconstitutional as applied to PLN because

it censored the entirety of that issue of the publication: (i) without a valid, rational connection between the content of that issue and the legitimate penological interest in safety and security represented by D.O. 914.08, Policy Number 1.1.18; (ii) without a reasonable alternative means for PLN to exercise its First Amendment right to communicate with prisoners; (iii) despite the fact that permitting PLN to communicate to prisoners through its April 2014 issue would not have had an impact on guards and other inmates, and on the allocation of prison resources generally; and (iv) despite the fact that allowing the delivery of the April 2014 issue of *Prison Legal News* to prisoners, as other Departments of Correction did, was a ready alternative to Defendants' censorship decision.  Moreover, Defendants' decision was unconstitutional as applied to PLN in that it did not specify which article(s) or page(s) of the April 2014 issue of *Prison Legal News* purportedly violated those policies, nor did it provide PLN adequate notice and an opportunity to be heard – having only been communicated to PLN after Defendants had already censored that issue.

- Defendants' decision to censor the July 2014 issue of *Prison Legal News* because the publication "feature[d] nudity and/or sexual behaviors and/or the publication is promoted based on such depictions" on the basis of D.O. 914.07, Policy Numbers 1.1 through 1.2.2.6, is unconstitutional as applied to PLN because it censored the entirety of that issue of the publication: (i) without a valid, rational connection between the content of that issue and the legitimate penological interest in safety and security represented by D.O. 914.07, Policy Numbers 1.1 through 1.2.2.6; (ii) without a reasonable alternative means for PLN to exercise its First Amendment right to communicate with prisoners; (iii) despite the fact that permitting PLN to communicate to prisoners through its July 2014 issue would not have had an impact on guards and other inmates, and on the allocation of prison resources

1    generally; and (iv) despite the fact that allowing the delivery of the July 2014

2    issue of *Prison Legal News* to prisoners, as other Departments of Correction

3    did, was a ready alternative to Defendants' censorship decision.  Moreover,

4    Defendants' decision was unconstitutional as applied to PLN in that it did

5    not specify which article(s) or page(s) of the July 2014 issue of *Prison Legal*

6    *News* purportedly violated those policies, nor did it provide PLN adequate

7    notice and an opportunity to be heard – having only been communicated to

8    PLN after Defendants had already censored that issue.

9    •   Defendants' decision to censor the October 2014 issue of *Prison Legal News*

10    because of "Sexually Explicit Material" on the basis of D.O. 914.07, is

11    unconstitutional as applied to PLN because it censored the entirety of that

12    issue of the publication: (i) without a valid, rational connection between the

13    content of that issue and the legitimate penological interest in safety and

14    security represented by D.O. 914.07; (ii) without a reasonable alternative

15    means for PLN to exercise its First Amendment right to communicate with

16    prisoners; (iii) despite the fact that permitting PLN to communicate to

17    prisoners through its October 2014 issue would not have had an impact on

18    guards and other inmates, and on the allocation of prison resources generally;

19    and (iv) despite the fact that allowing the delivery of the October 2014 issue

20    of *Prison Legal News* to prisoners, as other Departments of Correction did,

21    was a ready alternative to Defendants' censorship decision. Moreover,

22    Defendants' decision was unconstitutional as applied to PLN in that it did

23    not specify which article(s) or page(s) of the October 2014 issue of *Prison*

24    *Legal News* purportedly violated those policies, nor did it provide PLN

25    adequate notice and an opportunity to be heard – having only been

26    communicated to PLN after Defendants had already censored that issue.

