# Exhibit C

# Prison Legal News

VOL. 25  No. 4
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

April 2014

# An Interview with Noam Chomsky on Criminal Justice and Human Rights

O**N FEBRUARY 5, 2014,** *PRISON LEGAL News* editor Paul Wright interviewed Noam Chomsky, 75, at his home in Lexington, Massachusetts. Professor Chomsky is the foremost dissident intellectual in the United States, and for decades has been a prominent critic of U.S. foreign policy, human rights abuses, imperialism and the media's facilitation of same. He is also one of the world's eminent linguists and has been a professor of linguistics at the Massachusetts Institute of Technology since 1955. He was arrested and jailed for anti-war activism in the 1960s.

The author of dozens of books on politics, media analysis, foreign policy and other issues, Professor Chomsky was also one of *PLN*'s earliest subscribers and has corresponded with Paul on various topics since the early 1990s. However, in his books, essays and interviews, Professor Chomsky has rarely addressed human rights abuses in the United States with respect to policing and prisons – until now.

While Professor Chomsky agreed to be interviewed by *PLN*, scheduling was difficult due to his extensive travel and speaking schedule. It turned out that the day of the interview was also the day a massive snowstorm hit Boston, and he did not come into work. He graciously agreed to conduct the interview at his home, and Paul and *PLN* advertising director Susan Schwartzkopf made an adventurous cab ride through the snowstorm to his house.

We extend our thanks to Professor Chomsky for this interview and to his assistant, Beverly Stohl, for making the necessary arrangements.



*Noam Chomsky*

• • •

**PAUL WRIGHT: I think one of the things that's interesting is I've been reading your work since I was in high school, and I would say that for at least 30 years now, 30-plus years, I've been reading your work and all the interviews that you've done, and very few people ever ask you about domestic issues.**

**NOAM CHOMSKY**: Really?

**PW**: Yes. About domestic stuff, in terms of ... you know, they ask you about human rights in other countries, but not about human rights in this country. I think you did one interview in the mid-90s which we reprinted in *Prison Legal News*.

**NC**: There are many. I don't know what happens to them. There are so many, I can't keep track. There's several a day.

**PW**: Okay. My first question, Professor Chomsky, is the United States talks about human rights abroad but not domestically. Why is that? Why aren't Americans deemed to have human rights while people overseas are?

**NC**: Well, first of all, it's not true that people overseas are. We talk about human rights in enemy states, but we don't talk about them in our own client states. So, for example, compare, say, Eastern Europe and Latin America. Eastern Europe was Soviet domain in the post-Stalin, post-Second World War period, up until 1990. Eastern Europe was dominated by the Soviet Union. And there's an enormous amount of discussion about human rights in Eastern Europe. Human Rights Watch, the organization, pretty much grew out of Helsinki Watch, which was concerned specifically with Eastern Europe.

Well, what about the U.S. domains during the same period? Say, roughly 1960

## INSIDE

| | |
|---|---|
| From the Editor | 16 |
| Prison Food Allergy Policies | 18 |
| $15 Million Settlement in NM | 20 |
| Recidivism & Family Communication | 24 |
| Arkansas DOC Suing Prisoners | 30 |
| TASERs May Cause Heart Attacks | 34 |
| Mass Incarceration by the Numbers | 36 |
| GPS Monitoring Problems in LA | 40 |
| Book Review: The Redbook | 43 |
| PLN Awarded Fees, Costs in OR Suit | 44 |
| Prisoner Organ Transplants, Donations | 52 |
| Excessive Force Claims in Oregon | 54 |
| News in Brief | 56 |

# DON'T LET THE TIME DO YOU.
# STAY CONNECTED!

**Guaranteed savings of up to 90%** on your long distance, out-of-state, and international calls from Federal prisons, county jails and State prisons.

### Best Rates and Plans

Multi-number Friends & Family Package for as little as $10.00/month

More plans & more numbers than any operator -

### No Hidden Fees

**What We Say Is What You Pay** – NO additional "fees", "charges" or "surcharges"

International calls are billed only on call acceptance. No bogus rounding

### No Contracts, No Penalties, No Hassles

No long term commitments – Service is always month – to – month. Cancel at anytime with NO penalties and NO cancellation fees with just a phone call or an e-mail.

### Fast and EZ Setup

We **ALWAYS** have numbers and can set up instantaneously online or on the phone.

## Special Commitment, Civil Detention & Halfway House

$0.40 connection charge from payphones lowest in the business

Voice Mail and Call Recording options

Call, write, e-mail or have your loved ones check out our website for more information.

SP Telecom
1220 Broadway - # 801-A
New York, NY 10001
www.inmatefone.com
e-mail: clients@inmatefone.com
Español: soporte@inmatefone.com
Call:      1(845)326-5300   (Collect calls are NOT accepted)
Español: 1(845)342-8110    (Llamadas por cobrar no se aceptan)

Some restrictions apply. Plan availability depends on the Institution

# NO PERMITA QUE EL TIEMPO
# LE SEPARE DE SU FAMILIA!

**Garantizamos  ahorros de hasta el 90%** en sus llamadas de larga distancia,entre estados, y en las llamadas internacionales desde prisiones federales,estatales y locales.

### Los mejores Planes y Tarifas

Plan para familias y amigos con varios numeros por tan solo $10.00/ mes .

Mas planes y numerous que ningun otro operador .

### No hay letra pequeña

**Lo Que Ves Es Lo Que Pagas**, NO hay ningun otro cargo extra.

Las llamadas internacionales solo se facturan cuando es aceptada por el familiar al otro lado del hilo telefonico.

**No hay contrato , permanencia ni ningun tipo de travas** .

El servicio siempre se ofrece en base a un mes de duracion pudiendo renovar el mismo todo los meses sin ningun cargo por la terminacion del servicio  y lo puede solicitor con una simple llamada de telefono o con un correo electronico (E-MAIL)

### La solicitud se puede hacer rapida y muy facil .

Nosotros siempre tenemos numerous y podemos procesar to registro inmediatamente  en lines o por telefono.

**Detenidos civiles en carceles especiales y reclusos en camino a casas de medio camino le ofrecesmos los siguientes servicios.**

$0.40 de recarfo desde telefonos de prepago, la tarifa mas baja en el sector  .

Buzon de Voz  y la posibilidad de grabar las llamadas .



Inmatefone
Keeping You In Touch

**Prison Legal News**

*a publication of the*
*Human Rights Defense Center*

www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg,
Derek Gilna, Gary Hunter,
David Reutter, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel
Robert Jack—Staff Attorney

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

Prison Legal News
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## Noam Chomsky Interview (cont.)

to 1990? You take a look at the scholarly literature, it's quite straight. Human rights in the U.S. domains of Latin America were under vastly greater attack than in Eastern Europe. It's true whether you look at the murders, torture, incarceration, slaughters the U.S. was carrying out, including a major war against the Church. The story after Vatican II, really, there were lots of religious martyrs.

So in 1989, the Berlin Wall falls. A lot of, you know, justified excitement; there's liberation in Eastern Europe. And what happens in Central America at that time? Well, shortly after the Berlin Wall fell, a Salvadoran brigade, the Atlacatl Brigade, U.S.-trained, U.S.-armed, fresh from renewed training at the John F. Kennedy School of Counter-Insurgency Warfare, under the orders of the high command, broke into the university and murdered six leading Jesuit intellectuals, leading Latin American intellectuals. Anything like that happen in Eastern Europe? I mean, people were, you know, Václav Havel was in prison, but he didn't have his head blown off. And this is the record all the way through. Is it discussed? No.

**PW: And I think it's interesting that you use the example of Eastern Europe because we can note that since the collapse of the Soviet Union and Eastern bloc countries, I think it's no coincidence that we now learn that Eastern European countries, like Poland, Lithuania and elsewhere, are leading rendition states for the United States to set up its secret torture prisons where people can be kidnapped and tortured with impunity, which, arguably, did not happen under the Soviet Union.**

**NC:** That's very interesting, in fact, because there was a study by the Open Society Forum of countries that had been involved in the U.S. rendition programs, and these, as you say, are kind of at the extreme end of commitment to torture. Taking suspects and sending them to countries like Syria or Egypt or Libya, where you know they're going to be tortured. Who participated? Well, of course, European countries mostly participated. The former Eastern European domains and Soviet Union did. The Middle East, of course, participated. That's where they were sending them to be tortured. One region of the world didn't participate.

**PW: Latin America.**

**NC:** Latin America. What happened is in the past 10 years, roughly 10-15 years, Latin America has pretty much extricated itself from U.S. domination. Not entirely, but substantially. This is a dramatic example of it. It's kind of doubly interesting because during the period when Latin America was pretty much controlled by the United States, it was one of the world centers of torture. And now that it's somewhat, pretty much liberated itself, it didn't participate in the massive U.S. torture programs. And actually it shows up in other ways, too.

The U.N. Economic Commission for Latin America [recently] published a report on poverty reduction in Latin America. I don't think it was reported here. But it's striking. What it basically shows is the usual. The more countries that were free of U.S. control, free to carry out reforms, the more they carried out extensive poverty reduction. So Venezuela, Brazil, other countries had a very sharp reduction in poverty. You get closer to home, say, Guatemala and Honduras, poverty remains extreme. Now the interesting case is Mexico. A rich country, relatively speaking, under the NAFTA umbrella, and practically the only country where poverty substantially increased last year.

These are very systematic properties. But are they discussed? No. So it's not just human rights in the United States that aren't discussed, it's in U.S. domains even when it is really dramatic. Like, for example, Central America.

As you know, the huge increase in incarceration in the United States was mostly since around 1980, and during those years Central America was subjected to really massive atrocities, all backed by the United States or carried out by the United States. Hundreds of thousands of people slaughtered. All kinds of torture. The murder atrocities. I mentioned one case, but it's vastly greater. Now you take a look at, say, immigration today; there's a big immigration problem in the United States. So, for example, people are coming to the United States illegally, undocumented aliens from the Mayan highlands in Guatemala. Why? Because they were practically wiped out in the early '80s by a really genocidal attack backed by President Reagan, who assured us that the general in charge was a nice guy committed to democracy and so on. So

### Noam Chomsky Interview (cont.)

now the people in the areas that we helped destroy are fleeing for refuge to the United States, and President Obama has sent back [deported] two million, not just from there but from other places. None of this gets discussed except kind of at the margins.

**PW:** One of the things, too, is what I think of as a discussion of human rights and slaughters, and I think one of the things that's interesting with Guantanamo seems to be almost a quantitative departure. For over 60 years the United States ran a very successful counterinsurgency program around the world which consisted of kidnapping people, torturing whatever information they had out of them, murdering them and disappearing the bodies. They did this very successfully in the Philippines and Central America, as you know, with less success in Southeast Asia.

**NC:** Oh, there was plenty of success in Southeast Asia. Tiger cages in South Vietnam were major torture chambers.

**PW:** Sure. Exactly. But at some point, one of the things I find interesting is that with Guantanamo they've publicly acknowledged capturing people, though not always, hence the secret rendition prisons. But at least in Guantanamo they're publicly acknowledging that they've kidnapped people. They've pretty much publicly acknowledged that they tortured them extensively. And continue to torture them. But they aren't killing them and dumping the bodies, as they did for decades before that. Do you have any idea why that changed?

**NC:** Well, there is a difference. Some of the major scholarly work done on torture is done by Alfred McCoy, a historian.

**PW:** Yes. We've published his work.

**NC:** He's pointed out that there is a difference. The U.S. used to delegate torture to subsidiaries. It was sometimes carried out by U.S. operatives, but usually it was kind of delegated. The last couple of years it's been carried out by the U.S. It's pretty much the same thing, as you say, but there's a difference in direct participation. And in fact, he also points out that you could make a case that George Bush's resort to extensive torture is not illegal by U.S. law.

**PW:** No. It isn't.

**NC:** The U.S. never really signed or ratified the torture convention. There is a U.N. torture convention which the U.S. technically ratified, but after rewriting it to exclude the methods that are used by the CIA.

**PW:** Actually, the second question I was going to ask you was that the U.S. routinely signs international treaties on issues like torture and prisoners' rights. Then it holds there's no private causes of action for them and, of course, as you're noting right now, it doesn't fully ratify them or creates critical exemptions that prevent enforcement. So my question is, why sign them?

**NC:** Well, there are two steps. Signing and ratifying. Ratifying is what counts, otherwise nothing happens. But the U.S. has ratified very few international conventions. I mean, even ones like the rights of a child and things like that; I think the U.S. and Somalia are the only countries that didn't ratify it. And in the very rare cases where the U.S. ratifies a convention, there's a reservation attached. It's called "non self-executing," which means, "inapplicable to the United States." So, for example, the U.S. did finally sign the genocide convention after 40 years, but with a condition: "not applicable to the United States."

That's actually been upheld by the World Court. Because under the Court rules, a country can be prosecuted only if it's accepted the jurisdiction of the Court. When Yugoslavia brought a case against NATO after the bombing in 1999, the United States withdrew from the case. And the Court accepted that because one of the charges was genocide and the U.S. is not susceptible to charges of genocide.

And this runs right through the record. In fact, even in 1946, when the U.S. pretty much led the establishment of the International Court of Justice, the World Court, it added a condition that the U.S. is not subject to any charges under international treaties such as the OAS Charter and the U.N. Charter. And the foundation of the U.N. Charter, of course, bars threats or use of force in international affairs. But the U.S. is not susceptible to that rule. And, in fact, that's kind of tacitly understood. So, for example, President Obama, high officials and others are constantly threatening force against Iran. That's what it means to say "All options are open."

### CALIFORNIA LIFER NEWSLETTER

*Published by Life Support Alliance*

CLN: Comprehensive newsletter  mailed every 8 weeks containing state and federal cases, parole board news, statistics, legislation and articles of interest to Lifers and their supporters.

**CLN SUBSCRIPTIONS**

Prisoners .... $30 per year (or 100 stamps)
Others ....      $90 per year

**Make checks payable to LSAEF**
(Life Support Alliance Education Fund)
**CLN, P.O.Box 277, Rancho Cordova, CA. 95741**

*CLN no longer provides copy service of legal cases, articles or news and materials from the Internet.*

www.lifesupportalliance.org    (916) 402-3750

**Incarcerated Entrepreneur Freight Agent Training Course**
12 Module Training course takes you through everything you will need to graduate and be a certified freight agent moving freight for commision.



**Toll Free 1-877-238-9185**
**S.A.S.E. For more informationTo:**
**Lone Wolf Institute**
**1015 Townsend Dr. Pocahontas, AR 72455**
**Payment plans available from $25.00**
**lonewolfofarkansas@gmail.com**

**PW**: Sure. And every other country in the world, too.

**NC**: Well, they can do what they want, but if the U.S. were brought to the Court under that charge, they would appeal that it's not applicable. And, in fact, that was done. Nicaragua brought the United States to the World Court.

**PW**: For the mining of its harbors.

**NC**: Well, that was what the final charge was, because the main charges were thrown out by the World Court since they were charges of violations of the Organization of American States treaty against intervention. But the Court pointed out you can't charge [under the OAS treaty]. The U.S. is free from that.

**PW**: And, obviously, I think for *Prison Legal News* readers sitting in prison the idea that you're only susceptible to a criminal court's jurisdiction if you agree to it sounds like a pretty good deal.

**NC**: A pretty good deal. But, of course, if we go back to Guantanamo, the torture at Guantanamo was horrible. But it's kind of standard in American prisons.

**PW**: Actually, it is. When Abu Ghraib first happened, one of the things I've no-

ticed over the many years of publishing *Prison Legal News* is that human rights abuses that occur overseas will get a lot of American media attention. But when the same abuse occurs in American prisons, being done by American officials to Americans, it gets very little attention or is largely ignored.

**NC**: It gets nothing. Take isolation. The U.N. and other authorities consider that torture. And, in fact, as is known, a short amount of [solitary confinement] drives people completely crazy.

**PW**: And we've done this for several hundred years.

**NC**: Yes. But that's standard in America, in American prisons. Almost total isolation for prisoners if they want to, and other treatment, too. There's a general principle that if we carry out a crime, it doesn't happen.

**PW**: Or it's not a crime.

**NC**: Either it's not a crime, or it doesn't happen. It literally doesn't happen. And that's true of the media. It's largely true of scholarship.

**PW**: Do you believe that Americans have fewer or more rights vis-à-vis state

power than the citizens of other industrialized countries?

**NC**: We do, in fact. It's an unusually free country. Despite all of these crimes, which are real, it is nevertheless quite a free country for people who are relatively privileged. Not if you're a black kid in the slums of Boston. But if you're, say, living where we're talking now, you've got lots of rights. In many respects, more so than other countries. For example, freedom of speech, which is after all a crucial right, is protected in the United States to an extent beyond maybe any other country. Certainly other western countries.

**PW**: I find it ironic that you say that because our organization is involved right now, for example, ... we're going to trial in Georgia to protect our right to send prisoners letters where the jail bans all books and magazines. They only allow prisoners to send and receive postcards. And it's ironic in the age of the Internet, we're defending a 15th century means of communication.

**NC**: Yes, well, life is complex. Both things are true. The U.S. has set formally high standards for protection of freedom





**Noam Chomsky Interview (cont.)**

of speech, and they are pretty well implemented to the extent that you have a degree of privilege. Prisoners in Georgia are down at the opposite end. They don't gain the rights.

**PW: Okay. The past 40 years have seen a massive increase in the U.S. prison population. The U.S. now imprisons more people than any other country in the world ever has, even including, you know, the Soviet Union at the height of the collectivization in the 1930s, even Nazi Germany. In your view, what has led to the rise of mass imprisonment in the United States?**

**NC:** Primarily the drug war. Ronald Reagan, who was an extreme racist, barely concealed it under his administration. There had been a drug war but it was reconstituted and restructured so it became basically a race war. Take a look at the procedures of the drug war beginning from police actions. Who do you arrest? All the way through the prison system, the sentencing system, even to the post-release system.

And, here, Clinton was involved. Taking away rights of former prisoners, say, to live in public housing and so on. The lack of any kind of rehabilitation. The impossibility of getting back into your own community, into a job, essentially it demands recidivism. So there's a system in place, mostly directed against black males – although by now it's also African-American women, Hispanics and so on – but it's overwhelmingly been black males, which essentially criminalizes black life. And it has led to a huge increase in incarceration and essentially no way out.

It started with the Reagan years and goes on right up to the present.

**PW: And what do you think is the basis for that?**

**NC:** Well, it's kind of striking. First of all, it has a historical parallel which is worth thinking about. After the Civil War there were Constitutional amendments that freed slaves. And there was a brief period, roughly ten years, in which freed slaves had formal rights.

**PW: Right, Reconstruction.**

**NC:** The Reconstruction period. And it was not insignificant, like you had black legislators and so on. After the Reconstruction period, roughly a decade, there was a north-south compact which effectively permitted the former slave states to do essentially what they liked, and what they did was they criminalized black life. So, for example, if a black man was standing on a corner he could be accused of vagrancy and charged some fee which he couldn't pay, so he went to jail. If he was looking at a white woman the wrong way, somebody claimed attempted rape, you know. A bigger fine. Pretty soon they had a very large part of the black population – black male, mainly – in jail. And they became a slave labor force.

A large part of the American Industrial Revolution was based on slave labor in the post-Civil War period. And for U.S. steel and mining corporations and others, it was a wonderful labor force. I mean, much better than slavery. Slavery is a capital investment; you've got to keep your slave alive. [But] you can pick them up from the state system for nothing. They're docile. They're obedient. They can't unionize. They can't ask for anything. I mean, we're familiar with the chain gangs, but that's only the agricultural aspect of it. There was also an industrial as-

pect. This went on almost until the Second World War when there was a demand for free labor for the war industry. And we're essentially reconstituting it.

**PW: Well, we've reported extensively on prison slavery in both the former, the older types as well as the modern ones. *Prison Legal News* has broken some of the major stories on that, but I think one of the bigger impacts now isn't the prisoners working. It's not the 5,000 prisoners working for private corporations or the 60,000 working for prison industries. It's the 2.3 million who aren't working at all. That's the impact on labor markets.**

**NC:** Yes. But that's the difference between now and the latter part of the 19th century. The latter part of the 19th century was a period of the Industrial Revolution. Now it's quite different. It's industrial anti-revolution.

**PW: Or devolution.**

**NC:** In fact, what's really happening is this is a superfluous population. A lot of the working class is basically superfluous at a time when multi-national corporations can shift their production operations to northern Mexico or Vietnam or somewhere. And the black population has never escaped the effects of slavery; I mean, the first slaves came to the United States in the early 17th century. By 1620, there were slaves. And the effect of slavery has never been overcome, in all sorts of ways, so the most superfluous population is the black male population. Fine. So we stick them in prison. Get rid of them.

**PW: One of the things, too, as you say this, there's obviously a number of black, racial minority political organizations in this country, and for the most part they've all been pretty silent about criminal justice policies over the past 40 years. If you**

## Pen Pals for Prisoners

Your ad on the Internet worldwide: One year for $9.95. Mail name & address for FREE order form or online:

**www.PrisonerPal.com**

PO Box 19689
Houston, TX 77224



**Law Office of**
## TIMOTHY C. CHIANG-LIN, PLLC

Representing Individuals Sexually Abused in Washington State's Foster Care, Group Home, City, County Jail and Prison

**2155 112th Ave NE, Bellevue, WA 98004**

**chiang-lin.com**    tim@chiang-lin.com

look at a lot of the major organizations like the NAACP, the Urban League, folks like that, they've been pretty silent on criminal justice issues, and today we have President Obama, who obviously is black. So is our Attorney General. And, you know, while the Attorney General has made some noises on criminal justice issues, if you look at actual practices, nothing's really changed. So to an extent it seems that the political black community has largely been silent or supportive of mass incarceration.

NC: Well, yes. They have their own reasons. But there has been progress in civil rights which for the more privileged sector of the black community has meant more rights. And while I don't like to criticize them – as I said, they have their own reasons – I can see why they might want to try to expand the range of rights that they've achieved and not take on issues that would be unacceptable to the ruling groups.

Take a look at what happened to Martin Luther King, for example. It was very striking. When you listen to the oratory on Martin Luther King Day, it typically ends with his "I have a dream" speech in Washington, in 1963. But he didn't stop there. He went on to the north. He went on to northern racism, to class issues, urban problems in Chicago, then he was assassinated supporting a public workers' strike. That part of his life has been kind of wiped out. In fact, he lost his northern liberal popularity at that point. As long as he was attacking racist sheriffs in Alabama it was acceptable. When he started talking about racist and class-based oppression in the north, that was beyond the limits.

After all, when he was killed he was on his way to organizing a party of the poor. Not of the blacks. Of the poor. And that's beyond the pale when you do that. So, how much this kind of understanding resonates in the minds of black leadership I don't know, but they can't be oblivious to the phenomenon.

**PW: And I guess one of the things, too, it's not just the black leadership of civil organizations, but we pretty much have a bipartisan consensus on mass imprisonment. I think it's like U.S. foreign policy, just like it has a bipartisan consensus. And we can see that over the past 40 years, to use your slavery analogy,** looking back to recent modern history of 1980 or so, no one law at a time but thousands of laws every year around the country have led to mass imprisonment. There's never been one sweeping law, for example. But within mainstream political parties there's been no opposition to mass incarceration, whether it's mandatory minimums, draconian prison conditions or whatever. And why is there, for lack of a better term, mass consensus within the political elite and within the legislative bodies of this country on mass imprisonment?

NC: We're talking about a period of kind of a major neoliberal assault on the population which had all kinds of effects. One of them is that both political parties drifted to the right. There used to be a quip that the United States is a one-party state, the business party, which has two factions, the Democrats and the Republicans. It's not really true anymore. It's still a one-party state, the business party. But it has only one faction, and it's not Democrats. It's moderate Republicans. The contemporary Democrats are what used to be called moderate Republicans.

---

## Stamps for CASH!

*Great Goods will buy your stamps!*



**70%** of Face Value: *Complete books or sheets of Forever Stamps*

**65%** of Face Value: Complete books, sheets, or rolls of 45-cent stamps

**60%** of Face Value: Complete books or sheets of high denomination stamps above 45-cent

**Payment sent within 24 hours of receipt.**



W E WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps. • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

## GREAT GOODS

**PO Box 399, West Chesterfield NH 03466**
**www.greatgoods.org**

STAMPS © USPS. ALL RIGHTS RESERVED.

---

### Noam Chomsky Interview (cont.)

Meanwhile, the Republican Party has just drifted off the spectrum. The distinguished political conservative analyst, Norman Ornstein of the American Enterprise Institute, speaking from the right, describes the contemporary Republican Party as just what he calls a radical insurgency which has abandoned any commitment to functioning as a parliamentary party. It's just dedicated to extreme wealth and power. Period. And it's had to kind of mobilize popular forces of the kind that hadn't been politically mobilized much in the past, which is why you see what you do. But as both parties drifted to the right, yes, you get the consensus on rightwing policies. As I mentioned, Clinton's policies just made the incarceration system even harsher.

**PW: Well, Clinton remains, I think, the worst thing that's happened to American prisoners not just in living memory but in American history. The laws that he passed, the Prison Litigation Reform Act, the Anti-terrorism and Effective Death Penalty Act among them. The elimina-** tion of Pell Grants for prisoners to get an education in prison. And, you know, again, it's all happened with bipartisan consensus.

**NC**: I wouldn't call it bipartisan because we've lost the concept of [two parties]. There was a narrow spectrum of bipartisan division under the framework of the business party, and that's pretty much gone. The only question is, how rightwing are you? And somebody like Richard Nixon would be regarded as a liberal today.

**PW: You know, he had some pretty good ideas, like the Environmental Protection Agency. I wouldn't see that passing today.**

**NC**: In fact, they're attacking it now. The earned income tax credit, OSHA, you know. Nixon's reforms would be considered way off the spectrum now.

**PW: In your view, what's the Obama administration's track record on domestic human rights issues?**

**NC**: Well, I never frankly expected much of Obama.

**PW: Neither did I.**

**NC**: I wrote about him before the primaries even, in 2008, just using his own web page. But there was one thing that surprised me, and that's his attack on civil liberties. I don't understand it. It's gone way beyond anything I expected, and I don't even think he gets any political gain from it. I just don't understand what's driving it.

**PW: Well, he did campaign as being a better technocratic manager.**

**NC**: Yes, but why the attack on civil liberties? I mean, some of these attacks aren't even discussed much.

**PW: Well, I think if you look at the rise of militarized policing, and that in this country the ruling class is fully geared up for a full-blown counter-insurgency. They barely have protests, much less resistance. It seems like they're just not taking any chances.**

**NC**: That I can understand. But take something like one of the most extreme attacks, which barely gets discussed – the Humanitarian Law Project case. Here's a case where the Obama administration brought it to the courts, went up to the Supreme Court. They won. And what it does is expand the concept of material assistance to terrorism. Like if you're on the terrorist list and I give you a gun, so, okay, I'm complicit. The Obama administration expanded that to advice. To talk. The case in question [involved] a group that was giving legal advice to some group that's on the terrorist list, but the colloquy in the court extends it way beyond that.... That's a tremendous attack on civil liberties.

# LET US HELP GET YOU HOME!

D&D Worldwide Services LLC, is an Inmate Service Provider. We create detailed parole plans and provide parole plan documentation services worldwide. We are a team of Christian Professional Consultants with over 14 years' experience with the prison system. Our services are intended to guide Pro-Se Clients in the "Right Direction" while assisting them during the parole review process. When building your case, we focus on showing the Parole Board a real person, the positive outcome of incarceration, and you to be a favorable candidate for the privilege of parole!

**Full Service (Texas Only)** - Our office will collaborate the details of your case, create into a personalized parole plan with an Interview Request. We will also provide you with the updates of the major occurrences of your file when in review. Services are provided UNTIL an approval is granted or you are released from prison. Effective March 1, 2014 Service fee is $800.00

**Standard Service (Worldwide)** - Our standard parole plan is approved in ALL STATES where parole is available. Our office will verify your supporters, build your support system, and create into a personalized standard parole plan. Send SASE for a processing form. Effective March 1, 2014 Service fee is $200.00

*Although the Prison system may only see Prison Numbers...*
*We see "Faces" with "Names" with "Loving families" – "We See People"!*

### D&D Worldwide Services, LLC
12337 Jones Rd # 408 Houston, TX 77070
P.O. Box 40081; Houston, TX 77240
Office: (281) 580-8844; Website: www.myparole.info

*Se Habla Español.*



PENACON.com

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see.  Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLN5OFF
FOR $5 OFF

**PW**: And the right to free speech or the notion of....

**NC**: Of free speech. Yes. But it's barely even discussed. Incidentally, the whole concept of the terrorist list is a scandal which should never be accepted. The terrorist list is by executive order. No recourse.

**PW**: And no due process right as to how you get on or how you get off.

**NC**: Nothing. If you look at the record, it's appalling. Like, for example, Nelson Mandela was on it until a couple of years ago. And Saddam Hussein was taken off it because Reagan wanted to support him during the Iraq invasion of Iran.

**PW**: One of the things you've written extensively about is the impunity of American client state torturers in other countries, specifically like in East Timor and Indonesia and Central America. And yet here in the United States human rights abusers such as policemen kill unarmed, innocent civilians. In *Prison Legal News*, we report routinely in every issue of our magazine about prisoners who are just outright murdered, directly through use of excessive force by prison and jail staff, as well as much more commonly through medical neglect, through the withholding of adequate medical care. And yet the government officials who do this enjoy virtual impunity. Occasionally there are a few criminal prosecutions. There are civil suits, but government officials have a broad range of immunities. And, again, those only seek money damages and, statistically, are not very successful. So in your view, what accounts for this virtual impunity for American and domestic human rights abusers?

**NC**: In part, impunity is automatic if it's not discussed. It's barely even discussed. Who talks about it?

**PW**: No one. Well, *Prison Legal News* does, but....

**NC**: Yes, I know, but anywhere near the mainstream there's just no discussion of it. The number of people in the country who even know about it outside the prisoners' families is very slight. And if things are not even a topic of discussion, sure, there's going to be impunity. And all of this reflects the fact that it's simply accepted in the elite culture.

We want to protect ourselves – privileged white people. What happens to the rest, this is not our business. You know, Guantanamo itself is pretty remarkable. So, for example, the first case that came up under Obama was the Omar Khadr case. He was kidnapped in Afghanistan. He happened to be a Canadian citizen, [and] was a 15-year-old kid who was in a village which was attacked by American troops.

**PW**: And, also, it was interesting since when are soldiers on the battlefield deemed to be war criminals when defending themselves on the battlefield?

**NC**: This is a 15-year-old child. Foreign soldiers are attacking his village. And he's accused of defending it. So he was taken, he was kidnapped. He was put in Bagram, which is worse than Guantanamo, I think, for several years. Then he was moved to Guantanamo. More torture. Finally, he came to trial where he was given a choice. Of course, his lawyers have to make the choice. The choice was, plead innocent and you'll stay in Guantanamo forever, or worse. Or plead guilty and you'll only have to stay for eight more years. And it was public. Did you see any outcry about it? I mean, the very idea of kidnapping a child for the crime of defending his village from aggression, it's



# INMATE TOLL BUSTERS

## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*

**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

## www.InmateTollBusters.com
## Call 24 Hours: 888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.



## Noam Chomsky Interview (cont.)

so scandalous you don't know what to say about it.

**PW**: Well, we follow Guantanamo fairly closely, and one of the things I think is interesting now is that as soon as the prisoners start talking about being tortured or how they've been tortured, the judges immediately cut off the sound system. And so they can't even talk about the torture they've endured, so it's not even … you know, we've got multiple layers of impunity.

**NC**: It goes beyond that. So, for example, there's one Australian citizen, David Hill, who was kidnapped in Afghanistan, sold by bounty hunters to the American army. He was held in prison for years in Afghanistan, Bagram and other prisons, and finally Guantanamo. Horrible prison story. Finally, after a lot of negotiations, the Australian government began to intervene slightly. They hadn't done much. And he was released.

He wrote a book about it – a detailed book describing his years of torture, humiliation, how it worked in Afghanistan, what it was like in Guantanamo. Did you read a review of it? It's more than the judges cutting off testimony. It's when material is published in our open, free society, it is deep-sixed. This is not the only case by any means.