•   Defendants' decision to censor the PLN-distributed book *The Celling of*

*America* under the justifications of "Unauthorized Publications and Material"

and "Riots/Work Stoppages/Resistance" pursuant to D.O. 914.08, is
unconstitutional as applied to PLN because it censored the entire book: (i)
without a valid, rational connection between the content of any portion of the
book and the legitimate penological interest in safety and security
represented by D.O. 914.08; (ii) without a reasonable alternative means for
PLN to exercise its First Amendment right to communicate with prisoners;
(iii) despite the fact that permitting PLN to communicate to prisoners
through the book would not have had an impact on guards and other inmates,
and on the allocation of prison resources generally; and (iv) despite the fact
that allowing the delivery of the book to prisoners, as other Departments of
Correction do, was a ready alternative to Defendants' censorship decision.
Moreover, Defendants' decision was unconstitutional as applied to PLN in
that it did not specify which chapter(s) or page(s) of the book purportedly
violated those policies, nor did it provide PLN adequate notice and an
opportunity to be heard – having only been communicated to PLN after
Defendants had already censored that book.

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 16**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is vague and calls for a
legal conclusion.

Subject to and without waiving any objections, Plaintiff responds as follows:

- Defendants' decision to censor the March 2014 issue of *Prison Legal News*
  because of "Riots/Work Stoppages/Resistance," and "Unacceptable Sexual
  or Hostile Behaviors," on the basis of D.O. 914.08, effective February 26,
  2010, Policy Numbers 1.1.1 and 1.1.18 is unconstitutional as applied to PLN
  because it censored the entirety of that issue of the publication: (i) without a
  valid, rational connection between the content of that issue and the legitimate
  penological interest in safety and security represented by D.O. 914.08, Policy

1    Numbers 1.1.1 and 1.1.18; (ii) without a reasonable alternative means for

2    PLN to exercise its First Amendment right to communicate with prisoners;

3    (iii) despite the fact that permitting PLN to communicate to prisoners

4    through its March 2014 issue would not have had an impact on guards and

5    other inmates, and on the allocation of prison resources generally; and (iv)

6    despite the fact that allowing the delivery of the March 2014 issue of

7    *Prisoner Legal News* to prisoners, as other Departments of Correction did,

8    was a ready alternative to Defendants' censorship decision.  Moreover,

9    Defendants' decision was unconstitutional as applied to PLN in that it did

10   not specify which article(s) or page(s) of the March 2014 issue of *Prison*

11   *Legal News* purportedly violated those policies, nor did it provide PLN

12   adequate notice and an opportunity to be heard – having only been

13   communicated to PLN after Defendants had already censored that issue.

14   ○ Defendants' decision to censor the April 2014 issue of *Prison Legal News*

15   because of "Unacceptable Sexual or Hostile Behaviors," on the basis of D.O.

16   914.08, effective February 26, 2010, Policy Number 1.1.18 is

17   unconstitutional as applied to PLN because it censored the entirety of that

18   issue of the publication: (i) without a valid, rational connection between the

19   content of that issue and the legitimate penological interest in safety and

20   security represented by D.O. 914.08, Policy Number 1.1.18; (ii) without a

21   reasonable alternative means for PLN to exercise its First Amendment right

22   to communicate with prisoners; (iii) despite the fact that permitting PLN to

23   communicate to prisoners through its April 2014 issue would not have had

24   an impact on guards and other inmates, and on the allocation of prison

25   resources generally; and (iv) despite the fact that allowing the delivery of the

26   April 2014 issue of *Prison Legal News* to prisoners, as other Departments of

Correction did, was a ready alternative to Defendants' censorship decision.

Moreover, Defendants' decision was unconstitutional as applied to PLN in

[3217590.2]

42

that it did not specify which article(s) or page(s) of the April 2014 issue of *Prison Legal News* purportedly violated those policies, nor did it provide PLN adequate notice and an opportunity to be heard – having only been communicated to PLN after Defendants had already censored that issue.