**PW**: This is in the context, as you're mentioning atrocities that are occurring today, that if you look at *The New York Times*, for example, books that are being published, I was recently reading a review not too long ago, by, I think, Applebaum, about human rights violations under Stalin. And it's like, okay, so *The New York Times* is still mulling over human rights violations that happened 70 years ago in the Soviet Union, but nary a word or very little about what's actually occurring today by the American government.

**NC**: And again, I think maybe one of the most striking cases is just the comparison of post-Stalin Eastern Europe with U.S. domains in the same period, like Central America or South America. It's almost not discussed. I mean, some of the things that happened are kind of mind-boggling. Like, for example, right after the murder of the Jesuit intellectuals, something which never happened in Eastern Europe post-Stalin….

**PW**: Even under Stalin, I don't think they were….

**NC**: Well, not that way. I mean, there were plenty of purges and monstrosities.

**PW**: They weren't doing it openly.

**NC**: Yes, but remember, this is under the orders of the high command, very close to the American Embassy. The troops had just returned from further training in the United States and they carried out this atrocity. Okay. A couple of days after that, there was a visit to the United States by Václav Havel, a Czech dissident who suffered under….

**PW**: And became president.

**NC**: Yes. And he addressed a joint session of Congress, and he received massive applause, standing ovations when he praised the United States as the defender of freedom – the defender of freedom that was just responsible for the slaughter of half a dozen of his counterparts in Central America. You take a look at the press after that; the liberal press was just swooning with admiration. Why can't we have wonderful intellectuals like this who praise us for being defenders of freedom, and we've just carried out huge atrocities? Anthony Lewis wrote about how we're in a romantic age, you know, and there's no comment on this. It just passes as if it's normal.

I mean, it's happening right at this moment. Take the crimes going on in Iraq, especially in Fallujah. In Fallujah, there's an insurgent force being attacked by the Iraqi army. There are many laments here in the press about "the pain we suffer after American boys fought to liberate Fallujah. Look what's happening." How did American boys fight to liberate Fallujah? It's one of the major war crimes of the 21st century. You take a look at the record, even as it was just reported in the press.

**PW**: Yes. They flattened the city.

**NC**: They surrounded the city. They cut off food. They allowed people to escape but kept the male population inside, and then they went in and mostly slaughtered them. We don't know how many because we don't count our crimes.

**PW**: And the U.S. has been doing that since at least the 1850s.



**12 FREE ISSUES!**

FREE!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription! Quarterly drawing WINS $100! **(Void in New York)** (Last Quarter's winner from **Somers, CT.**) TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

**Inmate Magazine Service INC.**

**NC**: Well, you know, but now we suffer pain because the American boys fought to liberate it. I mean, there's no comment on this. And, in fact, people here don't know what happened. Or in England, incidentally. There was just a poll in England recently, people were asked how many Iraqis they thought had died during the war. The mean answer was 10,000.

**PW**: **If you ask them how many Jews died in the Holocaust, everyone knows those numbers.**

**NC**: Yes, I mean, that's like you know probably 5% of the number. There were some efforts to get the British press to publish something about it. Most were rejected.

**PW**: **Let me ask you this while we're on the subject of people dying. Why are the U.S. and Japan the only industrialized countries that judicially execute their own citizens through use of the death penalty? And notice I didn't say "kill" because we're going to leave out the extra-judicial murders and death squads which most governments engage in when they're threatened.**

**NC**: That's true that most countries have abandoned the death penalty.

**PW**: **Formally.**

**NC**: The United States is different, sometimes in interesting ways. I happened to be in Norway a couple of times last year. I was there fortuitously, you remember the Anders Breivik massacre?

**PW**: Yes.

**NC**: So I was there just at the time when he was captured and identified. And then I was there again at the time when he was sentenced. And it was very interesting to see just the attitudes of the population. The question of the death penalty never arose. He was treated as a human being who had carried out a horrible crime, but he's a human being. At the court proceedings he was permitted to rave and rant on as long as he wanted. The sentence finally was, I think, 21 years.

**PW**: **Which was the maximum allowed under Norwegian law.**

**NC**: Which was the maximum, with the possibility of rehabilitation. The circumstances of his imprisonment would seem like a luxury hotel by U.S. standards. And this was accepted, you know? It wasn't bitterly denounced. The attitude was, well, yes, we have to treat people humanely even when they've carried out a shocking massacre. He killed, I think, what, 70 children? Can you imagine what would have happened here?

**PW**: **I don't know. It's interesting because I was imprisoned in Washington State, and you have Gary Ridgway who ultimately pleaded guilty to kidnapping, raping and murdering, I think it was 51 women, mostly prostitutes, and ultimately he was sentenced to life without parole. And yet at the same time you have people in Washington State, which has the three-strikes law, on their third offense they're sticking their finger in their pocket, pretending it's a gun and robbing an espresso stand. And they get life without parole. So you can say that the equivalency of the punishment for sticking your finger in your pocket and pretending it's a gun to rob someone is the same whether you're doing that or if you're killing 51 people.**

**NC**: Well, as soon as you have any contact with the prison system, what you discover is appalling. I don't have to tell you. For example, in one of the demonstra-



# William L Schmidt
## ATTORNEY at LAW, P.C.

911CIVILRIGHTS@GMAIL.COM

**559.261.2222**

**OCTOBER 2013, CALIFORNIA:**
- **$90,000 settlement with CDCR and LA Sheriff**
- **Confidential settlement with CDCR**
- **$600,000 injury recovery**
- **$150,000 bad faith settlement**
- **Federal action dismissed without penalty by agency**
- **Parole dates granted by BPH**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------OUR CLIENTS GO HOME, HOW ABOUT YOU? -----------------
*Please submit a single page summary of your case. Due to the volume, we cannot return documents or respond to all inquires. We are not a low cost or pro bono law firm, but if you want results, contact us.*

**PO Box 25001 Fresno, CA 93729**





## Nolo's Plain-English Law Dictionary

$29.99

Order from

**Prison Legal News**

P.O. Box 1151
Lake Worth, FL 33460
561-360-2523
Add $6 shipping for orders under $50

**www.prisonlegalnews.org**



## Save on Prescription Eyeglasses & Shades

Send for a **FREE** Catalog
Money Back Guarantee

## Prism Optical, Inc.

**10954 NW 7th Ave
Dept: LN0414
Miami, FL 33168**

Inquiries from Friends
and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

**Noam Chomsky Interview (cont.)**

tions in the early '60s in the south, I was with Howard Zinn. We went to Jackson, Mississippi for a demonstration and at one point we were able to get the police chief to take us through the Jackson prison, which, I should say, by the standards of northern prisons, wasn't too bad. I've been in worse ones. Just, you know, under civil disobedience arrests.

But as we were walking through the halls, of course they were all black men, you know, a child tapped on the bars. He was in the prison and he asked me if he could have a drink of water. So I asked the police chief, "Can I get him a drink of water?" He said, "Okay." When we got back to his office, I asked did he know why that child was in the jail? So he asked some secretary who looked it up, and it turned out that the child had been found in the streets and they didn't know who he was, and they had nothing special to do with him, so they put him in jail.... How much of this goes on?

**PW**: Actually, it still goes on. *Prison Legal News* has reported cases of mentally ill children in Florida who, for lack of any place to care for them, they wind up in the prison system.

**NC**: This kid wasn't even mentally ill. They just didn't know what happened. Maybe he got lost, or whatever it might have been. If it had been a white kid, he wouldn't have been put in jail.

**PW**: Yes. And I think that one of the things we've seen increasingly in the last 30 years – it goes back to what you talk about as a system of class and race control – is that the solution for everything in this country domestically seems to be prison. We may not have public housing for the poor, but we've got prisons. I think it goes back to Governor Cuomo using HUD funds for low-income housing to build prisons, which, in a grotesque way, *is* low-income housing.

**NC**: Unfortunately true. A lot of it. And the racism is really severe and can't be overlooked. The whole record of white supremacy in the United States is beyond anything that was known.

**PW**: Well, one of the things that I find interesting is that *Prison Legal News* has sued a number of jails around the country, and when you go to jurisdictions like the District of Columbia, Atlanta

and places like Birmingham, we find that the prisoners are still mostly black but the elected officials, the sheriffs, the prosecutors, the mayors, the judges, huge portions of the police force and most of the guards, they're all black too, and the conditions are as bad if not worse than they were under Bull Connor, their white counterparts, 40 or 50 years ago.

**NC**: That's pretty common. If you go to South Africa, remember, the worst crimes were carried out by black forces mobilized by the white government. It's the way coercive systems operate.

**PW**: So, basically, what's more important is who's doing it rather than the color of who's doing it.

**NC**: There are all kinds of reasons why people, individuals do what they do, but it's very standard to co-opt oppressed people to carry out crimes and atrocities for the government. I mean, take, say, England and India. Some of the worst crimes were carried out by Indian troops, Indian Sikh police. In fact, England sent them all over the world to impose imperial rule.

**PW**: One of the things you've talked about is race, and yet we've got two-and-a-half million people in prison and even when we talk about race, no one is claiming that wealthy black people or Hispanics are being herded into prison in significant numbers. So what accounts for the virtual absence of the wealthy from the U.S. prison population?

**NC**: The virtual absence of....

**PW**: Of the wealthy from the prison population? That should be an easy question. Well, they're rich.

**NC**: Do I even have to answer? I'll give you an anecdote. We're living in a pretty well-to-do suburb, right? You can see that when you walk around. Once we were away, the neighbors called and told us there was a broken window in the house. So we came back and took a look, and it turned out somebody had broken in. We called the local police and they came and the first thing they asked us was, "is there a pillowcase missing?" So we looked upstairs, and yes, there was a pillowcase missing. Then they said, "We want you to take a look in your medicine cabinet." So we looked, and yes, somebody had rummaged through the cabinet. And they said, "Well, we know who's doing this. This is teenage kids who live here, and they're going sort of house to house, and if they find one that's easy to

break into, they'll go in and see if they can get drugs." They said, "We know who they are, and we could arrest them. But it's no use. Their parents will have them out of jail tomorrow." That's a typical example.

Or, say, let's go way high up. Last week there were news reports about the fact that Jamie Dimon, CEO of JPMorgan Chase, just had his salary almost doubled. Why? It was in gratitude because he had saved the bank directors from going to prison and they were only fined $20 billion for criminal activities. Well, $20 billion, first of all, a lot of it's tax deductible and the rest is kind of a statistical error on their accounts. Now here's a guy who was supervising criminal activities serious enough to cause a $20 billion fine. Is anybody in jail? What would have happened if this was a kid who robbed a store?

**PW: Yes, that's the joke. Rob the 7-11 for $20 and get 20 years. And, you know, rob other people of $20 billion and you get a raise.**

NC: That's class-based justice.

**PW: Do you see the criminal justice system, police and prisons, as a tool of class war domestically?**

NC: Class war and race war. It's been

very clearly, especially since Reagan; it's very hard to see it as anything other than a kind of race war. There is kind of a reasonably close class-race correlation in the United States, to some extent you can't....

**PW: The racial minorities are disproportionately poor.**

NC: Yes. But it goes beyond that. I mean, as I said, from police practices up till post-sentencing, it's sharply racially discriminatory. But, you know, it's a racist country since its origins. I mean, it's even familiar in scholarship. There's a major study of white supremacy by George Frederickson, a well-known historian. He basically compares South Africa and the United States, but it's really a comparative study. His conclusion is there is nothing anywhere in South Africa or anywhere else to compare with the horror of white supremacy in the United States. Actually, it is so deeply ingrained that none of us even notice it. I mean, for example, take President Obama. He's called a black president. In Latin America he wouldn't be called a black president.

**PW: Right.**

NC: He'd be called one of the various

gradations of mixed race. But the United States still has kind of tacitly, not formally, the principle of one drop of black blood. That's deep-seated racism.

**PW: I have a black Cuban friend. We were in prison together, and he once told me that he didn't know he was black until he came to the United States. He said in Cuba he was just Cuban. And then he comes here and....**

NC: Or mulatto. There's a whole bunch of gradations of mixed race, but here the racism is extreme. You can see it coming back to Reagan. So he opened his 1980 campaign in Philadelphia, Mississippi. A tiny little town. Why pick that? Nobody knows anything about it except one thing. They murdered civil rights workers there. Did that affect the campaign?

**PW: Yes. Arguably, that's what led to him winning the Presidency.**

NC: It leads to Obama calling him a great transformative figure, you know.

**PW: My final question is at this point, after 40 years of mass incarceration with militarization of the police, we've had a massively expanding prison and jail system. We've seen some small dips**

## BETTER JOBS FASTER PAROLE

**The only affordable 2-yr and 4-yr college programs available to inmates**

New Freedom College is designed for inmates, so our 2-yr & 4-yr programs offer a wide range of classes & majors that can all be completed in prison. At only $33-$50/credit, NFC will save you over $20,000 compared to traditional schools like Adams State ($165/credit + books = about $25,000 for 120 cr).

**New Freedom has:**
- majors you want like Business & Psych
- multi-class & referral discounts
- lots of feedback
- flexibility to meet your needs & openness to your ideas
- low rates that include books, study guides, etc.



4-yr diploma as low as $3,960

We have a Certificate Program so everyone can participate, plus a monthly payment plan to best meet what you're able to afford.

... Write for info guide & enrollment form:

**NF** **New Freedom College**
1957 W. Burnside St. #1660
Portland, OR 97209
NewFreedomCollege.org

## BRANLETTES BEAUTIES

**OUR SIMPLE POLICIES:**

SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP-FRIENDLY). DUE TO PROCESSING TIME AND COST ANSWERING LETTERS, UNLESS YOU ARE PLACING AN ORDER OR A QUESTION REGARDING YOUR ORDER, WE WILL NOT REPLY TO ANY OTHER QUESTIONS. SASE ARE REQUIRED FOR ANY INQUIRES OR CONCERNS!

YOU AND YOU ALONE ARE RESPONSIBLE FOR YOUR SELECTIONS BEING ALLOWED INTO YOUR FACILITY:

KNOW YOUR INSTITUTIONS POLICIES AS TO WHAT IMAGE CONTENT IS ALLOWED. RETURNED ORDERS ARE NON-REFUNDABLE. THEY WILL BE HELD FOR 14 CALENDAR DAYS IN ORDER FOR YOU TO SEND SELF-ADDRESSED STAMPED: 3 FIRST CLASS STAMPS PER ENVELOPE, WITH A STREET ADDRESS FOR EVERY 20 PICTURES. ALL RETURNED IMAGES HELD AFTER TWO WEEKS WILL BE RE-SOLD AND WE WILL RETURN TO OUR STOCK.

ALL PAYMENTS ARE BY INSTITUTIONAL CHEACKS OR U.S. POSTAL SERVICE OR WESTERN UNION MONEY ORDERS.

THESE PAYMENTS ARE PROCESSED IMMEDIATELY AND SHIPPED IN LESS THAN 3-4 WEEKS. ANY OTHER COMPANY MONEY ORDERS DELAY SHIPMENT 8-10 WEEKS OR UNTIL THAT MONEY CLEARS OUR BANK. YES, WE DEAL WITH PEOPLE THAT ARE, WHILE IN PRISON, STILL TRYING NICKEL AND DIME SCAMS...

ALL SALES ARE FINAL! EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM HIGH QUALITY PRINTS ON 4X6 GLOSSY PHOTO PAPER

**OUR PRICES ARE SIMPLE:**

1-4999 PHOTOS = 0.45 CENTS EACH
5000+ PHOTOS = 20% DISCOUNT
1-9 CATALOGS : $3.00 EACH ( +SASE )
10 CATALOGS : $25.00+SASE (4 STAMPS )

**SHIPPING & HANDLING:**

DUE TO VARIOUS PRISON POLICIES REGARDING HOW MANY PICTURES CAN BE SENT IN ONE ENVELOPE, OUR POLICY IS AS FOLLOWS:

01 - 5 PHOTOS---$1.00 PER ENVELOPE
06 - 15 PHOTOS--$1.50 PER ENVELOPE
16 -25 PHOTOS---$2.00 PER ENVELOPE

**BRANLETTES BEAUTIES**

SELECT YOUR FAVORITE:
WHITE CATALOGS (60 VOLUMES)
BLACK CATALOGS (60 VOLUMES)
ASIAN&LATINO CATALOGS (60 VOLUMES)
PLEASE STATE WHAT STYLE PHOTOS'S:
PROVOCATIVE POSES OR NUDE

**FREE CATALOG???**

YOU READ IT RIGHT!
JUST SEND US TWO U.S. FOREVER STAMPS AND A SELF ADDRESSED SELF ENVELOPE AND WE WILL SEND TO YOU ONE NUDE OR BOP-FRIENDLY SAMPLE CATALOG (1 PER CUSTOMER) WITH 84 GORGEOUS GIRLS IN FULL COLOR. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!

BRANLETTES BREATHLESS BEAUTIES BAG A RANDOM SELECTION OF 50 OF THE RARE AND EXOTIC +++YES, FIFTY BEAUTIES. ALL POSING JUST FOR YOU!+++ PLUS TWO OF OUR FINEST COLOUR CATALOGS (ONLY $19.95 AND YOU READ THAT RIGHT!!!) +++$19.95++++ YES, ONLY $19.95 FOR BRANLETTES BREATHLESS BEAUTIES (PLEASE SPECIFY NUDE OR BOP-FRIENDLY) +++PLUS+++ TWO OF OUR FINEST COLOUR CATALOGS FREE (YOU PICK A VOLUMES) +++ TWO OF OUR REGULAR SHIPPING AND HANDLING POLICIES APPLY.

**BRANLETTES**
P.O.BOX 5765
BALTIMORE, MD
21282

**Noam Chomsky Interview (cont.)**

in [prison population] numbers in the last year or two in the United States. It's too soon to tell if that's just a statistical anomaly.

NC: I don't think it's an anomaly. I think it's just gotten to a point where it's kind of economically unfeasible to maintain it.

PW: My question is, do you see any prospect of permanent change in U.S. prison and criminal justice policies and practices in the near future?

NC: Sure. I mean, if you went back 60 years, you couldn't have predicted the achievements of the Civil Rights Movement.... You couldn't have predicted the women's movement, which completely changed things for half the population. After all, if you go back to the early days of the Republic, under law, women were

not persons. They were property. A woman was the property of her father, transferred to her husband.

And in fact it wasn't until 1975 – not that long ago – that the Supreme Court recognized that women were peers. They had a legal right to serve on federal juries. Prior to that they weren't peers. And that's sort of the core of being a person under law. You couldn't have predicted it. And you can't predict what will happen in the future; it depends how people act. If they become organized, militant, active, the system of coercion is pretty fragile and I think it can crack very quickly.

PW: Do you know who Thomas Mathiesen is? The Norwegian criminologist?

NC: Yes.

PW: One of his quotes that I've always thought about, and this is in the context that I recall when the Soviet Union collapsed and I have a degree in Soviet history, is that no one predicted that one coming.

NC: One of the people who didn't predict it was [former CIA director] Robert Gates, who was a Soviet specialist. He didn't predict it even after it was happening.

PW: And, you know, Mathiesen's comment is that systems of repression appear to be stable right up until the moment they collapse.

NC: That's right.

PW: And so do you think that's possible?

NC: This is a very fragile system here. I think it can crack very easily.

PW: Why do you say it's fragile?

NC: Because there is very little coercive force behind it. By comparative standards, the state in the United States has quite limited capacity for violent repression. I mean, what happens is unacceptable, but again, by comparative standards it is not high.

PW: By comparative standards, are you referring to....

NC: Western countries.

PW: So you would say, for example, in England, that their police and military has more domestic repressive capacity?

NC: I think so. And, in fact, they have much harsher constraints on even things like freedom of speech.

PW: Yes. The libel laws are pretty outrageous.

NC: Horrifying. And how fragile it is, let's take Norway again, which you mentioned. The famous Norwegian criminologist Nils Christie wrote a history of punishment.

PW: I've read it. It's one of my favorite books.

NC: Right. And if you remember, in the early 19th century, Norway was outlandish.

PW: All the Scandinavian countries were.

NC: Horrifying, horrifying crimes. And now they're remarkably humane. Things can change.

PW: Okay. Well, this is one of the few times we end anything on an optimistic note in *Prison Legal News*. Thank you very much. ◀

# TYPING
### SERVICES
Provided since 1998

Specifically designed, with special rates for the incarcerated person.

**Black / Color Printing and Copying**

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

**Special Offer: $2.00 off first order.**
Special offer void after: 12/31/2014



Serving You with Excellence Since 2009

**FreedomLine**®

*We make it simple.*

You reach your loved ones by calling a local number.
That's a lot cheaper than calling long distance. *It's that simple!*

• We charge $2.50 per month for the number.
• For Calls to anywhere in the U.S., we charge you 5¢ per minute
• To Mexico - 15¢; to Canada - 11¢, to just about anywhere else in the world - 31¢
• No Contract, No Credit Check, No Setup Fee, No Cancellation Fee, No Early Termination Fee
• Cancel anytime; any money left on the account is refunded

*Any time you refer a new customer and they sign up, you both get 300 free minutes!*
Some restrictions apply. Details upon request.

Tell Your Folks to Sign Up at www.freedomline.net

*Or Mail:* FreedomLine
PO Box 7 - SCA
Connersville, IN 47331

*Also see our long-running Classified Ad in this and every issue*

FCC Reg. No. 0021217047



### The Habeas Citebook: Ineffective Assistance of Counsel
**Brandon Sample**
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

$49.95

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



### Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition
**Jon Marc Taylor**
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

$49.95

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



### Prisoners' Self-Help Litigation Manual, 4th Edition
**John Boston & Dan Manville**
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

$45.95

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook,
Ineffective Assistance of Counsel
$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
3rd edition
$49.95

☐ Prisoners' Self-Help
Litigation Manual
4th edition
$45.95

***Shipping included in all prices***

***Order by mail, phone, or on-line.***   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address_____

City _____ State ____ ZIP _____

PUBLISHED BY

**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 1151 • Lake Worth, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

# From the Editor

### by Paul Wright

THIS MONTH'S INTERVIEW WITH NOAM Chomsky is part of *PLN*'s ongoing series of interviews with notable people who have diverse views of the U.S. criminal justice system. Prior interviews have been conducted with well-known actor Danny Trejo, media mogul and millionaire Conrad Black, and wrongfully convicted former prisoner Jeff Deskovic. We hope that these interviews serve to further what passes for discussion and debate on this country's criminal justice system in general and prisons in particular.

We still need to expand our circulation in order to keep our subscription rates as low as possible; since most publishing-related costs are fixed, the higher our circulation the lower our per-issue expenses for things like printing, postage and layout, which helps keep our costs – and thus our subscription rates – low.

How can you help? First, you can subscribe to *PLN* for four years and get a copy of *The Habeas Citebook: Ineffective Assistance of Counsel* for free! This $49.95 value is yours if you subscribe for four years or extend your existing subscription for four years. Second, if you know someone who would benefit from *PLN*, purchase a gift subscription for them. *PLN* makes a great gift, especially for friends or family members who are incarcerated.

If you write to *PLN*, please try to be as concise as possible as our office staff is limited and it saves time if you can let us know the purpose of your letter in the opening paragraph. We are always interested in reporting lawsuit wins by prisoners, including verdicts, settlements and judgments, so let us know when you prevail in a case. Informing us that you have filed a lawsuit is not useful until there has been a ruling on the merits, at a minimum.

Lastly, look in this issue of *PLN* for full-page ads for the Washington Prison Phone Justice Campaign and how you can take action on prison phone contracts in other states that are up for renewal or re-bids. *PLN* and our parent organization, the Human Rights Defense Center, continue to advocate for lower phone rates and reform of the prison phone industry.

Enjoy this issue of *PLN* and please consider renewing your subscription or purchasing gift subscriptions for others who are interested in criminal justice-related issues. 🐾

# $2.25 Million Jury Verdict against LCS in Texas Prisoner Death Suit

### by Matt Clarke

ON OCTOBER 24, 2012, A FEDERAL JURY in Texas awarded $2.25 million to the estate and survivors of a prisoner who died at a facility operated by LCS Corrections Services (LCS), after finding the company was 100% at fault. The district court subsequently reversed its dismissal of § 1983 claims against LCS and granted a new trial as to those claims.

Mario A. Garcia was incarcerated at the Brooks County Detention Center (BCDC) in Falfurrias, Texas, owned and operated by LCS, when he died of a seizure on January 12, 2009. After Garcia was booked into BCDC, his wife delivered a supply of clonazepam, a prescription anti-anxiety medication he had been using for years, to the facility. BCDC officials received the medication but did not give it to Garcia because they allegedly had a policy of refusing to allow prisoners to take any controlled substances, even bona fide prescription medications.

Garcia began shaking badly later that day. He was taken to the emergency room, treated and returned to BCDC. The prison's contract physician, Dr. Michael Pendleton, saw Garcia twice – the last time on January 8, 2009. After the second visit with Dr. Pendleton, Garcia's condition deteriorated rapidly; he was admitted to the prison's medical unit with uncontrollable shaking on January 10 and remained there until he had a seizure and died two days later.

Garcia's estate, widow, son and parents filed a civil rights action pursuant to 42 U.S.C. § 1983 in federal court that alleged failure to provide adequate medical care plus state law claims of wrongful death and gross negligence. Garcia's father died a few months prior to trial, after which his mother agreed to a confidential settlement.

The district court had previously dismissed the § 1983 claims against LCS, finding that because Garcia was a federal prisoner the company was acting under color of federal law – and § 1983 claims only apply to deprivations of rights under color of state law.

At trial on the plaintiffs' remaining claims, experts testified that Garcia could have been saved had he been taken to a hospital on January 10, and might not have had the seizure at all had he not been denied his medication. LCS named Dr. Pendleton as a responsible third party and claimed he was 75% at fault. The jury found that neither Pendleton nor Garcia was at fault, but rather LCS was 100% responsible for Garcia's death.

The jury awarded Garcia's estate $500,000 for personal injury and past pain and suffering. His widow received a total of $500,000 in damages, and the jury awarded Garcia's son $1.25 million for loss of companionship and mental anguish. The total award against LCS was $2.25 million plus prejudgment interest at a rate of 5%.

On March 25, 2013, Garcia's widow filed a motion for a new trial on the § 1983 claims that had been dismissed, noting that another federal court in the Southern District of Texas



# Corcoran Sun

Full Color Prison Yard Monthly
News ♦ Entertainment ♦ Resources

**3 Month Special Subscription**

## $5 or 20 FCS Stamps

**COLOR NEW 18 PAGES**
Expanded full color format with exciting episodes of thrilling novels and sexy pics. Many how-to articles on writing, art and health. Filled with entertainment: puzzles, trivia, jokes, poetry... Submit your writing, art, poetry etc. See your submission, name and contact info in print.

**Special 6-Issue Subscription ($10 or 40 FCS stamps)**
Special Year Subscription ($20 or 80 FCS stamps)
Payments to: Freebird Publishers
Box 541– Dept. BK, North Dighton, MA 02764
*www.FreebirdPublishers.com*
*Diane@FreebirdPublishers.com*

had found LCS was a state actor because it derived its authority to operate a prison from the State of Texas, even though the facility housed federal prisoners.

The district court agreed, reversing its dismissal of the § 1983 claims and granting the motion for a new trial as to those claims against LCS. The new trial remains pending; the plaintiffs are represented by Corpus Christi attorneys Craig Henderson and Kathryn A. Snapka. See: *Garcia v. LCS Corrections Services,* U.S.D.C. (S.D. Tex.), Case No. 2:11-cv-00004.

Additional source: *www.verdictsearch.com*

# Ohio: Attorney General May Not Increase Sex Offender's Registration Requirements

IN APRIL 2013, AN OHIO APPELLATE court ruled that a sex offender, who was required by virtue of a California conviction to register his address annually for ten years, could not subsequently be indicted, after moving to Ohio and being reclassified under the Adam Walsh Act, for failing to register every 90 days.

Ansuri Ameem was convicted in California of sexual assault and pandering. Classified as a sexually-oriented offender under the former Megan's Law, Ameem was required to register his address annually for ten years.

In July 2007, after moving to Ohio, that state's attorney general reclassified Ameem as a Tier III offender under the Adam Walsh Act. The reclassification subjected Ameem to an increased obligation to register – specifically, every 90 days for life. Ameem failed to register as required and was indicted in July 2010.

After unsuccessfully moving to have the indictment dismissed on grounds that the Ohio attorney general's reclassification was unconstitutional, Ameem pleaded no contest to failing to register.

On appeal, the Eighth Appellate District of the Court of Appeals held that the attorney general's reclassification of Ameem from Megan's Law to the Adam Walsh Act was invalid. Relying on Ohio Supreme Court precedent, the appellate court found that the reclassification violated the separation of powers doctrine because it would allow the executive branch to review or overrule a decision made by the judicial branch.

The Court of Appeals further noted that Ameem's case was not affected by the Ohio Supreme Court's decision in *State v. Brunning,* 2012 Ohio 5752, 983 N.E.2d 316 (Ohio 2012), which held that "despite an offender who was originally classified under Megan's Law being wrongly reclassified under the Adam Walsh Act, the state could still maintain a prosecution for a violation of the reporting requirements as long as the alleged violation also constituted a violation of Megan's Law."

Accordingly, Ameem's conviction for failure to register was reversed. See: *State v. Ameem,* 2013 Ohio 1555 (Ohio Ct. App. 2013); 2013 Ohio App. LEXIS 1448.



# The Inadequacy of Prison Food Allergy Policies

*by Jamie Longazel and Rachel Archer*

MICHAEL SAFFIOTI WAS ARRESTED ON a misdemeanor marijuana charge and held at the Snohomish County Jail (SCJ) in Washington State. On the morning of July 2, 2012, he arrived at the center of his module where breakfast was being served. Because he had a severe dairy allergy, Saffioti examined very closely the pancake and oatmeal he was given. Video footage obtained by local news agency KIRO-7 showed him discussing his food with guards, servers and fellow prisoners. This was not the first time Saffioti was held at the SCJ, so his allergy was on record. Yet jail staff had brought no special diet trays to his module that morning; they instead simply removed the pancake from his tray and assured him the oatmeal would be safe to eat.

After taking just a few bites, Saffioti began to experience shortness of breath. Video footage showed him approaching a guard's desk, where reports say he asked for his inhaler and to see a nurse. He was given the inhaler but his request for a nurse was denied, and shortly afterwards he was sent back to his cell. Once there, according to a subsequent lawsuit, he pressed his call button and repeatedly asked when the nurse would arrive. By looking closely at the video footage, one can see how he later began jumping up and down in his cell, seeking assistance. Thirty-five minutes later a guard found Saffioti unconscious. After attempts to perform CPR were unsuccessful, he was rushed to a nearby hospital where he was pronounced dead.

Saffioti's tragic death raises many important questions about food allergy policies in U.S. prisons and jails – a subject that has been relatively overlooked, likely to the detriment of many prisoners. The federal Bureau of Prisons (BOP) estimates that 0.2% to 3.5% of all prisoners suffer from food allergies. And a recent study by the Centers for Disease Control and Prevention reported a 50% increase in food allergies among children since 1997. With approximately 2.2 million people confined in U.S. prisons and jails today, this means prison food allergy policies impact as many as 77,000 prisoners and likely many more in years to come, including some like Saffioti whose allergies are so severe that meal choices can literally mean life or death.

As far as we can tell, there is no reliable data on how common it is for prisoners with food allergies to die or otherwise suffer from unmet dietary needs. We do know that prisoners file a fair number of lawsuits pertaining to food allergies each year. Given the many legal obstacles confronted by those challenging the conditions of their confinement, these cases are likely just the tip of the iceberg. In an effort to shine more light on the issue, we sent public records requests to all fifty states (we received responses from 39), asking about the food allergy policies used in their prison systems.

Three observations become apparent after analyzing these policies. The first is that many are lacking – in some cases, substantially. The implication is that some prisoners likely suffer from food allergies that the facilities at which they are confined do not recognize. An official in Kansas responded to our inquiry by noting that they "do not have a procedure in place on this subject." California – whose prison system houses more than 117,000 people (as many as 4,000 with food allergies, if the BOP's estimate is accurate) – has a very vague policy that places limits on the therapeutic diets that physicians are able to order for prisoners. Neighboring Oregon only recognizes food allergies that are "life threatening." This policy thus excludes prisoners who suffer from soy allergies, for example, a condition that the Mayo Clinic notes is "rarely ... life threatening" but could nonetheless cause substantial discomfort with symptoms that include tingling in the mouth, hives, swelling, abdominal pain, diarrhea, nausea or vomiting.