- Defendants' decision to censor the July 2014 issue of *Prison Legal News* because the publication "feature[d] nudity and/or sexual behaviors and/or the publication is promoted based on such depictions" on the basis of D.O. 914.07, effective February 26, 2010, Policy Numbers 1.1 through 1.2.2.6, is unconstitutional as applied to PLN because it censored the entirety of that issue of the publication: (i) without a valid, rational connection between the content of that issue and the legitimate penological interest in safety and security represented by D.O. 914.07, Policy Numbers 1.1 through 1.2.2.6; (ii) without a reasonable alternative means for PLN to exercise its First Amendment right to communicate with prisoners; (iii) despite the fact that permitting PLN to communicate to prisoners through its July 2014 issue would not have had an impact on guards and other inmates, and on the allocation of prison resources generally; and (iv) despite the fact that allowing the delivery of the July 2014 issue of *Prison Legal News* to prisoners, as other Departments of Correction did, was a ready alternative to Defendants' censorship decision.  Moreover, Defendants' decision was unconstitutional as applied to PLN in that it did not specify which article(s) or page(s) of the July 2014 issue of *Prison Legal News* purportedly violated those policies, nor did it provide PLN adequate notice and an opportunity to be heard – having only been communicated to PLN after Defendants had already censored that issue.

- Defendants' decision to censor the October 2014 issue of *Prison Legal News* because of "Sexually Explicit Material" on the basis of D.O. 914.07, effective February 26, 2010, is unconstitutional as applied to PLN because it

censored the entirety of that issue of the publication: (i) without a valid, rational connection between the content of that issue and the legitimate penological interest in safety and security represented by D.O. 914.07; (ii) without a reasonable alternative means for PLN to exercise its First Amendment right to communicate with prisoners; (iii) despite the fact that permitting PLN to communicate to prisoners through its October 2014 issue would not have had an impact on guards and other inmates, and on the allocation of prison resources generally; and (iv) despite the fact that allowing the delivery of the October 2014 issue of *Prison Legal News* to prisoners, as other Departments of Correction did, was a ready alternative to Defendants' censorship decision. Moreover, Defendants' decision was unconstitutional as applied to PLN in that it did not specify which article(s) or page(s) of the October 2014 issue of *Prison Legal News* purportedly violated those policies, nor did it provide PLN adequate notice and an opportunity to be heard – having only been communicated to PLN after Defendants had already censored that issue.

• Defendants' decision to censor the PLN-distributed book *The Celling of America* under the justifications of "Unauthorized Publications and Material" and "Riots/Work Stoppages/Resistance" pursuant to D.O. 914.08, effective February 26, 2010, is unconstitutional as applied to PLN because it censored the entire book: (i) without a valid, rational connection between the content of any portion of the book and the legitimate penological interest in safety and security represented by D.O. 914.08; (ii) without a reasonable alternative means for PLN to exercise its First Amendment right to communicate with prisoners; (iii) despite the fact that permitting PLN to communicate to prisoners through the book would not have had an impact on guards and other inmates, and on the allocation of prison resources generally; and (iv) despite the fact that allowing the delivery of the book to prisoners, as other

Departments of Correction do, was a ready alternative to Defendants' censorship decision. Moreover, Defendants' decision was unconstitutional as applied to PLN in that it did not specify which chapter(s) or page(s) of the book purportedly violated those policies, nor did it provide PLN adequate notice and an opportunity to be heard – having only been communicated to PLN after Defendants had already censored that book.

- Under ADC DO 914, effective March 4, 2016, Defendants censored *Prison Legal News*'s March 2016 and April 2016 issues without providing any notice to PLN.

- Under the April 7, 2017 Revised ADC D.O. 914, unconstitutional censorship of Prison Legal News, in violation of the First and Fourteenth Amendments has continued. Defendants have censored the April, May, June and November 2017 issues of Prison Legal News, despite their purported exceptions. Defendants have never applied these exceptions to any publication to date, including to ostensibly deserving publications. In practice, the changed policy continues to contain no exception for the discussion of sexual acts in a non-salacious manner for journalistic purposes.

- Defendants have also censored the April, May, June and November 2017 issues of PLN without adequate process in violation of the Due Process Clause of the Fourteenth Amendment.