New Hampshire's policy identifies only certain allergies as "acceptable" – specifically, the "main food allergies (i.e. onion, tomato, egg, and peanut)." Saffioti's severe dairy allergy would not have been recognized under this policy, nor would someone suffering from a wheat or gluten allergy, among many others. Georgia draws a slightly different line between allergies that are acknowledged and those that are not. They "honor the following Food Allergies: Milk, Egg, Wheat, Gluten, Fish/Shellfish, Peanut/Nut, Chocolate, and Tomato."

The second observation is that even among states that do acknowledge an array of allergies, prisoners face a substantial burden in becoming eligible for alternative diets. Many states require that an allergy be "verifiable and documented," and that



**EVERY ISSUE CONTAINS:**
- 200 Pen Pal Resources
- 400 Businesses Serving Prisoners
- 200 Non Profit Orgs for Prisoners
- 80 Designer Gift Stores
- Free Ad Space to Sell Your Stuff
- 15 Magazine Sellers
- Sexy Photo Sellers
- and lots of ladies, too, BOP cool.
- Typist & Publishing Services

**CENSORED EDITION AVAILABLE**
Contains NO Pen Pal or Sexy Photos

Pay to: Inmate Shopper
P.O. Box 231 • Edna, TX 77957
PRICE: $17.99 + $6 Priority Mail with Tracking #.

INMATE SHOPPER 2014 READERS CHOICE RESULTS

America's Largest Up-To-Date Resources For Prisoners

$14.98 FREE Shipping

Bonus! 100 Orgs en Espanol!

amazon.com

Corrlinks: info@inmateshopper.com

The Best 500 NON PROFIT ORGanizations For Prisoners & Their Families

"written medical proof" be provided. This means either that prisoners must have had access to allergy tests before their confinement – which for the uninsured can cost hundreds of dollars – or that they be tested while behind bars. In the latter case, the trouble is that some states impose limits on who can be tested for food allergies.

For example, Arizona's policy stipulates: "Inmates should only be allergy tested when there is sufficient evidence to do so." This raises concern for those who suffer from allergies where physical symptoms are absent, such as celiac disease. As the National Digestive Diseases Information Clearinghouse points out, "People with celiac disease may have no symptoms but can still develop complications of the disease over time. Long-term complications include malnutrition – which can lead to anemia, osteoporosis, and miscarriage, among other problems – liver diseases, and cancers of the intestine." In other words, a diet can be doing substantial harm to a prisoner's body and some existing food allergy policies provide no means by which that harm can be avoided.

At least one state has a policy in place that actually deters prisoners from being tested for food allergies. Kentucky's policy permits prisoners to take an allergy test, but stipulates that prisoners will be charged for tests that come up negative. One can assume that this is an attempt to root out false claims, but even if it succeeds in doing so, the policy may disaffect those who really do suffer from allergies. As Food Allergy Research and Education points out, allergy tests "do not always provide clear-cut answers" and patients "may have to take more than one test before receiving [a] diagnosis." Even under the circumstances when all the

hoops are jumped through and prisoners do manage to furnish acceptable "proof" of their allergy, a number of states require continual renewal of such proof, usually every 90 days.

A final observation is that the burden is often on the prisoner to make choices about their food. This is not to say that prisoners with food allergies should not be well aware of their condition and have a firm understanding of how to respond in the event of an allergic reaction, but rather to point out the lack of institutional support for food allergy issues. Choices about what to eat and what to avoid are especially difficult to make when prisoners are served food they did not prepare. Yet some institutions tell prisoners to fend for themselves, often without recognizing how difficult doing so can be.

Take Oregon's policy, for example: "We encourage inmates to self-select from the line. For example, if an inmate has a peanut allergy and we are serving peanut butter & jelly sandwiches, they may select the meal alternative tray which consists of beans, rice, vegetables, fruits, and bread." South Carolina's policy similarly states little more than the obvious: "If an inmate notifies medical staff of a food allergy, the medical staff will instruct the inmate to avoid that allergy in his/her food choices." Georgia's policy is that once a prisoner receives a food tray, they are considered compliant. This policy also brings Saffioti's case to mind, for technically after servers handed him the pancake and oatmeal breakfast tray, he would have been considered compliant and his desperate attempts to learn the contents of the food would have been irrelevant in a lawsuit.

In conclusion, our content analysis of

prison food allergy policies provides cause for alarm. Granted, it is possible that prison staff go beyond what is listed on policy forms in helping prisoners meet their dietary needs. However, given the conditions of confinement that have characterized our nation's overcrowded prisons in this era of mass imprisonment, we have little reason to be so optimistic. Consider that in the realm of health care, containment has taken precedent over healing, as was recently exposed in California's sweeping *Brown v. Plata* class-action lawsuit.

Along similar lines, cost cutting rather than nutritional adequacy seems to be increasingly emphasized in the realm of prison food. A recent *Prison Legal News* article, for example, detailed the great lengths that Aramark – a company that contracts with more than 600 correctional facilities – goes through to cut costs. A class-action lawsuit filed by prisoners in Illinois protesting the high amounts of soy in their diet is another example of providing prison food "on the cheap" to the detriment of prisoners' health. The likelihood that prisoners with food allergies have their needs met is thus diminished as they confront not just a set of inadequate policies, but also a system whose main concern is not their health and well-being. ✍

*Jamie Longazel is an Assistant Professor of Sociology at the University of Dayton, Ohio. He is co-author (with Benjamin Fleury-Steiner) of the book, The Pains of Mass Imprisonment (Routledge, 2013). Rachel Archer is a Criminal Justice Studies major at the University of Dayton who has research interests in the areas of food allergies, law and prison conditions. They provided this article exclusively for Prison Legal News.*

## MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

**(213) 489-7715**



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite 1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

# Kitchen Supervisor Gets Prison Time for Sexually Abusing Two Prisoners

A CIVILIAN PRISON EMPLOYEE'S SEXUAL abuse of two prisoners at a federal facility in Phoenix, Arizona was made public after an FBI surveillance camera captured the lascivious details of their ménage à trois.

According to a rather explicit criminal complaint filed on August 29, 2012 in U.S. District Court, Carl David Evans, the kitchen supervisor at FCI-Phoenix, traded packs of cigarettes for oral sex with two male prisoners identified only as "J.I." and "E.D." Evans was charged with two counts of sexual abuse of a ward and one count of providing contraband.

Prison officials learned in June 2012 that Evans was "engaged in a sexual relationship" with at least one prisoner, according to FBI Agent Tyler Woods. Investigators hid a video camera in the food storage area in the kitchen where the alleged sex acts were taking place, and recorded Evans' work shifts for an entire week.

Woods then reviewed the video and discovered footage showing Evans, J.I. and E.D. entering the storage area. E.D. was heard asking Evans and J.I. if they were "ready to suck some dick." Evans locked the door, and the trio then had mutual fellatio on top of some food sacks.

E.D., who worked as a cook, told FBI investigators that beginning in April 2012, Evans gave him a pack of cigarettes every two weeks that he sold to other prisoners for

as much as $150 each. Evans exacerbated the relationship when he became "aggressive physically," according to E.D., asking him to take off his shirt and then proceeding to play with his nipples.

E.D. estimated that Evans performed oral sex on him 15-20 times. Once, E.D. alleged, Evans brought K-Y gel and placed a condom on him, and the men briefly engaged in anal sex before E.D. had a change of heart.

J.I. told investigators that he engaged in oral sex with Evans and E.D. three times, only because he knew that E.D. had access

to food and "benefited from his relationship with Evans," according to the complaint.

Evans pleaded guilty to five of the federal charges in February 2013, and seven other charges were dropped. He was sentenced on July 3, 2013 to 36 months in prison, three years of supervised release and a $5,000 fine. Evans has since appealed his sentence to the Ninth Circuit. See: *United States v. Evans*, U.S.D.C. (D. Ariz.), Case No. 2:12-cr-01634-SRB.

Additional sources: *Arizona Republic, www. thesmokinggun.com*

# $15.5 Million Settlement for Mentally Ill Jail Detainee Held in Solitary Confinement

A MENTALLY ILL DETAINEE WHO WAS placed in solitary confinement in a New Mexico county jail for nearly two years, without adequate medical or mental health care, accepted a $15.5 million settlement for violations of his civil rights.

Stephen Slevin, 59, served almost 22 months in solitary confinement between 2005 and 2007 at the Doña Ana County Detention Center in Las Cruces, New Mexico. On January 24, 2012, a federal jury awarded him $22 million. The award was upheld by a federal judge after county officials challenged it as being excessive, but

Slevin decided in February 2013 to accept a $15.5 million settlement and end the legal battle without further appeals.

"It has been a long and hard fight to bring Mr. Slevin justice," said one of his attorneys, Matthew Coyte. "This settlement, although very large, does not give back to Mr. Slevin what was taken from him, but if it prevents others from enduring the pain and suffering he was subjected to, then the fight has been worthwhile."

Slevin's ordeal began on August 24, 2005, when he was booked into the jail on charges of driving while intoxicated and



## Support Prison Legal News with these beautiful gifts!

CALL **561-360-2523**, MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/

### Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

receiving or transferring a stolen vehicle.

"He was driving through New Mexico and arrested for a DWI, and he allegedly was in a stolen vehicle. Well, it was a car he had borrowed from a friend; a friend had given him a car to drive across the country," said Coyte.

Slevin had a lifelong history of mental illness. He was found to have suicidal tendencies by former Doña Ana County Detention Center medical director Daniel Zemek. As a result, Slevin was placed alone in a bare, padded cell for a few days, then moved to the medical center and finally transferred to solitary confinement in October 2005. He remained there for the next 18 months.

When he entered the jail, Slevin "was a well-nourished, physically healthy, adult male with a mental illness." On May 8, 2007, he was transferred to the New Mexico Behavioral Health Institute (NMBHI) for a psychiatric review.

According to Slevin's civil rights complaint, when he was admitted to NMBHI he smelled, his beard and hair were overgrown and he had a fungal skin infection. He was also malnourished, weighed only 133 pounds and complained of paranoia, hallucinations, bed sores and untreated dental problems. He was disoriented and clueless to the fact that he had spent the last 18 months in solitary confinement.

Slevin received mental health care at NMBHI, and the reintroduction to human interaction and socialization brought back his alertness and awareness. After only 14 days of treatment, however, Slevin

was returned to the Doña Ana Detention Center where he was again placed in solitary confinement.

As before, his mental health began to deteriorate. The failure of jail officials to act on his requests for dental care forced Slevin to pull his own tooth while in his cell. His toenails "grew so long they curled under his toes," the *Albuquerque Journal* reported.

Slevin was finally released on June 25, 2007 after the charges against him were dismissed. He claimed he had never seen a judge and was placed in solitary confinement with no explanation from jail officials.

Slevin sued for deprivation of his civil rights. At trial, Zemek admitted that he couldn't remember ever having visited Slevin in solitary confinement during the time he worked as the jail's medical director, and accepted responsibility for being the person who was supposed to oversee Slevin's health care.

"There were circumstances beyond my control that contributed to that, my failure. I take the blame, yes," he testified. Zemek also said he had informed county officials that he felt the jail did not have enough medical staffing.

At the conclusion of the six-day trial, the jury found Doña Ana County Detention Center director Christopher Barela liable for depriving Slevin of his constitutional rights to humane conditions of confinement, adequate medical care and procedural due process, awarding Slevin $3 million in punitive damages.

The jury found Zemek liable for $3.5

million in punitive damages for the same types of violations, and also found that a municipal policy, implemented by the Board of Commissioners for the County of Doña Ana, resulted in violations of Slevin's rights under the Americans with Disabilities Act as well as various torts, including false imprisonment. The jury awarded $15.5 million in compensatory damages against the defendants.

The *Las Cruces Sun-News* reported in early 2013 that the County of Doña Ana is responsible for paying $9.5 million of the settlement, while the county's insurance provider will cover the remaining $6 million. See: *Slevin v. Board of County Commissioners for the County of Doña Ana*, U.S.D.C. (D. NM), Case No. 1:08-cv-01185-MV-SMV. ✍

Sources: *www.huffingtonpost.com, Las Cruces Sun-News, Santa Fe Reporter, Albuquerque Journal*



**DURHAM LAW OFFICE**

**APPEALS, POST-CONVICTION, HABEAS, § 2255, PAROLE**

**IDAHO ONLY**

Craig H. Durham, Attorney at Law
910 W. Main Street, Suite 328
Boise, ID 83702
chdlawoffice.com

LAW OFFICES OF

**ELMER ROBERT KEACH, III**
A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Washington Avenue Extension
Albany, NY 12205-5531
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration
Medical Indifference Cases • Corrections and Police Brutality
Sexual Abuse and Assault • Illegal Strip Searches
Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals, Post-Conviction Relief, Habeas Corpus

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED, YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages. DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS. Make sure to exhaust your administrative remedies and comply with state law notice requirements, if applicable, to preserve state law intentional tort/negligence claims.

# Colorado Prisoner who Murdered Guard
# Gets Life Without Parole

Last month, *Prison Legal News* reported that the parents of a slain Colorado prison guard did not want the prisoner who murdered him to face the death penalty. Edward Montour, who beat Lima Correctional Facility guard Eric Autobee to death in October 2002, was initially sentenced to death but that sentence was overturned in 2007.

Montour faced the death penalty again in a retrial, but Eric Autobee's parents, Bob and Lola, who now oppose capital punishment, wanted to provide a victim impact statement to the jury urging them not to impose a death sentence.

"A lot of people think because I forgave him [Montour], I don't want to hold him accountable or have him punished," Bob Autobee stated. "That's not true. People that do these things have to be punished, but death is not the answer."

Eighteenth Judicial District Attorney George Brauchler objected to the Autobees' request to provide a victim impact statement, arguing that such statements could only be for punitive and not mitigating purposes. [See: *PLN*, March 2014, p.24].

Before murdering Eric Autobee, Montour was serving a life sentence for killing his 11-week-old daughter, Taylor, which he claimed was an accident when she fell and hit her head. On February 27, 2014, the El Paso County coroner's office changed the cause of Taylor's death from homicide to undetermined, and a group of experts retained by Montour's defense counsel said her injuries were consistent with an accident.

Defense attorneys had intended to argue at trial that Montour's mental illness became worse after he was wrongfully convicted of killing his daughter, culminating in his fatal attack on Eric Autobee in the kitchen at the Lima Correctional Facility.

However, on March 6, 2014, Montour pleaded guilty to murdering Autobee in exchange for a sentence of life without parole; he said he owed the plea to Autobees' parents. Even if he is eventually exonerated in his daughter's death, he still must serve a life sentence for killing Eric Autobee.

"I had to get as much justice out of this situation as I could," Brauchler said in reference to offering the plea bargain to Montour.

Sources: *www.kdvr.com, Denver Post*

# U.S. Supreme Court: District Courts Can Make Federal Sentences Consecutive or Concurrent to Future State Sentences

On March 28, 2012, the U.S. Supreme Court held that a federal district court may impose a federal prison term that is consecutive to an adjudicated future state court sentence. In February 2014, the Third Circuit ruled that a district court's ability to impose such a sentence only applies at the time when the federal sentence is imposed.

Monroe Ace Setser was on probation for a drug charge when he was arrested in Texas on a new charge of possession with intent to deliver a controlled substance. After Setser was indicted on the new drug charge, the state moved to revoke his probation. A federal grand jury then indicted him on the federal offense of possession with intent to distribute 50 grams or more of methamphetamine, based on the same incident that had resulted in the new state drug charge.

This did not constitute double jeopardy based on the legal fiction that it is permissible to pursue state and federal charges for the same criminal conduct under the "dual sovereignty" doctrine.

Setser pleaded guilty to the federal charge and was sentenced to 151 months in prison. The federal judge made Setser's sentence consecutive to the sentence he would receive in the probation revocation proceedings, but concurrent with the sentence he would receive for the new state drug charge.

Setser appealed. While his appeal was pending, the state sentenced him to five years in prison for the probation revocation and 10 years for the new drug charge, with both sentences to run concurrent. This made it impossible to implement the federal sentence as ordered by the district court.

## EXECUTIVE CLEMENCY

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT**
**3907 N. Federal Highway, # 151**
**Pompano Beach, FL 33064**
**954-271-2304**

BBB ACCREDITED BUSINESS

**(35-Years of Clemency & Parole Assistance)**
**(Transfers Under The Int'l Prisoner Treaty)**

## Alexander Byrd Optics

### Single Vision Transitions eyeglasses
**$119.95** + S&H
with Lifetime Frame Warranty

To receive order form and details write to:

2150 Wise St. #4769
Charlottesville, VA 22905

or have someone go to:

abyrdoptics@gmail.com
www.abyrdoptics.com

Regardless, the Fifth Circuit Court of Appeals affirmed his federal sentence, holding that the district court had the authority to run a sentence consecutive to a future state sentence that had not yet been imposed, and that the sentence was reasonable even if "partially foiled" by the state court's decision to make the state sentences concurrent. Setser filed a petition for writ of certiorari in the U.S. Supreme Court, which was granted.

The Supreme Court held that the traditional broad discretion that federal judges enjoy when imposing sentences includes the ability to make a sentence consecutive to an anticipated state sentence, and that such a determination is not left for the Bureau of Prisons to decide. However, in this case the sentence pronounced by the federal judge could not be carried out because the state court had made the probation revocation and new drug charge sentences concurrent.

In such a case, the Supreme Court held that the Bureau of Prisons "ultimately has to determine how long the District Court's sentence authorizes it to continue Setser's confinement. Setser is free to urge the Bureau to credit his time served in state court based on the District Court's judgment that the federal sentence run concurrently with the state sentence for the new drug charges. If the Bureau initially declines to do so, he may raise his claim through the Bureau's Administrative Remedy Program. See 28 CFR § 542.10 *et seq.* (2011). And if that does not work, he may seek a writ of habeas corpus."

The judgment of the Fifth Circuit upholding Setser's federal prison sentence was therefore affirmed. See: *Setser v. United States*, 132 S.Ct. 1463 (2012).

On February 12, 2014, the Third Circuit Court of Appeals applied the ruling in *Setser* to find that while a district court can decide whether to run a federal sentence concurrent or consecutive to a future state sentence that has not yet been imposed, it can do so only at the time of sentencing on the federal charges.

Defendant Michael Sharpe was sentenced to 144 months in federal prison in 2004; he expired his sentence in May 2013 and was remanded to Pennsylvania officials for a parole violation. He then filed a motion in the district court seeking reconsideration of his federal sentence, requesting that the court run it concurrent with his subsequently-imposed Pennsylvania state sentence.

The district court held it did not have jurisdiction to modify Sharpe's sentence, which was affirmed on appeal. The Third Circuit found that *Setser* "holds merely that district courts have such authority" at the time the federal sentence is imposed when deciding whether federal sentences are to be made concurrent or consecutive to future state sentences.

The appellate court further noted that "even if the District Court had been authorized to modify Sharpe's federal sentence, that is not really what he was asking the court to do. Sharpe's federal sentence has expired and he is now serving a state-court sentence. Thus, Sharpe is really seeking to modify his state sentence on the ground that it should (or should have) run concurrently with his federal sentence. That is a matter for Pennsylvania authorities, not the federal courts." See: *United States v. Sharpe*, 2014 U.S. App. LEXIS 2653 (3d Cir. 2014) (unpublished). ⚑

# Legal Insights Inc.

- **Post-Conviction Specialists (State or Federal Convictions/Pleas, State & Federal Habeas Corpus, [28 U.S.C. § 2254, 2255], Coram Nobis, PRP, "Next Friend", Certiorari, SVP, Sentence Modification, DNA and more).**

- **All 50 States, D.C., Federal District Courts, Federal Courts of Appeal and Supreme Court.**

- **Comprehensive investigative services available.**

- **Expert and specialist services available.**

- **Staff attorney available.**

- **Post Conviction Specialists with over 12 years experience with proven results.**

- **Legal research and case law retrieval services available.**

- **Multi-lingual services available.**

- **FREE initial consultation.**

- **Payment plans available.**

### 25602 Alicia Parkway #323
### Laguna Hills, CA 92653
### 714-941-0578
info@legalinsights.org
www.legalinsights.org
A California 501(c)(3) Non-Profit Organization

# Lowering Recidivism through Family Communication

*by Alex Friedmann*

THERE ARE CURRENTLY 2.2 MILLION people held in prisons and jails in the United States,[1] and an estimated 95% of prisoners currently in custody will one day be released. Based on 2012 data, around 637,400 people are released annually from state and federal prisons.[2]

According to an April 2011 report by the Pew Center on the States, the average national recidivism rate is 43.3%.[3] Based on that average rate, an estimated 276,000 released prisoners can be expected to recidivate each year, many committing new crimes and returning to prison.

This negatively impacts our communities in several ways, including the societal costs of more crime and victimization as well as the fiscal costs of reincarcerating ex-prisoners who commit new offenses – at an average annual cost of $31,286 per prisoner, according to a 2012 report by the Vera Institute.[4]

Studies have consistently found that prisoners who maintain close contact with their family members while incarcerated have better post-release outcomes and lower recidivism rates.

These findings represent a body of research stretching back over 40 years. For example, according to "Explorations in Inmate-Family Relationships," a 1972 study: "The central finding of this research is the strong and consistent positive relationship that exists between parole success and maintaining strong family ties while in prison. Only 50 percent of the 'no contact' inmates completed their first year on parole without being arrested, while 70 percent of those with three visitors were 'arrest free' during this period. In addition, the 'loners' were six times more likely to wind up back in prison during the first year (12 percent returned compared to 2 percent for those with three or more visitors). For all Base Expectancy levels, we found that those who maintained closer ties performed more satisfactorily on parole."[5]

These findings still ring true. An article published in August 2012 in *Corrections Today*, a publication of the American Correctional Association, titled "The Role of Family and Pro-Social Relationships in Reducing Recidivism," noted that "Family can be a critical component in assisting individuals transitioning from incarceration because family members provide both social control and social support, which inhibit criminal activity.... In contrast, those without positive supportive relationships are more likely to engage in criminal behavior."[6]

Further, a Vera Institute study, published in October 2012, found that "Incarcerated men and women who maintain contact with supportive family members are more likely to succeed after their release.... Research on people returning from prison shows that family members can be valuable sources of support during incarceration and after release. For example, prison inmates who had more contact with their families and who reported positive relationships overall are less likely to be re-incarcerated."[7]

Another Vera Institute report, published in 2011, stated: "Research shows that incarcerated people who maintain supportive relationships with family members have better outcomes – such as stable housing and employment – when they return to the community. Many corrections practitioners and policy makers intuitively understand the positive role families can play in the reentry process, but they often do not know how to help people in prison draw on these social supports."[8]

According to research published in *Western Criminology Review* in 2006, "a remarkably consistent association has been found between family contact during incarceration and lower recidivism rates."[9]

Correctional practices that "facilitate and strengthen family connections during incarceration" can "reduce the strain of parental separation, reduce recidivism rates, and increase the likelihood of successful re-entry," according to a 2005 report by the Re-Entry Policy Council.[10]

A 2003 study by the Washington, D.C.-based Urban Institute, "Families Left Behind: The Hidden Costs of Incarceration and Reentry," as revised in 2005, noted: "Research findings highlight the importance of contact among family members during incarceration. Facilitating contact has been shown to reduce the strain of separation and increase the likelihood of successful reunification. Studies comparing the outcomes of prisoners who maintained family connections during prison through letters and personal visits with those who did not suggest that maintaining family ties reduces recidivism rates."[11]

Also, a 2004 study by the Urban Institute stated, "Our analysis found that [released prisoners] with closer family relationships, stronger family support, and fewer negative dynamics in relationships



BATTLING THE ADMINISTRATION
An Inmate's Guide to a Successful Lawsuit

David J. Meister

Written from a prisoner's perspective, this book is excellent for both the first-time litigant and the old hand, a practical guide for navigating the strange world of prisoner's rights.

⇒ Guidance on how to get organized
⇒ Tips for investigating and building a case
⇒ Spelling and Grammar refresher
⇒ Detailed overview of the legal system
⇒ Sample complaint and other forms
⇒ Covers court rules, evidence, and exhibits
⇒ Details on hearing and trial practice
⇒ Comprehensive summary of prisoner's rights
⇒ Hundreds of citations to controlling case law

**Battling The Administration**
by, David J. Meister
ISBN: 9781940638034    555 pages
Send check or money order to:
**Wynword Press**
**P.O. Box 557**
**Bonners Ferry, ID  83805**
Include  your full Name, DOC#, Institution name and your complete address.
Order online at: www.wynwordpress.com
**Tel (208) 267-0817**

$34.95    Price includes shipping

with intimate partners were more likely to have worked after release and were less likely to have used drugs." The study authors, Christy Visher, Vera Kachnowski, Nancy La Vigne and Jeremy Travis, concluded, "It is evident that family support, when it exists, is a strong asset that can be brought to the table in the reentry planning process."[12]

It is thus abundantly clear that maintaining close family relationships during incarceration results in lower recidivism rates and therefore less crime, which benefits society as a whole. Yet in spite of this clear correlation, corrections officials often do little to encourage contact between prisoners and their family members.

There are three primary forms of communication available to prisoners: letters, visits and phone calls.

With respect to letters, many prisoners are illiterate or functionally illiterate, which frustrates correspondence. A 2007 report by the National Center for Education Statistics found that 39% of prisoners scored "below basic" for quantitative literacy testing, while another 39% scored at only a "basic" level.[13]

Other studies likewise have found high levels of illiteracy or poor written communication skills among prisoners, which makes letter-writing as a means of regular contact between prisoners and their families problematic.

Further, an increasing number of jails are adopting postcard-only policies, whereby prisoners can only receive, and sometimes send, mail in the form of postcards – a very limited means of correspondence. [See: *PLN*, Nov. 2010, p.22]. Such policies place additional burdens on communication between prisoners and their families; PLN and other organizations have challenged postcard-only policies in various jurisdictions, including Florida, Tennessee, Oregon, Washington and Michigan. [See: *PLN*, Jan. 2014, p.42; Nov. 2013, p.24; June 2013, p.42; Jan. 2012, p.30; Sept. 2011, p.19].

In regard to visitation, a November 2011 study by the Minnesota Department of Corrections examined recidivism rates for 16,420 ex-prisoners over a five-year period, comparing rates for those who received visits while incarcerated and those who didn't. The study found that "Any visit reduced the risk of recidivism by 13 percent for felony reconvictions and 25 percent for technical violation revocations, which reflects the fact that visitation generally had a greater impact on revocations. The findings further showed that more frequent and recent visits were associated with a decreased risk of recidivism."[14] [See: *PLN*, May 2013, p.1].

However, prison officials often make visitation an unpleasant process, including lengthy waits, onerous searches, restricted visitation times and rigid enforcement of often petty rules. For example, one female attorney said she was told by prison officials that she could not visit a prisoner because her underwire bra set off the metal detector. After leaving, removing her bra and then returning, she was told she could not visit because she wasn't wearing a bra.

According to the 2011 Vera Institute study, "Many family members also indicated that prison rules and practices – including searches, long waits, and inconsistent interpretations of dress codes for visitors – can be unclear, unpleasant, too restrictive, and even keep people from visiting again."

Due to such problematic issues with visitation, and because prisoners are frequently housed at facilities located far from



**Lowering Recidivism (cont.)**

their families which makes in-person visits difficult (federal prisoners, for example, may be held at any federal prison in the United States), phone calls are a primary means of maintaining family contact.

As acknowledged by the largest prison phone company in the nation, Global Tel*Link: "Studies and reports continue to support that recidivism can be significantly reduced by regular connection and communications between inmates, families and friends – [a] 13% reduction in felony reconviction and a 25% reduction in technical violations."[15]

Kevin O'Neil, president of Telmate, another phone service provider, agreed, stating, "The more inmates connect with their friends and family members the less likely they are to be rearrested after they're released."[16]

When the Federal Communications Commission voted in August 2013 to reduce the cost of interstate prison phone calls nationwide, the issue of rehabilitation and recidivism played a contributing role in the FCC's decision.

As stated by FCC Commissioner Mignon Cyblurn: "Studies have shown that having meaningful contact beyond prison walls can make a real difference in maintaining community ties, promoting rehabilitation, and reducing recidivism. Making these calls more affordable can facilitate all of these objectives and more."[17]

The FCC's order imposing rate caps on interstate prison phone calls went into effect on February 11, 2014, though other parts of the order have been stayed by the D.C. Circuit Court of Appeals. [See: *PLN*, Feb. 2014, p.10].

Notably, numerous corrections officials filed objections to the FCC's plan to impose rate caps, and intrastate (in-state) prison phone rates, which were not affected by the FCC's order, remain high. Meanwhile, prisons and jails nationwide have received hundreds of millions of dollars in "commission" kickbacks from prison phone companies, and such kickbacks have long resulted in inflated phone rates that create financial barriers to communication between prisoners and their family members. [See: *PLN*, Dec. 2013, p.1; April 2011, p.1].

In conclusion, although research has consistently found that regular contact between prisoners and their families results in better post-release outcomes and lower recidivism rates, corrections officials have done little to facilitate – and have sometimes deliberately frustrated – such communication with respect to written correspondence, visitation and phone calls.

Investments in prison-based literacy programs and less restrictive mail policies, revising visitation policies to encourage visits by family members, and reducing intrastate prison and jail phone rates would provide prisoners with greater opportunities to maintain close relationships with their families, leading to lower recidivism rates and less crime in our communities.

Few corrections officials seem willing to take such actions, though, which is a strong indicator that reducing recidivism – thus reducing the size of our nation's prison population and the associated costs – is not one of their priorities. ◊

**ENDNOTES**

1 http://www.bjs.gov/content/pub/pdf/cpus12.pdf

2 http://www.bjs.gov/content/pub/pdf/p12tar9112.pdf

3 http://www.pewtrusts.org/uploadedFiles/wwwpewtrustsorg/Reports/sentencing_and_corrections/State_Recidivism_Revolving_Door_America_Prisons%20.pdf

4 www.vera.org/sites/default/files/resources/downloads/Price_of_Prisons_updated_version_072512.pdf

5 http://www.fcnetwork.org/reading/holt-miller/holt-millersum.html

6 https://www.aca.org/fileupload/177/ahaidar/Flower.pdf

7 http://www.vera.org/files/the-family-and-recidivism.pdf

8 http://www.vera.org/sites/default/files/resources/downloads/Piloting-a-Tool-for-Reentry-Updated.pdf

9 http://wcr.sonoma.edu/v07n2/20-naser/naser.pdf (citing other sources)

10 http://csgjusticecenter.org/wp-content/uploads/2013/03/Report-of-the-Reentry-Council.pdf

11 http://www.urban.org/UploadedPDF/310882_families_left_behind.pdf

12 http://www.urban.org/UploadedPDF/310946_BaltimorePrisoners.pdf

13 http://nces.ed.gov/pubs2007/2007473.pdf

14 http://www.doc.state.mn.us/pages/files/large-files/Publications/11-11MNPrisonVisitationStudy.pdf

15 Petitioners' Opposition to Petition for Stay of Report and Order Pending Appeal, FCC WC Docket No. 12-375, Exhibit D, page 6 (October 29, 2013)

16 www.telmate.com/oregon-doc-installatio

17 http://transition.fcc.gov/Daily_Releases/Daily_Business/2013/db0926/FCC-13-113A2.txt

# Iowa: Parole Agreement Does Not Constitute Voluntary Consent that Justifies Warrantless Search

LAST YEAR THE SUPREME COURT OF Iowa reversed a parolee's conviction on drug charges, holding that his acceptance of a search condition in a parole agreement did not constitute voluntary consent, and therefore a warrantless, suspicionless search of his car was unreasonable and violative of his rights under the search and seizure clause of the state constitution.

While on parole in 2009, Isaac A. Baldon III was subjected to a search of his person, the motel room where he was staying and his car, all pursuant to a consent-to-search provision in the parole agreement that Baldon, like all Iowa parolees, was required to sign as a prerequisite to being released on parole. The police found a large quantity of marijuana in Baldon's car and charged him with drug-related offenses.

Baldon moved to suppress the marijuana from the search of his vehicle, arguing that his signing of the parole agreement did not constitute voluntary consent to searches of his person or property. The district court denied the motion and found him guilty of the charges.