- Defendants censored the April 2017 issue of PLN due to an article on page 56 of the issue, entitled "Site of Gruesome Prison Riot Becomes New Mexico Tourist Attraction." The article was censored for containing sexual content under current ADC DO 914.07 at Policy Numbers 1.2.2.2, 1.2.2.3, 1.2.2.6, & 1.2.17. This article was also censored under current ADC DO 914.07 at Policy Numbers 1.1, 1.2.3, 1.2.16, & 1.2.20, despite the absence of any content in the article which "promote[s]" violence, or would "incite, aid, or abet" behavior detrimental to security.

- Defendants censored the May 2017 issue of PLN for articles found on pages 3-4, 8, 30-31, and 59-60 of the issue, entitled "Registration, Tracking of Sex Offenders Drives Mass Incarceration Numbers and Costs," "Vigilantes Assault, Rob and Murder Registered Sex Offenders," "Four Prisoners Murdered at South Carolina Facility," and "$25,000 Federal Jury Award in Suit over Teenager Raped in Oklahoma Jail." Defendants censored these articles for containing sexual content under current ADC DO 914.07 at Policy Numbers 1.2.2.1, 1.2.2.3, 1.2.2.6, & 1.2.17.These articles were also censored under current ADC DO 914.07 at Policy Numbers 1.1, 1.2.16, & 1.2.20, despite the absence of any content in these articles which "promote[s]" violence.

- Defendants censored the June 2017 issue for articles on pages 3-4, 52, 62, 63, and 65 of the issue. These articles were censored for containing sexual content under current ADC DO 914.07 at Policy Numbers 1.2.2.1, 1.2.2.3, 1.2.2.4, 1.2.2.5, 1.2.2.6, & 1.2.17. These articles were also censored under current ADC DO 914.07 at Policy Numbers 1.1, 1.2.3, 1.2.7, 1.2.12, 1.2.16, 1.2.20, despite the absence of any content in the articles which "promote[s]" violence, "[d]epict[s] or descri[bes], or promot[es]" drug use or manufacture, would "incite, aid, or abet" behavior detrimental to security, or which "depicts, encourages, or describes methods of escape."

- Defendants redacted the April, May, and June 2017 issues of *Prison Legal News* without authorization from PLN and without providing a copy of the redacted issues to allow PLN to appeal the additional censorship, and that Defendants have distributed the redacted versions of the April and May issues to at least some prisoners within ADC.

- Defendants have not allowed the November 2017 issue to be distributed within ADC to date. Defendants have censored the November 2017 issue for articles on the cover page and pages 1-14 for containing sexual content under

current ADC DO 914.07 at Policy Numbers 1.2.2.4 and 1.2.2.6.  To Plaintiff's knowledge, Plaintiff did not receive any notification or opportunity to appeal the censorship of the November 2017 issue.

- The email notification Defendants provided to PLN regarding their censorship of the April and May 2017 issues of *Prison Legal News* was not timely received by PLN.

- Moreover, the email notifications Defendants provided to PLN regarding their censorship of the April, May, and June 2017 issue of *Prison Legal News* did not identify the pages or articles containing the allegedly objectionable material and unconstitutionally required PLN to consent to the Office of Publication Review's redaction of any allegedly unauthorized material in order to appeal the censorship decision.

**INTERROGATORY NO. 17:**

Explain in detail all specific facts and legal theories supporting your claim that any part of any Arizona Department of Corrections Department Order is invalid under *Turner v. Safely*, 482 U.S. 78 (1987), including the number and effective date of all specific Department Orders claimed to be invalid under *Turner v. Safely*.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff incorporates by reference its preliminary statement set forth above.

Plaintiff objects to this Interrogatory to the extent that it is vague, overbroad and calls for a legal conclusion. Plaintiff's investigation and discovery is ongoing.  Subject to and without waiving any objections, Plaintiff responds as follows: PLN does not allege that any part of any Arizona Department of Corrections Department Order is invalid, but that some parts are unconstitutional and result in violation of PLN's First and Fourteenth Amendment rights.

**AMENDED RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff incorporates by reference its preliminary statement set forth above.