On appeal, the Iowa Supreme Court reversed the judgment. Analyzing the issue of consent on state constitutional grounds, the Court concluded, in a thoughtful opinion, that the standard search provision contained in Baldon's parole agreement did not represent a voluntary grant of consent to searches. Notably, this finding rested on provisions in the Iowa constitution, and the Supreme Court noted that many courts in other jurisdictions "have concluded that consent-search provisions in probation agreements constitute a waiver of search-and-seizure rights." See: *State v. Baldon*, 829 N.W.2d 785 (Iowa 2013). ◊

*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - ONLY $20!

+ $3.99 p&h

*"BEST DEAL ON THE POUND!"*

**Check your 5 magazines**
and underline three backup choices (in case of unavailability)

- ☐ 4 WHEEL DRIVE & SPORT UTILITY (12)
- ☐ ALLURE (12)
- ☐ AMERICAN PHOTO (6)
- ☐ ARTHRITIS TODAY (6)
- ☐ AUTOMOBILE (12)
- ☐ BACKPACKER (9)
- ☐ BETTER HOMES & GARDENS (12)
- ☐ BICYCLING (11)
- ☐ BLACK ENTERPRISE (12)
- ☐ BOATING (10)
- ☐ BON APPETIT (12)
- ☐ BOWHUNT AMERICA (6)
- ☐ BOWHUNTING WORLD (9)
- ☐ BRIDAL GUIDE (6)
- ☐ CABELA'S OUTFITTER JOURNAL (6)
- ☐ CAR & DRIVER (12)
- ☐ CAR CRAFT (12)
- ☐ CBS WATCH! MAGAZINE (6)
- ☐ CHARISMA (12)
- ☐ CHEVY HIGH PERFORMANCE (12)
- ☐ CIRCLE TRACK (12)
- ☐ COMPLEX MAGAZINE (6)
- ☐ CONDE NAST TRAVELER (12)
- ☐ CRUISING WORLD (12)
- ☐ CYCLE WORLD (12)
- ☐ DETAILS - FASHION (10)
- ☐ DETROIT HOME (6)
- ☐ DIGITAL PHOTO (7)
- ☐ DIRT RIDER (12)
- ☐ EBONY (11)
- ☐ ELLE DECOR (10)
- ☐ ENTREPRENEUR (12)
- ☐ ESPN MAGAZINE (26)
- ☐ ESQUIRE (11)
- ☐ EVERY DAY WITH RACHAEL RAY (10)
- ☐ FAMILY CIRCLE (12)
- ☐ FAMILY FUN (10)
- ☐ FAST COMPANY (10)
- ☐ FIELD & STREAM (12)
- ☐ FITNESS (10)

- ☐ FLEX (12)
- ☐ FLORIDA SPORT FISHING (6)
- ☐ FLYING (12)
- ☐ FOUR WHEEL & OFF ROAD (12)
- ☐ FOUR WHEELER (12)
- ☐ FREESKIER (6)
- ☐ GLAMOUR (12)
- ☐ GOLF DIGEST (12)
- ☐ GOLF TIPS (7)
- ☐ GOLFWEEK (40)
- ☐ HARPERS BAZAAR (10)
- ☐ HOT BIKE (12)
- ☐ HOT ROD (12)
- ☐ HOUR DETROIT (12)
- ☐ HOUSE BEAUTIFUL (10)
- ☐ INC (12)
- ☐ INSTRUCTOR K - 8 (6)
- ☐ ISLANDS MAGAZINE (8)
- ☐ JET (20)
- ☐ LADIES HOME JOURNAL (10)
- ☐ LATINA (10)
- ☐ LOG HOME LIVING (9)
- ☐ LUCKY (10)
- ☐ MARIE CLAIRE (12)
- ☐ MEN'S FITNESS (10)
- ☐ MEN'S JOURNAL (12)
- ☐ MIDWEST LIVING (6)
- ☐ MINISTRY TODAY (6)
- ☐ MORE (10)
- ☐ MOTOR TREND (12)
- ☐ MOTORCYCLIST (12)
- ☐ MUSCLE & FITNESS (12)
- ☐ MUSCLE MUSTANGS & FAST FORDS (12)
- ☐ NYLON GUYS (6)
- ☐ NYLON MAGAZINE (10)
- ☐ OLD HOUSE JOURNAL (6)
- ☐ OUTDOOR LIFE (12)
- ☐ OUTDOOR PHOTOGRAPHER (11) NR*
- ☐ OUTSIDE (12)
- ☐ PARENTS (12)

- ☐ PLANE & PILOT (12) NR*
- ☐ POPULAR PHOTOGRAPHY (12)
- ☐ POPULAR SCIENCE (12)
- ☐ PREDATOR EXTREME (6)
- ☐ PREVENTION (12)
- ☐ RED BULLETIN MAGAZINE (12)
- ☐ REDBOOK (12)
- ☐ ROAD & TRACK (10)
- ☐ SAVEUR (9)
- ☐ PARENT & CHILD (8)
- ☐ SELF (12)
- ☐ SEVENTEEN (10)
- ☐ SHAPE (12)
- ☐ SIEMPRE MUJER (6)
- ☐ SKI MAGAZINE (6)
- ☐ SLAM (10)
- ☐ SNOWBOARD (4)
- ☐ SNOWBOARDER (6)
- ☐ SPORT RIDER (10)
- ☐ SUPER CHEVY (12)
- ☐ SURFER (12)
- ☐ TAMPA BAY MAGAZINE (6)
- ☐ TEEN VOGUE (10)
- ☐ TENNIS (12)
- ☐ THE ATLANTIC MONTHLY (10)
- ☐ TIMBER HOME LIVING (6)
- ☐ TRANSWORLD MOTOCROSS (12)
- ☐ TRANSWORLD SKATEBOARDING (12)
- ☐ TRANSWORLD SNOWBOARDING (8)
- ☐ TRUCKIN (13)
- ☐ UPTOWN (6)
- ☐ UPTOWN MAGAZINE (6)
- ☐ W MAGAZINE (6)
- ☐ WATERFOWL & RETRIEVER (2)
- ☐ WEIGHT WATCHERS (6)
- ☐ WHITETAIL JOURNAL (6)
- ☐ WIRED (12)
- ☐ WORKING MOTHER (6)
- ☐ YOGA JOURNAL (9)

**Send as many "5 for $20" orders as you like!**

*"Tell your Friends and Families!"*

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or ***order online*** and use credit card or PayPal.

| Name and Inmate # (please print, maximum 24 characters): | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|

Address:

| City: | State: | Zip: |
|---|---|---|

\* No Renewal



# Inmate Magazine Service Inc.

*OK to Copy!*

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
● Adequate medical care
● Protection from assault
● Humane living conditions
● Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**561-360-2523**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

# Update on Missouri Incarceration Reimbursement Act Case

*Prison Legal News* previously reported a decision by the Bankruptcy Appellate Panel for the Eighth Circuit, which held that a Missouri bankruptcy court was correct in concluding that state prison officials did not violate a discharge injunction by collecting money from a prisoner's account for incarceration costs that accrued after the injunction was filed.

In 2009, Missouri prisoner Zachary A. Smith was initially ordered to pay $87,830.13 to cover the costs of his incarceration through March 2007 under the Missouri Incarceration Reimbursement Act (MIRA), plus future costs that accrued until his release from custody. He filed a Chapter 7 bankruptcy petition in 2010 and received a discharge in March 2011, effectively voiding the MIRA judgment.

In September 2012, however, prison officials seized funds deposited into Smith's prison account for costs that had accrued after he filed for bankruptcy. Smith sought a contempt ruling from the bankruptcy court, alleging the state had violated the discharge injunction. The bankruptcy court agreed that the MIRA judgment was void with respect to costs accrued as of the date of the bankruptcy filing, but held the judgment remained valid as to future incarceration reimbursement costs. The Eighth Circuit affirmed on February 5, 2013. [See: *PLN*, Feb. 2014, p.11].

Smith then filed a Rule 74.06(b) motion in circuit court, arguing that the state could not seize assets from his prison account for MIRA judgments that were unknown at the time of the MIRA hearing, citing *State ex rel. Koster v. Cowin*, 390 S.W.3d 239 (Mo. Ct. App. 2013) and *State ex rel. Koster v. Wadlow*, 398 S.W.3d 591 (Mo. Ct. App. 2013).

In a March 6, 2014 letter to *PLN*, Smith wrote: "The Chapter 7 [bankruptcy] was necessary to discharge the MIRA debt, but I had to argue that the AG's office could not be reimbursed with assets that were not identified and not known at the time of the MIRA hearing – meaning the AG could not impose future costs for incarceration against me unless it was shown to come from a current stream of income" that existed when the MIRA judgment was entered.

The state conceded, filing a satisfaction of judgment in the circuit court on October 16, 2013, and the MIRA liens against Smith were subsequently removed. Smith, who handled the litigation pro se, noted that Missouri prisoners facing MIRA judgments can successfully challenge them. See: *State of Missouri v. Smith*, Cole County Circuit Court (MO), Case No. 07AC-CC00109-01. ⏎

# No Discipline for Oregon Prosecutor and Defense Counsel for Illegal Confinement of Mentally Ill Defendant

Although the Oregon State Bar initially decided to pursue disciplinary charges against the district attorney for Washington County and a criminal defense attorney who represented a mentally ill defendant, for causing the defendant's illegal confinement, the charges were later dropped.

Donn Thomas Spinosa stabbed his wife to death on May 10, 1997, reportedly because she wouldn't give him money to play video poker. He was found unable to aid and assist in his defense and sent to the Oregon State Hospital (OSH) for mental health treatment.

Under Oregon law, Spinosa could be held at OSH for no more than three years. When he was still not competent to stand trial in 2000, the criminal charges against him were dismissed and he was civilly committed.

The civil commitment order was renewed annually until 2010, when Washington County District Attorney Bob Hermann claimed that OSH officials told him they were considering discharging Spinosa. An OSH official denied his claim.

In October 2010, Hermann refiled aggravated murder charges against Spinosa, who was again found unable to aid and assist in his defense and returned to OSH.

Hermann and Spinosa's defense counsel,

Robert B. Axford, then filed a joint motion asking Washington County Circuit Court Judge Thomas Kohl to issue a permanent "magistrate mental illness hold" requiring Spinosa's indefinite confinement at OSH and prohibiting his release without approval by the court. This was unusual because Oregon law does not recognize, or allow for, a "magistrate mental illness hold."

Nevertheless, Hermann argued that the hold was necessary due to the "woeful inadequacy of Oregon law" with respect to dangerous mentally ill defendants. He admitted that he and other prosecutors dislike the civil commitment process because it removes mentally ill offenders like Spinosa from the criminal justice system.

Neither Hermann nor Axford offered authority for the legality of a magistrate mental illness hold, because no such authority exists. Regardless, Judge Kohl signed the order and dismissed Spinosa's murder charges. The order cited no legal authority for the hold and simply referred to Hermann's memorandum.

In December 2011, retired Circuit Court Judge Jim Hargreaves filed complaints with the Oregon State Bar (OSB) against Hermann and Axford, as well as a judicial complaint against Judge Kohl.

Hargreaves stated in the OSB complaints that state law does not allow for a magistrate mental health hold. "Such an order is entirely without legal foundation in Oregon and stripped Mr. Spinosa of all his rights and protections," he wrote. Hermann, Axford and Kohl had agreed to an "undeniably invalid order" to sidestep the law, he alleged.

An unrepentant Hermann called the OSB complaint a "cruel irony" given that he, Axford and Judge Kohl had agreed on a solution that they felt best for the public and for Spinosa – even though that solution was unsupported by state law.

Hermann and Axford told the OSB that they believed the order was valid and did not intentionally violate the law. The OSB evidently disagreed, as it voted in September 2012 to pursue disciplinary charges against the two attorneys for unmeritorious legal positions and engaging in conduct prejudicial to the administration of justice.

Meanwhile, Judge Kohl granted OSH's request to dismiss the questionable magistrate mental illness hold, and Spinosa remained at the hospital under a regular civil commitment order.

Disability Rights Oregon (DRO) launched its own investigation following news reports about Spinosa's situation, according to Bob Joondeph, the organization's executive director.

Upon completion of that investigation, DRO issued a report in July 2012 that found Hermann, Axford and Kohl had acted outside the law in creating and imposing the magistrate mental illness hold. The legislature makes the law, the report noted, but in Spinosa's case the attorneys and judge "essentially created a new law that allows for a person with mental illness to be detained without the elements of due process."

In September 2013, the Oregon State Bar rescinded the charges against Hermann and Axford. "Most notably, the OSB's case rested on a belief that Hermann and Axford crafted an order essentially to bypass Oregon's civil commitment process in order to permanently institutionalize a criminal defendant without due process of law," the agency said in a statement. However, the OSB concluded that the attorneys had tried to initiate, rather than circumvent, civil commitment proceedings.

Hermann said the OSB had made the right decision, and noted the case had prompted the state legislature to pass Senate Bill 421 in July 2013, which created new civil commitment procedures for people who are mentally ill and deemed "extremely dangerous."

In other words, the legislature created the law that did not exist when Hermann, Axford and Judge Kohl ordered Spinosa to be held indefinitely at OSH.

Source: *The Oregonian*





**Know What's Good On TV With Channel Guide** magazine

➤ Daily schedules for **over 120 channels**
➤ Weekly **TV best bets**
➤ Over 3,000 movie listings
➤ **TV Crossword, Sudoku,** celebrity **interviews** and more
➤ **1 Year** (12 issues) for just **$30**

Mail your $30 check or money order payable to Channel Guide Magazine to:

Channel Guide Magazine AAEPLNA
PO Box 8501, Big Sandy, TX 75755-8501
Include your name, ID number and address.

Or call 866-323-9385

## Montana: Hospitalized Prisoner Entitled to Continuance in Divorce Case

The Montana Supreme Court held on March 5, 2013 that refusing to grant a hospitalized prisoner's motion for continuance of a divorce trial was an abuse of discretion.

David and Lori Eslick were married on August 15, 2005. In December 2010, David began serving a sentence in the Montana State Prison (MSP), and Lori filed for divorce.

David was unrepresented and appeared telephonically at all court hearings. A June 12, 2012 pretrial conference and June 25, 2012 trial were scheduled. David failed to appear at the pretrial conference, which was rescheduled for June 19, 2012.

David's failure to appear or communicate with opposing counsel and the court was due to an unexpected medical emergency. On May 5, 2012, he was hospitalized for amputation of septic toes and part of his foot as a result of diabetes. Due to complications he remained hospitalized until June 11, 2012, then was confined in the MSP infirmary for the following week.

David did not receive his mail and could not attend court proceedings during this time, or schedule phone calls with the trial court. On June 18, 2012 he mailed a motion to the court seeking a 60-day continuance.

When David did not appear at the June 19, 2012 pretrial hearing, the court entered a default judgment against him on June 26, 2012, dissolving the marriage, despite having received his motion requesting a continuance.

The Montana Supreme Court reversed, concluding that "David has demonstrated good cause for granting his motion for a continuance. David's unexpected medical emergency and the conditions of his incarceration were circumstances beyond his control that prevented his appearance at the final pretrial conference."

The Court also concluded that David had suffered prejudice, as the trial court had "entered its findings of fact, conclusions of law, and default decree of dissolution without the benefit of David's arguments." The case was therefore reversed and remanded for a new pretrial conference and trial. See: *In re Marriage of Eslick,* 2013 MT 53, 304 P.3d 372 (Mont. 2013). ◼

## Arkansas Suing Prisoners for Incarceration Costs

Arkansas officials are suing prisoners under the State Prison Inmate Care and Custody Reimbursement Act (Act), seeking reimbursement for the costs of their incarceration by obtaining court orders and seizing money from their prison trust accounts.

For example, a state court entered an order requiring prisoner Michael R. MacKool to pay reimbursement costs, and the state sought a similar judgment against prisoner Deral Plunk. Both were subject to orders that confiscated the funds in their accounts for placement in a court account pending the outcome of the litigation.

MacKool is serving a cumulative 60-year sentence for first-degree murder and theft of property. In October 2010, Arkansas filed a petition against him in state court under the Act. Following a show-cause hearing, $5,016.61 in MacKool's prison account was ordered deposited into the state treasury; he appealed that judgment, which was affirmed. See: *MacKool v. State,* 2012 Ark. 287 (Ark. 2012).

On rehearing, he argued the court had incorrectly held that his lack-of-due-process argument had not been presented to the circuit court. Next, he claimed money he had received from his mother was not part of his "estate" as that term is used in the Act. Finally, he argued his equal protection rights had been violated.

The due process claim was based on the funds in MacKool's prison account being ordered confiscated on October 18, 2010, but the court did not provide him with notice until over two weeks later. The Arkansas Supreme Court found the only time that MacKool pointed to this issue was during opening statements, which the Court held is not an occasion for argument; an opening statement is an outline of the evidence to be introduced and the nature of the issues to be tried. Thus, MacKool had failed to properly present the due process argument before the circuit court and could not raise it on appeal.

As to the definition of "estate," the Supreme Court held the plain language of

Introducing **THE BUZZ REPORT!** Subscribe today, and get all of your sports scores and lines delivered conveniently to your email inbox, every day! Add **info@sportzzbuzz.com** to your Corrlinks email subscription list for info. on how to get The Buzz!

the Act "reflects that any money received by an inmate, including a gift from a family member, is part of his 'estate' for purposes of this statute." Finally, the Court refused to hear the equal protection claim because MacKool had failed to raise it in his original briefs. See: *MacKool v. State,* 2012 Ark. 341 (Ark. 2012).

The state also filed a petition under the Act to seek reimbursement of incarceration costs from prisoner Deral Plunk. It secured an order to confiscate $7,007.47 from his prison account to hold in a court account until the litigation was concluded. Plunk moved to dismiss the action, and the state moved to transfer the case to another circuit court.

That court denied Plunk's motion but granted the state's motion. Plunk appealed. The Arkansas Supreme Court held that because neither part of the order constituted a final order, it was unappealable. As a result, Plunk's motion to proceed in forma pauperis on appeal was denied. See: *Plunk v. State,* 2012 Ark. 362 (Ark. 2012).

More recently, on October 31, 2013, a U.S. District Court in Arkansas ruled against state prisoner Michael Williams, who challenged the seizure of funds from his prison account that he had received as a judgment in a § 1983 lawsuit against jailers at the Miller County Detention Center. In March 2013, the district court had awarded Williams $10,350 in damages and costs in the suit. Pursuant to a state court order under the Act, however, $8,530.95 was confiscated from the judgment funds after they were deposited in his prison account.

Williams moved the district court to enjoin the state from seizing the judgment awarded in his § 1983 suit, which the court construed as a motion under Fed.R.Civ.P. 69, "invoking the Court's inherent power to enforce its judgments." However, the district court held it did not have jurisdiction to grant the motion after the judgment had been satisfied by the payment of funds to Williams.

The court noted that the Eighth Circuit "has previously held a state may not attach to section 1983 judgment proceeds awarded to an inmate for the purpose of recouping incarceration costs," citing *Hankins v. Finnel,* 964 F.2d 853 (8th Cir. 1992); however, "the facts presented here do not fit within the narrow parameters of that precedent." The district court found that the prohibition against the state's seizure of funds obtained in a § 1983 lawsuit for reimbursement of incarceration costs does not apply when the judgment in the suit was obtained from a non-state party – in this case, from Miller County.

"Therefore, the entity paying Williams's judgment proceeds and the entity seeking to attach to the judgment proceeds are entirely distinct, thus, eliminating any *Hankins* type concerns over the deterrent effect of a section 1983 award," the district court concluded. See: *Williams v. Rambo,* U.S.D.C. (W.D. Ark.), Case No. 4:09-cv-4088; 2013 U.S. Dist. LEXIS 156458 (W.D. Ark. 2013). ⬟

---

### *Actual Innocence*

Explains how the innocent are convicted by faulty eyewitness testimonies, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$16.00 from PLN's Book Store! See page 61 for more information.

---

### ~ THE SENZA COLLECTION ~

SENZA SPECIALIZES IN PROVIDING YOU SEVERAL CHOICES
ALL NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY  – OR –  NON NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY
WE HAVE DIVIDED OUR CATALOGS INTO THESE CATEGORIES:
**CAUCASIAN/AFRICAN–AMERICAN/HISPANIC/ASIAN/MIXED HOTTIES**
EACH PAGE OF OUR CATALOGS HAS 99 GLORIOUSLY SEDUCTIVE LADIES POSING JUST FOR YOUR ENJOYMENT.
OVER 250 CATALOGS TO COLLECT AT JUST $2.50 PER CATALOG
HERE'S A LITTLE FREEBIE FROM SENZA TO YOU!!!
ORDER YOUR FREE SENZA "99 HOTTIES" SAMPLE CATALOG
*JUST SEND US TWO U.S. FOREVER OR FIRST CLASS STAMPS AND A SELF ADDRESSED STAMPED ENVELOPE TO:*
**SENZA**
FREE CATALOG OFFER
**P.O. BOX 5840**
**BALTIMORE, MD 21282**
**AND FOR THOSE THAT JUST CANNOT WAIT…TAKE ADVANTAGE OF THIS LIMITED TIME OFFER**
**SENZA'S INTRODUCTORY SPECIAL   \*\*\*DIRTY DOZEN\*\*\***
$19.99 GETS YOU ALL THIS + FREE SHIPPING AND HANDLING
12 EYE POPPING CATALOGS! EACH CATALOG HAS 99 PICS TO CHOOSE FROM ON EACH PAGE
PLUS
12 4X6 PRINTS FROM OUR MIXED HOTTIES SELECTION TO SHOW OFF SENZA'S 4X6'S PRINT QUALITY.
**ALL FOR JUST $19.99**
**REMEMBER YOU MUST: SPECIFY NUDE OR NON–NUDE ON YOUR ORDER**
**SPECIFY YOUR INSTITUTIONS RESTRICTIONS AS TO THE NUMBER OF PRINTS ALLOWED IN ONE ENVELOPE.**
**SENZA  CORPORATE POLICIES – PLEASE REVIEW THEM CAREFULLY**
**ALL SENZA COLLECTION IMAGES ARE SOLD AT A FLAT PRICE OF 0.35 CENTS EACH.**
ANYONE WISHING TO PURCHASE 1000 + PRINTS AT ONE TIME WILL BE GIVEN A FLAT PRICE OF 0.30 CENTS PER IMAGE.
**SENZA HAS A MINIMUM ORDER REQUIREMENT OF:  $15.00 THIS DOESN'T INCLUDE S&H CHARGES.**
**SHIPPING AND HANDLING CHARGES ARE AS FOLLOWS:**
**1 – 5 4x6 PRINTS – $1.00 PER ENVELOPE / 6 – 15 4x6 PRINTS – $1.50 PER ENVELOPE /16 – 25 4x6 PRINTS – $2.00 PER ENVELOPE**
YOU MUST NOTIFY SENZA ON THE ORDER FORM, THE MAXIMUM NUMBER OF PRINTS YOUR INSTITUTION WILL PERMIT IN EACH ENVELOPE
**SENZA WILL ACCEPT U.S. FIRST CLASS POSTAGE STAMPS AT THE RATE OF $5.00 FOR EACH BRAND NEW FLAT BOOK OF 20 STAMPS.**
YOU ARE REQUIRED TO KNOW  YOUR INSTITUTIONS POLICIES REGARDING WHAT IMAGES ARE ACCEPTABLE INTO YOUR FACILITY INSTITUTION.  THERE ARE NO EXCEPTIONS TO THIS
POLICY. RETURNED/REJECTED MAIL – YOU WILL HAVE 15 BUSINESS DAYS IN A  SASE WITH A STREET ADDRESS IN WHICH TO MAIL YOUR RETURNED/REJECTED PRINTS.
AFTER 15 DAYS THE PRINTS ARE RETURNED TO OUR INVENTORY.
ALL SALES ARE FINAL/NO REFUNDS OR EXCHANGES

# Texas: False Arrest and Malicious Prosecution Result in $411,865.18 Recovery

A TEXAS PROBATIONER SUBJECTED TO false arrest and malicious prosecution has been awarded $169,000 in damages plus attorneys' fees and costs.

Thomas Hannon, 37, unemployed and on probation, had an outstanding arrest warrant for probation revocation. Dallas police knew he was at a local hotel, and on August 1, 2007, police officers arrested several people, including Hannon, at the hotel in connection with a black bag that contained drugs, a .357 revolver and materials related to identity theft. Hannon was jailed on gun, drug and identity theft charges. He was exonerated and released more than 10 months later.

Hannon sued several police officers, but only his claims against officers Jerry Dodd, David Nevitt and Randy Sundquist survived to reach trial. The evidence showed that when the officers arrived at the hotel, Hannon had been waiting for a ride. He was not part of the initial arrest and began walking down the highway.

Police officers were notified that Hannon was walking away, and pursued and arrested him. Prior to the arrest, Hannon had been with a friend. The friend was carrying the black bag with the gun and drugs, but Hannon contended he was never in possession of the bag or knew what it contained.

The police report prepared by Dodd indicated that Nevitt saw Hannon with the bag before the arrest; Nevitt never indicated in the report that he saw Hannon possess the bag, but he later testified to that fact. Nevitt further testified that he never dealt with the hotel clerk.

It was proven that Nevitt lied. Surveillance video showed Hannon's friend had the bag and Hannon was never in possession of it. The clerk testified that Nevitt had in fact requested a copy of the surveillance video from him. Hannon contended that Dodd and Nevitt falsified the police report to maliciously prosecute him; he also noted that Dodd failed to inform federal officials, who were investigating the identify theft, that he had been exonerated.

With respect to injuries, Hannon conceded he would have been arrested in any event and required to serve a month on the probation revocation, but said he remained jailed for 10 months as a result of the false arrest and malicious prosecution, which caused him severe depression and anxiety.

On February 3, 2012, a federal jury found that Hannon did not possess the bag and Dodd and Nevitt had violated his rights. Hannon was awarded $93,500 for mental anguish and wrongful confinement against Nevitt and Dodd jointly and severally, $500 in punitive damages against Dodd and $75,000 in punitive damages against Nevitt, for a total of $169,000.

On March 14, 2013, the district court denied the defendants' motions for a new trial and judgment as a matter of law. The court also awarded attorneys' fees to Hannon in the amount of $241,042.73, plus $1,591.81 in attorneys' costs and $4,414.16 in Hannon's costs. The court further awarded $2,591.71 in costs against Hannon in favor of defendant Sundquist, who prevailed at trial.

On May 8, 2013, pursuant to a joint motion filed by the parties, the district court vacated the judgment and dismissed the case after a settlement was reached in which the City of Dallas agreed to pay a total of $411,865.18 in combined damages, attorneys' fees and costs. Hannon was represented by Dallas attorneys Scott Palmer and John E. Wall, Jr. See: *Hannon v. Nevitt*, U.S.D.C. (N.D. Tex.), Case No. 3:09-cv-00066-N. ⬏

# California Supreme Court: Challenge to Booking Fee Order Forfeited Due to Failure to Object in Trial Court

ON APRIL 22, 2013, THE SUPREME Court of California, resolving a conflict among lower state courts, held that a defendant who fails to contest a jail booking fee order when it is imposed forfeits the right to challenge the order on appeal.

After pleading no contest to being a convicted felon in possession of a firearm, Antoine J. McCullough was sentenced to a state prison term of four years. When imposing the sentence, the trial court also ordered McCullough to pay a jail booking fee of $270.17.

On appeal, McCullough argued that although he had not objected when the trial court imposed the booking fee, he was entitled to challenge it for the first time on appeal because the evidence was insufficient to support a finding that he was able to pay the fee.

The Court of Appeal affirmed the booking fee order, holding that Mc-Cullough's failure to object in the trial court meant he had forfeited his right to challenge the imposition of the fee on appeal. The California Supreme Court granted review to resolve a split among the appellate courts on this question.

The Supreme Court initially held, as a matter of statutory construction, that the state law which authorizes the imposition of a booking fee – Government Code § 29550.2, subd. (a) – requires the trial court, before ordering payment, to determine the defendant's ability to pay. The Court then cited the general rule that a right may be forfeited if the defendant fails to timely assert it, and found no reason to deviate from that rule with respect to McCullough's challenge to the booking fee order.

Accordingly, the judgment of the Court of Appeal was affirmed. See: *People v. McCullough*, 56 Cal. 4th 589, 298 P.3d 860 (Cal. 2013). ⬏

**SMITH'S GUIDE to HABEAS CORPUS RELIEF**
for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence.   380 pages.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company
Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*

# State of Washington
# Prison Phone Justice Campaign!

*Prison Phone Justice Project needs your help for statewide campaign!*

While much progress has been made in reducing the costs of long distance prison calls, we are still fighting to reduce the high costs of in-state prison and jail calls at the local level. In January 2014, the Human Rights Defense Center (HRDC), the parent organization of Prison Legal News, reopened its Seattle office to launch the Washington Prison Phone Justice Campaign.

This is our first statewide phone justice campaign, and we're excited to have people involved on both the local and national levels who are dedicated to ending the exorbitant phone rates and kickbacks associated with the prison phone industry. David Ganim, HRDC's national Prison Phone Justice Director, has already been obtaining the phone contracts and rates for all 39 county jails in Washington, as well as data from the Washington Department of Corrections.

We recently hired a local campaign director, Carrie Wilkinson, who will manage our office in Seattle and coordinate the statewide campaign. Washington prisoners and their families pay some of the highest phone rates in the nation, and we need your help to win this battle!

Here's how you can help – first, please visit the Washington campaign website:

## www.wappj.org

There you can see all the ways you can make a difference. The site allows you to sign up for the campaign and upload videos and share blog entries about how high prison phone rates make it difficult for you to stay in touch with your incarcerated loved ones. You can also upload an audio message, and even call in your story to **1-877-410-4863**, toll-free 24 hours a day, seven days a week! We need to hear how you and your family have been affected by high prison phone rates. If you don't have Internet access, you can mail us a letter describing your experiences and we'll post it. Send letters to HRDC's main office at: **HRDC, Attn: WA Phone Justice Campaign, P.O. Box 1151, Lake Worth, FL 33460.** Washington state prisoners can mail us letters and send a copy of this notice to their family members so they can get involved.

By choosing to participate in the Washington Prison Phone Justice Campaign, you will be playing a key role in ending the unfair phone rates that prisoners' families have to pay. We cannot win this battle without your help, so please visit the campaign website and share your experiences! Donations are also welcome and greatly appreciated, and can be mailed to the above address or made online via the campaign site. Thank you for your support!

# Study: TASER Shocks May Cause Fatal Heart Attacks

*by Matt Clarke*

A STUDY INVOLVING EIGHT PEOPLE WHO lost consciousness immediately after being shocked by a TASER X26 – the most common electronic control device (ECD) used by police, corrections agencies and the military – concluded that ECD shocks can induce fatal cardiac arrest by causing cardiac "capture" and ventricular tachycardia/ ventricular fibrillation (VT/VF). Seven of the eight persons profiled in the study died while the eighth suffered memory impairment after receiving a near-fatal shock, according to an article published in *Circulation*, the journal of the American Heart Association.

The eight subjects of the peer-reviewed study were all male, ranging from 16 to 44 years old. Six were under the age of 25. All were struck in the chest with barbs from a TASER X26, a handgun-shaped weapon that fires the barbs with attached conductive wires using compressed nitrogen. The device delivers an initial 5,000-volt shock, followed by rapid micro-pulsing that is designed to mimic the electrical signals used by the brain to communicate with the muscles. The standard shock cycle lasts five seconds but can be shortened or repeated by the user.

The study found that a TASER shock "can cause cardiac electric capture and provoke cardiac arrest" resulting from an abnormal, rapid heart rate and uncontrolled, fluttering heart contractions. The journal article on the study's findings was authored by Dr. Douglas Zipes, with the Krannert Institute of Cardiology at Indiana University.

Scottsdale, Arizona-based TASER International, Inc., which manufactures the ECD devices, strongly defended its products. Company spokesman Steve Tuttle noted that with only eight subjects in the study, "broader conclusions shouldn't be drawn based on such a limited sample."

"There have been 3 million uses of TASER devices worldwide, with this case series reporting eight of concern," he added. "This article does not support a cause-effect association and fails to accurately evaluate the risks versus the benefits of the thousands of lives saved by police with TASER devices."