1       Plaintiff objects to this Interrogatory to the extent that it is vague and calls for a

2   legal conclusion.

3       Subject to and without waiving any objections, Plaintiff responds as follows:

4   *See* Amended Response to Interrogatory No. 16 above.

5

6

7       I declare under penalty of perjury under the laws of the United States and the State

8   of Florida that the foregoing is true and correct, and that this declaration is executed at

9   Lake Worth, Florida this 24th day of January, 2018.

10

11

12                                */s/ Paul Wright*
                                  _____

13                                 Paul Wright

14

15

16

17

18

19

20

21

22

23

24

25

26

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and **not a party to this action.** I am employed in the County of San Francisco, State of California. My business address is 50 Fremont Street, 19th Floor, San Francisco, CA 94105-2235.

On January 24, 2018, I served true copies of the following document(s) described as:

Plaintiff's Second Amended Response to Defendants' 1st Set of Interrogatories

on the interested parties in this action as follows:

**Michael E. Gottfried**
**Assistant Attorneys General**
**2005 North Central Avenue**
**Phoenix, AZ 85004-1592**

**BY FEDEX:** I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 24, 2018, at San Francisco, California.


Katherine C. Hamilton

[3217891.1]

1        Plaintiff objects to this Interrogatory to the extent that it is vague and calls for a

2    legal conclusion.

3        Subject to and without waiving any objections, Plaintiff responds as follows:

4    *See* Amended Response to Interrogatory No. 16 above.

5

6

7        I declare under penalty of perjury under the laws of the United States and the State

8    of Florida that the foregoing is true and correct, and that this declaration is executed at

9    Lake Worth, Florida this 24th day of January, 2018.



Paul Wright

**Attachment 9**

Lisa Ells – Cal. Bar No. 243657*
Krista Stone-Manista – Cal. Bar No. 269083*
Andrew G. Spore – Cal. Bar No. 308756*
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone: (415) 433-6830
lells@rbgg.com
kstone-manista@rbgg.com
aspore@rbgg.com

Sabarish Neelakanta – Fla. Bar No. 26623*
Daniel Marshall – Fla. Bar No. 617210*
Masimba Mutamba – Fla. Bar No. 102772*HUMAN RIGHTS DEFENSE CENTER
Post Office Box 1151
Lake Worth, Florida 33460-1151
Telephone: (561) 360-2523
sneelakanta@hrdc-law.org
dmarshall@hrdc-law.org
mmutamba@hrdc-law.org

David J. Bodney – Ariz. Bar No. 006065
Michael A. DiGiacomo – Ariz. Bar No. 032251
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone:   (602) 798-5400
bodneyd@ballardspahr.com
horrocksh@ballardspahr.com
digiacomom@ballardspahr.com

* Admitted *Pro Hac Vice*

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Prison Legal News, a project of the Human Rights Defense Center,<br><br>Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>Defendants. | No. CV15-02245-PHX-ROS<br><br>**PLAINTIFF'S AMENDED OBJECTIONS AND RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES** |

[3217801.2]

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES**

Plaintiff Prison Legal News ("PLN"), a project of the Human Rights Defense Center ("Plaintiff") hereby responds to Defendants' Second Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

No incidental or implied admissions are intended in these responses. Plaintiff's responses to all or any part of the Interrogatories should not be taken as an admission that: (1) Plaintiff accepts or admits the existence of any fact(s) set forth or assumed by that Interrogatory or (2) Plaintiff's response constitutes admissible evidence. Plaintiff's response to all or any part of an Interrogatory is not intended to be, and shall not be, a waiver by Plaintiff of all or any part of his objection(s) to that Interrogatory. In addition, each of Plaintiff's answers to an Interrogatory or part of any Interrogatory is not a waiver of part or all of any objection Plaintiff might make to that form of Interrogatory. Plaintiff asserts these objections without waiving or intending to waive any objections as to competency, relevancy, materiality or privilege.