The company's website boasts that TASERs have saved nearly 125,000 lives, and that "Every Day TASER CEWs [Conducted Electrical Weapons] are Used **904** Times, Saving a Life from Potential Death or Serious Injury Every **30** Minutes." The site also quotes a Wake Forest University study which found that "in 1,201 cases, 99.75% [of] people subjected to a TASER CEW had no significant injuries."

Research published by *USA Today* in May 2012 indicated that the use of TASERs by police has saved lives because officers are less likely to kill someone using a TASER than by shooting them. The research also found that TASERs reduced the number of injuries suffered by police officers when apprehending suspects.

Tuttle questioned whether Dr. Zipes might have possible bias because he had testified as an expert witness in lawsuits against TASER. "There are key facts that contradict the role of the TASER device in all of these cited cases, and Dr. Zipes has conveniently omitted all facts that contradict his opinion," Tuttle said.

However, Amnesty International reported in February 2012 that more than 500 post-ECD-shock deaths occurred following TASER deployments between 2001 and 2008. Further, a report from a commission of inquiry into the death of a man at the Vancouver airport in Canada concluded there was evidence "that the electric current from a conducted energy weapon is capable of triggering ventricular capture ... and that the risk of ventricular fibrillation increases as the tips of the probes get closer to the walls of the heart."

Other studies, including a 2011 report by the ACLU of Arizona, have also identified problems with the use of TASERs by law enforcement agencies. [See: *PLN*, April 2012, p.26]. Prior to Dr. Zipes' research, though, no peer-reviewed study had concluded that ECD shocks can induce ventricular fibrillation leading to sudden cardiac arrest and death.

TASER published an eight-page warning in March 2013 that stated, "exposure in the chest area near the heart has a low probability of inducing extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest.

When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death."

In November 2013, TASER submitted a statement to the U.S. Securities and Exchange Commission (SEC) indicating that the company would pay a total of $2.3 million in settlements in product liability lawsuits. The statement said the settlements were intended to end legal battles over TASER-related "suspect injury or death."

TASER also changed the warning labels on its ECD products. The company used to tout TASERs as delivering "non-lethal" shocks, but following several TASER-related deaths the language was changed in 2009 to read "less lethal." Company training manuals now state that "exposure in the chest area near the heart ... could lead to cardiac arrest."

The eight subjects in the study authored by Dr. Zipes were all clinically healthy. They were hit with one or both TASER barbs in the anterior chest wall near the heart, and all lost consciousness during or immediately after being shocked. In six cases, the first recorded heart rhythms were VT/VF. One had no heart rhythm, and in the eighth subject an external defibrillator reported a shockable rhythm but did not record it.

Two of the subjects had structural heart disease, two had elevated blood alcohol levels and two had both. The study concluded, however, that those conditions were considered unlikely to be the cause of the sudden loss of consciousness that occurred at the time or immediately after they received TASER shocks, although the conditions may have increased the likelihood of ECD-induced VT/VF.

The study also concluded it was unlikely that other known causes of in-custody death, such as "excited delirium" or restraint asphyxia, were factors in the deaths of seven of the eight subjects due to the proximity of the TASER shock to the loss of consciousness.

Dr. Zipes' research noted that studies in pigs, sheep and humans established that shocks across the chest from the TASER X26 and a new prototype ECD could cause cardiac capture. The pig studies also repeatedly showed that the TASER X26 could induce VT/VF at normal or higher-than-

normal outputs. Similar studies attempting to induce VT/VF by placing the barbs in the anterior chest and using strong, multiple and/or lengthy shocks could not be conducted on humans due to ethical considerations.

Of course, such considerations do not prevent police officers from using TASERs on suspects, or prison and jail guards from deploying TASERs against prisoners. █

Sources: *"Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device," by Douglas P. Zipes, M.D. (May 2012); www.taser.com; USA Today, www.theverge.com*

# Texas Court Holds CCA is a "Governmental Body" for Purposes of Public Records Law

ON MARCH 19, 2014, A STATE DISTRICT court in Travis County, Texas held that Corrections Corporation of America (CCA), the nation's largest for-profit prison company, is considered a "governmental body" for purposes of the state's Public Information Act and therefore subject to the Act's "obligations to disclose public information."

The court entered its ruling on a motion for summary judgment filed by Prison Legal News, which had brought suit against CCA in May 2013 after the company refused to produce records related to the now-closed Dawson State Jail in Dallas – including reports, investigations and audits regarding CCA's operation of the facility. [See: *PLN*, June 2013, p.46]. Such records would have been made public had the jail been operated by a government agency.

"This is one of the many failings of private prisons," said PLN managing editor Alex Friedmann. "By contracting with private companies, corrections officials interfere with the public's right to know what is happening in prisons and jails, even though the contracts are funded with taxpayer money. This lack of transparency contributes to abuses and misconduct by for-profit companies like CCA, which prefer secrecy over public accountability."

CCA currently operates nine facilities in Texas, including four that house state prisoners.

"The conditions of Texas prisons have been the focus of intense public scrutiny for nearly 40 years," stated Brian McGiverin, an attorney with the Texas Civil Rights Project. "Today's ruling is a victory for transparency and responsible government. Texans have a right to know what their government is doing, even when a private company is hired to do it."

In its summary judgment motion, PLN argued that CCA meets the definition of a governmental body under the state's Public Information Act, Section 552.003 of the Texas Government Code, because, among other factors, the company "shares a common purpose and objective to that of the government" and performs services "traditionally performed by governmental bodies."

In the latter regard, PLN noted that "Incarceration is inherently a power of government. By using public money to perform a public function, CCA is a governmental body for purposes" of the Public Information Act. CCA's argument to the contrary – that it is not a governmental body and therefore does not have to comply with public records requests – was rejected by the district court.

CCA had also argued that the taxpayer funds it receives from the State of Texas "are not necessarily used specifically for operating Texas facilities," and that such payments "are used generally to support CCA's corporate allocations throughout the United States."

PLN previously prevailed in a similar public records lawsuit against CCA in Tennessee, where the firm is headquartered; another records suit filed by PLN is pending against CCA in Vermont. The company has vigorously opposed lawsuits requiring it to comply with public records laws. [See: *PLN*, July 2013, p.42; June 2013, p.14].

"CCA and other private prison companies should not be able to hide behind closed corporate doors when they contract with government agencies to perform public services using taxpayer money," said PLN editor Paul Wright.

PLN was ably represented by attorneys Cindy Saiter Connolly with Scott, Douglass & McConnico, LLP and Brian McGiverin with the Texas Civil Rights Project. See: *Prison Legal News v. CCA*, Travis County District Court (TX), Cause No. D-1-GN-13-001445. █



**Complete GED Preparation**
[Paperback]
Publisher: Steck-Vaughn; 2nd edition
*928 pages; $24.99; Item #: 1099*

Over 2,000 GED-style questions thoroughly prepare learners for test day. This single book offers thorough coverage of the revised GED Test with new test information, instruction, practice, and practice tests. Answer key included.

Order from: **Prison Legal News**
*(Add $6 shipping for orders under $50)*
**PO Box 1151
Lake Worth, FL 33460
Phone: (561) 360-2523
www.prisonlegalnews.org**



STRENGTH STACK 52

114 BODYWEIGHT EXERCISE CARDS INSIDE!

JUST $21.95!*
(shipping included)

Experience the Game of Fit!

Send money orders or institutional checks made payable to:
Prisoner Assistant
Po Box 704
Lake Harmony PA 18624

Features:
-Soft cover book with perforated-card stock for playing cards.
-Many fitness games available.
-Effective NEW bodyweight training system.
-Exercise your entire body with no equipment.

# Mass Incarceration: The Whole Pie
## *A Prison Policy Initiative briefing*

*by Peter Wagner and Leah Sakala*

Wait, does the United States have 1.4 million or more than 2 million people in prison? And do the 688,000 people released every year include those getting out of local jails? Frustrating questions like these abound because our systems of federal, state, local and other types of confinement – and the data collectors that keep track of them – are so fragmented. There is a lot of interesting and valuable research out there, but definitional issues and incompatibilities make it hard to get the big picture for both people new to criminal justice and for experienced policy wonks.

On the other hand, piecing together the available information offers some clarity. This briefing presents the first graphic we're aware of that aggregates the disparate systems of confinement in this country, which hold more than 2.4 million people in 1,719 state prisons, 102 federal prisons, 2,259 juvenile correctional facilities, 3,283 local jails and 79 Indian Country jails as well as in military prisons, immigration detention facilities, civil commitment centers and prisons in U.S. territories.[1]

While the numbers in each slice of this pie chart represent a snapshot cross section of our correctional system, the enormous churn in and out of confinement facilities underscores how naive it is to conceive of prisons as separate from the rest of our society. In addition to the 688,000 people released from prisons each year,[2] almost 12 million people cycle through local jails annually.[3] Jail churn is particularly high because at any given moment most of the 722,000 people in local jails have not been convicted and are incarcerated because they are either too poor to make bail and are being held before trial, or because they've just been arrested and will make bail in the next few hours or days. The remainder of the people in jail – almost 300,000 – are serving time for minor offenses, generally misdemeanors with sentences under a year.

So now that we have a sense of the bigger picture, a natural follow-up question might be something like: how many people are locked up in any kind of facility for a drug offense? While the data don't give us a complete answer, we do know that it's 237,000 people in state prison, 95,000 in federal prison and 5,000 in juvenile facilities, plus some unknowable portion of the population confined in military prisons, territorial prisons and local jails.

Offense figures for categories such as "drugs" carry an important caveat here, however: all cases are reported only under the most serious offense. For example, a person who is serving prison time for both murder and a drug offense would be reported only in the murder portion of the chart. This methodology exposes some disturbing facts, particularly about our juvenile justice system. For example, there are nearly 15,000 children behind bars whose "most serious offense" wasn't anything that most people would consider a crime. Almost 12,000 children are behind bars for "technical violations" of the requirements of their probation or parole, rather than for a new criminal offense, and more than 3,000 children are behind bars for "status" offenses, which are, as the U.S. Department of Justice explains, "behaviors that are not law violations for adults, such as running away, truancy, and incorrigibility."[4]

Turning finally to the people who are locked up because of immigration-related issues, more than 22,000 are in federal prison for criminal convictions of violating federal immigration laws. A separate 34,000 are technically not in the criminal justice system but rather are detained by U.S. Immigration and Customs Enforcement (ICE), undergoing the process of deportation, and are physically confined in immigration detention facilities or in one of hundreds of individual jails that contract with ICE.[5] (Notably, those two categories do not include the people represented in other pie slices who are in some early stage of the deportation process due to non-immigration-related criminal convictions).

Now that we can, for the first time, see the big picture of how many people are locked up in the United States in the various types of facilities, we can see that something needs to change. Looking at the big picture requires us to ask if it really makes sense to imprison 2.4 million people on any given day, giving us the dubious distinction of having the highest incarceration rate in the world. Both policy makers and the public have the responsibility to carefully consider each individual slice of the pie chart in turn, to ask whether legitimate social goals are served by putting each category behind bars and whether any benefit really outweighs the social and fiscal costs. We're



How many people are locked up in the United States?

The United States locks up more people, per capita, than any other nation. But grappling with why requires us to first consider the many types of correctional facilities and the reasons that people are confined there.

awaiting trial (not convicted) 428,312

serving a jail sentence 293,342

other 353,228

Local Jails 721,654

public order 142,500

burglary 130,000

State Prisons 1,362,028

Federal Prisons 216,362

assault 146,800

murder 166,700

robbery 185,800

drugs 237,000

other 69,862

immigration offenses 22,100

weapons 29,800

drugs 94,600

status 3,016 drugs 4,986 aggravated assault 6,097 robbery 6,996 burglary 7,247

technical 11,604

other juvenile 30,846

Juvenile 70,792

Military 1,434

Immigration Detention 34,000

Indian Country Jails 2,146
Territorial Prisons 13,576
Civil Commitment 5,640

Sources and data notes: See http://www.prisonpolicy.org/reports/pie.html

PRISON POLICY INITIATIVE

optimistic that this whole-pie approach[6] can give Americans, who seem increasingly ready for a fresh look at the criminal justice system, some of the tools they need to demand meaningful changes to how we do justice.

### Notes on the Data

This briefing draws the most recent data available as of March 13, 2014 from:

• **Jails**: Bureau of Justice Statistics, Jail Inmates at Midyear 2012 - Statistical Tables, page 1 and Table 3, reporting data for June 30, 2012.

• **Immigration detention**: "Congress Mandates Jail Beds for 34,000 Immigrants as Private Prisons Profit," Bloomberg News, Sept. 24, 2013.

• **Federal**: Bureau of Justice Statistics, Prisoners in 2011, page 1 and Table 11, from data as of December 31, 2011.

• **State Prisons**: Bureau of Justice Statistics, Prisoners in 2011, Table 9, reporting data as of December 31, 2010.

• **Military**: Bureau of Justice Statistics, Correctional Populations in the United States, 2012, Appendix Table 2, reporting data for December 31, 2012.

• **Territorial Prisons**, Prisons in U.S. territories (American Samoa, Guam and the U.S. Virgin Islands) and U.S. commonwealths (Northern Mariana Islands and Puerto Rico): Correctional Populations in the United States, 2012, Appendix Table 2, reporting data for 2012 – includes both territorial prisons and jails.

• **Juveniles**: Office of Juvenile Justice and Delinquency Prevention, Census of Juveniles in Residential Placement, 2010, reporting data for February 24, 2010.

• **Civil Commitment**: Deidre D'Orazio, Ph.D., Sex Offender Civil Commitment Programs Network Annual Survey of Sex Offender Civil Commitment Programs, 2013.

• **Indian Country** (correctional facilities operated by tribal authorities or the Bureau of Indian Affairs): Bureau of Justice Statistics, Correctional Populations in the United States, 2012, Appendix Table 2, reporting data for June 29, 2012.



# HotFlixx
Photo Service

• $1/ Each -10 Picture Minimum

• High Quality/ Clear 4x6 Pictures

• Free Shipping /Fast Delivery

• Great Customer Service- We **LOVE** our customers!

• **FREE Catalog**- just send a SASE and tell us if you want a male or female catalog

• Custom Orders/ Special requests $2/ each (example celebrity upskirts)

• Enlargements 5x7, 8x10 available

The following catalogs are $3 each

    Women Vols 1, 2, 3, 4, 5, 6, 7
    Action shots, Black Women,
    Asian, Latina, Plumpers Vols 1,2,
    Topless Vols 1,2, Boobs Vols 1,2,
    Camel Toe Vols 1,2, Tattoo Girls,
    Foot Fetish, Transsexual,
    Male Vols 1,2,3,4,5

*We accept money orders/ inmate trust*

HotFlixx
PO Box 137481
Fort Worth, TX 76136



---

## Mass Incarceration (cont.)

Several data definitions and clarifications may be helpful to researchers reusing this data in new ways:

• The state prison offense category of "public order" includes weapons, drunk driving, court offenses, commercialized vice, morals and decency offenses, liquor law violations and other public-order offenses.

• The state prison "other" category includes offenses labeled "other/unspecified" (7,900), manslaughter (21,500), rape (70,200), "other sexual assault" (90,600), "other violent" (43,400), larceny (45,900), motor vehicle theft (15,000), fraud (30,800) and "other property" (27,700).

• The federal prison "other" category includes people who have not been convicted or are serving sentences of under 1 year (19,312), homicide (2,800), robbery (8,100), "other violent" (4,000), burglary (400), fraud (7,700), "other property" (2,500), "other public order offenses" (17,100) and a remaining 7,850 records that could not be put into specific offense types because the "2011 data included individuals committing drug and public-order crimes that could not be separated from valid unspecified records."

• The juvenile prison "other" category includes criminal homicide (924), sexual assault (4,638), simple assault (5,445), "other person" (1,910), theft (3,759), auto theft (2,469), arson (533), "other property" (3,029), weapons (3,013) and "other public order" (5,126).

• To minimize the risk of anyone in immigration detention being counted twice, we removed the 22,870 people – cited in Table 8 of Jail Inmates at Midyear 2012 – confined in local jails under contract with ICE from the total jail population and from the numbers we calculated for those in local jails that have not been convicted. (Table 3 reports the percentage of the jail population that is convicted (60.6%) and unconvicted (39.4%), with the latter category also including immigration detainees held in local jails).

• At least 17 states and the federal government operate facilities for the purposes of detaining people convicted of sexual crimes after their sentences are complete. These facilities and the confinement there are technically civil, but in reality are quite like prisons. They are often run by state prison systems, are often located on prison grounds and, most importantly, the people confined there are not allowed to leave.

### Acknowledgements

Thanks especially to Drew Kukorowski for collecting the original data for this project and to [PLN managing editor] Alex Friedmann for both identifying ways to update the data and for locating the civil commitment data. We thank Tracy Velázquez and Josh Begley for their insights on how to use color to tell this story. Thanks to Holly Cooper, Cody Mason and Judy Greene for helping untangle the immigration-related statistics. Thanks also to Arielle Sharma and Sarah Hertel-Fernandez for their copy editing assistance. ◀

*This briefing was published by the Prison Policy Initiative (www.prisonpolicy.org) on March 12, 2014; it is reprinted with permission.*

### ENDNOTES

1 The number of state and federal facilities is from Census of State and Federal Correctional Facilities, 2005; the number of juvenile facilities from Census of Juveniles in Residential Placement, 2010; the number of jails from Census of Jail Facilities, 2006 and the number of Indian Country jails from Jails in Indian Country, 2012. We aren't currently aware of a good source of data on the number of the other types of facilities.

2 U.S. Department of Justice, Prisoners in 2011, page 1, reporting that 688,384 people were released from state and federal prisons in 2011. [*Ed. note* – the number of releases dropped to 637,400 in 2012]

3 See page 3 of Bureau of Justice Statistics, Jail Inmates at Midyear 2012 - Statistical Tables for this shocking figure of 11.6 million.

4 See Office of Juvenile Justice and Delinquency Prevention, Census of Juveniles in Residential Placement, 2010, page 3.

5 Of all of the confinement systems discussed in this report, the immigration system is the most fragmented and the hardest to get comprehensive data on. We used "Congress Mandates Jail Beds for 34,000 Immigrants as Private Prisons Profit," Bloomberg News, Sept. 24, 2013. Other helpful resources include Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary; Dollars and Detainees: The Growth of For-Profit Detention; and The Math of Immigration Detention.

6 It is important to remember that the correctional system pie is far larger than just prisons and includes another 3,981,090 adults on probation and 851,662 adults on parole. See Bureau of Justice Statistics, Probation and Parole in the United States, 2012, Appendix Tables 2 and 4.

# New York Prisoner Secures Court Order for Visitation with Child

The New York Court of Appeals upheld a lower court's ruling that granted an incarcerated father visitation rights with his three-year-old child. The Court held the lower court had properly applied a legal standard that presumes in favor of visitation and considers whether that presumption is rebutted by evidence showing visits would be harmful to the child.

The petitioner, New York state prisoner Shawn G. Granger, acknowledged paternity of a child prior to his imprisonment. He sought an order under the Family Court Act allowing visitation after the mother refused to bring the child to see him in prison.

The family court noted that state law presumes a child's best interest is served by visits with a non-custodial parent, and "the fact that such parent is incarcerated is not an automatic reason for blocking visitation." The court found that Granger had been involved in the child's life prior to incarceration and had acted to maintain the relationship after he went to prison. Further, the court determined the child would not be harmed by travel to the prison and thus ordered periodic four-hour visits. The Appellate Division affirmed.

The Court of Appeals rejected the mother's argument that the family court had applied the wrong standard of law. It reaffirmed that "substantial proof" must be presented to overcome the presumption in favor of visitation, including when a parent is incarcerated. Visits should be denied to a non-custodial parent upon a showing they would be harmful to the child, which was not demonstrated in this case.

The Court declined to consider the impact of Granger's subsequent transfer to a more distant facility, as that issue should have been the subject of a modification petition and not presented as an issue of first impression on appeal. The lower court's order was affirmed. See: *Matter of Granger v. Misercola*, 21 N.Y.3d 86, 990 N.E.2d 110 (N.Y. 2013). ◀

# States Renewing Their Prison Phone Contracts

*As state DOCs renew or rebid their prison phone contracts, you can help urge them to eliminate commission kickbacks and lower intrastate phone rates.*

*The Campaign for Prison Phone Justice needs your help in*

## ***** *Kentucky, Alaska and Georgia!* *****

The Departments of Corrections in the above states are in the process of re-bidding or renewing their prison phone contracts. Most DOCs receive a commission (kickback) on revenue generated from calls made by prisoners, which results in excessively high phone rates. Although the FCC voted last year to cap the costs of interstate (long distance) prison calls, which went into effect on February 11, 2014, the order does not apply to intrastate (in-state) calls; an estimated 85% of prison phone calls are in-state. This is an opportunity to ask DOCs to forgo commissions and ensure their new prison phone contracts are based on the lowest cost to those who pay for the calls – mostly prisoners' families.

### Take Action NOW! Here's What YOU Can Do!

Ask your family members and friends to write, email, call and fax the DOC and the governor's office (addresses and contacts are listed below), requesting that the DOC: 1) forgo commission payments when re-bidding or renewing its prison phone contract, and 2) base the new contract on the lowest calling cost. Lower prison phone rates should apply not just to long distance calls but also to in-state calls. For a sample letter or to easily send an email, visit the Campaign for Prison Phone Justice's website and click on the "Take Action" tab:

# www.phonejustice.org

### Prison phone contract information & Contacts:

**Kentucky:** Receives a 54% kickback; existing contract expires on 5-31-2014. The DOC charges $4.50 for a 15-minute collect intrastate call and $1.85 for a collect local call. **Contacts:** Kentucky DOC, Commissioner LaDonna Thompson, 275 East Main Street, Frankfort, KY 40602; ph: 502-564-4726, fax: 502-564-5037, email: ladonna.thompson@ky.gov. Governor Steve Beshear, 700 State Capitol, Frankfort, KY 40601; ph: 502-564-2611, fax: 502-564-2517, email: governor@ky.gov

**Alaska:** Receives a 7 to 32.1% kickback; existing contract expires on 6-30-2014. The DOC charges $2.63 to $7.61 for a 15-minute collect intrastate call (local calls are free). **Contacts**: Alaska DOC, Commissioner Joseph Schmidt, 550 W. 7th Ave., Suite 860, Anchorage, AK 99501; ph: 907-465-4652, fax: 907-465-3390, email: joseph.schmidt@alaska.gov. Governor Sean Parnell, State Capitol, P.O. Box 110001, Juneau, AK 99811; ph: 907-465-3500, fax: 907-465-3532, email: governor@alaska.gov

**Georgia:** Receives a 60% kickback; existing contract expires on 6-30-2014. The DOC charges $4.85 for a 15-minute collect intrastate call and $2.70 for a collect local call. **Contacts:** Georgia DOC Comm. Brian Owens, 300 Patrol Road, Forsyth, GA 31029; ph: 478-992-5261, fax: 478-992-5259, email: gdccommish@dcor.state.ga.us. Governor Nathan Deal, 203 State Capitol, Atlanta, GA 30334; ph: 404-656-1776, fax: 404-657-7332, email: khorne@georgia.gov or georgia.governor@gov.state.ga.us

# Placing Rival Gang Members in Same Cell Not Per Se Unconstitutional

The Ninth Circuit Court of Appeals applied the harmless error test in finding that a district court's late *Rand* summary judgment notice did not deprive a prisoner of substantial rights. Additionally, the appellate court held prison officials were not deliberately indifferent to a substantial risk of violence by placing two rival gang members in the same cell.

This case involved the appeal of a Hawaii federal district court's grant of summary judgment to Corrections Corporation of America and CCA guards at the Saguaro Correctional Center (SCC) in Arizona. The suit was brought by Hawaii state prisoner Keone Labatad, who was housed at SCC and assaulted by another prisoner on July 23, 2009.

Three days earlier, Labatad, a member of the La Familia gang, got into a fight with Howard Giddeons, a member of the USO Family gang. Both told guards that the fight was not gang-related and they had shook hands afterwards. Following procedure, both were placed in administrative segregation.

Labatad was put in a cell with Shane Mara, a USO Family gang member. On the day of the assault, Mara waited until Labatad was in hand restraints in preparation for leaving the cell; he then hit Labatad in the head and back, causing a welt and a bloody nose.

Labatad filed a civil rights action alleging his Eighth Amendment rights were violated by a general policy at SCC that allowed rival gang members to be housed in the same cell, as well as the specific decision to place him in a cell with Mara. He sought damages and injunctive relief, and the defendants moved for summary judgment.

The day after Labatad filed a detailed response to the motion, the district court sent him the summary judgment notice required under *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) [*PLN*, April 1999, p.19]. The purpose of the *Rand* notice is to provide a pro se prisoner litigant "fair notice" of his "rights and obligations under Rule 56," his "right to file counter-affidavits or other responsive evidentiary materials and be alerted to the fact that failure to do so might result in the entry of summary judgment

against" him, and "the effect of losing on summary judgment." The court granted the defendants' motion and Labatad appealed.

The Ninth Circuit held the district court's delay in sending the *Rand* notice was error, but held this was "one of the unusual cases" where the error was harmless because "the record, viewed objectively, shows that Labatad knew and understood the information in the *Rand* notice before he received it."

The district court found that SCC's policy of permitting members of different gangs to be housed together in the same cell was not itself an Eighth Amendment violation. At oral argument, Labatad clarified he was not asserting a per se constitutional violation; instead, he was alleging the defendants were deliberately indifferent to the

risk of harm resulting from his cell assignment with Mara, a rival gang member.

Viewing the record objectively and subjectively, the Ninth Circuit found the evidence was insufficient to preclude summary judgment on that claim. Mara and Labatad had been in general population for an extended period of time without threats or problems between them, they were not listed as "separatees," and prison officials had been assured the fight between Labatad and Giddeons was resolved and not gang-related. In sum, there were no facts to suggest that Labatad was at substantial risk of harm when he was housed with Mara.

The district court's order granting summary judgment to the defendants was affirmed. See: *Labatad v. CCA*, 714 F.3d 1155 (9th Cir. 2013). ◼

# GPS Monitoring System in Los Angeles Plagued by False Alerts, Ignored Alarms

*by Christopher Zoukis*

Los Angeles County's GPS monitoring system, designed to keep track of high-risk probationers, has overwhelmed probation officers with thousands of false alerts each day – so many that some officers simply ignore them. As a result, dozens of probationers have been able to roam unmonitored. In some cases, even when probationers removed their monitoring devices, the removal was not discovered for lengthy periods of time.

GPS monitors are used to track the highest-risk probationers and parolees, including sex offenders. A massive shift of prisoners from state prisons to county jails under California's "realignment" legislation has led some counties to release hundreds of low-level offenders on electronic monitoring as a way to cut costs and reduce jail overcrowding.

The GPS system in Los Angeles County picks up satellite signals and transmits the data over cellular networks to a central computer. The system is designed to send an alert to a probation officer under a variety of circumstances; for example, if a probationer tries to remove the monitor or enter a designated prohibited area, or if the GPS batteries run down. The GPS devices

send alerts for a number of routine reasons, too, such as when the signal is blocked by a building or if the monitor has a loose strap or damaged case.

According to probation officers, there is no easy way to distinguish the cause of the alert. Thus, a prolonged lost monitoring signal might mean the probationer has absconded or simply that the signal is being blocked due to a building's structure.

County officials say they have been "overwhelmed" with thousands of alarms each day. Most are relatively meaningless, for low battery warnings or blocked signals, and are ignored or deleted by probation officers. Others are more serious; 80 probationers removed their GPS devices in 2013, and in one case an offender went unmonitored for 45 days.

"If a person's not being properly monitored or supervised, then what's going to stop them from taking it off and leaving?" asked Dwight Thompson, a representative for the union that represents Los Angeles County probation officers. "If they take it off, what was the point of putting it on?"

A field test in 2011 found that GPS devices used to monitor California sex of-

fenders transmitted no signal 55 percent of the time, and *PLN* previously reported that thousands of sex offenders in the state had removed their GPS monitors or committed monitoring violations, as there were few repercussions for doing so. [See: *PLN*, April 2013, p.18].

A November 13, 2013 corrective action notice sent by the Los Angeles County Probation Department to Sentinel Offender Services, the company that provides the county's GPS system, indicated that one in four GPS devices were faulty – they generated too many false alarms or had defective batteries. Sentinel blamed poorly-trained probation officers and probationers who didn't follow instructions for properly charging their GPS monitors. [See: *PLN*, Jan. 2014, p.18]. The company has increased training and replaced the monitors with more recent models.

Private companies that provide GPS monitoring services may be more interested in generating profit than ensuring public safety – one of several concerns related to the increased use of electronic monitoring. [See: *PLN*, March 2012, p.20].

While faulty equipment doesn't help matters, Los Angeles County also has the GPS system set up to send an email alert to a probation officer when a probationer passes through, or travels close to, a prohibited area – such as when sex offenders are near schools or parks. There are some 4,900 prohibited areas in the county, about one every square mile. This makes it almost impossible for a probationer to go anywhere without triggering alerts, and thousands of those alarms are generated each month.

"Just riding the Red Line [public transportation] would set off 10 alerts, passing schools on the way," noted John Tuchek, a vice-president for the Association of Probation Supervisors who also works as a probation officer. "If we keep getting false positives, we're not going to know the real ones that mean danger."

"When these alerts are in the tens of thousands, it seems like an unwinnable situation," said Matthew DeMichele, a former researcher for the American Probation and Parole Association, and coauthor of the Justice Department's guide on electronic monitoring. GPS monitoring systems simply don't provide the level of accountability and security that they claim, he added: "In some ways, GPS vendors are selling law enforcement agencies, politicians, the public a false bag of goods."

Sources: *Associated Press, www.latimes.com, www.utsandiego.com, http://arstechnica.com*



## FULTON & WELCH

### TEXAS PAROLE ATTORNEYS

o  AFFORDABLE
o  PERSONALIZED PACKET
o  2 HEARINGS
o  MEET WITH YOU & FAMILY

"LET US GET YOU HOME SOONER"

10701 Corporate Dr., Ste. 390,
Stafford, Texas 77477



**msp** | LAW

**Michael Soukup**
Licensed in Wisconsin and Illinois

**Matthew Pinix**[*]
Licensed in Wisconsin

## Appealing a Conviction?
## Hire an Appellate Attorney.

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, attorneys with more than 10-years' combined experience handling **criminal appeals** in **Wisconsin** and **Illinois**.

**Law Office of Matthew S. Pinix, LLC**
1200 East Capitol Drive, Suite 220
Milwaukee, Wisconsin 53211
(414) 963-6164
www.pinixlawoffice.com

» Rated by Super Lawyers*
» Rated by avvo.com
» Better Business Bureau accredited



**NEW FRIENDS, HIGHER EDUCATION, AND EMPLOYMENT & HOUSING UPON RELEASE THROUGH WRITEAPRISONER.COM PROFILES**

**S**tart Looking Forward
Contact WriteAPrisoner.com &
To Mail Call!

**AS SEEN ON**
CNN, 20/20, Fox News,
Dr. Phil, O Magazine,
E! True Hollywood,
and hundreds more!

**WriteAPrisoner.com...**
Simply the largest, highest ranked, &
most visited website of its kind!*

● Pen-pal Profiles are affordably priced at $40 for the first year, $30 for renewing year
● Features a comprehensive search that allows viewers to find your profile by age, race, location, keywords, & more - 32 search options in all
● Your new friends can email their first message to you along with a photo
● Advertises non-stop on every major search engine with thousands of websites linking back to us
● Offers free Reintegration Profiles for inmates seeking employment and housing upon release and education during incarceration
● Translated into 51 languages & geared for international search engines
● Viewers can "subscribe" to your profile to be notified when your profile is updated, blog is added, artwork is posted, poetry is added, your release is near & much more
● Pen-pals have the option of helping you with a broad range of topics using WriteAPrisoner.com's free Self-Help Series

**Get Started Today!**
Friends & family can submit your entire 250 word profile, photo, and payment for you online by visiting
**www.writeaprisoner.com/post**

**WriteAPrisoner.com**
We'll see you at mail call!

Or for a FREE Brochure, Send a
S.A.S.E. to:

WriteAPrisoner.com
PO Box 10- PLN
Edgewater, FL  32132 USA

Proud member of the Better Business Bureau of Central Florida & the Southeast Volusia Chamber of Commerce.
*Our website traffic can be independently verified at www.quantcast.com/writeaprisoner.com

# No Death Penalty for Maine Prisoner

*by Lance Tapley*

In 2008, within a supposedly high-security prison in the giant federal correctional complex in Florence, Colorado, Gary Watland, a "boarder" from Maine, murdered another prisoner, white supremacist Mark Baker.