The responses herein are based solely on the investigation and discovery conducted in this litigation. Without incurring an obligation to do so, Plaintiff fully reserves the right to supplement, amend or modify these responses as its discovery and investigation continue.

Plaintiff's responses are provided solely for the purpose of litigation in the matter of *Prison Legal News v. Charles L. Ryan; et al, CV-15-02245-PHX-ROS*, and may not be used

[3217801.2]

2

1    for any other purpose.  Subject to this Preliminary Statement, Plaintiff responds as follows:

2    **GENERAL OBJECTIONS**

3

4    1.    Plaintiff provides the following responses subject to all objections as to

5    competence, relevance, materiality, propriety, admissibility, privacy, privilege, and any and

6    all other objections that would require exclusion of any statement contained herein if any

7    such Interrogatories were asked of, or any statement contained herein were made by, a

8    witness present and testifying in court, all of which objections and grounds are reserved and

9    may be interposed at the time of trial.

10   2.    Plaintiff provides the following responses on the assumption that Defendants,

11   in serving these Interrogatories, did not intend to seek information protected against

12   discovery by the attorney-client privilege, the work product doctrine, or which contain or

13   reflect the impressions, conclusions, opinions, legal research, or theories of attorneys for

14   Plaintiff.  To the extent that Defendants' Interrogatories or any part thereof are intended to

15   elicit such information, Plaintiff objects thereto and asserts the foregoing privileges to the

16   fullest extent permitted by law.

17   3.    Plaintiff further objects to each Interrogatory to the extent that it asks for

18   admissions that are not relevant to the subject matter of this litigation.

19   4.    Plaintiff objects to each Interrogatory to the extent that it is vague and

20   ambiguous and does not include adequate definition, specificity, or limiting factors,

21   including but not limited to a narrowing timeframe, overly broad, unduly burdensome

22   and/or oppressive.  Plaintiff further objects to each Interrogatory to the extent that it is

23   duplicative of, and seeks the same materials as, one or more additional Interrogatories.

24   5.    Plaintiff objects to each Interrogatory to the extent that it prematurely seeks

25   documents and/or information relevant to Plaintiff's expert witness reports and/or trial

26   presentation.  Plaintiff also has not to date received all discovery from Defendants to which

1   it is entitled.  Plaintiff reserves the right, notwithstanding these answers and responses, to

2   employ at trial or in any pretrial proceeding herein information subsequently obtained or

3   discovered, information the materiality of which is not presently ascertained, or information

4   Plaintiff does not regard as coming within the scope of each Interrogatory as Plaintiff

5   understands it.

6          6.      Plaintiff objects generally to each Interrogatory that involves an opinion or

7   contention that relates to fact or the application of law to fact upon the ground that such

8   Interrogatories are premature and inappropriate.

9          7.      Plaintiff objects to each Interrogatory to the extent that it is unduly

10   burdensome because much or all of the information requested therein is in the possession of

11   Defendants or is otherwise equally or more available to Defendants than to Plaintiff.

12   Plaintiff further objects to each Interrogatory to the extent that it demands documents and/or

13   information available to Defendants through public sources or records, or through the

14   extensive documents, records and information that are already in Defendants' custody,

15   possession and control, on the grounds that such Interrogatories subject Plaintiff to

16   unreasonable and undue annoyance, oppression, burden and expense.

17

18          Subject to and without waiving the foregoing objections, and incorporating them by

19   reference into each of the responses provided below, Plaintiff hereby responds as follows:

20   **INTERROGATORY NO. 18:**

21          Plaintiff has challenged Arizona Department of Correction's ("ADC") regulations

22   or Department Orders ("DO") as unconstitutional under *Turner v. Safely*, 482 U.S. 78

23   (1987). *See, e.g.* Doc. 36 at 3.  In *Turner,* the Supreme Court identified four factors to

24   consider when determining whether a regulation is reasonably related to legitimate

25   penological interests.  The fourth of those four factors is the "absence of ready

26   alternatives." *Id.* at 89-90. "The burden is on the plaintiff to show an alternative that fully

1  accommodates [its] rights at *de minimis* cost to valid penological interests." *Nelson v.*

2  *Woodford*, C04-03684 CRB (PR), 2006 WL 571359, *4 (N.D. Cal. Mar. 2, 2006), *aff'd,*

3  249 Fed. Appx. 529 (9th Cir. 2007) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 418

4  (1989)).  For the purposes of this interrogatory, ADC asserts that its valid penological

5  interests are set-out in DO 914.07-1.1.