After five and a half years – and after, probably, millions in taxpayer-paid legal costs, including for his defense team – Watland, the only Maine prisoner facing a possible death penalty, saw federal prosecutors in Denver on February 5, 2014 accept his offer to spend life behind bars without the possibility of parole.

However, Watland, 51, already had accumulated enough time to spend life in prison. He had been placed in the federal system after being sentenced to 35 years for a 2006 escape attempt at the Maine State Prison, in Warren, where he was serving 25 years for killing a drinking buddy in 2004.

At Warren, Watland had plotted with his wife to have her smuggle a gun behind her belt buckle into the prison visitors' room, where he allegedly planned to kill guards and anyone else in his way during the breakout. After a prisoner tipped off authorities, Susan Watland was apprehended with the loaded gun in the parking lot.

In Colorado, Watland snuck up on Baker while he was playing poker and stabbed him in the neck with a homemade knife. The plea agreement states: "One blow was to the carotid artery and a second blow severed the brain stem. Mr. Baker fell to the floor dead." Watland maintained he was in a "kill or be killed" situation. Baker's prison gang, the Nazi Low Riders, was allegedly harassing gays. Defending his life, Watland came out of the closet.

The feds had wanted to use the arguments that Watland was still dangerous and had a low chance of rehabilitation to obtain a death sentence from a jury, but a judge ruled them out. Shortly after the ruling, prosecutors accepted the plea bargain.

Watland's case recently stimulated the Maine Prisoner Advocacy Coalition to urge the state Department of Corrections to ban sending Maine prisoners to jurisdictions with the death penalty. Maine doesn't have capital punishment; the federal government does.

"He's a classic example of why the death penalty shouldn't be used," commented a prisoner who knew him at Warren. "I believe that Gary Watland is mentally ill." In 2007 his mother told *The Portland Phoenix* he suffered from bipolar disorder. He denies any mental illness.

Originally from California, Watland re-established his relationship with his parents and teenage daughter during his years awaiting trial in the solitary-confinement ADX prison, which also is in the federal complex in Florence.

"He's grown as a person over the time I've known him," defense attorney Patrick Burke told the *Phoenix*. "I think he'll continue to make a contribution to his family and friends."

Any future contribution Watland makes will likely be from the austere isolation of the most dreaded supermax in America. Although the U.S. Bureau of Prisons will decide where Watland will be kept, expectations are he will continue to be held at ADX. If he were allowed into a prison's general population, he would risk being killed in gang revenge. ◾

*This article was originally published by The Portland Phoenix (http://portland.thephoenix.com) on February 12, 2014; it is reprinted with permission of the author.*

# Qualified Immunity Denied to Michigan Guard for Improper Strip Search of Amputee Prisoner

The Sixth Circuit Court of Appeals affirmed the denial of qualified immunity to a Michigan prison guard who allegedly strip searched a prisoner without a legitimate penological reason for doing so. The appellate court also vacated the denial of qualified immunity to a warden who sanctioned the prisoner's placement in isolation, remanding for consideration of the warden's qualified immunity defense.

When Martinique Stoudemire entered Michigan's prison system at the age of 23 in July 2002, she had a lengthy documented history of health problems. Absent proper care, she was at significant risk of experiencing kidney and liver damage, heart attacks, amputations and chronic pain. After arriving at the Huron Valley Women's Correctional Facility (Huron), her health quickly deteriorated.

By the time she was paroled in 2007, Stoudemire had undergone three amputations, eventually losing both legs below the knee. She attributed her health complications to the failure of prison staff, nurses and associated doctors to provide adequate medical care. The appeal in her lawsuit focused on her final amputation in December 2007, when she contracted a MRSA infection and was quarantined in Huron's segregation unit. [See: *PLN*, May 2007, p.1].

Michigan Department of Corrections (MDOC) policy provides for prisoners with MRSA to be quarantined, and the warden at Huron, Susan Davis, designated the facility's segregation unit as a quarantine location. Pursuant to that policy, Stoudemire spent two weeks in segregation.

While there she received "extremely poor" medical care: The cell was not equipped for disabled prisoners, and she was not provided with assistive devices to safely move between her bed, wheelchair, toilet and shower. Medical staff treated her with contempt, accused her of malingering and responded with hostility when she sought assistance. She was once forced to urinate in a bowl, defecated on herself once, received only one shower in the two weeks she spent in segregation and had to dress her own wounds.

Warden Davis argued that she was entitled to qualified immunity on Stoudemire's claim that the segregation conditions amounted to deliberate indifference to her serious medical needs. The Sixth Circuit found the district court did not make factual findings pertaining to Davis or her mental state or knowledge of the facts alleged by Stoudemire, and remanded that issue to the lower court to make such findings and rule on Davis' qualified immunity defense.

The Court of Appeals then addressed a claim against prison guard Ariel N. Dunagan, who strip searched Stoudemire on

February 10, 2007. An MDOC reprimand noted that "other persons could have observed" Stoudemire during the strip search because Dunagan failed to block a window in the cell door, and Dunagan admitted that such "visual contact" was possible.

Stoudemire alleged the search was "undertaken to harass or humiliate" her. The appellate court wrote that prisoners have a diminished right to be secure in their persons against unreasonable searches, but "a strip search is a particularly extreme invasion of that right." The Sixth Circuit said such searches require exigent circumstances.

Three facts, the Court of Appeals found, indicated that the search was invasive. First, the location allowed people in the hall outside Stoudemire's cell to view the search. Next, Dunagan refused to tell Stoudemire the reasons for the strip search. Dunagan also smirked during the search, which may suggest "personal animus and implicate the dignitary interest 'inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches.'"

The Court emphasized it was not reviewing MDOC policy, but rather considering the acts of a guard who violated that policy and was sued in her individual capacity. It found the right at issue was clearly established, precluding qualified immunity. The district court's order was vacated in part, affirmed in part, and remanded for a determination of Warden Davis' qualified immunity defense and of Davis and Dunagan's immunity defense to Stoudemire's state law claims. See: *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560 (6th Cir. 2013).

Following remand, on September 25, 2013 the district court granted Stoudemire's motion to reopen the record to obtain "new evidence in opposition to the MDOC Defendants' motion to dismiss and for summary judgment." The case remains pending. 

# The Redbook – A Manual on Legal Style, by Bryan Garner (Thomson West, 2nd Ed., 2006). 510 pages (spiral bound), $15.00.

*Book review by John E. Dannenberg*

T HE *REDBOOK* IS A COMPREHENSIVE reference manual that provides guidance with every facet of preparing legal documents. Reviewed by judges and attorneys, the *Redbook* authoritatively instructs litigants in the mechanics of writing (e.g., punctuation, spelling, citations, footnotes); grammar (all parts of speech, "legalese," troublesome words); and preparing specific documents such as business letters, case briefs, affidavits, pleadings and motions. The detailed table of contents – 24 pages, not included in the 510 page count – is thoroughly indexed to help locate answers to your questions without time-consuming searches.

The *Redbook* is much more than a reference tool, though. Its bold-faced head notes draw your eye quickly to important subjects. Short tutorial paragraphs follow, educating you about each sub-category within a given topic. This tutorial design provides a superb self-instruction course on English language writing, independent of its focus on legal writing. This text is recommended as the single reference book (beyond a dictionary or thesaurus) necessary for any serious incarcerated writer.

Have you ever stopped to ponder whether you're inaptly (or ineptly) using an incorrect word? Is it "insidious" or "invidious"? Did you mean "insoluble" or "insolvable"? The *Redbook* expends an impressive 100 pages reviewing troublesome words that we all stumble over – offering refreshing distinctions among choices with concise explanations of their differences. If you are not sure where to begin to find a word that's troubling you, a separate index includes 3,600 such words with page number references.

For jailhouse lawyers, the 55-page chapter on appellate briefs will prove useful in creating an effective presentation style beyond the legal points of your argument. Separate chapters guide you through pleadings and motions; additional chapters cover business letters and contracts. Each of the eleven chapters in Part 3 of the manual, "Preparing Legal Documents," contains printed examples that depict format and style as well as content.

The *Redbook* is an invaluable (i.e., "priceless" versus merely "valuable") reference and educational tool for people who want to prepare legal documents and concurrently improve their English language writing skills.

The 3rd edition of the *Redbook* was published in August 2013 and is priced around $45.00. Both editions are available from online booksellers such as Amazon, Alibris and Barnes & Noble. Note that the spiral binding of this book (2nd and 3rd editions) is made of metal wire, which may not be allowed in some prisons and jails. If removed, the wire can be easily replaced with a shoelace. 

# Earn an Adams State University Degree via Correspondence Courses



**Now Available: Bachelors Degree in English/Liberal Arts**

- Correspondence Courses via mail    • No internet access required
- Degree options available — Associate of Arts or Science, Bachelors degrees in English, Business Administration, Government, History, Interdisciplinary Studies, Sociology, Paralegal Certificate Program, Masters Degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 16+ years of experience serving incarcerated students
- Veteran friendly
- FREE unofficial evaluation of previously earned credits

**ADAMS STATE UNIVERSITY**
C O L O R A D O
*Great Stories Begin Here*
**EXTENDED STUDIES**

Call or write to receive additional information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101
www.adams.edu

# Court Awards $802,176 in Fees, Costs in PLN Censorship Suit Against Oregon County

In March 2014, a U.S. District Court ordered Columbia County, Oregon to pay $763,803.45 in attorney's fees and $38,373.01 in costs in a lawsuit raising claims of illegal censorship at the Columbia County Jail.

Prison Legal News had filed suit against Columbia County and Sheriff Jeff Dickerson in January 2012 after jail employees rejected PLN's monthly publication and letters mailed to prisoners at the facility. Further, the jail refused to provide notice or an opportunity to appeal the censorship of PLN's correspondence. [See: *PLN*, March 2013, p.50].

The Columbia County Jail rejected PLN's publication and letters pursuant to a policy that only allowed prisoners to send and receive mail in the form of postcards. Further, the jail did not allow magazines. In April 2013, following a bench trial, the district court entered judgment for PLN and prohibited enforcement of the policy – the first time that a jail's postcard-only policy has been struck down as unconstitutional following a trial on the merits. [See: *PLN*, June 2013, p.42].

During the litigation, the county admitted "that inmates have a First Amendment right to receive magazines and inmates and their correspondents have a Fourteenth Amendment right to procedural due process." However, the jail defended its postcard-only policy and claimed there was no official policy banning magazines at the facility.

Following the trial, the district court found that the defendants' purported reasons for adopting the postcard-only policy – preventing the introduction of contraband and saving time during mail inspection – were not supported by the evidence. Columbia County subsequently agreed to pay $15,000 to resolve PLN's claim for monetary damages.

In its March 24, 2014 order awarding $802,176.46 in attorney's fees and costs to PLN, the district court rejected the county's arguments and objections to the award.

Jesse Wing, lead counsel for PLN, praised the court for recognizing that the case had advanced the public interest and the rights of many other people. "In his ruling today, Judge Michael H. Simon re-marked that, 'This action brought specific injunctive relief not only to PLN but also to all inmates at the Jail and their family and friends and others who wish to correspond with them...,'" Wing noted.

"The court's award of over $802,000 in attorney's fees and expenses in this case represents the cost of failing to comply with the Constitution of the United States," said PLN editor Paul Wright. "When county officials willingly violate the Constitution and refuse to remedy those violations, instead choosing to engage in protracted litigation, ultimately there is a greater cost to the taxpayers."

Columbia County has appealed the district court's judgment and injunction prohibiting enforcement of the jail's post-card-only policy, and the appeal remains pending before the Ninth Circuit.

PLN was ably represented by Jesse Wing and Katie Chamberlain with the Seattle law firm of MacDonald Hoague & Bayless; by the late Marc D. Blackman with the Portland law firm of Ransom Blackman, LLP, who passed away on January 1, 2014; and by Human Rights Defense Center general counsel Lance Weber. See: *Prison Legal News v. Columbia County*, U.S.D.C. (D. Ore.), Case No. 3:12-cv-00071-SI. ◣

# Oregon Appellate Court Declines to Correct Unpreserved Sentencing Error Related to Restitution

### by Mark Wilson

In May 2013, the Oregon Court of Appeals agreed that a trial court had committed plain error when it recommended that a defendant pay restitution in an amount to be determined by the Board of Parole and Post-Prison Supervision (Board). The appellate court refused to correct the error, however, because the defendant did not object before the trial court.

Ramon E. Coronado was convicted of three assault charges. At a January 25, 2010 sentencing hearing on two of the convictions, the state requested restitution of $5,931.79 to the victim and $38,676.90 to the victim's insurance company. Corona-do's attorney said "No objection." During sentencing on the remaining conviction the following month, the court stated, "I'm going to recommend ... that [defendant] make restitution to the victim in this case in an amount to be determined by the [Board]."

Despite having failed to object to the second restitution order, Coronado argued that the Court of Appeals should exercise its discretion to review the order as plain error under Oregon Rule of Appellate Procedure 5.45(1).

The appellate court recognized that Coronado "correctly points out – and the state concedes – that no statute authorizes the court to recommend that [the Board] determine the amount of restitution."

The Court of Appeals declined to correct the error, however, finding that Coronado had failed to object before the trial court, which would have made this "an easy error for the court to fix." That is, if he "had brought it to the court's attention, the court could have imposed the restitution instead of recommending [the Board] do so. Now, defendant asks this court not to remand to correct the error, but to strike the portion of the judgment relating to restitution." The appellate court refused to do so, as "that could result in a windfall" for Coronado by vacating any restitution as to his third assault charge. See: *State v. Coronado*, 256 Ore. App. 780, 302 P.3d 477 (Or. Ct. App. 2013).

However, the Court of Appeals' refusal to correct the error may still result in a "windfall" for Coronado, given that the Board only has the power bestowed upon it by the legislature. As that authority does not include the power to impose restitution in criminal cases, any order from the Board purporting to do so presumably would be *ultra vires* and thus invalid. ◣

## New York Prison Officials Can Force-Feed Hunger Striking Prisoner

THE NEW YORK COURT OF APPEALS, the state's highest court, held that a hunger striking prisoner's rights were not violated by a judicial order allowing the state to feed him by nasogastric tube to preserve his life.

The Court's decision labeled New York state prisoner Leroy Dorsey a "serial hunger striker." Indeed, Dorsey went on a hunger strike three times in 2010, in an effort to obtain a transfer to another facility and bring attention to his claims of abuse and mistreatment.

Dorsey began one of the hunger strikes in October 2010; a month later he had lost 11.6% of his body weight. The New York Department of Corrections and Community Supervision (DOCCS) sought an order to insert a nasogastric tube and take other steps to hydrate him.

At a hearing on the petition, the DOCCS submitted testimony indicating that Dorsey was at imminent risk of starving to death or experiencing "a fatal cardiac arrhythmia due to electrolyte and fluid imbalance." Dorsey opposed the petition, arguing he was not suicidal and the DOCCS had no authority to interfere with his hunger strike protest.

The Supreme Court granted the DOCCS' petition. Following that decision, Dorsey voluntarily consumed a nutritional supplement and ate solid food. The Appellate Division deemed Dorsey's appeal moot but still ruled on the merits with respect to one issue, holding that when "an inmate's refusal to eat has placed that inmate at risk of serious injury and death ... the State's interest in protecting the health and welfare of persons in its custody outweighs an individual inmate's right to make personal choices about what nourishment to accept."

The Court of Appeals applied the four-part test set forth in *Turner v. Safley*, 482 U.S. 78 (1987). It agreed the state has a significant interest in preserving life and preventing suicidal acts, and had been found liable in the past for failing to do so. The Court also noted a hunger strike can have a "significant destabilizing impact" on a prison. Further, other means were available for Dorsey to protest his treatment, such as grievances or litigation, and the Court distinguished previous cases in which it held that a competent adult may refuse medical treatment.

"In some circumstances we do not doubt that the right to refuse medical treatment is a prerogative that is compatible with incarceration," the Court of Appeals wrote. "But, even if we assume that some permutation of that right was implicated here, its invocation as part of a strategy to strong-arm DOCCS into granting a privilege to which Dorsey was not otherwise entitled is obviously not."

Accordingly, the lower courts' orders were affirmed. See: *Matter of Bezio v. Dorsey*, 21 N.Y.3d 93, 989 N.E.2d 942 (N.Y. 2013).




# *Gold Star Fragrances*

**4 West 37th St**
**New York, New York 10018**
**Tel. 212.279.4474; Tel. 212.279.4470**
**Fax. 212.279.4471**
**email: gstarfragrances@gmail.com**
**website: goldstarfragrances.com**

We are the original distributer and importer of the finest perfume oils.

We carry over 1000 of the original and best perfume oils, soaps, incenses, body lotions, shower gels, body massage, bottles and more.

All of our oils are shipped in plastic bottles.

Catering to correctional facilities since 1976.

# Ninth Circuit: Delay in Providing Dental Care May Constitute Deliberate Indifference

In an unpublished ruling, a Ninth Circuit Court of Appeals panel reversed in part a district court's grant of summary judgment to prison officials who, a prisoner alleged, were deliberately indifferent to his serious medical needs.

In 2008, Nevada prisoner Martinez Aytch filed numerous requests for dental treatment for a "rotten" tooth that was causing him "awful" and "unbearable" pain. Nearly six weeks after filing an informal grievance alerting prison officials to his submission of five medical "kites," Aytch received pain medication and antibiotics but still had not seen a dentist. His informal grievance was denied.

Aytch then filed a § 1983 complaint alleging that prison officials had been deliberately indifferent to his dental needs; he also alleged they were deliberately indifferent to his vision problems. The district court granted summary judgment in favor of the prison officials, and Aytch appealed.

Noting that Aytch's vision problems had been addressed when he received eyeglasses, the Ninth Circuit affirmed the grant of summary judgment with respect to that issue.

Relying on precedent, however, such as *Hunt v. Dental Dep't*, 865 F.2d 198 (9th Cir. 1989), the appellate court held that Aytch had raised a triable issue as to whether or not the delay in providing dental care – when considered in light of the pain he had to endure as a result of that delay – constituted deliberate indifference to his serious medical needs.

The Court of Appeals noted that budgetary constraints do not absolve prison officials from liability for such indifference, and remanded the case to the district court for further proceedings. See: *Aytch v. Sablica*, 498 Fed.Appx. 703 (9th Cir. 2012) (unpublished).

Following remand, and after Aytch filed numerous motions related to discovery issues and his ability to access the prison law library and obtain legal copies, the case went to trial in November 2013. The jury found in favor of the defendants and Aytch filed a notice of appeal. In January 2014 the district court denied his motion for transcripts at the government's expense, as it would not certify that the appeal was not frivolous

pursuant to 28 U.S.C. § 753(f). Aytch litigated the case, including the trial, pro se. See: *Aytch v. Sablica*, U.S.D.C. (D. Nev.), Case No. 2:08-cv-01773-VCF-VCF.

On March 6, 2014, in another case involving a prisoner alleging inadequate dental care, the Ninth Circuit held in an en banc decision that prison officials sued for money damages may raise a defense of lack of available resources to justify the failure to provide adequate medical care. This is contrary to the appellate ruling in *Aytch* and other established precedent, and *PLN* will report the en banc decision in greater detail in a future issue. See: *Peralta v. Dillard*, 2014 U.S. App. LEXIS 4226 (9th Cir. 2014). ◣

# Burden-Shifting Jury Instruction Requires New Trial in Prisoner's Lawsuit

The Seventh Circuit Court of Appeals has ordered a new trial in a civil rights action that alleges a prisoner was subjected to improper strip searches to humiliate him, then was subjected to an "especially protracted, gratuitous and humiliating strip search" in retaliation for having filed grievances complaining about the earlier searches.

The Court of Appeals had previously reversed an Illinois district court's grant of judgment as a matter of law to the defendants. See: *Mays v. Springborn*, 575 F.3d 643 (7th Cir. 2009). Following remand, the case went to trial and the jury returned a verdict in favor of the defendants. The plaintiff, Tiberius Mays, formerly incarcerated at the Illinois state prison at Stateville, filed another appeal arguing that he was prejudiced by the instructions and special interrogatories submitted to the jury.

Mays' attorney had failed to object to the instructions and interrogatories. As such, the appellate court said it could reverse only if there was "plain error" – meaning error that was both indisputable and likely to have influenced the outcome of the case.

The appellate court found misleading an interrogatory related to an Eighth Amendment claim that asked the jury to state whether each defendant did or did not "have a valid penological reason for the group search conducted [in a specified month or on a specified date]." As the Seventh Circuit held in the previous reversal in this case, even if there was a valid penological reason for the strip searches, "the manner in which the searches were conducted must itself pass constitutional muster."

The evidence showed the group searches had gratuitously exposed the nudity

of each prisoner being searched, and the guards conducted the searches while wearing dirty gloves in a freezing basement and uttering demeaning comments about the prisoners' genitals.

In instructing the jury on Mays' First Amendment claim, the district court placed the burden of proof regarding causation on the wrong party by requiring Mays to negate the possibility that the retaliatory strip searches would have occurred even if there had been no retaliatory motive.

The Court of Appeals held the jury should have been instructed that Mays had the burden of proving retaliation was the motivating factor for the strip search, but even if he presented such proof, the defendants could still prevail if they persuaded the jury that it was more likely than not that the strip search would have occurred even had there been no retaliatory motive.

The failure to give such an instruction was found to be plain error, and that error was compounded by the special interrogatories submitted to the jury by the district court, which asked four times whether retaliation was "the *sole* motivating factor" for the strip search. Therefore, the judgment was reversed and the case remanded for another trial. See: *Mays v. Springborn*, 719 F.3d 631 (7th Cir. 2013).

Mays obtained new counsel following remand and a jury trial has been scheduled for May 20, 2014. This civil rights action, initially filed in 2001, has been pending for 13 years. ◣

---

**Dictionary of the Law**
Thousands of clear, concise definitions.
See page 61 for ordering information.

---

# Eighth Circuit: Federal Sentence Consecutive to Later-Imposed State Sentence

*by Mark Wilson*

ON JUNE 6, 2013, THE EIGHTH CIRCUIT Court of Appeals held that a prisoner was not entitled to credit toward his federal sentence for time already served on state charges.

In March 2007, Charles Lee Elwell was arrested in Iowa. A federal indictment was issued against him several days later; Elwell was transferred to federal custody and the state court stayed its prosecution until the federal charges were resolved.

Elwell pleaded guilty to the federal charges and was sentenced to 66 months in prison in November 2007. The district court did not address whether the federal sentence would run concurrent or consecutive to any yet-to-be-imposed state sentence, as permitted by *Setser v. United States*, 132 S.Ct. 1463 (2012). [See related article in this issue of *PLN*].

Elwell was then returned to Iowa's custody and sentenced to two concurrent five-year prison terms. The state court expressed its intent to impose the state sentence concurrent with the already-imposed federal sentence.

Later discovering that Elwell's state and federal sentences were not concurrent, however, the state court resentenced Elwell to time served on February 6, 2009. As a result, Elwell's state sentence ended that day and he was transferred to the federal prison system.

The Bureau of Prisons (BOP) subsequently denied Elwell's request for credit for time served toward his federal sentence and for a *nunc pro tunc* designation pursuant to 18 U.S.C. § 3621. Elwell then filed a habeas corpus petition, which was denied by the district court.

On appeal, the Eighth Circuit first applied the primary jurisdiction doctrine, finding that Iowa, not the federal government, had primary jurisdiction of Elwell from March 2007 to February 6, 2009. "Pursuant to the doctrine of primary jurisdiction, service of a federal sentence generally commences when the United States takes primary jurisdiction and a prisoner is presented to serve his federal sentence, not when the United States merely takes physical custody of a prisoner who is subject to another sovereign's primary jurisdiction," the Court of Appeals wrote.

Under 18 U.S.C. § 3584(a), "multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." As such, the appellate court found that "Elwell's federal sentence must run consecutive to his state sentence."

Given the express bar on double credit imposed by 18 U.S.C. § 3585(b), the Court of Appeals also rejected Elwell's challenge to the BOP's denial of federal credit for time served while he was in state custody between March 2007 and February 6, 2009.

Finally, the Eighth Circuit held the BOP did not abuse its discretion in denying Elwell's request for a *nunc pro tunc* designation of the various facilities where he was incarcerated prior to February 6, 2009 as the locations for serving his federal sentence under 18 U.S.C. § 3621. See: *Elwell v. Fisher*, 716 F.3d 477 (8th Cir. 2013).



inmateMAGS.com formerly MyMagstore.com

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **50+ Page Full Catalog** ($3 Discount Coupon Included)

InmateMAGS.com
4208 University Way NE
Seattle, WA 98105

www.inmateMAGS.com
Info@inmatemags.com
206-322-6397

## New Titles Available in PLN's Bookstore



**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**



**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**



**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**



**A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series),** by Bryan A. Garner, 768 pages. **$33.95**

❏ *Criminal Law in a Nutshell*   ❏ *Advanced Criminal Procedures in a Nutshell*   ❏ *Criminal Procedure*
❏ *Dictionary of Criminal Law Terms*

Amount enclosed (add $6 S&H for orders under $50; free shipping over $50) _____

By ❏ check   ❏ new postage stamps   ❏ credit card   ❏ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**PRISON LEGAL NEWS**   PO Box 1151 • Lake Worth, FL 33460
Tel [561] 360-2523 • www.prisonlegalnews.org

# Sexual Abuse by Oregon Jail Guard Nets Probation; Defense Attorney Blames Victim

A FORMER OREGON JAIL GUARD WAS SEN-tenced to probation for sexually abusing a female prisoner after pleading guilty to a misdemeanor charge; his defense attorney blamed the incarcerated victim while the prosecutor defended the light sentence. The guard, Eddie James Miller, 60, was later accused of sexually harassing a co-worker.

As previously reported in *PLN*, Miller's 21-year career at the Inverness Jail in Portland, Oregon came to an end when he was accused of walking in on a 34-year-old female prisoner as she was using the bathroom in the jail's medical unit and forcing her to perform oral sex on him on January 9, 2012 [See: *PLN*, April 2012, p.1].

The distraught prisoner immediately reported the incident to detectives, according to Mike Schults, a chief deputy with the Multnomah County Sheriff's Office.

Authorities said the woman's DNA was found on Miller, and she testified before a grand jury. On February 29, 2012, Miller was indicted on charges of official misconduct in the first degree and custodial sexual misconduct in the first degree.

The latter offense is a felony when an Oregon corrections employee or contractor engages in sexual intercourse with a prisoner; all other sexual contact constitutes the misdemeanor offense of custodial sexual misconduct in the second degree. Prisoners are not subject to prosecution, and consent is not a defense due to the power imbalance between guards and prisoners.

Miller entered a not guilty plea through his attorney, Lisa Ludwig. He was fingerprinted, photographed and booked into jail but released on pretrial supervision pending trial.

"We take these things very seriously," said Schults. During the investigation, Miller was initially put on paid leave but later placed on unpaid leave following the indictment. He resigned in April 2012. Schults said the female prisoner was transferred to the nearby Washington County Jail for her safety.

Miller was allowed to plead guilty to a misdemeanor charge of official misconduct in the first degree and sentenced to two years' probation on September 25, 2012. Multnomah County Deputy District Attorney Don Rees defended the plea agreement by claiming that Miller may in fact have been the victim of a scheme to obtain a cash settlement from the county.

Noting that the prisoner has a 15-year criminal history, including fraud and forgery convictions, investigators said they became suspicious of her intentions when her boyfriend and another prisoner reported that she had told them she was using Miller to get rich off the county. Several prisoners at the Washington County Jail also informed officials that Miller told them of a plan to trap another guard in a similar scheme – as if jail guards are somehow unable to resist having sex with prisoners.

When Miller was sentenced, Ludwig called the victim a "con artist" but conceded that Miller was guilty of official misconduct. In addition to probation, Miller was ordered to pay a $2,500 compensatory fine to the victim and forfeit his law enforcement certification.

Meantime, Portland attorney Jennifer Palmquist notified the county of the prisoner's intent to file suit. She said Ludwig's reference to her client as a con artist was nothing more than "blaming the victim." Palmquist stated her client wants to fix a broken system, noting that jail staff did not offer her medical treatment or counseling when she reported the sexual abuse.

Meantime, after Miller was placed on leave, a former co-worker at the Inverness Jail came forward to report that he had kissed and touched her in a sexually aggressive, inappropriate and non-consensual manner.

In January 2013, the former co-worker, Shireela Kennedy, filed a $900,000 lawsuit against Miller, Multnomah County and Aramark Correctional Services, which contracts with the jail. The suit claimed that Miller began making inappropriate comments shortly after she began working at the facility in September 2011.

According to her lawsuit, Kennedy's supervisors destroyed a written sexual harassment complaint she had filed against Miller and ignored her numerous verbal complaints. The suit also alleged that Aramark employee Eddie Climer brushed off her reports of sexual harassment.

Kennedy said she began having panic attacks, depression and difficulty sleeping following Miller's inappropriate actions. She was terminated from her job in February 2012; since then, according to her complaint, she has suffered loss of earnings, job opportunities and other employment benefits.

Kennedy's lawsuit was resolved in October 2013 under undisclosed terms. See: *Kennedy v. Aramark*, Multnomah County Circuit Court (OR), Case No. 130101276.

Source: *www.oregonlive.com*

**TEXAS ONLY**

Post-conviction State and Federal Habeas Corpus

Parole Representation

Family Law

**Ashley Burleson**
Attorney and Counselor at Law
1001 Texas Avenue, Suite 1400
Houston, Texas  77002

**WINNING HABEAS CORPUS & POST CONVICTION RELEIF**
Revised 4th Ed. 2012
Main subject: Ineffective Assistance of Counsel-"IAC"
Atty Kent Russel writes: "Simply the best source for a quick study on major subjects in the criminal process."

<> A virtual law library in a book, major constructional issues

<> 6th Amendment & IAC, Duty to investigate

<> Forensics, Plea IAC, Jury Instructions

<> §2254 & 2254 Procedure, Clearly estabished law

**POST COVICTION RELEIF FOR WASH. STATE-Personal Restraint Petition**

The only book for Wash. State prisoners who seek collateral review by PRP or CrR 7.8 motion. Covers all aspects of preparing a PRP, time bar, facial invalidity, Plea bargain, sentencing, incl. case law & rules.

**ORDER: (price incl. tax, plus S&H)**

[ ] Winning Habeas Corpus... $ 59.50
[ ] Post Conviction Relief for Wash. $ 49.50
[ ] Both Books $ 95.00

**To: FAST LAW PUBLISHING**
Box 577, Upland CA 91785  On-line www.fastlaw.com

# FREE LOCAL NUMBER WITH SENTEL

*Get a local Number & Save up to 85% on Prison Calls with Sentel.*

*Save on International Calls with Sentel*

Below is a summary of the Great plans we offer:

| FREE USA PLAN | USA -100 | USA UNLIMITED | INTERNATIONAL |
|---|---|---|---|
| **Features:** | **Features:** | **Features:** | Features: |
| Price: $0.00 | Price: $4.99 | Price: $9.99 | Price for 1st line: $1 |
| 20 Free Minutes | 100 Minutes | Unlimited USA | Add a line: 50 cents |
| Risk Free Sign Up | Additional lines @ $2.5 | Fair Minute Usage | Rates Based Upon Destination |
| Additional Minutes @ 6 cent | Additional Minutes @ 5 cents | Limited Time offer Only | Calls as low as 10 cents/mn |
| | | Hurry Up !!! | Guaranteed lowest rates |
| | | You have it You keep it | |

# NÚMERO LOCAL GRATIS CON SENTEL

Obtenga un número de locales y ahorra hasta un 85% en la prisión de llamadas con Sentel.