6      Identify each and every ADC regulation or DO you claim is unconstitutional and

7  for each identify in detail all alternatives that Plaintiff claims, or will claim, fully

8  accommodates its rights at a *de minimis* cost to valid penological interests.

9  **RESPONSE TO INTERROGATORY NO. 18:**

10     Plaintiff incorporates by reference its preliminary statement and general objections

11  set forth above. Plaintiff objects to this Interrogatory to the extent that it is overbroad,

12  unduly burdensome, and premature to demand that Plaintiff compile a list of all facts

13  supporting PLN's claims before the completion of discovery.  Plaintiff states that both the

14  2016 and 2010 iterations of D.O. 914 are unconstitutional both as written and as applied to

15  Plaintiff, but Plaintiff is unable to identify a complete list of alternatives available to

16  Defendants until it ascertains not only the complete set of penological interests that

17  Defendants intend to rely upon to support their regulations, but also the foundations and

18  rationales for those asserted interests, which will be explored at the deposition of the

19  Arizona Department of Corrections 30(b)(6) deponent.  Plaintiff's investigation and

20  discovery is ongoing.  Notwithstanding the foregoing objections, Plaintiff will supplement

21  its response to this premature interrogatory at an appropriate time.

22  **AMENDED RESPONSE TO INTERROGATORY NO. 18:**

23     Plaintiff incorporates by reference its preliminary statement and general objections

24  set forth above. Plaintiff objects to this Interrogatory to the extent that it is overbroad and

25  unduly burdensome.  Plaintiff states that all three of the 2017, 2016, and 2010 iterations of

26

D.O. 914 are unconstitutional both as written and as applied to Plaintiff.  Plaintiff states the following alternatives to the censorship of its publications:

1. Authorizing uncensored delivery of any and all issues of *Prison Legal News* as all three iterations of Defendants' mail policy do not satisfy the factors espoused in *Turner v. Safely*, 482 U.S. 78 (1987);

2. Narrowing the threshold for censorship of textual sexual content, such as by permitting delivery of materials that do not feature salacious and/or obscene written descriptions of or references to sex or sexual activity.


I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct, and that this declaration is executed at Lake Worth, Florida this 24th day of January, 2018.

*/s/ Paul Wright*

———————————————
Paul Wright

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is 50 Fremont Street, 19th Floor, San Francisco, CA 94105-2235.

On January 24, 2018, I served true copies of the following document(s) described as:

Plaintiff's Amended Response to Defendants' 2nd Set of Interrogatories

on the interested parties in this action as follows:

**Michael E. Gottfried**
**Assistant Attorneys General**
**2005 North Central Avenue**
**Phoenix, AZ 85004-1592**

**BY FEDEX:** I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 24, 2018, at San Francisco, California.

_____
Katherine C. Hamilton

[3217889.1]

FEB 05 2018

D.O. 914 are unconstitutional both as written and as applied to Plaintiff.  Plaintiff states the following alternatives to the censorship of its publications:

1.  Authorizing uncensored delivery of any and all issues of *Prison Legal News* as all three iterations of Defendants' mail policy do not satisfy the factors espoused in *Turner v. Safely*, 482 U.S. 78 (1987);

2.  Narrowing the threshold for censorship of textual sexual content, such as by permitting delivery of materials that do not feature salacious and/or obscene written descriptions of or references to sex or sexual activity.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct, and that this declaration is executed at Lake Worth, Florida this 24th day of January, 2018.

Paul Wright