*Ahorra en llamadas internacionales con Sentel*

A continuación se muestra un resumen de los Grandes planes que ofrecemos:

| GRATIS EE.UU. PLAN | EE.UU. -100 | EE.UU. ILIMITADO | INTERNACIONAL |
|---|---|---|---|
| Características: | Características: | Características: | Características: |
| Precio: $ 0.00 | Precio: $ 4.99 | Precio: $ 9.99 | Precio para 1ª línea: $ 1 |
| 20 minutos gratis | 100 Minutos | Ilimitado EE.UU. | Agregue una línea: 50 cents de dólar |
| Riesgo Inscribirse | Las líneas adicionales @ $ 2,5 | Uso de minutos Fair | Precios basados en la Destino |
| Minutos adicionales @ 6 cents | Minutos adicionales @ 5 cents | | Las llamadas de tan solo 10 cents |
| | | | Garantizado los mejores precios |

**We accept debit and credit card payments, institutional checks, bank deposits and paypal**

**Sentel, Sentel**
**9550 S. Eastern Ave Ste 253**
**Las Vegas, NV 89123**
**Ph: 702-430-9445**
**Email:**      sentel.nv@gmail.com
**Website:**   www.sentelinmatecall.com

# Federal Court Must Give Reasons for Special Conditions of Supervised Release

### by David Reutter

THE SIXTH CIRCUIT COURT OF APPEALS has reversed a district court's imposition of four special conditions of supervised release, due to the court's failure to explain its reasons for imposing them.

Rashan R. Doyle was convicted in New York of attempted sexual abuse in the first degree; as a result of that qualifying felony conviction, the Sex Offender Registration and Notification Act required him to register as a sex offender. When Doyle moved to Tennessee, however, he failed to register.

Doyle pleaded guilty to a charge of failure to register as a sex offender in violation of 18 U.S.C. § 2250(a). A federal district court in Tennessee sentenced him to 37 months in prison followed by ten years of supervised release, plus a $3,000 fine.

The term of supervised release included four special conditions that prohibited Doyle from possessing any pornography, even legal pornography; having direct or indirect contact with any child under eighteen, including loitering near school yards, playgrounds, swimming pools, arcades or other places frequented by children; using sexually-oriented telephone or computer-based services; and possessing or using a computer with access to any "on-line service" or other forms of wireless communication without the approval of his probation officer.

Because Doyle did not object to the special conditions at sentencing, the Sixth Circuit analyzed them under the plain-error standard. The appellate court held that "a district court errs if it fails, at the time of sentencing, to state in open court its rationale for mandating a special condition of supervised release." In this case, the district court had erred procedurally because it failed to explain its reasoning for the special conditions at issue; the Court of Appeals found the error was clear because the record did not show why the conditions were imposed.

Further, the district court's failure to explain its rationale for the special conditions "may have had a substantial influence on the outcome of the proceedings." The Sixth Circuit wrote, "there is a reasonable probability that the court may not have imposed the special conditions if it had fulfilled its obliga-tions to explain the basis for the conditions or at least made sure the record illuminated the basis for the conditions." Finally, as the special conditions were "likely more severe than the ones the district court would have imposed had it fulfilled its obligation to explain its reasoning," the error was not harmless and affected the fairness, integrity or public reputation of the proceedings.

The four special conditions of Doyle's supervised release were vacated and the case remanded for resentencing. The district court was reminded that if it does impose special conditions, they "'must be tailored to the specific case before the court.'" The Sixth Circuit noted that it did not see how some of the special conditions related to the nature and circumstance of Doyle's offense of failure to register; the one exception was contact with children or being in places where children congregate, but that provision should not apply to Doyle's own children. See: *United States v. Doyle*, 711 F.3d 729 (6th Cir. 2013).

Following remand, Doyle was resentenced on August 30, 2013 to 37 months in prison and five years of supervised release, plus a $3,000 fine.

# Idaho Supreme Court Upholds Dismissal of § 1983 Claims in Jail Suicide Case

### by Mark Wilson

THE IDAHO SUPREME COURT HAS AF-firmed a lower court's dismissal of § 1983 claims stemming from the death of a detainee who committed suicide at the Ada County Jail (ACJ).

On September 28, 2008, Bradley Munroe was arrested for robbery. He was hospitalized because he was intoxicated, uncooperative and exhibiting odd behavior. Munroe claimed he would commit suicide if released, but the hospital cleared him and he was transported to ACJ.

During the booking process, Munroe was screaming, being rowdy and not making sense. Given his bizarre behavior, booking was suspended until the next morning and he was placed in a holding cell for observation.

James Johnson, a psychiatric social worker at the jail, assessed Munroe's suicide risk. Johnson concluded that Munroe's risk level was insufficient to justify admitting him to ACJ's Health Services Unit (HSU).

After Johnson's assessment, Munroe answered some suicide risk questions in the affirmative during the booking process. Guards did not contact staff in the HSU, however, based on Johnson's evaluation.

Upon his request, Munroe was held in a single cell in protective custody. Guards were required to conduct well-being checks every 30 minutes.

At around 9 a.m. on September 29, 2008, Munroe's mother, Rita Hoagland, called ACJ to express concerns that her son was suicidal. Hoagland's concerns were reported to Johnson, but he did not alter his initial assessment.

That evening, Munroe was found hanging by a bed sheet from the top bunk in his cell. Efforts to revive him were unsuccessful.

On January 23, 2009, Hoagland filed suit in state court, in her personal capacity and as the representative of Munroe's estate, claiming that guards were watching football when her son committed suicide. The initial complaint alleged § 1983 claims, state law torts and wrongful death claims.

When the defendants moved for summary judgment, Hoagland withdrew all of her state law claims and proceeded with only the § 1983 claims.

The trial court granted qualified immunity to Johnson and dismissed Hoagland's claims against the other defendants. It awarded $15,815.31 to the defendants in costs as a matter of right and $77,438.12 in discretionary costs, but not attorneys' fees.

On appeal, the Idaho Supreme Court found "the district court properly held that Munroe's estate is not a valid § 1983 plaintiff," because "Munroe's § 1983 claim abated with his death."

"This Court has clearly held that

§ 1983 is a personal cause of action. Furthermore, there is no federal law governing the issue of abatement. Therefore, the law of Idaho governs to the extent that it is not inconsistent with federal law. At common law in Idaho, a personal tort cause of action abates with the death of the plaintiff."

The state Supreme Court also held that Hoagland had "failed to establish a violation of her constitutional rights underlying her § 1983 claim," as she did not prove the defendants intentionally interfered with her relationship with Munroe.

Given Hoagland's waiver of her state law wrongful death claim, the Court found that judicial estoppel barred her from asserting "that her § 1983 claim incorporates the wrongful death claim."

The Supreme Court upheld the trial court's denial of attorneys' fees but reversed the discretionary award of costs to the defendants, noting that "the district court failed to make adequate findings." On remand, the lower court was directed to reconsider the discretionary costs and make "express findings justifying the award." The Court also reduced to $14,897.31 the costs awarded to the defendants as a matter of right. See: *Hoagland v. Ada County,* 154 Idaho 900, 303 P.3d 587 (Idaho 2013). ◄

# Washington PRA Violations Result in Costs and Penalties

*by Mark Wilson*

The Washington Court of Appeals, Division Two, held on July 30, 2013 that a state agency violated Washington's Public Records Act (PRA) by failing to respond to a prisoner's request within the statutory time limit and by redacting information not exempt from disclosure. The appellate court instructed the lower court to determine on remand the amount of costs and penalties to be awarded as a result of the violations.

On July 20, 2009, Monroe Correctional Complex prisoner Derek E. Gronquist sent a PRA request to the Washington State Department of Licensing (DOL) for the master business license application of a specified company.

The DOL failed to respond within five days in violation of the PRA. When the agency responded to Gronquist's request on July 31, 2009, it provided the requested document but "redacted much of the application without providing a statutory basis for the redactions."

Gronquist filed suit in state court, alleging that the DOL had violated the PRA by providing a redacted copy of the application. Following an inspection of the redacted information, the trial court granted summary judgment to the DOL, holding that the redacted material was not subject to disclosure but protected as confidential under Washington law.

The Court of Appeals reversed, holding that: 1) the DOL did not respond within the statutory time frame; 2) none of the redacted information was exempt when it was requested; 3) the DOL failed to provide timely or adequate justification for the redactions; and 4) the trial court improperly refused to file the deposition transcripts offered by Gronquist in support of his motion for sanctions and in response to the DOL's summary judgment motion.

Due to a 2011 change that transferred the responsibility for master business licenses from the DOL to another state agency, the appellate court declined to order disclosure of the unredacted application requested by Gronquist. It remanded, however, instructing "the trial court to consider the imposition of costs and penalties after consideration of the entire record, including the depositions to be filed by the trial court." Gronquist was also awarded his costs on appeal.

The Court of Appeals did not address the applicability of RCW § 42.56.565(1), effective July 22, 2011, which specifies that a court shall not award penalties for violations of the PRA "to a person who was serving a criminal sentence in a state, local, or privately operated correctional facility on the date the request for public records was made, unless the court finds that the agency acted in bad faith in denying the person the opportunity to inspect or copy a public record." See: *Gronquist v. Washington State Department of Licensing,* 175 Wn. App. 729, 309 P.3d 538 (Wash. Ct. App. 2013). ◄

## Revealing the Secrets of Kabbalah
### Watch Your Life Make Sense

Studying Kabbalah is a fascinating journey. It changes our perspective on the world and the people around us, revealing aspects within us that we never knew existed. Kabbalah states very simply that when we need to know how to connect to the Upper Force, we will find our inner compass. This is the goal of Kabbalah – to help us make and sustain direct contact with the Creator. When we do, we will need no further guidance.

Free interactive correspondence course.

*Please send your letters to:*
Kabbalah Research Institute
**Attn: Mikhail Plaksin**
P.O. Box 670263
Flushing, NY 11365
Ph: 800-540-3234

# Prisoner Organ Transplants, Donations Create Controversy

PRISON OFFICIALS IN SEVERAL STATES ARE mulling over two sides of the same coin with respect to organ transplants for prisoners: first, the eligibility and cost of such medical procedures, and second, whether prisoners should be allowed to donate their organs.

## Prisoners in Need of Organ Transplants

IN RHODE ISLAND, A LIVER TRANSPLANT performed on a 27-year-old prisoner left officials defending the cost of the life-saving operation.

A spokeswoman for the Rhode Island Department of Corrections (RI DOC) said Jose Pacheco, who is serving a 6½-year sentence for robbery, became the first prisoner in the state to receive a liver transplant. The August 1, 2012 operation was performed in Boston because Rhode Island hospitals don't currently perform such transplants.

The procedure can cost up to almost $1 million, with the state required to pick up 40% of the bill, according to court precedent.

But the RI DOC said in a statement that it was unclear how much of Pacheco's hospital bills the state will actually pay because it's possible he qualified for Social Security benefits before he was incarcerated. In that case, Medicaid would cover about 50% of the cost.

"To date, the Department has paid only for the inmate's supervision in the hospital under an interagency agreement with the [Massachusetts Department of Corrections]," said RI DOC spokeswoman Tracey Zeckhausen. "That totaled just over $110,000" as of June 2012, she added.

"It is a sort of lose-lose situation for the taxpayer," said state Senator Dawson Hodgson. "It can amount to torture if you let someone die without healthcare. At the same time, $1 million is a tremendous amount of taxpayer resources, whether it is coming from the state or federal government, put into any person's healthcare – never mind someone who is a drug dealer and a thief."

Pacheco's case is not the first to generate controversy about prisoners receiving organ transplants, of course.

A California prisoner received a heart transplant in January 2002 at a cost of $1 million – which included follow-up care –

according to Russ Heimerich, a spokesman for the California Department of Corrections and Rehabilitation (CDCR). At the time, Heimerich said the 32-year-old prisoner was suffering from a fatal heart condition. [See: *PLN*, Sept. 2002, p.12].

Less than a year later the heart transplant recipient had died, the victim of what prison officials called a failure to adhere to the demanding medical protocols that follow such an operation. [See: *PLN*, Oct. 2003, p.28]. Transplant patients typically require close monitoring and a wide range of daily medications to prevent organ rejection and fight infections.

In 2004, a California federal court ordered the CDCR to contact transplant centers in the state to determine whether they would accept a prisoner as a candidate for a liver transplant. See: *Rosado v. Almeida*, 359 F.Supp.2d 1341 (S.D. Cal. 2004).

New York state prisoner Wilfredo Rodriguez received a $400,000 liver transplant in November 2005. [See: *PLN*, Feb. 2006, p.40]. When another New York prisoner, convicted of rape, was being evaluated in 2011 for a heart transplant, state lawmakers demanded a review of the policies that permitted such operations at taxpayers' expense.

"These reports raise a multitude of questions that demand and deserve answers for New York taxpayers, potential organ donors, and law-abiding families who are still waiting for life-saving transplants," said state Senator Michael Nozzolio. "We cannot allow law-abiding citizens to be denied transplants in favor of dangerous violent offenders, convicted of heinous crimes, who may never leave prison."

Apparently, Nozzolio was unaware that the provision of adequate healthcare by prison officials – including organ transplants when needed – is a Constitutional requirement. The U.S. Supreme Court ruled in *Estelle v. Gamble*, 429 U.S. 97 (1976) that denying necessary medical care to prisoners constitutes cruel and unusual punishment in violation of the Eighth Amendment.

"You get a liver transplant because you meet the very strict criteria, not because we like you," remarked Dr. David Kaufman, the medical director at Strong Memorial Hospital, which performed the liver transplant for Rodriguez.

The New York prisoner seeking a heart transplant, Kenneth Pike, was screened for

the operation but later declined the transplant for reasons that were not reported.

Meanwhile, the United Network for Organ Sharing (UNOS), a non-profit organization that manages the organ transplant system in the United States under a contract with the federal government, has taken the position that prisoners should not be precluded by their carceral status from receiving transplants, and should be eligible for such procedures to the same extent as non-incarcerated citizens.

People usually receive organ transplants according to their position on the waiting list, which is based on the severity of their medical condition. There are currently over 121,000 people on organ waiting lists nationwide.

## When Prisoners Want to Donate Organs

AT THE OPPOSITE END OF THE SPECTRUM, controversy has erupted in several states about the ability of prisoners – including those on death row – to donate their organs, and the appropriateness of such donations.

In Mississippi, Governor Haley Barbour commuted the life sentences of sisters Gladys and Jamie Scott in December 2010, on the condition that Gladys donate one of her kidneys to Jamie. Both prisoners, who had served 16 years for an $11 armed robbery, were released in January 2011; Barbour's decision may have been partly motivated by fiscal concerns, as Jamie's dialysis was reportedly costing the state prison system around $190,000 per year. It is unclear whether the post-release kidney transplant occurred, as it was initially postponed for medical reasons. [See: *PLN*, May 2011, p.34].

Utah enacted the Inmate Medical Donation Act in March 2013, which allows voluntary organ donations from prisoners who die "while in the custody" of the Department of Corrections. The law states that prison officials may "release to an organ procurement organization ... the names and addresses of all inmates who complete and sign the document of gift form indicating they intend to make an anatomical gift."

In Ohio, Governor John R. Kasich placed the November 2013 execution of death row prisoner Ronald Phillips on hold in order to study the feasibility of allowing Phillips and other condemned prisoners to donate their organs. Phillips was sentenced

to die for the 1993 rape and beating death of his girlfriend's 3-year-old daughter.

"Ronald Phillips committed a heinous crime for which he will face the death penalty," the governor said in a statement. "I realize this is a bit of uncharted territory for Ohio, but if another life can be saved by his willingness to donate his organs and tissues then we should allow for that to happen."

Phillips' request to donate his organs to sick relatives or others who need them was initially rejected by state prison officials. According to the governor's office, Phillips' non-vital organs, such as a kidney, would be removed and he would then be returned to death row pending his execution, which was re-scheduled for July 2014.

On March 21, 2014, Ohio Department of Rehabilitation and Correction chief counsel Stephen Gray said Phillips would not be able to donate his organs, as he could not to do so in time to allow for a 100-day recuperation period prior to his new execution date.

Some people worry about the ethics of allowing death row prisoners to donate their organs. Jeff Orlowski, who heads Life Share Transplant Services, compared the process to organ harvesting – a practice that has been condemned in China, which until only recently harvested organs from executed prisoners. [See: *PLN*, March 2013, p.27; Sept. 2009, p.35; Jan. 2008, p.16; Sept. 2007, p.24].

Life Share Transplant Services keeps track of the organ donation registry in Oklahoma, where one state lawmaker predicted widespread support for his proposal to allow death row prisoners to donate their organs.

"I don't think it will be a tough sell," state Rep. Joe Dorman said in November 2013. "I think with the strong stance that we have with members of the legislature being pro-life, I certainly see this as a pro-life idea because you're saving lives with the actions of that prisoner seeking redemption" by donating his organs.

"You can't put a price on life," he added, apparently without irony.

Rep. Dorman said organs donated by willing prisoners would benefit people waiting for transplants – especially for organs that are difficult to find, *The Oklahoman* reported. His proposed legislation would allow prisoners to be anesthetized, have their organs removed and then be placed on life support until their executions can be carried out. Oklahoma uses lethal injection, which renders organs useless for post-execution transplants.

"The only options for executing someone to obtain vital organs is to either shoot them in the head or chop their head off and have a team of doctors ready to step in immediately," noted Arthur Caplan, professor of medical ethics at NYU Langone Medical Center.

Oregon death row prisoner Christian Longo has pushed the issue of organ donation for several years. "If I donated all of my organs today, I could clear nearly 1 percent of my state's organ waiting list. I am 37 years old and healthy; throwing my organs away after I am executed is nothing but a waste," he wrote in a *New York Times* editorial on March 5, 2011. Prison officials denied his request.

Longo, who founded an organization called Gifts of Anatomical Value from Everyone (GAVE), renewed his efforts to donate his organs in March 2014, offering to give a kidney to Kevin Gray, an Oregon resident with kidney failure who is on dialysis.

"I don't care if you're incarcerated, if you're my neighbor – if you're willing to donate an organ to save a life it's very breathtaking and I'm very grateful," Gray said, although he later rejected the offer after learning that Longo was on death row.

"The department looks at organ donation on a case-by-case basis," stated Oregon Department of Corrections spokeswoman Jennifer Black. "If someone needs a bone marrow transplant or their mother needs a kidney and there's a match, then there's no reason that can't go forward," she said. "But it's not just a blanket 'yes.' All offenders can give part of their body away to somebody else. It has to be for the right reasons and the right person and all that."

Policies related to organ donations by prisoners, including those on death row, vary from state to state.

"There have been several instances in the United States within the last 20 years where condemned prisoners have requested to become organ donors, either upon their execution as a deceased donor or prior to execution as a living donor," UNOS said in a November 14, 2013 statement posted on the organization's website. "Ultimately the correctional authority must decide whether to allow any inmate to be evaluated for donation, and an organ procurement organization and/or transplant center must make medical decisions whether to accept any person as a donor and allow a transplant to proceed."

UNOS noted that organ donations from prisoners "present special concerns and vulnerabilities, and appropriate precautions are necessary to prevent the potential for coercion" – such as offering early release or other incentives in exchange for prisoners' organs. ◾

Sources: *www.630wpro.com*, *Providence Journal*, *www.osv.com*, *CBS News*, *NBC News*, *United Press International*, *www.waynepost.com*, *Associated Press*, *The New York Times*, *www.kgw.com*, *www.wamc.org*, *New York Daily News*, *NBC News*, *www.unos.org*, *The Oklahoman*, *www.gavelife.org*, *Statesman Journal*

**WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS**
STATE AND FEDERAL POST-CONVICTION AND APPEALS

Licensed since 1995, hundreds of appellate briefs and habeas petitions, capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas, Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment. Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**



**INMATE** CONNECTIONS.com
**& ConvictPenPals.com!**
465 NE 181st, #308 Dept. PLN Portland OR 97230
Since 2002 – Write for FREE brochure!

# Oklahoma Jailers Not Immune from Excessive Force Claims

THE OKLAHOMA SUPREME COURT HAS held that jail officials are not immune from liability for excessive force claims under the Oklahoma Governmental Tort Claims Act (OGTCA).

On May 17, 2011, Daniel Bosh was detained at the Cherokee County Detention Center for failure to pay a traffic ticket. Video surveillance showed him standing at the booking desk with his hands cuffed behind his back.

Bosh reportedly complained to guard Gordon Chronister, Jr. that his handcuffs were too tight; in response, Chronister grabbed him from behind and slammed his head onto the booking desk. He then placed Bosh's head under his arm and fell backwards, causing Bosh to strike the top of his head on the floor.

According to the video footage, other guards quickly joined the attack. They moved Bosh to a shower area outside the camera's view, where they continued to assault him for an undisclosed period of time.

"The video speaks for itself," said Bosh's attorney, Mitchell Garrett.

Guards then left Bosh to languish in a cell without medical treatment for two days before taking him to a local hospital.

Having suffered fractured vertebrae, Bosh required surgery to fuse several discs along his spinal cord.

Chronister later claimed that he thought Bosh was going to spit on him; based on that assertion, and the fact that Bosh had a long criminal history that damaged his credibility, prosecutors did not pursue criminal charges against Chronister or other guards involved in the incident.

On September 29, 2011, Bosh filed a 42 U.S.C. § 1983 action in state court against the Cherokee County Governmental Building Authority ("Authority"), which operates the jail, and against Assistant Jail Administrator T.J. Girdner and the guards who had assaulted him. The defendants removed the case to federal court.

The federal district court dismissed Bosh's state tort claims as being barred by the OGTCA, 51 O.S. 2011 §§ 151 *et seq.,* which "appears to allow the state, or, in this case the Authority, to elude tort liability when its employees beat and injure a citizen who is detained at one of its facilities."

Nevertheless, the district court allowed Bosh "to amend his complaint to assert a claim of excessive force" under Article 2,

§ 30 of the Oklahoma Constitution. The defendants moved to dismiss the constitutional claim, arguing that it too was barred by the OGTCA. On August 30, 2012, the federal court certified three questions of law to the Oklahoma Supreme Court related to the scope and application of the OGTCA.

In answering those questions, the Supreme Court first found that Article 2, § 30 "provides a private cause of action for excessive force, notwithstanding the requirements and limitations of the OGTCA." Construing the OGTCA "as providing blanket immunity ... would ... render the Constitutional protections afforded the citizens of this State as ineffective, and a nullity," the Court explained. Thus, excessive force claims brought under Article 2, § 30 are not barred by the OGTCA.

The Supreme Court then held that the cause of action it recognized with respect to excessive force claims under Article 2, § 30 applies retroactively "to all matters which were in the litigation pipeline, state and federal, when *Bryson v. Oklahoma County,* 2011 OK CIV APP 98, 261 P.3d 627 [(Okla. Ct. App. 2011)] was decided as well as any claims which arose when *Bryson* was decided."

Finally, the Court found that in regard to such claims under Article 2, § 30 of the Oklahoma Constitution, "respondeat superior applies to hold municipal corporations liable for the actions of their employees where those employees are acting within the scope of their employment."

Although the ruling was superficially amended and corrected on June 28, 2013, the outcome remained the same. See: *Bosh v. Cherokee County Governmental Building Authority,* 2013 OK 9, 305 P.3d 994 (Okla. 2013), *rehearing denied.*

Bosh's suit alleging excessive force claims remains pending before the federal district court, though it is now being litigated by his estate. On March 17, 2014, Bosh's wife notified the court that he had died. See: *Bosh v. Cherokee County Governmental Building Authority,* U.S.D.C. (E.D. Okla.), Case No. 6:11-cv-00376-JHP.

Additional source: *www.kjrh.com*



## FREE BOOK!

Get *The Habeas Citebook* with purchase of a 4-year subscription to *Prison Legal News.* Offer good for new subscriptions and renewals.

Special limited time only! All sales final and no refunds. Order now for this great deal worth $49.95.

**Prison Legal News** • PO Box 1151 • Lake Worth, FL 33460

Tel [561] 360-2523 • www.prisonlegalnews.org

# WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

**TENS OF THOUSANDS OF THE HOTTEST AND MOST SCANDALOUS BABES&DUDES FOUND ON THE PLANET.**
**EACH CATALOG PAGE HAS 120 BEAUTIFUL GIRLS OR BOYS POSING JUST FOR YOU!**
**ORDER ONE CATALOG PAGE FOR ONLY $4.50 OR FOR 10 U.S. FOREVER STAMPS WITH AN SASE ENCLOSED.**
**WE WILL SEND YOU VOLUME ONE.  EACH ADDITIONAL VOLUME THE SAME PRICE!**
## HELP US TO HELP YOU!
**WE ARE MORE THAN HAPPY TO ANSWER E-MAIL INQUIRES HOWEVER, DUE TO MAILING COST AT $0.46 CENTS**
**A LETTER, PLEASE ENCLOSE AN SASE WITH YOUR QUESTIONS, OTHERWISE NO REPLIES!**
## WHAT ABOUT OUR PRICES AND POLICIES
**COLOR PRINTS ON 4x6 GLOSSY PHOTO PAPER AS LOW AS $0.35 CENTS PER PRINT ON ORDERS OVER 500**
**SHIPPED ACCORDING TO POLICY: 25 PICTURES PER ENVELOPE EVERY 24 HOURS. S&H $2.00 PER ENVELOPE.**
## METHOD OF PAYMENT/CONTACT INFORMATION
**U.S. POSTAL SERVICE MONEY ORDERS-STATE & FEDERAL CORRECTIONAL INSTITUTIONAL CHECKS**
### PAYABLE ONLY TO: KRASNYA L.L.C.
**EQUATION FOR FIRST CLASS U.S. FOREVER STAMPS**
**BRAND NEW FLAT BOOK FOR ALL ORDERS AT THE RATE OF $6.00 PER FLAT BOOK.**
**WE RESPOND TO OUR CLIENTS NEEDS AND TRY TO HELP THE BEST WE CAN.**
**OUR SEASONAL SPECIALS MEAN A KICKOFF OF SAVINGS!**

---

**COLOR CATALOG DISCOUNT SALE**
ONE COLOR CATALOG OF 120 BABES
IN CLASSIC OR NUDE LINES $4.50
PLEASE INCLUDE
A SELF-ADDRESSED STAMPED
(2-FIRST CLASS STAMPS) ENVELOPE.
QUANTITY BUYS:

5-14 CATALOGS ===10% OFF OUR REGULAR PRICE
15 CATALOGS ===15% OFF OUR REGULAR PRICE
20 CATALOGS ===20% OFF OUR REGULAR PRICE
25 CATALOGS ===25% OFF OUR REGULAR PRICE
30 CATALOGS ===30% OFF OUR REGULAR PRICE
35 CATALOGS ===35% OFF OUR REGULAR PRICE
40 CATALOGS ===40% OFF OUR REGULAR PRICE
45 CATALOGS ===45% OFF OUR REGULAR PRICE
50 CATALOGS ===50% OFF OUR REGULAR PRICE
BE SURE TO SPECIFY CLASSIC OR NUDE BABES!

150 VOL. OF KRASNYA BABES CLASSIC LINE
150 VOLUMES OF KRASNYA BABES NUDE LINE

**$24.95 S&H FREE**
FOR GRAB BAG OF
**50 PHOTOS**
FROM ALL OUR CATALOGS
SPECIFY RACE AND MAIN
AREA OF YOUR INTERESTS
WE WILL PICK SELECTION
FOR YOU
BONUS 1 COLOR CATALOG
PAGE OF 120 BABES

**LOOSE STAMPS FOR LOOSE BABES**
KRASNYA LOOSE STAMP GRAB BAG SPECIAL
10 LOOSE BABES...........................30 STAMPS
25 LOOSE BABES...........................75 STAMPS
50 LOOSE BABES..........................150 STAMPS
ALL STAMPS MUST BE 1ST CLASS STAMPS
IN LIKE NEW CONDITION!
SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)
WE WILL PICK SELECTION FOR YOU

**KRASNYA BABES HAS SPRUNG SALE!**
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST
CLASS STAMPS! 1 CAT PER CUSTOMER
PLEASE SPECIFY MALE OR FEMALE BABES
NUDE OR BOP-FRIENDLY

3 BRAND NEW FLAT BOOKS OF FOREVER
STAMPS FOR GRAB BAG OF 45 PHOTOS
FROM ALL OUR CATALOGS. SPECIARY RACE
AND MAIN AREA OF YOUR INTERESTS
WE WILL PICK SELECTION FOR YOU
BONUS 1 COLOR CATALOG OF 120 BABES
PLEASE INCLUDE 6 FOREVER STAMPS
WITH YOUR ORDER FOR S&H

**KRASNYA L.L.C.**
P.O.BOX 32082
BALTIMORE, MD 21282
EMAIL AND CORRLINKS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM

WE'D LIKE TO START THE HOLIDAYS RIGHT THIS YEAR!
THE WAY TO DO THAT IS BY SENDING YOU INCREDIBLE VALUES
IT'S ONE THING TO TALK THE TALK, ANOTHER TO WALK THE TALK

50   GREAT BABES 0.50 CENTS EACH---$25.00
100 GREAT BABES 0.45 CENTS EACH!---$45.00
200 GREAT BABES 0.40 CENTS EACH!---$80.00
300 GREAT BABES 0.40 CENTS EACH!-$120.00
500 GREAT BABES 0.35 CENTS EACH!-$175.00

STANDARD TERMS & CONDITIONS APPLY – $2.00
PER ENVELOPE (25 PHOTO) FOR SHIPPING AND HANDLING!

**WAIT!**
YOU SAY YOU DON'T HAVE ENOUGH BABE CHOICES
OR CATALOGS? YOU NEED CATALOGS!
PREPAY YOUR ORDER AND WE WILL SEND YOU
FREE COLOR CATALOGS!
GREAT DEAL, BUT HOW MANY CATALOGS?

FOR EVERY 100 BABES WE'LL SEND YOU
240 BABES TO CHOOSE FROM!

**ORDER**

50 BABES_____ONE SINGLE CATALOG
100 BABES_____ONE DOUBLE CATALOG
200 BABES_____TWO DOUBLE CATALOGS
300 BABES_____THREE DOUBLE CATALOGS
500 BABES_____FIVE DOUBLE CATALOGS

---

KRASNYA IS PROUD TO INTRODUCE AT FANTASTIC INTRODUCTORY PRICES
**THE CONNOISSEUR'S COUTURE "CACHE TWO-FIVE COLLECTION"**
**OF INTERNATIONAL ADULT FILM STARS**
TWELVE PACKAGES OF 25 NUDE AND NON-NUDE POSES,
AVAILABLE ONLY IN OUR "CACHE TWO-FIVE" COLLECTION.

**"CACHE TWO-FIVE"**
"CACHE TWO-FIVE"  IS AVAILABLE IN TWELVE (12) SPECIALLY PRICED PACKAGES
OF 25 POSES IN NUDE AND NON-NUDE POSES.
PLEASE SPECIFY ON YOUR ORDERS IF YOU WANT NUDE OR NON-NUDE PACKAGES
AND WHAT COLLECTION NUMBER YOU'D LIKE.
COLLECTIONS ARE NUMBERED 01-12 FOR EXAMPLE ON YOUR ORDER YOU'D WRITE:
***NUDE CACHE TWO-FIVE PACKAGE 01 & 02***
REMEMBER THERE ARE TWELVE (12) COMPLETELY DIFFERENT PACKAGES OF 25 BABES,
THERE ARE NO DUPLICATES IN ANY OF THE 12 PACKAGES.
600 BEGUILING BEAUTIES, ALL BRAND NEW ADDITIONS TO OUR LINE AND AVAILABLE ONLY
IN OUR CACHE "TWO-FIVE" PACKAGES!  300 NUDES AND 300 NON-NUDE BEAUTIES
CAPTURE YOUR OWN COLLECTION OF KRASNYA'S "CACHE TWO-FIVE" SELECTIONS IN
INDIVIDUALIZED PACKAGING OF 25 RARE AND EXQUISITE BREATH-TAKING BEAUTIES.
THE CONNOISSEUR'S COUTURE COLLECTION OF "CACHE TWO-FIVE" BRINGS YOU
25 BEAUTIES IN EACH "CACHE TWO-FIVE" PACKAGE FOR ONLY $12.95 PER PACKAGE

LIMITED TIME SPECIAL ***** $59.95******
PLUS S&H FOR 6 "CACHE TWO-FIVE" PACKAGES OF THE NUDE OR NON-NUDE COLLECTIONS
150 BEAUTIES
IMAGINE 150 OF THESE EXCITING AND EXQUISITE BEAUTIES
FOR A RIDICULOUSLY LOW PRICE OF
*****$59.95****** PLUS $12.00 SHIPPING AND HANDLING CHARGE.
ADD $2.00 FOR SHIPPING AND HANDLING PER "CACHE TWO-FIVE" PACKAGE ORDERED.
YOU MUST SPECIFY NUDE OR NON-NUDE PACKAGES
IF NOT SPECIFIED NON-NUDE WILL BE SHIPPED AUTOMATICALLY
ALL OF OUR NORMAL POLICIES APPLY

**FOR KRASNYA CLIENTS WHO WORK THE YARDS;**
HAVE WE GOT A GREAT OPPORTUNITY FOR YOU...GRAB BAG

## MR. HUSTLE GRAB BAG BARGAIN DAY$

ONLY $0.25 CENT$ PER BABE
5 GRAB BAG MINIMUM PURCHASE REQUIRED
$2.00 SHIPPING AND HANDLING PER BAG

25 AWESOME BABES PER BAG AT ONLY $6.25 PER BAG
YOU MUST BUY AT LEAST 5 GRAB BAGS OR 50 GRAB BAGS.
THIS***GRAB BAG BARGAIN*** IS NOT GOING TO BE OFFERED
AGAIN THIS YEAR.    *SO STOCK UP NOW!*
AS YOU KNOW YOU GET AN ARRAY OF 25 GORGEOUS BABES
YOU CAN ONLY CHOOSE EITHER MALES OR FEMALES,
ALL NUDES OR BOP SAFE...THE INDIVIDUAL SELECTIONS COME
FROM OUR BEST CATALOGS!!!
YOU MAY WANT TO SIT DOWN FOR THIS BONUS BARGAIN!
OUR BABES CATALOGS SPECIAL OF THE DECADE
---  5 COLOR CATALOGS FOR   $6.00 ---
--- 10 COLOR CATALOGS FOR  $12.00 ---
--- 15 COLOR CATALOGS FOR  $18.00 ---
--- 20 COLOR CATALOGS FOR  $24.00 ---
OUR CATALOGS SPECIAL AVAILABLE WHEN YOU PURCHASE
THE 5 GRAB BAG MINIMUM!
THIS PRICE INCLUDES FREE SHIPPING ON THE CATALOGS
BECAUSE OF SHIPPING TERMS ALL CATALOGS SOLD IN
MULTIPLES OF 5 OR $6.00 ONLY.
YOU CHOOSE EITHER MALE OR FEMALE CATALOGS
AND IF YOU WANT NUDE OR BOP SAFE!!

# News in Brief

**Alabama**: Carbon Hill Mayor James "Pee Wee" Richardson, 61, was arrested on September 19, 2013 on multiple charges related to sexually abusing four prisoners at the city's municipal jail; he was released eight days later after posting a $250,000 property bond. In addition to the criminal charges, Richardson faces a civil lawsuit filed by a former prisoner who claims he took her into his office and groped her. The civil suit includes 11 counts of alleged wrongdoing by Richardson or the city, and seeks compensatory, statutory and punitive damages as well as attorney's fees.

**Angola**: A cell phone video, which went viral on the Internet, showed several Angola prison guards kicking prisoners and beating them with sticks, then laughing as they left them bleeding and crying on the floor. Amnesty International called the incident shocking and urged the government to prosecute the guards. In a rare reaction from one of Africa's most authoritarian governments, on September 27, 2013, Angola officials suspended 16 prison guards and firemen in connection with the brutal attack. The prison's director was among those suspended, and the Interior Ministry said criminal charges would likely follow.

**Arizona**: A Maricopa County jail employee was murdered in his driveway by a 15-year-old boy who police said was motivated by gangs, drugs and guns. The teen, identified on September 25, 2013 as Leonard Moreno, will be tried as an adult for the random shooting of Jorge Vargas, 27. Vargas was an eight-year employee of the sheriff's Custody Support Bureau. Moreno's mother and a friend also were arrested, accused of trying to dispose of evidence and helping him elude police.

**Arkansas**: On September 25, 2013, a man who escaped from a California prison in 1977 was taken into custody at his home in Jessieville, Arkansas, where he had been residing under an assumed name. Michael Ray Morrow scaled a fence at the California Institute for Men in Chino some 36 years earlier and was living as Carl Frank Wilson, a church-going grandfather. New technology was able to match Morrow's fingerprints to those of his alias from a 1984 arrest. Morrow, now 70, was extradited to California.

**Australia**: A report issued on September 26, 2013 by the Independent Commission Against Corruption recommended prosecution for a Long Bay prison guard who showed up for tower duty while high on ecstasy, sold steroids to both prisoners and fellow guards, and lied to the commission about his conduct. Robert Di-Bona worked at the Special Programmes Centre at the prison. The commission also recommended that Di-Bona be fired.

**California**: Danne Desbrow will remember September 17, 2013 as a day with both good and bad news. First the bad: he was sentenced to 53 years to life in prison after being convicted of murder. Then the good: he got married ... by the same judge who had just sentenced him. Plus he got to eat a slice of wedding cake baked by San Diego Superior Court Judge Patricia Cookson, though there was no honeymoon. Desbrow intends to appeal his murder conviction.

**Canada**: Canada's most notorious prison, Kingston Penitentiary, officially closed its doors on September 30, 2013 after 178 years in operation. The shutdown was a money-saving measure. The prisoners at Kingston were all transferred to other facilities and the prison will begin offering guided tours as a fundraiser for the United Way. Sometimes called Canada's Alcatraz, Kingston Penitentiary opened in 1835, before Canada was formed as a country.

**Colorado**: On September 25, 2013, a Pitkin County jailer obtained a restraining order against a prisoner who threatened her family. Deputy Deborah Kendrick sought the order to prevent Robert Rice from contacting her, her husband – who is a Pitkin County sheriff's deputy – and one of their family members. Kendrick said Rice had told her, "When I get out of here, I'm going to hurt your family." The order specified that Rice could have limited contact with Kendrick while he is incarcerated at the jail.

**El Salvador**: Six Mara Salvatrucha (MS-13) gang members were hanged during a riot at a juvenile rehabilitation center in Tonacatepeque on September 24, 2013 – El Salvador's Prisoners' Day. Two of the dead were minors and four were adults who had been sentenced at a younger age. Police believe the murders were carefully calculated gang killings. Prisons in El Salvador are notoriously overcrowded and violent as thousands of members of the country's notorious MS-13 and 18th Street gangs await trial or serve their sentences. The two rival gangs signed a truce in March 2012 but there is fear it may be crumbling, with gang-related murders on the rise.

**Florida**: On September 26, 2013, Boyd Wallace Higginbotham, Jr. was sentenced to life in prison for the March 2008 stabbing death of fellow prisoner Steven Pritchard in the mess hall at FCC Coleman in

**Drug Policy Alliance,** the nation's leading organization working to end the war on drugs, is looking for cases that might be eligible for executive clemency in NYS. If you know of any cases please contact Anthony Papa at tpapa@drugpolicy.org or 212-613-8037 or write him at  Drug Policy Alliance/131 West 33rd Street/15th Floor /NY, NY 10001/Attn: Clemency Cases NYS

Sumter County. A federal jury found Higginbotham guilty of first-degree murder. The men had been involved in an argument that escalated over several days until Higginbotham grabbed Pritchard around the neck and repeatedly stabbed him.

**Florida:** Tomoka Correctional Facility Major Shannon Wiggins, 44, was arrested on grand theft charges in September 2013. Wiggins, who worked part-time as a security guard at the Daytona International Speedway, was charged with stealing more than $100,000 worth of Speedway merchandise and selling it on eBay. A friend who was helping him sell the merchandise has not yet been arrested but is under investigation. Wiggins was placed on leave by the Florida Department of Corrections.

**France:** On September 25, 2013, Sabrina Bonner, 25, and her boyfriend, prisoner Lionel Barthelemy, 31, each received 20-year sentences for raping Bonner's 4-year-old son in 2010 in the visiting area of the Toul detention center. Behind visitation room windows covered with black trash bags, as is standard practice in French prisons for privacy, Bonner blindfolded the boy, made him kneel on a chair and held him by the arms as Barthelemy raped him. Bonner then returned with her son for a second visit, knowing that he would be raped again. A lawyer representing the child said he intends to initiate legal proceedings against the prison.

**Hawaii:** Two Oahu Community Correctional Center guards, Kevin Ignacio and Ismael Castro, face trial over allegations that they beat prisoner Jeffrey Diaz bloody in October 2012. Ignacio is accused of repeatedly punching Diaz in the head and face, while Castro was caught on surveillance video kicking him in the head. On September 17, 2013, Judge Patrick Border expressed his displeasure when the two guards failed to appear with their attorneys at a hearing to combine their criminal cases.

**Illinois:** When Cook County jail guards told prisoner Jeremiah Harris to pack up to go home on September 16, 2013, he told them to "quit playin'." Harris, 25, who had been serving a 12-year sentence as a habitual criminal and was being held at the Cook County jail for a court appearance, became the third person in 2013 to be mistakenly released. Earlier that year, prisoners Steven Robbins and Steven Derkits were erroneously released by jailers.

**Indiana:** Prisoners at the Delaware County Jail are adjusting to frosted windows in their cells, which let sunlight in but prevent unauthorized communication with the outside world. The windows have been a source of concern in the decades since the jail was built, because prisoners sometimes expose themselves or make obscene gestures to passersby on the street. Sheriff Mike Scroggins told reporters on September 3, 2013 that the "fix," a coating of paint applied to the windows, had cost around $91.

**Kansas:** Ness County Jail escapee Benito Cardenas, Jr., 38, apologized to his victims and law enforcement officials before being sentenced in back-to-back hearings for a two-day crime spree that occurred after he cut through four bars at the jail in August 2012. After escaping, Cardenas stole a van, burglarized a residence and accosted two women before surrendering to officers. He was sentenced on September 24, 2013 to 151 months in prison on two counts of aggravated burglary and a single count of aggravated escape, to be served consecutive to his life sentence on unrelated charges.

**Kentucky:** Prisoner Ashley Marler, four months pregnant, escaped twice in the same week. She failed to return to the Fayette County Detention Center from a medical pass on September 16, 2013, and was arrested the next day and charged with escape. On September 24, 2013, Marler was taken to the same medical clinic. She reportedly left her clothing behind, climbed into the ceiling and fled wearing only a towel and white t-shirt. She was recaptured two days later.

**Kentucky:** Former FCI Ashland guard James Lewis and Cindy Gates, the girlfriend of a prisoner at the facility, both pleaded not guilty in September 2013 to charges related to smuggling contraband into the prison. Gates' boyfriend, prisoner Gary Musick, was accused of participating in the scheme by telling Gates and Lewis what items to procure and directing other prisoners to sell the items. The contraband included marijuana, tobacco, cell phones and sexually explicit photos.

**Louisiana:** On September 19, 2013, Floyd Tillman, 26, pleaded not guilty to attempted second-degree murder after ramming the gates of the state peniten-

# FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription! Quarterly drawing WINS $100! (Void in New York) (Last Quarter's winner from Airway Heights, WA.) TELL YOUR FRIENDS!   ACT NOW!!

## PO Box 2063 • Fort Walton Beach FL. 32549
## www.InmateMagazineService.com

# Inmate Magazine Service Inc.

## News In Brief (cont.)

tiary at Angola with his car, while guards opened fire on him. Tillman had taken his daughters, ages 8 months and 2 years, from Terrebonne Parish. He then drove to the prison and argued with guards about taking a tour. After being told many times there were no tours that day, he began ramming the gate. It is anticipated that Tillman's defense attorney will seek a mental health evaluation for his client.

**Michigan**: An attorney representing Oakland County jail guard Garry Jackson told a judge on September 16, 2013 that Jackson vehemently denied having sexual contact with a female prisoner in a broom closet while on duty at the jail. The incident was discovered after other prisoners started talking about a sexual relationship between Jackson and a 24-year-old prisoner. Although the investigation revealed that the sex was consensual, Jackson was charged with three felony counts of criminal sexual conduct; he was released on $10,000 personal bond and ordered not to have contact with the female prisoner.

**Myanmar**: On September 13, 2013, a riot at Nine Mile Prison in Kawthaung Township resulted in the death of one prisoner and injuries to seven others. The incident was sparked after Warden Saw Hla Chit ordered prison staff to beat and kick prisoners Ye Ko Hlaing and Htun Htun in retaliation for their participation in a fight. Officials cut the power lines to the facility in an attempt to disperse the rioters, but gunfire broke out shortly after the prison went dark. The prisoner who died, identified as Htay Nge, and the other casualties suffered gunshot wounds.

**New Jersey**: Bobby Singletary, 55, a former guard, was convicted on September 27, 2013 of smuggling heroin and marijuana into the Adult Diagnostic and Treatment Center in Avenel, a facility for sex offenders. A prisoner who was tried with him was acquitted of all charges. Jurors heard how Singletary had prisoners pay for drugs by wiring money to outside accomplices; he was found guilty of conspiracy, official misconduct and bribery.

**New Mexico**: Former Columbus Police Chief Angelo Vega was on the payroll of the local Juarez Cartel at the same time he collected a $40,000 annual salary for his public position, according to testimony in federal court on September 25, 2013. A witness stated that Vega received $2,000 a month plus bonuses from the cartel for performing background and license plate checks, buying military gear and allowing cartel members to use official vehicles. Vega's wife is Assistant U.S. Attorney Paula Burnett; she has not been charged with any crime.

**New York**: As part of a September 30, 2013 plea bargain, prison guard Aaron A. Netto, 36, agreed to resign from his posi-

┌─────────────────────────────────┐
## PLN Classifieds
└─────────────────────────────────┘

**NON NUDE FLIX CATALOG $2 + SASE**
M and M Publications PO Box 1127
Roanoke, TX 76262

**PUZZLE BOOKS & EYE GLASSES**
Brochure & Free Gifts
Send 2 Forever Stamps or $1.00
Mara Worldwide
115 W. California Blvd Ste 424-R
Pasadena, CA 91105

**FREE & LOW COST SERVICES!**
Pen Pal listing, photo copies,
pen pal list, freak pics & more.
We accept stamps as payment!
No SASE needed. Mention "PLN"
V.I.Prisoners, P.O. Box 1052,
Allen Park, MI 48101
Email: viprisoners@gmail.com

**Help from Beyond the Walls**
New Services and Fast Turnaround
Pictures, publications, phone
services and more. Write today
for free brochure. P.O. Box 185,
Springvale, ME 04083

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how
to receive Voices.Con monthly, send
SASE to: PO Box 361, King City, CA 93930.
On the web at: VoicesDotCon.org;
Email: Publisher@VoicesDotCon.org

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare
Manuscripts for Self-Publishing
Reasonable Rates! Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**Free facebook & instagram setup**
People searches,release shopping
Amazon books,book editing,photo
Duplications,flower&gift,drivers
License&state case legal research
Vipprisonersservices@gmail.com
P.O.Box 584609 kissimmee fl 34749
(863) 496-1862 for info or email

**CONNECT TO OUTSIDE WORLD!**
PP provides services via internet
Your information - social networks
Up to 20 sites - free brochure

PRISONER PROMOTIONS
2355 Fairview Ave #214
Roseville, Mn 55113

**INMATESERVICES.NET** – Affordable
Gifts. Mail first-class stamp to
Archipelago 13017 Wisteria Dr.
#310, Germantown, MD 20874 for
catalog. Show them you care.

**Want Quality Pictures of**
Quality Babes? 4x6 High Res pics
Send self addressed stamped
envelope for free catalog!
PHOTO TRYST
PO Box 103
Chapmansboro TN 37035

**BB 5 Huge Booty DripNwet $5.00**
Buy Bad Broads 1,2,3,4 & 5 $25
Full Color Cats,1000s of options
Non-nude – Huge variety
Send 11 stmps per cat or $5 MO
To: On Demand Inmate Services
PO BOX 81 - PLN, Chelt, PA 19012
US Female Pen pal list $22 M/O

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet
& People Searches, Amazon Books,
Erotic Photos &Stories,PenPals,
Special Requests and Much More.
Send SASE to: Elite Paralegal &
Prisoner Services PO Box 1717,
Appleton, WI 54912

tion at the Riverview Correctional Facility. He was charged with possessing property stolen from several construction sites. In addition to resigning, he faces up to three years' probation and will pay $1,600 in restitution. Netto entered an Alford plea, meaning he did not admit to the allegations but pled guilty to avoid the possibility of being convicted at trial.

**Ohio**: On September 18, 2013, three Ohio Department of Youth Services guards were arraigned on charges of assaulting a teenager at the Scioto Juvenile Correctional Facility. Though details of the incident were at first sketchy, guards Laurel Jeffreys, Nathaniel Strong and Antonio Keith were identified as the suspects who allegedly beat the unnamed 15-year-old. The state's Youth Services agency was recently named in a U.S. Bureau of Justice Statistics report as among the worst in the nation for rape and sexual assaults of juvenile prisoners.

**Oklahoma**: According to court documents, Shealane Fields, a corporal who was fired from her job at the Logan County Detention Center on September 24, 2013, is accused of committing several felonies for prisoner Daniel Clark, with whom she developed a relationship. Fields allegedly smuggled contraband into the jail for Clark, including tobacco, a lighter, a flat blade screwdriver, crazy glue and a cell phone. Investigators also found 49 love letters, including one where the couple planned a tryst in a medical cell and another where they talked about a plan for Clark to walk out of the jail.

**Oklahoma**: Tulsa County jail guard Cory Laddel Jones, 22, was arrested on September 21, 2013 on charges of bringing contraband into the facility for a $100 payment. The arrest report said a prisoner told jail officials that Jones was paid to smuggle packages he obtained from a woman he arranged to meet at a convenience store. Jones was jailed on more than $25,000 bond.

**Pennsylvania**: On September 17, 2013, Warden John Walton of the Westmoreland County Prison announced a new policy instituted by the facility's contract healthcare provider that requires all female prisoners to submit to pregnancy tests. The policy was created after an unidentified prisoner lied about not being pregnant and not being addicted to drugs. In order to protect the well-being of their unborn children, pregnant prisoners will receive obstetrics care and be weaned off drugs. Four percent of female prisoners at the Westmoreland County Prison were pregnant in the first nine months of 2013.

**Pennsylvania**: During a preliminary hearing on September 27, 2013, details emerged about why a Bucks County prison guard fired two gunshots in the direction of an acquaintance, Pearson Crosby, following an early morning altercation in June 2013. Anthony Pekarski, 26, free on $50,000 unsecured bail, was charged with simple assault, reckless endangering, disorderly conduct and possession of a weapon. He admitted firing the shots because his girlfriend, who had been sitting beside Crosby in the backseat of Pekarski's car, had an "uncomfortable look" and he wanted to scare Crosby away.

**Saudi Arabia**: On September 25, 2013, a prisoner returned after a 24-hour family visit wearing an explosive belt and threatened to detonate it, taking 200 prisoners hostage in the process. Prison officials in Madinah said the man was not mentally ill and made no demands during the six-hour standoff. According to a prison source, Saudi media reports about the incident were not accurate; the man had a gun as well as explosives. There were no reports of damage or casualties.

**South Carolina**: Tyheem Henry, convicted as the ringleader of a 2011 mob beating, was serving a 15-year sentence at

**MIDNIGHT EXPRESS BOOKS**
THE PREFERRED & ONLY FULL TIME company helping inmate authors publish books for 10+ years.
PO Box 69, Dept PLN,
Berryville, AR 72616
Midnightexpressbooks.com
Corrlinks: MEBooks1@yahoo.com

**FREE BOOK CATALOG & PRAYER CARD**
Send $1 for S&H or
SASE w/2 (two) US Forever Stamps
Fiction, Nonfiction, Dictionary,
Pastimes & Religious books
English & Spanish.
Jaguar Books 6881 Stanton Ave #F
Buena Park CA 90621

**Education Behind Bars Newsletter**
Free electronic newsletter
For prisoners viaCorrLinks.
Add news@prisonlawblog.com
to subscribe. The content
is curated specifically
for prisoners.

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games.  We Sell Photos of Sexy
Women, Gifts for Loved Ones,
Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**Prisonerinmatefamilyservice.com**
Send a SASE for a free catalog;
PO Box 1852 Pismo Beach,Ca 93448
We buy stamps- 7.50 a book;
Single stamps .25 cents; Amazon
Orders, copies of photos/artwork
And SO much more!
FamilyInmateSev@aol.com

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**A DEGREE/ORDINATION FROM PRISON**
Correspondence Courses via mail
INT'L CHRISTIAN COLLEGE&SEMINARY
PO BOX 530212 Debary, FL 32753-0212
Associates thru PhD credit for
Life Experience *ACCREDITED*
Tuition as Low as $19.95 a month
Send SASE for a Free Evaluation

**Celebrity Photos For Sale:**
Send self addressed stamped
envelope for lists. Name stars
you would like to order photos of.
Start your collection today!
Photoworld-PLN
PO Box 401016
Las Vegas, Nv. 89140

**#1 PHOTO FORWARDING SERVICE**
**SPECIAL** $25.00 for 60 Photos!
Email & Text your photos 2 us
We Print & Mail them 2 YOU!
infolincs.us (4 more info)
Email: infolincs@centurylink.net
Check/$$ Order: InfoLINCS, LLC
PO Box 644, Shady Cove, OR 97539

## News In Brief (cont.)

the Lee Correctional Institute. On September 8, 2013, the website Charleston Thug Life published Facebook postings Henry had made using a contraband cell phone, prompting a shakedown at the prison. Henry was charged with disciplinary violations, placed in segregation and lost good time credits and canteen, telephone and visitation privileges.

**South Dakota**: Robert Corsini was serving a seven-day jail term with work release after being caught in two separate online prostitution stings. In court on September 10, 2013, a judge found it "implausible" that Corsini had invited yet another prostitute he found online to meet him at his home while he was on work release. Judge John Schlimgen sentenced Corsini to 90 more days in jail – this time without the option of work release.

**Tennessee**: Hawkins County jail guard Scott Winkle "laid hands" on a prisoner while walking him back to a cell following a disturbance. Although the physical contact did not rise to the level of assault and no criminal charges were filed, Winkle was fired on September 19, 2013 for violating county regulations. He had recently attended a training session on appropriate physical contact in response to a February 2013 staff-on-prisoner assault incident. In that case, jailer Roy Junior Mathes was charged with misdemeanor assault. 🖎

---

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the *NPP Journal* (available online) and the *Prisoners' Assistance Directory* (write for more information). Contact: ACLU NPP, 915 15th Street NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisoners-rights/aclu-national-prison-project

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to your HIV status. Contact: CHJ, 900 Avila Street, Suite 301, Los Angeles, CA 90012 (213) 229-0985; HIV Hotline: (213) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Centurion Ministries

Works to exonerate the wrongfully convicted, in both cases involving DNA evidence and those that do not. Centurion only takes 1-2 new cases a year involving actual innocence. They do not consider accidental death or self-defense murder cases, he said/she said rape cases, or child abuse or child sex abuse cases unless there is physical evidence. All case inquiries must be from the prisoner involved, in writing. Contact: Centurion Ministries, 1000 Herrontown Road, Princeton, NJ 08540 (609) 921-0334. www.centurionministries.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes *The Abolitionist* newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science, faulty eyewitness testimony and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) advocates against mandatory minimum sentencing laws with an emphasis on federal laws, and works to "shift resources from excessive incarceration to law enforcement and other programs proven to reduce crime and recidivism." Contact: FAMM, 1100 H Street, NW #1000, Washington, DC 20005 (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes *Fortune News*, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongfully convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides resources for imprisoned and released rape survivors and activists for almost every state. Contact: JDI, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, which includes all back issues of the Justice Denied magazine and a database of more than 4,500 wrongfully convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters (such as federal prisoners and sex offenders) that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the *CURE Newsletter*, $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, Washington, DC 20013-2310 (202) 789-2126. www.curenational.org

### November Coalition

Advocates against the war on drugs and previously published the *Razor Wire*, a bi-annual newsletter on drug war-related issues, releasing drug war prisoners and restoring civil rights. No longer regularly published, back issues are available online. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### Prison Activist Resource Center

PARC is a prison abolitionist group committed to exposing and challenging all forms of institutionalized racism, sexism, able-ism, heterosexism and classism, specifically within the Prison Industrial Complex. PARC produces a free resource directory for prisoners. Contact: PARC, P.O. Box 70447, Oakland, CA 94612 (510) 893-4648. www.prisonactivist.org

---

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book / index orders OVER $50** (effective 3-1-2014 until further notice). **$6.00** S/H applies to all other book orders.

**SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!**
1. **SIX (6) FREE ISSUES FOR 54 TOTAL!** OR
2. **PRISON PROFITEERS (A $24.95 VALUE!)** OR
3. **THE HABEAS CITEBOOK (A $49.95 VALUE!)**

**Prison Profiteers,** edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how.   1063

**The Habeas Citebook: Ineffective Assistance of Counsel,** by Brandon Sample, PLN Publishing, 200 pages. **$49.95**. This is PLN's second published book, written by federal prisoner Brandon Sample, which covers ineffective assistance of counsel issues in federal habeas petitions. Includes hundreds of case citations!   1078

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$35.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.   1041

**The Celling of America, An Inside Look at the U.S. Prison Industry,** edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.   1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada,** updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95**. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college courses by mail.   1071

**The Criminal Law Handbook: Know Your Rights, Survive the System,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.   1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.   1037

**Law Dictionary,** Random House Webster's, 525 pages. **$19.95**. Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.   1036

**The Blue Book of Grammar and Punctuation,** by Jane Straus, 110 pages. **$14.95**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners.   1046

**Legal Research: How to Find and Understand the Law,** by Stephen Elias and Susan Levinkind, 568 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.   1059

**Deposition Handbook,** by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed.   1054

**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**. Provides an overview of criminal law, including punishment, specific crimes, defenses & burden of proof.   1086

**SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!**
1. **FOUR (4) FREE ISSUES FOR 40 TOTAL!** OR
2. **PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)**

**Protecting Your Health and Safety,** by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.   1060

**Spanish-English/English-Spanish Dictionary,** 2nd ed. Random House. **$15.95**. Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.   1034a

**Writing to Win: The Legal Writer,** by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers.   1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right,** updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. **$16.00**. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.   1030

**Webster's English Dictionary,** Newly revised and updated, Random House. **$8.95**. 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms.   1033

**Everyday Letters for Busy People,** by Debra Hart May, 287 pages. **$18.99**. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters.   1048

**Roget's Thesaurus,** 717 pages. **$8.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words.   1045

**Beyond Bars, Rejoining Society After Prison,** by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95**. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.   1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.,** by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95**. In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.   1073

**With Liberty for Some: 500 Years of Imprisonment in America,** by Scott Christianson, Northeastern University Press, 372 pages. **$18.95**. The best overall history of the U.S. prison system from 1492 through the 20th century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years.   1026

**Complete GED Preparation,** by Steck-Vaughn, 922 pages. **$24.99**. This useful handbook contains over 2,000 GED-style questions to thoroughly prepare students for taking the GED test. It offers complete coverage of the revised GED test with new testing information, instructions and a practice test.   1099

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95.** Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.                                   1031

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95.** Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.                                   1084

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95.** The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!                         1077

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99.** While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.                                   1075

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits,** by Lewis Laska, 336 pages. **$39.95.** Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners.                                   1079

**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95.** This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication.                                   1090

**Our Bodies, Ourselves,** by The Boston Women's Health Book Collective, 944 pages. **$26.00.** This book about women's health and sexuality has been called "America's best-selling book on all aspects of women's health," and is a great resource for women of all ages.                         1082

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95.** This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.                                   1083

**Nolo's Plain-English Law Dictionary,** by Gerald N. Hill and Kathleen T. Hill, 496 pages. **$29.99.** Find terms you can use to understand and access the law. Contains 3,800 easy-to-read definitions for common (and not so common) legal terms.                                   3001

**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95.** Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure. 1085

**A Dictionary of Criminal Law Terms** (Black's Law Dictionary® Series), by Bryan A. Garner, 768 pages. **$33.95.** This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to help navigate your way through the maze of legal language in criminal cases.                                   1088

**PLN Cumulative Index.** **$22.50 each.** PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

---

| **Subscription Rates** | | | | |
|---|---|---|---|---|
| | 1 year | 2 years | 3 years | 4 years |
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** | $90 | $180 | $270 | $360 |
| (Attorneys, agencies, libraries) | | | | |

**Subscription Bonuses**

**2 years** - 2 bonus issues for 26 total issues
**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 61
**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 61

(All subscription rates and bonus offers are valid as of 3-1-2014)

---

Purchase with Visa, MasterCard, AmEx or Discover by phone: **561-360-2523**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

**Mail Payment
and Order to:**

Prison Legal News
P.O. Box 1151
Lake Worth, FL 33460

**All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by institutional policies.***

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News**                                   **$ Amount**

6 month subscription (prisoners only) - $18       _____

1 yr subscription (12 issues)                   _____

2 yr subscription (2 bonus issues for 26 total!)   _____

3 yr sub (*write below which FREE book you want*) _____
    or 4 bonus issues for 40 issues total!

4 yr sub (*write below which FREE book you want*) _____
    or 6 bonus issues for 54 issues total!

Random sample issue of PLN - $3.50 each            _____

**Books or Index Orders** (No S/H charge on
3 & 4-year sub free books OR book orders OVER $50!)   **Qty.**

_____   ____   _____

_____   ____   _____

_____   ____   _____

_____   ____   _____

**Add $6.00** S/H to Book Orders **UNDER $50**       _____

FL residents ONLY add 6% to Total Book Cost         _____

**Total Amount Enclosed:**                           _____

***\* No refunds on PLN subscription or book / index orders after orders have been placed \****



# 3RD STRIKE? WRONGLY CONVICTED? ?ERRORS?

**ATTENTION!!   CA 3RD STRIKERS DON'T BE LEFT OUT OR WAIT FOR THE SYSTEM.  WE CAN HELP!**

## INMATE LEGAL HELP 411 FREEDOM ANGELS

Brian P – "They helped me remove 4 life sentences
"Big" D McGwen – Back into Court.. And SET FREE
Tyron S. – 38 years deducted.. FREE NOW!

### PERSONALIZED & REASONABLY PRICED
**ADVANCED LEGAL SERVICES
SUCCESSFUL WINNING STRATEGIES
EVEN YOUR ODDS**

*You are in our thoughts and prayers*

We find the MISSING facts & information that were never considered or heard in your case originally.

**OUR GOAL= Evidentiary Hearing for YOU!**

*MAKE FREEDOM A PRIORITY?*
**HAVE FAMILY / FRIENDS CALL NOW**
PLANHELP@411FreedomANGELS.com
HABEAS Booklet ~ $20 PayPal or Stamps
www.411FreedomANGELS.com

**WRITS~MOTIONS~BRIEFS**
3RD STRIKERS GO to TOP of the List
• **Post Conviction Relief Assistance**
• **Writ Of Habeas Corpus**-State / Federal
• **Sentence Modifications**
  • **Pre-Post Parole Board**
  • **In House Legal Investigators**
• **Resolve Warrants on pending cases**
• **MANY Other Legal Services**

**AGGRESSIVE REPRESENTATION to PROTECT YOUR RIGHTS**
**JACKSON & ASSOCIATES LAW CENTERS**
402 W. Broadway POB 81609 San Diego, CA 92138
**24/7 call NOW! 1*855*411*ANGELS (2643)**

---



# Great Self-Help Book Deals
## From Prison Legal News!

### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

• protect your rights after an accident
• determine what your claim is worth
• handle a property-damage claim
• deal with uncooperative doctors, lawyers and insurance companies
• counter the special tactics insurance companies use
• prepare a claim for compensation
• negotiate a full and fair settlement
• stay on top of your case if you hire a lawyer


The Criminal Law Handbook
$39.99


Represent Yourself in Court
$39.99


Legal Research
$49.99


Nolo's Deposition Handbook
$34.99

**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org


**NOLO**
**YOUR LEGAL COMPANION**



**Prison Legal News**
PO Box 1151
Lake Worth FL 33460

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

### Subscription Renewal
Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2015 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 04/2014** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



# PRISONLEGALNEWS.org
## Dedicated to Protecting Human Rights

>>FREE Data Search |

Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements

**If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!**

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

Subscribe to **Prison Legal News Online!** http://www.prisonlegalnews.org