# Exhibit D

# Prison Legal News

VOL. 25  No. 7
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

July 2014

## Systemic Changes Follow Murder of Colorado Prison Director

*by John Dannenberg*

Just over a year after Colorado Department of Corrections Director Tom Clements was killed by former prisoner Evan Ebel, who had been released directly from long-term solitary confinement, there have been significant and far-reaching changes in Colorado's prison system.

Following a police chase, Ebel, 28, was killed in a shootout with Texas law enforcement officers on March 21, 2013. Autopsy results later obtained by *The Denver Post* confirmed that he died from a gunshot wound to the forehead. Prior to the chase, Ebel had been stopped in his 1991 black Cadillac DeVille for a traffic offense and shot Texas deputy James Boyd multiple times, hitting him in the shoulder and chest and grazing his head.

Ebel spent nearly all of his eight years in prison in solitary confinement, known in Colorado as administrative segregation (adseg). His father, well-known attorney Jack Ebel, who was close to Colorado Governor John Hickenlooper, had previously said his son suffered from behavioral problems as a child, and that solitary damaged him even more.

"What I have seen over six years is, [Evan] has a high level of paranoia and [is] extremely anxious," Jack Ebel said at a state Senate Judiciary Committee hearing in 2011, when he testified about the effects of solitary confinement. "He may have had mental conditions going on. But they are exacerbated to the point that I hardly recognize my son sometimes. We are creating mental illness. We are exacerbating mental illness."

### Murders and Aftermath

Colorado authorities said Ebel first lured Domino's pizza deliveryman Nathan Leon to a truck stop in Denver on March 17, 2013, supposedly to deliver a pizza, then shot him to death. Before killing Leon, Ebel forced him to read a statement into a tape recorder criticizing the prison system's use of solitary confinement.

"[Y]ou didn't give two [expletive] about us or our families and you ensured that we were locked behind a door, to disrespect us at every opportunity, so why should we care about you and yours," a transcript of the recording stated. "In short, you treated us inhumanely, and so we simply seek to do the same, we take [comfort] in the knowledge that we leave your wives without husbands, and your children fatherless. You wanted to play the mad scientist, well they [prisoners held in solitary] will be your Frankenstein."

Ebel took Leon's pizza delivery uniform and, two days later, on March 19, wore it to the Clements' secluded home in Monument, Colorado, about an hour south of Denver. Lisa Clements, director of the Colorado Human Services' Behavioral Health Office, said she and her husband were watching TV when the doorbell rang. Tom Clements answered the door and Ebel shot him at point-blank range. Lisa said he died in her arms.

Ebel then hid out in Colorado Springs for two days before heading to Texas, where he was killed by officers following his shooting of Deputy Boyd, who survived.

In an August 26, 2013 article, *The Denver Post* quoted a source who described details of the investigation into Clements' death, based on sealed court documents. The newspaper said the source, who spoke on the condition of anonymity, had "direct access to and knowledge of the documents and the investigation itself."

The source said investigators traced Ebel to a white supremacist prison gang known as the 211 Crew, and the gang might have orchestrated Clements' killing. Federal and state authorities thought Ebel may have been recruited by gang founder Benjamin Davis to kill Clements to repay a debt, the source said. Both men had served sentences at the same time at the Sterling prison where Ebel, reportedly a member of 211 Crew, was targeted by a rival gang.

"Ebel had been threatened," the source told the *Post*. "Davis stepped in and saved him."

According to the source, Davis then told Ebel that he expected a favor in return once Ebel was released from prison. Clements had ordered 211 Crew members to be separated and transferred to other facilities, which may have made him a target of the gang.

Another theory considered by investigators was that Clements' killing might

## INSIDE

| | |
|---|---|
| From the Editor | 10 |
| Bonnie Kerness & Solitary Confinement | 12 |
| PLN Suit vs. Ventura County, CA | 16 |
| Oregon Parole Board Answers to Nobody? | 18 |
| New Hepatitis C Treatment | 20 |
| Prison Phone Issues in Louisiana | 26 |
| LA County Probation Officer Arrests | 32 |
| Same-Sex Marriage for Prisoners | 38 |
| Spoliation of Evidence in NY Suit | 42 |
| NC Repeals Racial Justice Act | 44 |
| Legally Innocent in North Carolina | 48 |
| Do Faith-Based Prisons Work? | 50 |
| News in Brief | 56 |

# DON'T LET THE TIME DO YOU.
# STAY CONNECTED!

**Guaranteed savings of up to 90%** on your long distance, out-of-state, and international calls from Federal prisons, county jails and State prisons.

### Best Rates and Plans

Multi-number Friends & Family Package for as little as $10.00/month

More plans & more numbers than any operator -

### No Hidden Fees

**What We Say Is What You Pay** – NO additional "fees", "charges" or "surcharges"

International calls are billed only on call acceptance. No bogus rounding

### No Contracts, No Penalties, No Hassles

No long term commitments – Service is always month – to – month. Cancel at anytime with NO penalties and NO cancellation fees with just a phone call or an e-mail.

### Fast and EZ Setup

We **ALWAYS** have numbers and can set up instantaneously online or on the phone.

## Special Commitment, Civil Detention & Halfway House

$0.40 connection charge from payphones lowest in the business

Voice Mail and Call Recording options

Call, write, e-mail or have your loved ones check out our website for more information.

SP Telecom
1220 Broadway - # 801-A
New York, NY 10001
www.inmatefone.com
e-mail: clients@inmatefone.com
Español: soporte@inmatefone.com
Call:      1(845)326-5300   (Collect calls are NOT accepted)
Español: 1(845)342-8110    (Llamadas por cobrar no se aceptan)

Some restrictions apply. Plan availability depends on the Institution

# NO PERMITA QUE EL TIEMPO
# LE SEPARE DE SU FAMILIA!

**Garantizamos  ahorros de hasta el 90%** en sus llamadas de larga distancia,entre estados, y en las llamadas internacionales desde prisiones federales,estatales y locales.

### Los mejores Planes y Tarifas

Plan para familias y amigos con varios numeros por tan solo $10.00/ mes .

Mas planes y numerous que ningun otro operador .

### No hay letra pequeña

**Lo Que Ves Es Lo Que Pagas**, NO hay ningun otro cargo extra.

Las llamadas internacionales solo se facturan cuando es aceptada por el familiar al otro lado del hilo telefonico.

**No hay contrato , permanencia ni ningun tipo de travas** .

El servicio siempre se ofrece en base a un mes de duracion pudiendo renovar el mismo todo los meses sin ningun cargo por la terminacion del servicio  y lo puede solicitor con una simple llamada de telefono o con un correo electronico (E-MAIL)

### La solicitud se puede hacer rapida y muy facil .

Nosotros siempre tenemos numerous y podemos procesar to registro inmediatamente  en lines o por telefono.

**Detenidos civiles en carceles especiales y reclusos en camino a casas de medio camino le ofrecesmos los siguientes servicios.**

$0.40 de recarfo desde telefonos de prepago, la tarifa mas baja en el sector  .

Buzon de Voz  y la posibilidad de grabar las llamadas .



Inmatefone
Keeping You In Touch

**Prison Legal News**

*a publication of the*
*Human Rights Defense Center*

www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright
**MANAGING EDITOR**
Alex Friedmann
**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal
**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg,
Derek Gilna, Gary Hunter,
David Reutter, Mark Wilson,
Joe Watson, Christopher Zoukis
**RESEARCH ASSOCIATE**
Mari Garcia
**ADVERTISING DIRECTOR**
Susan Schwartzkopf
**LAYOUT**
Lansing Scott
**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel
Robert Jack—Staff Attorney
Sabarish Neelakanta—Staff Attorney

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

Prison Legal News
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org

PLN reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. PLN welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

PLN is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## Colorado DOC Murder (cont.)

have been linked to his decision to deny a request by a Saudi Arabian prisoner to return to his native country to serve out the remainder of his prison sentence.

Attorneys for Homaidan al-Turki, who was sentenced on charges of sexually assaulting his maid, denied that their client was involved in Clements' murder, but investigators said they were looking into whether there are any connections, financial or otherwise, between al-Turki and the 211 Crew.

Investigators suspected that Ebel was headed to Texas after the killings, to the home of a paroled 211 Crew member who lived south of Dallas. After Ebel was killed in the Texas police shootout, authorities found his cell phone and tracked calls he had made while on parole. He also had a hit list with the names of 20 other prison and law enforcement officials; the names on the list have not been disclosed.

Phone records confirmed that Ebel frequently contacted other 211 Crew members who had been released from prison, and that he made or received 23 calls in one 24-hour period, including the hours just before and after Clements was gunned down, the source said. According to El Paso County Sheriff's Lt. Jeff Kramer, Ebel made the calls to fellow gang members.

"There's a pretty logical chain of evidence in this case," the source told *The Denver Post*. "It would be highly coincidental if [Ebel] had done all this on his own and there were 23 calls between him and other gang members around [the time of] Clements' murder. There is just too much there, and they are all 211 Crew members. It sounds like everything points to 211."

Then again, it's equally possible that Ebel was simply contacting people he had known in prison, which included gang members, because he had no one else to reach out to after he was released.

In March 2014, Lisa Clements said she was frustrated at how slowly the investigation into her husband's murder was progressing. She said she was concerned that the various agencies involved in the investigation were not doing enough to coordinate their efforts: "Each of them have a piece of the picture, but the whole picture is missing."

She also stated she didn't want people

in Colorado to forget that authorities have not solved the case. "I realize that as impactful as Tom's life and his death was for our family, that it's human nature for the public, for us as individuals, to sort of get on with life."

"Grief takes a while," she continued. "In the days and months that followed Tom's murder, we had our hands full with all that we could do to get through days. As we've begun to address our trauma from that night, and the grief since, we perhaps in our healing process have more space to recognize anger, as well."

El Paso County Sheriff Terry Maketa said his department is determined to get to the bottom of Clements' murder.

"I want her to know that we are not going to give up. It would be really easy to say, 'We know who pulled the gun and shot Dr. Clements,'" Maketa said. "We could easily close out our case and move down the road. But that isn't the responsible thing to do."

He added, "It's just a very slow process. This isn't Hollywood."

The El Paso County Sheriff's Office is the lead agency in the investigation, which also involves the Department of Corrections (DOC), the FBI and other law enforcement officials. According to an unnamed source, in August 2013, El Paso County Judge Jonathan L. Walker, who had issued search warrants as part of the investigation into Clements' death, went into hiding due to allegations that 211 Crew leaders had placed a "hit" on him.

### Who Was Evan Ebel?

Ebel had a well-documented history as a violent and troubled individual both before and during his time in prison. According to public records, Ebel went on a crime spree as a teenager, then a second spree which included a carjacking in 2005 that resulted in an eight-year prison sentence. After he was incarcerated his criminal behavior escalated.

On September 17, 2005, Ebel threatened to kill a female prison guard, telling her "that he would kill her if he ever saw her on the streets and that he would make her beg for her life."

Later in 2005 and again in 2006, Ebel threatened to kill staff members in two different prisons. In another incident, he threatened to beat guards if they didn't handcuff him. Overall, Ebel received 28 disciplinary charges, including four for as-

**Colorado DOC Murder (cont.)**

sault and three for fighting, as well as two for disobeying direct orders. According to prison reports, he sometimes injured himself and smeared feces on his cell door and the door of another prisoner.

While in solitary, Ebel came to be known by other prisoners as "Evil Ebel." Prison records showed he was tattooed with Nazi symbols and had the word "hopeless" tattooed across his stomach and "hate" inked on his right hand.

He expressed his frustrations with the prison system through letters and poems sent to his mother and to a project called Incarcerated Voices, which provides "free speech radio by and for prisoners."

In a June 2012 poem titled "Life," Ebel wrote: "I've looked in the mirror and don't even recognize / This thing staring back at me / Though I see your death implicit in its eyes / And really that's all I care to see."

"It's clear that solitary changed him. He didn't recognize himself in the mirror," noted Dr. Scott Washington, director of advocacy for Incarcerated Voices. "Ideally, somebody would have been working with him to address those problems before he was released."

Ebel filed several grievances with prison officials while he was in solitary. "Do you have an obligation to the public to re-acclimate me, the dangerous inmate, to being around other human beings prior to being released and, if not, why?" he asked. Prison staff responded to his last grievance after he was already out, writing, "you claim that you are just looking for answer [sic] to questions about policy. Grievance Procedures is not the appropriate method for debating policy questions nor is it designed to address the policy questions you have posed."

Colorado state prisoner Troy Anderson, who served time with Ebel, said Ebel "was consumed by what they did to him."

"You know, what they do through their solitary policies is akin to rape. They steal such a precious part of our souls, our humanity, our ability to be," he added. "They committed such hateful acts on us. Through contempt and disdain they breed rage. They stole his chance at any real future."

Anderson is no stranger to solitary himself. On August 24, 2012, a Colorado federal district court held that Anderson's long-term confinement in ad-seg violated his constitutional rights. "With the exception of approximately one month in 2001 ...[Anderson] has not been out of doors for 12 years," the court wrote. Prison officials were ordered to provide him with at least one hour of outside recreation three times a week. The state did not appeal. See: *Anderson v. Colorado DOC*, U.S.D.C. (D. Col.), Case No. 1:10-cv-01005-RBJ-KMT.

## Solitary Confinement Connection

Ebel was released from prison directly from solitary confinement when he reached his mandatory parole date on January 28, 2013. A prerelease assessment said he was considered a "very high risk" for recidivism. Two months later, he cut off the ankle monitor he wore as a condition of his parole before killing Nathan Leon and then Tom Clements.

Although the investigation into Clements' death still remains open, including whether Ebel acted alone, it appears that his murder was not related to the 211 Crew or Saudi prisoner Homaidan al-Turki. Rather, the evidence points to Ebel's lengthy stay in solitary confinement and its impact on his mental health as the catalyst for Clements' murder.

According to former prisoner Ryan Pettigrew, who served time with Ebel, "This is what he planned to do as his final get-back at the system."

Ironically, Tom Clements had pushed hard for reforms during his slightly more than two-year tenure as director of the Colorado DOC. Colleagues said he was especially concerned about finding ways to eliminate the DOC's reliance on solitary confinement, particularly when it was used to control dangerous and violent prisoners

**WISDOM IS THE KEY TO SUCCESS**
*Get Wise; Get a SMITH'S GUIDE™*



**SMITH'S GUIDE to Executive Clemency for State and Federal Prisoners**
For those who have exhausted all legal remedies or have sentences that are too long to serve, this book lays out every aspect of the clemency process. [288 pages]

**SMITH'S GUIDE to Chapter 7 Bankruptcy Guide** *(June 2014)*
Get immediate freedom from liens against offender account by filing chapter 7 bankruptcy. Includes required bankruptcy forms and detailed filing instructions.

$24.95 + $6.95 shipping/handling (in CA, include additional sales tax of $2.18) for each book. Please specify book(s) ordered. Sent via USPS media mail. Money orders, personal checks or institutional checks ONLY. **Send name, address and DOC/BOP number, with payment of $31.90 (in CA, $34.08)** *per book*, payable to Roberts Company:

**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*



Want another chance?

**inPENPALS®**
*where meaningful relationships begin*

Write to:
*inpenpals*
*P.O. Box 18245*
*San Antonio, TX 78218*

www.inpenpals.com
Tambien esta disponible en espanol

**Photo Tryst**                    **Quality Pics of Quality**
**PO Box 103**                                        **Babes**
**Chapmansboro TN 37035**

All catalogs 450 full color pics
Summer 2013      free with SASE
All other catalogs $4 or 10 forever stamps, and ship with a coupon for 5 free pics with your minimum order of 10

Winter 2014        Spring 2014      Topless #1 (contains frontal Nudity)                            All Nude #1 (you see it all)

Our next general (season) catalog free with each order
You can deposit funds with us and order your pics "on account"
We accept institutional checks, personal checks from friends and family, and money orders
Stamp orders are only with stamp coupons obtained with regular orders
Oregon and Utah consistently deny our catalogs so we cannot do business there.  Sorry

such as Ebel, and to provide prisoners being released from solitary with counseling and therapy to help them successfully transition back into society.

"Evan Ebel was exactly what Tom warned us about every single day," said Roxane White, chief of staff for Governor Hickenlooper.

Indeed, the damaging effects of solitary confinement on prisoners' mental health are both well-documented and well-known; long-term isolation worsens existing psychological problems and can drive the sane insane. [See: *PLN*, Oct. 2012, p.1].

The American Civil Liberties Union of Colorado heaped posthumous praise on Clements for his efforts as a reform-minded prison director.

"Mr. Clements never saw a contradiction between protecting human rights, fiscal responsibility and protecting institutional security," stated ACLU staff attorney Rebecca Wallace. "He thought they all could be met simultaneously. That belief is no more clear than in his work on ad-seg."

Wallace said the ACLU, which has a history of litigation against the Colorado DOC, "didn't file a single lawsuit against the Department during Mr. Clements' tenure."

Paul Herman, a colleague and longtime friend of Clements, remarked, "Here you had two people [Ebel and Clements], one who suffered significantly from solitary confinement and the other who was trying to do something about it."

"If what happened to Tom isn't the ultimate irony," he said, "I don't know what is."

## Changes Follow Clements' Death

There have been several major changes in the Colorado DOC as a result of Clements' death. As one example, *The Denver Post* reported on March 16, 2014 that the state's prison population has been rising due to fewer paroles being granted – an 8% decrease in paroles since before Clements was murdered. Meanwhile, the number of technical parole violations has increased, and the Fugitive Apprehension Unit has captured over 400 parolees who had absconded.

Rick Raemisch, who replaced Clements as director of the Colorado DOC, said it was "human nature" that parole officials would be stricter in the wake of Clements' death. After Ebel removed his ankle monitor and absconded from parole, it took almost a week before officials sought a warrant for his arrest.

"I don't like it, but I understand it," stated Michael Dell with Colorado-CURE, a prisoners' advocacy group. "When parole board members see what happened to Tom Clements, they are not going to take a gamble on someone else."

State Parole Chief Tim Hand was placed on paid administrative leave following Clements' murder and later fired.

Further, the investigation into Clements' death determined that Ebel had been released from prison four years early due to a clerical error. A district court had failed to specify that his four-year sentence for assaulting a prison guard was to be served consecutive to his 8-year sentence for carjacking. As a result the sentences were run concurrently, leading to Ebel's early release in January 2013. His sentence had also been reduced by about four months under a law, SB11-176 – approved by Clements – that allowed prisoners to earn good behavior credits during time spent in ad-seg.

**The American Friends Service Committee is seeking testimony from men, women, and children in US prisons.** Both the United Nations Periodic Review of the US and the Shadow Report for the UN Convention Against Torture are due within the next few months. Both need input from you on "no touch" (solitary), physical and chemical torture, rape, racism, brutality, sexual and other violence, lack of medical care and other aspects of prisoner treatment that violate human rights. We will be accepting testimonies until September 2014. Although we are unable to respond, you will receive confirmation of receipt of testimony. The writing should be no more than two pages describing what you have experienced or seen. Send to Bonnie Kerness, AFSC, 89 Market St. 6th floor, Newark, NJ 07102. We appreciate your courage in sharing your voice. Thank you.



NEW FRIENDS, HIGHER EDUCATION, AND EMPLOYMENT & HOUSING UPON RELEASE THROUGH WRITEAPRISONER.COM PROFILES

Contact WriteAPrisoner.com & Start Looking Forward To Mail Call!

**AS SEEN ON**
CNN, 20/20, Fox News, Dr. Phil, O Magazine, E! True Hollywood, and hundreds more!

WriteAPrisoner.com...
Simply the largest, highest ranked, & most visited website of its kind!

• Pen-pal Profiles are affordably priced at $40 for the first year, $30 for renewing year
• Features a comprehensive search that allows viewers to find your profile by age, race, location, keywords, & more - 32 search options in all
• Your new friends can email their first message to you along with a photo
• Advertises non-stop on every major search engine with thousands of websites linking back to us
• Offers free Reintegration Profiles for inmates seeking employment and housing upon release and education during incarceration
• Translated into 51 languages & geared for international search engines
• Viewers can "subscribe" to your profile to be notified when your profile is updated, blog is added, artwork is posted, poetry is added, your release is near & much more
• Pen-pals have the option of helping you with a broad range of topics using WriteAPrisoner.com's free Self-Help Series

Get Started Today!
Friends & family can submit your entire 250 word profile, photo, and payment for you online by visiting
www.writeaprisoner.com/post

WriteAPrisoner.com
We'll see you at mail call!

Or for a FREE Brochure, Send a S.A.S.E. to:
WriteAPrisoner.com
PO Box 10- PLN
Edgewater, FL  32132 USA

Proud member of the Better Business Bureau of Central Florida & the Southeast Volusia Chamber of Commerce.
*Our website traffic can be independently verified at www.quantcast.com/writeaprisoner.com

## Colorado DOC Murder (cont.)

However, Clements had opposed provisions in the original bill that would have placed restrictions on the DOC's ability to hold mentally ill prisoners in solitary.

"[Clements] was concerned about the administrative segregation population, and he asked Sen. Carroll and I to scale the bill back a little because it featured a number of requirements for the DOC to change administrative segregation," said state Rep. Claire Levy. "The original bill, for example, wanted [the DOC] to have more psychiatric resources available. They would have had to make more checks on mental health. We scaled the bill back at Clements' request."

In May 2013, Governor Hickenlooper signed into law legislation that requires the Department of Corrections to seek clarification from the court if a sentencing order does not indicate whether a sentence is to be served concurrently with or consecutive to another sentence. The DOC has two business days to request clarification and the court has two days to respond.

Hickenlooper also ordered an audit to determine whether clerical errors had resulted in other erroneous early releases. By August 2013, judges had reviewed 1,514 cases and corrected the sentences for 267 prisoners. Nine who had already been released were returned to prison to serve out their full terms.

Most notably, there have been changes in the Colorado DOC's use of ad-seg and the number of prisoners released directly from solitary to the community. According to Raemisch, the DOC's ad-seg population has declined from 1,511 in 2011 to 590 as of March 2014. The number of prisoners released from prison directly from solitary has dropped from 70 last year to just one or two a month in early 2014.

"We have people that are well trained on how to handle dangerous people, and yet we felt they are too dangerous to be in general population, so we'll put them in administrative segregation and then, 'oh by the way,' release them into the community. It just doesn't make any sense," Raemisch said.

In fact, Raemisch spent a day locked in an ad-seg cell at the Colorado State Penitentiary to see what it was like – an experience that led him to curtail the use of solitary confinement, particularly for prisoners with mental health problems. [See article in this issue of *PLN*, p. 8.]

There was still room for improvement, however.

A report issued by the Colorado ACLU in July 2013 found that prison officials continued "to rely on long-term solitary confinement to manage mentally ill prisoners, often for months or even years." The report, titled "Out of Sight, Out of Mind," noted that during Tom Clements' tenure the Colorado DOC started the Residential Treatment Program (RTP) to provide treatment to mentally ill prisoners. However, according to ACLU public policy director Denise Maes, "The information that we're getting is that RTP looks very much like ad-seg."

A December 10, 2013 memo issued by the DOC stated that wardens were no longer allowed to place prisoners with a "major mental illnesses" in solitary.

"This is an enormous foundational step toward getting seriously mentally ill prisoners out of solitary confinement and into treatment," stated ACLU staff attorney Rebecca Wallace. "There is still more important work to be done, but we want to take this moment to recognize something we have been asking the Department of Corrections to do for years."

Still, the policy change did not apply to prisoners who have mental health problems



# BRANLETTES BEAUTIES

### OUR SIMPLE POLICIES:

SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP-FRIENDLY). DUE TO TREMENDOUS TIME AND COST ANSWERING LETTERS, UNLESS YOU ARE PLACING AN ORDER OR A QUESTION REGARDING YOUR ORDER, WE WILL NOT REPLY TO ANY OTHER QUESTIONS. SASE ARE REQUIRED FOR ANY INQUIRES OR CONCERNS.

YOU AND YOU ALONG ARE RESPONSIBLE FOR YOUR SELECTIONS BEING ALLOWED INTO YOUR FACILITY:
KNOW YOUR INSTITUTIONS POLICIES AS TO WHAT IMAGE CONTENT IS ALLOWED. RETURNED ORDERS ARE NON-REFUNDABLE. THEY WILL BE HELD FOR 14 CALENDAR DAYS IN ORDER FOR YOU TO SEND SELF-ADDRESSED STAMPED; 3 FIRST CLASS STAMPS PER ENVELOPE. WITH A STREET ADDRESS FOR EVERY 20 PICTURES. ALL RETURNED IMAGES HELD AFTER TWO WEEKS WILL BE RE-SOLD AND WE WILL RETURN TO OUR STOCK.

ALL PAYMENTS ARE BY INSTITUTIONAL CHECKS OR U.S. POSTAL SERVICE OR WESTERN UNION MONEY ORDERS.

THESE PAYMENTS ARE PROCESSED IMMEDIATELY AND SHIPPED IN LESS THAN 3-4 WEEKS. ANY OTHER COMPANY MONEY ORDERS DELAY SHIPMENT 8-10 WEEKS OR UNTIL THAT MONEY CLEARS OUR BANK. YES, WE DEAL WITH PEOPLE THAT ARE, WHILE IN PRISON, STILL TRYING NICKEL AND DIME SCAMS...

ALL SALES ARE FINAL! EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM HIGH QUALITY PRINTS ON 4X6 GLOSSY PHOTO PAPER

### OUR PRICES ARE SIMPLE:

1-4999 PHOTOS  = 0.45 CENTS EACH
5000+  PHOTOS  = 20% DISCOUNT
1-9 CATALOGS : $3.00 EACH ( +SASE )
10 CATALOGS : $25.00+SASE (4 STAMPS )

### SHIPPING & HANDLING:

DUE TO VARIOUS PRISON POLICIES REGARDING HOW MANY PICTURES CAN BE SENT IN ONE ENVELOPE, OUR POLICY IS AS FOLLOWS:
01 - 5 PHOTOS----$1.00 PER ENVELOPE
06 - 15 PHOTOS---$1.50 PER ENVELOPE
16 -25 PHOTOS—-$2.00 PER ENVELOPE

BRANLETTES BREATHLESS BEAUTIES BAG A RANDOM SELECTION OF 50 OF THE RARE AND EXOTIC ***YES, FIFTY BEAUTIES ALL POSING JUST FOR YOU!***
PLUS TWO OF OUR FINEST COLOUR CATALOGS ONLY $19.95 BUY INTO THAT RIGHT??? ****$19.95????**** YES, ONLY $19.95 FOR 50 OF BRANLETTES BREATHLESS BEAUTIES (PLEASE SPECIFY NUDE OR BOP-FRIENDLY) ++PLUS++
TWO OF OUR FINEST COLOUR CATALOGS FREE (YOU PICK A VOLUMES) OUR REGULAR SHIPPING AND HANDLING POLICIES APPLY.

### BRANLETTES BEAUTIES
SELECT YOUR FAVORITE:
WHITE CATALOGS (60 VOLUMES)
BLACK CATALOGS (60 VOLUMES)
ASIAN&LATINO CATALOGS (60 VOLUMES)
PLEASE STATE WHAT STYLE PHOTOS'S:
PROVOCATIVE POSES OR NUDE

### FREE CATALOG???
YOU READ IT RIGHT!
JUST SEND US TWO U.S. FOREVER STAMPS AND A SELF ADDRESSED SELF ENVELOPE AND WE WILL SEND TO YOU ONE NUDE OR BOP-FRIENDLY SAMPLE CATALOG (1 PER CUSTOMER) WITH 84 GORGEOUS GIRLS IN FULL COLOR. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!

BRANLETTES
P.O.BOX 5765
BALTIMORE, MD
21282



# Corcoran Sun
Full Color Prison Yard Monthly
News ♦ Entertainment ♦ Resources

### 3 Month Special Subscription
## $5 or 20 FCS Stamps

**COLOR NEW 18 PAGES**
Expanded full color format with exciting episodes of thrilling novels and sexy pics. Many how-to articles on writing, art and health. Filled with entertainment: puzzles, trivia, jokes, poetry... Submit your writing, art, poetry etc. See your submission, name and contact info in print.

Special 6-Issue Subscription ($10 or 40 FCS stamps)
Special Year Subscription ($20 or 80 FCS stamps)
Payments to: Freebird Publishers
Box 541– Dept. BK, North Dighton, MA 02764
*www.FreebirdPublishers.com*
*Diane@FreebirdPublishers.com*

but have not been diagnosed with a "major" mental illness.

"As an initial matter, we remain concerned that the definition of major mental illness adopted by the [Colorado DOC] is too narrow and that there are still prisoners in administrative segregation who are seriously mentally ill and should not be placed in prolonged solitary confinement," the ACLU stated.

In April 2014, the Colorado General Assembly passed a bill, SB14-064, that would make it more difficult to place mentally ill prisoners in solitary absent exigent circumstances; the bill had passed the senate unanimously.

"Today's vote moves Colorado one step closer to realizing the former director's stated desire of bringing greater safety to the public and humanity to the prisons by ending our state's historic over-reliance on solitary confinement," the Colorado ACLU said in a statement.

The bill was signed into law by Governor Hickenlooper on June 6, 2014. "[A]s of today, we have no offenders with mental illness in solitary confinement," said a spokesman for the DOC. Colorado was the second state – after New York – to enact legislation to remove mentally ill prisoners from solitary.

## Conclusion

AS A POSTSCRIPT TO CLEMENTS' MURDER, authorities investigated where Ebel had obtained the 9mm handgun he used to kill Clements and Leon. They discovered the gun had been purchased by Stevie Marie Anne Vigil, a childhood friend of Ebel's, who gave it to him shortly before the killings. Vigil pleaded guilty to providing a firearm to a convicted felon, and on March 3, 2014 she was sentenced to 27 months in federal prison. These was no evidence that she knew Ebel had planned to use the gun to commit the murders.

Ultimately, no one escaped the damaging consequences of Ebel's actions – not Vigil, nor the families of Tom Clements and Nathan Leon, nor Texas deputy James Boyd or the Colorado prisoners who now have a more difficult time making parole, nor Ebel himself and his family members.

"I'm angry at the horrific senselessness," said Lisa Clements. "I'm angry that it impacted not just one individual [but also] our entire family, our community, our friends, our neighbors, our loved ones."

While "Evil" Evan Ebel has been vilified for murdering Clements, and an investigation continues into the possible involvement of the 211 Crew prison gang, few have condemned the Colorado DOC's treatment of mentally ill prisoners and use of long-term ad-seg as factors that directly contributed to Clements' death. As Ebel himself had said, the prison system creates monsters; thus, society should not be surprised when those monsters are released with predictable results.

"In Colorado, by using solitary confinement as the default for mentally ill prisoners, we're doing the least safe thing for the most amount of money," observed state Senator Jessie Ulibarri. "The case of Evan Ebel and Tom Clements is the most extreme example of that."

*Sources: CNN, The Denver Post, Colorado Independent, Associated Press, www.officer. com, www.gazette.com, www.rawstory.com, Huffington Post, www.aclu.org, www.acluco. org, The Atlantic, Los Angeles Times, www. incarceratedvoices.com*



# Two Corrections Chiefs Serve Time in Segregation

*by Christopher Zoukis*

Rick Raemisch, Colorado's new corrections director, wanted to better understand the experience of solitary confinement – so he spent a night in segregation at a state prison.

Raemisch had been on the job for seven months when he decided to stay overnight in an ad seg cell at the Colorado State Penitentiary. "I thought he was crazy," said Warden Travis Trani, who added, "I also admired him for wanting to have the experience." Trani received only nine hours notice that his boss was arriving for an extended visit.

On January 23, 2014, just after 7:00 p.m., Raemisch, handcuffed and shackled and wearing a prison uniform, entered cell 22. He was classified as "RFP," or "Removed From Population." After being uncuffed through the food slot he was left alone in the 7-by-13-foot cell.

In an editorial published in *The New York Times* on February 20, Raemisch said the experience was challenging.

"First thing you notice is that it's anything but quiet. You're immersed in a drone of garbled noise: other inmates, blaring TVs, distant conversations, shouted arguments. I couldn't make sense of any of it, and was left feeling twitchy and paranoid," he wrote. "I kept waiting for the lights to turn off, to signal the end of the day. But the lights did not shut off. I began to count the small holes carved in the walls. Tiny grooves made by inmates who'd chipped away at the cell as the cell chipped away at them. For a sound mind, those are daunting circumstances. But every prison in America has become a dumping ground for the mentally ill, and often the 'worst of the worst,' some of society's most unsound minds, are dumped in Ad Seg."

Raemisch then described some of the day-to-day routine that prisoners in solitary endure for years – sometimes decades.

"[T]here were the counts. According to the Ad Seg rules, within every 24-hour period there are five scheduled counts and at least two random ones. They are announced over the intercom and prisoners must stand with their feet visible to the officer as he looks through the door's small window. As executive director, I praise the dedication, but as someone trying to sleep and rest my mind, forget it. I learned later that a number of inmates make earplugs out of toilet paper.... When 6:15 a.m. and breakfast finally came, I brushed my teeth, washed my face, did two sets of push-ups, and made my bed. I looked out my small window, saw that it was still dark outside, and thought, now what?"

Raemisch said that by 11:30 a.m. the next day, he broke a promise to himself and asked a guard what time it was. "I felt like I had been there for days. I sat with my mind. How long would it take before Ad Seg chipped that away? I don't know, but I'm confident that it would be a battle I would lose," he wrote.

After Raemisch, 61, took over as Colorado's top prison official following the murder of his predecessor, Tom Clements, by a prisoner who was released directly from solitary, he decided to continue Clements' efforts to curtail the use of long-term segregation. Clements had reduced Colorado's solitary population from about 1,500 to 726; Raemisch has since cut that number to under 600.

Raemisch shared his experience at a U.S. Senate subcommittee hearing on the topic of solitary confinement in February 2014, saying segregation was "overused, misused, and abused" in America's prisons. His comments were received by many well-wishers, including officials with the ACLU, who joked that other corrections commissioners might want to take "the Colorado challenge."

Predictably, some criticized Raemisch for being "soft" on criminals or for trying to grandstand through his brief stint in solitary.

Raemisch said he was moved by the experience. "Everything you know about treating human beings, [segregation's] not the way to do it," he stated. "When I finally left my cell at 3 p.m., I felt even more urgency for reform. If we can't eliminate solitary confinement, at least we can strive to greatly reduce its use. Knowing that 97 percent of inmates are ultimately returned to their communities, doing anything less would be both counterproductive and inhumane."

Raemisch spent just 20 hours in segregation – a short time, but long enough to make a lasting impression. On average, Colorado prisoners sent to solitary stay 23 months.

At least one other corrections chief has served time in segregation to gain empirical experience of what it's like. On May 2, 2014, New Mexico Corrections Department Secretary Gregg Marcantel, 53, entered cell 106 in E pod at the state penitentiary in Santa Fe for a 48-hour visit.

"I can tell you, pacing it, I had five large paces from the edge of my bed to the door. I traveled that route quite a bit," he said. "It's where I ate, where I exercised, where my toilet was. I didn't, for 48 hours, speak a word. I did internal dialog, but I didn't speak a word to another person."

Marcantel said he wanted the experience to be as authentic as possible, even though he knew it was for only a short time. He spent the first day under conditions of adminstrative seg and the last day in disciplinary segregation.

"There are just things sometimes that you gotta feel, you gotta taste, and you gotta hear and you gotta smell," he noted.

Although he tried to play the part – arriving in restraints, wearing prison clothes, growing a beard to hide his appearance and pretending to be deaf and mute so he wouldn't have to speak – other prisoners in the unit became suspicious and assumed he was a cop.

Marcantel said it got "ugly" and "tense."

His brief time in solitary was recorded on a video camera as he paced, read books, looked out the cell window and ate prison food.

"You start after a while to count everything, because that's how you kind of grab a little bit of control," he observed. "You become a lot more detail-oriented about what your environment looks like."

Marcantel said he made several policy changes based on his experience in segregation; according to one news report, 60 to 80 New Mexico state prisoners have since been moved from solitary confinement to the general prison population.

Sources: *www.nytimes.com, www.abqjournal.com, Wisconsin State Journal, www.kob.com*

# WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

TENS OF THOUSANDS OF THE HOTTEST AND MOST SCANDALOUS BABES&DUDES FOUND ON THE PLANET.
EACH CATALOG PAGE HAS 120 BEAUTIFUL GIRLS OR BOYS POSING JUST FOR YOU!
ORDER ONE CATALOG PAGE FOR ONLY $4.50 OR FOR 10 U.S. FOREVER STAMPS WITH AN SASE ENCLOSED.
WE WILL SEND YOU VOLUME ONE.  EACH ADDITIONAL VOLUME THE SAME PRICE!

## HELP US TO HELP YOU!
WE ARE MORE THAN HAPPY TO ANSWER E-MAIL INQUIRES HOWEVER, DUE TO MAILING COST AT $0.46 CENTS
A LETTER, PLEASE ENCLOSE AN SASE WITH YOUR QUESTIONS, OTHERWISE NO REPLIES!

## WHAT ABOUT OUR PRICES AND POLICIES
COLOR PRINTS ON  4x6 GLOSSY PHOTO PAPER AS LOW AS $0.35 CENTS PER PRINT ON ORDERS OVER 500
SHIPPED ACCORDING TO POLICY: 25 PICTURES PER ENVELOPE EVERY 24 HOURS. S&H $2.00 PER ENVELOPE.

## METHOD OF PAYMENT/CONTACT INFORMATION
U.S. POSTAL SERVICE MONEY ORDERS-STATE & FEDERAL CORRECTIONAL INSTITUTIONAL CHECKS
PAYABLE ONLY TO: KRASNYA L.L.C.
EQUATION FOR FIRST CLASS U.S. FOREVER STAMPS
BRAND NEW FLAT BOOK FOR ALL ORDERS AT THE RATE OF $6.00 PER FLAT BOOK.
WE RESPOND TO OUR CLIENTS NEEDS AND TRY TO HELP THE BEST WE CAN.
OUR SEASONAL SPECIALS MEAN A KICKOFF OF SAVINGS!

---

### COLOR CATALOG DISCOUNT SALE
ONE COLOR CATALOG OF 120 BABES
IN CLASSIC OR NUDE LINES $4.50
PLEASE INCLUDE
A SELF-ADDRESSED STAMPED
(2-FIRST STAMPS) ENVELOPE.

**QUANTITY BUYS:**

5-14 CATALOGS  =10% OFF OUR REGULAR PRICE
15 CATALOGS     =15% OFF OUR REGULAR PRICE
20 CATALOGS     =20% OFF OUR REGULAR PRICE
25 CATALOGS     =25% OFF OUR REGULAR PRICE
30 CATALOGS     =30% OFF OUR REGULAR PRICE
35 CATALOGS     =35% OFF OUR REGULAR PRICE
40 CATALOGS     =40% OFF OUR REGULAR PRICE
45 CATALOGS     =45% OFF OUR REGULAR PRICE
50 CATALOGS     =50% OFF OUR REGULAR PRICE
BE SURE TO SPECIFY CLASSIC OR NUDE BABES!

150 VOL. OF KRASNYA BABES CLASSIC LINE
150 VOLUMES OF KRASNYA BABES NUDE LINE

### $24.95  S&H FREE
FOR GRAB BAG OF
## 50 PHOTOS
FROM ALL OUR CATALOGS
SPECIFY RACE AND MAIN
AREA OF YOUR INTERESTS
WE WILL PICK SELECTION
FOR YOU
BONUS 1 COLOR CATALOG
PAGE OF 120 BABES

KRASNYA IS PROUD TO INTRODUCE AT FANTASTIC INTRODUCTORY PRICES
**THE CONNOISSEUR'S COUTURE "CACHE TWO-FIVE COLLECTION"**
**OF INTERNATIONAL ADULT FILM STARS**
TWELVE PACKAGES OF 25 NUDE AND NON-NUDE POSES,
AVAILABLE ONLY IN OUR "CACHE TWO-FIVE" COLLECTION.

**"CACHE TWO-FIVE"**
"CACHE TWO-FIVE"  IS AVAILABLE IN TWELVE (12) SPECIALLY PRICED PACKAGES
OF 25 POSES IN NUDE AND NON-NUDE POSES.
PLEASE SPECIFY ON YOUR ORDERS IF YOU WANT NUDE OR NON-NUDE PACKAGES
AND WHAT COLLECTION NUMBER YOU'D LIKE.
COLLECTIONS ARE NUMBERED 01-12 FOR EXAMPLE ON YOUR ORDER YOU'D WRITE:
***NUDE CACHE TWO-FIVE PACKAGE 01 & 02***
REMEMBER THERE ARE TWELVE (12) COMPLETELY DIFFERENT PACKAGES OF 25 BABES,
THERE ARE NO DUPLICATES IN ANY OF THE 12 PACKAGES.
600 BEGUILING BEAUTIES, ALL BRAND NEW ADDITIONS TO OUR LINE AND AVAILABLE ONLY
IN OUR CACHE "TWO-FIVE" PACKAGES!  300 NUDES AND 300 NON-NUDE BEAUTIES
CAPTURE YOUR OWN COLLECTION OF KRASNYA'S "CACHE TWO-FIVE" SELECTIONS IN
INDIVIDUALIZED PACKAGING OF 25 RARE AND EXQUISITE BREATH-TAKING BEAUTIES.
THE CONNOISSEUR'S COUTURE COLLECTION OF "CACHE TWO-FIVE" BRINGS YOU
25 BEAUTIES IN EACH "CACHE TWO-FIVE" PACKAGE FOR ONLY $12.95 PER PACKAGE
LIMITED TIME SPECIAL ***** $9.95******
PLUS S&H FOR 6 "CACHE TWO-FIVE" PACKAGES OF THE NUDE OR NON-NUDE COLLECTIONS
150 BEAUTIES
IMAGINE 150 OF THESE EXCITING AND EXQUISITE BEAUTIES
FOR A RIDICULOUSLY LOW PRICE OF
*****$9.95***** PLUS $12.00 SHIPPING AND HANDLING CHARGE.
ADD $2.00 FOR SHIPPING AND HANDLING PER "CACHE TWO-FIVE" PACKAGE ORDERED.
YOU MUST SPECIFY NUDE OR NON-NUDE PACKAGES
IF NOT SPECIFIED NON-NUDE WILL BE SHIPPED AUTOMATICALLY
ALL OF OUR NORMAL POLICIES APPLY

---

### LOOSE STAMPS FOR LOOSE BABES
KRASNYA LOOSE STAMP GRAB BAG SPECIAL
10 LOOSE BABES................................30 STAMPS
25 LOOSE BABES................................75 STAMPS
50 LOOSE BABES..............................150 STAMPS
ALL STAMPS MUST BE 1ST CLASS STAMPS
IN LIKE NEW CONDITION!
SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)
WE WILL PICK SELECTION FOR YOU

KRASNYA BABES HAS SPRUNG SALE!
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST
CLASS STAMPS! 1 CAT PER CUSTOMER
PLEASE SPECIFY MALE OR FEMALE BABES
NUDE OR BOP-FRIENDLY

3 BRAND NEW FLAT BOOKS OF FOREVER
STAMPS FOR GRAB BAG OF 45 PHOTOS
FROM ALL OUR CATALOGS. SPECIFY RACE
AND MAIN AREA OF YOUR INTERESTS
WE WILL PICK SELECTION FOR YOU
BONUS 1 COLOR CATALOG OF 120 BABES
PLEASE INCLUDE 6 FOREVER STAMPS
WITH YOUR ORDER FOR S&H

**KRASNYA L.L.C.**
P.O.BOX 32082
BALTIMORE, MD 21282
EMAIL AND CORRLINKS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM

---

WE'D LIKE TO START THE HOLIDAYS RIGHT THIS YEAR!
THE WAY TO DO THAT IS BY SENDING YOU INCREDIBLE VALUES
IT'S ONE THING TO TALK THE TALK, ANOTHER TO WALK THE TALK

50  GREAT BABES 0.50 CENTS EACH——$25.00
100 GREAT BABES 0.45 CENTS EACH!—$45.00
200 GREAT BABES 0.40 CENTS EACH!—$80.00
300 GREAT BABES 0.40 CENTS EACH!-$120.00
500 GREAT BABES 0.35 CENTS EACH!-$175.00

STANDARD TERMS & CONDITIONS APPLY – $2.00
PER ENVELOPE (25 PHOTO) FOR SHIPPING AND HANDLING!

**WAIT!**
YOU SAY YOU DON'T HAVE ENOUGH BABE CHOICES
OR CATALOGS? YOU NEED CATALOGS?
PREPAY YOUR ORDER AND WE WILL SEND YOU
FREE COLOR CATALOGS!
GREAT DEAL BUT HOW MANY CATALOGS?

FOR EVERY 100 BABES WE'LL SEND YOU
240 BABES TO CHOOSE FROM!

**ORDER**

50 BABES——————ONE SINGLE CATALOG
100 BABES—————ONE DOUBLE CATALOG
200 BABES————TWO DOUBLE CATALOGS
300 BABES———THREE DOUBLE CATALOGS
500 BABES————FIVE DOUBLE CATALOGS

---

### FOR KRASNYA CLIENTS WHO WORK THE YARDS;
HAVE WE GOT A GREAT OPPORTUNITY FOR YOU...GRAB BAG

## MR. HUSTLE GRAB BAG BARGAIN DAY$
ONLY $0.25 CENT$ PER BABE
5 GRAB BAG MINIMUM PURCHASE REQUIRED
$2.00 SHIPPING AND HANDLING PER BAG
25 AWESOME BABES PER BAG AT ONLY $6.25 PER BAG
YOU MUST BUY AT LEAST 5 GRAB BAGS OR 50 GRAB BAGS.
THIS***GRAB BAG BARGAIN*** IS NOT GOING TO BE OFFERED
AGAIN THIS YEAR.     *SO STOCK UP NOW!*
AS YOU KNOW YOU GET AN ARRAY OF 25 GORGEOUS BABES
YOU CAN ONLY CHOOSE EITHER MALES OR FEMALES,
ALL NUDES OR BOP SAFE...THE INDIVIDUAL SELECTIONS COME
FROM OUR BEST CATALOGS!!!
YOU MAY WANT TO SIT DOWN FOR THIS BONUS BARGAIN!
OUR BABES CATALOGS SPECIAL OF THE DECADE
—— 5 COLOR CATALOGS FOR  $6.00 ——
—— 10 COLOR CATALOGS FOR  $12.00 ——
—— 15 COLOR CATALOGS FOR  $18.00 ——
—— 20 COLOR CATALOGS FOR  $24.00 ——
OUR CATALOGS SPECIAL AVAILABLE WHEN YOU PURCHASE
THE 5 GRAB BAG MINIMUM!
THIS PRICE INCLUDES FREE SHIPPING ON THE CATALOGS
BECAUSE OF SHIPPING TERMS ALL CATALOGS SOLD IN
MULTIPLES OF 5 FOR $6.00 ONLY.
YOU CHOOSE EITHER MALE OR FEMALE CATALOGS
AND IF YOU WANT NUDE OR BOP SAFE!!

---

# From the Editor

*by Paul Wright*

Since we began publishing *PLN* in 1990 we have documented the horrific effects of solitary confinement and its overall goal and purpose of psychologically destroying prisoners subjected to long-term isolation. It's not a coincidence that the rise of solitary confinement in the U.S. began in the 1970s just as American courts were ending the use of corporal punishment as a form of discipline by prison officials. For example, as recently as the early 1970s prisoners were still being flogged with leather straps in Tennessee and Arkansas.

The rise of solitary confinement also coincided with the successful use of long-term isolation and sensory deprivation by the U.S. as a torture and interrogation technique against freedom fighters and anti-imperialists in Vietnam, South America and elsewhere. What began as a counter-insurgency tactic overseas is now routinely used against an estimated 80,000 U.S. prisoners on a daily basis – the vast majority of whom harbor no animus toward the prisons that imprisons them but are simply a little too poor, a little too mentally ill, not law abiding enough or not subservient enough to stay out of prison or, once incarcerated, to avoid being placed in solitary. As states and the federal government spent billions to build supermax prisons, it was no surprise they would be filled with whoever was available to fill them.

Colorado was among the states that invested in solitary confinement as a means of controlling – and torturing – prisoners. After decades of using long-term segregation, it appeared there was some modest hope for change when Tom Clements was appointed director of the Colorado DOC and began to curtail the use of solitary.

I met Clements at a conference on supermax prisons several years ago at Columbia Law School, where we were both speakers. He discussed his efforts to reduce the use of isolation in Colorado, which had already been moderately successful. He seemed genuinely committed to the notion of reform; therefore, it was all the more shocking and ironic that he would be killed by a prisoner recently released from solitary confinement. This month's cover story delves behind the headlines of Clements' death into the background of his killer, Evan Ebel, and the repercussions that followed.

This issue of *PLN* also includes a poem by renowned poet Maya Angelou, who passed away on May 28, 2014. In addition to being a poet she was at various times homeless, a lounge singer, a pimp, a prostitute, a victim of child rape – all of which influenced her work – and had demonstrated by the time of her death that she was much more, by serving as a powerful voice for the voiceless. Several of her poems are especially meaningful for people behind bars, such as "Prisoner" and "Caged Bird." The world will be a more somber place without her poetry but is more illuminated because of it.

Each year we spend a great deal of money sending sample copies of *PLN* to potential subscribers in the hope they will subscribe. From now until the end of the year we are running our Subscription Madness campaign, whereby people can purchase multiple one-year subscriptions to *PLN* for individuals who have not subscribed before, at reduced rates.

Our hope is that after receiving *PLN* for a year, people will want to renew at our regular rates. The Subscription Madness rates do not apply to current or former subscribers – only those who have never subscribed previously. The goal is to introduce new people to *PLN*. This is a great time to purchase subscriptions for your favorite judges, legislators, corrections officials, prisoners, family members or anyone else who you think needs to learn more about the realities of mass incarceration and its impact on our nation. See the ad on p. 51.

Our fight against prison and jail censorship continues. As this issue goes to press we are awaiting a decision in our challenge to system-wide censorship of *PLN* by the Florida DOC that has been ongoing since 2009. We are currently litigating the censorship of *PLN* books by the Nevada DOC and are challenging postcard-only policies and book and magazine bans by jails in Florida, Georgia, California, Washington, Tennessee, Michigan, Arizona and Virginia. Within the past month we have successfully concluded lawsuits against jails in Wisconsin and Texas. If you are a *PLN* subscriber or purchase books from *PLN*, please let us know if you experience censorship of any *PLN* reading materials. We are dedicated to ensuring that prisoners anywhere in the U.S. can receive *PLN* and the books we distribute. All too often, prison and jail officials fail to notify us of censorship decisions; thus, we rely on our readers to keep us informed so we can take appropriate action.

Enjoy this issue of *PLN*, and please encourage others to subscribe and to participate in Subscription Madness! ⬧

## Earn an Adams State University Degree via Correspondence Courses



**Now Available: Bachelors Degree in English/Liberal Arts**

- Correspondence Courses via mail    • No internet access required
- Degree options available — Associate of Arts or Science, Bachelors degrees in English, Business Administration, Government, History, Interdisciplinary Studies, Sociology, Paralegal Certificate Program, Masters Degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 16+ years of experience serving incarcerated students
- Veteran friendly
- FREE unofficial evaluation of previously earned credits



ADAMS STATE UNIVERSITY
C O L O R A D O
*Great Stories Begin Here*
EXTENDED STUDIES

Call or write to receive additional information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101
www.adams.edu

# In Remembrance of Maya Angelou

(April 4, 1928 – May 28, 2014)

## Caged Bird

by Maya Angelou

A free bird leaps
on the back of the wind
and floats downstream
till the current ends
and dips his wing
in the orange sun rays
and dares to claim the sky.

But a bird that stalks
down his narrow cage
can seldom see through
his bars of rage
his wings are clipped and
his feet are tied
so he opens his throat to sing.

The caged bird sings
with a fearful trill
of things unknown
but longed for still
and his tune is heard
on the distant hill
for the caged bird
sings of freedom.

The free bird thinks of another breeze
and the trade winds soft through the sighing trees
and the fat worms waiting on a dawn bright lawn
and he names the sky his own.

But a caged bird stands on the grave of dreams
his shadow shouts on a nightmare scream
his wings are clipped and his feet are tied
so he opens his throat to sing.

The caged bird sings
with a fearful trill
of things unknown
but longed for still
and his tune is heard
on the distant hill
for the caged bird
sings of freedom.

*"Caged Bird" from SHAKER, WHY DON'T YOU SING? by Maya Angelou, copyright © 1983 by Maya Angelou. Used by permission of Random House, an imprint and division of Random House LLC. All rights reserved. Any third party use of this material, outside of this publication, is prohibited. Interested parties must apply directly to Random House LLC for permission.*

# Bonnie Kerness: Pioneer in the Struggle Against Solitary Confinement

*by Lance Tapley*

IN 1986, OJORE LUTALO, A BLACK revolutionary in Trenton State Prison – now the New Jersey State Prison – wrote to Bonnie Kerness' American Friends Service Committee (AFSC) office in Newark. His letter described the extreme isolation and other brutalities in the prison's Management Control Unit (MCU), which he called a "prison within a prison."

"I could not believe what he was telling me" about the MCU, Kerness says. She reacted by becoming "this lunatic white lady" calling New Jersey corrections officials about Lutalo.

She immediately went to work trying to stop MCU guards from harassing prisoners by waking them at 1 a.m. to make them strip in front of snarling dogs leaping for their genitals – or arbitrarily have them switch cells. She got this practice stopped.

Lutalo's letter also began to open her eyes to the torture of solitary confinement, which in the mid-1980s was just starting to spread across the country as a mass penological practice. Coordinator of the AFSC's national Prison Watch Project, Kerness had worked on prison issues since the mid-1970s. Now she became an antisolitary confinement activist. She has been one longer and more consistently than, possibly, anyone else.

"I try not to use the word 'pioneer' lightly," says David Fathi, director of the American Civil Liberties Union's National Prison Project, "but it certainly applies to Bonnie. She did the groundwork for the progress and success we are now having."

Corey Weinstein, a California physician who also was a pioneering activist against solitary confinement, says Kerness made a huge contribution early on by bringing a human rights vision to the effort. It provided "the intellectual framework that we could grasp onto" to understand what was happening.

Reflecting on how difficult it has been for solitary confinement to be publicly recognized as torture, Stuart Grassian, a Massachusetts psychiatrist – another trailblazer who is credited with identifying long-term isolation as the cause of a devastating psychiatric syndrome – observes: "How frightening it is to see people choose not to see what's in front of them."

Many years ago Bonnie Kerness chose to see what was in front of her.

## A Child Shocked by Injustice

KERNESS IS VERY SLIM, LOOKS MUCH younger than 69, and dresses stylishly – though her wardrobe is purchased at thrift shops, she says. She makes sweeping gestures when she speaks in her East Coast urban twang.

Born in Manhattan, she grew up in the Bronx and Queens. Her working-class family was not political, but at 12 years old she was shocked to see on the television news "kids my own age" being beaten for trying to integrate schools in the South. This glimpse of injustice would lead to her life's work.

When she was 14, in 1956, she began doing volunteer social work in the Lower East Side, where for the first time she met community organizers. Five years later she became one herself, traveling the South for the civil rights movement, working with the NAACP and other groups.

She portrays herself then as "a young white kid who went south with very little political understanding." But in addition to on-the-job training, she received what might be called an elite community-organizing graduate-school education: a year in the mid-1960s at Tennessee's Highlander Research and Education Center, formerly the Highlander Folk School, a legendary social justice leadership school which Rosa Parks and Martin Luther King had attended.

"I have a special feeling for my generation," Kerness says – the activist sixties' generation. "We each had something outside of ourselves" to be devoted to.

In the early 1970s she went up from



**FREE!**

# 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!

Quarterly drawing WINS $100! **(Void in New York)**
(Last Quarter's winner from **Somers, CT.**)

TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

## Inmate Magazine Service INC.

the South to New Jersey and got work with the AFSC in a housing campaign. She and others noticed that many poor people had a father or other family member in prison. This perception led to the founding of a New Jersey prisoner-rights effort that ultimately morphed into the Prison Watch Project.

In her teenage years in Queens, she had completed two years of college. She began taking courses again, eventually getting a master's in social work from Rutgers. She also became active in the women's, gay rights and anti-Vietnam War movements.

And she married and divorced. She has three biological children, an adopted child and "one of my lovers had three African-American children" she helped raise. Now she attends to seven young people she all calls her grandchildren – one of whom interrupts an interview in the tidy AFSC office in gritty downtown Newark with a call to grandma to ask if she will pay for a pizza with her credit card.

Kerness' life outside her work – half-time, theoretically, now that she's officially retired – revolves around her grandchildren.

## The Discovery of Solitary Confinement

AFTER LUTALO'S LETTER REVEALED THE horrors of the Trenton MCU, to better understand the control-unit phenomenon Kerness got in touch with the Committee to End the Marion Lockdown. In 1983 the United States Penitentiary in Marion, Illinois became the first prison in modern times to adopt near-total confinement of all prisoners to their cells – thus, the first supermax.

Kerness credits Nancy Kurshan, a prominent sixties' and seventies' radical and founder of the Marion anti-lockdown group, with helping guide her initial work, as did several former Marion prisoners. Kerness soon founded the AFSC's Control Unit Monitoring Project, focusing first on the 80 to 90 African-American politicized prisoners in the Trenton unit.

As she began getting letters from prisoners in other states who told stories similar to Lutalo's, she contacted organizations around the country that were beginning to be alarmed by the rise of these draconian units. This new kind of imprisonment

seemed so bizarre, "People weren't sure what they were looking at," Kerness says.

And while she worked to build opposition to solitary confinement, she saw it rapidly become common. Only a handful of sizeable control units existed in the mid-1980s, but fewer than 15 years later more than 40 states had them. Many were large, free-standing supermax prisons.

Kerness also watched in dismay as control units and supermaxes became dumpsters into which society threw the mentally ill. The arbitrariness of the supermax regimen became clear. "You're there because we want you there," she says of the ultimate criterion for who is put into isolation.

As citizen campaigns specifically against control units began popping up spontaneously, Kerness made connections with them and helped them – in California, Wisconsin, Illinois, Massachusetts. In 1994, she helped bring 40 activists from around the country to the AFSC offices in Philadelphia to found the National Campaign to Stop Control Unit Prisons, which held public meetings on solitary confinement in several states.



**William L Schmidt**
ATTORNEY at LAW, P.C.

911CIVILRIGHTS@GMAIL.COM

**559.261.2222 (clients only collect)**

*Legal Services for California Inmates:*
**APPEALS**
**WRITS OF HABEAS CORPUS**
**Civil Litigation**
**Catastrophic Injury Litigation**
**Money Management**
**Business Windup**
**Contracts**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------OUR CLIENTS GO HOME, HOW ABOUT YOU? -----------------
*Please submit a single page summary of your case. Due to the volume, we cannot return documents or respond to all inquires. We are not a low cost or pro bono law firm, but if you want results, write us.*

P.O. BOX 25001 FRESNO, CA 93729

**Bonnie Kerness (cont.)**

### Solitary: First Among Other Issues

KERNESS HAS BEEN INVOLVED WITH many other prison issues, including sexual abuse, restraint chairs and beds, the overuse of stun guns and pepper spray, and prison privatization.

Her work has been particularly devoted to solitary confinement, she says, because "we're so well known on this issue." Her daily duties include answering mail and telephone calls, sending out reams of requested material, contacting the news media, mentoring student interns, giving talks to college and community groups, and writing articles and reports.

Her AFSC reports include, as editor or author: "The Prison Inside the Prison: Control Units, Supermax Prisons, and Devices of Torture" (with Rachael Kamel, 2003); "Survivors Manual: Surviving in Solitary" (4th Printing, 2008); and "Torture in United States Prisons: Evidence of Human Rights Violations" (Second Edition, 2011).

Although she praises several Quaker activists who encouraged her, she expresses frustration with the AFSC for starting national anti-solitary confinement campaigns only to shut them down.

After four years the AFSC unaccountably "pulled the plug," she says, on the National Campaign to Stop Control Unit Prisons. Similarly, after a well-attended "StopMAX" conference in Philadelphia in 2008, the substantial national effort that was supposed to grow out of it never materialized.

An official at the AFSC's national headquarters in Philadelphia, Clinton Pettus, says the organization, "like most nonprofits, went through a period of financial constraint a few years ago," and was forced "to do more with less" in its solitary confinement work. The result: "We partner with like-minded groups and individuals to form state-based coalitions that build grassroots campaigns."

Kerness also generally faults the national organizations involved with prison reform for not making better connections between the American domestic prison system and the American foreign war machine. The organizations don't recognize, she says, that there's a worldwide class and racist oppression coming from the top of the economic pyramid.

"The people who run the country own the means of production," she says, and this rich elite is ultimately responsible for the "war against the people here" – which she sees as a campaign of social control – and American wars against the people of other countries. Both here and abroad, the primary targets are black and brown people. [*Ed. note*: Plus poor people in general].

### A Partner in Activism

KERNESS BEGAN HELPING OJORE LUTALO in 1986, but he has been, during the many years he spent on the inside, and since 2009, when he was released from prison, a professional partner in conveying to the world the horrors of solitary confinement.

He has vast knowledge of the subject. He spent 22 of his 28 years behind bars in isolation in the Trenton MCU. Now 66 – strong-looking, with a shaved head – he volunteers twice a week in the AFSC Newark office at a desk across a small room from Kerness. And he speaks beside her when she goes to colleges and community groups.

Lutalo got in touch with Kerness to protest what he says were the prison's "corrupt" practices, including inadequate food and medical care and arbitrary denials of visitors. But the corruption also was more fundamental. Lutalo spent so many years in solitary, he says in an interview, not because he broke prison rules but for "entertaining political thoughts the administration didn't approve of."

He presents proof, showing a 2008 letter from prison officials stating he was being kept in the MCU because his "radical views and ability to influence others poses a threat to the orderly operation of this Institution." Serving time for armed robbery and assault with intent to kill, he had been a member of the Black Liberation Army, an underground, revolutionary offshoot of the Black Panthers.

Kerness has written of Lutalo: "During the quarter century that we monitored Ojore Lutalo in isolation, he was never assaulted either physically or chemically. The 'no-touch' torture he endured consisted of sleep deprivation, screeching sounds, extreme silence, extreme cold and heat, intentional situational placement, humiliation – a systematic attack



**FreedomLine**®

Serving You with Excellence Since 2009

*We make it simple.*

**You reach your loved ones by calling a local number.**
**That's a lot cheaper than calling long distance.** *It's that simple!*

- We charge $2.50 per month for the number.
- For Calls to anywhere in the U.S., we charge you 5¢ per minute
- To Mexico - 15¢; to Canada - 11¢, to just about anywhere else in the world - 31¢
- No Contract, No Credit Check, No Setup Fee, No Cancellation Fee, No Early Termination Fee
- Cancel anytime; any money left on the account is refunded

*Any time you refer a new customer and they sign up, you both get 300 free minutes! Some restrictions apply. Details upon request.*

Tell Your Folks to Sign Up at www.freedomline.net

Or Mail: FreedomLine
PO Box 7 - SCA
Connersville, IN 47331

*Also see our long-running Classified Ad in this and every issue*

FCC Reg. No. 0021217047

on all human stimuli."

"The goal was to break me psychologically," Lutalo says.

He didn't break. But maintaining sanity during decades of solitary confinement is exceedingly difficult, he says. He saw many prisoners "wiped out" by the isolation. He says his political commitment kept him sane. His creation of political art – collages that combine drawings and newspaper clippings – was especially helpful.

With Kerness' assistance, Lutalo's plight and the conditions at the MCU became known. Reporters interviewed him; documentary films appeared; a class-action lawsuit was filed on behalf of the unit's African-American prisoners. In 1995 the lawsuit was settled, and the court appointed a special master to review each prisoner's case.

Eventually, after years, most prisoners were released into the prison's general population. Lutalo spent several years in general population, but was put back into the MCU because, Kerness says an official told her, of a request from the federal Department of Homeland Security. He was released from isolation only when his prison term ended.

### A Harsh State

Although Kerness' work has often been on the national stage, the Trenton MCU has continued to be a major concern. The state's prison system has "always been one of the toughest" on prisoners, she says, and the MCU is still being used "unconscionably" for mentally ill prisoners. But, she adds, it's difficult to know what's going on in it and anywhere else in "an extremely closed" New Jersey system.

As if to prove that point, when the New Jersey Department of Corrections is asked about the number of prisoners held in solitary confinement, a spokesman replies by email: "New Jersey does not utilize solitary confinement in any of its prisons."

This is a common response from corrections departments, since "solitary confinement" is not a bureaucratic phrase. Further inquiry produces an admission that "administrative segregation (ad seg) ... is utilized as a punishment for inmates and entails the loss or reduction of certain privileges." The spokesman, Matthew Schuman, adds that "the vast majority of inmates in ad seg are double-bunked. Even those in single cells have opportunities to interact with other inmates, so ad seg is distinctly different from solitary confinement."

Kerness, however, counts over 329 ad seg beds at the Trenton prison that "we're pretty sure are isolation cells." In addition, she's "positive" there are 96 solitary confinement cells in the MCU. Ad seg beds in four other prisons total 994, she says. These may or may not be doubled-bunked, but they're "locked down." Then there are special needs and protective custody housing units about which, she says, little is known.

Jean Ross, a volunteer prisoners' rights attorney based in Princeton, agrees with Kerness that New Jersey's prison system is unhelpful in providing information, isolates many prisoners and is a harsh system.

Ross has specifically challenged, in a class-action lawsuit on behalf of prisoners, the conditions in the "falling apart" West Compound of the 178-year-old Trenton facility. Ross says it has poor ventilation, excessive heat and cold, leaking pipes, rodent and insect infestations, and fire-safety deficiencies, among other problems.

Kerness also was involved in bringing to light the particularly vicious conditions that alleged gang members suffered in a "high risk" Security Threat Group Management Unit of Newark's huge Northern State Prison. Reports of the "use of physical, chemical, and psychological abuse" came to her "during the entire 12 years" the gang unit remained open, she writes in "Torture in United States Prisons."

The unit was shut down in 2010 after prisoner Omar Broadway, a Bloods gang member, used a camera smuggled in by a guard to secretly film abusive treatment of prisoners. His video, with scenes of guards pepper-spraying and beating prisoners, was shown at the 2008 Tribeca Film Festival and, in 2010, on HBO. Kerness says many of the Northern State prisoners were transferred to ad seg units in other New Jersey prisons.

### The Future of Anti-solitary Work

Kerness welcomes the embrace in recent years of the anti-solitary cause by mainstream groups such as the National Religious Campaign Against Torture – "they're doing dynamite." She believes

LAW OFFICES OF

## ELMER ROBERT KEACH, III
A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Washington Avenue Extension
Albany, NY 12205-5531
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration*
*Medical Indifference Cases • Corrections and Police Brutality*
*Sexual Abuse and Assault • Illegal Strip Searches*
*Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals, Post-Conviction Relief, Habeas Corpus

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED, YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages.
DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS.
Make sure to exhaust your administrative remedies and comply with state law notice requirements, if applicable, to preserve state law intentional tort/negligence claims.

**Bonnie Kerness (cont.)**

describing solitary confinement as torture is the angle to accentuate. She has written that American legitimization of torture presents the country with "a critical crisis."

She sees welcome developments, too, in law schools, especially with their students. She hopes "we will begin to see lawyers with a more progressive" bent. At present, progressive lawyers are "still a very small group."

But most important to the anti-solitary battle, she says, are "the people inside," such as Lutalo, who stimulated her activism.

As for her future, "I wouldn't know how else to live," Kerness says, other than a life

of activism, despite the slowness of change. Years ago, "I almost did give it up because I was alone." That was "right at the moment I met Ojore."

Hers has been a difficult crusade, too, because it's "always been a struggle financially." To be an activist for social change "costs money personally" – those collect calls received at home from prisoners, for example.

In a telephone interview, Ross, who has worked with Kerness on prison issues for 10 years, sums her up: "She's very smart. She's very articulate. She writes very well because she thinks very well. She has a passion for justice. She's not afraid to confront the most difficult problems."

Later, by email, Ross adds: "Because

she has persisted in this difficult and stressful work for so long, she brings the wisdom of memory."

Kerness says she's not discouraged, but she's no Pollyanna about ending widespread solitary confinement. During her decades of work on prison issues she saw the American prison system become ever more repressive. "I can only hope," she says of the future.

Whatever the future, "I will spend as much time as I can" working on these issues. "If there's activism in you, you do it until you drop." ◼

*Lance Tapley is a Maine-based freelance writer. This article was first published by Solitary Watch (www.solitarywatch.com) in November 2012; it is reprinted with permission.*

# Preliminary Injunction Entered in PLN Censorship Suit Against Ventura County, California

**O**N MAY 29, 2014, IN A SIGNIFICANT victory for the First Amendment rights of prisoners and those who correspond with them, the U.S. District Court for the Central District of California granted a preliminary injunction barring Ventura County's jail system from enforcing a "postcard only" policy that prohibits prisoners from receiving mail in envelopes.

"We are very pleased the judge is upholding the constitution," said *Prison Legal News* editor Paul Wright.

The preliminary injunction was the latest in a series of successful legal actions filed by PLN challenging unduly restrictive mail policies implemented in jails nationwide, which courts have repeatedly found are not justified by a rational penological purpose. [See: *PLN*, Jan. 2014, p.42; Nov.

2013, p.24; Sept. 2013, p.40].

After considering the parties' arguments, the federal district court found that Ventura County's "restrictive mail policies violate [PLN's] First Amendment right to communicate with inmates," and that the jail system's "practice of rejecting mail without providing notice and an opportunity to appeal" violates the Fourteenth Amendment.

The court ordered the defendants to "suspend enforcement of the postcard-only policy for incoming mail within 21 days" and "give senders of rejected mail written notice and an opportunity to appeal the rejection decision." Further, the jail "shall not reject mail for containing 'suggestive' content, Xeroxed material, or subscription order forms."

The district court noted that "[p]ublishers have a First Amendment right to communicate with prisoners by mail," citing *Prison Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2000).

In analyzing PLN's motion for a preliminary injunction, the court applied the test set forth in *Turner v. Safley*, 482 U.S. 78 (1987), examining four factors to determine whether a regulation is "reasonably related to legitimate penological interests."

Although Ventura County cited security concerns to justify its postcard-only policy, the district court wrote that "our deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute."

The court noted the county jail system

had allowed prisoners to receive mail in envelopes until 2011, and had presented no evidence indicating it could not do so again because, as with letters, it still had to inspect postcards for contraband. Further, most other federal, state and county correctional facilities allow prisoners to receive mail in envelopes without compromising institutional security.

The district court held the county had not met its burden to show a rational basis for its postcard-only policy in light of the policy's obvious impact on PLN's First Amendment rights, citing *Prison Legal News v. Columbia County*, 942 F.Supp.2d 1068 (D. Or. 2013) [*PLN*, June 2013, p.42].

In granting the preliminary injunction, the court determined, based upon the evidence presented, that PLN was likely to prevail on the merits in the case – a clear victory for the First Amendment rights of not only prisoners and publications such as PLN, but also for the free-flow of information and correspondence between people who are incarcerated and their friends, family members and others on the outside.

PLN is represented by the San Francisco law firm of Rosen Bien Galvan & Grunfeld, LLP and attorney Brian Vogel. The case remains pending. See: *Prison Legal News v. County of Ventura*, U.S.D.C. (C.D.Cal.), Case No. 2:14-cv-00773-GHK-E. ◼

*Additional source: Ventura County Star*

**TYPING**

**S E R V I C E S**
**Provided since 1998**

Specifically designed, with special rates for the incarcerated person.

Black / Color Printing and Copying

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

Special Offer: $2.00 off first order.
Special offer void after: 12/31/2014



## Stay in touch with a good Magazine!
### Get 5 Full One Year Subscriptions ONLY $20!
*+ $4.99 p&h*

**Check your 5 magazines** and underline three backup choices (in case of unavailability)   "BEST DEAL ON THE POUND!"

*July 4* **Special!**
July 1-Sep 31, 2014
1 FREE Subscription
per paid 5 for 20 order!!
Check 6 magazines instead of 5!

- ALLURE (12)
- AMERICAN PHOTO (6)
- ARTHRITIS SELF MANAGEMENT (6)
- ARTHRITIS TODAY (6)
- AUTOMOBILE (12)
- BACKPACKER (9)
- BETTER HOMES & GARDENS (12)
- BLACK ENTERPRISE (12)
- BOATING (10)
- BOATING WORLD (9)
- BON APPETIT (12)
- BOWHUNT AMERICA (6)
- BOWHUNTING WORLD (9)
- BRIDAL GUIDE (6)
- CABELA'S OUTFITTER JOURNAL (6)
- CAR & DRIVER (12)
- CHARISMA (12)
- COMPLEX MAGAZINE (6)

- CONDE NAST TRAVELER (12)
- COSMOPOLITAN (12)
- CRUISING WORLD (12)
- CYCLE WORLD (12)
- DETAILS - FASHION (10)
- DIABETES SELF MANAGEMENT (6)
- DIGITAL PHOTO (7)
- DIRT RIDER (12)
- EBONY (12)
- ELLE (12)
- ELLE DECOR (10)
- ENTREPRENEUR (12)
- ESQUIRE (10)
- EVERY DAY WITH RACHAEL RAY (10)
- FAMILY CIRCLE (12)
- FAMILY FUN (10)
- FAST COMPANY (10)
- FIELD & STREAM (12)
- FITNESS (10)
- FLORIDA SPORT FISHING (6)
- FLYING (12)
- FOUR WHEEL & OFF ROAD (12)
- FOUR WHEELER (12)
- FREESKIER (6)
- GLAMOUR (12)
- GOLF DIGEST (12)
- GOLF TIPS (7)
- GOLFWEEK (38)
- GOOD HOUSEKEEPING (12)
- HARPERS BAZAAR (10)

- HOT BIKE (12)
- INC (12)
- INSTRUCTOR K - 8 (6)
- ISLANDS MAGAZINE (8)
- LATINA (10)
- LIFE EXTENSION (13)
- LOG HOME LIVING (9)
- LUCKY (10)
- MARIE CLAIRE (12)
- MARLIN (8)
- MEN'S FITNESS (10)
- MEN'S JOURNAL (12)
- MIDWEST LIVING (6)
- MINISTRY TODAY (6)
- MORE (10)
- MOTOR TREND (12)
- MOTORCYCLIST (12)
- NATURAL HEALTH (6)
- NYLON GUYS (6)
- NYLON MAGAZINE (10)
- OK! MAGAZINE (52)
- OLD HOUSE JOURNAL (8)
- OUTDOOR LIFE (12)
- OUTDOOR PHOTOGRAPHER (11) NR*
- OUTSIDE (12)
- PLANE & PILOT (12) NR*
- POPULAR PHOTOGRAPHY (12)
- POPULAR SCIENCE (12)
- PREDATOR EXTREME (6)

- RED BULLETIN MAGAZINE (12)
- REDBOOK (11)
- ROAD & TRACK (10)
- ROLLING STONE (26)
- SALT WATER SPORTSMAN (10)
- PARENT & CHILD (8)
- SELF (12)
- SEVENTEEN (10)
- SHAPE (12)
- SIEMPRE MUJER (6)
- SKI MAGAZINE (6)
- SNOWBOARD (4)
- SPORT RIDER (10)
- TEEN VOGUE (10)
- TENNIS (6)
- THE ATLANTIC MONTHLY (10)
- TIMBER HOME LIVING (6)
- TOWN & COUNTRY (10)
- UPTOWN (6)
- US WEEKLY (52)
- VERANDA (6)
- W MAGAZINE (10)
- WATERFOWL & RETRIEVER (2)
- WEIGHT WATCHERS (6)
- WHITETAIL JOURNAL (6)
- WIRED (12)
- WOMAN'S DAY (12)
- WORKING MOTHER (6)
- YACHTING (12)
- YOGA JOURNAL (9)   * No Renewal

OK TO COPY

*"Tell your Friends and Families!"*

****DUE TO PUBLISHER PROCESSING TIMES, WE WILL NOT UNDER ANY CIRCUMSTANCES CHECK WITH ANY PUBLISHER ABOUT THE STATUS OF ANY MAGAZINE SUBSCRIPTION UNTIL AFTER 90 DAYS HAVE PASSED FROM THE DATE OF PROCESSING YOUR ORDER! NO EXCEPTIONS!****

Name and Inmate # (please print, maximum 24 characters):
Address:
City:                State:                Zip:

P.O. Box 2063, Fort Walton Beach, FL 32549
www.InmateMagazineService.com

Allow 6-8 weeks for delivery.  Pay by Check, Money Order or **Order Online** and use Credit Card or PayPal.  Keep Address Short!

## Stay in touch with a good Magazine!
### Get 5 Full One Year Subscriptions ONLY $20!
*+ $4.99 p&h*

**Check your 5 magazines** and underline three backup choices (in case of unavailability)   "BEST DEAL ON THE POUND!"

*July 4* **Special!**
July 1-Sep 31, 2014
1 FREE Subscription
per paid 5 for 20 order!!
Check 6 magazines instead of 5!

- ALLURE (12)
- AMERICAN PHOTO (6)
- ARTHRITIS SELF MANAGEMENT (6)
- ARTHRITIS TODAY (6)
- AUTOMOBILE (12)
- BACKPACKER (9)
- BETTER HOMES & GARDENS (12)
- BLACK ENTERPRISE (12)
- BOATING (10)
- BOATING WORLD (9)
- BON APPETIT (12)
- BOWHUNT AMERICA (6)
- BOWHUNTING WORLD (9)
- BRIDAL GUIDE (6)
- CABELA'S OUTFITTER JOURNAL (6)
- CAR & DRIVER (12)
- CHARISMA (12)
- COMPLEX MAGAZINE (6)

- CONDE NAST TRAVELER (12)
- COSMOPOLITAN (12)
- CRUISING WORLD (12)
- CYCLE WORLD (12)
- DETAILS - FASHION (10)
- DIABETES SELF MANAGEMENT (6)
- DIGITAL PHOTO (7)
- DIRT RIDER (12)
- EBONY (12)
- ELLE (12)
- ELLE DECOR (10)
- ENTREPRENEUR (12)
- ESQUIRE (10)
- EVERY DAY WITH RACHAEL RAY (10)
- FAMILY CIRCLE (12)
- FAMILY FUN (10)
- FAST COMPANY (10)
- FIELD & STREAM (12)
- FITNESS (10)
- FLORIDA SPORT FISHING (6)
- FLYING (12)
- FOUR WHEEL & OFF ROAD (12)
- FOUR WHEELER (12)
- FREESKIER (6)
- GLAMOUR (12)
- GOLF DIGEST (12)
- GOLF TIPS (7)
- GOLFWEEK (38)
- GOOD HOUSEKEEPING (12)
- HARPERS BAZAAR (10)

- HOT BIKE (12)
- INC (12)
- INSTRUCTOR K - 8 (6)
- ISLANDS MAGAZINE (8)
- LATINA (10)
- LIFE EXTENSION (13)
- LOG HOME LIVING (9)
- LUCKY (10)
- MARIE CLAIRE (12)
- MARLIN (8)
- MEN'S FITNESS (10)
- MEN'S JOURNAL (12)
- MIDWEST LIVING (6)
- MINISTRY TODAY (6)
- MORE (10)
- MOTOR TREND (12)
- MOTORCYCLIST (12)
- NATURAL HEALTH (6)
- NYLON GUYS (6)
- NYLON MAGAZINE (10)
- OK! MAGAZINE (52)
- OLD HOUSE JOURNAL (8)
- OUTDOOR LIFE (12)
- OUTDOOR PHOTOGRAPHER (11) NR*
- OUTSIDE (12)
- PARENTS (12)
- PLANE & PILOT (12) NR*
- POPULAR PHOTOGRAPHY (12)
- POPULAR SCIENCE (12)
- PREDATOR EXTREME (6)

- RED BULLETIN MAGAZINE (12)
- REDBOOK (11)
- ROAD & TRACK (10)
- ROLLING STONE (26)
- SALT WATER SPORTSMAN (10)
- PARENT & CHILD (8)
- SELF (12)
- SEVENTEEN (10)
- SHAPE (12)
- SIEMPRE MUJER (6)
- SKI MAGAZINE (6)
- SNOWBOARD (4)
- SPORT RIDER (10)
- TEEN VOGUE (10)
- TENNIS (6)
- THE ATLANTIC MONTHLY (10)
- TIMBER HOME LIVING (6)
- TOWN & COUNTRY (10)
- UPTOWN (6)
- US WEEKLY (52)
- VERANDA (6)
- W MAGAZINE (10)
- WATERFOWL & RETRIEVER (2)
- WEIGHT WATCHERS (6)
- WHITETAIL JOURNAL (6)
- WIRED (12)
- WOMAN'S DAY (12)
- WORKING MOTHER (6)
- YACHTING (12)
- YOGA JOURNAL (9)   * No Renewal

OK TO COPY

*"Tell your Friends and Families!"*

****DUE TO PUBLISHER PROCESSING TIMES, WE WILL NOT UNDER ANY CIRCUMSTANCES CHECK WITH ANY PUBLISHER ABOUT THE STATUS OF ANY MAGAZINE SUBSCRIPTION UNTIL AFTER 90 DAYS HAVE PASSED FROM THE DATE OF PROCESSING YOUR ORDER! NO EXCEPTIONS!****

Name and Inmate # (please print, maximum 24 characters):
Address:
City:                State:                Zip:

P.O. Box 2063, Fort Walton Beach, FL 32549
www.InmateMagazineService.com

Allow 6-8 weeks for delivery.  Pay by Check, Money Order or **Order Online** and use Credit Card or PayPal.  Keep Address Short!

# Oregon Parole Board: "Don't Have to Explain Nothing to Nobody"

For at least the fifth time, a state court has ordered the Oregon Board of Parole and Post-Prison Supervision (Board) to provide more than boilerplate reasons for its decisions. There is little reason to believe, however, that the Board has any intention of complying.

Oregon law requires the Board to "state in writing the detailed bases of its decisions." The Board is exempt, however, from a statutory requirement to make findings of fact and conclusions of law.

The Oregon Court of Appeals reversed a Board decision in 1997, holding that despite the statutory exemption, the Board was required to "make findings of fact and provide an explanation as to why its findings lead to the conclusions that it reaches." See: *Martin v. Board of Parole*, 147 Ore. App. 37, 934 P.2d 626 (Or. Ct. App. 1997). The Oregon Supreme Court affirmed, holding that the Board must provide "some kind of an explanation connecting the facts of the case (which would include the facts found, if any) and the result reached." See: *Martin v. Board of Parole*, 327 Ore. 147, 957 P.2d 1210 (Or. 1998). This is commonly referred to as "the substantial-reason requirement."

In 1999, the Board asked the Oregon legislature to overrule *Martin*. The proposed law change expressly relieved the Board of a duty to "explain how [its] order is supported by the facts and the evidence in the record."

The Oregon judiciary, however, did not appreciate such overt disrespect for its authority. James Nass, appellate legal counsel for the Oregon Supreme Court and Court of Appeals, opposed the Board's proposed legislation, SB 401.

As the bill advanced through the legislature, the judiciary's opposition grew "more vociferous." Nass called the bill "bad public policy" and warned it "will decrease the quality of judicial review" and "increase the work load of the appellate courts."

He pulled no punches. "There is nothing subtle about this bill," he said. "The bill starkly presents this policy issue: Should any governmental agency be exempt from explaining how its decisions are supported by the evidence in the record? Apparently these Boards would say yes. Under SB 401, their motto would be: 'We're the Board. We don't have to explain nothing to nobody.'"

Nass continued: "According to these Boards, they shouldn't have to explain their decisions to inmates whose fates lie in their hands. No problem there, of course, because few people have sympathy for criminals. But, this bill also means that the Boards would not have to explain their decisions to victims or victims' families. They would not have to explain their decisions to the media. They wouldn't have to explain their decisions to any legislator who might be interested in a particular case. And, they wouldn't have to explain their decisions to the courts to aid in judicial review of those decisions."

In the end, a compromise was struck between Oregon's Attorney General, the Chief Justice of the Oregon Supreme Court and the judge who authored the *Martin* decision. The proposed bill was gutted and replaced with a single sentence that was added to ORS 144.335(3): "The order of the board need not be in any special form, and the order is sufficient for purposes of judicial review if it appears that the board acted within the scope of the board's authority."

Apparently believing the legislation allowed it to conduct business as usual, the Board continued to offer only boilerplate reasons for its parole decisions.

On December 28, 2007, the Oregon Supreme Court again reminded the Board of its responsibility under *Martin* – i.e., to set forth in its orders the reasoning that leads from the facts it has found to the conclusions it draws from those facts. See: *Gordon v. Board of Parole*, 343 Ore. 618, 175 P.3d 461 (Or. 2007).

Just fourteen days later, a trial court granted a victim's request to vacate a decision by the Board to release the man imprisoned for raping her. Relying in part on *Gordon*, the court held that the Board's "bare conclusions are simply not enough... the Board's findings, reasoning, and conclusions must demonstrate that it acted in a rational, fair, and principled manner, and not on an arbitrary or ad hoc basis."

Steven R. Powers, then Board Chair-

## Support Prison Legal News with these beautiful gifts!

CALL **561-360-2523,** MAIL ORDER OR USE WEB FORM HTTP://WWW.PRISONLEGALNEWS.ORG/

### Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

man and now Deputy General Counsel to Oregon Governor John Kitzhaber, defended the Board's standard language in its decisions, claiming that detailed findings could give prisoners more ammunition for appeals.

Bronson James, the public defender who represented the prisoner whose release was vacated following a legal challenge by the rape victim, said that offenders and their attorneys shared the objections voiced by the victim and her lawyer.

"We have been complaining for decades with nobody taking us seriously," James said in August 2008.

He argued then that the Board should "issue detailed rulings that explain why it denied parole rather than the typical two-sentence decision that includes nothing but boilerplate reasoning."

The Board's response, however, indicated that it still took the position that it didn't "have to explain nothing to nobody."

On November 18, 2009, the Oregon Court of Appeals again reversed a parole decision, finding the Board had violated the substantial-reason requirement. Citing the same boilerplate language that was found in every Board order, the appellate court said, "the board has provided only a conclusion: 'Based on the doctor's report and diagnosis, coupled with all the information that the board is considering,' it is reasonably probable that petitioner would violate his parole or a law.... That is an announcement, not an explanation. It gives us nothing to judicially review. Our duty is to evaluate the board's logic, not to supply it." See: *Castro v. Board of Parole*, 232 Ore. App. 75, 220 P.3d 772 (Or. Ct. App. 2009).

Of course, nothing changed – the Board did not make even the slightest variation in its standard language.

On September 5, 2013, the Court of Appeals once again held that the Board is required "to provide an inmate with some explanation of the rationale for concluding that" release on parole should be postponed. Rejecting the Board's argument that the 1999 "*Martin* amendment" exempts it from the substantial-reason requirement, the appellate court concluded that the Board's "reading of the statute runs counter to its text, context, and legislative history."

Following *Martin*, *Gordon* and *Castro*, the Court of Appeals wrote "that the board used the same boilerplate wording rejected in *Castro*," and held "it is apparent that the board's order references the contents of the entire record, as opposed to particular parts of the record that were pivotal." As such, "the order ... offers a mere conclusion and does not permit us 'to determine if the board's findings, reasoning, and conclusions demonstrate that it acted in a rational, fair, and principled manner in deciding to defer petitioner's parole release.'" One appellate judge dissented from the majority opinion. See: *Jenkins v. Board of Parole*, 258 Ore. App. 430, 309 P.3d 1115 (Or. Ct. App. 2013).

Given that the Board has repeatedly ignored two state Supreme Court decisions, a previous Court of Appeals decision and a trial court order on this very issue, there is little reason to believe that yet another judicial ruling is going to alter its behavior.

Apparently the rule of law and the authority of the courts mean little when you're the Board and believe you "don't have to explain nothing to nobody."

However, the Oregon Supreme Court, which granted review in *Jenkins* on January 30, 2014, may have the final word regarding the Board's reasoning for its decisions. ◄

## D&W helping you

This service is only for NY and CA state prisoners.

*Is it difficult to get in contact with your loved ones, friends, or attorneys?*

We have operators on stand-by waiting for phone calls in order to connect with anyone within the United States and internationally. Once you open an account with us, our operators will accept your collect call and will connect you with the person that you want to speak to. An account can be opened with no less than $10.00. Once we receive your check or money order, you will be notified via regular mail with your new account #, account balance and telephone number for you to call us.

**For New York State Prisons only: (Flat Rate) within the U.S.**
Up to 15 minutes----------$2.50
16 to 30 minutes----------$5.00

**Prices for international calls: (Flat Rate)**
Up to 15 minutes----------$4.00
16 to 30 minutes----------$8.00

**For California State Prisons only: (Flat Rate) within the U.S.**
Up to 15 minutes ----------$3.50
16 to 30 minutes----------$7.20

**Prices for International calls: (Flat Rate)**
Up to 15 minutes----------$5.10
16 to 30 minutes----------$10.20

This service is for all federal, state and county prisoners.

Get a local number for $4.99 in the first month and then pay $9.99 all months after that, for unlimited calls. Just send a payment of five dollars and the number you are calling with that person's name. Then we will get in contact with that person and give them a local number so you can start calling.

No contract and same day activation. Local numbers only for the U.S. Contact us: Inmatesolution@aol.com. We speak English and Spanish.

Send payment to: **D&W helping you**
P.O. Box 1594, Allentown, PA 18105
Or call # 484-809-5235

## Learn The Law!

### It's a POWERFUL influence in your life.

Choose education to help yourself and others. Blackstone's Independent Study Paralegal Program offers you the opportunity to be productive while serving time.

■ Learn Civil & Criminal Law
■ Learn Legal Research
■ 110 Years of Legal Training Experience
■ Study in Your Spare Time
■ Affordable Tuition, Easy Payment Plan

Only **$30.00** Per Month

❏ **Yes!** I'd like to learn more    ❏ Paralegal Course
*Please rush me FREE course information.*

Name _____ Doc# _____
Address _____
_____
City _____ State _____ Zip _____

**Blackstone Career Institute**
SINCE 1890

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.

**P.O. Box 3717 • Allentown, PA 18106**

# Prisoners Unlikely to Benefit from New, Highly Effective Hepatitis C Treatment

*by Greg Dober*

Hepatitis C (HCV) is a blood-borne virus that is typically spread through intravenous drug use (i.e., sharing needles), tattooing with non-sterile needles, and sharing razors, toothbrushes, nail clippers or other hygiene items that may be exposed to blood. It is often a chronic disease and, if left untreated, can lead to severe liver damage.

Recent good news in the battle against HCV, in the form of two new drugs that are highly effective in eliminating the virus, is tempered by the fact that the companies that produce the drugs have priced them at $60,000 to $80,000 per 12-week course of treatment. This high cost prices the medications beyond the reach of most prison and jail systems – which is especially troubling considering that a substantial number of prisoners are infected with HCV.

The new drugs, approved by the FDA in late 2013, are simeprevir, branded as Olysio and manufactured by Janssen Therapeutics (a Johnson & Johnson company), and sofosbuvir, branded as Sovaldi and manufactured by Gilead Sciences. Based on clinical trials, Sovaldi has an 84-96% cure rate while Olysio has an 80-85% cure rate. Both drugs are used in combination with other HCV anti-viral medications, peginterferon alfa and/or ribavirin, and their cure rates vary depending on HCV genotype – specific variations of the virus.

Unlike the current treatments for hepatitis C, Olysio and Sovaldi have fewer side effects, greater efficacy and reduce treatment durations by up to 75% (12 to 24 weeks rather than 48 weeks). In addition, the new drugs are administered orally rather than by injections. However, given tight corrections budgets and the high cost of the new HCV medications – Sovaldi costs approximately $1,000 per pill – getting them into prisons and jails ranges from difficult to impossible.

According to the Centers for Disease Control, "The prevalence of HCV infection in prison inmates is substantially higher than that of the general U.S. population. Among prison inmates, 16%-41% have ever been infected with HCV, and 12%-35% are chronically infected, compared to 1%-1.5% in the uninstitutionalized U.S. population."

Josiah Rich, director of the Center for Prisoner Health and Human Rights at the Miriam Hospital Immunology Center in Rhode Island, noted that "With more than 10 million Americans cycling in and out of prisons and jails each year, including nearly one of every three HCV-infected people, the criminal justice system may be the best place to efficiently identify and cure the greatest number of HCV-infected people."

* **Post-Conviction Specialists (Habeas Corpus/2254/2255/AEDPA/Procedural Bars/Coram Nobis/PRP/Certiorari/Sentence Modifications/DNA and more).**
* **All 50 States and D.C., Federal District Courts, Federal Courts of Appeal, and Supreme Court.**
* **Experts and specialists available.**
* **Professional staff with extensive State and Federal post conviction experience.**
* **Special programs available for Veterans.**
* **Pre/Post Convictions/Pleas ONLY .**
* **Payment plans available.**
* **Now accepting Credit Cards.**
* **FREE initial consultation.**

## LEGAL INSIGHTS INC.

### 25602 ALICIA PARKWAY SUITE 323
### LAGUNA HILLS, CA 92653
### 714-941-0578
### INFO@LEGALINSIGHTS.ORG
### WWW.LEGALINSIGHTS.ORG

A CALIFORNIA 501(C)(3) NON-PROFIT ORGANIZATION



**msp** | LAW

**Michael Soukup**
*Licensed in Wisconsin and Illinois*

**Matthew Pinix***
*Licensed in Wisconsin*

## Appealing a Conviction? Hire an Appellate Attorney.

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, attorneys with more than 10-years' combined experience handling **criminal appeals** in **Wisconsin** and **Illinois**.

**Law Office of Matthew S. Pinix, LLC**
1200 East Capitol Drive, Suite 220
Milwaukee, Wisconsin 53211
(414) 963-6164
www.pinixlawoffice.com

» Rated by Super Lawyers®
» Rated by avvo.com
» Better Business Bureau accredited

Despite the need for improved drugs to treat prisoners with hepatitis C, the cost of the new medications is prohibitive for prisons and jails. Rich estimated that treating all prisoners currently infected with HCV would cost $33 billion.

"I agree with the premise that prisons are an important point to address this problem," said Dr. Joe Goldenson, director of health services for San Francisco's jail system. "But this has to be addressed from an overall strategy of public health and the funding has to come out of that system. Corrections is not a place that can handle these costs."

Since 2011, spending on HCV treatment in correctional settings has climbed rapidly. The increase has been attributed to the introduction of two HCV drugs produced by pharmaceutical companies Merck and Vertex. However, with the recent introduction of the new and more effective treatments, costs are expected to rise again.

The federal Bureau of Prisons (BOP), which houses approximately 216,800 prisoners, may have an easier time affording the drugs. Through a U.S. Department of Veterans Affairs program, the BOP will receive a 44% discount on Olysio and Sovaldi. In February 2014, the federal prison system began making the new HCV medications available to some prisoners.

According to a May 2014 BOP clinical practice guidelines report, titled "Interim Guidance for the Management of Chronic Hepatitis C Infection," the use of sofosbuvir and simeprevir in combination with peginterferon and/or ribavirin is the "preferred treatment regimen." State prisoners, however, may not be as fortunate.

In Washington State, prison officials have established a committee of healthcare providers that meets twice a month to review HCV cases for treatment eligibility with the new drugs. In April 2014, Kevin Bovenkamp, the Washington DOC's assistant secretary for health services, said that of ten cases reviewed by the committee, none were approved for treatment.

Dr. Lara Strick, an infectious disease specialist for the Washington DOC, told a reporter from *The News Tribune* that HCV is a progressive disease and not all prisoners need immediate treatment. She also noted that it might be better for certain patients to wait until newer treatments, with even fewer side effects, are available.

However, it is likely that future HCV treatments that are more effective and have fewer side effects than Olysio and Sovaldi will demand an even higher price, and patients who are currently denied treatment due to fiscal constraints will eventually face the same cost-based roadblocks in the future. On the other hand, additional HCV drugs may lead to greater competition and thus lower prices. Merck, for example, is currently developing a two-drug hepatitis C regimen that reportedly has a 98% cure rate.

Dr. Strick acknowledged that future pricing of new HCV treatments may dictate whether the epidemic of hepatitis C among prisoners can be eradicated as a public health issue.

Since 2010, before Olysio and Sovaldi were available, the cost of HCV treatment for the Washington DOC had more than doubled by 2013 – rising from approximately $834,000 per year to $1.8 million annually. The DOC is trying to determine if a discount from the manufacturers of the new HCV drugs can be negotiated. Gilead



# AHRONY, GRAHAM, & ZUCKER, LLP
## A POST-CONVICTION LAW FIRM

**Appeals**

**Habeas Corpus Writs (Factual Innocence)**

**Parole Hearings**

**SB 260 Hearings**

**MDO Hearings**

**Re-Sentencing**

**Probation Violations**

**Rap Sheet Correction**

**Prison & Parole Issues**

**115 Discipline Issues**

**California & Federal Courts**

Bruce Zucker        Orly Ahrony        Ian Graham

12400 WILSHIRE BLVD.  SUITE 400 • LOS ANGELES, CA 90025
TEL. (310) 979-6400 • WWW.AHRONYGRAHAM.COM
California Cases Only • Unsolicited Original Documents Will Not Be Returned
This is an Advertisement for Legal Services

## HCV Treatment (cont.)

has defended its pricing for Sovaldi, citing the drug's potential to prevent longer-term costs resulting from HCV such as liver transplants and treatment for cirrhosis or cancer.

In Illinois, prison officials estimate there are approximately 100 to 150 prisoners afflicted with HCV in each of the state's prisons. They acknowledge that not every HCV-positive prisoner will receive the new drugs; consideration will be given to severity of medical condition, length of sentence and overall health of each prisoner. Still, state corrections officials indicated that even if one-third of the prisoners with HCV receive the new medications, treatment costs would increase to $61 million annually from the current $8 million.

Other states like New York and Wisconsin are dispensing the new HCV drugs on a limited case-by-case basis. A spokesperson for the New York DOC told the *Wall Street Journal* that nearly 60 prisoners with the most serious cases of HCV had begun treatment with the new drugs. Oregon is reportedly providing the new medications to HCV-positive prisoners with a life expectancy of under one year.

Although prison officials must provide adequate healthcare to prisoners with serious medical needs, as required by the Eighth Amendment pursuant to *Estelle v. Gamble*, 429 U.S. 97 (1976), failing to supply the new HCV drugs might not be considered deliberate indifference. Many of the court decisions regarding prison healthcare have required corrections officials to provide adequate treatment that meets minimal constitutional standards – which is not necessarily the best care available. If the new drugs become the community standard of care for hepatitis C, though, the argument can be made that that standard should equally apply to prisoners.

Critics of making the new HCV medications available to prisoners argue the drugs may not be covered under health insurance plans for people who are not incarcerated; thus, prisoners would receive better treatment than those in the general population. Yet this ignores the reality that the less costly and older treatments for HCV currently available to prisoners are routinely denied. [See: *PLN*, July 2013, p.16; March 2013, p.36].

Prison medical officials can deny HCV treatment for a variety of reasons, including the length of a prisoner's sentence, if they have recently used or been found in possession of illegal drugs or alcohol, or have recently received tattoos. Thus, even should Olysio and Sovaldi become available in prison systems, it is unlikely that many prisoners will actually receive the costly medications.

Gilead has been criticized for pricing Sovaldi based on a scale relative to a country's per-capita income. For example, the drug is offered in Egypt at a 99% discount to the U.S. list price, resulting in treatment costs of approximately $900. Therefore, a U.S. nongovernmental organization based in Egypt could more readily afford to treat Egyptian prisoners using Sovaldi than state prison officials could treat prisoners in the U.S. The company fails to take into account that many of the people infected with HCV in the United States live below the federal poverty level or are incarcerated, on Medicaid or otherwise under the average per-capita income in the U.S.

Janssen Therapeutics spokesman Craig Stoltz said the company continues to "work with public and private payers and health systems" to make simeprevir available to "marginalized and underserved populations," including prisoners.

Eventually, the question of public health ethics must be asked and answered. By not providing the most effective treatment to HCV-positive prisoners, are we endangering the health of the general public? According to a study published in the March-April 2014 issue of *Public Health Reports*, prisoners represent 28.5-32.8% of the total HCV cases in the United States, based on 2006 data. Prisoners who are untreated, or not effectively treated, are more likely to infect others after they are released.

For Gilead Sciences and Janssen Therapeutics, however, that may be welcome news, because they can then sell their high-priced HCV drugs to even more patients. Until affordable HCV medications are made available to everyone who needs them – including prisoners – the hepatitis C epidemic might be slowed but will not be stopped. ◼

*Gregory Dober has been a contributing writer for PLN since 2007.*

Sources: *KOVR-TV, http://sacramento.cbslocal.com, www.cbsnews.com, www.pewstates.org, Public Health Reports (March-April 2014), www.kuow.org, Quad-City Times, Wall Street Journal, The News Tribune, www.cdc.gov, Forbes, Reuters, www.olysio.com, www.sovaldi.com, BOP Clinical Practice Guidelines (May 2014)*



**FULTON & WELCH**

TEXAS PAROLE ATTORNEYS

o AFFORDABLE
o PERSONALIZED PACKET
o 2 HEARINGS
o MEET WITH YOU & FAMILY

"LET US GET YOU HOME SOONER"

10701 Corporate Dr., Ste. 390, Stafford, Texas 77477

---

**Alexander Byrd Optics**

**Single Vision Eyeglasses Special**

$36.99 plus S&H

Upgrade to photochromic/Transitions by adding $69.99

All eyeglasses include free UV and Anti-scratch coatings (a $29.95 value)

Bi-Focals for $54.99 plus S&H a pair and new
Two year anything happens warranty for $25.00

Alexander Byrd Optics
Po Box #1063
Richland, WA 99352

To receive order form and details write:

Contact us on CorrLinks at:  abyrdoptics@gmail.com
www.abyrdoptics.com



# Eighth Circuit: No Qualified Immunity for Detainee's Overdose Death

### by Mark Wilson

THE EIGHTH CIRCUIT COURT OF APPEALS held on September 20, 2013 that an Arkansas jail guard was not entitled to qualified immunity for his deliberate indifference to a detainee's serious medical condition which resulted in the detainee's death.

On December 18, 2008, Saline County deputy sheriff Stephen Furr arrested Johnny Dale Thompson, Jr. During the arrest, Deputy Furr discovered an empty Xanax bottle that indicated it had been filled with 60 pills two days earlier. Thompson, who was slurring his words, admitted to taking medication and slept in the patrol car, but was easily awakened at the jail.

Jail guard Ulenzen C. King conducted Thompson's booking process. King noted that Thompson appeared intoxicated; he asked to sit down but nearly fell out of the chair. He was unable to sign his name and "couldn't even answer questions that Officer King was asking him." King wrote "Too Intox to Sign" on the booking sheet.

Sometime after Thompson was placed in a cell at 7:42 p.m., another detainee alerted King that Thompson needed help, but King did nothing.

At 9:09 p.m., King and another jailer entered Thompson's cell and discovered he was "cool to the touch, not breathing, and non-responsive." He was pronounced dead at a hospital around 20 minutes later.

An autopsy revealed that Thompson had ingested a cocktail of drugs, including hydrocodone, methadone and alprazolam. The medical examiner classified his death as accidental.

Thompson's mother filed suit in federal court against Saline County and several individual defendants. The district court granted qualified immunity to all the defendants except Furr and King; both then filed an interlocutory appeal.

The Eighth Circuit observed that its review was limited to determining whether Furr and King knew that Thompson had a serious medical need but deliberately disregarded that need.

The appellate court followed *Grayson v.*

*Ross*, 454 F.3d 802 (8th Cir. 2006) in holding that Furr lacked subjective knowledge that Thompson required medical attention. As such, it concluded that Furr was not deliberately indifferent to Thompson's medical needs and was entitled to qualified immunity.

The Court of Appeals found, however, that "*Ross* does not compel the same conclusion for Officer King." Rather, Thompson "presented a noticeably more intoxicated condition during his encounter with Officer King than the detainee in *Ross*."

Given the information available to King when Thompson was booked into the jail, the Eighth Circuit affirmed the district court's denial of qualified immunity, holding that "a reasonable jury could find that ... King had subjective knowledge of a serious medical need and deliberately disregarded that need." See: *Thompson v. King*, 730 F.3d 742 (8th Cir. 2013).

Following remand, the case went to trial in January 2014 and the federal jury found in favor of King, resulting in no recovery for Thompson's estate.





# Ninth Circuit: Damages Required for Compelled Religious-Based Treatment

*by Mark Wilson*

THE NINTH CIRCUIT COURT OF APPEALS has held that damages are required, as a matter of law, when a parolee is incarcerated for objecting to compelled participation in a religious-based drug treatment program.

Citing "uncommonly well-settled case law," the Court of Appeals found in 2007 that the First Amendment is violated when the state coerces an individual to attend a religious-based substance abuse program. See: *Inouye v. Kemna*, 504 F.3d 705 (9th Cir. 2007).

The California Department of Corrections and Rehabilitation (CDCR) contracts with Westcare, a private entity, to provide drug and alcohol treatment for parolees in Northern California. Westcare, in turn, contracts with Empire Recovery Center, a non-profit facility. "Empire uses a 12-step recovery program, developed by Alcoholics Anonymous and Narcotics Anonymous, that includes references to

'God' and to 'higher power.'"

Barry A. Hazle, Jr., an atheist, was incarcerated due to California drug convictions. His parole conditions required him to complete a 90-day residential drug treatment program.

Prior to his February 26, 2007 release from prison, Hazle had asked prison and Westcare officials to place him in a non-religious treatment program. Westcare officials directed Hazle to Empire.

When Hazle realized Empire was a religious-based program, he repeatedly objected to Westcare officials. They responded "that the only alternative to Empire was a treatment facility whose program had an even greater focus on religion."

Hazle asked parole agent Mitch Crofoot for a transfer to a secular treatment program, and was ordered to remain at Empire while Crofoot looked into the issue.

Westcare claimed that it had no secular programs; Crofoot then informed Hazle that no alternative programs were available and he needed to complete the Empire program or his parole would be revoked and he would return to prison.

On April 6, 2007, Empire informed Crofoot that Hazle was being "disruptive, though in a congenial way," and that his demeanor was "sort of passive aggressive." Crofoot and parole supervisor Brenda

Wilding were aware of Hazle's religious objections, but recommended revocation of his parole for refusing to participate in the treatment program. Hazle's parole was revoked and he was returned to prison for 100 days.

Hazle then sued Westcare and several state officials, alleging they had violated his First Amendment rights by requiring his participation in a 12-step program as a condition of parole, rejecting his requests for a secular program and revoking his parole for refusing to participate in the 12-step program. He sought compensatory damages – for loss of liberty and emotional distress – as well as punitive damages and injunctive relief.

After Hazle filed suit, the CDCR issued a directive in response to *Inouye*, stating that parolees who refuse to participate in religious-based programs may not be compelled to attend such programs and must "be referred to an alternative non-religious program."

The district court entered summary judgment against the defendant state officials, finding them liable for violating Hazle's First Amendment rights. The court granted summary judgment to Westcare, however, holding that "Hazle had not established the necessary causal connection between Westcare's actions and the



## Save on Prescription Eyeglasses & Shades

Send for a **FREE** Catalog
Money Back Guarantee

## Prism Optical, Inc.

**10954 NW 7th Ave**
**Dept: LN0714**
**Miami, FL 33168**

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

## HOT DREAMS

GET YOUR NEW NON NUDE CAT #31 AND FREE PHOTO U MUST SEND A S.A.SE ALONG WITH 5 STAMPS OR $2.00 HUNDREDS TO CHOOSE IN BIKINI AND PANTIES GET THE NON-NUDE SUPER CATALOG PACKAGE#1 THAT HAS OVER 2000 HOT BABES IN PANTIES, LINGERIE, THONGS, YOU FAVORITE TYPES OF SHOTS ONLY $15.00 FREE S/H TO RECEIVE A 30 PIC SET OF CAMELTOE SHOTS AND COEDS OF ALL SEXY HOT WHITE BABES SEND ONLY $20.00 ALONG WITH 4 STAMPS! THEY ARE HOT! IN PANTIES BRA AN THONGS AN GSTRINGS GOT STAMPS? SEND 50 STAMPS TO GET 10 NON NUDE HOT PICS. SEND $27.00 TO GET NON NUDE CATALOGS 2-11  SEND $15.00 TO GET CATALOGS 2-7 AND SAME PRICE IF U ONLY CATALOGS 7-11 COMES WITH THE SET CATALOG. SEND 5 STAMPS OR $2.00 TO GET NON NUDECAT#30. SEND ONLY$15 TO GET THE ALL NUDE BIG PACK CATALOG#1 PLEASE MAKE ALL PAYMENTS TO : **HOT DREAMS**
P.OBOX 652 DEPT PN/  RACELAND,LA 70394

DON'T REMOVE THIS AD!!

violation of his rights."

A trial was then held to determine damages. The district court informed the jury it had previously found "that each defendant violated plaintiff's First Amendment Establishment Clause right by ... arresting and incarcerating plaintiff because of [his] failure to participate in the program."

At the request of the defendants, however, the court instructed the jury to decide if they were jointly and severally liable or whether damages should be apportioned among them. In the latter case, the jury was to apportion damages.

The jury returned a damages verdict finding the defendants were not jointly and severally liable, and awarded Hazle no damages against each defendant.

Hazle moved for a new trial under FRCP 59(a), arguing that the zero damages verdict was contrary to the law and evidence. The district court denied the motion, holding that Hazle had waived his objection by failing to raise it before the jury was discharged, and that the jury's finding that damages could be apportioned among the defendants was consistent with its finding that none of the defendants had caused Hazle's constitutional injuries.

The Ninth Circuit reversed, holding that Hazle did not waive his objection and the district court had improperly denied his motion for a new trial.

"The jury's verdict, which awarded Hazle no compensatory damages at all for his loss of liberty, cannot be upheld," the Court of Appeals concluded. "Given the indisputable fact of actual injury resulting from Hazle's unconstitutional imprisonment, and the district judge's finding that the state defendants were liable for that injury," the Court held that "an award of compensatory damages was mandatory. The jury simply was not entitled to refuse to award any damages for Hazle's undisputable – and undisputed – loss of liberty, and its verdict to the contrary must be rejected."

The district court had also "erred in putting the question of apportionment to the jury in the first place," the Ninth Circuit wrote. That "is a legal [issue] to be decided by the judge, not the jury." The jury's resolution of that issue was "simply inconsistent with the district judge's order holding defendants liable for Hazle's false imprisonment."

In addition, the appellate court reversed the district court's grant of summary judgment in favor of Westcare, finding "a genuine issue of material fact as to whether Westcare's policy of contracting solely with religious facilities was a proximate cause of [Hazle's] constitutional injuries." The Ninth Circuit noted that "*Inouye* leaves little room for Westcare to argue that constitutional injuries of the sort suffered by Hazle were not a foreseeable result of its actions."

Lastly, the Court of Appeals reversed the dismissal of Hazle's state law claim for injunctive relief to enjoin the CDCR from "carrying on any unlawful actions." The Court said the facts in this case established "that, notwithstanding the state's directive [to provide alternative nonreligious programs], the defendants do not appear to have taken any concrete steps to prevent other parolees from suffering the same constitutional violations Hazle suffered."

The case was reversed and remanded, and remains pending on remand. See: *Hazle v. Crofoot*, 727 F.3d 983 (9th Cir. 2013).



**NEW!!!**

365 inspirational true stories written in prison for prisoners.

***Freedom Devotional***
**by Elizabeth Macdonald, PhD**

Available at amazon.com and major book distributors. www.macdonaldbooks.biz



CONNECTIONS.com

92% Response Rate in 2013!
50,000 Hits Daily!
A+ Rating with the Better Business Bureau!
Facility and personal checks, credit cards, stamps, & Moneygram payments accepted!

Write for a free brochure/application:
CONPALS® INMATECONNECTIONS.COM® LLC
465 NE 181st Ave. #308 Dept. PLN
Portland, OR 97230-6660

Email inquiries and Federal Corrlinks users:
info@convictpenpals.com

Since 2002

**PEN PALS**

Get your profile on the craziest, exciting Pen Pal Web sites for Singles, Fetishes, Foreign ladies, GLBT, Mexican, Religious, African American & More.

**3 WEB SITES $24.98**

We Post your Profile on 3 Pen Pal Websites. Choose your 3 Web sites from our new up to date list of Specialty Sites.

**FREE BONUS**
New Pen Pal Catalog

NOW Contains up-to date snail-mail contacts for Free Pen Pal Ads in the USA and overseas. PLUS complete details of the top 20 fee based prisoner Pen Pal web sites in USA.
**ORDER TODAY**
Rated 10 by Inmate Shopper

Get posted on 3 websites and our Pen Pal Catalog: Send $24.98 Free Shipping
Inmate Shopper - PEN PALS
PO Box 4311
Mission, TX 78574
Corrlinks:info@inmategifts.net

# Louisiana Public Service Commission Considers Prison Phone Issues

*The Advocate* reported in March 2014 that tensions were high between Louisiana Public Service Commission (PSC) Chairman Eric Skrmetta and PSC Commissioner Foster Campbell during a hearing on issues related to prison and jail phone rates.

Previously, in December 2012, the PSC voted to lower the cost of phone calls made by Louisiana prisoners by cutting the rates of some calls by 25% and prohibiting surcharges. The ban on surcharges went into effect on February 28, 2013, while the rate reduction – which only applies to calls made to family members, clergy, attorneys and certain other parties – was postponed until 2014. [See: *PLN*, April 2013, p.29; Jan. 2013, p.14; Feb. 2012, p.36].

Two prison phone service providers, City Tele-Coin and Securus Technologies (which also has the phone contract for Louisiana's state prison system), were subsequently cited by the PSC for con-

tempt for charging additional fees in spite of the prohibition on surcharges.

Commissioner Campbell had championed the prison phone reforms, including the 25% rate reduction. City Tele-Coin and Securus have since petitioned the PSC to rescind the rate cut and ban on surcharges.

Additionally, City Tele-Coin hosted a fundraiser for PSC Chairman Skrmetta's election campaign, and the company's owner, Jerry Juneau, and his wife donated $10,000 to Skrmetta's campaign fund in December 2013.

Although the contempt citations against Securus and City Tele-Coin were pending before administrative law judges, Chairman Skrmetta asked the PSC to settle the cases.

The City Tele-Coin surcharges at issue include an "administrative cost" of up to $10 when opening a direct-pay account; a "processing cost" on direct-pay refunds of $5; a "transfer fee" of up to $2.50 to move balances on direct-pay accounts to a different phone number; and a monthly "inactivity fee" of up to $10 for accounts with no activity in a six-month period.

Securus charges a "processing fee" of $6.95 for credit card and check-by-phone payments; a "wireless administrative fee" of up to $2.99 a month when a user lists a wireless number authorized to receive prison phone calls; and a "processing fee" of $4.95 on refunds from unused accounts.

On April 2, 2014, the PSC held a hearing to address issues related to the contempt citations. Commissioner Campbell had asked the PSC to hire a technical consultant to audit the books of the two prison phone companies, but the Commission rejected his request. Chairman Skrmetta sought to go into a behind-closed-doors executive session to settle the citations against Securus and City Tele-Coin, which also was rejected by the full Commission; consequently, the administrative law process will continue and the verdicts will be reviewed by the PSC. A number of prison phone justice advocates and community faith leaders testified at the hearing as to how the surcharges and high phone rates hurt prisoners' families and the local community.

Another PSC hearing, held in May 2014, was attended by Caddo Parish Sheriff Steve Prator, who criticized the Commission's actions to reduce prison and jail phone rates, saying they compromised security at his jail.

"I'm not getting in your business about what the phone rates are. That's not what I'm here to tell you. I'm just going to emphasize they've got to be monitored and we've got to have the technology, and it's expensive to do. Government has to pay for it. We have to pay for it," Prator said.

The rate reductions also have been criticized by an organization called "Crimefighters," founded by a retired New Orleans police officer, which took out a full-page ad in the *Shreveport Times* accusing Commissioner Campbell of "fighting for the rights of criminals" and "being soft on crime."

Similarly, Keith Gates, an attorney who is challenging Campbell's seat on the PSC in elections this fall, accused him of helping "jailbirds."

On June 6, 2014, in a monthly news column, Commissioner Campbell noted that high prison phone rates have troubled him for more than a decade. "This issue involves millions of dollars collected by monopoly telephone companies, the correctional facilities they do business with, and the families of 40,000 people in jail in Louisiana," he said.

"The Public Service Commission must assure that monopoly utility companies don't abuse their customers," Campbell added. "Inmate families have few advocates to defend them against corporations charging outrageous phone rates and questionable fees."

*PLN* will report future developments concerning prison phone rates in Louisiana. If City Tele-Coin and Securus are found guilty of the contempt citations, they face thousands of dollars in fines and the potential loss of their licenses to operate in the state.

Sources: *The Advocate, www.shreveporttimes. com, Commissioner Foster Campbell's monthly news column ( June 6, 2014), www.kcbd.com, www.fox8live.com*





## Nolo's Plain-English Law Dictionary

$29.99

Order from

**Prison Legal News**

P.O. Box 1151
Lake Worth, FL 33460
561-360-2523
Add $6 shipping for orders under $50

www.prisonlegalnews.org



# State of Washington
# Prison Phone Justice Campaign

### *Prison Phone Justice Project needs your help for statewide campaign!*

While much progress has been made in reducing the costs of long distance prison calls, we are still fighting to reduce the high costs of in-state prison and jail calls at the local level. In January 2014, the Human Rights Defense Center (HRDC), the parent organization of Prison Legal News, reopened its Seattle office to launch the Washington Prison Phone Justice Campaign.

This is our first statewide phone justice campaign, and we're excited to have people involved on both the local and national levels who are dedicated to ending the exorbitant phone rates and kickbacks associated with the prison phone industry. We have already been obtaining the phone rates and contracts from all 39 county jails in the state and the Washington DOC.

We hired a local campaign director, Carrie Wilkinson, who manages our office in Seattle and is coordinating the statewide campaign. Washington prisoners and their families pay some of the highest phone rates in the nation, and we need your help to win this battle!

Here's how you can help – first, please visit the campaign website:

## www.wappj.org

There you can see all the ways you can make a difference. The site allows you to sign up for the campaign and upload videos and share blog entries about how high prison phone rates make it difficult for you to stay in touch with your incarcerated loved ones. You can even call in your story to **1-877-410-4863**, toll-free, at any time! We need to hear how you and your family have been affected by high prison and jail phone rates. If you don't have Internet access, you can mail us a letter describing your experiences. Send letters to HRDC's main office at: **HRDC, Attn: WA Phone Justice Campaign, P.O. Box 1151, Lake Worth, FL 33460**. Washington state prisoners can send a copy of this notice to their family members so they can get involved.

**We especially need copies of telephone bills that show prison and jail phone charges!**

By choosing to participate in the Washington Prison Phone Justice Campaign, you will be playing a key role in ending the unfair phone rates that prisoners' families have to pay. We cannot win this battle without your help, so please visit the campaign website and share your experiences! Donations are also welcome and greatly appreciated, and can be mailed to the above address or made online via the campaign website. Thank you for your support!

# Two Murders in Seven Months at CCA-run Prison in Tennessee

On May 23, 2014, the Medical Examiner's Office in Nashville completed an autopsy report on Tennessee state prisoner Jeffery Sills, 43, who was murdered at the South Central Correctional Facility in Clifton, Wayne County on March 28. The facility is operated by Corrections Corporation of America (CCA), the nation's largest for-profit prison company.

Sills' death was classified as a homicide caused by "blunt and sharp force injuries." He was allegedly beaten and stabbed to death by his cellmate, Travis Bess, who was later transferred to the Riverbend Maximum Security Institution.

Jeffery Sills was at least the second prisoner murdered at the CCA-run prison since September 1, 2013, when Gerald Ewing, 28, was killed during a series of fights at the facility. Comparably, according to the Tennessee Department of Correction there were no homicides at state-run prisons in calendar year 2013 and to date this year.

Jeffery Sills' death was particularly brutal, according to the autopsy report. He suffered lacerations, abrasions and contusions to his head and neck, fractured cheek and nasal bones, cutting and stab/puncture wounds, and hemorrhages in the "posterior cervical spinal muscles" and "skeletal muscle of back and intercostal muscles of posterior thorax."

*Prison Legal News* managing editor Alex Friedmann, who also serves as associate director of PLN's parent organization, the Human Rights Defense Center (HRDC), said both prisoners and a CCA staff member employed at South Central contacted HRDC after Sills was murdered.

"Several prisoners said Bess had publicly stated he would kill Jeffrey Sills if they were placed in a cell together, and that CCA guards were present when he made that statement. Regardless, they were both put in the same cell with predictable results." Additionally, "the CCA employee who contacted us reported that Sills had asked to be placed in protective custody, but prison staff failed to act on his request before he was murdered," said Friedmann, who served six years at South Central himself prior to his release in 1999.

The Tennessee Bureau of Investigation is investigating Sills' death and has reportedly indicated that an indictment will issue soon.

"Two murders within seven months is extremely disturbing," Friedmann stated, "especially considering that CCA houses about 5,000 [Tennessee] state prisoners in three facilities while around *15,000* prisoners are held in 11 state-run facilities. Yet despite holding one-third as many prisoners, none of whom are classified maximum-security, two murders occurred at a CCA facility and zero in state prisons within the same time period."

According to research conducted by HRDC, historically there have been higher rates of violence at the three CCA-operated facilities in Tennessee than in state prisons. Based on the most recent data provided by the Department of Correction, during the first five months of 2013 the average rate of violent incidents at the CCA-run prisons – including prisoner-on-prisoner assaults, prisoner-on-staff assaults and institutional disturbances – was 24.6% higher than at state facilities.

"Other studies have also found higher levels of violence at privately-managed prisons," said Friedmann. "This is presumably due to the business model of the private prison industry, which must cut costs in order to generate profit. Those cuts, particularly in regard to staffing costs, lead to high staff turnover rates, understaffing and thus less security at private prisons. Consequently there are higher rates of violence – up to and including murder, evidently."

The FBI is currently investigating fraudulent staffing reports at a CCA prison in Idaho. [See: *PLN*, Oct. 15, 2013, p.28; May 2013, p.22].

There have been two other recent homicides at CCA-operated prisons in other states, including the November 2013 murder of Michael Patrick McNaughton, 55, who was beaten to death at a CCA facility in Florence, Arizona, and the March 2014 murder of California prisoner Todd Bush, 33, at the CCA-run North Fork Correctional Facility in Oklahoma. ◊

Source: *HRDC press release (June 12, 2014)*

# Visitors Fingerprinted at Alabama Prisons

Alabama's prison system is the first – and currently only – in the nation to require visitors to be fingerprinted. In late 2012, the Alabama Department of Corrections (ADOC) implemented the new policy due to what officials claimed was a need for greater efficiency. A new computer system had the capacity to scan fingerprints, something the old system was not able to do. The fingerprinting procedure was "part of the upgrade" and the brainchild of the ADOC's IT department, according to prison system spokesman Brian Corbett.

The old system required guards to review each visitor's driver's license to verify their identity before allowing them into a state prison.

"That was a time-consuming task," Corbett told the *Montgomery Advertiser*. "Now, the verification process is much faster, so visitors are moved through the process much faster."

"We still require visitors to have a government-issued photo ID, and that requirement will remain in place," he added. "But there are times when someone else resembles the photo on an ID. Scanning the fingerprint of visitors verifies they are who they say they are."

The program prompted an immediate response from the American Civil Liberties Union. David Fathi, director of the ACLU's National Prison Project, didn't buy the ADOC's purported security concerns.

"Alabama prison officials can't say with a straight face that it is a security issue, not when the remaining 49 state prison systems do not require the scanning of visitors' fingerprints," he stated. "It is an unnecessary barrier to visiting inmates."

Fathi called the fingerprint scan "extreme" – especially since visitors to Alabama state prisons already have to undergo a criminal background check.

"If showing a driver's license is all that is required to get on an airplane that will fly you near the White House," he said, "it should be enough to get you inside a prison

to visit someone."

ADOC officials claimed that visitors' fingerprints will not be shared with local, state or other law enforcement agencies, nor will they be used to check for outstanding warrants. Alabama is the first state to require visitor fingerprinting at all state prisons, but other correctional facilities have considered similar policies.

In March 2011, the *Topeka Capital-Journal* reported that the El Dorado Correctional Facility in Kansas was going to fingerprint visitors when leaving the prison. Captain Dale Call, then the administrative officer at El Dorado, said visitors would be required to place an index finger on a scanner before they exit as a security measure to help prevent prisoners from inadvertently being released. Their fingerprints would not be kept on file, however.

In the nation's capital, officials with the District of Columbia Department of Corrections (DC DOC) announced in early 2011 that they were considering fingerprinting visitors at the D.C. jail to check for outstanding warrants.

The proposal prompted concerns that the fingerprinting would be overly intrusive, even though DC DOC officials said they never intended to digitally store the fingerprints and the Metropolitan police would decide what to do if a visitor's fingerprints revealed an outstanding warrant.

Corrections officials told the *Washington Examiner* that they wanted to use "live scan" technology to take an image of the visitors' fingerprints – the same technology used on prisoners to confirm their identity when they enter and leave the jail. The District planned to use federal grant money to pay for the system.

"Through a $134,000 grant from the Office of Justice Grants, we will be [using] the technology in our visitors control area to assist [D.C. police] in the identification of individuals with outstanding warrants," corrections spokeswoman Sylvia Lane told the *Examiner*. "If a match is made, DOC will detain the visitor and contact the police department and the visitor will be taken into custody," she said.

The DC DOC's plan to fingerprint visitors faced sharp criticism, however, and officials announced in March 2011 that they were reevaluating the proposal due to a "host of legal, financial and operational concerns that have been raised."

In Maryland, a public protest accompanied the March 2013 implementation of a policy requiring all visitors to the Baltimore City Detention Center to be fingerprinted. The warden at the jail said if the fingerprinting reveals that a visitor has been incarcerated, then he or she will not be allowed to visit.

Sources: *USA Today, www.correctionsone.com, www.allgov.com, Associated Press, http://cjonline.com, www.nbcwashington.com, www.wbaltv.com, Montgomery Advertiser*




## Prison Industries in India Compete in Open Market

THE GOVERNMENT OF THE INDIAN STATE of Tamil Nadu is expanding a program that allows prison industries to compete in the open marketplace under the ironic brand name "Freedom." Prison industry programs already exist at nine central prisons, three women's prisons and nine district jails scattered across Tamil Nadu, located in the southern tip of the Asian nation. The facilities hold a combined total of about 11,000 prisoners.

Prison authorities are adding open-air bazaars to market fresh produce grown by prisoners to shoppers from neighboring communities. The bazaars are in addition to current prison industries that include the production of soap, leather, textiles, books and baked goods. Traditionally, those products have been sold only to other government agencies and are considered substandard.

"So far, we were manufacturing goods for the police and other departments. Such government clients are not very demanding in terms of pricing, delivery schedule and quality, although we ourselves try to maintain this," said S.K. Dogra, Additional Director-General of Police in Tamil Nadu. "But once you operate in the open market, you have to adopt the best commercial practices. So, naturally the entire process of manufacturing will have to move up the scale in terms of efficiency and quality."

Providing prisoners with skills they can use to obtain jobs after their release is a major objective of the program. Prison officials said they have identified individuals who are qualified to provide training to prisoners in the use of modern manufacturing technology. Additionally, a portion of the revenue generated by the sale of prison-made goods on the open market is earmarked for prisoners' accounts.

The expansion of the "Freedom" label includes a jail in Ondipudur, in the western part of the state, where prisoners have taken to farming. Under the watchful eye of guards, they sell their produce in a newly-created bazaar on the facility grounds.

P. Govindarajan, Deputy Inspector General of Prisons in nearby Coimbatore, said the bazaar is an effort to both rehabilitate and re-socialize prisoners. One of the prisoners at the facility said the program has allowed him to pursue his goal of becoming a farmer. "Life took me elsewhere, but I am finally living my childhood dream," said "Madhu," a prisoner whose real name was not disclosed, in February 2014.

Another prisoner said the program gave him a sense of fulfillment. "It was a very proud moment to see something I'd planted give fruit," he said, holding an ear of corn he had grown.

Prison officials said the profits from the bazaar are shared among prisoners, prison staff and the Tamil Nadu government, with each receiving 20% of the net proceeds. The remaining 40% is placed in a state prison fund.

On February 23, 2014, Chief Minister J. Jayalalithaa inaugurated a "Freedom Shop" in the Puzhal prison complex in eastern India, to serve as a market for prisoner-produced goods; the shop includes a bakery, a waiting hall for visitors and other facilities.

A press release said the Chief Minister directed that "Freedom Shops" be opened in all central Indian prisons to market goods made by prisoners. The initiative is part of the state's effort to reform prisoners and provide them with training to help them live a decent life after they complete their sentences.

Products for sale include garments, bakery items, footwear, soaps, candles, mosquito nets, rain coats and more, all manufactured by prisoners. In addition, the program is providing agricultural training to prisoners at two other facilities in Singanallur and Salem.

"I do not see any difficulty in marketing the products," said Dogra. "Many of the prison inmates are highly skilled. Since they do not have any diversions within the prison, they usually work with greater focus."

Taken from a different perspective, however, Dogra's comments could portend abuse of the system. Because prisoners "do not have any diversions," which makes them good workers, prison authorities may have an incentive to prevent the introduction of any "diversions" – such as educational, treatment or other rehabilitative programs – to ensure that prisoners focus on their profit-generating prison industry jobs.

Sources: *www.thehindu.com, http://m. newindianexpress.com*



**PASS**

Prisoner Assistance Scholastic Service provides educational materials nationally to prisoners in state and federal prisons and jails.

◆ Victim Awareness
◆ Anger Management
◆ Addiction/Substance Abuse
◆ Domestic Violence
◆ Gang Diversion
◆ Conflict Resolution
◆ Parenting
◆ Non-violent Communication
◆ Re-entry in Society
◆ Living With Purpose

Prisoners who successfully complete the PASS program earn a degree in Personal Psychological Development which can be used as evidence of rehabilitation before parole boards and with prison officials.

$500 for the entire course of study and degree.

**10 COURSES 2 SEMESTERS**

Graded study - completed through the mail.

**FOR MORE INFO**

**1-888-670-7277**
www.passprogram.org
pass@passprogram.org

PASS Program, PO BOX 2009, San Francisco, CA, 94126

## Jury's Tasteless Gag Gifts to Judge and Bailiff Fail to Demonstrate Unfair Trial

THE ELEVENTH CIRCUIT COURT OF APpeals has affirmed the denial of a death row prisoner's habeas corpus petition that contended he was denied a fair trial by an impartial judge and jury because the jurors gave inappropriate gag gifts to the judge and one of the bailiffs.

The habeas proceeding involved Georgia death row prisoner Marcus A. Wellons, who was convicted of the murder and rape of a fourteen-year-old girl in 1989. During his trial, Wellons did not dispute that he had killed and raped the victim; rather, he claimed he was either not guilty by reason of insanity or guilty but mentally ill. After finding him guilty, the jury recommended a sentence of death for the murder and life for the rape.

Defense counsel learned during post-trial interviews that some jurors gave gag gifts to the judge and a bailiff either near the end of or immediately following the penalty phase of the trial. The judge received chocolate candy in the shape of a penis while the bailiff received chocolate in the shape of female breasts. Wellons' counsel

also learned that when the sequestered jurors dined at a local restaurant, the judge had spoken to them.

Motions for a new trial and for recusal of the judge were denied, Wellons' convictions were affirmed on appeal and the Supreme Court denied review. Likewise, a state habeas petition was denied. After the federal district court denied Wellons' habeas petition, the Eleventh Circuit affirmed. This time, however, the Supreme Court granted certiorari and the matter was subsequently remanded for an evidentiary hearing on the "disturbing facts of this case." The district court again denied relief and Wellons again appealed.

As for the encounter at the restaurant, most of the jurors testified that the judge had waved or nodded or made a brief comment. One juror recalled the encounter occurred on the day the jury saw the autopsy photos, and the judge commented that she understood the jurors were upset.

Four of the jurors said they did not become aware of the gag gift to the judge until later. As it turned out, a friend of one of the jurors owned a confectionery shop, and the juror asked her husband to ask the friend to make chocolate turtles for the jury. The friend, who was unaware of the serious nature of the case, included the gag gifts to "lighten things up." On the last day of the trial, the gifts were given to the judge and bailiff.

The Eleventh Circuit cited precedent holding that an ex parte communication alone is insufficient to overturn a conviction. Additionally, the record did not indicate the trial judge had showed partiality during the brief encounter with the jurors at the restaurant, so habeas relief on that issue was properly denied.

Further, the Court of Appeals found the gag gifts did not call into question the impartiality of the jury. It held the "unfortunate giving of these tasteless gifts" was "inconsequential to the verdict" and played no role in the judge's or jury's consideration of the case. The jurors testified that the gifts, which were given at the conclusion of the case, had nothing to do with anything that occurred during the trial.

The appellate court noted judges or bailiffs should not receive gifts from the jury. "Trial judges are expected to handle these situations, sternly admonish or discipline those involved, and disclose such occurrences to each party so that timely objections can be considered and made," wrote the Eleventh Circuit. While the judge had failed to do so in this case, the Court of Appeals found the jurors' testimony did not indicate Wellons had received an unfair trial.

"We also acknowledge that the ill-advised actions of a few thoughtless jurors could create the perception that this jury was too busy joking around rather than deciding Wellons's fate," the appellate court stated. "But these were two isolated incidents in the span of a multi-week trial and we cannot say, on the basis of this record, that the verdicts were tainted."

Accordingly, the district court's denial of Wellons' habeas petition was affirmed.

A petition for writ of certiorari, filed with the U.S. Supreme Court, was denied on October 7, 2013. Wellons remains on Georgia's death row. See: *Wellons v. Warden, Georgia Diagnostic and Classification Prison*, 695 F.3d 1202 (11th Cir. 2012), *cert. denied.* ◢

---

### *Actual Innocence*
Explains how the innocent are convicted by faulty eyewitness testimonies, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$17.00 from PLN's Book Store!
See page 61 for more information.

---

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
● Adequate medical care
● Protection from assault
● Humane living conditions
● Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
561-360-2523

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

---

## WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS
### STATE AND FEDERAL POST-CONVICTION AND APPEALS

Licensed since 1995, hundreds of appellate briefs and habeas petitions, capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas, Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment.
Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**

# Decline in Arrests of Los Angeles County Probation Officers

THE LOS ANGELES COUNTY PROBATION Office has cited tougher self-policing and stricter hiring standards for a dramatic decrease in the number of employees arrested for driving under the influence and various other crimes, but the union representing probation officers complained the changes have led to understaffing.

Probation Office Chief Jerry Powers said the number of probation employees arrested for crimes both on and off the job fell from a high of 74 in 2011 to just 32 in 2013. Nearly half the arrests last year – 15 – were for DUI offenses. Most of the remaining charges were theft and assault.

"We've come light years from where we were to where we are today," Powers said at a news conference.

But the president of AFSCME Local 685, the union representing the county's probation officers, disputed Powers' claim that the drop in the number of arrests was the result of hiring standards and self-policing.

"It's like crime statistics, they go up and down all the time," union president Ralph Miller said. "Taking credit for those numbers going down is like taking credit for the sun rising and setting."

Powers said stricter hiring standards, including polygraph tests and more extensive background checks of job applicants, were responsible for the decline. The Probation Office has also become more aggressive with internal investigations.

"The amount of discipline has almost tripled, so we're holding employees accountable," Powers stated. "I think that sends a message to all employees in the department that you're going to behave, on duty and off duty, and if you fail to meet our standards, we're prepared to see that you correct your behavior or you find another employer."

The Los Angeles County Board of Supervisors heaped praise on the Probation Office in late 2013 for implementing the new standards, but the union said the changes jeopardized public safety. By January 2014, the union noted, more than 1,000 of the Probation Office's 6,600 job positions remained vacant, while probation officers were required to monitor some 80,000 adult and juvenile offenders – a number that has increased under California's Realignment initiative. [See: *PLN*, June 2014, p.1].

AFSCME Local 685 complained that the new hiring standards are not realistic, and in a letter to the Board of Supervisors accused Powers of having "seriously mismanaged the hiring and promotional process, resulting in a grave public safety crisis."

Arrests of probation officers fell from 74 in 2011 to 44 in 2012, but included some high-profile cases, including one high-ranking employee who was charged with defrauding banks by falsely claiming his identity had been stolen.

On September 17, 2012, FBI agents arrested Carl Edward Washington, a division chief of intergovernmental relations. In announcing the arrest, the FBI said Washington faced "three counts of bank fraud and three counts of making a false statement to a federally insured financial institution."

Washington is also an ordained minister and a former lawmaker who was elected three times to the state Assembly. As a Probation Office employee, he reportedly received loans and credit cards to purchase airline tickets and hotel rooms and to obtain cash advances totaling "several thousand dollars," according to investigators.

Washington eventually stopped paying his debts and claimed to be a victim of identity theft. On July 22, 2013, he was sentenced to one day in federal prison with credit for one day already served, plus three years of supervised release and $193,898.25 in restitution.

Of the 44 Los Angeles County probation officers arrested in 2012, dozens were charged with drunk driving, drug possession and theft. Charges were also filed against a six-year veteran employee for filing false workers' compensation claims, and against a probation officer for allegedly shooting a man in a bar.

"They shouldn't have 40 arrests in any department," said Connie Rice, a civil rights attorney and police watchdog who has been critical of the Probation Office. "If you have 40 arrests, that ought to be a sign that something is very wrong. It's like, 'Houston, we have a problem.'"

The number of probation employees charged with crimes fell again to 32 in 2013.

"We don't want any arrests, but reducing the numbers by half in two years shows our new policies are having an impact," said Assistant Chief Probation Officer Don Meyer. "If we could reduce it to zero – which is unrealistic – that would be nice, but we've obviously done a good job. It's not by accident that those numbers have gone down."

Still, some high-profile arrests have continued. In August 2013, probation officer Frank Elliott Boyd III, 48, pleaded not guilty to charges arising from a scheme to defraud the state of $1.6 million in phony childcare payments.

According to prosecutors, Boyd, his ex-girlfriend and four other co-defendants allegedly set up a number of licensed home-based childcare centers, then urged parents to file fake documents with county and state agencies for childcare that was never provided. Boyd was charged with conspiracy, grand theft and perjury.

Also in 2013, a former probation officer was arrested on misdemeanor charges of using his iPad to take photos up a woman's skirt. Julio Mario Medal was sentenced to five years' probation and ordered to perform 120 days of community service after pleading guilty to secretly videotaping for sexual gratification, unlawful loitering and attempted videotaping for sexual gratification.

Arrests have continued into 2014. For example, former Los Angeles County probation officer Robyn Palmer, 29, was arrested on felony charges of insurance fraud, forgery, grand theft and wire fraud on May 16, 2014. She had received over $29,000 in workers' comp payments for an injury allegedly received while restraining a juvenile offender. However, it was later learned she was not at work on the day she claimed the injury occurred. Palmer was jailed on $100,000 bond.

Meyer noted that most of the Probation Office employees who have been arrested were hired in 2005-2008, when the office did not conduct background checks on job applicants.

Sources: *Los Angeles Times, www.scpr.org, http://losangeles.cbslocal.com, www.examiner.com, www.dailynews.com*

# States Renewing Their Prison Phone Contracts

*As state DOCs renew or rebid their prison phone contracts, you can help urge them to lower intrastate phone rates and eliminate commission kickbacks!*

The Campaign for Prison Phone Justice needs your help in:

## **** *Utah, Arkansas and Nevada* ****

The Departments of Corrections in the above states are in the process of re-bidding or renewing their prison phone contracts. Most DOCs receive a commission (kickback) on revenue generated from calls made by prisoners, which results in excessively high phone rates. Although the FCC voted last year to cap the costs of interstate (long distance) prison calls, which went into effect on February 11, 2014, the order does not apply to intrastate (in-state) calls. An estimated 85% of prison phone calls are in-state. This is an opportunity to ask DOCs to forgo commissions and ensure their new prison phone contracts are based on the lowest cost to those who pay for the calls – mostly prisoners' families.

### Take Action NOW! Here's What YOU Can Do!

Ask your family members and friends to write, email, call and fax the DOC and the governor's office (addresses and contacts are listed below), requesting that the DOC: 1) forgo commission payments when re-bidding or renewing its prison phone contract, and 2) base the new contract on the lowest calling costs. Lower prison phone rates should apply not just to long distance calls but also to in-state calls. For a sample letter or to easily send an email, visit the Campaign for Prison Phone Justice's website and click on the "Take Action" tab:

## www.phonejustice.org

### Prison phone contract information & Contacts:

**Utah:**  Receives a 55% kickback; existing contract expires on 7-31-2014. Charges $4.60 for a 15-minute collect intrastate call and $3.15 for a collect local call. **Contacts:** Utah DOC, Director Rollin Cook, 14717 South Minuteman Drive, Draper, UT 84020; ph: 801-545-5513, fax: 801-545-5726, email: musher@utah.gov. Governor Gary R. Herbert, State Capitol, Suite 200, Salt Lake City, UT 84114; ph: 801-538-1000 or 800-705-2464, fax: 801-538-1557, email: sdeakin@utah.gov

**Arkansas:**  Receives a 45% kickback; existing contract expires on 8-15-2014. Charges $4.80 for a 15-minute collect intrastate and local call. **Contacts:** Arkansas DOC, Director Ray Hobbs, Arkansas Department of Correction, P.O. Box 8707, Pine Bluff, AR 71611-8707; ph: 870-267-6200, fax: 870-267-6244, email: ray.hobbs@arkansas.gov. Governor Mike Beebe, State Capitol, Room 250, Little Rock, AR 72201; ph: 501-682-2345, fax: 501-682-1382, email: tonya.mercer@governor.arkansas.gov

**Nevada:**  Receives a 54.2% kickback; existing contract expires on 8-28-2014. Charges $2.95 for a 15-minute collect intrastate and local call. **Contacts:** Nevada DOC, Director James Cox, 3955 West Russell Road, Las Vegas, NV 89118; ph: 702-486-9910, fax: 702-486-9961, email: gcox@doc.nv.gov. Governor Brian Sandoval, State Capitol Building, 101 North Carson Street, Carson City, NV 89701; ph: 775-684-5670, fax: 775-684-5683, email: scheduling@gov.nv.gov

# Kentucky Prisoner's Due Process Rights Violated in Disciplinary Hearing

*by Robert Warlick*

On August 29, 2013, the Kentucky Supreme Court affirmed an appellate decision that found an Adjustment Committee (AC) in a prison disciplinary proceeding had violated a prisoner's due process rights by not meeting the "some evidence" standard as applied to confidential informants (CIs).

Ontario Thomas, imprisoned at the Northpoint Training Center in Kentucky, was found guilty by the AC in June 2009 of assaulting another prisoner, based solely on statements from at least two CIs.

On December 16, 2009, Thomas filed a petition in the Lyon Circuit Court alleging that the AC's reliance on the CI information violated his due process rights. However, before the court ruled on his petition, two AC reviews were conducted which determined that the CI statements were reliable, reaffirming the guilty finding. The AC stated it had "review[ed] the confidential information and believe it to be true and reliable according to policy." The Circuit Court subsequently dismissed Thomas' petition, finding that his rights had not been violated.

The Court of Appeals reversed due to the AC's failure to meet the "some evidence" standard during Thomas' disciplinary hearing. The appellate court relied primarily on *Hesley v. Wilson*, 850 F.2d 269 (6th Cir. 1988), which requires a court to assess the reliability of a CI and the CI's information to determine whether it qualifies as "some evidence." The record on appeal provided no details as to the credibility of the CIs; consequently, the Court of Appeals held that Thomas' due process rights were violated and remanded the case for a new AC hearing.

The state appealed and the Kentucky Supreme Court affirmed. Citing supporting federal cases from the Third, Seventh, Eighth and Ninth Circuits, the Court noted that the record "simply begs for some corroborating factors" of the CIs' reliability, which could be done by stating for the record, "without divulging identities, why witnesses are reliable."

The state Supreme Court concluded that "there is plainly no evidence to support the Adjustment Committee's determination that the informants' information was reliable. We know nothing of these informants and their information – whether they were eyewitnesses or whether there was any corroborating evidence. It would be helpful if the investigating officer, after being duly sworn, gave written details of what was related. This would not only bolster the observation of the witnesses, but would also provide the inmate charged with a better opportunity to rebut the evidence against him." See: *Haney v. Thomas*, 406 S.W.3d 823 (Ky. 2013).

# *Brady* Violations Result in Habeas Relief for Pennsylvania Death Row Prisoner

*by David Reutter*

To correct a "grave miscarriage of justice," Pennsylvania U.S. District Court Judge Anita Brody granted a writ of habeas corpus to a state prisoner and vacated his conviction and death sentence for a murder that "in all probability he did not commit." The court found violations under *Brady v. Maryland*, 373 U.S. 83 (1963) due to the state's withholding of evidence.

James A. Dennis was convicted in Philadelphia for the October 22, 1991 killing of high school student Chedell Williams. Williams, 17, and a friend, Zahra Howard, were approached by two men who demanded they give up their earrings. The girls fled; Howard hid behind a fruit stand while Williams ran into the street.

The men chased Williams. One of them held a gun to her neck and shot her; they then jumped into a car and sped away.

Williams was pronounced dead shortly after her arrival at a hospital.

Dennis' conviction was "based on scant evidence at best," the district court wrote in an August 21, 2013 ruling. "It was based solely on shaky eyewitness identifications from three witnesses, the testimony of another man who said he saw Dennis with a gun the night of the murder, and a description of clothing seized from the house of Dennis' father that the police subsequently lost before police photographed or catalogued it."

The police never recovered a weapon, never found the car used by the assailants and never found two accomplices described by witnesses. Judge Brody said confidence in Dennis' conviction was significantly diminished by flaws with the investigation and prosecution of the case, and noted "There was virtually no physical evidence presented at trial."

All five of the nine witnesses who provided estimates of the shooter's height put him at 5'7" to 5'10", with four describing him as 5'9" or 5'10". Dennis, however, is only 5'5". None of the witnesses confidently identified Dennis right away, but three ultimately became the only testifying witnesses for the state. The other witnesses did not testify – a fact the district court found to be a troubling flaw in trial counsel's investigation and trial preparation.



inmateMAGS.com (formerly MyMagstore.com)

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **50+ Page Full Catalog** ($3 Discount Coupon Included)

InmateMAGS.com
4208 University Way NE
Seattle, WA 98105

www.inmateMAGS.com
Info@inmatemags.com
206-322-6397

Of the witnesses not called to testify, four did not identify Dennis as the shooter, three did not pick him from a photo array and another chose a different suspect from a line-up. A witness who had looked the shooter in the eye definitively said Dennis was not the shooter, but the state never informed defense counsel of that fact.

Upon considering Dennis' habeas petition, the federal district court found several *Brady* violations. First, it found violations in the suppression of six documents. The state did not dispute that it failed to disclose the documents to Dennis until a decade after his trial.

One of those documents was a statement from a jail prisoner who had corroborated evidence in the case and pointed to two other suspects. Another involved a witness who saw Dennis on the day of the murder; she gave police an original receipt from the Department of Public Welfare that would have corroborated Dennis' alibi that she had seen him on a bus at the time of the murder.

The prosecution also suppressed statements from Zahra Howard's aunt and uncle, who said she had recognized the shooter from her high school and two people she knew were present during the shooting.

As for the witness who said he had seen Dennis with a gun on the day Williams was killed, he only made that statement after being arrested "for a violent assault of his pregnant girlfriend that left her in the hospital," and six months later prosecutors dropped the felony assault charges against him "without explanation."

The district court found that Dennis was prejudiced under *Brady* by the prosecution's withholding of documents related to the two witness statements and the receipt that would have corroborated his alibi. It also held the cumulative effect of the *Brady* violations provided a basis for granting habeas relief.

"[T]here can be no question" that the state had violated Dennis' right to due process by withholding exculpatory evidence that would have made a material difference at his trial, Judge Brody wrote. "As a result, after serving over 20 years in prison, Dennis is entitled to receive either a new trial or his freedom."

As of July 2014, however, he has received neither. The state appealed the district court's judgment, which has been stayed pending a decision by the Third Circuit. Meanwhile, Dennis remains on Pennsylvania's death row. He is represented pro bono by the law firm of Arnold & Porter, LLP. See: *Dennis v. Wetzel*, 966 F.Supp.2d 489 (E.D. Pa. 2013).

Additional sources: *www.jimmydennis.org, www.metro.us, www.dailymail.co.uk, www.arnoldporter.com*



*Lone Wolf of Arkansas is offering a Training program designed to be taken as a correspondance course while incarcerated and applied when released. As a Freight Agent for Lone Wolf you will earn c mission on loads of freight. Contact us for more details. S.A.S.*

*Lone Wolf of Arkansas*
*1015 Townsend Drive*
*Pocahontas, AR 72455*
*1-870-222-0270*
*lonewolfbusiness.com*

# New York Jail Guard Sentenced for Sexually Abusing Seven Prisoners

A former guard at the Monroe County Correctional Facility in Rochester, New York received six months in jail plus 10 years' probation and was required to register as a sex offender after he pleaded guilty in April 2013 to sexually abusing seven female prisoners.

Former Sgt. Robert Wilson, 41, was sentenced after entering the plea to a 21-count indictment that accused him of engaging in criminal sexual contact with the prisoners for two years, from 2010 to July 2012. The charges included rape, sexual abuse and official misconduct. [See: *PLN*, Nov. 2013, p.56].

Four of the seven victims filed suit in federal court in October 2013 against Wilson and Monroe County Sheriff Patrick O'Flynn for unspecified compensatory and punitive damages, joining a previous lawsuit that was filed in July. The five suits, which also name Monroe County as a defendant, contend that O'Flynn and the county knew as early as 2010 that Wilson had an "inappropriate relationship" with a female prisoner but did nothing to stop his misconduct.

"These are five women that are at the lowest point in their life," said attorney Robert King, who is representing the victims. "What we know is that this happened time after time after time, woman after woman after woman, inside the jail and in some instances outside the jail after they were released."

Each of the lawsuits claims that "other members of the Monroe County Sheriff's Office allowed Sergeant Wilson to be alone" with the women, and one victim alleged the Sheriff's Office was "alerted to the inappropriate relationship" but "did not investigate.... If they did investigate, the investigation was not sufficient," and officials "did not take action to remedy the situation and prevent future harm."

At the time of his indictment, Wilson was a 17-year veteran and supervisor at the jail; investigators said that for more than two years he used his position to sexually abuse female prisoners. He resigned after being charged.

"I find that Wilson's actions were obviously reprehensible and disturbing, and they are an embarrassment to our organization and to the community we serve," said Sheriff O'Flynn. "He was a supervisor in charge so he had access to the entire facility, and he had very calculated actions to be able to manipulate the system to accommodate his actions."

Investigators said they believe Wilson had relationships with many of the women before they entered the jail; he apparently did not take any of the prisoners off jail property, but did take them out of secure areas at times.

Monroe County District Attorney Sandra Doorley stated the victims deserve justice. "Regardless of what they've done in the past and where they are and what their situation in life is, if they are victims and a law is violated, we will represent their interest in court," she said.

The prisoners' lawsuits allege numerous sexual encounters involving Wilson. One of the victims said Wilson encouraged her "to strip tease in her cell while he watched," then later directed her to perform oral sex. In another case, the victim claimed Wilson called her away from her cell for "unscheduled medical appointments" and led her into an office where he engaged "in personal, flirtatious and sexually explicit conversation."

The same victim's lawsuit also alleges that Wilson told her to "write sexually explicit letters to him, which she did," and "Wilson wrote a sexually explicit letter" back. She also claims that after she was released from jail, Wilson took her to his apartment and "tried to force" her to have sex "but allowed her to give him oral sex instead."

Another of the prisoners said Wilson came to her cell, sat on her bunk and "directed her to show him her breasts." The lawsuit filed by a fourth victim alleges that Wilson took her to a private room for sex after calling her into a hallway with the excuse that he had cleaning chores for her to do.

Authorities said Wilson was not reported by any of the prisoners he victimized; rather, an investigation was initiated after another staff member at the jail reported Wilson for improper use of computers, which led to the discovery of his sexual misconduct. The five lawsuits filed by Wilson's victims all remain pending. See: *Goodison, Jansen, Andrews, DiStefano and Knapp v. Monroe County*, U.S.D.C. (W.D. NY), Case Nos. 6:13-cv-06342, 6:13-cv-06566, 6:13-cv-06567, 6:13-cv-06568 and 6:13-cv-06569. ◀

Sources: *www.corspecops.com, www.whec. com, Associated Press, Rochester Democrat and Chronicle, www.13wham.com*



# FREE JAIL CALLS

Get A Free, Guaranteed ConsCallHome Number & 20 Minutes Of Free Talk Time Every Month.

It's FREE

Call: 855-232-2012   www.FreeJailCalls.com

# BOP Grievance System Contributes to "Compliance or Defiance" by Prisoners

### by Derek Gilna

A 2013 STUDY FOUND THAT THE GRIEV-ance system utilized by the federal Bureau of Prisons (BOP) appears to have become an important tool to defuse prisoner complaints, supporting the belief that the failure of BOP officials to adequately respond to grievances contributes to higher levels of violence in federal prisons.

The research study determined that another benefit of the BOP's grievance system is deflecting or reducing potential litigation. Indeed, many federal court decisions have been decided in the BOP's favor based upon prisoners' failure to exhaust administrative remedies as required by the Prison Litigation Reform Act.

The study, "Procedural justice and prison: Examining complaints among federal inmates (2000-2007)," was conducted by David M. Bierie with the U.S. Marshals Service and the Department of Criminology and Criminal Justice at the University of Maryland. Although it concentrated on what it termed the "procedural justice paradigm," the study also revealed what Bierie called an unexpected finding: "violence grew as the number of support staff per inmate (e.g., teachers, counselors) declined within a given prison. However, the opposite effect was found with respect to increases in custody staff per inmate within a given prison."

The study appears to validate the BOP's grievance system. "Generally speaking, people feel a process is more 'just' when their voice is heard before decisions are made, decision makers treat everyone equally, outcomes are proportionate, and there is a process of appeal or challenge if they don't agree with an outcome." The opposite is also true if the system is perceived to be unfair; thus, the grievance process plays "a central role in generating compliance or defiance" by prisoners.

The study makes liberal use of other research into the U.S. criminal justice system to lend weight to its conclusions. Several previous studies had found that a grievance system was not only about directly resolving problems, but also allowing prisoners to vent their frustrations and anger about perceived injustices by prison officials without resorting to violence.

According to the 2013 study, prisons "present an environment optimized to magnify the likely impacts of perceived injustice by presenting environments that are characterized by verbal threats and insults, physical pain, unpleasant odors, disgusting scenes, noise, heat, air pollution, personal space violations and high density."

Therefore, "[p]erceived injustice is serious, especially in the eyes of inmates, and the impact and relevance is further magnified by the environment they live in, delivering a near constant state of elevated and clustered strain."

The study found that the BOP's grievance system is perceived by some prisoners as overly formal and more concerned with procedural practices and deadlines than the substance of a complaint. Accordingly, "data suggest a higher volume of late or rejected [grievance] responses will increase violence."

Bierie examined data from the BOP's Sentry system, staffing levels in federal prisons, and other BOP documents showing the number and classification of prisoner grievances over a seven-year period from January 2000 through December 2007.

The research revealed that most complaints concerned issues related to discipline, medical care and staff, with food, housing and use of force at the bottom of the list. The number of procedural grievance rejections and prisoner density (i.e., overcrowding) were tracked, as well as the ratio of prisoners to BOP employees, to determine if a relationship existed between those factors and levels of prisoner violence.

Interestingly, according to the study, the number of grievances appeared to peak in 2004 while assaults and serious violence within BOP facilities increased from 2000 through 2007, perhaps reflecting increased overcrowding in the federal prison system.

In addition to its other findings, the study concluded that "most features of the grievance process ... did not impact violence. Neither the volume of current complaints, nor the distributive justice outcomes predicted violence." However, "[t]wo features of the grievance process consistently predicted ... violence: the proportion of responses which were late, and the proportion of responses which were substantively rejected."

Source: "*Procedural justice and prison: Examining complaints among federal inmates (2000-2007)," by David M. Bierie. Psychology, Public Policy and Law, Vol. 19(1), Feb. 2013*



**Simple Business** *Consulting*
Prisoner Outreach Services

SIMPLE BROCHURE - SIMPLE PRICING
FAST PROFESSIONAL SERVICE
YOU CAN SET UP A SERVICE ACCOUNT
FLAT FEES OR RETAINER FOR TERM PROJECTS

**FINANCIAL REQUIREMENTS**
NO BANK ACCOUNT
NO MINIMUM BALANCE
NO MONTHLY FEE
NO MEMBERSHIP FEE
NO APPLICATION

PUBLISHING - VIRTUAL OFFICE - GRAPHIC DESIGN - MARKETING - BUSINESS

**Make a change today!**
Do you have an idea, dream, goal or plan you have been wanting to develop? What are you waiting for?

Send SASE for our brochure....
It is that
*SIMPLE*!

VISION
IS A PICTURE OF THE FUTURE THAT CREATES
PASSION WITHIN YOU
TODAY

SIMPLE BUSINESS CONSULTING
3308 ROUTE 940 - SUITE 104-304
MOUNT POCONO, PA 18344
WWW.SIMPLEBUSINESSCONSULTING.COM

# England, Increasing Number of States Allow Same-Sex Prisoner Marriages or Civil Unions

Prisoners in England, including those in the highest security classification, are being allowed to enter into same-sex civil unions due to a policy change that mirrors changes to same-sex marriage laws in an increasing number of states in the U.S.

Prison Service Order 4445 outlines the requirements for prisoners in England and Wales seeking to enter into same-sex civil unions. The Order requires that both prisoners be of the same gender, over 16 years old, not related, not currently married and have at least three months remaining on their sentences. The Order also covers transsexual prisoners.

Prisoners are responsible for making all arrangements for the civil partnership ceremony and must pay all associated costs. They are allowed to invite guests, but only a reasonable number as determined by the prison governor. Before authorizing the civil partnership, prison authorities are required to make a risk assessment determination.

The Order applies to the Prison Service's population of around 86,000 prisoners.

In the United States, the Department of Justice announced in a February 2014 memo that it will grant full recognition to same-sex marriages to "the greatest extent possible under the law." U.S. Attorney General Eric Holder said the federal government is committed to equal protection.

"In every courthouse, in every proceeding and in every place where a member of the Department of Justice stands on behalf of the United States – they will strive to ensure that same-sex marriages receive the same privileges, protections, and rights as opposite-sex marriages under federal law," Holder stated.

For federal prisoners, the policy change means that same-sex spouses now have visitation rights, and prisoners can seek furloughs for a crisis involving a same-sex spouse. In federal court, same-sex couples now have the right to refuse to testify against their spouse, even in states that do not recognize same-sex marriages.

Gay rights advocates praised Holder's announcement, saying it will "change the lives of countless committed gay and lesbian couples for the better." Human Rights Campaign President Chad Griffin told the *Washington Post*, "While the immediate effect of these policy decisions is that all married gay couples will be treated equally under the law, the long-term effects are more profound."

In August 2013, the California Department of Corrections and Rehabilitation (CDCR) issued a memo extending to state prisoners the right to marry same-sex partners. The memo followed a Supreme Court ruling that overturned Proposition 8, which had prohibited same-sex marriages in the state.

"Effective immediately, all institutions must accept and process applications for a same sex marriage between an inmate and a non-incarcerated person in the community, in the same manner as they do marriages between opposite sex couples," M.D. Stainer, director of the CDCR's Division of Adult Institutions, wrote in the memo.

However, "a currently incarcerated inmate shall not, at this time, be permitted to marry another currently incarcerated inmate" due to security concerns.

In Illinois, prison officials said a policy regarding same-sex marriages will be in place when a statute legalizing such marriages in the state takes effect on June 1, 2014. "The Illinois Department of Corrections will be prepared to implement a policy regarding this law when it goes into effect," said spokesman Tom Shaer. Illinois state prison policy bans the marriage of two prisoners, but prisoners will be able to marry non-prisoners of the same gender.

Marriages between prisoners are also prohibited in Minnesota, but Minnesota Public Radio reported in September 2013 that state prison officials are considering how they will handle marriage requests by sex offenders who have finished their prison sentences but are considered too dangerous to be released. According to the news report, two male prisoners who have been civilly committed contacted local officials to request a marriage license. State law requires marriage license applicants to apply in person, however, and the Minnesota Department of Human Services denied the offenders' request for transportation to the licensing office.

In New York, the State Department of Corrections and Community Supervision held its first same-sex marriage at the Auburn Correctional Facility in December 2011, when a male prisoner married a former prisoner in a civil ceremony. [See: *PLN*, May 2012, p.37; April 2013, p.50].

Sources: *www.dailymail.co.uk, New York Daily News, www.pbs.org/newshour, www.pantagraph.com, www.mprnews.org*

# Oregon Victim's Right to Restitution Survives Prosecutor's Statutory Violation

*by Mark Wilson*

The Oregon Court of Appeals held that a prosecutor's failure to comply with state restitution laws did not deprive a trial court of authority to impose restitution after sentencing.

Oregon law requires the prosecutor to "investigate and present to the court, prior to the time of sentencing, evidence of the nature and amount" of a victim's damages resulting from a crime.

Cindie Wagoner was charged with identity theft. On October 15, 2009, the victim provided proof of her economic losses to Flores, a victim advocate assigned to her case by the Washington County District Attorney's Office. However, Flores did not forward that information to the prosecutor.

Wagoner pleaded guilty and was sentenced in December 2009. The prosecutor noted that the time had passed for the victim to request restitution, and the trial court did not award any restitution. The January 5, 2010 judgment in Wagoner's case indicated that the restitution amount was zero.

Flores was terminated the following month. When other employees cleaned out Flores' desk they found the victim's October 15, 2009 proof-of-loss documents.

In March 2010, the victim filed a mo-

tion asserting that she had a right to receive prompt restitution under Article I, section 42(1)(d) of the Oregon Constitution.

After a hearing, the trial court agreed that the victim was entitled to restitution; the court then issued a May 24, 2010 supplemental judgment requiring Wagoner to pay restitution of $800.

Wagoner appealed, arguing that because the prosecutor had failed to present evidence of the victim's loss before sentencing as required by ORS 137.106, the trial court had no authority to subsequently impose restitution.

The Oregon Court of Appeals noted that it had "recently addressed a very similar question" in *State v. Thompson*, 257 Ore. App. 336, 306 P.3d 731 (Or. Ct. App. 2013), and found the ruling in *Thompson* controlled. The violation of ORS 137.106 "did not prevent the court from imposing restitution in order to provide the victim a remedy by due course of law, after it was discovered that her constitutional right to restitution was violated."

Accordingly, the trial court's order requiring Wagoner to pay restitution was affirmed. See: *State v. Wagoner*, 257 Ore. App. 607, 307 P.3d 528 (Or. Ct. App. 2013).

# Habeas Petitioner Cannot Avoid Payment of Appellate Filing Fees

### *by Michael Brodheim*

THE SEVENTH CIRCUIT COURT OF Appeals has held that a prisoner seeking collateral relief cannot avoid paying appellate filing fees.

Following a murder conviction, Indiana prisoner Kelly S. Thomas was sentenced to 65 years in prison. After his appeal and collateral attack were rejected in the state courts, he filed a federal petition for writ of habeas corpus under 28 U.S.C. § 2254. When that was denied he filed a notice of appeal. The district court judge declined to issue a certificate of appealability, instead certifying that the appeal was not taken in good faith.

Based on that certification, Thomas was required to pay appellate fees of $455 before the Seventh Circuit would consider entertaining his appeal, unless he could persuade the appellate court to allow him to proceed in forma pauperis. Even then he would still owe the fees – if he won, they would be shifted to the state as part of the appeal costs; if he lost, the fees would be "payable like any other debt."

Thomas filed a motion requesting that the Court of Appeals disregard the district court's certification of bad faith. He contended that prisoners are simply not required to pay appellate fees assessed under the Prison Litigation Reform Act (PLRA).

The Seventh Circuit rejected his argument, noting that appellate fees are authorized by 28 U.S.C. § 1913, which long predates the PLRA. The Court of Appeals gave Thomas 21 days to file a motion for permission to proceed in forma pauperis (which depends on demonstrating that he cannot pay the fees and his appeal is not frivolous) and a certificate of appealability (which is dependant on a "substantial showing of the denial of a constitutional right").

The Seventh Circuit noted that an appeal can be non-frivolous and still fail to meet the standard for a certificate of appealability. Thomas filed a petition for writ of certiorari, which was denied on November 18, 2013. See: *Thomas v. Zatecky*, 712 F.3d 1004 (7th Cir. 2013), *cert. denied*.

***Roget's Thesaurus***
Can't think of the right word?
Let Roget's help you! Over 11,000 words listed alphabetically.
See page 61 for more information.



Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see.  Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLN5OFF
FOR $5 OFF



## FREE BOOK!

Get ***The Habeas Citebook*** with purchase of a 4-year subscription to *Prison Legal News*. Offer good for new subscriptions and renewals.

Special limited time only! All sales final and no refunds. Order now for this great deal worth $49.95.

**Prison Legal News** • PO Box 1151 • Lake Worth, FL 33460
Tel [561] 360-2523 • www.prisonlegalnews.org

# Prison Officials Liable for Private Employer ADA Violations

### by Mark Wilson

THE NINTH CIRCUIT COURT OF APPEALS held last September that prison officials are liable for violations of the Americans with Disabilities Act (ADA) committed by private employer contractors.

Arizona law requires state prisoners to work 40 hours per week. Most are employed in the Arizona Department of Corrections' Work Incentive Pay Program (WIPP), earning from 10 to 50 cents per hour. Prisoners who work for Arizona Correctional Industries (ACI), which provides prison labor for private company contractors, earn significantly more.

One of those companies is Eurofresh, "America's largest greenhouse operation," which boasts that it can produce 200 million pounds of hydroponic tomatoes annually.

In July 2008, Arizona prisoner William W. Castle was hired by Eurofresh as a tomato picker, earning more than $2.25 an hour. He was required to push a 600-pound tomato cart and stand or walk during his entire seven-hour shift.

Castle soon began suffering ankle swelling and pain when he stood longer than two hours. Decades earlier, Castle had received a 20% service-connected disability rating for an ankle injury sustained in an Army parachute accident.

After a Eurofresh supervisor told Castle he would be fired for taking breaks to rest his ankle, Castle asked ACI and Eurofresh to be reassigned to a different position. His request was denied and he was told his only option was to quit. Prison officials then moved Castle to a WIPP job in the motor pool, which paid only 50 cents an hour.

Castle filed suit against Eurofresh and state prison officials, claiming they had violated the ADA and the Rehabilitation Act by failing to accommodate his disability. The district court granted summary judgment to the defendants and Castle appealed.

The Ninth Circuit reversed summary judgment as to the prison officials, rejecting their argument that they lacked authority over Eurofresh employment decisions.

Following *Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) [*PLN*, Nov. 2011, p.28], the appellate court observed that government officials are liable

for ADA violations committed by private contractors.

Since ACI admittedly contracted with Eurofresh to provide "benefits" to prisoners, including paid labor and vocational training, the Court of Appeals concluded that "one benefit State Defendants may not harvest is immunity for ADA violations: State Defendants are obligated to ensure that Eurofresh – like all other State contractors – complies with federal laws prohibiting discrimination on the basis of disability."

Noting that the en banc court in *Hale v. Arizona*, 993 F.2d 1387 (9th Cir. 1993) [*PLN*, Sept. 1993, p.8] had held that prisoners are not "employees" entitled to minimum wage under the Fair Labor Standards Act, the Ninth Circuit found that "Castle is not Eurofresh's employee under the ADA because his labor belongs to the State of Arizona." Therefore, Eurofresh was not liable for its ADA violations and was entitled to summary judgment.

"Castle's claims against Eurofresh were properly dismissed because Castle and Eurofresh were not in an employment relationship, and Eurofresh does not receive federal financial assistance. However, judgment was improperly granted to the State Defendants. The State Defendants are liable for disability discrimination

committed by a contractor," the Court of Appeals concluded.

"A profit-seeking firm that hires convicts at its own worksite should not be shielded from the costs of compliance with the ADA," Circuit Judge Marsha S. Berzon wrote in a concurring opinion, encouraging reconsideration of *Hale*. "Permitting private employers to escape those costs while profiting from the use of prison labor markets undermines the enforcement of the statutory requirements generally, by creating incentives for competing employers to shirk compliance with regard to non-prison labor – and thereby economically disadvantaging competitors of those employers using prison labor."

Nevertheless, noting that precedent "forecloses consideration of such concerns," Judge Berzon reluctantly concurred that *Hale* precludes a finding that Castle was an "employee" under federal law. Thus, his only remedy is against Arizona prison officials. See: *Castle v. Eurofresh*, 731 F.3d 901 (9th Cir. 2013).

The case remains pending on remand, with the Arizona Department of Corrections filing a renewed motion for summary judgment on April 14, 2014. Castle, who has been released from prison, is proceeding pro se. ◣

# Seventh Circuit Reverses Summary Judgment in Dental Care Suit

### by David M. Reutter

ON JULY 19, 2013, THE SEVENTH CIRcuit Court of Appeals reversed a grant of summary judgment to three defendants, holding there was sufficient evidence for a jury to find they acted with deliberate indifference to a prisoner's serious dental needs.

Richard M. Smego, a civil detainee at Illinois' Rushville Treatment and Detention Center, filed suit in federal court alleging that a dentist, two doctors and a dental hygienist had violated his constitutional rights.

When Smego arrived at Rushville, Dr. Jacqueline Mitchell, a dentist who contracts with Wexford Health Sources, examined

him in December 2005 and found he had twelve teeth with cavities. She promised to begin filling them in early 2006.

Yet it was not until June 24, 2007 – eighteen months later – that Dr. Mitchell saw Smego again. She provided no care during that visit, and it was not until the next month that she installed a temporary filling in one tooth but did nothing for his most painful tooth. In August 2007, she extracted the painful tooth and prescribed Motrin, a painkiller to which Smego was allergic.

Smego complained to his therapist about his persistent dental pain in November 2007, almost two years after he first

saw Dr. Mitchell. The therapist informed Dr. Michael Bednarz, Rushville's Medical Director, and Mitchell assured him that Smego was receiving appropriate care.

Dr. Hughes Lochard, a Wexford physician who saw Smego for an unrelated medical issue, examined Smego's teeth. While he said he did not want to get involved in dental issues, he prescribed Motrin for the pain and refused to prescribe any other medication.

Dr. Mitchell did not see Smego again until 2008, when she placed fillings in three of his teeth; three days after that visit, Smego filed his federal civil rights action. The district court granted summary judgment to the defendants and he appealed.

The Seventh Circuit disagreed with the district court's conclusion that Smego had failed to state viable claims or only alleged negligence by the defendants. The Court of Appeals found a jury could conclude that Mitchell failed "to spare Smego thirty months of serious dental pain by providing the treatment she herself already decided was necessary." Moreover, "Dr. Mitchell admitted that even five years after she had diagnosed Smego's cavities she still had not begun treating at least two of them," the appellate court noted.

There was ample evidence of Mitchell's personal contact with Smego, which made her aware of his tooth decay and pain. A jury could also conclude, the Seventh Circuit wrote, that what little care Dr. Mitchell provided was inappropriate.

The dental hygienist, Kelly Lawshea, told Smego to not be a "pest" when he spoke to her about his pain and difficulty in obtaining dental treatment. While she could not be held liable for failing to sched-

ule treatment or obtain supplies that were blamed as the cause of the delay in treatment, a jury could find her "pest" statement "discouraged Smego from taking more aggressive steps to receive treatment from the dental office."

As to Dr. Bednarz, the Court of Appeals found that Smego failed to present sufficient evidence of deliberate indifference. Bednarz took action by contacting Dr. Mitchell, and he was allowed to rely on her representations absent clear evidence that those representations were false. The opposite conclusion was reached as to Dr. Lochard, however. He never contacted Mitchell and did not defer to her, and had also prescribed the ineffective treatment of Motrin. In the latter regard, the Seventh Circuit noted that in a different case, another "Wexford physician repeatedly prescribed ibuprofen (the active ingredient in Motrin) despite a known allergy," citing *Olive v. Wexford Corp.*, 494 Fed. Appx. 671 (7th Cir. 2012).

The district court's summary judgment order was vacated as to Mitchell, Lawshea and Lochard, and remanded for further proceedings. See: *Smego v. Mitchell*, 723 F.3d 752 (7th Cir. 2013).

Following remand, Smego moved to disqualify U.S. District Court Judge Harold A. Baker from presiding over the case. He pointed out that Judge Baker had dismissed two of his lawsuits, both with findings that an appeal would be in bad faith. Both times, Smego appealed and the Seventh Circuit remanded the cases to the district court. Further, in one of those cases, Judge Baker had stated during a hearing that he wouldn't believe Smego "on a stack of Bibles." The judge also told the jurors after they ruled for the defendants that they had "vindicated" him, apparently referring to his prior dismissal of the case.

Judge Baker granted Smego's motion and recused himself on January 31, 2014. Smego subsequently settled his claims against Lawshea and Dr. Lochard in May 2014, while his claims against Dr. Mitchell are scheduled for trial on July 15, 2014. Notably, Smego litigated this case pro se, including on appeal. See: *Smego v. Adams*, U.S.D.C. (C.D. Ill.), Case No. 3:08-cv-03142-SEM-TSH.

## New Titles Available in PLN's Bookstore



***Criminal Law in a Nutshell,*** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**



***Advanced Criminal Procedure in a Nutshell,*** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**



***Criminal Procedure: Constitutional Limitations,*** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**



***A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series),*** by Bryan A. Garner, 768 pages. **$33.95**

❑ Criminal Law in a Nutshell   ❑ Advanced Criminal Procedures in a Nutshell   ❑ Criminal Procedure
❑ Dictionary of Criminal Law Terms

Amount enclosed (add $6 S&H for orders under $50; free shipping over $50) _____

By ❑ check  ❑ new postage stamps  ❑ credit card  ❑ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**PRISON LEGAL NEWS**   PO Box 1151 • Lake Worth, FL 33460
Tel (561) 360-2523 • www.prisonlegalnews.org

## SMITH'S GUIDE to HABEAS CORPUS RELIEF
### for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence.   380 pages.

$24.95 + $6.95 shipping & handling.  In CA add $2.18 sales tax. Sent via USPS media mail Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company

Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*

# Judge May Resolve Exhaustion Issue; No Policy on Grievance Non-decisions Means Remedies Unavailable

### by David Reutter

The Third Circuit Court of Appeals held on August 26, 2013 that a judge may resolve factual disputes relevant to the exhaustion of administrative remedies without the participation of a jury. It also held the district court had erred in finding a failure to exhaust where a prisoner did not receive a response to his grievances and appeals were not required in such circumstances.

Robert L. Small, a pretrial detainee at New Jersey's Camden County Correctional Facility (CCCF) and a paraplegic, filed a civil rights complaint alleging excessive force, denial of medical treatment, and confiscation of his wheelchair and its replacement with one without leg rests. The suit concerned events during two stints that Small served at CCCF between June and September 2004 and again between May 2005 and January 2008.

The lawsuit, originally filed in 2006, was amended by pro bono counsel in January 2008. The defendants moved for summary judgment in late 2009, claiming Small had failed to exhaust administrative remedies under CCCF's grievance policy. The district court dismissed all but one of Small's claims following an evidentiary hearing, and he appealed.

Small argued the Prison Litigation Reform Act requires that a jury, not a judge, determine factual disputes related to administrative exhaustion issues because Seventh Amendment rights are implicated.

The Third Circuit disagreed, joining the Second, Fifth, Seventh, Ninth and Eleventh Circuits in concluding "that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury."

The appellate court then turned to the exhaustion issue itself. First, it found "Small knew of, and was able to access, CCCF's grievance procedures." Having concluded that administrative remedies were available to him, the Court of Appeals considered whether he had substantially complied with the jail's grievance process.

Small argued he had complied by submitting sick call requests and letters of complaint, some of which were sent to people outside CCCF. The Third Circuit held those efforts were not substantially compliant with CCCF's grievance procedure.

However, as to two grievances that Small filed concerning incidents in 2005, the Court of Appeals found the district court had erred in finding Small did not comply with CCCF's grievance policy because he failed to appeal.

It was undisputed that neither of the grievances had resulted in a decision by jail staff, and the appellate court said it disagreed "that substantial compliance with CCCF's procedures requires appealing non-decisions." Rather, the jail's grievance policy addressed "only the appeal of a *decision* with which the inmate is not satisfied," and did not "mention what must be done or even could be done by the inmate when a decision is never made."

As CCCF's grievance procedure "did not contemplate an appeal from a non-decision ... the appeals process was unavailable" to Small. The Third Circuit thus affirmed in part and reversed and remanded as to claims related to the two grievances that did not result in decisions by jail staff. See: *Small v. Camden County*, 728 F.3d 265 (3d Cir. 2013).

Following remand, the district court appointed counsel to represent Small on February 21, 2014. This case, now eight years old, remains pending.

# New York Prisoner Awarded Sanctions for Spoliation of Evidence; Case Settles for $500,000

### by Mark Wilson

On September 4, 2013, a New York federal district court held that a jail official was precluded from testifying in a prisoner's lawsuit about what she supposedly witnessed on surveillance video footage that had been erased. The court also granted the prisoner's request for an adverse inference jury instruction and attorney's fees.

In May 2011, guards did not intervene as New York City jail detainee Dwaine Taylor was savagely beaten by several gang members, including Batise Boyce, in a courthouse holding cell. He wasn't removed from the cell for approximately three hours.

When Taylor was finally taken to an emergency room, he was diagnosed with "jaw fractures on both ... sides of his face," an impacted tooth and another loose tooth. During surgery the next day, doctors closed the "jaw fractures with a metal plate and screws," removed one of his teeth and wired his jaw shut. Taylor was hospitalized for three days and then returned to the infirmary at the Rikers Island jail, where he remained for another month.

Within 15 days, officials prepared "an investigation 'package' recommending that Boyce be 're-arrested' for assaulting" Taylor. That package included copies of surveillance video footage. One week later, Boyce was indicted.

Taylor served notice of his intent to sue and on July 31, 2012 filed a failure to protect suit against jail officials in federal court. He alleged that the assault was sanctioned by guards "under a widespread practice called 'the Program,'" which permitted gang members to attack other non-gang-associated prisoners as a means of control.

"A ceiling-mounted, twenty-four hour surveillance camera" captured events in the holding cell during the assault. Assistant Deputy Warden Executive Officer Jacqueline Brantley reviewed the entire three hours of the video but saved just eight minutes, and the remaining footage was erased.

On June 7, 2013, Taylor moved for spoliation of evidence sanctions. The defendants claimed they had no duty to preserve the remaining three hours of video footage and that Brantley should be allowed to

testify as to what the rest of the footage depicted.

The district court disagreed, holding that Brantley was precluded from testifying about what she observed on the deleted surveillance footage. The court also granted Taylor's request for an adverse inference jury instruction and an award of reasonable attorney's fees and costs in connection with the motion for sanctions.

The case settled in October 2013, with the defendants agreeing to pay $500,000 inclusive of fees and costs. Taylor was represented by the Legal Aid Society and the law firm of Emery Celli Brinckerhoff & Abady, LLP. See: *Taylor v. City of New York*, U.S.D.C. (S.D. NY), Case No. 1:12-cv-05881-RPP. 🖐

## Awesome Deal

**7photo pk.+ free cat.**
For 7.50 or 20 stamps
For cat. Only send
2.75 or 9 stamps to:
**Picture Entertainment,**
PO Box 54806,
L.A., CA 90054
**We also buy stamps
at .31 each**

# Seventh Circuit Admits Prisoner is Right but Denies Relief, Suggests Clemency

THE ARMED CAREER CRIMINAL ACT (ACCA), 18 U.S.C. § 924(e), mandates sentence enhancements for certain federal defendants who commit crimes with firearms; those who have three or more prior "violent felonies" or "serious" drug offenses face a minimum 15-year prison term.

In some cases, however, prior state convictions should not quality as "predicate" offenses for the purpose of triggering an ACCA sentence enhancement.

In April 2014, the Seventh Circuit Court of Appeals issued a ruling in a case involving federal prisoner Cody F. Ellerman, who had challenged his ACCA enhanced sentence for being a felon in possession of a firearm.

The appellate court noted that "Ellerman's frustration with his inability to obtain relief is understandable given that he is correct, on the merits, that he never should have been sentenced as an armed career criminal." The Court of Appeals found that "His prior drug convictions were all for selling marijuana in Kansas, ... and as level 3 felonies, did not subject him to a statutory maximum of at least ten years.... Accordingly, those convictions did not qualify as 'serious drug offenses' under 18 U.S.C. § 924(e)(2)(A)(ii), and Ellerman should not have been sentenced as an armed career criminal."

However, he had not filed a direct appeal to his 2003 conviction, his post-conviction appeals were untimely and the Seventh Circuit wrote it was "not empowered to correct the sentencing error."

The appellate court concluded: "Having fallen victim to the procedural complexity of collateral attacks, Ellerman is out of judicial remedies. But he may consider asking the President for a pardon or to commute his sentence." See: *Ellerman v. Walton*, Seventh Circuit Court of Appeals, Case No. 14-501

(April 21, 2014).

In cases raising similar issues, scores of federal prisoners convicted in North Carolina have been found legally innocent in firearm possession cases, including cases involving ACCA enhancements. Yet some of those prisoners have been denied relief and remain incarcerated, too. [See related article in this issue of *PLN*, p. 48].

Ellerman informed PLN in June 2014 that, following the suggestion of the Seventh Circuit, he had filed a petition for commutation with the Office of the Pardon Attorney. That may be an even longer shot than trying to obtain judicial relief, however, considering President Obama's paltry track record of granting requests for clemency. [See: *PLN*, Jan. 2013, p.32; May 2011, p.36].

In February 2014, the U.S. Department of Justice announced an expanded clemency initiative; the administration apparently has taken the change seriously, replacing Pardon Attorney Ronald Rodgers in April 2014.

The initiative may not help Ellerman's chances for commutation, though, as it only applies to federal prisoners who have served at least 10 years of their sentence, have no significant prior convictions, and were convicted of a nonviolent crime that would have resulted in a lower sentence had they been sentenced today. The expanded clemency initiative will be covered in greater detail in a future issue of *PLN*. 🖐

Additional source: *www.aclu.org*

## Federal Writs

• • •

## Texas Parole

• • •

## Texas Writs

We will fight endlessly for your rights and to secure your freedom.

Time is of the essence for many remedies, so please contact our office today.

You do not have to accept this. You CAN keep fighting.

Is your freedom worth it?

Surprisingly affordable.

Law Office of
**David Rushing**
723 Main St. Ste. 816
Houston, TX 77002
713-877-1300

ADVERTISEMENT

*Hepatitis & Liver Disease:
A Guide to Treating & Living
with Hepatitis & Liver Disease*
Revised ed. By Dr. Melissa Palmer
See page 61 for more information.

# North Carolina Repeals Racial Justice Law

In June 2013, North Carolina Governor Pat McCrory signed legislation repealing the state's Racial Justice Act of 2009 (the Act), a controversial law that supporters said was an effort to address racism in death penalty cases. Opponents, however, argued it merely clogged the legal system and denied justice to victims of the state's 154 prisoners sentenced to death.

"Nearly every person on death row, regardless of race, has appealed their death sentence under the Racial Justice Act," Governor McCrory said in a statement that accompanied his repeal of the law. "The state's district attorneys are nearly unanimous in their bipartisan conclusion that the Racial Justice Act created a judicial loophole to avoid the death penalty and not a path to justice."

The Act was passed following the exoneration of three North Carolina prisoners who had been wrongfully convicted and sentenced to death. All were black. [See, e.g.: PLN, Aug. 2010, p.32].

The Racial Justice Act allowed condemned prisoners to challenge a death sentence "sought or obtained on the basis of race" if they could prove that race was a factor in their prosecution, jury selection or sentencing, and to petition to reduce their sentence to life in prison without the possibility of parole. According to the North Carolina Department of Public Safety, slightly more than half – approximately 53% – of the state's death row prisoners are African-American. U.S. Census Bureau statistics indicate that blacks only comprise around 22% of the state's population.

When the Act was passed in 2009, opponents contended it was a thinly-veiled attempt by a Democratic governor and a Democrat-controlled state legislature to essentially do away with capital punishment. Due to various legal appeals, North Carolina has not carried out an execution since 2006. Republicans took control of the legislature in 2010, and McCrory, a Republican, was elected in 2012.

"It [the Act] tries to put a carte blanche solution on the problem," said Republican state Rep. Tim Moore. "A white supremacist who murdered an African-American could argue he was a victim of racism if blacks were on the jury."

Colon Willoughby, the district attorney in Wake County, which surrounds Raleigh, the state capital, said death row prisoners can already petition to reduce their sentences on the basis of racial bias under a U.S. Supreme Court ruling. He said the Racial Justice Act "came about and set up new artificial obstacles and barriers that were designed simply to put a moratorium on the death penalty and not to promote justice for anyone." As a result, he argued, the Act did nothing but clog North Carolina's courts.

"The premise of it is that somehow, because juries were white, that they discriminated against people, both white and black," he said. "The whole underlying concept of it is ridiculous."

"It's incredibly sad," countered Democratic state Rep. Rick Glazier, a long-time supporter of the Act. "If you can't face up to your history and make sure it's not repeated, it lends itself to being repeated."

Four prisoners have had their death sentences reduced to life without parole under the Act, all in 2012. In Cumberland County, the court cited a study which strongly suggested racial bias in jury selection. Researchers from Michigan State University who studied North Carolina cases between 1990 and 2010 found that prosecutors removed black citizens from juries in murder trials at more than twice the rate of other races.

"We think that essentially this legislature is sweeping evidence of racial bias under the rug, and it's really disappointing," said Sarah Preston, policy director for the ACLU of North Carolina. "Instead of looking at the cases that have passed as evidence of the necessity for the law, they have decided that it's evidence that the law should be repealed."

Preston and other legal experts said the question now is whether appeals still pending under the now-repealed Act will go forward or be dismissed. "Everyone who has made a claim under the Racial Justice Act is probably going to have to litigate over whether or not they continue to have a claim," Preston said.

The North Carolina legislature had been chipping away at the law ever since Republican control in the state government grew stronger. In 2012, the state House and Senate overrode then-Democratic Governor Bev Perdue's veto of legislation gutting the Act, replacing it with an amended law that made it more difficult for prisoners to challenge their death sentences. Instead of using race-related statistics from the entire state or region, appeals under the Act were limited to statistical data from the judicial district where the crime occurred. The amended law also specified that statistics alone were not enough to prove racial bias, and that the race of the victim could not be considered.

The amended Act was written by Republican House Majority Leader Paul "Skip" Stam, who touted the measure as a means of ending the lengthy halt to executions in North Carolina.

"With [the] override of the governor's veto, the end of the moratorium is in sight," Stam said following the July 2, 2012 vote to amend the Racial Justice Act. "The basic principal of justice is restored: individual responsibility."

In debate leading up to the vote, local district attorneys and other supporters of the death penalty said changes to the Act would allow defendants to rely less on statistics that could mislead judges into finding that racism played a role in convictions and death sentences.

"I don't trust statisticians or people who came in after the fact to find some way to get cold-blooded killers off of death row," said state Senator Thom Goolsby, who is also a defense attorney.

"We should not allow racism to come into our courtrooms," countered state Senator Floyd McKissick during the veto debate. "Race still impacts the minds and the hearts and the consciences of many people who serve on our juries."

The Senate easily overrode then-Governor Perdue's veto, but in the House the vote was 72-48 – exactly the 60% majority needed. After using her veto power, Perdue said she supported the death penalty. "But it has to be carried out fairly – free of prejudice," she added.

In December 2012, following the legislative amendment to the Act, then-Superior Court Judge Gregory A. Weeks reduced the death sentences of three prisoners – two black and one Native American – to life without parole.

According to the American Bar Association, "Judge Weeks found that the prisoners met their burdens of proof ...

through the use of statewide and county-specific statistical evidence, as well as non-statistical evidence. This 'powerful evidence of race consciousness and race-based decision making' included hand-written notes from the Cumberland County prosecutor that noted the race of potential jurors who were black, sometimes associating them with drug or alcohol abuse. The prosecutor also repeatedly noted which potential jurors lived in predominantly black neighborhoods.... The prosecutor's notes did not indicate which potential jurors were white or lived in predominately white neighborhoods. Judge Weeks' ruling also noted that prosecutors had a 'cheat sheet' that instructed prosecutors how to deflect charges of racial bias in jury strikes. In one case, the prosecution struck black jurors at twice the rate of white jurors; in the other two cases, the rate was four times as high."

The court's ruling was "based primarily on the words and deeds of the prosecutors involved in these cases," Judge Weeks said. "Despite protestations to the contrary, their words, their deeds, speak volumes. During presentation of evidence, the court finds powerful and persuasive evidence of racial consciousness, race-based decision making in the writings of prosecutors long buried in the case files and brought to light for the first time during this hearing."

Now that the Racial Justice Act has been repealed, however, whether death penalty cases in North Carolina will be "free of prejudice" – the phrase used by former Governor Perdue – is again a matter of debate.

On April 14, 2014, the North Carolina Supreme Court agreed to hear appeals in the cases of the four prisoners whose death sentences were reduced to life without parole under the Act – Marcus Robinson, Tilmon Golphin, Christina Walters and Quintel Augustine. Prosecutors are seeking to have their death sentences reinstated. The state Supreme Court is composed of seven justices; one is black and the other six are white. Not that race matters, of course.

Sources: *www.journalnow.com, Raleigh News & Observer, www.cnn.com, The New York Times, www.wral.com, www.american-bar.org, Associated Press, www.ncapd.org*





*Stamps for* **CASH!**
*Great Goods will buy your stamps!*

**70%** of Face Value: *Complete books or sheets of Forever Stamps*

**65%** of Face Value: Complete books, sheets, or rolls of 45-cent stamps

**60%** of Face Value: Complete books or sheets of high denomination stamps above 45-cent

**Payment sent within 24 hours of receipt.**

WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps. • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

# GREAT GOODS
**PO Box 399, West Chesterfield NH 03466**
**www.greatgoods.org**

# Prison Closures Cause Economic Turmoil

Shrinking state budgets across the country are leading to prison closures that in turn have a negative impact on communities that depend on the facilities as a source of jobs and revenue. [See: *PLN*, June 2013, p.1; April 2009, p.1]. Small towns in Kentucky, Georgia and New York are among those facing recent adjustments to this new economic reality, but some local residents and lawmakers have fought back with campaigns to keep the prisons open.

The city of Wheelwright, Kentucky was hit hard by the closure of the 600-bed Otter Creek Correctional Center, a prison owned and operated by Corrections Corporation of America (CCA). Officials said over 170 jobs were lost, although CCA pledged to relocate as many employees as possible to other facilities. The company said the June 2012 closing of Otter Creek was necessary after Kentucky did not renew its contact to house state prisoners at the facility.

"A lot of them [the employees] live within the city and a lot of them live in the community, you know," said Andy Akers, Wheelwright's mayor. "We're a tight knit community around here." Just before the closure of the prison, Akers had predicted a devastating impact on local businesses, fearing the city's economy would suffer.

"If you don't have jobs you can't spend money at them. Money keeps rolling over and over when you spend it," he said. "I hate to see it closing, but if there's any way we can help we're trying."

Kentucky also declined to renew its last contract with CCA in June 2013, to house prisoners at the company's 826-bed Marion Adjustment Center in St. Mary. State officials said the decision would save $1.5 to $2.5 million per year, and the prisoners will be moved to other facilities. CCA vice president Steve Owen said the non-renewal of the contract, resulting in the closure of the prison, was "disappointing" – though he was likely referring to the economic impact it would have on the company rather than the local community.

Kentucky DOC spokesperson Jennifer Brislin said the state would assist the 166 CCA employees whose jobs were eliminated due to the facility's closure.

"We understand that this creates uncertainty for them," she stated. "We're mindful that this creates an enormous challenge." However, "It's just to help with applications and the like," she clarified. "Obviously, that doesn't guarantee a job" elsewhere.

Additionally, CCA announced in December 2013 that it would be closing the North Georgia Detention Center in Gainesville, Georgia due to a decline in the number of immigration detainees held at the facility. The closure will affect around 130 employees.

City Manager Kip Padgett said they "will be exploring all options for future use of the facility"; Gainesville had expected to receive $825,000 in rent from the CCA-operated detention center for fiscal year 2014. The facility also had a $7 million payroll and CCA spent around $295,000 with local businesses.

"It was news to us," Gainesville Mayor Pro-Tem Bob Hamrick said, in regard to CCA's unexpected announcement that it was closing the detention center. "Obviously, it is a blow to our employment here. But, hopefully, we can come up with some way to not only absorb the employees that will be laid off but also to find some use for that facility."

In New York, a community group organized to prevent the state from closing the Chateaugay Correctional Facility as scheduled on July 26, 2014, which will eliminate up to 111 jobs with a $5.8 million annual payroll. The Save Chateaugay Correctional Facility Task Force published a 30-page booklet describing the impact the closure will have on the community and Franklin County.

For example, the booklet compares the number of jobs lost in Chateaugay to the equivalent of 6,000 jobs lost in Brooklyn. It also notes that Chateaugay is the state's newest medium-security prison, and that it will cost less to operate once the facility starts using natural gas instead of fuel oil, taking advantage of a pipeline project in the county.

Chateaugay is one of four prisons scheduled to close under a proposal announced by New York Governor Andrew Cuomo in July 2013, but state lawmakers questioned whether the closures are truly justified. State Senator Kathleen Marchione, who has been critical of the plan, said "misplaced priorities" are to blame for closing 15 New York correctional facilities since 2011. She said she will fight to keep open the Mt. McGregor prison, a medium-security facility located in the legislative district she represents.

"The closure of Mt. McGregor would cost our community 320 public safety positions and hurt the local economy," Marchione argued. "I disagree with the administration's closure proposal that would impact the public safety professionals who serve New York with honor and work in some of the toughest, most stressful and dangerous conditions imaginable."

In addition to Chateaugay and Mt. McGregor, the Cuomo administration has announced the closure of the Butler Correctional Facility in Red Creek and Monterey Shock Facility in Beaver Dams. Closing the four prisons will save an estimated $30 million.

Groups that represent prison employees have mounted opposition to the closures, claiming that shutting down the four facilities does nothing to alleviate the condition of more than 10,000 state prisoners who are still double-bunked due to steps taken by former Governor Mario Cuomo in the 1990s to address prison overcrowding.

The New York State Correctional Officers & Police Benevolent Association called the state's decision to close the prisons "political posturing," "insulting" and "a show of disrespect." The association called on its members to hold rallies, sign petitions and contact their legislators to oppose the closures, urging them to "Stand with your brothers and sisters and stop the closures of more prisons and mental health agencies! Enough is enough! Your facility could be next!"

Local resolutions have been passed by officials in the cities and counties affected by the prison closures, including the towns of Wilton and Chateaugay as well as Chemung, Franklin, Wayne and Saratoga Counties.

Contending that the legislature was blindsided by the Cuomo administration's plan, Senator Marchione and State Assemblyman James Tedisco both introduced bills that would require approval by state lawmakers before any prisons could be closed. The legislation would also require the state to announce closings at least a year in advance.

Although the four facilities are expected to close as planned, the legislature imposed a two-year moratorium – until July 2016 – on any further prison closures.

Officials with the state Department of

Corrections and Community Supervision (DOCCS) said the crime rate in New York has fallen 13% over the past decade, reducing the need for prison capacity. Further, the state's prison population has dropped nearly 24% since 1999, from 71,600 to around 54,100.

 "As the inmate population has continued to decline, prisons that are no longer needed can close," stated DOCCS Commissioner Anthony J. Annucci. "By pursuing policies that are tough, smart and fair, we can maintain or improve public safety on the outside, so there is less need to put offenders on the inside, delivering great savings to New York."

Meanwhile, prison officials pledged to do what they can to soften the impact on state employees. "At the time of the closure announcement there were 673 employees at the four facilities," according to a DOCCS statement. "As of February 3, 2014, there were 386 staff remaining, and DOCCS personnel have been holding another round of meetings with those staff members to assist in planning their transitions."

State officials noted that since the closings were announced there has been "a gradual transition of staff to other prisons, other state agencies or retirement."

Sources: *www.wkyt.com, www.floydcounty-times.com, www.pressrepublican.com, www.legislativegazette.com, www.gainesvilletimes.com, www.abc12.com, www.mlive.com, www.corrections.com, Associated Press, www.kentucky.com, Atlanta Journal-Constitution, www.nyscopba.org*

## Administrators Fired at Privately-Run Texas Jail

THE WARDEN AND HEAD OF SECURITY at the Liberty County Jail (LCJ) in Liberty, Texas have been fired in the wake of allegations that the chief of security sexually assaulted a female prisoner at the facility. The 285-bed jail is operated by the New Jersey-based Community Education Centers (CEC), a for-profit company.

Warden Timothy New and Chief of Security Kenneth Reid Nunn were fired in September 2012, just days after the county received a notice of claim from attorney Paul Houston LaValle on behalf of former LCJ prisoner Brandy Nichole O'Brien. O'Brien had been incarcerated at LCJ for failing to make timely child support payments.

According to the notice of claim, O'Brien "was repeatedly subjected to assault and battery, sexual assault, deviant sexual assault, humiliation, degradation and intentional infliction of emotional distress at the hands of Chief of Security Kenneth Reid Nunn and others" while incarcerated at the privately-run lock-up.

"Further, when Chief Nunn was repeatedly caught violating my client's rights by other members of the jail staff or sheriff's office, my client was threatened, coerced and coached on the statements she gave to investigators by Warden Tim New and others," LaValle wrote.

In a statement announcing the terminations of New and Nunn, CEC said it was working with law enforcement to investigate staff at the jail.

"The allegations, which have just come to the company's attention, apparently began approximately a year ago when, as a weekender, [O'Brien] encountered the jail's former employees and began cooperating with law enforcement," said CEC representative Christopher Creeder.

Liberty County has a $4 million annual contract with CEC to operate the jail. CEC manages eight secure facilities in Ohio, Pennsylvania and Texas, and "provides a full range of therapeutic residential and non-residential reentry services with a documented record of reducing recidivism," according to the company's website.

Sources: *www.yourhoustonnews.com, www.cecintl.com, www.libertytxsheriff.com*



STRENGTH STACK 52

114 BODYWEIGHT EXERCISE CARDS INSIDE!

JUST $21.95!* (shipping included)

Experience the Game of Fit!

Send money orders or institutional checks made payable to:
Prisoner Assistant
Po Box 704
Lake Harmony PA 18624

Features:
-Soft cover book with perforated-card stock for playing cards.
-Many fitness games available.
-Effective NEW bodyweight training system.
-Exercise your entire body with no equipment.



NOLO

Win Your Lawsuit
Sue in California Superior Court
Without a Lawyer
Judge Roderic Duncan

Win Your Lawsuit
Sue in California Superior Court Without a Lawyer

$39.99

Order from **Prison Legal News**
P.O. Box 1151
Lake Worth, FL 33460
561-360-2523
Add $6 shipping for orders under $50

www.prisonlegalnews.org

## Pen Pals for Prisoners

Your ad on the Internet worldwide: One year for $9.95. Mail name & address for FREE order form or online:

**www.PrisonerPal.com**

PO Box 19689

Houston, TX 77224

# North Carolina: Hundreds of Federal Prisoners Legally Innocent, Some Still Incarcerated

*by Derek Gilna*

Following a 2011 federal appellate court ruling, the U.S. Department of Justice (DOJ) initially tried to delay the release of federal prisoners who were wrongly convicted in North Carolina. The government later announced that it would halt such tactics, but has continued to oppose challenges filed by some offenders who are legally innocent.

The DOJ's actions followed a review of prosecutions in three federal courts in North Carolina. DOJ spokesman Wyn Hornbuckle said "many more" cases could surface when all of the state's federal court cases are examined.

The prisoners were convicted of possessing firearms in what the Fourth Circuit Court of Appeals held was a misapplication of the sentencing criteria, a circumstance unique to North Carolina due to the state's system of "structured sentencing." Adopted by the state legislature in 1993, the system mandates that the maximum prison term for any given crime is based on the offender's criminal record. As a result, sentences for even minor crimes can extend for years if a defendant has numerous prior offenses.

Federal law provides that anyone convicted of a crime punishable by more than a year in prison is considered a felon, and thereby prohibited from possessing a firearm or ammunition. However, that provision of federal law, as imposed by North Carolina federal courts, conflicted with the state's structured sentencing.

For example, an offender convicted of a minor crime in a North Carolina state court – writing a bad check, for example – would be considered a felon under federal law if his or her prior record was serious enough to warrant a prison sentence longer than a year. Federal courts proceeded under the notion that if one person convicted of writing a bad check was considered a felon, then all offenders convicted of writing bad checks were felons ... even if a defendant's record warranted a sentence of less than one year under the state's structured sentencing system. Consequently, offenders found in possession of a firearm were charged with violating federal law even if their prior state offenses should not have been considered felonies.

The Fourth Circuit held in August 2011, in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc), that federal courts had been misapplying the law. Only those offenders who could have actually faced a prison sentence of longer than a year, the appellate court held, should be considered felons under federal law. As a result, scores of federal defendants should not have been prosecuted for being felons in possession of a firearm, because they didn't meet the legal definition of "felon" at the time they were charged.

The ruling in *Simmons* meant that about half of the convictions in North Carolina state courts over the past decade should no longer be considered felonies under federal law. A 2012 investigation by *USA Today* concluded that "none of them [prisoners serving time for firearm possession] had criminal records serious enough to make them felons under federal law."

*USA Today*'s investigation examined firearm possession convictions in western North Carolina between 2005 and 2011, and "was limited to people who had been convicted only of gun possession and included only those cases in which federal prosecutors had specifically identified the prior offense that made possession a crime."

In the wake of *Simmons*, the DOJ initially did little to address the problem of offenders serving federal prison terms despite being legally innocent. In fact, the Department of Justice did not try to identify or notify the affected prisoners, and even argued in individual prisoners' cases that they should not be released.

DOJ officials claimed it wasn't their responsibility to inform prisoners who were serving sentences for what the Fourth Circuit had determined was no longer a crime. While federal prosecutors conceded the prisoners were innocent, they maintained that offenders affected by *Simmons* had to follow federal court rules and file motions challenging their convictions and sentences.

"We can't be outcome driven," said Anne Tompkins, the U.S. Attorney in Charlotte. "We've got to make sure we follow the law, and people should want us to do that." She added that her office was "looking diligently for ways, within the confines of the law, to recommend relief for defendants who are legally innocent."

That effort apparently was not a high priority, however. Ripley Rand, the U.S. Attorney in Greensboro who conducted the DOJ's review of cases affected by *Simmons*, conceded that more than a third of the firearm cases prosecuted by his office might be called into question. "We're going to be addressing this for a while," he remarked. In fact, the 20 prosecutors in his office were so inundated by prisoners challenging their sentences that other prosecutions were placed on hold. "It's definitely been a huge burden," Rand said.

"No one wants anyone to spend time in jail who should not be there," noted one prosecutor in Raleigh, that cases that are already final "are in a totally different posture and require us to follow the existing statutory habeas law." Rand added that he was "not aware of any procedural mechanism by which [the affected prisoners] can be afforded relief."

Defense attorneys disagreed, saying federal prosecutors should assume a greater role in identifying cases for review. "We're doing it with our hands tied," said Eric Placke, a Greensboro public defender. "I appreciate the compelling considerations they have to deal with. But I do think in cases of actual innocence that it would be nice, to say the least, if they would be a little more proactive." He said his office was handicapped by limited access to records in closed cases.

Legal experts agreed that the procedural approach to such cases was not an easy one. Saying "I'm innocent" may not be sufficient for a successful challenge, according to Nancy King, a law professor at Vanderbilt University. Nevertheless, she noted, "innocent people should be able to get out of prison."

Following *Simmons*, federal judges have freed numerous prisoners and removed others from post-release supervision. Some had been incarcerated for up to eight years. Since *Simmons* was decided, it has been cited in over 200 Fourth Circuit decisions and more than 960 rulings in North Carolina district courts as of July 1, 2014.

One of the first federal prisoners to have his conviction vacated was Terrell McCullum. Prosecutors had opposed his release. "At most, [McCullum] has become legally innocent of the charges against him," federal prosecutors stated in an April 2012 court filing, arguing that he still had a criminal record and possessed a gun, and should not be freed.

In August 2012, U.S. District Court Judge James Fox rejected the prosecution's arguments and reversed McCullum's conviction "in the interests of justice," even though he had already completed his sentence and been released a month earlier.

"After careful consideration, the Department of Justice has decided to take a litigating position designed to accelerate relief for defendants in these cases who, by virtue of a subsequent court decision, are no longer guilty of a federal crime," DOJ spokeswoman Adora Andy said shortly before the court ruled in McCullum's case. "We are working with the court, the probation office and the federal public defenders to ensure that these matters are addressed as effectively and quickly as possible."

Another federal prisoner, Marion Howard, was freed on December 5, 2012 after appealing to the court in a letter to "please rule on my case before the holidays" so he could be home with his family. Many other prisoners have since been released as a result of the *Simmons* decision, and cases are still working their way through the court system.

On May 23, 2014, for example, U.S. District Court Judge Martin Reidinger ruled on a pro se habeas petition filed by federal prisoner Marvin Barnette. "The Government concedes that the Petitioner's motion has merit, and although the motion was untimely presented, the Government agrees to waive the defense of the statute of limitations to Petitioner's claims," the court said.

"Petitioner's sentence was enhanced based on his prior convictions for breaking and entering.... As the Government concedes, and as reflected by the state-court judgments relevant to these convictions, these offenses were Class H felonies, and at the time Petitioner was convicted of these offenses, Petitioner was a prior record level II," Judge Reidinger wrote. "As such, the maximum sentence Petitioner could have received for either of these offenses was 10 months. Because Petitioner could not have received a sentence of more than one year in prison based on these convictions under North Carolina law, *Simmons* dictates that these convictions no longer qualify as 'violent felonies' for purposes of the ACCA [Armed Career Criminal Act]."

Judge Reidinger vacated Barnette's sentence and granted a resentencing hearing. See: *Barnette v. United States*, U.S.D.C. (W.D. NC), Case No. 3:08-cr-00124-MR-1; 2014 U.S. Dist. LEXIS 71118.

On April 8, 2014, the Fourth Circuit held that a defendant sentenced as a career offender before *Simmons* was decided, but who could not be designated a career offender after *Simmons*, constituted a "fundamental miscarriage of justice" that warranted equitable tolling of the statute of limitations and habeas relief. See: *Whiteside v. United States*, 748 F.3d 541 (4th Cir. 2014).

However, others have not been as fortunate. Federal prisoner Clyde Dial, Jr. filed a motion to vacate under 28 U.S.C. § 2255 challenging his guilty plea to two charges with an Armed Career Criminal Act enhancement, arguing that "the convictions used to apply the enhancement no longer qualify as felonies" after *Simmons*. He had received a 176-month prison sentence. However, as part of his plea agreement Dial waived his right to challenge his conviction or sentence under 28 U.S.C. § 2255.

The DOJ opposed Dial's motion and sought to enforce the terms of the plea agreement. The district court agreed with the government, finding in a June 18, 2014 order that Dial had knowingly waived his right to seek relief – even though he was legally innocent with respect to the ACCA enhancement. See: *Dial v. United States*, U.S.D.C. (E.D. NC), Case No. 7:02-cr-00090-F1; 2014 U.S. Dist. LEXIS 83017.

The ACLU of North Carolina estimated in 2012 that more than 3,000 federal prisoners may be entitled to relief as a result of *Simmons*, including reduced sentences or release from prison, because they are legally innocent. In some cases, though, such innocence means little to federal prosecutors. ◢

Sources: *USA Today, www.whiteandhearne. com, www.reason.com, Associated Press, www.pagepate.com*

---

## Law Office of Benjamin Ramos

705 E Bidwell, Suite 2-359
Folsom, CA 95630
916-358-9842

EXPERIENCED HABEAS CORPUS PRACTITIONER, ADMITTED IN ALL CALIFORNIA STATE *AND FEDERAL COURTS*

**www.lawofficeofbenjaminramos.com**

- 28 Successful Habeas Corpus Petitions Against the BPH/Governor/CDCR
- Numerous successful appeals in criminal cases in California State Courts
- Representation in *Federal Court on § 2255 Motions* and Federal Appeals
- Parole Hearing Representation since 2000, appointed to more than 700 parole cases; numerous private parole hearing clients; successful law practice since 1991.
- Writs Challenging Parole Denial/Governor Reversal
- Writs Challenging Bogus Gang Validation Decisions
- Writs to Enforce Broken Plea Agreements

# Do Faith-Based Prisons Work?

## by Alexander Volokh

There are a lot of faith-based prison programs out there. As of 2005, 19 states and the federal government had some sort of residential faith-based program, aimed at rehabilitating participating prisoners by teaching them subjects like "ethical decision-making, anger management, victim restitution" and substance abuse in conjunction with religious principles.

One of them – the InnerChange Freedom Initiative program in Iowa – was struck down on Establishment Clause grounds in 2006, but various faith-based prison programs still exist, including InnerChange programs in other states. InnerChange programs, which are explicitly motivated by Christian and Biblical principles, are probably more vulnerable to constitutional challenges; programs that are more interfaith and have less explicitly religious content, like Florida's Faith- and Character-Based Institutions or the federal Life Connections Program, are probably less so.

Faith-based prisons continue to be promoted as promising avenues for reform, chiefly on the grounds that they improve prison discipline and reduce recidivism. Unfortunately – even if we ignore the constitutional issues – most of the empirical studies of the effectiveness of faith-based prisons have serious methodological problems and, to the extent they find any positive effect of faith-based prisons, can't be taken at face value. Those few empirical studies that approach methodological validity either fail to show that faith-based prisons reduce recidivism, or provide weak evidence in favor of them.

\* \* \*

The most serious problem with studies of the effectiveness of faith-based prisons is the self-selection problem. Prisoners obviously choose faith-based prisons voluntarily. And the factors that would make a prisoner choose a faith-based prison may also make him less likely to commit crimes in the future. (One such factor might be religiosity itself). Also, a prisoner who takes the trouble to choose a rehabilitative program may be more motivated to change, and this may make him more likely to change.

As a result, faith-based programs might *appear* to have better results because its participants have lower recidivism rates – but this might have nothing to do with whether the programs actually "work." A program with zero effect that successfully attracts better prisoners will appear to have better results – in fact, even a program that's slightly *harmful* (i.e., has a negative "treatment effect") might appear to have better results, as long as it attracts prisoners who are sufficiently better (i.e., has a positive "selection effect"). If the positive selection effect is greater than the negative treatment effect, the program might fool naïve observers into thinking it's a success.

Therefore, what we certainly don't want to do is just compare the results of participants in a faith-based program with those of non-participants. (Nonetheless, some studies do this!). This presents the self-selection effect in its most naked form – and the results of such a study can't be taken seriously.

Other studies are slightly more sophisticated. They compare the group of participants with a matched group of non-participants, where non-participants are matched to participants based on various observable factors like race, age, criminal history and the like. Thus, suppose there are 100 participants and 1,000 non-participants. As stated above, we shouldn't just compare the 100 with the 1,000 – the 100 are systematically different from the 1,000, because the 100 chose to participate and the 1,000 didn't. The 100 have some sort of motivation that sets them apart from everyone else, even apart from any effectiveness of the program. Instead, what these studies do is take the 1,000 non-participants and identify 100 who "look like" the 100 participants – each of the 100 non-participants is as close as possible to one of the participants in race, sex, age, education and other observable factors. The hope is that comparing the 100 participants with the 100 *matched* non-participants will make for a more valid comparison.

Alas, this hope is probably unjustified. Even if you could perfectly match the 100 participants with 100 non-participants who looked very similar, you can only match prisoners based on *observable* factors like race, sex, age and so on. But one of the most important factors – motivation to change – is unobservable. So, in my view, these studies, though somewhat more sophisticated, still aren't good enough to overcome the self-selection problem.

The third type of study uses a more sophisticated statistical technique called "propensity score" matching. Participants are matched to participants not based on observable factors directly, but based on their propensity score, that is, their estimated probability of participating in the program. But these propensity scores are generated using observable characteristics like race, sex, age, education and so on. Motivation remains unobservable, and that's still one of the most important factors in whether a released prisoner reoffends. So propensity scores still don't solve the self-selection problem.

So far, we've seen three types of studies – naïve comparisons of participants to non-participants, matching based on some observable characteristics, and matching based on propensity scores. None of these three types of studies are credible because they don't account for self-selection. Prisoners who are motivated enough to choose to participate in a rehabilitative program are already less likely to reoffend. So any study that compares voluntary participants and voluntary non-participants may just be picking up the effect of being a good person, not the effect of the program itself. (Some of these studies are subject to even further sources of bias. For instance, in addition to self-selection in the decision whether and how intensively to participate, there can be selection by the program staff in the decision of whom to admit or whom to kick out, as well as "success bias" in the consideration only of those who completed the program without dropping out).

In my view, the only credible studies so far fall into a fourth category – those that compare (voluntary) participants in faith-based programs with people who volunteered for the program but were rejected.

Finally, a class of statistically valid studies! Unfortunately, the results from these studies generally aren't good. In a 2003 evaluation of the Texas Inner-

Change program, there was no significant difference between how well accepted and rejected volunteers did in terms of two-year arrest or reincarceration rates. Same goes for a 2003 evaluation of the Biblical Correctives to Thinking Errors program at Indiana's Putnamville Correctional Facility, a 2004 evaluation of the Kairos Horizon Communities in Prison program at Florida's Tomoka Correctional Institution and a 2009 evaluation of Florida's dorm-based "faith and character" programs.

I've looked at two evaluations of an *after-care* program for ex-prisoners, the Detroit Transition of Prisoners program. This program may confer some benefits, though it's hard to say because the results aren't reported in a form that would make this easy to determine. But even if this program is successful, we still have to grapple with the "resources problem": The studies compare participation in the program either with the alternative of no program at all or with the "business as usual" alternative of whatever other programs happen to be available, rather than with participation in a comparably funded secular program.

Thus, even if a religious program is better than nothing at all, it could be because of the greater access to treatment resources (for instance, mentors and counselors) and not because of the religious content of the program.

\* \* \*

In the end, this article has bad news and good news.

The bad news, as explained above, is that most studies are low-quality and the results of the higher-quality studies aren't promising. There seems to be little empirical reason to believe that faith-based prisons work.

The good news is that there's also no proof that they don't work. The absence of statistically valid or statistically significant findings isn't the same as the presence of negative findings. And while the self-selection problem is real and important, the resources problem may not even be a problem at all: maybe the "zero alternative" or the "business as usual" alternatives really are proper empirical baselines, since they reflect both reality and, perhaps, political feasibility. So the picture isn't uniformly bleak;

there are some programs that seem to show some statistically significant effects, even if they're weak and even if we're not sure how well they compare to the hypothetical effects of a hypothetical, comparably funded secular program.

Perhaps future research will shed light on these questions. In the meantime, clearly some groups want to have faith-based prisons, some prisoners want to attend them and they probably do little if any harm. If some programs don't work, this is an indication to future practitioners that something needs to be changed; if some programs work, maybe they can be replicated elsewhere. Better results won't emerge unless they're allowed to emerge by a process of experimentation. ◗

*Alexander Volokh blogs at the Volokh Conspiracy (www.washingtonpost.com/news/volokh-conspiracy) and is an Associate Professor of Law at the Emory University School of Law; this is a synopsis of his research on faith-based prisons, which was published in the* Alabama Law Review *(Vol. 63, 2011). He provided this article exclusively for Prison Legal News.*

---



### Complete GED Preparation
[Paperback]
Publisher: Steck-Vaughn; 2nd edition
*928 pages; $24.99; Item #: 1099*

Over 2,000 GED-style questions thoroughly prepare learners for test day. This single book offers thorough coverage of the revised GED Test with new test information, instruction, practice, and practice tests. Answer key included.

Order from: **Prison Legal News**
*(Add $6 shipping for orders under $50)*
**PO Box 1151
Lake Worth, FL 33460
Phone: (561) 360-2523
www.prisonlegalnews.org**

---

# SUBSCRIPTION MADNESS 2014

Our Subscription Madness promotion has been so successful in the past that we have decided to offer it again!

PLN is offering a discount on blocks of 2 or 4 one-year subscriptions for any person not a current or former subscriber who has a US address, whether they are imprisoned or not. Subscription Madness is the only opportunity attorneys, librarians and corrections professionals have to receive a PLN subscription at a fraction of the normal rate of $90 per year, and for prisoner family members and concerned activists to subscribe at a steep discount from the normal rate of $35 per year. Prisoner subscriptions are also less than the normal $30 per year. Check out these discounts!

- **$50 buys 2 one-year subscriptions ($25 each)**
- **$80 buys 4 one-year subscriptions ($20 each)**

If you want to take advantage of Subscription Madness but are stumped for people to send them to, PLN can provide names of indigent prisoners who would love a PLN subscription. Use a separate piece of paper to order by mail, call our office to order with a credit card, or go to our website to order online. **No Renewals!** Sorry, but Subscription Madness is for new one-year subscriptions only, and cannot be used to renew or extend a current or former subscription. PLN is a 501(c)(3) non-profit. (Subscription Madness 2014 expires 12-31-2014).

**Prison Legal News, PO Box 1151, Lake Worth, FL 33460
561-360-2523; www.prisonlegalnews.org**

# SEC Rejects CCA, GEO Group Shareholder Resolutions to Reduce Prison Phone Rates

On February 18, 2014, the Securities and Exchange Commission (SEC) granted a request filed by for-profit prison company GEO Group to exclude a shareholder resolution that sought to reduce the high cost of phone calls made by prisoners at GEO-operated facilities. Ten days later, the SEC granted a request by Corrections Corporation of America (CCA) to exclude a similar shareholder resolution.

The resolutions, filed by Alex Friedmann, managing editor of *PLN* and associate director of the Human Rights Defense Center (HRDC), would have required the companies to forgo "commission" kickbacks from prison phone service providers. [See: *PLN*, Jan. 2014, p.44]. Such kickbacks are typically based on a percentage of revenue generated from inmate telephone services (ITS) – revenue that is mostly paid by prisoners' families.

Specifically, the shareholder resolutions stated that GEO and CCA "shall not accept ITS commissions" at their facilities, and that when the companies contract with prison phone service providers they "shall give the greatest consideration to the overall lowest ITS phone charges among the factors [they consider] when evaluating and entering into ITS contracts." CCA and GEO both filed no-action requests with the SEC seeking to exclude the resolutions from their proxy materials.

According to its SEC filings, GEO Group received $608,108 in prison phone kickbacks in 2012. The shareholder resolution submitted to CCA noted that one of the company's jails, the Silverdale Detention Facility in Chattanooga, Tennessee, received a commission of 48% of prison phone revenue, and that a 15-minute call from that facility cost as much as $9.75.

On February 11, 2014, a Federal Communications Commission (FCC) order went into effect that caps the cost of long distance prison phone calls nationwide at $.25 per minute for collect calls and $.21 per minute for debit and prepaid calls. The order does not apply to intrastate (in-state) prison phone rates, however, which remain high at many correctional facilities. [See: *PLN*, Feb. 2014, p.10; Dec. 2013, p.1].

Research has consistently found that prisoners who maintain close connections with their families while incarcerated have better post-release outcomes and lower recidivism rates. As stated by FCC Commissioner Mignon Clyburn: "Studies have shown that having meaningful contact beyond prison walls can make a real difference in maintaining community ties, promoting rehabilitation, and reducing recidivism. Making these calls more affordable can facilitate all of these objectives and more." [See: *PLN*, April 2014, p.24].

GEO Group objected to the shareholder resolution by arguing that Friedmann had a "personal grievance" or would personally benefit from reducing prison phone rates at the company's facilities; that the resolution did not address an issue significantly related to the company's business; that it lacked the power or authority to implement the resolution; that the proposal concerned GEO's ordinary business operations; and that the resolution constituted "multiple proposals."

"GEO Group basically threw the kitchen sink at the resolution seeking to exclude it, and was ultimately successful," said Friedmann. "This is what happens when essential public safety and criminal justice services, such as operating prisons, are contracted out to a private corporation without a conscience that is only interested in making money."

He added, "Make no mistake, when GEO claims it is interested in rehabilitating offenders, as it does on its website, it is merely providing lip-service. GEO Group had an opportunity to make a real difference in terms of increasing the ability of prisoners to stay in touch with their families, which would benefit our communities through lower recidivism rates and thus less crime and victimization. Instead, the company protected its profits from prison phone kickbacks."

Similarly, with respect to CCA, Friedmann said: "The company claims that it's interested in rehabilitating offenders, but when faced with a resolution that would have reduced phone rates at its for-profit facilities, thereby having a rehabilitative effect on prisoners and resulting in less recidivism, CCA decided its profits from prison phone kickbacks were more important. Which demonstrates that despite its corporate PR rhetoric, CCA cares little about rehabilitation or public safety."

Friedmann was ably represented before the SEC by attorneys Jeffrey Lowenthal and Jon Burke with the New York-based law firm of Stroock, Stroock & Lavan.

Source: *HRDC press releases (March 3, 2014 and Feb. 19, 2014)*

# Seventh Circuit: No Qualified Immunity for Diabetic Detainee's Death

*by Mark Wilson*

On August 20, 2013, the Seventh Circuit affirmed a district court's denial of qualified immunity in a case concerning an Illinois pretrial detainee's death due to medical neglect.

Phillip Okoro, 23, was arrested for a misdemeanor property offense in October 2008 and held at the Williamson County Jail. Although *Gerstein v. Pugh*, 420 U.S. 103 (1975) requires a probable cause hearing to be held within 48 hours, Okoro was incarcerated for 69 days without such a hearing.

As a teenager, Okoro was diagnosed with Type I diabetes, which he controlled by carefully monitoring his blood sugar levels. In college, however, Okoro's health deteriorated when he suffered from schizophrenia and stopped monitoring his diabetes.

Williamson County contracts with Health Professionals, Ltd. (HPL) to provide medical care at the county jail. Immediately after his arrest, Okoro's family alerted jail and medical staff about his mental illness and diabetes.

While incarcerated, Okoro was confined in an isolation cell under the care of HPL employees Dr. Jogendra Chhabra and Nurse Marilyn Ann Reynolds. He was dependent on jail and medical staff to monitor his blood sugar levels, provide insulin shots and deliver other necessary medical treatment.

On December 23, 2008, Okoro collapsed in his cell and died from diabetic ketoacidosis, a buildup of acidic ketones in the bloodstream that occurs when the body runs out of insulin.

Okoro's sister, Jaclyn Currie, filed a federal lawsuit against jail officials, HPL, Dr. Chhabra, Nurse Reynolds and others. She alleged the defendants were deliberately indifferent to Okoro's medical needs and his death was "completely preventable" with adequate medical care, regular blood sugar monitoring and sufficient insulin.

Currie initially claimed violations of the Eighth and Fourteenth Amendments. "At the close of discovery, however, in response to the defendants' motion for summary judgment, Currie argued for the first time that the Fourth Amendment's 'objectively unreasonable' standard should govern," since Okoro was a pretrial detainee. The district court granted Currie leave to amend her complaint to allege a Fourth Amendment violation.

Shortly after that ruling the county and jail officials settled with Currie, leaving HPL and its employees, Chhabra and Reynolds, as the only remaining defendants.

The HPL defendants then moved to dismiss, claiming they were entitled to qualified immunity because the Fourth Amendment has not been applied to medical professional subcontractors. When the district court denied their motion, Chhabra and Reynolds filed an interlocutory appeal.

"A jailer might violate an arrestee's Fourth Amendment rights by unreasonably denying the arrestee access to insulin," they argued, "but a health care professional who unreasonably withholds insulin does not."

The Seventh Circuit found their argument lacked "support in law or logic," noting that "from the perspective of the arrestee, it matters not a whit whether it is the jailer or the doctor whose conduct deprives him of life-saving medical care."

Following the Sixth Circuit's reasoning in *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), the appellate court found "the contours of Okoro's Fourth Amendment rights were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right' throughout the period of Okoro's detention."

The Court of Appeals also rejected the defendants' argument that they were entitled to qualified immunity because they were unaware of Okoro's legal status as a pretrial detainee.

Such an argument "assumes that health care providers calibrate the level of medical care they provide to a jail inmate based on their assessment of the inmate's legal status, taking advantage of the right to be sloppy where the standard is lower," the Seventh Circuit observed. "We sincerely hope that this is not how Chhabra, Reynolds, and Health Professionals, Ltd. go about caring for those in the State's custody." The appellate court concluded that "if the defendants truly tailor their care (or lack thereof) in this fashion, then their failure to ascertain Okoro's correct status cannot be characterized as a 'reasonable' mistake, and their qualified immunity claim still fails." See: *Currie v. Chhabra*, 728 F.3d 626 (7th Cir. 2013).

Following remand, Dr. Chhabra agreed to settle the case in December 2013 for $775,000, resolving claims related to the remaining HPL defendants. Okoro's sister was represented by the Chicago law firm of Loevy & Loevy. ◪

# Update on PLN Suit Against Nevada DOC

**P**RISON LEGAL NEWS continues its efforts to defend its First Amendment right to communicate with prisoners in the Nevada Department of Corrections (NDOC). In 1999 the NDOC banned all copies of PLN, claiming the publication constituted "inmate correspondence." PLN filed suit and was granted a preliminary injunction requiring delivery of PLN subscriptions and mail to Nevada prisoners. The state entered into a consent decree in September 2000, agreeing that prisoners "shall be permitted to subscribe to the publications of their choice," subject only to specified security concerns.

However, ongoing censorship of PLN's monthly magazine and books resulted in a June 2013 lawsuit in which PLN seeks to enjoin the unconstitutional censorship of its publications by prison officials. [See: *PLN*, Nov. 2013, p.18]. In conjunction with the lawsuit, PLN also filed a motion for an order to show cause in the prior suit, seeking to hold the NDOC in contempt for violating provisions of the 2000 consent decree by enacting and enforcing policies that continue to censor PLN's monthly publication and book orders sent to Nevada prisoners. The federal district court later consolidated the two cases.

On June 17, 2014, the NDOC filed a motion to dismiss PLN's suit, claiming a revised mail policy (AR 750) resolved any constitutional issues with the old mail policy. The court has not yet ruled on the motion; a jury trial in the case is scheduled for January 27, 2015. See: *PLN v. Cox*, U.S.D.C. (D. Nev.), Case No. 3:00-cv-00373-HDM-WGC.

PLN relies on information we receive from prisoners to assist us in our litigation, and we invite Nevada readers to contact us concerning censorship of mail and books at NDOC facilities. Specifically, whether prisoners receive notice when mail is withheld or censored, whether they have participated in an appeals process, and if they are receiving book orders without "pre-approval." Nevada prisoners can contact us in these regards at: Prison Legal News, Attn: NV DOC Suit, P.O. Box 1151, Lake Worth, FL 33460. ◪

## CALIFORNIA LIFER NEWSLETTER

**Published by Life Support Alliance**

CLN: Comprehensive newsletter mailed every 8 weeks containing state and federal cases, parole board news, statistics, legislation and articles of interest to Lifers and their supporters.

### CLN SUBSCRIPTIONS

Prisoners .... $30 per year (or 100 stamps)
Others .... $90 per year

**Make checks payable to LSAEF**
(Life Support Alliance Education Fund)
CLN, P.O.Box 277, Rancho Cordova, CA. 95741

*CLN no longer provides copy service of legal cases, articles or news and materials from the Internet.*

www.lifesupportalliance.org   (916) 402-3750

# Flimsy Reasons for Prolonged, Frequent Lockdowns State Eighth Amendment Claim

### by David Reutter

THE SEVENTH CIRCUIT COURT OF Appeals has held that an Illinois prisoner's complaint that frequent lockdowns for substantial periods of time deprived him of exercise and caused him various health problems stated an Eighth Amendment claim. However, the Court found that he failed to state a due process claim concerning the loss of his monthly stipend due to the lockdowns.

The appellate ruling followed a district court's dismissal, under 28 U.S.C § 1915A, of a civil rights complaint filed by Menard Correctional Center (MCC) prisoner Gregory J. Turley. The dismissal addressed Turley's Eighth Amendment claims but not his Fourteenth Amendment claim.

The Seventh Circuit determined that Turley had exhausted his administrative remedies and had brought his action in a timely manner, noting that Illinois has a "two-year statute of limitations, which is tolled while the prisoner exhausts the administrative grievance process." As he was not procedurally barred, the Court of Appeals turned to the merits of the case.

Turley, serving a life sentence, was classified as a "low-aggression offender" and housed in a unit of similarly classified prisoners. Between January 7, 2008 and October 4, 2010, there were 25 lockdowns imposed at the MCC. The longest lasted 81 days and there were 534 total lockdown days, which amounted to lockdown status for "more than 50% of the period in question."

The lockdowns, Turley argued, were "often imposed for non-penologically-related purposes, such as isolated fights between two inmates from other cellhouses, rumors of a potential fight or for no reason at all." He further contended "the excessive use of lockdowns arose out of a conspiracy among prison officials and union employees to create a staff shortage and negotiate a pay raise."

Additionally, he alleged "a conspiracy to exaggerate prison response to minor incidents, or no incidents at all, in order to allow staff to take vacation and/or to psychologically punish all prisoners for the misconduct of a few." Finally, he claimed the lockdown periods resulted in his $10 monthly idle pay stipend to be withheld, depriving him of due process.

The Seventh Circuit initially found the district court had wrongly concluded that Turley failed to list the specific periods of lockdown confinement at issue. It then rejected the state's reliance on a lockdown case involving a single prisoner, *Pearson v. Ramos*, 237 F.3d 881 (7th Cir. 2001) [*PLN*, Oct. 2001, p.18]. In doing so, the appellate court rejected the notion of "an ironclad rule that a denial of yard privileges shorter than 90 consecutive days cannot be the basis for an Eighth Amendment claim."

Rather, the Court of Appeals wrote it had previously explained the "norm of proportionality" should be applied in such cases, and that a lockdown not exceeding 90 days could violate the norm if it were "imposed ... for some utterly trivial infraction of the prison's disciplinary rules."

In this case, the Court said it was "confronted with a pattern of prison-wide lockdowns, which Turley alleges occurred for flimsy reasons or no reason at all." He alleged serious injuries resulting from the inability to exercise outside or in his small cell, in the form of "irritable bowel syndrome, severe stress, headaches, and tinnitus."

While the appellate court held that prison officials were made aware of Turley's Eighth Amendment claims through his grievances and prior lawsuits by other MCC prisoners, it found he had a post-deprivation remedy for the stipend claim through the Illinois Court of Claims, thus his due process claim failed. The district court's judgment was reversed in part as to Turley's Eighth Amendment claims and affirmed as to his due process claim, and the case remains pending on remand. See: *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013).

# Illinois $50 State's Attorney Fee Applies Only to Habeas Proceedings

### by Mark Wilson

THE ILLINOIS SUPREME COURT HELD in September 2013 that a $50 State's Attorney fee authorized in habeas corpus cases does not apply to non-habeas collateral proceedings.

After an Illinois trial court dismissed a post-conviction petition filed by state prisoner Omar Johnson, he submitted a petition for relief from judgment under section 2-1401 of the Illinois Code of Civil Procedure.

The state moved to dismiss the petition and requested that Johnson be assessed filing fees and court costs under section 22-105(a) of the Code of Civil Procedure, for filing a frivolous petition.

The trial court granted the state's motion to dismiss and assessed fees and costs against Johnson, including a $50 State's Attorney fee pursuant to section 4-2002.1(a) of the Counties Code, which authorizes the fee in habeas corpus cases. Johnson appealed, lost in the appellate court and the Illinois Supreme Court granted review.

The Supreme Court interpreted section 4-2002.1(a) to determine whether the legislature had intended the fee to extend beyond habeas cases to all collateral proceedings.

"Giving the term 'habeas corpus' ... its plain and ordinary meaning," the Court concluded the fee "only applies to the various types of habeas corpus proceedings." The Court held that "collateral proceedings such as a section 2-1401 petition and a post-conviction petition" are not habeas proceedings, and the legislature did not intend for the fee to "apply 'generically' to all collateral proceedings."

As such, the state Supreme Court reversed in part the judgment of the trial and appellate courts, and remanded with instructions to vacate the $50 State's Attorney fee. See: *People v. Johnson*, 2013 IL 114639, 995 N.E.2d 986 (Ill. 2013).

Although a legal victory, the ruling may be small consolation for Johnson, who is serving natural life plus at least 60 years.



**The Habeas Citebook: Ineffective Assistance of Counsel**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

$49.95

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



**Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition**
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

$49.95

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



**Prisoners' Self-Help Litigation Manual, 4th Edition**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

$45.95

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook,
Ineffective Assistance of Counsel
$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
3rd edition
$49.95

☐ Prisoners' Self-Help
Litigation Manual
4th edition
$45.95

**Shipping included in all prices**

***Order by mail, phone, or on-line.***   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address_____

City _____ State ____ ZIP _____

PUBLISHED BY

**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 1151 • Lake Worth, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

# News in Brief

**Arizona**: A prisoner serving time for gang- and drug-related offenses, as well as his attorney-wife, mother, sister, ex-wife and another woman have been indicted on more than 250 charges following a two-year investigation into the New Mexican Mafia prison gang. Angel Lopez Garcia is accused of being a gang leader who has, since at least 2007, directed drug sales, extortion, money laundering and gang violence from behind bars with assistance from the women named as co-defendants. His wife, Phoenix criminal defense attorney Carmen Fischer, and the four other women accused in the conspiracy, Rosio Robles Gonzales, Oralia L. Garcia, Tanya Garcia-Ochoa and Rosemary Ann Garcia, were arrested on October 4, 2013. Fischer pleaded guilty on March 31, 2014 and was sentenced to three years in prison.

**Arkansas**: St. Francis County deputies have filed a number of new charges against Jonathan Paulman, 22, who was in jail for burglary when he set fire to his cell on October 15, 2013. Paulman told jail officials that he had started the fire as a way to get out to attend his young son's birthday party. He used a contraband cigarette lighter to torch a mattress, towel and laundry bag in the cell he shared with four other prisoners. Paulman told deputies that he planned to blame the arson on someone else. No one was injured in the blaze.

**California**: A licensed bail agent in Modesto was arrested on November 26, 2013 on various charges related to his soliciting gang members at the Stanislaus County Jail to carry out violent crimes, including murder. Praveen Singh, who is also known as "Prajeer Singh," was arrested following a lengthy joint investigation by the Modesto, Turlock and Ceres Police Departments, Stanislaus County Sheriff's Department and Stanislaus County District Attorney's Office.

**Colorado**: Former deputy Matthew Andrews initially pleaded not guilty to helping prisoner Felix Trujillo escape from the downtown Denver Detention Center. [See: *PLN*, Nov. 2013, p.56]. On November 22, 2013, however, he pleaded guilty to a felony charge of attempting to influence a public servant. "What you did is not only a dishonor to yourself but the whole sheriff's department," the judge told Andrews when he sentenced him on January 24, 2014 to the maximum six years in prison.

**Delaware**: State police announced on November 20, 2013 that Christopher Peck, a guard at the Sussex Correctional Institution, had been arrested and charged with sexual misconduct. Peck, 39, faces 11 counts of sexual relations in a detention facility. A 19-year-old prisoner reported that she had sex with Peck, and in the course of the investigation police learned that two other prisoners, aged 27 and 28, had also been victimized by the guard. Peck entered a guilty plea to six of the charges and was sentenced to three years in prison on June 6, 2014.

**District of Columbia**: Trey Radel – now known as the "Cocaine Congressman" – voted to allow states to drug test food stamp recipients. It turns out that he should have been the one tested for drugs. Radel pleaded guilty to buying cocaine in an FBI and DEA sting operation, and was sentenced in November 2013 to one year of probation and residential substance abuse treatment. According to the Associated Press, Radel's guilty plea to the misdemeanor drug possession charge was the first by a sitting congressman in 31 years. Radel is fortunate to have been sentenced in D.C., where a special drug court handles certain drug offense cases.

**Florida**: Two Orange County jail guards were fired on October 11, 2013 after fighting on a charter bus while headed home from a charity event. Michael Dean and Donald Casey had been drinking when Dean thought Casey made comments about his girlfriend, also a jail guard. Investigators said Dean initiated the fight by throwing a punch, and afterward Casey threatened to stab him. The bus driver said all of the jail employees were "very drunk and very rude," and had trashed the bus. Dean was reinstated to his job in January 2014 but demoted.

**Florida**: Alexander Lansky, a property clerk at the Pinellas County Jail, admitted to having an addiction to prescription pills when detectives interviewed him following complaints from two prisoners who said their legally-prescribed painkillers were missing from their property when they were released from jail. The sheriff's office accused Lansky of stealing Vicodin, Percocet and morphine pills from five prisoners, and he was charged with five counts of grand theft and five counts of possession of prescription drugs on October 22, 2013.

**Idaho**: The Idaho Department of Correction announced on November 13, 2013 that it was suspending visitation for all prisoners in Unit 2 at the Pocatello Women's Correctional Center after a prisoner tested positive for hepatitis A. Prison staff also suspended all prisoner transfers into and out of the facility while health care providers watched for more possible cases. Unit 2 prisoners were scheduled to receive hepatitis A vaccine and immune globulin as a precaution.

**Illinois**: Former Wills County courthouse bailiff Jerome W. Henry was sentenced in August 2013 to three years in prison for possession of child porn. On November 14, 2013, Judge Sarah Jones granted his motion to reconsider and resentenced him to 147 days in jail, three years' probation, 130 hours of public service and $2,999 in fines and costs. The 130 hours of public service was later waived. Henry, 63, is registered as a sexual predator in the state's online sex offender database.

**Illinois**: On November 26, 2013, Illinois DOC spokesman Tom Shaer said officials at the minimum-security Taylorville Correctional Center were trying to control an outbreak of a skin rash, with at least 17 prisoners reporting symptoms of intense itching. One prisoner was diagnosed as having scabies. One wing of a housing unit was placed on quarantine, and prisoners showing signs of the rash were isolated before being returned to a special quarantine room.

**Iran**: Reza Heydarpour, arrested by the Ministry of Intelligence on November 4, 2013, has not been heard from since being transferred to Evin Prison. Heydarpour was the physician who completed a report on the death of Internet blogger Sattar Beheshti, who died at Evin Prison in October 2012. Beheshti's death was reported by many as the result of severe beatings and torture following his arrest for his online activities. In 2009, another Iranian prison physician, Ramin Pourandarjani, died under suspicious circumstances.

**Libya**: A Libyan security official who spoke with the Associated Press on condition of anonymity said unknown gunmen had attacked the prison in Sabha on November 29, 2013 and succeeded in releasing 40 prisoners. The gunmen helped

the prisoners escape by opening fire and threatening the guards; prison director Shaaban Nasr said scores of escapees later surrendered.

**Montana**: Former prison nurse Tisha Ann Brunell, 45, was facing 53 charges for engaging in sexual misconduct with a prisoner. [See: *PLN*, Sept. 2013, p.17]. A jury trial was held on March 22, 2014 and Brunell was found guilty of 48 of the charges. After she is sentenced, she faces another trial for trying to threaten a witness while she was out on bond.

**New York**: On November 7, 2013, prisoner Armando Ortiz was subjected to a random frisk search at the Marcy Correctional Facility and guards found a handmade sharp instrument attached to his prosthetic leg. A local prosthetics company called in to disassemble the leg found four more razor weapons and a small amount of Suboxone. Ortiz, who was serving 1½ to 3 years for attempted felony assault, faced disciplinary charges but no new criminal charges were filed.

**North Carolina**: Matthew Ethelbert Toney was fired and charged with a felony on November 22, 2013. Toney, a Durham County sheriff's jailer since 1996, is accused of engaging in sexual activity with a prisoner; he posted a $30,000 bond following his arrest and was released.

**Ohio**: James Miracle was fired from his job at the Mansfield Correctional Institution on November 22, 2013. As a building construction supervisor at the prison he was required to properly supervise tools that were used during the July 2013 escape of prisoner James David Myers. Myers, who was serving a life sentence, used a pickax to break into a storage area to get three ladders, which he then used to climb over security fences. He was captured one day later by customers at a convenience store. Miracle also was accused of falsifying forms and forging signatures on maintenance inventories, which "compromised or undermined the security of the institution."

**Oklahoma**: A former guard at the Corrections Corporation of America-operated Cimarron Correctional Facility was charged in November 2013 with bringing contraband into the prison. Alyson Frances Posey was approached by prisoner Reeco Cole, who told her that the father of one of her children, who was incarcerated at another prison, owed him money. She agreed to bring tobacco into the facility to pay off the debt, then began smuggling other contraband for cash payments. She also gave nude photos of herself to Cole. Investigators said Cole denied having any relationship with Posey.

**Oklahoma**: On November 23, 2013, Mayes County jailer Aaron Peters appeared in court to enter a not guilty plea to a charge of rape by instrumentation. Peters, 23, was assigned to supervise a female prisoner during her stay at a hospital. He allegedly entered the bathroom where the prisoner was showering and performed sexual acts on her; he subsequently passed out from the medication she was taking, and awoke to find Peters engaging in sex acts with her. The prisoner's complaint interview was conducted while she was wearing Peters' shirt; she had also stolen his handcuff key.

**Oklahoma**: The Associated Press reported on November 23, 2013 that seven state prisoners were hospitalized over a three-week period with symptoms of salmonella poisoning. Nearly 100 prisoners at the Eddie Warrior, Jim E. Hamilton, Joseph Harp and Bill Johnson correctional centers reported symptoms. Department of Corrections spokesman Jerry Massie said it was uncommon for so many prisoners to fall ill at different facilities. The state Department of Health is investigating the source of the outbreak.

**Pennsylvania**: After a traffic stop on November 11, 2013, John Vincent was arrested on an outstanding warrant. When he was booked into the Northampton County Prison, a strip search revealed that he had attached 18 packets of heroin to his penis with a rubber band. Vincent was charged with possession of drug paraphernalia, possession of heroin and providing false identification to a law enforcement officer. His bail was set at $50,000.

**Pennsylvania**: Six members of the group Citizens for Social Justice were told by Delaware County officials that they did not need a permit to peacefully protest across from the George W. Hill Correctional Facility. When the group gathered on November 5, 2013 at the Community Education Centers-operated prison to highlight issues of abuse and improper releases, they were met by a large show of force and told to move more than a mile away. "They had about 20 guards, K-9s, county police; it looked like a whole Gestapo troop," said

**12 FREE ISSUES!**
FREE!
Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription! Quarterly drawing **WINS $100! (Void in New York)** (Last Quarter's winner from **Airway Heights, WA.)** TELL YOUR FRIENDS!   ACT NOW!!
PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com
**Inmate Magazine Service Inc.**

## News In Brief (cont.)

Pastor Keith Collins, one of the protest organizers. Collins said the group would like to meet with both CEC and the County Prison Board, and encourages the formation of a citizen advisory board to enhance accountability at the prison.

**Texas**: On October 31, 2013, fourteen former workers from the McConnell Unit were sentenced in federal court on racketeering and drug charges. Eleven other people also were convicted for their roles in the scheme. The large-scale criminal enterprise was uncovered when the Texas Department of Criminal Justice and federal agencies began investigating the McConnell Unit in 2009. The Aryan Circle and Mexican cartels were involved in the scheme, which included organizing drug deals outside the prison.

**Texas**: Among other responsibilities, former Winkler County Attorney Steve Taliaferro prosecuted misdemeanor cases. He resigned from his position and pleaded guilty on November 6, 2013 to solicitation of prostitution and official oppression. Taliaferro was audio-recorded propositioning a woman and telling her he would settle her case if she consented to having sex with him. Under the terms of his plea agreement, Taliaferro was ordered to serve 45 days in the Winkler County Jail.

**Texas**: On November 6, 2013, an East Texas parole officer pleaded guilty and was sentenced to 42 months in federal prison for using his state computer to view child pornography. Barry Porter Griffith was arrested after Texas Department of Criminal Justice computer engineers detected an unusual amount of bandwidth being accessed by a system in Griffith's office. Officials were able to remotely view the websites he

was visiting and discovered the presence of child porn. Griffith also surrendered two personal computers that contained child pornography.

**United Kingdom**: The Ministry of Justice was fined £140,000 on October 22, 2013 after it emailed confidential personal information about HMP Cardiff's 1,182 prisoners to families of other prisoners. A spreadsheet containing names, addresses, offense details, sentence length, ethnicity and release dates was mistakenly sent to three families, according to the Information Commissioner's Office. "The potential damage and distress that could have been caused by this serious data breach is obvious," said Director of Data Protection David Smith.

**Utah**: Former Salt Lake City Judge Virginia Ward, who had presided over countless misdemeanor drug cases, was sentenced on November 19, 2013 to 90 days in

---

## PLN Classifieds

**INMATE SPORTS LINES + NEWS**
Emailed to you daily
INFO@forthescoop.com
PO BOX 90594
San Antonio, TX 78209

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare
Manuscripts for Self-Publishing
Reasonable Rates! Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**INMATE PHOTO SERVICE**
Mail your photo to us
We scan and email your
Photo to family + friends
INFO@forthescoop.com
PO BOX 90594
San Antonio, TX 78209

**WINNING LEGAL BRIEFS**
Example legal briefs on prisoner
issues that have WON favorable
decisions in state & fed courts.
For catalog send $1.50 to W.
Barron, 122 Lakeshore Dr, Unit
704-D037, Lake Harmony, PA 18624
$1.50 credit towards your order.

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how
to receive Voices.Con monthly, send
SASE to: PO Box 361, King City, CA 93930.
On the web at: VoicesDotCon.org;
Email: Publisher@VoicesDotCon.org

**FINALLY REAL LADIES/REAL LETTERS**
Genuine, friendly, compassionate
Writers! GUARANTEED RESPONSES!
WE'RE WAITING FOR YOUR LETTERS!
Send a SASE 4 this GREAT news!
Nubian Princess Ent.   Est 1998
POB 37    PLN
Timmonsville, SC 29161

**CONNECT TO OUTSIDE WORLD!**
PP provides services via internet
Your information - social networks
10 sites 20 US, 20 sites 30 US
Free Brochure
PRISONER PROMOTIONS
2355 Fairview Ave #214
Roseville, MN 55113

**Ms. Tahtianna Fermin**
387 Sheperd Ave, Suite 3A
Brooklyn, NY 11208
All types of Legal Services
Inexpensive, from all areas of
law, information on anything.
Specializing in all prison
litigations/civil and criminal.

**Inmate Services! E-mail, Legal**
ads/Walmart Release
Clothing? Send SASE to: Morris
Inmate Serv. 312 E Burke St #B
Martinsburg, WV 25404

**No Bull – Not a Scam**
Direct from Inmateshopper.com
400 Pen Pal addresses $15.98
15% with Photos. 50% American
50% Overseas. No two lists are
the same – RUSH $15.98 TO:
Inmate Shopper, Box 4311
Mission, TX 78574 INFO/SASE

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet
& People Searches, Amazon Books,
Erotic Photos & Stories, PenPals,
Special Requests and Much More.
Send SASE to: Elite Paralegal &
Prisoner Services, PO Box 1717,
Appleton, WI 54912

**GET PUBLISHED, $ FOR SCHOOL**
Inmate anthology seeks authors &
cover artist. Send up to 2 poems
(must be signed) & 1 prose piece
(10pg max) & cover art to NFC,
1957 W Burnside #1660, Port OR
97209 by July 15. Published authors will earn $ for NFC classes

---

jail and three years of probation after pleading guilty to possession of Oxycodone with intent to distribute. Although Ward had initially faced up to 15 years in prison, her attorney said the sentence was "disappointingly harsh." Courtroom observers thought differently; one man reportedly commented "slap on the wrist," while another said, "I would have gotten the same sentence for a speeding ticket."

**Virginia**: Sometime between September and November 2012, former federal prison guard Jeffery T. Jones accepted bribes of at least $1,500 to smuggle over a quarter pound of marijuana and at least 10 cartons of cigarettes into FCC Petersburg. He pleaded guilty to receiving bribes and providing contraband on November 12, 2013. Two prisoners at the facility, Alvin Dewayne Hall and Patrick Gregory, also pleaded guilty to charges in connection with the smuggling scheme.

**Virginia**: Following an internal affairs investigation, a former Henrico County Sheriff's Deputy was arrested on November 21, 2013 and charged with three felony counts of carnal knowledge of an inmate by an employee. Jennifer Ann Baran, 33, resigned from the sheriff's department in May 2012, when the investigation began.

She is accused of having a sexual relationship with a prisoner at Henrico Jail West; the prisoner, who was not identified, was discovered with a cell phone that he then flushed down a toilet. A search of his cell revealed 25 handwritten love letters from Baran.

**Virginia**: Samah Yellardy died at the Powhatan Correctional Center on November 7, 2013. The prison did not notify his mother, who learned of her son's death through posts from other prisoners' families on Facebook. Janice Yellardly said several prisoners and even a guard who was on duty at the time her son died had contacted the family. "My son complained his side, not his heart. It ain't right. The warden told me he had a massive heart attack and I said no sir, my son did not have a heart attack. My son was 29 years old and had no medical problems." She added, "They messed with the wrong one. If I have to fight until the day I die, I'm going to get justice for my son."

**Washington**: On November 21, 2013, Sean Wright, 34, was charged with felony first-degree custodial sexual misconduct. The Snohomish County jail guard is accused of forcing a female prisoner to perform a sex act on him inside a broom

closet. The incident was discovered during an unrelated investigation that found Wright had let several other women have time out of their cells or other privileges if they allowed him to watch them shower or change clothes.

**Washington**: Facing embezzlement and possible harassment charges, a 16-year veteran jail guard, Sgt. Bruce Benscoter, resigned on September 30, 2013 after being on paid leave for several months. Benscoter, 43, was the subject of separate investigations into improper financial dealings as a director of the Wapato Youth Athletics League and for improper sexual conduct with a former prisoner while on duty at the Wapato City Jail. Benscoter allegedly threatened two prisoners who cooperated in an internal investigation into the sexual misconduct allegations. He was charged in the embezzlement case with second-degree theft and misappropriation and falsification of accounts by a public officer.

**West Virginia**: Jason Noel Squires, a former federal prison guard, and his girlfriend, Nikole Monique Watkins, were both sentenced on November 25, 2013. Squires and Watkins raked in approximately $40,000 in cash payments from prisoners' family members for tobacco that Squires

**MIDNIGHT EXPRESS BOOKS**
THE PREFERRED & ONLY FULL TIME company helping inmate authors publish books for 10+ years.
PO Box 69, Dept PLN,
Berryville, AR 72616
Midnightexpressbooks.com
Corrlinks: MEBooks1@yahoo.com

**FREE BOOK CATALOG & PRAYER CARD**
Send $1 for S&H or
SASE w/2 (two) US Forever Stamps
Fiction, Nonfiction, Dictionary,
Pastimes & Religious books
English & Spanish.
Jaguar Books, 6881 Stanton Ave #F
Buena Park, CA 90621

**Education Behind Bars Newsletter**
Free electronic newsletter
For prisoners viaCorrLinks.
Add news@prisonlawblog.com
to subscribe. The content
is curated specifically
for prisoners.

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games.  We Sell Photos of Sexy
Women, Gifts for Loved Ones,
Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**Prisonerinmatefamilyservice.com**
Send a SASE for a free catalog;
PO Box 1852, Pismo Beach, CA 93448
We buy stamps- 7.50 a book;
Single stamps .25 cents; Amazon
Orders, copies of photos/artwork
And SO much more!
FamilyInmateSev@aol.com

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**\*\*Bottle Thoughts Gift Store\*\***
Show someone you are thinking of
them by sending a Special Gift
Send SASE for FREE Brochure
PO Box 110752, Carrollton, TX 75011
Corrlinks:sales@bottlethoughts.com
Contact us 1-877-705-0425
FREE Shipping on All Gift Orders

**Celebrity Photos For Sale:**
Send self addressed stamped
envelope for lists. Name stars
you would like to order photos of.
Start your collection today!
Photoworld-PLN
PO Box 401016
Las Vegas, NV 89140

**How to get girls while in prison**
"The best techniques & methods to get more girls than u can handle even though u are locked up."
Send SASE for your free report:
The Convict's Education Group
19141 Stone Oak Pkwy #104
Dept.: A. San Antonio, TX 78258

## News In Brief (cont.)

smuggled into FCI Gilmer. Squires, 28, was sentenced to 18 months in prison and two years of supervised release, while Watkins, 24, received 12 months in prison and two years of supervised release.

**Wisconsin**: On October 22, 2013, criminal complaints were released by Racine County prosecutors that detailed allegations of sexual misconduct by two health care workers at the Racine Correctional Institution. Lisa M. Hawkins, 33,

and Karina Herrera, 40, were both charged with felony sexual assault by correctional staff; Hawkins faces an additional charge of obstructing an officer and Herrera faces another felony count of delivering illegal items to an inmate. The women are accused of performing sex acts on the same prisoner at different times in the bathroom of the Health Services Unit at the facility. Because Hawkins worked for a private medical contractor, her defense attorneys argued she was not a DOC employee and thus did not meet the definition of "correctional staff." Prosecutors disagreed, saying the statute

also applies to contractors.

**Wisconsin**: The Wisconsin Employment Relations Commission released data in November 2013 that indicated a prison guard union had failed to reach the required number of member votes to remain certified. Collective bargaining restrictions instituted by Governor Scott Walker require members of public employee unions to vote annually on whether they want the organization to continue to represent them. A union representing about 7,000 prison guards failed to meet the 51% majority vote needed to retain its certification. 🖎

---

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Centurion Ministries

Works to exonerate the wrongfully convicted, in both cases involving DNA evidence and those that do not. Centurion only takes 1-2 new cases a year involving actual innocence. They do not consider accidental death or self-defense murder cases, he said/she said rape cases, or child abuse or child sex abuse cases unless there is physical evidence. All case inquiries must be from the prisoner involved, in writing. Contact: Centurion Ministries, 221 Witherspoon Street, Princeton, NJ 08542 (609) 921-0334. www.centurionministries.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: JDI, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### Prison Activist Resource Center

PARC is a prison abolitionist group committed to exposing and challenging all forms of institutionalized racism, sexism, able-ism, heterosexism and classism, specifically within the Prison Industrial Complex. PARC produces a free resource directory for prisoners, and supports activists working to expose and end the abuses of the Prison Industrial Complex and mass incarceration. Contact: PARC, P.O. Box 70447, Oakland, CA 94612 (510) 893-4648. www.prisonactivist.org

---

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book / index orders OVER $50** (effective 4-1-2014 until further notice). **$6.00** S/H applies to all other book orders.

**SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!**
1. **SIX (6) FREE ISSUES FOR 54 TOTAL!** OR
2. **PRISON PROFITEERS (A $24.95 VALUE!)** OR
3. **THE HABEAS CITEBOOK (A $49.95 VALUE!)**

**Prison Profiteers,** edited by Paul Wright and Tara Herivel, 323 pages. **$24.95.** This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how.                1063

**The Habeas Citebook: Ineffective Assistance of Counsel,** by Brandon Sample, PLN Publishing, 200 pages. **$49.95.** This is PLN's second published book, written by federal prisoner Brandon Sample, which covers ineffective assistance of counsel issues in federal habeas petitions. Includes hundreds of case citations!    1078

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$35.95.** PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.                1041

**The Celling of America, An Inside Look at the U.S. Prison Industry,** edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95.** PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.    1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada,** updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95.** Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college courses by mail.                1071

**The Criminal Law Handbook: Know Your Rights, Survive the System,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99.** Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.    1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99.** Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.                1037

**Law Dictionary,** Random House Webster's, 525 pages. **$19.95.** Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.          1036

**The Blue Book of Grammar and Punctuation,** by Jane Straus, 110 pages. **$14.95.** A guide to grammar and punctuation by an educator with experience teaching English to prisoners.    1046

**Legal Research: How to Find and Understand the Law,** by Stephen Elias and Susan Levinkind, 568 pages. **$49.99.** Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.                1059

**Deposition Handbook,** by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99.** How-to handbook for anyone who conducts a deposition or is going to be deposed.                1054

**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95.** Provides an overview of criminal law, including punishment, specific crimes, defenses & burden of proof.    1086

**SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!**
1. **FOUR (4) FREE ISSUES FOR 40 TOTAL!** OR
2. **PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)**

**Protecting Your Health and Safety,** by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00.** This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.                1060

**Spanish-English/English-Spanish Dictionary,** 2nd ed. Random House. **$15.95.** Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.    1034a

**Writing to Win: The Legal Writer,** by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95.** Explains the writing of effective complaints, responses, briefs, motions and other legal papers.    1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right,** updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. **$16.00.** Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.                1030

**Webster's English Dictionary,** Newly revised and updated, Random House. **$8.95.** 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms.                1033

**Everyday Letters for Busy People,** by Debra Hart May, 287 pages. **$18.99.** Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters.                1048

**Roget's Thesaurus,** 717 pages. **$8.95.** Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words.                1045

**Beyond Bars, Rejoining Society After Prison,** by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95.** *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.                1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.,** by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95.** In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.                1073

**With Liberty for Some: 500 Years of Imprisonment in America,** by Scott Christianson, Northeastern University Press, 372 pages. **$18.95.** The best overall history of the U.S. prison system from 1492 through the 20th century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years.                1026

**Complete GED Preparation,** by Steck-Vaughn, 922 pages. **$24.99.** This useful handbook contains over 2,000 GED-style questions to thoroughly prepare students for taking the GED test. It offers complete coverage of the revised GED test with new testing information, instructions and a practice test.                1099

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95.** Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.                    1031

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95.** Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.                    1084

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95.** The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!   1077

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99.** While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.                    1075

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits,** by Lewis Laska, 336 pages. **$39.95.** Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners.                    1079

**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95.** This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication.                    1090

**Our Bodies, Ourselves,** by The Boston Women's Health Book Collective, 944 pages. **$26.00.** This book about women's health and sexuality has been called "America's best-selling book on all aspects of women's health," and is a great resource for women of all ages.   1082

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95.** This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.                    1083

**Nolo's Plain-English Law Dictionary,** by Gerald N. Hill and Kathleen T. Hill, 496 pages. **$29.99.** Find terms you can use to understand and access the law. Contains 3,800 easy-to-read definitions for common (and not so common) legal terms.                    3001

**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95.** Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure. 1085

**A Dictionary of Criminal Law Terms** (Black's Law Dictionary® Series), by Bryan A. Garner, 768 pages. **$33.95.** This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to help navigate your way through the maze of legal language in criminal cases.                    1088

**PLN Cumulative Index.** **$22.50 each.** PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

---

### Subscription Rates

|  | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** (Attorneys, agencies, libraries) | $90 | $180 | $270 | $360 |

### Subscription Bonuses

**2 years** -  2 bonus issues for 26 total issues

**3 years** -  4 bonus issues (40 total) or a bonus book as listed on pg. 61

**4 years** -  6 bonus issues (54 total) or a bonus book as listed on pg. 61

(All subscription rates and bonus offers are valid as of 4-1-2014)

---

Purchase with Visa, MasterCard, AmEx or Discover by phone: **561-360-2523**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 1151
Lake Worth, FL 33460

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no single stamps) or pre-stamped envelopes, if allowed by institutional policies.

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News**                    **$ Amount**

6 month subscription (prisoners only) - $18       _____

1 yr subscription (12 issues)       _____

2 yr subscription (2 bonus issues for 26 total!)       _____

3 yr sub (write below which FREE book you want)       _____
      or 4 bonus issues for 40 issues total!

4 yr sub (write below which FREE book you want)       _____
      or 6 bonus issues for 54 issues total!

Single back issue or sample copy of **PLN** - $5.00 each       _____

**Books or Index Orders**   (No S/H charge on 3 & 4-year sub free books OR book orders OVER $50!)   **Qty.**

_____ ____ ____

_____ ____ ____

_____ ____ ____

_____ ____ ____

**Add $6.00** S/H to **BOOK ORDERS UNDER $50**
(PLN subs do not count towards $50 for free S/H for book orders)

FL residents ONLY add 6% to Total **Book** Cost       _____

**Total Amount Enclosed:**       _____

*****  NO REFUNDS on PLN subscription or book / index orders after orders have been placed. *****
*****  We are not responsible for incorrect addresses or address changes after orders have been placed. *****

## ~ THE SENZA COLLECTION ~

SENZA SPECIALIZES IN PROVIDING YOU SEVERAL CHOICES

ALL NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY  – OR –  NON NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY

WE HAVE DIVIDED OUR CATALOGS INTO THESE CATEGORIES:

**CAUCASIN/AFRICAN–AMERICAN/HISPANIC/ASIAN/MIXED HOTTIES**

EACH PAGE OF OUR CATALOGS HAS 99 GLORIOUSLY SEDUCTIVE LADIES POSING JUST FOR YOUR ENJOYMENT.

OVER 250 CATALOGS TO COLLECT AT JUST $2.50 PER CATALOG

HERE'S A LITTLE FREEBIE FROM SENZA TO YOU!!!

ORDER YOUR FREE SENZA "99 HOTTIES" SAMPLE CATALOG

*JUST SEND US TWO U.S. FOREVER OR FIRST CLASS STAMPS AND A SELF ADDRESSED STAMPED ENVELOPE TO:*

**SENZA**

FREE CATALOG OFFER

**P.O. BOX 5840**

**BALTIMORE, MD 21282**

**AND FOR THOSE THAT JUST CANNOT WAIT…TAKE ADVANTAGE OF THIS LIMITED TIME OFFER**

**SENZA'S INTRODUCTORY SPECIAL    ***DIRTY DOZEN*****

$19.99 GETS YOU ALL THIS + FREE SHIPPING AND HANDLING

12 EYE POPPING CATALOGS! EACH CATALOG HAS 99 PICS TO CHOOSE FROM ON EACH PAGE

PLUS

12 4X6 PRINTS FROM OUR MIXED HOTTIES SELECTION TO SHOW OFF SENZA'S 4X6'S PRINT QUALITY.

**ALL FOR JUST $19.99**

**REMEMBER YOU MUST: SPECIFY NUDE OR NON–NUDE ON YOUR ORDER**

**SPECIFY YOUR INSTITUTIONS RESTRICTIONS AS TO THE NUMBER OF PRINTS ALLOWED IN ONE ENVELOPE.**

**SENZA  CORPORATE POLICIES – PLEASE REVIEW THEM CAREFULLY**

**ALL SENZA COLLECTION IMAGES ARE SOLD AT A FLAT PRICE OF 0.35 CENTS EACH.**

ANYONE WISHING TO PURCHASE 1000 + PRINTS AT ONE TIME WILL BE GIVEN A FLAT PRICE OF 0.30 CENTS PER IMAGE.

**SENZA HAS A MINIMUM ORDER REQUIREMENT OF:  $15.00 THIS DOESN'T INCLUDE S&H CHARGES.**

**SHIPPING AND HANDLING CHARGES ARE AS FOLLOWS:**

**1 – 5 4x6 PRINTS – $1.00 PER ENVELOPE / 6 – 15 4x6 PRINTS – $1.50 PER ENVELOPE /16 – 25 4x6 PRINTS – $2.00 PER ENVELOPE**

YOU MUST NOTIFY SENZA ON THE ORDER FORM, THE MAXIMUM NUMBER OF PRINTS YOUR INSTITUTION WILL PERMIT IN EACH ENVELOPE

**SENZA WILL ACCEPT U.S. FIRST CLASS POSTAGE STAMPS AT THE RATE OF $5.00 FOR EACH BRAND NEW FLAT BOOK OF 20 STAMPS.**

YOU ARE REQUIRED TO KNOW  YOUR INSTITUTIONS POLICIES REGARDING WHAT IMAGES ARE ACCEPTABLE INTO YOUR FACILITY INSTITUTION.  THERE ARE NO EXCEPTIONS TO THIS POLICY. RETURNED/REJECTED MAIL – YOU WILL HAVE 15 BUSINESS DAYS TO SEND US A  SASE WITH A STREET ADDRESS IN WHICH TO MAIL YOUR RETURNED/REJECTED PRINTS.

AFTER 15 DAYS THE PRINTS ARE RETURNED TO OUR INVENTORY.

ALL SALES ARE FINAL/NO REFUNDS OR EXCHANGES

# Great Self-Help Book Deals
## From Prison Legal News!

### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer

**Order from Prison Legal News**

Add $6 shipping for orders under $50

**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**Phone: 561-360-2523**
**www.prisonlegalnews.org**



The Criminal Law Handbook
$39.99



Represent Yourself in Court
$39.99



Legal Research
$49.99



Nolo's Deposition Handbook
$34.99



**NOLO**

**YOUR LEGAL COMPANION**



**Prison Legal News**
PO Box 1151
Lake Worth FL 33460

**Change Service Requested**

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

**Subscription Renewal**
Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2015 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 07/2014** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



# Exhibit E

# Prison Legal News

VOL. 25  No. 10
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

October 2014

## In Washington State Prisons, Negligent Health Care Turns Illness into a Death Sentence

### *Ricardo Cruz Mejia went to prison a murderer, he left a victim.*

#### by Rick Anderson

Ricardo Cruz Mejia's final days began with a stomach problem. It was October 2010. After the 26-year-old Walla Walla State Penitentiary prisoner discovered blood in his stool, he signed in at the prison infirmary. A test and exam turned up a severely inflamed colon. The onetime Latino gang member from Skagit County, doing 34 years for seven felonies including murder, was given hydrocortisone enemas and tabs of prednisone, used to treat inflammation. The prison medical staff also gave him sulfasalazine for abdominal pain.

In November, Mejia, a stocky, tattooed prisoner with a closely shaved head, began to experience other symptoms – headaches, sore throat, then vomiting. He also had begun to develop a rash, for which he was given penicillin, though it didn't seem to help.

In the ensuing days, he became a familiar figure to infirmary nurses. From December through the first week of January 2011, he showed up at the infirmary 14 times. Nurses doled out a topical corticosteroid for skin inflammation and tried other drugs to ease his symptoms. Still, none alleviated the persistent, painful irritations and stomach problems.

On January 10, 2011, he arrived to tell medical staffers his sore throat was killing him – "It hurts to breathe," he said, according to notes in his medical record. Staffers seemed stumped. His vital signs weren't taken and no new treatment was offered.

Mejia returned the next day and announced he was having what he called "a medical emergency." In addition to his earlier symptoms, he had developed fever blisters, sore joints and rectal pain. His pulse was racing, his blood pressure rising. He had been unable to eat for three days, he said.

Prison physician Barry Kellog, who examined him, did not find Mejia in any acute distress and prescribed more prednisone and sulfasalazine. He'd later recall he saw Mejia only briefly, and was not informed by the nurse who was assisting him and had treated Mejia earlier that the patient turned out to be allergic to sulfasalazine. Nor did she tell him, Kellog recalled, that Mejia had a rash and had been diagnosed with colitis, an inflamed colon.

On January 13, 2011 at 8 a.m., Mejia was back complaining of similar problems, and a new one – blisters on his anus. He was examined and given an oral antifungal.

The next day, Mejia returned – this time with painful mouth and rectal ulcers and severe abdominal pain. He'd been unable to have a bowel movement for four days, he said. He was given hydrocortisone, milk of magnesia and an anesthetic. A nurse provided moistened gauzes to place on the painful skin ulcers.

Nurse Allison Oleson would later say that it was clear Mejia was "quite sick" that day. "When this kid came into the exam room, he was clearly in distress." She said she called on Kenneth Moore, a physician's assistant, to take a look at Mejia. (Known as PAs, the assistants are not accredited doctors but practice medicine on a team under the supervision of physicians and surgeons; typically they are formally educated to diagnose illness or injury and provide general treatment).

But Moore, like the earlier doctor, did not examine Mejia, Oleson recalled. He didn't even see him. During a phone chat with the nurse, he ordered Lidocaine, a topical pain-numbing gel.

Mejia returned to his cell. But his symptoms grew worse. At 4:30 the next morning, January 15, a medical staffer who visited Mejia in his cell undertook a brief examination and told him to come into the infirmary a few hours later.

When the prisoner showed up at 7:30 a.m., he was seated uncomfortably in a wheelchair. He was unable to sit and was experiencing diarrhea. His pulse, temperature and blood pressure were all rising and

## INSIDE

| | |
|---|---|
| CCA Loses TX Public Records Case | 9 |
| From the Editor | 10 |
| Women Prisoners in Solitary | 12 |
| How Courts View Accreditation | 18 |
| JustLeadershipUSA | 22 |
| VA Prison Medical Care Suit | 26 |
| $8.15 Million in NY Jail Death | 32 |
| Jail Video Visits Considered in Dallas | 34 |
| Ruling in Ad Seg Lighting Case | 40 |
| ICE Limits Solitary Confinement | 44 |
| "Ban the Box" Movement Spreads | 46 |
| CA Prison Medical Costs Soar | 50 |
| News in Brief | 55 |



## TAKE ACTION ON PRISON PHONE RATES – CONTACT THE FCC NOW!

After nearly a decade, the Federal Communications Commission (FCC) took action in 2013 and issued an order, effective February 11, 2014, that capped the cost of interstate (long distance) prison phone rates. This led to an almost 80% decrease in interstate phone costs in some states, and those costs are now capped at $.25/minute for collect calls and $.21/minute for debit and prepaid calls. On September 25, 2014, the FCC indicated that it plans to take further action to reduce prison phone rates, including in-state (intrastate) rates – which still remain high in many jurisdictions. In fact, in-state phone rates are now higher than long distance rates in many cases.

You can submit a public comment to the FCC; even if you have sent comments before, you can resubmit them or submit new information. Please write to the FCC as soon as possible, addressing any of the following topics:

- **Positive Impact of the FCC Order Reducing Interstate Calls:** Let the FCC know how the rate caps on interstate prison phone calls have resulted in lower costs or helped you and your family!

- **Negative Impact of Intrastate Phone Calls:** While the FCC capped long distance phone rates, the order did not apply to in-state calls, which make up 85% of all calls from prisons and jails. How much do you or your family pay for in-state phone calls? The FCC needs to hear about this issue so they know why intrastate prison phone rates need to be reduced, too.

- **Ancillary Fees:** Do you or your family have to pay extra fees (ancillary fees) to make or accept calls, such as fees to set up, add money to or cancel a prepaid or debit prison phone account? Are you charged fees but were not told about them before they were charged? How much are these fees? Have they increased?

- **Importance of Prison Phone Reforms:** Tell the FCC why it is important to enact permanent reform of prison phone rates for interstate and in-state calls, including rate caps and the elimination of "commission" payments to corrections agencies. Also, the FCC needs details about fee-based video visitation services.

*Comments can be sent by mail to:*

**Marlene H. Dortch, Secretary**
**Federal Communications Commission**
**445 12th Street, SW; Room TW-B204**
**Washington, DC 20554**

Address the letter "Dear Secretary Dortch," and please speak from your personal experience. You must state the following in your letter: "This is a public comment for **WC Docket Number 12-375**." Note that your comment will be made part of the public docket.

People with Internet access can register their comments online with the FCC, by entering Proceeding Number **12-375** and uploading a document at this address: http://apps.fcc.gov/ecfs/upload/display.action?z=nyy6z

For more information about the fight to reduce prison phone rates, visit the Campaign for Prison Phone Justice:

# www.phonejustice.org

# Prison Legal News

*a publication of the*
**Human Rights Defense Center**

www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg,
Derek Gilna, Gary Hunter,
David Reutter, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel
Sabarish Neelakanta—Staff Attorney

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**561-360-2523**
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## Deadly Prison Health Care (cont.)

his buttocks were red with blisters.

At 8:45, Moore, the PA, agreed to examine him. But he initially decided not to admit Mejia to the prison's inpatient unit. Pressed by nurse Vickie Holevinski, who recognized signs of sepsis – indicating Mejia was suffering from widespread infection with a threat of multiple organ failure – Moore relented.

Mejia was treated with antibiotics and given whirlpool baths. Still, two and a half hours into treatment, he was breathing rapidly and his blood pressure had plunged while his heart continued to race. He had skin excoriations over much of his body, particularly down his legs and around his buttocks. In some places, his skin had broken open, turned purple and was draining. He was dizzy and in pain, he told nurses, and suffering from shortness of breath.

Faced with clear indications Mejia was in danger, PA Moore decided he needed to go to an outside hospital. At 1 p.m. on January 15, 2011, an ambulance ferried Ricardo Mejia downtown to Walla Walla's Providence St. Mary Medical Center. It would be his last day in prison. And his last full day of life.

St. Mary doctors, finding a severely ill man in their emergency room, began running tests. Within a short time, they concluded Mejia, now in shock, needed specialized emergency care they were not equipped to deliver. He was a stretcher-ful of ailments, including perianal cellulitis, proctitis, sepsis and ulcerative colitis. Most crucial, doctors discovered necrotizing bilateral tonsillitis. A flesh-eating disease had set in.

Doctors alerted the state medical airlift service, and Mejia was hurried to Walla Walla Regional Airport and put aboard a small plane. By 6 p.m. he was in the air, flying over the prison, headed to Providence Sacred Heart Medical Center in Spokane, one of the region's biggest hospitals and specialty-care centers.

Alerted in advance, Sacred Heart doctors were ready when Mejia was wheeled in. He was immediately prepared for surgery, and doctors realized they'd have to cut away infected sections of his body. He had Fournier's gangrene, a critical infection of the genitalia. Capable of developing quickly, within hours, it causes severe pain in the penis and scrotum and progresses from a spreading redness to necrosis – the death of tissue.

That and contributing conditions were also causing Mejia's kidneys to shut down. The medical team had no alternatives in surgery, and began removing his rectum and large portions of his buttocks.

It was a long, challenging debriding of the infected areas. And it came too late. At 2:02 the next morning, January 16, 2011, state prisoner Ricardo Mejia – a patient who'd been denied admittance to the prison infirmary 16 hours earlier – was pronounced dead.

Mejia's death didn't make the news. But it mattered to his family, at least, including his two children by separate mothers in Skagit County, and his surrogate mom, as April Soria calls herself. A counselor in a Skagit work-training program, Soria first met Mejia – whom she calls "Richard" – when he was a teen in trouble. Born a U.S. citizen, Mejia was abandoned by his birth mom when he was young and raised by others, spending much of his time on the streets. Young Mejia came to confide in Soria, and the two struck up a familial relationship. As his designated outside prison contact, she was first to get the bad-news phone call from Spokane early on the morning he died.

"It was the hospital chaplain," Soria recalls. "At first I didn't know he was saying Richard had died. I couldn't understand what this thing was that had happened. Then he said – I can't forget the words – 'This is the worst case of medical negligence we've ever seen.'"

But, as Soria would find out, it happened within a system not prone to publicize its mistakes or generate public sympathy for its prisoners. After all, Mejia, a onetime street gangster known as Li'l Jokes, entered prison with 17 felonies on his record. He'd already done a two-year prison stretch for discharging a weapon in public during a Mount Vernon gang dispute in 2005. In 2009, he was returned to custody, this time sent to the hard-time Walls for a string of crimes including the murder of an elderly woman.

In September 2007, Mejia, then 23, of Sedro-Woolley, was sought for burglary, assault, car theft and eluding deputies. With two female accomplices, he was looting a home outside Burlington when the homeowner walked in. The three fled

**Deadly Prison Health Care (cont.)**

in a car and eluded police in a mad chase, hitting speeds of up to 90 mph and crashing the car in a cornfield. The women were nabbed but Mejia got away, running to a nearby home.

There he encountered an 84-year-old woman named Clara Thorp and demanded her car keys. She had no car. An enraged Mejia pushed the frail lady to the floor and ran to a second home nearby, where he was able to commandeer a car and escape. Officers found that car crashed in west Mount Vernon, but Mejia was gone again. Two days later, attempting to break into a vehicle in Mount Vernon, he was spotted by an officer. After a standoff in which Mejia climbed a structure and resisted arrest – he was Tased six times in a struggle – police took him into custody.

Three months later, the elderly woman died. Clara Thorp had been on the floor, undiscovered, for more than an hour, and was hospitalized with a broken pelvis. A few days later she also suffered a heart attack. She ended up disabled, living in a senior care center, turning 85, and never regaining her health. On January 11, 2008 she died from pneumonia stemming from her injuries, the medical examiner ruled, labeling the death a homicide. By law, a death that occurs during the commission of a felony can be charged as a murder. Skagit prosecutors refiled 14 felony charges altogether against Mejia, including first-degree murder, accusing him of exhibiting "deliberate cruelty" in his attack on the defenseless Thorp.

Mejia, who faced the possibility of life in prison, mulled over his chances as the case dragged out for a year. Soria, his adopted mom, says "I told him, 'You have to plead guilty.' He didn't intend to kill her. But he had to take responsibility for what happened." Mejia agreed to a plea bargain. The case was winnowed down to seven felonies and the murder charge dropped to second-degree.

In June 2009, Mejia was sentenced to 34 years. "For a 24-year-old man, this criminal record could be the biggest one I've ever seen," said Skagit County Superior Court Judge John Meyer, according to a report in the *Skagit Valley Herald*. Clara Thorp's son, granddaughter and great-grandson were in the courtroom and read a statement about Thorp's assault and death, recalling the agony of having "watched her go through so much pain she didn't deserve."

Mejia, contrite, apologized for his life of crime, drugs and gang-banging. "I know I'm a monster," he told Thorp's family. "I know you guys hate me. I hate myself for the things I've done." Says mom Soria: "There was never a minute, from the day of her death to the day of his death, that he wasn't sorry for what he did."

As a career criminal, Mejia wasn't a likely candidate to change his life by doing another prison stretch. Still, he had hope: If he'd completed his full term and been released, he'd have been 58. At least he wasn't a lifer, nor had he been condemned to death.

Not officially, anyway. As it turned out, Mejia, like his victim, went through pain he didn't deserve, serving a capital sentence he wasn't given. Unlike Clara Thorp's, however, no one would be punished for his death.

An autopsy ordered by the state determined Ricardo Mejia died of blood poisoning and septic shock resulting from the flesh-eating disease and rectal infection. The death raised concerns at the state Department of Health, and inspectors began perusing prison medical records and asking questions.

In a May 2011 report, the department found the prison had failed to provide "a formalized process for continuity of care and supervision." Medical staff was not prepared, and supervisors were missing in action. There was only informal oversight of mid-level care providers, such as physician's assistants, and a lack of case discussion between line staff and the prison's medical director, Dr. James Edwards.

In Mejia's case, nurses had repeatedly failed to obtain his vital signs or contact the on-call doctor or PA when those signs were out of whack – and even then there was a lack of urgent response, investigators found. On January 15, 2011, the day Mejia ended up being rushed to the hospital, the nurse visiting his cell that early morning recorded his heart rate at 154 – and merely made an appointment for him to see a doctor three hours later. Help should have come immediately.

# T Y P I N G
## S E R V I C E S
### Provided since 1998

Specifically designed, with special rates for the incarcerated person.

Black / Color Printing and Copying

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

Special Offer: $2.00 off first order.
Special offer void after: 12/31/2014

## MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization
**Certified Criminal Law *and* Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(626) 564-1136



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**
**31 years of success**
595 East Colorado Blvd
Suite  324
Pasadena, CA 91101
marileemarshallandassociates.com

To critics of the prison medical-care system, the Mejia case sounded eerily familiar. In 2004, Charles Manning, a prisoner at Stafford Creek Correctional Center outside Aberdeen, was diagnosed as having an allergenic reaction to Robitussin, the cold medicine. He endured two days of pain in the prison infirmary, treated with an ice pack and medications. He was then belatedly diagnosed with an infection and transferred to Grays Harbor Community Hospital. There, emergency doctors determined – much as the Walla Walla and Spokane doctors did in Mejia's case – that Manning had Fournier's gangrene.

To save his life, the Aberdeen doctors removed his genitals and pounds of flesh. Unlike Mejia, Manning survived. But he was left disfigured and disabled. As *Prison Legal News* put it in a report, "Charlie Manning, doing 13 months after a drunken argument with a neighbor, left prison with no penis." [See: *PLN*, June 2008, p.20].

Such cases are costly not only to the victims but to taxpayers – Manning, for example, later sued for damages, accepting a $300,000 settlement from the state in 2008. (In one of the most costly state cases, Ger-

trude Barrow, 41, died at the Washington Corrections Center for Women in Purdy of a perforated chronic peptic ulcer and acute peritonitis. In 1994, her family was awarded $630,000 due to state negligence).

"Prison doctors are not necessarily going to be the best practitioners available," Paul Wright says in a purposeful understatement. "The state DOC has a long history of employing doctors with disciplinary histories and not sanctioning them even when they kill, and keeping them on the payroll."

And Wright would know. Some of those doctors treated him. Wright was a state prisoner for 17 years, convicted of the murder of a drug dealer. Among those who tended him was a dentist named Joel Driven. In one example of his care, according to state investigators, the 72-year-old dentist wrenched out part of a McNeil Island prisoner's jawbone rather than the tooth he intended to pull. That tore open the roof of the prisoner's mouth, causing Driven to panic as the prisoner faced the likelihood of bleeding to death. A second dentist also froze, as did a dental assistant. Another assistant saved the day, taking over

Driven's patient, shouting commands to the doctor and calling for emergency aid. She told investigators that what she'd witnessed was "torture ... barbaric." In 2007, Driven was let go and his license revoked.

Wright, who served his time and went on to found *Prison Legal News* and campaign for prisoner rights, says the 10-year-old Manning case should have been a turning point for corrections medical reform. But "Whatever they did [after that settlement], if they did anything, obviously didn't help Ricardo Mejia."

Wright's umbrella organization, the Human Rights Defense Center of Lake Worth, Florida, got interested in Mejia's case. Started on a $50 budget with an all-volunteer grassroots base, the center has today become a 501(c)(3) organization with 13 full-time employees including two staff attorneys. It specializes in litigation and advocacy for prisoners.

"Manning was crippled and Mejia killed because of the sheer neglect and ineptitude of DOC medical staff," Wright says. "This is an ongoing story with the state DOC."

It was a story that Mejia's mom, Soria,



William L Schmidt
ATTORNEY at LAW, P.C.

911CIVILRIGHTS@GMAIL.COM

559.261.2222 (clients only collect)

_Legal Services for California Inmates:_
**APPEALS**
**WRITS OF HABEAS CORPUS**
**Civil Litigation**
**Catastrophic Injury Litigation**
**Money Management**
**Business Windup**
**Contracts**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------OUR CLIENTS GO HOME, HOW ABOUT YOU? -----------------
*Please submit a single page summary of your case. Due to the volume, we cannot return documents or respond to all inquires. We are not a low cost or pro bono law firm, but if you want results, write us.*

P.O. BOX
25001
FRESNO, CA
93729

**Deadly Prison Health Care (cont.)**

wasn't getting in full, she says. "It was so difficult to get at the truth. The state wouldn't provide public records. One state records clerk I got to know said, off the record to me, 'This isn't normal. These records should be available. You need to get an attorney.'" She did.

In April last year, Wright's defense center filed a legal tort claim for damages against the state for the medical failures leading to Mejia's death. It was brought on behalf of Soria and Mejia's two children, ages 12 and 7. Jesse Wing, the lead attorney in the claim, from the Seattle law firm of MacDonald Hoague & Bayless, says "Mr. Mejia's case illustrates something worse than inadequate care. He suffered not just incompetent care, but obvious indifference to his serious pain and illness. This 'I don't care if you live

or die' attitude is at odds with the most basic duty of a health-care provider and of the Hippocratic oath."

The claim focused particularly on the role of Moore, the physician's assistant who'd been reluctant to admit Mejia as an inpatient. Prison medical director Edwards told state investigators that Moore "tends not to listen to nurses ... [he] irritates and frustrates" them. Pat Rima, the prison's former health-care administrator, said Moore was "at times ... on the edge with his care decisions," and that at one point she opted not to renew his then-part-time contract. But after Rima moved on to another job, her replacement rehired Moore, with Edwards' approval, full-time.

One nurse recalled that on the day Mejia would eventually be rushed to an outside hospital, she had repeatedly beseeched Moore to admit him as an inpatient. Mejia had arrived in a wheelchair in great pain, his heart racing. Another nurse said Mejia was so obviously septic he "could go south in a hurry," yet "Mr. Moore was sitting there, allowing the patient to wait 45 minutes while no treatment orders or medication was given."

About the time the claim was filed, the state Medical Quality Assurance Commission – responding to a separate complaint filed by Wright's group – lodged charges against Moore, claiming his care may have constituted medical "incompetence, negligence, or malpractice." He failed to recognize a life-threatening condition, the commission said, and lacked concern when urgency was called for.

Moore didn't take much time to settle the complaint. And why not? His penalty was to write a paper about his error. In what it calls an informal disposition, the commission ordered Moore to study up on sepsis, colitis and necrotizing fasciitis, then compose 1,000 words on those topics. He'd also have to make a class-like presentation to others on the prison medical team, and would have to reimburse the commission for costs, $750. "It was a slap on the wrist," says Mejia attorney Wing.

In January of this year the charges against Moore were formally withdrawn, although he still must comply with the writing and educational stipulations of the disposition.

That same month, having received no answer to the claim filed against the state, Wright's group went to court and formally filed a lawsuit against the Department of Corrections on behalf of Mejia's estate. In the suit, attorneys alleged that Mejia "died a horrible and painful death at age 26 ... [his] medical providers ignored obvious signs of infection and serious medical illness, and he literally rotted to death." Timely diagnoses and treatment would have spared his life and the pain he suffered, the suit claimed, citing mistakes turned up by the Health Department probe.

Four months later, in April 2014, the DOC agreed to settle. [See related article in this issue of *PLN*, p.8].

The department conceded some responsibility for Mejia's painful death. It agreed to pay $740,000 to his family, likely a record amount in such a case. The

****7 DAY FREE TRIAL****

INMATE EMAIL NEWS + SERVICES

BOP INMATES - CORRLINKS USERS

DAILY EMAILS + UPDATES ON SPORTS

NEWS, MUSIC, ENTERTAINMENT - TV

TONIGHT'S MOVIE AND SPORTS GUIDE

INFO@FORTHESCOOP.COM

P.O. BOX 90594

SAN ANTONIO, TX 78209



**FreedomLine**®

Serving You with Excellence Since 2009

*We make it simple.*

**You reach your loved ones by calling a local number.**
That's a lot cheaper than calling long distance. *It's that simple!*

- We charge $2.50 per month for the number.
- For Calls to anywhere in the U.S., we charge you 5¢ per minute
- To Mexico - 15¢; to Canada - 11¢, to just about anywhere else in the world - 31¢
- No Contract, No Credit Check, No Setup Fee, No Cancellation Fee, No Early Termination Fee
- Cancel anytime; any money left on the account is refunded

*Any time you refer a new customer and they sign up, you both get 300 free minutes!* Some restrictions apply. Details upon request.

Tell Your Folks to Sign Up at www.freedomline.net

Or Mail: FreedomLine
PO Box 7 - SCA
Connersville, IN 47331

*Also see our long-running Classified Ad in this and every issue*

FCC Reg. No. 0021217047

department also said it had made some changes in its prison medical operations to comply with the Health Department's findings, including assigning prisoners to doctors, expanding dialogue between staff and supervisors, and informing staff in more detail about flesh-eating bacteria. But the state admitted no legal wrongdoing in Mejia's death.

Nonetheless, as in the earlier flesh-eating case, it was a costly mistake in life and money that could have been avoided, says Paul Wright. "The common theme here is the DOC botched the diagnoses until it was too late – and remember, these are deep-tissue bacteria that take at least a week to develop to the killer phase, and as soon as these men were taken to a hospital, the ER doctors diagnosed them almost immediately.

"I think the most compelling story is the bigger issue of inadequate medical care," Wright says. "The DOC spends over $100 million a year on [care] and prisoners still die gruesome deaths from easily diagnosed illnesses."

Wright says his organization expects to bring other suits in the future. Unfor-

tunately, he says, there will be a need for them.

As for April Soria, she didn't share in the settlement. "She is just a very good person who tried to help him and his family," says attorney Wing, "so the settlement money went to his children."

In June 2014, Moore showed up at a medical commission hearing to see how he had complied with settlement stipulations. Wing, who also attended, said "a state lawyer told us afterwards that a purpose of the hearing was for the board to see Mr. Moore's demeanor when discussing care of patients. We pointed out that Mr. Moore's demeanor did not seem appropriate under the circumstances. He did not show any sense of responsibility for the death of Mr. Mejia or even that he was discussing the death of a human being at the hearing."

But apparently Moore received the state's blessings. He remains a practicing, full-time PA at the state pen. ◾

*This article was originally published by* Seattle Weekly *(www.seattleweekly.com) on July 9, 2014; it is reprinted with permission, with minor edits.*



## Save on Prescription Eyeglasses & Shades

Send for a **FREE** Catalog
Money Back Guarantee

## Prism Optical, Inc.
**10954 NW 7th Ave**
**Dept: LN1014**
**Miami, FL 33168**

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

* Post-Conviction Specialists (Habeas Corpus/2254/2255/ AEDPA/Procedural Bars/Coram Nobis/PRP/Certiorari/ Sentence Modifications/DNA and more).
* All 50 States, D.C., Federal District/Appellate and Supreme Court.
* Special programs available for Veterans.
* Payment plans available.
* Now accepting Credit Cards.
* FREE initial consultation (send SASE)
* CALIFORNIA INMATES: We do 2-3 striker VARGAS petitions
* FEDERAL INMATES: We do "Drugs Minus Two" Petitions which are RETROACTIVE!
* SPECIAL RATES FOR PLN SUBSCRIBERS!

### Legal Insights Inc.

25602 Alicia Parkway Suite 323
Laguna Hills, CA 92653
714-941-0578
info@legalinsights.org
www.legalinsights.org

A California 501(c)(3) Non-Profit Organization

# Learn The Law!
## It's a POWERFUL influence in your life.

Choose education to help yourself and others. Blackstone's Independent Study Paralegal Program offers you the opportunity to be productive while serving time.

■ Learn Civil & Criminal Law
■ Learn Legal Research
■ 110 Years of Legal Training Experience
■ Study in Your Spare Time
■ Affordable Tuition, Easy Payment Plan

Only **$30.00** Per Month

❏ **Yes!** I'd like to learn more     ❏ Paralegal Course
*Please rush me FREE course information.*

Name _____ Doc#_____

Address _____

City _____ State_____ Zip_____

## Blackstone
## Career Institute
SINCE 1890

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.

**P.O. Box 3717 • Allentown, PA 18106**

# $750,000 Settlement for Washington State Prisoner's Wrongful Death

*by Carrie Wilkinson*

Although Prison Legal News and its parent organization, the Human Rights Defense Center (HRDC), are best known for litigation involving censorship by prison and jail officials, HRDC also co-counsels select other cases, mainly involving wrongful deaths on behalf of prisoners' surviving family members.

As detailed in this issue's cover story, one of those cases involved Washington state prisoner Ricardo Cruz Mejia, who died after an untreated infection turned deadly. The medical examiner listed his cause of death as necrotizing fasciitis/Fournier's gangrene, sepsis and septic shock.

Mejia's preventable death was a case of history repeating itself. In 2004, Washington prisoner Charles Manning was initially diagnosed as having a reaction to Robitussin. Hospital staff subsequently found he had Fournier's gangrene, and his genitals were amputated to save his life. Manning survived and filed suit, settling with the state for $300,000 in 2008. [See: *PLN*, June 2008, p.20].

Ricardo Mejia was diagnosed with ulcerative colitis in October 2010 while incarcerated at the Washington State Penitentiary in Walla Walla, and prison medical staff prescribed medication to treat his condition. His symptoms included gastrointestinal problems and blood in his stool. He was seen by medical staff 14 times in the 48 days before he died, and not only reported the treatments were not working but that his symptoms were becoming progressively worse – including headaches, a sore throat, skin rashes, pain and vomiting.

As with Manning, the initial treatment prescribed for Mejia did not remedy his symptoms and DOC medical staff failed to take further action until it was too late and his condition escalated into Fournier's gangrene. Mejia died of the same infection under the care of the same prison medical system that had almost killed Manning seven years earlier.

A DOC incident report prepared by Dr. David Kenney seven months after Mejia's death noted that "the drugs he received to control his symptoms (steroid enemas, aminosalicylates and oral steroids) may not have completely controlled his disease," and that "an ongoing evaluation of his response to these medications was not recorded."

Following an initial tort claim, a complaint was filed in Thurston County Superior Court on December 20, 2013 on behalf of Mejia's estate and his two minor children, alleging that DOC medical staff had "ignored obvious signs of infection and serious illness and he literally rotted to death under their care through negligence and deliberate indifference."

According to the complaint, Mejia's symptoms worsened in January 2011, and on January 14 he sought medical care for mouth and rectal ulcers; a nurse noted he had not had a bowel movement in four days, and his rectum "showed a large, excoriated, blistered area." Physician assistant Kenneth Moore refused to see Mejia or admit him to the prison's inpatient unit, but only ordered Lido-caine for pain over the phone. Moore later agreed to admit Mejia for inpatient care after a nurse voiced concerns.

Following worsening symptoms, Mejia was finally transported to an outside hospital on January 15, 2011, where surgeons "cut away large portions of his buttock and rectum" in a last-ditch effort to save his life. They were unsuccessful and he "died a horrible, grotesque, and painful death, at age 26."

The lawsuit claimed that Washington DOC medical staff had violated standards of patient care by failing to provide adequate treatment to Mejia in spite of his obvious, serious symptoms. The complaint noted that recognizing those symptoms "required only basic health care skills and knowledge; it is 'Medicine 101.'"

The Washington Department of Health conducted an investigation into Mejia's death and found that prison medical staff "did not provide a formalized process for continuity of care and supervision of care," which "may result in inappropriate and unsafe care." Further, the investigation determined that "the facility did not have a formalized process for midlevel providers to discuss complex medical cases with the medical director and did not have [a] formalized process to refer complex cases from the midlevel provider to the medical director."

Dr. Kenney's review recommended ten improvements for DOC medical staff, including a review and assessment of the primary care system "to optimize comprehensive assessment and management of medical conditions, [to] ensure that continuity of that care is maintained and [staff] be accountable for oversight of all care delivered."

Four months after the lawsuit was filed, which named the Washington DOC and six DOC medical practitioners – including Moore – as defendants, the case settled in March 2014 for $750,000. Mejia's estate was represented by the Human Rights Defense Center and Seattle attorney Jesse Wing with MacDonald Hoague & Bayless. See: *Soria v. Washington DOC*, Thurston County Superior Court (WA), Case No. 13-2-02598-9. ◆



It's The Sequel ... GIRL MEETS WORLD

## Channel Guide
magazine

THE '90s
The Era That Brought Us ...

Back With A Vengeance (For Real!)
SHARKNADO 2

Halle Berry
Completely "Extant"

THE LOTTERY
Lifetime's New Summer Drama!

Guillermo Del Toro's
THE STRAIN

### Know What's Good On TV With
## Channel Guide
magazine

➤ Daily schedules for **over 120 channels**
➤ Weekly **TV best bets**
➤ Over **3,000 movie** listings
➤ **TV Crossword, Sudoku,** celebrity **interviews** and more
➤ **1 Year** (12 issues) for just **$35**

**Mail your $35 check or money order payable to Channel Guide Magazine to:**
Channel Guide Magazine AAKPLNG
PO Box 8501, Big Sandy, TX 75755-8501
**Include your name, ID number and address.**
**Or call 866-323-9385 or 903-636-1107**

# Texas Court Finds CCA Subject to State's Public Information Act, Awards Attorney Fees

On September 15, 2014, a Travis County District Court entered a final judgment that found Corrections Corporation of America (CCA), the nation's largest for-profit prison company, is a "governmental body" for purposes of the Texas Public Information Act and is therefore subject to the "Act's obligations to disclose public information."

This was the first time a Texas court had held that a private prison company was required to comply with the state's public records law, joining decisions by courts in Tennessee, Florida and Vermont. [See: *PLN*, July 2013, p.42; June 2013, p.14; June 2010, p.29].

Travis County District Court Judge Gisela D. Triana entered the judgment in a lawsuit brought against CCA by Prison Legal News.

PLN filed suit on May 1, 2013 after the company refused to produce records related to the now-closed Dawson State Jail, including reports and audits concerning CCA's management of the facility. [See: *PLN*, June 2013, p.46]. CCA operates nine facilities in Texas, including four state jails.

PLN had argued that CCA meets the definition of a "governmental body" under the Texas Public Information Act because – among other factors – the company "shares a common purpose and objective to that of the government" and performs services "traditionally performed by governmental bodies."

In the latter regard, PLN noted that "Incarceration is inherently a power of government. By using public money to perform a public function, CCA is a governmental body for purposes" of the state's public records law.

The court agreed, noting that "CCA failed and refused to disclose the documents" requested by PLN, which were "public information" as defined by state law. Accordingly, CCA was ordered to produce the records; Judge Triana also ordered the company to pay $25,000 in PLN's attorneys' fees and costs, plus another $5,000 if it unsuccessfully appeals.

"That is the right result and clearly what the Public Information Act requires," stated Cindy Saiter, one of PLN's attorneys.

CCA has vigorously opposed compliance with state public records laws and has lobbied against the Private Prison Information Act on the federal level. [See: *PLN*, Feb. 2013, p.14].

"Although CCA acts as the functional equivalent of a government agency when it runs prisons and jails, it opposes efforts to hold the company accountable under public records laws to the same extent as government agencies," said PLN editor Paul Wright. "It makes you wonder what the company is hiding, and why it doesn't want to be held accountable to members of the public whose tax dollars pay for CCA's private prison contracts."

"The public saw truly awful things when we began pulling the veil from the CCA-operated Dawson State Jail last year," added attorney Brian McGiverin with the Texas Civil Rights Project. "Today, allegations are coming to light of CCA's complicity in a widespread sexual abuse hazing ritual at the Bartlett State Jail. Is it any wonder CCA opposes greater transparency?"

PLN was represented by attorneys Cindy Saiter with Scott, Douglass & Mc-Connico, LLP and Brian McGiverin with the Texas Civil Rights Project. The case is *Prison Legal News v. CCA*, Travis County District Court, 353rd Judicial District, Cause No. D-1-GN-13-001445.

The hazing ritual mentioned by Mc-Giverin involves allegations in a federal lawsuit that claims prisoners at the Bartlett State Jail were stripped of their clothing, turned upside down and had their naked buttocks slammed against the window of a guard station – known as "ass on the glass." A prisoner subjected to the hazing said he was sexually assaulted during the incident, and that there was only one CCA guard in the unit, who did nothing to stop it.

The October 2013 "ass on the glass" incident reportedly lasted two hours and involved 55 prisoners. The lawsuit, filed in September 2014, remains pending. See: *Doe v. CCA*, U.S.D.C. (W.D. Texas), Case No. 1:14-cv-00840.

Sources: *HRDC press release (Sept. 18, 2014); www.mysanantonio.com*



LAW OFFICES OF

# ELMER ROBERT KEACH, III
A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Albany, NY 12205-5531
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration
Medical Indifference Cases • Corrections and Police Brutality
Sexual Abuse and Assault • Illegal Strip Searches
Class Actions • First Amendment Litigation*

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED, YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages.
DO NOT SEND UNSOLICITED RECORDS. THEY CANNOT BE RETURNED.
Make sure to exhaust your administrative remedies and comply with state law notice requirements, if applicable, to preserve state law intentional tort/negligence claims.

# From the Editor

*by Paul Wright*

This month's cover story about the Washington Department of Corrections killing prisoner Ricardo Mejia through medical neglect is in many ways an old one. Over the past 24 years, PLN has run hundreds of articles about prisons and jails murdering prisoners through medical and mental health neglect, malpractice and deliberate indifference.

What is different about this story is that attorneys from the Human Rights Defense Center – the organization that publishes *Prison Legal News* – represented Mr. Mejia's family and estate in obtaining some modicum of justice following his death, with the goal of trying to ensure it does not happen to other prisoners.

When PLN was founded in 1990, one of our goals was to be able to conduct public interest litigation involving the criminal justice system. Between 1993 and 2009, PLN filed a number of censorship and public records lawsuits around the country, many involving cutting-edge legal issues, which helped to ensure that the right of prisoners and publishers to send and receive information was respected, and brought a modest amount of transparency to the secrecy of government institutions.

In 2009 we created our litigation project, which allowed us to employ our first staff attorney to represent PLN in censorship and public records litigation as well as represent others in matters related to HRDC's mission. Today, HRDC's litigation project employs two full-time attorneys including Lance Weber, our litigation director, plus two full-time paralegals.

To date, HRDC attorneys have successfully represented the estates of two prisoners in Tennessee who died due to medical neglect involving private prison companies, the estate of a Pennsylvania prisoner who died from a lack of mental health treatment and the family of a prisoner brutally murdered by other prisoners at a private prison in Arizona. Those cases were all resolved by confidential agreements, which have not allowed us to report the outcomes; several were resolved pre-litigation.

The case involving Mr. Mejia is not subject to a confidentiality provision and is fully reported in this issue of PLN. An upcoming issue will report the results of a lawsuit against Corrections Corporation of America, which HRDC resolved in favor of a former prisoner whose baby was born prematurely and died while she was held at a CCA-run jail.

Due to our very limited resources, HRDC's attorneys can only provide representation in a select number of cases; our current focus is on cases involving deaths, and as the cover story makes clear, where the facts of the case lend to larger public issues related to the need for prison reform. We would like to thank Mr. Mejia's family for choosing HRDC to represent them and also our co-counsel, Jesse Wing at MacDonald Hoague & Bayless (MHB) in Seattle. Carrie Wilkinson, the director of our Washington Prison Phone Justice Campaign, also worked on the case while she was employed at MHB prior to joining HRDC.

We have a lot of exciting news this month. In addition to the resolution of Mr. Mejia's wrongful death suit, we are very happy to announce that we are publishing the *Disciplinary Self-Help Litigation Manual* by Dan Manville within the next few weeks. Since 2009, PLN has published two other books – the *Prisoners' Guerrilla Handbook to Correspondence Courses in the U.S. and Canada (3rd ed.)* and *The Habeas Citebook: Ineffective Assistance of Counsel*. Our goal is to continue to publish high quality self-help, non-fiction reference books which are of interest to prisoners and will help them help themselves.

We are proud to be publishing the second edition of the *Disciplinary Self-Help Litigation Manual*. Dan was HRDC's first staff attorney; we have published his articles for many years, and he has represented PLN in censorship litigation dating back to 1999. Every prisoner in America is subject to prison and jail disciplinary hearings and needs to know his or her rights in order to enforce them. The book is in the final stages of production and we anticipate it

## Support Prison Legal News with these beautiful gifts!

CALL **561-360-2523,** MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/



### Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

will be available for shipping no later than November 15. If you want to pre-order your copy and have it shipped immediately upon receipt, order it now for $49.95 — see the ad on p. 53.

Additionally, it is time for the annual PLN and HRDC fundraiser. We recently realized that many people, including long-time PLN subscribers, are not aware of the full scope of our activities on behalf of prisoners and their families. This year we are sending everyone a copy of our 2013 annual report and some news articles about PLN that provide a detailed overview of everything we do on an ongoing basis.

Our fundraising goal this year is $75,000 to help cover the costs of the Campaign for Prison Phone Justice. Thanks to the help of our readers and supporters, HRDC was able to play an integral leadership role in getting the Federal Communications Commission to cap the cost of interstate phone calls from prisons and jails. We are currently trying to get the FCC to extend those rate caps to the costs of intrastate (in-state) phone calls, which make up the majority of calls from detention facilities.

We incur extensive costs in obtaining the phone contracts, calling rates, ancillary fees and commission data that have underpinned the FCC campaign, and most importantly, everyone in the advocacy community has relied on our data. Travel expenses for testifying before the FCC, meeting with FCC commissioners and staff, etc. all add up, and we have a full-time staff member working on the campaign.

Donations are urgently needed to support our efforts; your financial help has made the Campaign for Prison Phone Justice possible, and we are close to achieving significant reforms beyond the interstate rate caps. If you and your family are tired of being gouged and ruthlessly exploited by prison telecom companies and the prisons and jails that take kickbacks in exchange for telephone monopolies, then please donate to HRDC so we can continue the fight.

This issue of *PLN* includes an ad describing how to contact the FCC about the high costs of in-state prison phone calls and the negative impact those costs have had on you and your family. Comments can be submitted in writing by prisoners and online by non-prisoners. This is the

time to make your voice heard – please let others know about the need to contact the FCC and to donate to HRDC and PLN so we can maintain the Campaign for Prison Phone Justice!

Lastly, as the holidays approach, nothing makes for better gifts than a subscription to PLN and some of the books we distribute, plus you can still take advantage of our Subscription Madness offer (see the ad on page 25).

Enjoy this issue of *PLN* and please encourage others to subscribe.



**BATTLING THE ADMINISTRATION**
An Inmate's Guide to a Successful Lawsuit
by David J. Meister
ISBN: 9781940638034

Send Check or Money order to: Wynword Press P.O. Box 557 Bonners Ferry, ID 83805
*Guidance on how to get organized *Sample complaint & other forms *Covers court rules, evidence and exibits *Citations to controlling case law *Summary of prisoner's rights*Details on hearing and trial practice, ...and more!
Tele: 208-267-0817

1st Edition 2013-2014
$34.95 includes shipping
Order online at: www.wynwordpress.com





**Nolo's Plain-English Law Dictionary**
$29.99

Order from
**Prison Legal News**
P.O. Box 1151
Lake Worth, FL 33460
561-360-2523
Add $6 shipping for orders under $50

www.prisonlegalnews.org

# BRANLETTES BEAUTIES

**OUR SIMPLE POLICIES:**
SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP-FRIENDLY).
DUE TO TREMENDOUS TIME AND COST ANSWERING LETTERS, UNLESS YOU ARE PLACING AN ORDER OR A QUESTION REGARDING YOUR ORDER, WE WILL NOT REPLY TO ANY OTHER QUESTIONS. SASE ARE REQURED FOR ANY INQUIRIES OR CONCERNS!

YOU AND YOU ALONG ARE RESPONSIBLE FOR YOUR SELECTIONS BEING ALLOWED INTO YOUR FACILITY:
KNOW YOUR INSTITUTIONS POLICIES AS TO WHAT IMAGE CONTENT IS ALLOWED. RETURNED ORDERS ARE NON-REFUNDABLE. THEY WILL BE HELD FOR 14 CALENDAR DAYS IN ORDER FOR YOU TO SEND SELF-ADDRESSED STAMPED: 3 FIRST CLASS STAMPS PER ENVELOPE, WITH A STREET ADDRESS FOR EVERY 20 PICTURES. ALL RETURNED IMAGES HELD AFTER TWO WEEKS WILL BE RE-SOLD AND WE WILL RETURN TO OUR STOCK.

ALL PAYMENTS ARE BY INSTITUTIONAL CHEACKS OR U.S. POSTAL SERVICE OR WESTERN UNION MONEY ORDERS.

THESE PAYMENTS ARE PROCESSED IMMEDIATELY AND SHIPPED IN LESS THAN 3-4 WEEKS. ANY OTHER COMPANY MONEY ORDERS DELAY SHIPMENT 8-10 WEEKS OR UNTIL THAT MONEY CLEARS OUR BANK. YES, WE DEAL WITH PEOPLE THAT ARE, WHILE IN PRISON, STILL TRYING NICKEL AND DIME SCAMS...

ALL SALES ARE FINAL! EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM HIGH QUALITY PRINTS ON 4X6 GLOSSY PHOTO PAPER

OUR PRICES ARE SIMPLE:
1-4999 PHOTOS = 0.45 CENTS EACH
5000+ PHOTOS = 20% DISCOUNT
1-9 CATALOGS : $3.00 EACH (+SASE)
10 CATALOGS: $25.00+SASE (4 STAMPS)

SHIPPING & HANDLING:
DUE TO VARIOUS PRISON POLICIES REGARDING HOW MANY PICTURES CAN BE SENT IN ONE ENVELOPE, OUR POLICY IS AS FOLLOWS:
01 - 5 PHOTOS----$1.00 PER ENVELOPE
06 - 15 PHOTOS---$1.50 PER ENVELOPE
16 -25 PHOTOS----$2.00 PER ENVELOPE

BRANLETTES BEAUTIES
SELECT YOUR FAVORITE:
WHITE CATALOGS (60 VOLUMES)
BLACK CATALOGS (60 VOLUMES)
ASIAN&LATINO CATALOGS (60 VOLUMES)
PLEASE STATE WHAT STYLE PHOTOS's:
PROVOCATIVE POSES OR NUDE

FREE CATALOG???
YOU READ IT RIGHT!
JUST SEND US TWO U.S. FOREVER STAMPS AND A SELF ADDRESSED SELF ENVELOPE AND WE WILL SEND TO YOU ONE NUDE OR BOP-FRIENDLY SAMPLE CATALOG (1 PER CUSTOMER) WITH 84 GORGEOUS GIRLS IN FULL COLOR. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!

BRANLETTES
P.O.BOX 5765
BALTIMORE, MD
21282

# Women in Solitary Confinement:
# "The Isolation Degenerates Us into Madness"

## by Victoria Law

A MASS PRISONER HUNGER STRIKE rocked California's prison system last year, drawing international attention to the extensive use of solitary confinement in the United States. Increasingly, solitary is finding its way into the mainstream media and onto activist agendas. Nearly all of the attention, however, has focused on solitary confinement in men's prisons; much less is known about the conditions and experiences inside women's prisons.

During legislative hearing on solitary confinement in California in October 2013, lawmakers asked prison officials about women in solitary confinement. Officials from the California Department of Corrections and Rehabilitation (CDCR) stated that 74 women were held in the Security Housing Unit at the California Institution for Women (CIW) and a handful of women were awaiting transfer from the Central California Women's Facility (CCWF). CDCR does not separate people in the SHU with mental illness from those without mental illness. CDCR officials did not address the number of people in the Administrative Segregation (or Ad Seg) Unit.

According to CDCR statistics, as of September 2013, 107 women were held in Ad Seg at CCWF, which has a budgeted capacity of 38. The average stay was 131 days. Twenty women had been there longer than 200 days, two had exceeded 400 days and another two women had exceeded 800 days. At CIW, 34 women were in Ad Seg with an average stay of 73 days. Two women have exceeded 200 days.



FINALLY REAL LADIES / REAL LETTERS!!
Genuine, friendly, compassionate Writers! GUARANTEED RESPONSES!
**WE'RE WAITING FOR YOUR LETTERS! **
(this is a service – a fee is involved)
Send a SASE & $3.00
4 this true exciting news!
Nubian Princess Ent.
POB 37
Timmonsville, SC 29161  18+
Facebook.com/chanail.paree
Also XXX DVD's and Erotic Letters –
Non Inmates Welcome!
Est 1998

Lawmakers' inquiry prompted advocacy group California Coalition for Women Prisoners to send an open letter to Assemblywoman Nancy Skinner requesting that she investigate conditions of solitary confinement in women's prisons. The group noted that, with the conversion of Valley State Prison for Women to a men's prison and the transfer of several hundred women to California's other two women's prisons, the use of solitary confinement has dramatically increased.

To justify the increase, CDCR has cited "enemy concerns" or a documented disagreement between people that may have led to threats or violence. Those designated as having "enemy concerns" are locked in their cells 22 to 24 hours a day and lose all privileges. CDCR reports do not separate the number of people in Ad Seg or the SHU for rules violations versus those confined because of "enemy concerns." The California Coalition for Women Prisoners has noted that many of these "enemy concerns" are based on incidents that happened years ago and may not be valid today.

Dolores Canales has a son who has spent 13 years in Pelican Bay's SHU. Canales has also had firsthand experience with solitary confinement. While imprisoned at CIW, she spent nine months in Ad Seg, where she was confined to her cell 22 hours a day. "There, I had a window. The guards would take me out to the yard every day. I'd get to go out to the yard with other people," she recalled.

But the isolation still took its toll: "There's an anxiety that overcomes you in the middle of the night because you're so locked in," she described. Even after being released from segregation, Canales was unable to shake that anxiety. She broke into a sweat and panicked each time she saw a group of officers even though she had broken no rules. "I just can't forget," she stated years after her release from prison.

Although the spotlight on solitary has focused largely on California, every women's prison has a solitary confinement unit. Florida's Lowell Correctional Institution for Women has a Closed Management Special Housing Unit (CM SHU) where women are confined to their cells 23 to 24 hours a

day. "There is no free movement or social interaction," reported one woman. "We just sit locked in a concrete and steel room the size of a small residential bathroom."

In Indiana, Sarah Jo Pender has spent nearly five years in solitary. "My cell is approximately 68 square feet of concrete with a heavy steel door at the front and a heavily barred window at the back that does not open," she described. "Walls are covered in white; the paint chipped off by bored prisoners reveals another layer of primer white. No family photos or art or reminder notes are allowed to be taped to the walls; they must remain bare. Our windowsills would be a great place to display greeting cards and pictures, but those are off-limits, too....

"There is a concrete platform and thin plastic mat, a 14-by-20-inch shelf and round stool mounted to the floor, and a steel toilet-sink combo unit. We get no boxes to contain our few personal items. Everything must fit on the shelf, bed or end up on the floor."

Her cell is searched daily by guards although, like everyone else in the prison, she is strip searched any time she leaves the unit for a doctor's appointment or a no-contact visit. When she is taken to the showers, she is handcuffed, then locked into a 3-foot-by-3-foot shower stall with a steel cage door for a 15-minute shower. As is the case across the country, visits are conducted behind glass.

Pender was placed in solitary confinement after successfully escaping from prison in 2008. With the assistance of a guard who had been having sex with her and several other women in the prison, she escaped. After 136 days, she was found, re-arrested and returned to prison, where she began her unending stint in solitary confinement.

Because Pender is considered a high escape risk, the administration has taken steps to isolate her even within the segregation unit. "Other women could talk to each other through their doors, but they were instructed to never talk to me or else they'd be punished," she recounted. "The male guards were never to speak to me unless there was a second guard present, and only to give me orders. Female guards

only spoke when absolutely necessary, per orders, except they chatted freely with any other prisoner."

As in many jails and prisons, those with mental health concerns are often placed in segregation. "One of them is going to be released to society this month," Pender wrote. "She has been in solitary for six or eight months because she has repeatedly cut herself with razors, including her throat, several times. Their solution: Lock her in a room and don't give her a razor."

Another woman spent two-and-a-half years in segregation, originally for disruptive behavior. Her stay was extended each time she hurt herself. "She cut her wrists in the shower. They found her, took her to the hospital, stitched her up, put her back in lock and wrote her up for self-mutilation.

"She ripped the stitches out and got another battery write-up. Threw a mop bucket at the sergeant for another assault write-up and was completely maxed out on her sentence, so they let her go home from solitary. She returned that same year with new charges. She never got therapy while here – or any mental health care that she obviously needed."

While Pender did not enter with preexisting mental health concerns, years of little to no human contact has taken its toll. At times she feels lethargic and depressed. In 2010, she had a psychotic break, which lasted nine months. Since then, she has been on and off half a dozen kinds of psychotropic medications.

"I didn't need the meds for the two years I spent in godawful Marion County Jail and didn't need them for five years at Rockville prison," she recalled. "But when you lock people in rooms for long periods of time, the isolation degenerates us into madness, or at least depression."

Others with no preexisting mental health conditions have also been affected. "I watched a woman claw chunks out of her cheeks and nose and write on the window with her blood," Pender said. "My neighbor bashed her head against the concrete until officers dragged her out to a padded cell. Two other women tried to asphyxiate themselves with shoestrings and bras."

In Florida, faced with the prospect of ten months in CM SHU, a woman attempted suicide. "I had hung myself and was quite dead when the guards cut me down. My heart must've stopped because of the loss of involuntary functions, but still they wrapped me in a sheet and rushed me to medical and succeeded in reviving me," she recalled.

Despite being locked in a cell the size of a bathroom for the foreseeable future, Pender hopes the increased outrage about solitary confinement leads to concrete changes. What would she ask people to do?

"They can help by contacting their legislators and judges about their views on long-term solitary confinement. They can help by supporting small groups of activists and organizations who are passionate about this topic.

"Many people don't have the desire to donate two hours of their week or month to a group, but what about two hours of their monthly wages? Or the book of stamps and box of envelopes that has been collecting dust since email was invented?

"There are lots of ways to help change the system. Whatever you choose to do, just DO something. Just having conversations with others about the subject is doing something. Someone else might volunteer to type up and format a newsletter. Help design a website. Circulate the info. Make





**Women in Solitary (cont.)**

phone calls to organize events. Anything is better than turning the page to the next article and forgetting about us, leaving us alone in our cells," she said.

### Sent to solitary for reporting sexual assault

IT SEEMS ABSURD THAT A PERSON WHO HAS been sexually assaulted would be punished for speaking up, especially since prison policy prohibits sexual contact between staff and the people whom they guard. Yet, in many women's prisons, many of those who report rape and other forms of sexual assault by prison personnel are sent to solitary confinement.

After enduring over a year of repeated sexual assaults by a guard, Stacy Barker became one of 31 women incarcerated in Michigan who filed *Nunn v. MDOC*, a 1996 lawsuit against the Department of Corrections for the widespread sexual abuse by prison guards. The following year, Barker was repeatedly sexually assaulted by an officer who was also a defendant in *Nunn*.

After a month of silence, she reported the assaults to a prison psychiatrist. Barker was immediately placed in segregation and then transferred to Huron Valley Center, which was then a psychiatric hospital for prisoners. There, she reported that hospital attendants verbally harassed her.

In October 1997, Barker attempted suicide. She did not receive counseling or psychiatric evaluation. Instead, three male guards stripped her naked, placed her in five-point restraints (a procedure in which a prisoner is placed on her back in a spread-eagle position with her hands, feet and chest secured by straps) on a bed with no blanket

for nine hours. She was then placed on suicide watch. She reported that one of the staff who monitored her repeatedly told her he would "bring her down a few rungs."

Placing women in solitary confinement for reporting staff sexual harassment or abuse is far from rare. In 1996, Human Rights Watch found that, in Michigan, incarcerated women who report staff sexual misconduct are placed in segregation pending the institution's investigation of their cases. The placement is allegedly for the woman's own protection. The five other states investigated also had similar practices of placing women in segregation after they reported abuse.

Not much has changed in the 13 years since Human Rights Watch chronicled the pervasive and persistent sexual abuse and use of retaliatory segregation in 11 women's prisons. Former staff at Ohio's Reformatory for Women have stated that women who reported sexual abuse are subjected to lengthy periods of time in solitary confinement, where cells often had feces and blood smeared on the wall.

In Kentucky, a woman who saved evidence from her sexual assault was placed in segregation for 50 days. In Illinois, a prison administrator threatened to add a year onto the sentence of a woman who attempted to report repeated sexual assaults. She was then placed in solitary confinement.

In 2003, the Prison Rape Elimination Act (PREA) became law, ostensibly to address the widespread sexual abuse in the nation's jails and prisons. Among its recommendations was "the timely and comprehensive investigation of staff sexual misconduct involving rape or other sexual assault on inmates."

However, this has not stopped the widespread practice of utilizing solitary to

punish those who speak out. An investigation into sexual abuse at Alabama's Tutwiler Prison for Women found that women who report sexual abuse "are routinely placed in segregation by the warden."

Some prison systems have also created new rules to continue discouraging reports of staff sexual assault. At Denver Women's Correctional Facility, a woman reported that prison officials responded to PREA by creating a rule called "False Reporting to Authorities."

"A lot of us do not report any kind of staff misconduct because history has proven that any kind of reports true or false are found [by the administration] to be false," she stated. "When it was found to be false, the people were immediately found guilty and sent to administrative segregation." In some cases, a woman may not even file an official complaint but may only be speaking within earshot of another staff member.

"I didn't want to believe it, but then I experienced it first hand with a close acquaintance of mine. She had conversations with a guard and he asked sexually explicit questions about what she would be able to do in bed because of her disability and it went on for a while.

"She came to me and said she didn't want to be around him and she told an office worker about him and he ended up writing a report on her, before she could do it to him, and she was eventually questioned. I was questioned and I told the investigator that I believed her and that the officer was a pervert and flirted openly with any girl who was desperate for a man's attention.

"I told him I felt like he was a predator and shouldn't be working at a women's prison. I later found out she went to the hole and was going to be Ad Seg'd just like the



# EXECUTIVE CLEMENCY

**For Info. On Sentence Reduction through Executive Clemency:**

## NATIONAL CLEMENCY PROJECT
**3907 N. Federal Highway, # 151
Pompano Beach, FL 33064
954-271-2304
nationalclemencyprojectinc.com**

**(35-Years of Clemency & Parole Assistance)
(Transfers Under The Int'l Prisoner Treaty)**

BBB
ACCREDITED
BUSINESS



**Post conviction State and Federal Habeas Corpus petitions**

## FOR VIRGINIA ONLY

Full review of case:

**$2995.00**

Write to:
Dale Jensen, Criminal Law Attorney
606 Bull Run
Staunton, VA 24401

or have someone call or go to:
(540) 324 - 8828
djensencrimlaw@gmail.com
www.djensencrimlaw.com

others but she left on her mandatory parole to go back to court and was re-sentenced and brought back. Luckily they didn't Ad Seg her when she came back. I'm not sure why they dropped it but maybe it was because she was gone for a while."

Under PREA, those accused of sexual assault are sent to solitary confinement even before the charges are proven. In California, Amy Preasmyer was placed in solitary confinement after being accused of sexual assault by another woman.

"I was abruptly removed from my bed late in the evening to face an extended wait and then a transfer to Ad-Seg," she reported. "Upon entering my newly assigned chambers at 3 a.m., I found the toilet was backed up and a DD3 (EOP) [person with a disability] had urinated everywhere prior to me, leaving extremely unsanitary conditions and aromas." She was not allowed to access supplies that would allow her to clean or disinfect her cell.

Although she was eventually cleared of all charges, being in Ad Seg forced her to miss her final examinations for college. During that time, she also lost the privilege to shop, walk outside or even call home.

Preasmyer reflected on the double standard between prison staff and prisoners accused under PREA: "Had this woman falsely accused an officer, would that officer have been arrested and forced to relinquish rights pending results of the investigation into the accusation? Would the employee suffer a wage loss? Would disciplinary action and consequences be rendered to the accuser once charges turned out to be baseless?"

After reading Preasmyer's article in her segregation cell in Indiana, Sarah Jo Pender, who has spent five years in solitary confinement after an officer helped her escape, agreed. She noted that, although the officer who helped her escape had had sex with her and seven other women in the prison, he evaded a sexual misconduct charge as part of a plea bargain.

He was sentenced to seven years in prison and released after two years. As far as Pender knows, he spent no time in solitary confinement. On the other hand, the superintendent at the Indiana Women's Prison has told her that she will remain in segregation so long as she is incarcerated so that he knows where she is at any given time.

We might know more about the preva-

lence of isolating those who report sexual abuse if that threat didn't hang over their heads. But it does, bullying who-knows-how-many into silence. As one woman in Texas reported:

"When officers and inmates are found to be involved, the common course of action here is to move her to another facility. If she consented in any way, she will be placed in Ad Seg. Being moved with the jacket of a prior officer relationship can make time very difficult. And, if they found any reason to write the inmate a major case, it also costs her at least a one-year parole set-off. Being moved, time in isolation, a label and a set-off? Those are powerful motivations to keep a girl quiet." ☟

*Victoria Law is a writer, photographer and mother. She is the author of* Resistance Behind Bars: The Struggles of Incarcerated Women *(PM Press, 2012). Her writings, many of which focus on gender, incarceration and resistance, have appeared in* Bitch, HipMama, The Nation, SolitaryWatch *and* Truthout. *This article was originally published in two parts by SolitaryWatch (www.solitarywatch.com) in December 2013; it is reprinted with permission of the author.*



**msp** | LAW

**Michael Soukup**
Licensed in Wisconsin and Illinois

**Matthew Pinix** *
Licensed in Wisconsin

## Appealing a Conviction? Hire an Appellate Attorney.

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, attorneys with more than 10-years' combined experience handling **criminal appeals** in **Wisconsin** and **Illinois**.

**Law Office of Matthew S. Pinix, LLC**
1200 East Capitol Drive, Suite 220
Milwaukee, Wisconsin 53211
(414) 963-6164
www.pinixlawoffice.com

» Rated by Super Lawyers*
» Rated by avvo.com
» Better Business Bureau accredited



JailCallsUSA

$9.95 per month

**\*UNLIMITED JAIL CALLS\***

" WE BEAT ALL OUR COMPETITORS "

**SWITCH TO US TODAY!!**

No Contracts

No Credit Checks

No Equipment to buy

**LOWER THE CALL RATES FOR:**
GLOBAL TEL LINK
SECURUS
V-CONNECT
PAYTEL
ICSOLUTIONS
VAC
PLUS MORE

FEDERAL \* STATE \* COUNTY

SAME DAY ACTIVATION - NO PER MINUTE CHARGES ON OUR END. JUST $9.95 A MONTH!

**GET A LOCAL NUMBER TODAY**
**888-776-2012**

# www.JailCallsUSA.com

Online Payments Accepted   PayPal

# Tennessee Senate Judiciary Committee Holds
# Hearings on Criminal Justice Reform

O~N SEPTEMBER 15 AND 16, 2014,~ while Tennessee's General Assembly was out of session, the Senate Judiciary Committee held hearings on criminal justice reform – the first time a legislative body in the state has comprehensively addressed that topic for at least a decade. The hearings were chaired by Senator Brian Kelsey, and speakers testified on issues ranging from the history of sentencing in Tennessee to the state's growing prison population, high crime rate and potential solutions to those problems.

According to the FBI, Tennessee had the highest violent crime rate in the nation based on 2012 statistics.

Criminal defense attorney David Raybin, a former district attorney and former member of the Tennessee Sentencing Commission (abolished in 1995), who helped develop Tennessee's criminal sentencing statutes, testified about the history of sentencing laws in the state, including the Class X laws and 1989 Sentencing Reform Act. He noted that the Sentencing Commission had made a number of recommendations that were ignored by lawmakers.

Others who testified included officials from the district attorney's office and attorney general's office. The DA's office complained that criminal sentences in Tennessee mislead the public and victims, as a ten-year sentence does not mean defendants will serve 10 years. Rather, they are eligible for parole at 30% of their sentence for standard range 1 offenders, and those with "truth in sentencing" sentences may serve 85% rather than 100% of their sentences. Further, life sentences do not mean life in prison, as life-sentenced prisoners can be paroled after serving 51 calendar years. With respect to parole, the DA's office did not mention that the average parole grant rate in Tennessee is around 36%.

Two members of the Vera Institute of Justice, Rebecca Silber and Nancy Fishman, testified about their review of Tennessee's criminal justice system and offered suggestions for reforms; the Vera Institute provides research and technical assistance to government agencies to help improve justice systems, policies and practices.

Marc Levin, director of the Center for Effective Justice at the Texas Public Policy Foundation and policy director of Right on Crime, spoke about what Texas has done to reduce its prison population through criminal justice reforms – although Texas presently has the largest state prison population in the nation.

Levin observed that 90% of Tennessee's corrections budget goes to the state's prison system instead of probation, drug courts or community supervision programs. "Our view is, the pendulum's swung a little bit too far," he stated.

Other speakers at the Committee hearings included Anderson County Mayor Terry Frank, Tennessee ACLU director Hedy Weinberg, Knoxville police chief David Rausch, commissioners of the Department of Mental Health and Department of Safety, Tennessee Department of Correction (TDOC) Commissioner Derrick Schofield, the director of the Tennessee Association of Professional Bail Agents, Court of Criminal Appeals Judge John Everett Williams, the director of the Heritage Foundation's Edwin Meese III Center for Legal and Judicial Studies, and Tennessee State Employees Association (TSEA) director Tommy Francis.

Commissioner Schofield discussed the need to reduce recidivism rates, while Francis spoke about challenges faced by TDOC employees represented by the TSEA. Charlie White, director of the Association of Professional Bail Agents, mainly addressed the contributions of the for-profit bail industry in terms of providing a means for people to get out of jail (those who can afford to make bond, that is).

Vanderbilt University Professor Chris Slobogin testified three times over the two-day hearings and discussed what other states have done in terms of criminal justice reform – including pretrial release initiatives, de-criminalization, expanding re-entry and community corrections programs, and enacting probation and parole reforms. He also presented recommendations from the Tennessee Consultation on Criminal Justice – a faith-based group working on reform of the state's justice system.

Those recommendations included: 1) ending the practice of sending technical probation and parole violators to prison when short jail stays of 2 to 3 days would be more effective; 2) increasing parole grant rates; 3) developing effective reentry and community supervision strategies; 4) conducting a study to examine successful programs and policies implemented in other states; 5) reinstituting the Tennessee Sentencing Commission to provide guidance to the legislature about changes to sentencing laws; 6) reinstituting the joint legislative Oversight Committee on Corrections, which was disbanded in 2011, to exercise oversight over the TDOC; and 7) ensuring that the TDOC has current and accurate data with respect to recidivism rates and other statistics.

Additionally, Professor Slobogin cited the need to re-evaluate the role of using privately-operated prisons in Tennessee and recommended that the state consider justice reinvestment initiatives, whereby savings from criminal justice policies that reduce the prison population are reinvested in communities affected by high incarceration rates – such as job creation programs and re-entry programs.

Overall, there was consensus that reforms are needed in Tennessee's criminal justice system, including changes in sentencing laws, alternatives to incarceration and the need to address a growing prison population – which is currently around 21,180 in TDOC facilities plus another 8,700 convicted felons in local jails. The state recently contracted with Nashville-based Corrections Corporation of America to house prisoners at a 2,500-bed facility in Trousdale County that is expected to open in 2015. CCA already holds one-quarter of the state's prison population in privately-operated facilities.

PLN managing editor Alex Friedmann, a member of the Tennessee Consultation on Criminal Justice, attended the Senate Judiciary Committee hearings. ◪

Sources: *The Tennessean, USA Today, www.hollinslegal.com, Tennessee Senate Judiciary Committee hearings*

# PLN FUNDRAISER 2014



## *Please Support Prison Legal News and the Human Rights Defense Center!*



Prison Legal News, a project of the non-profit Human Rights Defense Center, cannot fund its operations through subscriptions and book sales alone. We rely on donations from our readers and supporters – like you!

PLN conducts just one fundraiser a year; we don't bombard our readers with donation requests, we only ask that if you are able to contribute something to our important work, please do so. Every dollar counts and is greatly appreciated and will be put to good use. No donation is too small, even books of stamps!

### Where does your donation go? Here's some of what we've done in the past year:

- HRDC, a co-founder and leader of the Campaign for Prison Phone Justice, was instrumental in getting the Federal Communications Commission to reduce the cost of prison phone calls, which the FCC did when caps on interstate prison phone rates went into effect in February 2014!
- PLN settled censorship suits against jails in Ventura County, California; Upshur and Comal County, Texas; and Kenosha County, Wisconsin. In all of those cases, the jails agreed to change their mail policies to allow prisoners to receive PLN and other correspondence.
- PLN has other censorship lawsuits pending against the Nevada DOC, the Florida DOC and jails in Texas, Tennessee, Virginia, Arizona, Michigan, Georgia and Florida.
- PLN settled a wrongful death suit brought by the family of a Washington state prisoner who died due to inadequate medical care, and settled a lawsuit filed on behalf of a former prisoner who lost her baby after guards at a CCA-run jail in Tennessee delayed sending her to a hospital.

### With your help we can do more! Please send your donation to:

**Prison Legal News, P.O. Box 1151, Lake Worth, FL 33460**
*Or* call PLN's office at 561-360-2523 and use your credit card to donate.
*Or* visit PLN's website at www.prisonlegalnews.org and click on the "Donate" link.

## PLN Support Gifts

### Gift option 1
As a token of our gratitude for your support, we are providing the PLN card when making a donation of $50. The card is hand embroidered by women prisoners in Bolivia who are paid a fair wage for the cards to help support their families.



### Gift option 2
In recognition of your support, we are providing the PLN hemp tote bag when making a donation of at least $75. Handmade in Vermont using hemp fiber. Carry books and groceries stylishly and help end the war on drugs!



### Gift option 3
To show our appreciation for your support, we are providing the following selection of books for you to choose from when making a donation of $100. Donations of $100 or more can choose one free title. Each $100 donation entitles you to another free title; i.e., donate $500 and you get five books! $1,000 and you get everything on the page! Please circle the books you want and send the corresponding donation amount.

 

     

### Gift option 4
As a thank you gift for your support, we are providing the entire PLN anthology of critically acclaimed books on mass imprisonment signed by editor Paul Wright! (The Celling of Amercia, Prison Nation and Prison Profiteers) plus the PLN hemp tote bag to carry the books in when making a donation of $250 or more.

  

# How the Courts View ACA Accreditation

*by Alex Friedmann*

THE AMERICAN CORRECTIONAL ASSOciation (ACA), a private non-profit organization composed mostly of current and former corrections officials, provides accreditation to prisons, jails and other detention facilities.

According to the ACA, "Accreditation is a system of verification that correctional agencies/facilities comply with national standards promulgated by the American Correctional Association. Accreditation is achieved through a series of reviews, evaluations, audits and hearings."

To achieve accreditation a facility must comply with 100% of applicable mandatory standards and at least 90% of applicable non-mandatory standards. Under some circumstances, the ACA may waive certain accreditation standards. There are different standards for different types of facilities, such as adult correctional institutions, jails, juvenile detention facilities and boot camp programs.

The standards are established by the ACA with no oversight by government agencies, and the organization basically sells accreditation by charging fees ranging from $8,100 to $19,500, depending on the number of days and auditors involved and the number of facilities being accredited. [See, e.g.: *PLN*, Aug. 2014, p.24].

The ACA relies heavily on such fees; it reported receiving more than $4.5 million in accreditation fees in 2011 – almost half its total revenue that year. The organization thus has a financial incentive to provide as many accreditations as possible.

Notably, the accreditation process is basically a paper review. The ACA does not provide oversight or ongoing monitoring of correctional facilities, but only verifies whether a facility has policies that comply with the ACA's self-promulgated standards at the time of accreditation. Following initial accreditation, facilities are re-accredited at three-year intervals.

As a result, some prisons have experienced significant problems despite being accredited. For example, the Otter Creek Correctional Center in Kentucky, operated by Corrections Corporation of America (CCA), was accredited by the ACA in 2009 when at least five prison employees were prosecuted for raping or sexually abusing prisoners. [See: *PLN*, Oct. 2009, p.40]. Kentucky and Hawaii withdrew their female prisoners from Otter Creek following the sex scandal, but the facility did not lose its ACA accreditation. The prison has since closed.

The privately-operated Walnut Grove Youth Correctional Facility in Mississippi was accredited by the ACA even though the U.S. Department of Justice found "systemic, egregious practices" at the facility, including "brazen" sexual activity between staff and offenders that was "among the worst that we've seen in any facility any-

where in the nation." When approving a settlement in a class-action lawsuit against Walnut Grove in 2012, a U.S. District Court wrote that the facility had "allowed a cesspool of unconstitutional and inhuman acts and conditions to germinate, the sum of which places the offenders at substantial ongoing risk." [See: *PLN*, Nov. 2013, p.30].

More recently, the ACA-accredited Idaho Correctional Center, operated by CCA, has been cited for extremely high levels of violence, understaffing and fraudulent reporting of staffing hours. A video of CCA guards failing to intervene while one prisoner was brutally beaten by another has been widely circulated. CCA was held in contempt by a federal court in September 2013 for violating a settlement in a class-action lawsuit against the facility, and a separate suit alleges that CCA employees collaborated with gang members to maintain control at the prison. The state took control of the Idaho Correctional Center on July 1, 2014 and the FBI is currently conducting an investigation into CCA's staffing fraud. [See: *PLN*, Oct. 2013, p.28; May 2013, p.22; Feb. 2012, p.30]. Regardless, the facility remains accredited by the ACA.

Prisoners who litigate prison and jail conditions cases sometimes try to raise claims related to violations of ACA standards, even though the standards



FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! (Void in New York)
(Last Quarter's winner from Somers, CT.)
TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

Inmate Magazine Service Inc.

alone do not create enforceable rights. On the other side of such lawsuits, the ACA says the benefits of accreditation for corrections officials include "a stronger defense against litigation through documentation and the demonstration of a 'good faith' effort to improve conditions of confinement."

But how do the courts view ACA accreditation – and comparable accreditation of prison and jail medical services by the National Commission on Correctional Health Care (NCCHC) – both in terms of claims alleging violations of accreditation standards and as a defense by prison officials?

The U.S. Supreme Court noted in *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) that accreditation does not determine constitutionality. With respect to standards established by organizations such as the American Correctional Association, the Court wrote: "[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."

In *Grenning v. Miller–Stout*, 739 F.3d 1235, 1241 (9th Cir. 2014), the defendants contended that the level of lighting in a prisoner's cell "passed the national accreditation standards of the ACA...." However, the Ninth Circuit said it was "unable to determine ... the significance of the 'accreditation' by the ACA. We are not informed of the standards of the ACA, nor are we informed about the thoroughness of the testing performed" at the prison. The mere fact of ACA accreditation did not entitle the defendants to summary judgment on the prisoner's Eighth Amendment claim. [See article on p.40].

The Fifth Circuit stated in *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) that it was "absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards. Additionally, the ACA's limited inspections are not be [sic] binding as factual findings on the magistrate or on this court. While compliance with ACA's standards may be a relevant consideration, it is not per se evidence of constitutionality."

Further, in a lawsuit challenging inadequate medical care in the jail system in Maricopa County, Arizona, a federal district court wrote: "The Board Defendants argue that because the parties stipulated to incorporate in the Amended Judgment the 'essential' standards for health services in jails of the National Commission on Correctional Health Care ('NCCHC'), Correctional Health Services adopted policies conforming to NCCHC standards, and Correctional Health Services substantially complies with all of the 'essential' NCCHC standards, they have met their burden in proving there are no current and ongoing violations of pretrial detainees' federal rights."

However, "The Court decides independently whether there are current and ongoing violations of pretrial detainees' constitutional rights and does not rely on any determinations made by an accrediting organization such as the NCCHC. The NCCHC 'essential' standards do not specifically focus on all of pretrial detainees' constitutional rights." Additionally, the district court noted that "Some of the NCCHC 'essential' standards



# AHRONY, GRAHAM, & ZUCKER, LLP
## A POST-CONVICTION LAW FIRM

Appeals

Habeas Corpus Writs (Factual Innocence)

Parole Hearings

SB 260 Hearings

MDO Hearings

Re-Sentencing

Probation Violations

Rap Sheet Correction

Prison & Parole Issues

115 Discipline Issues

California & Federal Courts

Bruce Zucker     Orly Ahrony     Ian Graham

12400 WILSHIRE BLVD. SUITE 400 • LOS ANGELES, CA 90025
TEL. (310) 979-6400 • WWW.AHRONYGRAHAM.COM
California Cases Only • Unsolicited Original Documents Will Not Be Returned
This is an Advertisement for Legal Services

## Courts on ACA (cont.)

address administrative functions and are not narrowly tailored to meet constitutional requirements," and "[a]lthough the NCCHC standards may be helpful for a jail, the Court makes its findings based on the Eighth and Fourteenth Amendments of the United States Constitution."

The court found that healthcare services provided by the defendants remained unconstitutional despite NCCHC accreditation. See: *Graves v. Arpaio*, 2008 U.S. Dist. LEXIS 85935 (D. Ariz. Oct. 22, 2008) [*PLN*, Jan. 2010, p.43; May 2009, p.28].

In Texas, a federal district court commented on accreditation of Texas Department of Criminal Justice (TDCJ) facilities by both the ACA and NCCHC.

"While TDCJ's participation in the ACA accreditation process is to be commended, accreditation, in itself, is not a clear indication that TDCJ is properly following its policies and procedures. Experts from both parties recognized the limitations of ACA accreditation," the court wrote, noting "that ACA accreditation is a tool, but not a constitutional standard."

The district court also remarked that one expert had "testified to a number of examples where a prison system was accredited by the ACA, but was, nevertheless, held by a court to be operating in an unconstitutional fashion, including prisons in Florida and the San Quentin prison in California."

With respect to accreditation by the NCCHC, the district court stated: "Rather than analyze the actual quality of the medical care received by inmates, the NCCHC's evaluation focuses on the written standards, policies, protocols, bureaucracy, and infrastructure that makes up the medical care system [cite omitted]. Further undermining defendants' attempt to use NCCHC accreditation as a proxy for a certification of the constitutionality of its medical care is the fact that at least two of the plaintiffs' experts who testified about profound shortcomings in the quality of care in TDCJ-ID also work as NCCHC accreditors.... While NCCHC accreditation does bolster defendants' claims that its medical care system is functioning constitutionally, the accreditation simply cannot be dispositive of such a conclusion." See: *Ruiz v. Johnson*, 37 F.Supp.2d 855, 902, 924-25 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001).

A U.S. District Court in Puerto Rico also found that prison medical care was unconstitutional despite accreditation by the NCCHC, with the court noting "the National Commission on Correctional Health Care in 1992 had accredited the medical care programs at four prisons and provisionally accredited four more, with several additional prisons under consideration for accreditation. However, one of the monitor's consultants, Dr. Ronald Shansky, found noncompliance with at least one essential standard at every institution the Commission had accredited." The court further observed that "During this investigation, Department of Health personnel provided the monitor's staff with credible evidence that other employees had falsified documents in support of accreditation." See: *Feliciano v. Gonzalez*, 13 F.Supp.2d 151, 158 n.3 (D.P.R. 1998).

A Florida district court addressed ACA accreditation in *LaMarca v. Turner*, 662 F.Supp. 647, 655 (S.D. Fla. 1987), *appeal dismissed*, 861 F.2d 724 (11th Cir. 1988), stating: "Defendants make much of the relevance to this litigation of the accreditation of prisons and [Glades Correctional Institution] in particular by the American Correctional Association. The Magistrate found that the GCI accreditation had 'virtually no significance' to this lawsuit because accredited prisons have been found unconstitutional by courts. Having considered the GCI accreditation along with the remainder of the evidence, the undersigned district court finds it of marginal relevance in this case."

And in a challenge to the adequacy of the law library at the Buena Vista Correctional Facility in Colorado, a district court stated it was "simply ludicrous" for the defendants to argue they were entitled to summary judgment because "the American Correctional Association formally accredited" the facility and ACA standards address prison law libraries. See: *Boulies v. Ricketts*, 518 F.Supp. 687, 689 (D. Colo. 1981).

However, other courts have taken ACA accreditation into consideration when determining the constitutionality of policies or practices at correctional facilities, such as in *Yellow Horse v. Pennington County*, 225 F.3d 923, 928 (8th Cir. 2000) (suicide prevention procedures) and *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) (death of restrained prisoner).

Therefore, incarcerated litigants should use caution when basing arguments on violations of accreditation standards rather than violations of constitutional or statutory rights, and should note the above case law when corrections officials raise accreditation as a defense in lawsuits related to conditions of confinement in prisons and jails. ◣

Additional source: *www.aca.org*



# FREE BOOK!

Get *The Habeas Citebook* with purchase of a 4-year subscription to *Prison Legal News*. Offer good for new subscriptions and renewals.

Special limited time only! All sales final and no refunds. Order now for this great deal worth $49.95.

**Prison Legal News** • PO Box 1151 • Lake Worth, FL 33460
Tel [561] 360-2523 • www.prisonlegalnews.org

# States Renewing Their Prison Phone Contracts

*As state DOCs renew or rebid their prison phone contracts, you can help urge them to lower intrastate phone rates and eliminate commission kickbacks!*

*The Campaign for Prison Phone Justice needs your help in:*

## **** *North Dakota, Oklahoma, Washington* ****

The Departments of Corrections in the above states are in the process of re-bidding or renewing their prison phone contracts. Most DOCs receive a commission (kickback) on revenue generated from calls made by prisoners, which results in excessively high phone rates. Although the FCC voted last year to cap the costs of interstate (long distance) prison calls, which went into effect on February 11, 2014, the order does not apply to intrastate (in-state) calls. An estimated 85% of prison phone calls are in-state. This is an opportunity to ask DOCs to forgo commissions and ensure their new prison phone contracts are based on the lowest cost to those who pay for the calls – mostly prisoners' families.

### Take Action NOW! Here's What YOU Can Do!

Ask your family members and friends to write, email, call and fax the DOC and the governor's office (addresses and contacts are listed below), requesting that the DOC: 1) forgo commission payments when re-bidding or renewing its prison phone contract, and 2) base the new contract on the lowest calling costs. Lower prison phone rates should apply not just to long distance calls but also to in-state calls. For a sample letter or to easily send an email, visit the Campaign for Prison Phone Justice's website and click on the "Take Action" tab:

## www.phonejustice.org

### Prison phone contract information & Contacts:

**North Dakota:** Receives a 40% kickback; existing contract expires on 10-31-2014. Charges $6.00 for a 15-minute collect intrastate call. **Contacts:** North Dakota DOC, Director Leann Bertsch, 3100 Railroad Avenue, Bismarck, ND 58502-1898; phone: 701-328-6362, fax: 701-328-6651, email: lebertsc@nd.gov. Governor Jack Dalrymple, State Capitol, 600 E. Blvd Ave., Bismarck, ND 58505-0001; phone: 701-328-2200, fax: 701-328-2205, email: governor@nd.gov

**Oklahoma:** Receives an effective kickback of 76.6%; existing contract expires 12-31-2014. Charges $3.00 for a 15-minute collect intrastate call and $3.00 for a local call. **Contacts:** Oklahoma DOC, Director Robert Patton, 3400 Martin Luther King Ave., Oklahoma City, OK 73111; phone: 405-425-2505, fax: 405-425-2578, email: terri.watkins@doc.state.ok.us. Governor Mary Fallin, Capitol Building, 2300 N. Lincoln Blvd. Rm. 212, Oklahoma City, OK 73105; phone: 405-521-2342, fax: 405-521-3353, email: www.ok.gov/governor/# (click "E-mail Governor Fallin" under the "Contact the Governor" tab)

**Washington:** Receives a 51% kickback; existing contract expires on 12-31-2014. Charges $3.50 for a 15-minute collect intrastate call and $3.50 for a collect local call. **Contacts:** Washington DOC, Secretary Bernard Warner, P.O. Box 41100, Mail Stop 41100, Olympia, WA 98504-1100; phone: 360-725-8213, fax: 360-664-4056, email: doccorrespondenceunit@doc.wa.gov. Governor Jay Inslee, P.O. Box 40002, Olympia, WA  98504-0002; phone: 360-902-4111, fax: 360-753-4110, email: https://fortress.wa.gov/es/governor (use online email form)

# Leading with Conviction: JustLeadershipUSA

*by Glenn Martin and Sasha Graham*

**F**OR DECADES, ADVOCATES AND SCHOLARS alike have publicly decried the crippling financial and human costs of mass incarceration. Today their calls for reform are amplified by an emerging bipartisan consensus that current incarceration trends are unsustainable, ineffective and increasingly harmful to individuals, families, communities and society as a whole.

Several states, including New York, New Jersey and California, have prioritized criminal justice reforms intended to reduce excessive criminalization and incarceration.[1] Last year, 300 bills were introduced on the state level that promoted smarter, healthier approaches to crime prevention and reductions in our overreliance on incarceration.[2] Yet despite this abundance of political will and a growing legion of zealous advocates, we have yet to realize significant and widespread reform of our criminal justice system. In fact, recent successes notwithstanding, the justice system continues to operate at full throttle, consuming millions of individuals, countless families and entire communities.

The problem is that for far too long the individuals and communities directly impacted by mass incarceration have been glaringly absent – or worse, omitted – from the conversation. Ironically, in a movement

established in their name, the currently and formerly incarcerated are often relegated to roles of service provision and symbolism. It is not enough that advocates for reform be genuine believers in the depravity and inhumanity of our carceral policies. The failure of policy makers, advocates and service providers to invest time and energy into cultivating meaningful ways to work collaboratively with people and communities most impacted by the criminal justice system has expunged the expertise needed to achieve substantial reform.

No community wants, needs or understands the urgency of sweeping reform more than those held captive by the disastrous policy failures of a broken justice system. These individuals not only bring a valuable and culturally-competent frame to the discussion, but "living closer to the problem" often means that they have given significant thought to possible solutions. In what appears to be a watershed moment for criminal justice reform we need these communities of the currently and formerly incarcerated to instruct us on what needs to change, where we can improve and what strategies we need to implement.

JustLeadershipUSA is dedicated to putting new and authentic drivers in the seat of the reform locomotive. We know that it is not for lack of intelligence or hard work that formerly incarcerated people rarely assume roles of leadership, but a lack of access to resources and opportunities. We believe that everyone has the capacity to lead, though not everyone is exposed to opportunities that teach them critical leadership skills. Through our leadership development training program we instruct formerly incarcerated people with proven leadership capacity in their respective

careers and communities, to drive decarceration efforts around the country.

Together with the Center for Institutional and Social Change at Columbia University, JustLeadershipUSA has collaborated with over 50 formerly incarcerated leaders to research, develop and employ a dynamic and inclusive leadership model. Our cohort-based training practices include peer coaching sessions, peer group learning projects and individualized one-on-one sessions, to produce a sustainable leadership community that fosters ongoing development and support long after the program is complete.

While we believe those closest to the problem are closest to the solution, we know this does not exempt the rest of us from playing our part in correcting the wanton harm produced by four decades of failed criminal justice policy. Contrary to popular sentiment, mass incarceration is neither a minority issue nor a poor people's issue, but an American issue. The criminal justice system is a menacing threat to our democracy – squandering the potential of millions of Americans, destroying families and communities, and wasting billions of taxpayer dollars each year.

At JustLeadershipUSA, we know that the presence of allies has been crucial to every movement against systemic injustice (the abolition of slavery, the women's rights movement, the Civil Rights movement, etc.). As such, we employ a membership model to encourage people of all backgrounds, including those who are incarcerated, to band together against policies that are wasteful and ineffective and to incentivize investment in practices that are fairer, smarter and morally aligned with our values.



PENACON.com

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see. Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE PLN5OFF FOR $5 OFF

**WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS**
STATE AND FEDERAL POST-CONVICTION AND APPEALS

Licensed since 1995, hundreds of appellate briefs and habeas petitions, capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas, Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment. Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**

Our founder, Glenn E. Martin, a national criminal justice reform advocate and formerly incarcerated individual, created JustLeadershipUSA because he believes one of the most unjust features of the existing system is that the millions of men and women in America's prisons have been barred from making decisions regarding their own lives. JustLeadershipUSA knows that systemic change is accelerated and amplified through strength in numbers. We ask that people who are currently incarcerated and the more than 60 million American adults who have criminal records[3] become members of our movement to elevate the voices of those impacted by incarceration and articulate their own salvation, as only they can.

By joining JustLeadershipUSA you are safeguarding against the adoption of policies contrary to your best interests and the health and well-being of your families and communities. As a member your contributions will fund our efforts to replace mandatory sentencing laws with more flexible and individualized guidelines, eliminate the use of "three-strike" laws, eliminate tough-on-crime-era truth in sentencing laws, expand labor market opportunities for formerly incarcerated people and encourage the increased use of prison population reduction strategies such as executive pardons, parole release, clemency and merit time. Together, with a united voice and a united vision for reform, we can halve the U.S. prison population by 2030 and afford those who are incarcerated equal opportunities to be part of the solution.

To become a member of JustLeadershipUSA, please send $10.00 (the cost of annual membership) to JustLeadershipUSA at 112 West 34th Street, Suite 2104, New York, NY 10120. Also, please spread the word about JustLeadershipUSA; ask your family and friends to become members, too! Together we can redefine JUSTICE.

For more information, visit our website: www.justleadershipusa.org.

1 Mauer, Marc, "Fewer Prisoners, Less Crime: A Tale of Three States," The Sentencing Project, July 2014.

2 Cockburn, Chloe, "Ending Mass Incarceration: Progress Report," ACLU, May 28, 2014; www.aclu.org/smart-justice-fair-justice/ending-mass-incarceration-progress-report.

3 Rodriguez, Michelle and Maurice Emsellem, "65 Million Need Not Apply: The Case for Reforming Criminal Background Checks for Employment," National Employment Law Project, March 2011.

# Washington State: Injunction Entered Against Lewis County in PLN Censorship Suit

On September 10, 2014 a federal judge entered a preliminary injunction against Lewis County, Washington in a lawsuit challenging a postcard-only mail policy at the county jail.

The lawsuit, filed by Prison Legal News in April 2014, alleged that the jail's policy of restricting incoming and outgoing correspondence to postcards violated PLN's rights under the First Amendment. Further, the complaint argued that the jail's failure to provide notice to the sender when mail was censored or rejected violated the due process clause of the Fourteenth Amendment.

While county officials claimed the jail had changed its mail policy after the suit was filed, "and is now allowing news sources to distribute both publications and other forms of correspondence to prisoners," U.S. Magistrate Judge J. Richard Creatura wrote there was "substantial evidence to believe that this policy has not yet been adopted." Further, "First Amendment rights are too important to be subject to such arbitrariness," he added.

Between September and October 2013, pursuant to the jail's postcard-only policy, jailers had rejected dozens of letters sent to prisoners by PLN, including subscription brochures, book catalogs and copies of court rulings.

"The postcard-only policy drastically reduces prisoners' and other correspondents' ability to communicate. It is more than a mere inconvenience and becomes a substantial barrier to First Amendment rights," Judge Creatura stated, noting that the Washington Department of Corrections and other jail systems in the state, including those in King, Pierce and Spokane counties, do not have postcard-only policies.

The district court enjoined county officials from "restricting incoming and outgoing prisoner mail to postcards only," from "rejecting mail to or from prisoners without providing notice to the prisoner" and from "rejecting mail from non-prisoner correspondents without providing notice to the non-prisoner correspondent." The court also required appeals of rejected mail to be referred to a jail official "other than the person who originally rejected the correspondence."

"We are pleased that the court found the constitutional violations at the jail warranted the entry of an injunction against Lewis County," said PLN editor Paul Wright. "No one is above the law or the Constitution – and sometimes it takes a federal judge to make that clear."

Jesse Wing, one of PLN's attorneys, noted that the jail's restrictive mail policy not only harmed pretrial detainees who have not been convicted, but also people in the community who want to correspond with prisoners. Communicating with the outside world is "essential to maintaining family, employment, educational and other important relationships critical for a person to productively return to society after time in jail," he said. "The court's order has a huge positive effect, helping many people."

PLN is represented by attorneys Jesse A. Wing and Katherine Chamberlain with the Seattle law firm of MacDonald Hoague & Bayless, and by Human Rights Defense Center general counsel Lance Weber. The case remains pending. See: *Prison Legal News v. Lewis County*, U.S.D.C. (W.D. Wash.), Case No. 3:14-cv-05304-JRC.

Sources: *HRDC press release (Sept. 11, 2014); www.courthousenews.com*



# Drug Courts Partner with Pharmaceutical Company to Combat Heroin, Alcohol Abuse

THE 406TH DISTRICT DRUG COURT IN Webb County, Texas has turned to a new approach for breaking the cycle of addiction related to heroin, opiate and alcohol abuse: The court formed a partnership with Irish pharmaceutical company Alkermes plc to provide a drug called Vivitrol to drug court participants.

Vivitrol is an intramuscular medication delivered once-monthly by injection. It works to block the production of endorphins, which in turn prevents the brain from producing surges of dopamine – the body's pleasure hormone. Essentially, Vivitrol prevents a person from getting high or drunk. As a result, if a heroin addict shoots up or an alcoholic takes a drink, he or she won't feel anything pleasurable – although Vivitrol is only meant to be used after a person has detoxed or stopped drinking.

A primary benefit of the drug compared to other medical treatments, such as Suboxone and methadone, is that Vivitrol is not addictive.

One dose of Vivitrol lasts 30 days, though the drug is expensive; the cost can range from $800 to $1,200 for a single shot. Alkermes agreed to a three-year partnership with Webb County in which the company will provide one free dose of Vivitrol to drug court participants – a $200,000 commitment.

The court also received a $1 million Substance Abuse and Mental Health Services Administration grant to implement a client treatment plan that includes Vivitrol and cognitive intervention. In addition, Webb County Commissioners approved a half-million dollars in November 2012 to build a new adult detoxification and residential treatment facility for drug offenders. Vivitrol will be given to people released from the residential program.

The drug is not without its critics, but has been used for three decades. Known side effects include possible liver damage or hepatitis, risk of overdose if patients continue using drugs or alcohol while taking Vivitrol, and allergic reactions and depression.

The federal government first developed the drug Naltrexone some 30 years ago to prevent heroin relapses. It was approved by the Food and Drug Administration (FDA) in pill form in 1984 as a treatment for heroin

addiction, and in 1994 for alcoholism.

But the drug required a strict regimen of daily doses. The National Institute on Drug Abuse funded research in the 1990s to develop a form of Naltrexone that could be delivered by injection. The result was Vivitrol, which was approved by the FDA in 2006 to treat alcoholism and in 2010 to treat opiate addiction.

David McCann, of the National Institute on Drug Abuse's Division of Pharmacotherapies and Medical Consequences, said a Russian study used by the FDA to grant approval found that more than one-third of Vivitrol patients – 36% – stayed drug-free and in treatment for six months, compared to less than one-fourth – 23% – of those not taking the drug.

But John Schwarzlose, who heads the Betty Ford Center in California, is among the skeptics who warn that research on Vivitrol is "spotty."

"The pharmaceutical company will have you believe it is the cure for alcoholism," Schwarzlose wrote in an email to the St. Louis *Post-Dispatch*. "But recovery is learning to live without mood-altering chemicals."

Still, testimonials of Vivitrol's success caught the ear of Gil Kerlikowske, then the head of the White House's Office of National Drug Control Policy. After visiting a clinic in St. Louis, Missouri in August 2012, Kerlikowske told the *Post-Dispatch* that Vivitrol and similar drugs represent the future of addiction treatment, which until now has relied almost exclusively on therapy or medicines that are just as addictive as the drugs they are designed to replace.

St. Louis Circuit Court Judge James Sullivan, who oversees the city's drug court, began referring offenders to Vivitrol centers instead of prison more than three years ago. He said 60 to 70 defendants on his docket are taking Vivitrol in addition to mandatory therapy in the 11-to-16-month program.

"Vivitrol has assisted us in reaching some very difficult long-term addicts and alcoholics who have not been able to benefit from listening to drug treatment programs that are focused on treatment rather than the cravings," Sullivan said.

In 2011, the *Journal of Substance Abuse Treatment* published a study in which re-

searchers examined 64 participants from Sullivan's court plus two Michigan drug courts. Half received monthly Vivitrol injections in addition to therapy; the others received only therapy.

The study, funded by Alkermes, determined that Vivitrol patients were about 57% less likely to miss drug court sessions than those who participated in therapy alone. Additionally, only 8% of those treated with Vivitrol were rearrested compared to 26% of the non-Vivitrol participants. The study estimated that keeping addicts from re-entering the criminal justice system generated savings of between $4,000 and $12,000 per person following an initial arrest.

Four offenders in Hocking County, Ohio are among Vivitrol's success stories. In April 2014, they were recognized for breaking their addictions in an emotional graduation ceremony attended by family and friends.

"This is not something that is easy," said Municipal Court Judge Fred Moses, who spearheaded the drive to create a Vivitrol drug court program. He put together a coalition of state and county agencies to secure funding for the program, which began in late 2012.

"It's not about the court, it's about the community and those seeking help and who want to be helped," Moses said.

Authorities in Warren County, Ohio initiated a Vivitrol pilot program in March 2014, led by Common Pleas Court Judge Robert Peeler, who had been actively seeking the medication for heroin-addicted defendants on his docket. Under an $832,000 grant from the Ohio Department of Rehabilitation and Correction, about a dozen people are already enrolled in the program; the grant will cover a total of 120 participants.

"The goal is to try to find some alternative for these non-violent drug offenders to go somewhere other than prison," Peeler said. "Hopefully, that means back to work; they get their kids back if they've lost them. It's giving people a chance for hope; it's giving people a chance for success."

Butler County, Ohio Common Pleas Court Judge Keith Spaeth, who runs the county's specialty drug court, said state money channeled through the Butler

County Alcohol and Drug Addiction Services Board enabled him to start a Vivitrol pilot program. He observed that the results, while not conclusive, have been extraordinary.

"It's purely anecdotal at this time but there have been amazing results," Spaeth said. "People we have worked with for over a year and can't seem to make progress, suddenly they are on Vivitrol and they are like a different person. Their personality changes, and they stop using, and they get a job, and they become human."

Butler County Sheriff Richard Jones, however, has called Vivitrol programs in jails a "waste of money."

The drug court in Lane County, Oregon was the first in that state to begin a Vivitrol program, in the summer of 2014. The court received a $38,000 grant from the Oregon Community Foundation to pay for enough doses of the drug to help the roughly 115 eligible people in the county's Adult Drug Court and Veterans Treatment Court.

"The one concrete report that they continue to hear [is] that it takes away the cravings for the addiction," stated Lane County Adult Drug Court Director Bonnie McIrvin. "For opiate addicts, that is the biggest draw."

Meanwhile, Webb County, Texas hopes to use its Vivitrol treatment program as a magnet to attract more funding.

"We want to use this as leverage at the state and federal level to bring in more monies for our program," said Jesse Hernandez, a licensed drug counselor, grant writer and drug court consultant.

Currently, Vivitrol programs are available in courts, jails and prisons in at least 21 states; however, as with most drug courts, participants are usually limited to non-violent, low-level offenders – even though those convicted of violent crimes would also benefit, and perhaps have the greatest need for such treatment programs.

In February 2014, Alkermes estimated net sales of Vivitrol to range from $90 to $100 million this year. For fiscal year 2013, net sales of the drug were $58.1 million.

Sources: *Laredo Morning Times, www.logandaily.com, www.stltoday.com, www.thefix.com, http://registerguard.com, www.daytondailynews.com, www.vivitrol.com, www.cleveland.com, www.rttnews.com*




# SUBSCRIPTION MADNESS 2014

Our Subscription Madness promotion has been so successful in the past that we have decided to offer it again!

PLN is offering a discount on blocks of 2 or 4 one-year subscriptions for any person not a current or former subscriber who has a U.S. address, whether they are imprisoned or not. Subscription Madness is the only opportunity attorneys, librarians and corrections professionals have to receive a PLN subscription at a fraction of the normal rate of $90 per year, and for prisoner family members and concerned activists to subscribe at a steep discount from the normal rate of $35 per year. Prisoner subscriptions are also less than the normal $30 per year. Check out these discounts!

- $50 buys 2 one-year subscriptions ($25 each)
- $80 buys 4 one-year subscriptions ($20 each)

If you want to take advantage of Subscription Madness but are stumped for people to send them to, PLN can provide names of indigent prisoners who would love a PLN subscription. Use a separate piece of paper to order by mail, call our office to order with a credit card, or go to our website to order online. **No Renewals!** Sorry, but Subscription Madness is for new one-year subscriptions only, and cannot be used to renew or extend a current or former subscription. PLN is a 501(c)(3) non-profit. (Subscription Madness 2014 expires 12-31-2014).

**Prison Legal News, PO Box 1151, Lake Worth, FL 33460**
**561-360-2523; www.prisonlegalnews.org**

# Class-Action Suit Claiming Inadequate Medical Care at Virginia Prison Set for Trial

A December 2014 trial date has been scheduled in a class-action federal lawsuit that could determine the future of health care for prisoners at the Fluvanna Correctional Center for Women (FCCW) in Troy, Virginia.

The suit was filed in July 2012 on behalf of five women incarcerated at Fluvanna, and names as defendants the Virginia Department of Corrections (VDOC), Armor Correctional Health Services and both VDOC and Armor officials for failing to provide constitutionally adequate medical care at FCCW. The Legal Aid Justice Center (LAJC) in Charlottesville, Virginia; the Washington, D.C. law firm of Wiley Rein, LLP and the Washington Lawyers' Committee for Civil Rights and Urban Affairs are jointly representing the plaintiffs – Cynthia B. Scott, Bobinette D. Fearce, Patricia Knight, Marguerite Richardson and Rebecca L. Scott.

On July 15, 2013, the district court held that Corizon Health, Inc., of Brentwood, Tennessee, which was the contract provider for medical care in VDOC facilities prior to Armor, and which outbid Armor in May 2013 to resume its role as Virginia's correctional health care provider, could be added as a defendant.

The suit does not seek monetary damages, but rather "declaratory and injunctive relief to address and remedy the failure of FCCW, on a systematic, pervasive, and on-going basis," to provide constitutionally adequate medical care.

An LAJC press release said the quality of health care at FCCW is so deficient that it violates the Eighth Amendment's ban on cruel and unusual punishment.

"The women suffer extreme pain for prolonged periods as a result of the refusal to provide for these women who have no other options for securing life-saving medical care," said LAJC litigation director Abigail Turner. "Some spend months confined to wheelchairs because medical staff fail to act promptly. Some have died. The human tragedy is almost all the pain and suffering could have been prevented."

Turner blamed the VDOC's outsourcing of prison health care to private companies as contributing to the problem. "The suffering stems directly from the poli-

cies and practices of a for-profit corporation that puts profits over people," she said.

Turner added that she believes at least ten deaths at FCCW over the past 3 to 4 years could have been prevented had prisoners received sufficient medical treatment.

The complaint cites the failure of health care staff to treat the plaintiffs and other prisoners as examples of system-wide failures. As one example, the lawsuit describes the death of FCCW prisoner Darlene White, an acknowledged diabetic.

White went to the prison's infirmary in the early morning hours of December 21, 2011, complaining of severe headache, nausea and diarrhea. A nurse gave her a shot to relieve her nausea and sent her back to her dorm. Later that day she returned to the infirmary. A nurse checked her blood sugar and "found that it was radically elevated above normal levels," the suit claims. She was instructed to lie on a bed, where she remained for the next day vomiting and defecating on herself without receiving care or a medical exam. A nurse did try to administer an IV to White, who was "completely non-responsive," shortly before she died.

A second example cited in the lawsuit involves prisoner Jeanna Wright. Beginning in 2011, Wright complained for months of intense abdominal pain and rectal bleeding, but "for at least one year," medical staff at FCCW assured her that she was "fine." Wright was finally taken to the University of Virginia (UVA) Medical Center, where she was diagnosed with Stage IV abdominal cancer. She died only a few weeks later.

The lawsuit cites numerous other examples intended to demonstrate the inadequate care that prisoners receive – or in some cases don't receive. The LAJC claimed that despite having to pay a $5 co-pay for sick call visits, prisoners often wait several months to see a doctor or nurse practitioner to diagnose and treat their medical needs, and that the denial of access to doctors results in medical staff refusing to examine, diagnose and treat serious medical conditions.

The complaint further alleges that Armor's medical staff have failed to provide the plaintiffs with timely referrals and treatment for specialized care such as

degenerative disc disease, severe shortness of breath, recurring throat infections and sarcoidosis – a disease that causes inflammation in the body's organs. Even when a specialist prescribes a specific course of treatment, Armor's staff regularly refuse to carry it out.

The suit also contends that prisoners with chronic illnesses, such as hypertension, diabetes, incontinence, frequent constipation, arthritis and other mobility impairments, are deprived of care as their health deteriorates.

FCCW prisoner Taylor Gilmer, 23, is one such example. When Gilmer was seven years old, doctors diagnosed her with Type 1 diabetes; her mother said that since Gilmer has been incarcerated at FCCW, medical staff have been negligent in her treatment.

Her mother claimed that FCCW health care staff misidentified Gilmer's Type 1 diabetes as Type 2, and prison officials prevented her from routinely checking her blood sugar levels.

"I'm really scared," said her mom. "She cries to me on the phone ... she says 'I'm losing my vision.' She's afraid she's going to lose her feet." She wonders what condition her daughter will be in when she is finally released in 2017. "How bad will she be by then, if she even lives? The outlook is not so good."

Another FCCW prisoner was approved for medical clemency and released in early December 2013, after doctors at the UVA Medical Center gave her only weeks to live. Donna Kidd spent nearly ten years behind bars on charges of fraud and larceny, and suffered from hepatitis C when she was incarcerated. Barbara Kingery, her older sister, said Kidd's health quickly deteriorated once she was in prison due to poor medical care.

"They are in there paying for their mistakes, but they shouldn't have to pay with their life," Kingery stated. "If she had gotten the proper treatment, she wouldn't be where she is now."

The VDOC defendants filed a motion to dismiss the lawsuit, which was denied by the district court in December 2012. The suit alleges that medical care has been equally deficient under both Armor and Corizon, with Corizon underbidding its

rival by around $17 million when the contract was rebid in 2013.

"Everything we've seen so far [indicates] more of the same from Corizon," said LJAC attorney Brenda Castaneda. "I wish the care would be better, but that's not what we're hearing from our clients and it's not what we anticipate based on past experiences." She said LJAC had petitioned to add Corizon to the lawsuit so the court could order the company to provide adequate care in the future.

"It doesn't take a rocket scientist to know that their mission is to make money," noted Hope Amezquita, an attorney with the ACLU of Virginia. "They're a for-profit company. It may be cynical of me to say this, but you can't make more money unless you cut services and treatment and staff."

Attorneys for the plaintiffs said they were left with no other option but to sue. "Each year prisoners at Fluvanna file hundreds of grievances recounting the failure to provide appropriate medical care," said Deborah Golden, an attorney with the Washington Lawyers' Committee. "Yet, [VDOC] has not required [its outside provider] to adopt and improve medical care. By its actions and inactions, [VDOC] has shown deliberate indifference to plaintiffs' serious medical problems and needs."

In April 2014, the district court granted the plaintiffs' motion for $15,980 in attorney's fees for having to file a motion to compel in a discovery dispute in the case, and on July 28, 2014, Corizon was dismissed from the suit upon agreement of the parties.

The company had announced its intention to withdraw from its $76.5 million contract with the VDOC effective October 1, 2014, citing costs as a factor. Armor will resume medical care in Virginia prisons at that time on an interim basis; as Corizon will no longer be subject to declaratory or injunctive relief, it was dismissed as a defendant.

A motion to certify a class in the case remains pending, and a jury trial is scheduled for December 1, 2014. See: *Scott v. Clarke*, U.S.D.C. (W.D. Va.), Case No. 3:12-cv-00036-NKM.

Sources: *www.newsplex.com, www.justice4all.org, www.c-ville.com, www.wvtf.org, www.dailyprogress.com*





**Professional Paralegal Services**

"You Deserve Due Diligence, Not Just Due Process."

**PPS Is Prepared To Offer You:**

- High quality parole packages with color photos -- $250.00

  This includes:
  - communicating with family and friends to help you coordinate your support system;
  - working closely with our clients in editing their package to maximize their potential for parole; and
  - explaining to family and loved ones how the parole process works.

- PPS also assists in obtaining court documents, case law, and legal records; $40.00 min. plus the cost of the records

- Explaining to families and loved ones the processes of prison life;

  Let me use my behind-the-bars experience to help get you home

**Gary Hunter**
411 McCauley Blvd                    (210) 422-3685 Fax (210)922-4348
San Antonio, TX 78221               letstalknowandlater@gmail.com

## New Titles Available in PLN's Bookstore



**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**



**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**



**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**



**A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series),** by Bryan A. Garner, 768 pages. **$33.95**

❏ Criminal Law in a Nutshell   ❏ Advanced Criminal Procedures in a Nutshell   ❏ Criminal Procedure
❏ Dictionary of Criminal Law Terms

Amount enclosed (add $6 S&H for orders under $50; free shipping over $50) _____

By ❏ check   ❏ new postage stamps   ❏ credit card   ❏ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____   State _____   Zip _____

**PRISON LEGAL NEWS**   PO Box 1151 • Lake Worth, FL 33460
Tel [561] 360-2523 • www.prisonlegalnews.org

## Pen Pals for Prisoners

Your ad on the Internet worldwide:
One year for $9.95. Mail name & address for FREE order form or online:

**www.PrisonerPal.com**

PO Box 19689
Houston, TX 77224

# Prison and Jail Phone Reforms Needed in New Jersey

*by Karina Wilkinson*

TWO PRISON PHONE SERVICE PROVIDERS, Global Tel*Link and Securus, continue to overcharge prisoners and their families for calls made from prisons and jails in New Jersey. While federal regulations capped interstate (long distance) calls from correctional facilities beginning in February 2014, the State of New Jersey has allowed a grave injustice to continue by permitting companies to charge high rates and allowing county jails to accept commissions on in-state calls ranging from 50% to 70%. Such commissions amount to legal "kickbacks" that let phone companies share profits with state and local governments at the expense of those who can least afford it.

Prior to the Federal Communication Commission's order capping interstate phone rates, charges of $.33 per minute from New Jersey state prisons and as high as $15.00 for 15-minute calls from county jails have translated to hundreds and even thousands of dollars of debt for prisoners and their families. New Jersey Advocates for Immigrant Detainees* and other advocacy groups have received reports of parents forgoing calls with their children because they couldn't afford the cost.

"It is absolutely obscene that a private vendor can charge fees that amount to a tax on children, grandmothers and families in crisis," wrote Assemblywoman Bonnie Watson Coleman in the *Trenton Times*.

Following the FCC's order, New Jersey initially lowered phone rates in state prisons to $.19 per minute, and in early September 2014 dropped the rates a second time to $.15 per minute. The most recent contract renewal extends for three months, ending in December 2014. Although the state has lowered both in-state and interstate rates to $.15 per minute, it has not gone far enough in adopting fair and just phone charges. The state could follow New York's example and adopt a flat rate of $.05 per minute; New York contracts with the same prison phone service provider as New Jersey, Global Tel*Link.

County jails are doing the minimum to comply with the FCC's order. They've lowered interstate rates to $.21 per minute for debit and prepaid calls and $.25 per minute for collect calls, but left in place high rates and commissions for in-state calls. It is now less expensive for county jail prisoners to call outside the state than to call one town over.

As examples of some of the phone rates at local facilities, calls from jails in seven counties cost $5.50 for 15 minutes within the same area code (except local calls) and $8.50 outside the area code but still within New Jersey. Seven other counties charge $4.75 for most calls within the same area code and $7.75 outside the area code but still within the state. Out-of-state calls, meanwhile, are capped at $3.15 for debit and prepaid calls and $3.75 for collect calls. This makes no sense.

Limiting calls to family members is only one aspect of this injustice. There are around 2,200 beds in New Jersey for people detained by Immigration and Customs Enforcement (ICE), and the majority are in county jails. These detainees are awaiting immigration hearings for which they have no guarantee of legal representation if they cannot afford it. Many must represent themselves in court, and phone calls are crucial for accessing the necessary documents and information for their cases – yet they are still subjected to high phone rates.

Within the next several months, the Board of Public Utilities is expected to vote on a petition seeking to open a process to regulate phone rates in correctional facilities and lower in-state rates at both county jails and state prisons. For more information on the petition filed by a coalition of advocacy organizations, including New Jersey Advocates for Immigrant Detainees, New York University School of Law Immigrant Rights Clinic, the New Jersey Institute for Social Justice, the law firm of DLA Piper and LatinoJustice, visit www.njphonejustice.org. ◢

* New Jersey Advocates for Immigrant Detainees is a statewide coalition which includes organizations that visit detainees in detention and provide immigrants with legal and religious services.

*Karina Wilkinson is a co-founder of the Middlesex County Coalition for Immigrant Rights and a member of New Jersey Advocates for Immigrant Detainees and New Jersey Phone Justice.*

# Pretrial Detainee's First Amendment Retaliation Claim Survives Summary Judgment

*by David M. Reutter*

IN A DECEMBER 26, 2013 DECISION, THE Eighth Circuit Court of Appeals reversed a district court's grant of summary judgment, holding that a former pretrial detainee had presented sufficient evidence that he was subjected to retaliation for filing grievances and a lawsuit.

Randy G. Spencer filed suit alleging a First Amendment claim related to his stay at the Jackson County Detention Center (JCDC) in Missouri. When he entered the JCDC in January 2005 he faced multiple charges, including tampering with a motor vehicle, assaulting a police officer, theft and resisting arrest.

Despite those charges and a prior criminal record, Spencer was approved for and assigned to the Inmate Worker Program (IWP), also known as the trustee program. The IWP not only provided special privileges such as late nights, contact visits, movies, sodas, popcorn and extra food for kitchen workers, it also paid detainees for each shift worked.

Spencer was commended by the program's supervisor, Margo Carter. He was reentered in the IWP after completing a substance abuse treatment program, and remained in the IWP until he was released from jail. In 2006, Spencer filed a lawsuit against Carter and other JCDC employees, alleging he received inadequate medical and dental care at the facility and faced retaliation by Carter.

Spencer returned to the JCDC in October 2009 on a theft charge. He was again approved for the IWP. About 10 days later, he saw Carter and apologized for filing the

lawsuit against her. After a "few seconds," she advised him that he was being terminated from the IWP.

The next day, Spencer filed a request for administrative remedy, known as a JPO, which is required before filing a formal grievance. Carter denied his request to return to the trustee program due to his "past charges, behavior and actions."

Spencer then filed several other JPOs and requested grievance forms from his case manager, Gale Anthony. He made repeated requests which were denied, and Anthony had him moved to another unit with "younger, aggressive inmates." His new case manager, Brenda Williams, advised him that he "wasn't going to get any grievance forms." Spencer filed suit and the district court granted summary judgment to Carter, Anthony and Williams.

On appeal, the Eighth Circuit held the district court had erred, noting that "In order to demonstrate retaliation in violation of the First Amendment under 42 U.S.C. § 1983, Spencer must 'show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'"

As to the claim against Carter, the appellate court wrote that she had not "explained how Spencer became disqualified from the trustee program when his record was essentially the same as when he entered it originally in 2005." She did not claim he had a disqualifying offense, nor did she present "evidence that Spencer's record changed between his October 2009 approval for the trustee program and his later removal from that program." Thus, a jury could conclude his lawsuit against her was the motivating factor for his termination from the IWP.

A jury could also conclude the actions of Anthony and Williams were motivated by retaliation for Spencer's efforts to file grievances. The Court of Appeals therefore reversed the district court's grant of summary judgment. Following remand the defendants filed a renewed motion for summary judgment on April 22, 2014, which remains pending. See: *Spencer v. Jackson County, Missouri*, 738 F.3d 907 (8th Cir. 2013).

## law offices of
## Susan L. Burke

Please contact me if you want to join the class actions against telephone companies who have been overcharging inmates and their families for phone calls.

Susan L. Burke
Law Offices of Susan L. Burke
1611 Park Avenue
Baltimore MD 21217
Phone 410.733.5444
Website: www.burkepllc.com

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, *Protecting Your Health and Safety*, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check or money order to:
**Prison Legal News
PO Box 1151
Lake Worth, FL 33460
561-360-2523**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*



# Simple Business *Consulting*
## Prisoner Outreach Services

SIMPLE BROCHURE · SIMPLE PRICING
FAST PROFESSIONAL SERVICE
YOU CAN SET UP A SERVICE ACCOUNT
FLAT FEES OR RETAINER FOR TERM PROJECTS

**FINANCIAL REQUIREMENTS**
NO BANK ACCOUNT
NO MINIMUM BALANCE
NO MONTHLY FEE
NO MEMBERSHIP FEE
NO APPLICATION

PUBLISHING · VIRTUAL OFFICE · GRAPHIC DESIGN · MARKETING · BUSINESS

**Make a change today!**
Do you have an idea, dream, goal or plan you have been wanting to develop? What are you waiting for?

Send SASE for our brochure....
It is that
*SIMPLE!*

VISION IS A PICTURE OF THE FUTURE THAT CREATES PASSION WITHIN YOU TODAY

SIMPLE BUSINESS CONSULTING
3308 ROUTE 940 · SUITE 104-304
MOUNT POCONO, PA 18344
WWW.SIMPLEBUSINESSCONSULTING.COM

# Alaska Filing Fee Statute Denies Prisoners Court Access

*by Mark Wilson*

On December 6, 2013, the Alaska Supreme Court held that barring an indigent prisoner from filing an appeal due to inability to pay the filing fee deprived him of his fundamental right of access to the courts.

In May 2011, Alaska prisoner James Barber was found in violation of prison rules and placed in segregation. He appealed the violation to the superior court, requesting a partial filing fee exemption under AS 09.19.010 due to his indigency. The superior court granted a partial exemption and reduced the filing fee to $33.86, to be paid within 30 days.

AS 09.19.010 specifies that prisoners "must pay a full court filing fee before commencing litigation against the State. But the statute allows a court to exempt part of the filing fee if the prisoner demonstrates exceptional circumstances."

In September 2011, Barber was found guilty of a second disciplinary violation and again put in segregation. He also attempted to challenge that order in superior court, seeking a partial filing fee exemption due to his inability to pay. The superior court again set the filing fee at $33.86, due within 30 days.

When Barber failed to pay, the superior court dismissed both actions. He then appealed to the Alaska Supreme Court, arguing that the prisoner litigation filing fee statute deprived him of access to the courts. The Supreme Court asked the Alaska Association of Criminal Defense Lawyers to appear as amicus curiae in support of Barber's position.

The Court observed that it had "recited the proposition that 'an inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold. All other rights ... are illusory without it,'" citing *Mathis v. Sauser*, 942 P.2d 1117 (Alaska 1997) (quoting *Adams v. Carlson*, 488 F.2d 619 (7th Cir. 1973)).

Analyzing Barber's court access claim as an issue of procedural due process, the Supreme Court applied the balancing test of *Matthews v. Eldridge*, 424 U.S. 319 (1976) and concluded, following an extensive analysis, that "as applied to prisoners in Barber's circumstances, AS 09.19.010 denies adequate procedural due process."

"Although the state may have a legitimate interest in reducing frivolous prisoner litigation," the Court wrote, "due process cannot allow that interest to be furthered by barring an individual prisoner's court access because of an actual inability to pay." The dismissals of Barber's appeals were reversed and the case remanded for further proceedings. See: *Barber v. Alaska DOC*, 314 P.3d 58 (Alaska 2013).

# California: Federal Judge Certifies Class-Action Over SHU Placement, Conditions

*by Derek Gilna*

California state prison officials could be forgiven for complaining that the federal courts spend a lot of time monitoring their activities, but the facts indicate that such attention is warranted. California's prison system, already singled out by the U.S. Supreme Court for overcrowding and court-ordered population reductions, is currently under additional scrutiny for constitutional violations in the Security Housing Unit (SHU) at Pelican Bay State Prison.

A lawsuit filed by the Center for Constitutional Rights on behalf of ten prisoners who have spent at least ten years in the SHU at Pelican Bay alleges that prolonged SHU confinement constitutes cruel and inhumane punishment.

According to Alexis Agathocleous, one of the attorneys representing the plaintiffs, "Since their 2011 hunger strikes, hundreds of prisoners at the Pelican Bay SHU – and across California – have stood together in solidarity to protest inhumane conditions and broken policies they've been subjected to for decades. This case has always been about the constitutional violations suffered by all prisoners at the SHU...."

The federal judge hearing the case of *Ashker v. Brown* apparently agreed, and on June 2, 2014 certified the lawsuit as a class-action for all similarly situated prisoners held in Pelican Bay's SHU.

The prisoners' tactic of engaging in hunger strikes, uncommon in U.S. prisons, has focused attention on what prisoners' rights advocates argue have been long-term problems in California's prison system. [See: *PLN*, Aug. 2013, p.18; July 2012, p.32].

Following an expansive investigation, Amnesty International (AI) issued a 63-page report in September 2012, concluding that SHU conditions "breach international standards on humane treatment." The SHU at Pelican Bay is intentionally designed to "minimize human contact and reduce visual stimulation," the report stated.

The district court noted that "Plaintiffs allege that SHU inmates live in almost total isolation. They spend at least twenty-two and a half hours per day in windowless, concrete cells with perforated steel doors and typically leave only to shower or exercise alone in an enclosed pen."

According to the AI report, "Under California regulations, SHU is intended for prisoners whose conduct endangers the safety of others or the security of the institution." Yet two-thirds of SHU prisoners are serving "indeterminate" terms in segregation – not due to violent behavior but because they have been "validated" by prison authorities as gang members or associates. [See: *PLN*, May 2014, p.30; Dec. 2013, p.40].

The arbitrariness of such isolation practices has led to an average stay in Pelican Bay's SHU of 6.8 years, AI stated. At least 500 prisoners have spent more than 10 years in solitary confinement, where the conditions "would crush you" according to Tess Murphy, an Amnesty observer who toured Pelican Bay. Disturbingly, nearly 60 prisoners have been held in the SHU for over 20 years, many of them since the facility first opened in 1989.

Now these practices will be subjected to judicial scrutiny in the latest of a long line of federal lawsuits that have mined a seemingly endless vein of questionable conditions of confinement that have exacted an immense cost in unnecessary human suf-

fering in California's prison system.

Although there have been recent efforts by state prison officials to review SHU placements and move certain SHU prisoners into a "step down" program, such efforts have been criticized as inadequate. As of June 9, 2014, prison officials had conducted 828 SHU reviews, resulting in 557 prisoners being moved to general population and 231 placed in various levels of the step down program. Five of the original plaintiffs in *Ashker* have been removed from SHU confinement.

In its class certification order, the district court certified two classes, one consisting of "all inmates who are assigned to an indeterminate term at the Pelican Bay SHU on the basis of gang validation..." and the other of "all inmates who are now, or will be in the future, assigned to the Pelican Bay SHU for a period of more than ten continuous years." Prisoners held in SHUs at other facilities are not included.

The court also assigned five of the original named plaintiffs who remain at Pelican Bay to serve as class representatives, and denied a motion by the California Correctional Peace Officers Association (CCPOA) to intervene in the case. See: *Ashker v. Brown,* U.S.D.C. (N.D. Cal.), Case No. 4:09-cv-05796-CW; 2014 U.S. Dist. LEXIS 75347 (N.D. Cal. June 2, 2014).

In a related matter, a bill that would have required certain reforms in SHUs in California prisons, SB892, died in the state legislature in late August 2014. For example, the bill would have allowed SHU prisoners to have photographs and make phone calls if they maintained good behavior for three months. Fears that Governor Jerry Brown would veto the legislation contributed to its demise.

"I became convinced that to get a bill signed into law would require further weakening it to a point where it could no longer accomplish its goals," said state Senator Loni Hancock.

Thus, it appears that changes in SHU practices will have to be accomplished through the courts, as California lawmakers lack the political will to do so. ◪

Additional sources: *www.townhall.com, www.truth-out.org*

**WINNING HABEAS CORPUS & POST CONVICTION RELIEF**
Revised 4th Ed. 2012

Main subject: Ineffective Assistance of Counsel-"IAC"

Atty Kent Russel writes: "Simply the best source for a quick study on major subjects in the criminal process."

◇ A virtual law library in a book, major constructional issues

◇ 6th Amendment & IAC, Duty to investigate

◇ Forensics, Plea IAC, Jury Instructions

◇ §2254 & 2255 Procedure, Clearly established law

**POST COVICTION RELIEF FOR WASH. STATE-Personal Restraint Petition**

The only book for Wash. State prisoners who seek collateral review by PRP or CrR 7.8 motion. Covers all aspects of preparing a PRP, time bar, facial invalidity, Plea bargain, sentencing, incl. case law & rules.

**ORDER: (price incl. tax, plus S&H)**

| [ ] Winning Habeas Corpus... | $59.50 |
| [ ] Post Conviction Relief for Wash. | $49.50 |
| [ ] Both Books | $95.00 |

To: FAST LAW PUBLISHING

Box 577, Upland CA 91785  On-line at www.fastlaw.org

**THE SENZA COLLECTION**

SENZA SPECIALIZES IN PROVIDING YOU SEVERAL CHOICES
ALL NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY
- OR -
NON NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY
WE HAVE DIVIDED OUR CATALOGS INTO THESE CATEGORIES:
CAUCASIAN/AFRICAN-AMERICAN/HISPANIC/ASIAN/MIXED HOTTIES
EACH PAGE OF OUR CATALOGS HAS 99 GLORIOUSLY SEDUCTIVE LADIES POSING JUST FOR YOUR ENJOYMENT.
OVER 250 CATALOGS TO COLLECT AT JUST $2.50 PER CATALOG
———————————— HERE'S A LITTLE FREEBIE FROM SENZA TO YOU!!! ————————————
ORDER YOUR FREE SENZA "99 HOTTIES" SAMPLE CATALOG
JUST SEND US TWO U.S. FOREVER OR FIRST CLASS STAMPS AND A SELF ADDRESSED STAMPED ENVELOPE TO:
SENZA FREE CATALOG OFFER  P.O. BOX 5840  BALTIMORE, MD 21282

AND FOR THOSE THAT JUST CANNOT WAIT...TAKE ADVANTAGE OF THIS LIMITED TIME OFFER
SENZA'S INTRODUCTORY SPECIAL ****DIRTY DOZEN****
$19.99 GETS YOU ALL THIS + FREE SHIPPING AND HANDLING
12 EYE POPPING CATALOGS! EACH CATALOG HAS 99 PICS TO CHOOSE FROM ON EACH PAGE
PLUS
12 4X6 RANDOM PRINTS FROM OUR MIXED HOTTIES SELECTION TO SHOW OFF SENZA'S 4X6'S PRINT QUALITY.
ALL FOR JUST $19.99
REMEMBER YOU MUST: SPECIFY NUDE OR NON-NUDE ON YOUR ORDER
SPECIFY YOUR INSTITUTIONS RESTRICTIONS AS TO THE NUMBER OF PRINTS ALLOWED IN ONE ENVELOPE.
SENZA  CORPORATE POLICIES - PLEASE REVIEW THEM CAREFULLY
ALL SENZA COLLECTION IMAGES ARE SOLD AT A FLAT PRICE OF 0.35 CENTS EACH.
ANYONE WISHING TO PURCHASE 1000 + PRINTS AT ONE TIME WILL BE GIVEN A FLAT PRICE OF 0.30 CENTS PER IMAGE.
SENZA HAS A MINIMUM ORDER REQUIREMENT OF: $15.00 THIS DOESN'T INCLUDE S&H CHARGES.
SHIPPING AND HANDLING CHARGES ARE AS FOLLOWS:
1 - 5 4x6 PRINTS - $1.00 PER ENVELOPE / 6 - 15 4x6 PRINTS - $1.50 PER ENVELOPE
16 - 25 4x6 PRINTS - $2.00 PER ENVELOPE
YOU MUST NOTIFY SENZA ON THE ORDER FORM,
THE MAXIMUM NUMBER OF PRINTS YOUR INSTITUTION WILL PERMIT IN EACH ENVELOPE
SENZA WILL ACCEPT BRAND NEW  U.S. FIRST CLASS POSTAGE STAMPS AT THE RATE OF $5.00
FOR EACH BRAND NEW FLAT BOOK OF 20 STAMPS.
YOU ARE REQUIRED TO KNOW YOUR INSTITUTIONS POLICIES REGARDING WHAT IMAGES ARE ACCEPTABLE INTO YOUR FACILITY INSTITUTION.
THERE ARE NO EXCEPTIONS TO THIS POLICY. RETURNED/REJECTED MAIL - YOU WILL HAVE 15 BUSINESS DAYS TO SEND US A  SASE
(3 STAMPS PER 25 REJECTED PHOTOS) WITH A STREET ADDRESS IN WHICH TO MAIL YOUR RETURNED/REJECTED PRINTS.
AFTER 15 DAYS THE PRINTS ARE RETURNED TO OUR INVENTORY.
ALL SALES ARE FINAL/NO REFUNDS OR EXCHANGES

**Complete GED Preparation**
[Paperback]
Publisher: Steck-Vaughn; 2nd edition
*928 pages; $24.99; Item #: 1099*

Over 2,000 GED-style questions thoroughly prepare learners for test day. This single book offers thorough coverage of the revised GED Test with new test information, instruction, practice, and practice tests. Answer key included.

Order from: **Prison Legal News**
*(Add $6 shipping for orders under $50)*
**PO Box 1151
Lake Worth, FL 33460
Phone: (561) 360-2523
www.prisonlegalnews.org**

# $8.15 Million Jury Award for Prisoner's Death at New York Jail

*by David Reutter*

A New York City jury awarded $8.15 million to the estate of a prisoner who died after being denied access to medical care.

While incarcerated in 1996 at the Vernon C. Bain Correctional Center, part of the Rikers Island complex, Jose Santiago, 25, told a guard he was experiencing symptoms that included a rapid heartbeat, profuse perspiration and difficulty breathing. The guard dismissed Santiago's request for treatment at the facility's clinic.

Just 30 minutes later, moments before he collapsed, Santiago again approached the same guard who again refused to help him. Santiago's pulse could not be detected when medical staff arrived, so they started CPR and summoned emergency medical technicians. The emergency responders did not arrive until 30 minutes later, and pronounced Santiago dead after their life-saving efforts failed.

Following his October 24, 1996 death, Santiago's estate, represented by a public administrator, sued the City of New York and the city's Department of Correction.

The estate's emergency medical expert, Rachael L. Waldron, opined that Santiago's symptoms were caused by atrial fibrillation. She said his symptoms indicated he was receiving insufficient oxygen and his heart could have been stabilized with simple defibrillation, which was available in the jail's clinic but not utilized.

Waldron also opined that medical staff failed to properly administer CPR and delayed treatment by not directing the emergency technicians to Santiago's location. She concluded that Santiago's death was due to lack of proper medical care.

During the litigation, the trial court sanctioned the defendants for failing to exchange information in discovery.

Santiago's death left his 4-year-old son and 2-year-old daughter without a father. The case went to trial in June 2013, and after ten days the jury unanimously found that employees at the jail were negligent.

The jurors awarded $150,000 for past loss of household services and $200,000 for economic losses; $4 million was awarded to Santiago's daughter and $3.8 million to his son for loss of parental guidance. The estate was represented by attorney Michael J. Kuharski. See: *Rodriguez v. City of New York*, Bronx Supreme Court (NY), Case No. 24068/98.

# Tenth Circuit Holds "Consensual" Sex Defeats Prisoner's Eighth Amendment Claim

*by Mark Wilson*

The Tenth Circuit Court of Appeals has held that a female prisoner's "consensual" sex with two guards did not violate the Eighth Amendment.

Stacey Graham was housed in solitary confinement at a jail in Logan County, Oklahoma. Between July and October 2009, jail guard Rahmel Jefferies began talking to Graham over the intercom and their discussions soon became sexual. They also exchanged sexually explicit notes. "I look forward to fucking you," Graham wrote in one note. "Damn, just the thought of that gets my nipples hard. I'm such a nympho!" She also flashed her breasts at Jefferies "for the hell of it."

On October 7, 2009, another jailer, Alexander Mendez, called Graham over the intercom, "asked about her sexual fantasies" and told her about his. "She responded that her fantasy was to 'be with two men at the same time.'... He asked who she would like him to bring. She said, 'Bring Jefferies.'" Graham then agreed to allow Mendez to see her naked when he came by her cell.

During the early morning hours of October 9, 2009, Jefferies and Mendez entered Graham's cell. She "was wearing just her T-shirt. Mendez took it off and Ms. Graham kissed Jefferies.... it was then 'back and forth' between the two men, and both had their hands on her. Jefferies began to have intercourse with Ms. Graham while she simultaneously performed oral sex on Mendez. The two men then switched positions...."

Another prisoner later alerted the assistant jail administrator that something was going on between Graham and the guards. Graham eventually admitted to having consensual sex with Mendez and Jefferies, but said she "didn't really want Mendez there."

Both guards were immediately terminated after they admitted to the sex acts. Graham was transferred to a different facility, where she told a psychologist that two guards had raped her. She "had a history of bipolar disorder and sexual abuse," but neither Jefferies nor Mendez was aware of her mental health issues.

Graham filed suit in federal court, alleging that the sexual encounter with Mendez and Jefferies violated her rights under the Eighth Amendment. The district court granted summary judgment to the defendants, "holding that 'in light of the consensual sexual activity at issue in this case,' there was no Eighth Amendment violation."

The Tenth Circuit affirmed on December 20, 2013, noting that Graham, unsurprisingly, focused "not on whether she consented as a factual matter but on whether a prisoner can legally consent to sex with one of her custodians." The Court of Appeals declined to hold that consensual sex in this context violates the Eighth Amendment.

The Court observed that "it is a matter of first impression in this circuit whether consent can be a defense to an Eighth Amendment claim based on sexual acts." It then noted that other courts had split on the issue, and the Ninth Circuit had recently "adopted a middle ground in *Wood v. Beauclair*, 692 F.3d 1041 (9th Cir. 2012)," creating "a rebuttable presumption of nonconsent." [See: *PLN*, March 2014, p.54].

"Even were we to adopt the same presumption as the Ninth Circuit," the appellate court wrote, in Graham's case "the presumption against consent would be overcome by the overwhelming evidence of consent." See: *Graham v. Sheriff of Logan County*, 741 F.3d 1118 (10th Cir. 2013).



## Stay in touch with a good Magazine!
### Get 5 Full One Year Subscriptions  ONLY $20!
*+ $5.99 p/h*

**Check your 5 magazines** and underline three backup choices (in case of unavailability)   *"BEST DEAL ON THE POUND!"*

- ALLURE (12)
- AMERICAN PHOTO (6)
- ARTHRITIS SELF MANAGEMENT (6)
- ARTHRITIS TODAY (6)
- AUTOMOBILE (12)
- BACKPACKER (9)
- BETTER HOMES & GARDENS (12)
- BLACK ENTERPRISE (12)
- BOATING (10)
- BOATING WORLD (9)
- BON APPETIT (12)
- BOWHUNT AMERICA (6)
- BOWHUNTING WORLD (9)
- CAR & DRIVER (12)
- CHARISMA (12)
- CONDE NAST TRAVELER (12)
- COSMOPOLITAN (12)
- COUNTRY LIVING (10)
- CRUISING WORLD (12)
- CYCLE WORLD (12)
- DETAILS - FASHION (10)
- DIABETES SELF MANAGEMENT (6)
- DIGITAL PHOTO (7)
- DIRT RIDER (12)
- EATING WELL (6)
- EBONY (12)
- ELLE (12)

- ELLE DECOR (10)
- ENTREPRENEUR (12)
- ESQUIRE (10)
- EVERY DAY WITH RACHAEL RAY (10)
- FAMILY CIRCLE (12)
- FAMILY FUN (10)
- FAST COMPANY (10)
- FIELD & STREAM (12)
- FITNESS (10)
- FLORIDA SPORT FISHING (6)
- FLYING (12)
- FREESKIER (6)
- GLAMOUR (12)
- GOLF DIGEST (12)
- GOLF TIPS (5)
- GOLFWEEK (38)
- GOOD HOUSEKEEPING (12)
- HARPERS BAZAAR (10)
- HOT BIKE (12)
- INC (12)
- INSTRUCTOR K - 8 (6)
- ISLANDS MAGAZINE (8)
- LATINA (10)
- LIFE EXTENSION (13)
- LOG HOME LIVING (9)
- LOW COST COOKING (1)
- LUCKY (10)

- MARIE CLAIRE (12)
- MARLIN (8)
- MEN'S FITNESS (10)
- MEN'S JOURNAL (12)
- MEXICAN FIESTA (1)
- MIDWEST LIVING (6)
- MINISTRY TODAY (6)
- MORE (10)
- MOTOR TREND (12)
- MOTORCYCLIST (12)
- NATURAL HEALTH (6)
- NYLON MAGAZINE (10)
- NYLON GUYS (6)
- OK! MAGAZINE (52)
- OLD HOUSE JOURNAL (8)
- OUTDOOR LIFE (12)
- OUTDOOR PHOTOGRAPHER (11)
- OUTSIDE (12)
- PARENTS (12)
- PLANE & PILOT (12)
- POPULAR PHOTOGRAPHY (12)
- POPULAR SCIENCE (12)
- PREDATOR EXTREME (6)
- RED BULLETIN MAGAZINE (12)
- REDBOOK (11)
- ROAD & TRACK (10)
- ROLLING STONE (26)

- SALT WATER SPORTSMAN (10)
- PARENT & CHILD (8)
- SELF (12)
- SEVENTEEN (10)
- SHAPE (12)
- SIEMPRE MUJER (6)
- SKI MAGAZINE (6)
- SNOWBOARD (4)
- SPORT RIDER (12)
- TEEN VOGUE (10)
- TENNIS (6)
- THE ATLANTIC MONTHLY (10)
- TIMBER HOME LIVING (6)
- TOWN & COUNTRY (10)
- TRANSWORLD MOTOCROSS (12)
- UPTOWN (6)
- US WEEKLY (52)
- VERANDA (6)
- W MAGAZINE (10)
- WEIGHT WATCHERS (6)
- WHITETAIL JOURNAL (6)
- WIRED (12)
- WOMAN'S DAY (12)
- WOOD (7)
- WORKING MOTHER (6)
- YACHTING (12)
- YOGA JOURNAL (9)   *\* No Renewal*

*"Tell your Friends and Families!"*

**Inmate Magazine Service.com**
P.O. Box 2063, Fort Walton Beach, FL 32549
www.InmateMagazineService.com

****DUE TO PUBLISHER PROCESSING TIMES, WE WILL NOT UNDER ANY CIRCUMSTANCES CHECK WITH ANY PUBLISHER ABOUT THE STATUS OF ANY MAGAZINE SUBSCRIPTION UNTIL AFTER 90 DAYS HAVE PASSED FROM THE DATE OF PROCESSING YOUR ORDER!  NO EXCEPTIONS!****

Name and Inmate # *(please print, maximum 24 characters)*:
Address:
City: | State: | Zip:
Allow 6-8 weeks for delivery.  Pay by Check, Money Order or **Order Online** and use Credit Card or PayPal.  Keep Address Short!

---

## Stay in touch with a good Magazine!
### Get 5 Full One Year Subscriptions  ONLY $20!
*+ $5.99 p/h*

**Check your 5 magazines** and underline three backup choices (in case of unavailability)   *"BEST DEAL ON THE POUND!"*

(list repeated identically as above)

*"Tell your Friends and Families!"*

**Inmate Magazine Service.com**
P.O. Box 2063, Fort Walton Beach, FL 32549
www.InmateMagazineService.com

****DUE TO PUBLISHER PROCESSING TIMES, WE WILL NOT UNDER ANY CIRCUMSTANCES CHECK WITH ANY PUBLISHER ABOUT THE STATUS OF ANY MAGAZINE SUBSCRIPTION UNTIL AFTER 90 DAYS HAVE PASSED FROM THE DATE OF PROCESSING YOUR ORDER!  NO EXCEPTIONS!****

Name and Inmate # *(please print, maximum 24 characters)*:
Address:
City: | State: | Zip:
Allow 6-8 weeks for delivery.  Pay by Check, Money Order or **Order Online** and use Credit Card or PayPal.  Keep Address Short!

# Colorado Law Grants Immunity to Law Enforcement Officers Transporting Juveniles

### *by David M. Reutter*

THE COLORADO SUPREME COURT HELD on January 13, 2014 that "allegations of negligence alone are not sufficient to overcome the statutory grant of immunity and the presumption of good faith afforded to law enforcement officers" under section 19-2-508(7), C.R.S. (2013) – a statute that pertains to officers who transport juveniles.

The Court's ruling vacated a trial court's order denying a motion to dismiss on immunity grounds in a lawsuit filed against the Jefferson County Sheriff and Deputy John Hodges. While transporting juveniles Daniel Larson and Dylan Bucy on July 28, 2010 from a court hearing to the Mount View Youth Services Center, a collision occurred between the transport van and a car that failed to yield when Deputy Hodges pulled into an intersection.

Larson and Bucy were injured. They filed suit, alleging that Hodges had acted negligently by failing to secure their seatbelts while they were handcuffed and by driving into the intersection without ensuring it was clear. After the trial court denied the defendants' motion to dismiss, the Colorado Supreme Court granted review.

Under section 19-2-508(7), it "shall be presumed" that law enforcement officers "acting under the direction of the court who in good faith transport[] any juvenile" are entitled to immunity for civil or criminal liability.

The trial court found that immunity under the statute did not apply because

there was sufficient evidence to "infer that Hodges failed to act in faithfulness to his duty or obligation to secure the [juveniles] and accordingly did not transport the [juveniles] in good faith."

The Supreme Court held that if negligence alone were sufficient to rebut the presumption of good faith, "the immunity afforded by section 19-2-508(7) would be gutted because law enforcement officers would have to demonstrate a complete lack of negligence – meaning they would not be

liable in the first place – in order to receive immunity."

The Court therefore concluded "that allegations of negligence alone are not sufficient to overcome the immunity and the presumption of good faith provided by section 19-2-508(7). To hold otherwise would impermissibly defile the legislature's attempt to immunize qualifying law enforcement officers from liability." See: *Young v. Jefferson County*, 2014 CO 1, 318 P.3d 458 (Colo. 2014).

# Jail Video Visitation Proposal Considered in Dallas County, Texas

ON SEPTEMBER 9, 2014, THE DALLAS County Commissioners Court unanimously rejected a proposal that would have ended all face-to-face visits with prisoners at the Dallas County Jail. The Commissioners Court had been considering bids to equip the jail with a video visitation system. Prison phone service provider Securus Technologies appeared to have the edge on the contract; however, when the company submitted a plan that included the elimination of in-person visits at the jail, it met vigorous opposition from County Judge Clay Jenkins.

Judge Jenkins' outspoken rejection of the plan was a rallying cry for a number of prisoners' rights advocates, including Texas CURE, former state Rep. Terri Hodge and Richard Miles, a former Texas prisoner who

was exonerated following a wrongful murder conviction. The Commissioners Court also received hundreds of emails and a petition with over 2,000 signatures objecting to Securus' video visitation plan.

The company's proposal included charging $10 for each 20-minute visit, and tried to sweeten the deal by offering the county a 25% commission on video visitation revenue. The Commissioners Court initially decided to table the issue and allow previous bidders to submit new bids based on revised criteria. Any new bids would be required to 1) retain in-person visits with prisoners, 2) eliminate commissions on video visitation and 3) clarify various details including the number of video visitation terminals that would be installed.

"It is a way to make money ... off the



## AFFORDABLE INMATE CALLING SERVICES

### *Keeping you Connected while saving you Money!*

**NO hidden fees. One flat monthly rate • NO setup fee with referral information
NO charges to add/ remove numbers • NO transfer fees • 100% BOP Compliant!**

**2 vanity numbers for $15 + tax /month, additional # for $1.50 each**

**Ask us about our REFERRAL PROGRAM!**

*Contact Us:*
**Inmates: inmates@aicsllc.net • 303-214-0097
Families: www.aicsllc.net • billing@aicsllc.net • 866-645-9593**

backs of families," said Judge Jenkins. "I am very pleased with the court today in looking at these commissions and saying that they want to get out of the commission business."

However, in late September, due to legal concerns, the Commissioners Court renewed contract negotiations with Securus to provide video visitation at the Dallas County Jail. The county will require the continuation of in-person visits and will not accept commissions from video visitation revenue. The contract with Securus may also extend to phone services at the jail, which currently include commission payments. In 2013, Dallas County reportedly received $2.8 million in phone commissions – a practice that has also drawn criticism.

"It is very important that we do not profit on the backs of inmates in the jail," stated Commissioner Elba Garcia.

For years, *PLN* has reported on the nationwide epidemic of price gouging by prison and jail phone companies like Securus and Global Tel*Link. [See, e.g.: *PLN*, Dec. 2013, p.1; April 2011, p.1]. Those companies, and a growing number of other firms, are increasingly extending their commission-based business model to video visitation. [See: *PLN*, March 2014, p.50].

Sources: *www.prisonpolicy.org, www.dallasnews.com, www.statesman.com*

# California Exhaustion Requirement Extends to Independent Contractors

## by Mark Wilson

On December 6, 2013, the California Court of Appeal, Third Appellate District, held that prisoners must exhaust administrative remedies before suing independent contractors employed by the prison system.

California prisoner Ira Don Parthemore was examined by Dr. Peter R. Col, an optometrist under contract at the Mule Creek State Prison.

Col diagnosed Parthemore with cataracts in both eyes and advised him that he would need surgery. Col later re-examined him and concluded surgery was not necessary. Col prepared a transfer request, incorrectly identifying Parthemore as being "legally blind." He was then transferred to a medical facility.

A different optometrist examined Parthemore and found that he "never should have been diagnosed as legally blind or transferred to the medical facility."

Parthemore fell while at the medical facility, breaking his right kneecap and several bones in his left shoulder. After he recovered, he was sent back to Mule Creek.

Parthemore sued Dr. Col in state court for negligence, alleging that the injuries from his fall were caused by Col's refusal to issue a new eyeglasses prescription. He also alleged that Col intentionally falsified official medical records, resulting in his unnecessary transfer to the medical facility.

Col moved to dismiss, arguing that Parthemore had not exhausted his administrative remedies concerning the claims alleged in his complaint; Parthemore, in turn, argued that exhaustion was not required under the Government Claims Act, Gov. Code § 810 *et seq.*, because Col was an independent contractor and not a government employee. The trial court agreed with Col and dismissed the lawsuit.

The Court of Appeal affirmed, finding that Parthemore did not exhaust administrative remedies. It then observed that California prisoners must exhaust "any policy, decision, action, condition, or omission by the department or its staff." The word "staff" was intended to be defined "as broadly as possible," the appellate court concluded. As such, it includes "independent contractors, like defendant, who are retained by the department to provide services on its behalf."

The Court of Appeal concluded that "plaintiff's obligation to exhaust the administrative remedies available to prisoners concerning the medical treatment they receive is independent of the obligation to comply with the Government Claims Act."

Parthemore sought review by the California Supreme Court, which was denied on March 12, 2014. See: *Parthemore v. Col*, 221 Cal. App. 4th 1372 (Cal. App. 3d Dist. 2013), *review denied*.

## CALIFORNIA LIFER NEWSLETTER

**Published by Life Support Alliance**

CLN: Comprehensive newsletter  mailed every 8 weeks containing state and federal cases, parole board news, statistics, legislation and articles of interest to Lifers and their supporters.

### CLN SUBSCRIPTIONS

Prisoners .... $30 per year (or 100 stamps)
Others ....    $90 per year

**Make checks payable to LSAEF**
(Life Support Alliance Education Fund)
**CLN, P.O.Box 277, Rancho Cordova, CA. 95741**

*CLN no longer provides copy service of legal cases, articles and news and materials from the Internet.*

www.lifesupportalliance.org   (916) 402-3750

**Photo Tryst**                 Quality Pics of Quality
**PO Box 103**                        Babes
**Chapmansboro TN  37035**

All catalogs 450 full color pics
Summer 2013     free with SASE
All other catalogs $4 or 10 forever stamps, and ship with a coupon for 5 free pics with your minimum order of 10

Winter 2014     Spring 2014     Topless #1 (contains frontal
Nudity)                         All Nude #1 (you see it all)

Our next general (season) catalog free with each order
You can deposit funds with us and order your pics "on account"
We accept institutional checks, personal checks from friends and family, and money orders
Stamp orders are only with stamp coupons obtained with regular orders
Oregon and Utah consistently deny our catalogs so we cannot do business there.  Sorry

# Former Wyoming Probation Officer Receives, Violates Probation

*by Derek Gilna*

A FORMER WYOMING DEPARTMENT of Corrections probation officer was placed on probation herself following her conviction on drug and theft charges.

Ruby Maddox, 36, was enrolled in a rehabilitation center to address her addiction to prescription medication as part of a plea agreement after she admitted to stealing drugs from probationers she was responsible for supervising. She was also charged with stealing a puppy from a probationer and taking money from a charity event.

Maddox received probation plus a suspended prison sentence of three-to-five years in April 2013 after pleading guilty to one felony count of possession of a controlled substance and four counts of petty larceny.

During her initial three-year term of supervised probation, Maddox was ordered to complete a program at the Casper Re-Entry Center. Maddox has Graves' disease, an autoimmune disorder; she was admitted in mid-2013 to Wyoming Recovery for addiction to painkillers.

"A person can get in trouble with it before you know it," her attorney, Tom Smith, said about his client's abuse of prescription drugs.

Maddox was initially arrested in October 2012 following an investigation by the Natrona County Sheriff's Office and the Wyoming Department of Corrections' internal affairs office. Two women probationers supervised by Maddox told investigators how their prescription painkillers turned up missing after she "accidentally" spilled them on the floor.

One woman, who had told Maddox that she was prescribed hydrocodone for dental pain, thought it strange that her pills went missing after a visit by her probation officer.

The same probationer also accused Maddox of stealing her puppy. She told investigators the former probation officer convinced her that the puppy was unsuitable for her and she had to give it away. When she agreed, Maddox took possession of the puppy and said she had found a new home for the dog. That new home turned out to be Maddox's own, an investigator later discovered, and the puppy was returned to its original owner.

A second probationer also reported missing prescription painkillers after Maddox visited her home. Additionally, prosecutors charged Maddox with stealing money she had collected from co-workers for a fundraising event and keeping it for her own use.

When imposing probation and the suspended prison sentence, Natrona County District Judge Catherine Wilking said Maddox had damaged the public's trust by using her position with the Wyoming Department of Corrections to serve her own purposes.

"Without faith and fidelity in the probation and parole system, nothing works in the judicial system," Wilking stated.

"She has abused a position of trust in this community," added Natrona County District Attorney Michael Blonigen. "She had power over these people, and she exploited them."

In May 2013, Maddox was terminated from the Casper Re-Entry Center for violating her probation by taking more than her regular amount of prescription medication. She was arrested due to the violation, but later reinstated on a new three-year probation term.

Sources: *www.correctionsone.com, http://trib.com, http://k2radio.com*

# Ninth Circuit: Exhaustion Prior to Amended Complaint Satisfies PLRA

*by Mark Wilson*

ON JANUARY 14, 2014, THE NINTH Circuit Court of Appeals held that claims raised in an amended complaint satisfy administrative exhaustion requirements under the Prison Litigation Reform Act (PLRA) if they are exhausted before the amended complaint is filed.

On December 4, 2007, Arizona prisoner Erineo Cano filed suit alleging that prison officials were deliberately indifferent to his mental illness and risk of committing suicide. He then moved to submit a first amended complaint, asserting religious diet and court access claims that arose before the original complaint was filed.

Although Cano had exhausted the new claims before seeking to file his amended complaint, prison officials moved to dismiss them, arguing that the PLRA's exhaustion requirement, 42 U.S.C. § 1997e(a), requires exhaustion of all claims before an action is filed. The district court agreed, and since Cano did not exhaust until after the initial complaint was filed, his amended claims were dismissed.

The Ninth Circuit reversed, noting it had recently held "that a prisoner may file an amended complaint and add new claims where the additional cause of action arose after the initial filing, as long as he has exhausted administrative remedies as to those additional claims before filing the amended" complaint. See: *Rhodes v. Robinson,* 621 F.3d 1002 (9th Cir. 2010) [PLN, May 2012, p.28] and *Akhtar v. Mesa,* 698 F.3d 1202 (9th Cir. 2012) [PLN, Dec. 2013, p.42]. Cano presented "a slightly different factual situation," however, in that his amended claims arose prior to his initial complaint but were exhausted before filing the amended complaint.

"Following the logic of *Rhodes* and *Akhtar*," the appellate court held "that claims that arose as a cause of action prior to the filing of the initial complaint may be added to a complaint via an amendment, as long as they are administratively exhausted prior to the amendment." The Ninth Circuit also affirmed the district court's dismissal of Cano's claim related to mental health care.

Cano has since been released from prison, and the case remains pending on remand. See: *Cano v. Taylor,* 739 F.3d 1214 (9th Cir. 2014).

**Roget's Thesaurus**
Can't think of the right word? Let Roget's help you! Over 11,000 words listed alphabetically. See page 61 for more information.

# CHEAP LOCAL FEDERAL CALLS

*Get a local Number & Save up to 85% on Prison Calls with Sentel.*
*Save on International Calls with Sentel.*

## For Packages USA, Canada and Puerto Rico only:

| ECONOMY PLAN (USA) | 3-MONTH PLAN (USA) | 6-MONTH PLAN (USA) | 12-MONTH PLAN (USA) |
|---|---|---|---|
| **Price: $14.99**<br>For the first line | **Price: $41.99**<br>For the first line | **Price: $71.99**<br>For the first line | **Price: $119.99**<br>For the first line |
| ***400 Minutes per Month***<br>Duration: 1 Month | ***400Mns per Month***<br>Duration: 3 Months | **400Mns per Month**<br>Duration: 6 Months | **400 Mns per Month**<br>Duration: 12 Months |
| Additional lines @ $2 each<br>Best up to 4lines Monthly | Additional lines@ $4.5 each<br>Best up to 4lines | Additional lines @ $6 each<br>Best up to 4lines | Additional lines @ $12ea<br>Best up to 4 lines |

### For USA & INTERNATIONAL PLANS PER MINUTE RATE

| USA & INTERNATIONAL | | |
|---|---|---|
| **Price for 1st line: $1**<br>**Activation Fee: $1**<br><br>Add a line: 50 cents<br>Rates Based Upon<br>Destination<br>Guaranteed lowest rates<br>Rollover Minutes<br>Great for Multiple Lines | USA: 6 cents for All<br>Mexico landline: 10 cents<br>Mexico Cellphone: 15cents<br>Colombia: 15 cents<br>Nigeria: 22cents<br>Most of Europe: 22 cents<br>Honduras: 22 to 29 cents<br>Guatemala: 22 to 29 cents<br>Jamaica: 29 cents | Dominican Rep: 15 cents<br>Haiti: 35 cents<br>India: 10 cents<br>China: 10 cents<br>Ecuador: 29 to 35 cents<br>Most of our International rates : 22cents<br>For Areas not Cited Please contact us |

**We accept debit and credit card payments, institutional checks, bank deposits and paypal**

## Sentel, Sentel

**9550 S. Eastern Ave Ste 253**
**Las Vegas, NV 89123**
**Ph: 702-430-9445**
**Email: sentel.nv@gmail.com**
**Website: www.sentelinmatecall.com**
**Note : Please do not send any inquiries by mail. Mail is only for orders and payments.**
**Note: We do not provide service to County Jails and States Prisons**

# Fifth Circuit Holds Louisiana Commutation Changes Not *Ex Post Facto*

### by Matt Clarke

In an opinion filed May 21, 2013, the Fifth Circuit Court of Appeals held that changes to commutation laws and rules in Louisiana, which gave the pardons board the authority to deny a hearing on commutation and increased the amount of time before a prisoner could reapply for commutation, did not violate the constitutional prohibition against *ex post facto* laws.

Robert Howard, a Louisiana state prisoner sentenced to life in 1968, has served over forty years. Life-sentenced prisoners in Louisiana are not eligible for parole; to become eligible, a prisoner serving life must first have his sentence commuted to a fixed number of years.

At the time of Howard's offense, the rules of the Board of Pardons allowed a prisoner to reapply for a pardon or commutation one year after the previous board action. At that time, the governor could grant commutations based upon the recommendation of two of the following officials: the lieutenant governor, attorney general and trial court judge.

A revised state constitution enacted in 1974 created a new Board of Pardons; the governor could only grant pardons upon the board's recommendation. Later changes in state law mandated a five-year period between commutation applications. Subsequent changes in board rules allowed the board to refuse to grant a hearing on an application for commutation, and those changes were applied to Howard to deny him a hearing.

Howard filed a federal civil rights action against the governor and Board of Pardons members, alleging that applying the changes in the laws and rules violated the *ex post facto* clause by creating a significant risk of increasing the length of his incarceration. The district court granted summary judgment to the defendants and Howard appealed.

Assuming arguendo that the *ex post facto* clause applies to changes in commutation procedures, the Fifth Circuit held that the changes in question resulted in only an attenuated and speculative chance of increasing Howard's length of incarceration. The Court of Appeals noted that being granted a hearing did not mean Howard would receive a favorable recommendation, as he had had hearings in the past in which such a recommendation was denied.

Further, a favorable recommendation did not mean he would receive a commutation, as he had been favorably recommended previously to three different governors, none of whom granted commutation. Finally, being granted commutation would not mean that he would then be paroled; it would only make him eligible for parole. Thus, it was extremely speculative that the commutation changes created a significant risk of increasing Howard's incarceration, and consequently they did not constitute *ex post facto* violations.

The judgment of the district court was affirmed. Howard petitioned the U.S. Supreme Court for a writ of certiorari, which was denied in November 2013. See: *Howard v. Clark*, 719 F.3d 350 (5th Cir. 2013), *cert. denied*. ◢

# Second Circuit: Spraying with Feces Not *De Minimis* Injury; $7,000 Settlement After Remand

### by Mark Wilson

The Second Circuit Court of Appeals held on December 20, 2013 that spraying a prisoner with a mixture of feces, vinegar and oil is not a *de minimis* injury.

New York state prisoner John Hogan was confined at the Attica Correctional Facility on February 14, 2009 when he claimed three guards with their faces concealed by brown paper bags sprayed vinegar, feces and machine oil on his body and in his mouth, eyes and nose in retaliation for his having reported several other staff assaults. As a result, he suffered recurring eye and skin problems plus significant psychological harm.

On May 5, 2009, Hogan filed suit in federal court against several named and John Doe guards. Despite numerous discovery and public records requests over a three-year period, he was unable to identify the guards who sprayed him.

## Incarcerated Students: Earn an Adams State University Degree via Correspondence Courses Through the Mail



**Now Available: Bachelors Degree in English/Liberal Arts**

- No internet access required
- Degree options available — Associate of Arts or Science, Bachelors degrees in English, Business Administration, Government, History, Interdisciplinary Studies, Sociology, Paralegal Certificate Program, Masters Degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses. Payment options include cashiers check, credit card, money order or verified personal check.
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (the highest level of post-secondary accreditation available)
- 20+ years of experience serving incarcerated students
- Veteran friendly/GI Bill accepted
- FREE unofficial evaluation of previously earned credits
- Student advisor with over 21 years working with incarcerated individuals



ADAMS STATE UNIVERSITY
C O L O R A D O ®
*Great Stories Begin Here*
**EXTENDED STUDIES**

Prison College Program
Call or write to receive additional
information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101
www.adams.edu

Pursuant to FRCP 12(b)(6) and 12(c), the defendants moved to dismiss Hogan's claims against only the named guards in his complaint. The Attorney General's office expressly stated the motion was not brought on behalf of any John Doe defendants. Nevertheless, the district court dismissed the action in its entirety, and denied Hogan's pending discovery motions as moot.

The district court concluded that "spraying a person with feces and vinegar was a *de minimis* use of force and not of a sort repugnant to the conscience of mankind."

The Second Circuit disagreed, holding that Hogan had stated a cognizable Eighth Amendment claim. The appellate court was "unwilling to accept, as a matter of law, the proposition that spraying an inmate with a mixture of feces, vinegar, and machine oil constitutes a *de minimis* use of force." In fact, such an abusive action "in the circumstances alleged here is undoubtedly 'repugnant to the conscience of mankind' and therefore violates the Eighth Amendment."

The Court of Appeals also rejected the defendants' argument that expiration of the statute of limitations barred Hogan from amending his complaint on remand to name the Doe defendants.

The Court found that under FRCP 15(c)(1)(A), the John Doe claims related back to the date the initial complaint was filed, because New York Civil Practice Law and Rules § 1024 permits such substitutions *nunc pro tunc.*

Thus, the Second Circuit concluded that Hogan's Doe claims were not time-barred, and he should be allowed to continue his efforts to identify those defendants and be granted leave to amend to name any unknown defendants he is able to identify. The appellate court further suggested that it may be helpful for the district court to appoint counsel to assist Hogan "in pursuing the necessary discovery, drafting any appropriate amendments to the complaint, and prosecuting his claim." See: *Hogan v. Fischer*, 738 F.3d 509 (2d Cir. 2013).

Following remand, the case settled on September 12, 2014 for $7,000 with no admission of liability by the defendants. Hogan litigated the case pro se, including on appeal. 





# Ninth Circuit Revives Ad Seg 24-Hour Lighting Claim

*by Mark Wilson*

On January 16, 2014, the Ninth Circuit Court of Appeals reversed a summary judgment order dismissing a prisoner's claim related to 24-hour lighting in a segregation cell.

While incarcerated at the Airway Heights Corrections Center, Washington prisoner Neil Grenning was placed in administrative segregation (ad seg) for thirteen days "pending investigation" of his alleged involvement in a fight. Ad seg cells are lit by three four-foot-long fluorescent light tubes. Prisoners can turn off two of the tubes, but one remains illuminated at all times.

Grenning stated in a grievance that he could not sleep and suffered headaches due to the constant lighting. When prison officials refused his request to replace the tube with something that produced less light, he filed suit. He alleged that the continuous lighting violated the Eighth Amendment because "the light was so bright he could not sleep, even with 'four layers of towel wrapped around his eyes.'" Grenning also claimed "that the lighting gave him 'recurring migraine headaches' and that he could not distinguish between night and day in the cell." He said the light caused him pain and disorientation.

The district court granted summary judgment to the defendant prison officials, holding that Grenning had not established an Eighth Amendment violation.

The Ninth Circuit reversed. The appellate court first rejected the defendants' argument that Grenning's claims were barred by the "physical injury" requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e).

Citing *Oliver v. Keller*, 289 F.3d 623 (9th Cir. 2002) [*PLN*, April 2003, p.24], the Court of Appeals noted that § 1997e(e) applies only to claims of mental and emotional injury. "This section does not bar Grenning's case," the Court held, "because he does not seek recovery for 'mental or emotional injury.'"

The Ninth Circuit then observed it had previously "held that continuous lighting can satisfy the objective" prong of a deliberate indifference claim, and that issues of fact as to how bright the light was, its effect on Grenning and whether prison officials were deliberately indifferent precluded summary judgment. Further, the appellate court rejected the defendants' argument that Airway Heights was accredited by the American Correctional Association and complied with ACA standards for cell lighting.

Noting that qualified immunity had not been addressed, the Court of Appeals left that issue "for the district court to determine in the first instance on remand."

Additionally, Grenning was allowed to proceed *in forma pauperis* and the district court withheld 20% of his prison wages to pay court fees pursuant to 28 U.S.C. § 1915(b). The Ninth Circuit also granted Grenning *in forma pauperis* status on appeal, and another 20% of his funds was withheld to pay the appellate filing fee.

Relying on *Torres v. O'Quinn*, 612 F.3d 237 (4th Cir. 2010), Grenning asked the Ninth Circuit to cap the total fee withholdings at 20% under "a method called the 'sequential' or 'per prisoner' approach." The defendants argued that 40% was proper under "a method termed the 'simultaneous' or 'per case' approach." The appellate court declined to decide the issue, however, directing the lower court to consider it on remand.

This case remains pending before the district court, with Grenning now represented by counsel. See: *Grenning v. Miller-Stout*, 739 F.3d 1235 (9th Cir. 2014).



⚖ **NOLO**

**Win Your Lawsuit**

Sue in California Superior Court Without a Lawyer

$39.99

Order from **Prison Legal News**

P.O. Box 1151
Lake Worth, FL 33460
561-360-2523

Add $6 shipping for orders under $50

**www.prisonlegalnews.org**

## Calling for Essays by Incarcerated Americans, Prison Workers, and Prison Volunteers

The American Prison Writing Archive (APWA) is an internet-based, non-profit archive of first-hand testimony to the living and working conditions experienced by incarcerated people, prison employees, and prison volunteers. Anyone who lives, works, or volunteers inside American prisons or jails can contribute non-fiction essays, based on first-hand experience: 5,000 word limit (15 double-spaced pages); a signed APWA permission-questionnaire must be included in order to post work on the APWA. All posted work will be accessible to anyone in the world with internet access. For more information and to download the permissions-questionnaire, go to: http://www.dhinitiative.org/projects/apwa/, or write to: APWA, 198 College Hill Road, Clinton, NY 13323-1218. Sincerely—The APWA Editors.

# Seventh Circuit Extends Appeal Filing Deadline for Prisoner Misled by Court Clerk

*by Matt Clarke*

In a well-crafted opinion delivered on August 8, 2013, the Seventh Circuit Court of Appeals held that a prisoner who was misled by a court clerk regarding the status of his habeas corpus petition should be allowed to appeal the district court's ruling despite his notice of appeal being filed more than two years after the petition was decided.

Michael Carter, an Illinois state prisoner, filed a petition for writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254. The district court denied the petition on February 10, 2011 but failed to make a separate judgment or send a copy of the opinion to Carter. On December 5, 2011, Carter wrote to the court clerk inquiring about the status of his petition. The clerk responded that no action had been taken and he would be promptly notified by mail when an order was entered. About a year later, Carter contacted the clerk again. This time he was informed of the judgment in a letter received on March 22, 2013.

Carter filed a notice of appeal less than a month later. The appellate court, in screening new filings for possible jurisdictional problems, noticed the length of time between the judgment and notice of appeal.

The Seventh Circuit held that because the district court had failed to issue a separate judgment pursuant to Federal Rule of Civil Procedure 58(c)(2), the judgment would not be considered rendered until 150 days after the denial of the petition was entered on the docket. A petitioner who did not receive actual notice of the denial would then have 180 days to request reopening of the case in order to file a notice of appeal. The 150 days added to the 180 days would have brought the filing date up to January 7, 2012, about a month after Carter had been erroneously informed by the court clerk that his petition was still pending. Thus, had the clerk not misled him, he could have reopened the case and filed a timely notice of appeal.

The time for filing a notice of appeal is not subject to equitable tolling, "the judge-made doctrine, well established in federal common law, that excuses an untimely filing when the plaintiff could not, despite the exercise of reasonable diligence, have discovered all of the information he needed in order to be able to file his claim on time." However, equitable tolling can be applied to the 150-day period, and it was in the interest of justice to do so since the clerk had misled Carter and "[h]e could not, considering his situation as a prisoner without legal sophistication or a lawyer, have learned this essential information earlier."

Therefore, the Court of Appeals tolled the 150-day period until March 22, 2013, when Carter learned of the judgment. This made his notice of appeal timely and the appellate court therefore declined to dismiss his appeal. See: *Carter v. Hodge*, 726 F.3d 917 (7th Cir. 2013).



**SPORTZZBUZZ**

(pronounced SPORTS-BUZZ!)

THE OFFICIAL PROVIDER OF SPORTS SCORES, LINES, AND MUCH MORE FOR FEDERAL INMATES.

GET UP-TO-DATE SPORTS INFORMATION SENT DIRECTLY TO YOUR CORRLINKS EMAIL FOR ONLY

**$5/MONTH***

ADD INFO@SPORTZZBUZZ.COM TO YOUR CORRLINKS EMAIL SUBSCRIPTION LIST FOR MORE INFORMATION AND A FREE SAMPLE!

*$5 MONTHLY RATE AVAILABLE ONLY ON 12 MONTH SUBSCRIPTION

FANTASY FOOTBALL STATS AVAILABLE FOR A SMALL ADDITIONAL FEE

# Colorado: Sentencing Court May Override Sexually Violent Predator Risk Assessment Score

*by Matt Clarke*

THE COLORADO SUPREME COURT HAS held that a sentencing court may designate a person convicted of a sexual offense a Sexually Violent Predator (SVP) even if a risk assessment instrument (screening instrument) indicates that the person is unlikely to commit another sex offense. However, the sentencing court must make specific findings on the record to demonstrate the necessity of the SVP designation.

Brandon David Allen, a Colorado state prisoner, pleaded guilty to first-degree sexual assault and other charges related to breaking into his neighbor's home, grabbing her by the throat, threatening to kill her and repeatedly raping her. After the trial court sentenced him to 20 years to life in prison, it considered whether he should be designated an SVP.

Under § 18-3-212.5(1)(a), C.R.S. (2012), an offender who was at least 18 years old at the time of committing an enumerated sexual offense against a stranger or victim with whom the offender established a relationship primarily for the purpose of sexual victimization, and is likely to recidivate based on the results of the screening instrument, can be designated an SVP. A Sex Offender Management Board (SOMB)-trained evaluator administers and scores the screening instrument, then provides the result to the trial court.

The score, which ranges from one to ten, indicates the likelihood of recidivism. It is based upon ten indicators, six of which pertain to the offender's background and four that relate to the crime, acceptance of responsibility and degree of sexual deviancy. The only indicator scored against Allen related to admitting the crime, which he claimed not to remember.

The evaluator scored Allen as a one – below the threshold of being likely to reoffend. However, the trial court re-scored the screening instrument, determined that Allen was likely to recidivate and designated him as an SVP. Allen appealed. The Court of Appeals affirmed, and Allen's petition for review was granted.

The *en banc* Colorado Supreme Court held that the trial court should not have re-scored the screening instrument, but should

have substantially deferred to it. Further, if a trial court deviates from the results of the scored screening instrument, it must make "specific findings on the record to demonstrate the necessity of the deviation."

The Supreme Court then examined the record and held that Allen's likely "deviant sexual fantasies," difficulty with

relationships, threatening to kill the victim to avoid punishment, denial of the crime and two prior incidents in which women sought restraining orders against him made it likely that he would reoffend. Therefore, his designation as an SVP was upheld. See: *Allen v. People*, 2013 CO 44, 307 P.3d 1102 (Colo. 2013).

# Seventh Circuit Upholds Dismissal of Illinois Booking Fee Challenge

*by Mark Wilson*

IN JANUARY 2014, THE SEVENTH CIRCUIT Court of Appeals upheld the dismissal of a challenge to a jail's booking fee policy.

The Village of Woodridge, Illinois imposes a $30 booking fee on any person who is arrested and taken into custody. The fee is collected without any hearing, or opportunity to challenge the deprivation or seek reimbursement.

On January 8, 2011, Jerry G. Markadonatos was arrested and booked into jail. He paid the $30 booking fee and was given a receipt, but was not afforded a hearing or any other opportunity to challenge the fee.

After Markadonatos successfully completed a period of supervised release, he was adjudicated "not guilty." Despite this favorable resolution the booking fee was not refunded and he was denied an opportunity to seek reimbursement.

Markadonatos filed suit on behalf of himself and all arrestees who were charged the booking fee, alleging that the fee violates procedural and substantive due process. The district court dismissed the action for failure to state a claim.

The Seventh Circuit affirmed. Applying the balancing test in *Matthews v. Eldridge*, 424 U.S. 319 (1976), the Court of Appeals concluded "that the district court was correct in holding that Mr. Markadonatos cannot state a procedural due process violation based upon Woodridge's booking fee ordinance." The Court reasoned that "the risk of an erroneous deprivation" was "practically non-existent," and "additional

safeguards would not in any way reduce the risk thereof."

The appellate court also held that Markadonatos was unable to climb the "steep hill" of proving that collection of the booking fee "shocks the conscience." The Seventh Circuit ultimately concluded "that Woodridge's booking fee does not violate Mr. Markadonatos' right to substantive due process" because no fundamental right was implicated and the fee was rational and not arbitrarily imposed. Accordingly, the district court's order of dismissal was affirmed.

One judge dissented, likening the defense of the booking fee to the Queen of Hearts' philosophy of "sentence first, verdict afterwards" in *Alice in Wonderland*, and to the doublespeak of George Orwell's *1984*, "where language is used to mean the opposite of reality."

"This should be a simple case," the lengthy dissent suggested. "The village's 'booking fee' ordinance is unconstitutional on its face. It takes property from all arrestees – the guilty and innocent alike – without due process of law." *See: Markadonatos v. Village of Woodridge*, 739 F.3d 984 (7th Cir. 2014).

The dismissal of the case was upheld in a divided *en banc* Seventh Circuit opinion on July 21, 2014, with five judges voting to affirm the district court, four voting to reverse and one voting to remand with instructions to dismiss due to lack of standing. See: *Markadonatos v. Woodridge*, 2014 U.S. App. LEXIS 13856 (7th Cir. 2014).



## State of Washington Prison Phone Justice Campaign
### Fighting the High Cost of Prison and Jail Phone Calls!

The Human Rights Defense Center (HRDC) has been reporting on the high cost of telephone calls from prisons, jails and other detention facilities in the U.S. for over two decades in its monthly publication *Prison Legal News*. An award of funds from the settlement in *Judd v. AT&T*, a prison phone-related lawsuit, has allowed us to launch the Washington Prison Phone Justice Campaign (WA PPJ). The goal of the campaign is to eliminate the kickbacks paid by telephone companies to detention facilities and to regulate the exorbitant rates charged to prisoners, their families and others who accept prison phone calls, including attorneys. Video visitation, which is following closely on the same path as the prison phone industry, has also been incorporated into the campaign.

HRDC co-founded the national Prison Phone Justice Campaign in 2011, which resulted in a historic vote by the FCC in August 2013 that capped the rates for **interstate** (long distance) prison phone calls at $.25/minute for collect calls and $.21/minute for debit and prepaid calls. Those rate caps became effective on February 11, 2014. While this has helped millions of families stay connected across state lines, it did nothing for prisoners incarcerated in Washington State who make local and **intrastate** (in-state) calls, estimated by the FCC to constitute 85% of all prison and jail calls.

Studies show that a prisoner's ability to communicate with family and friends while incarcerated results in a smoother transition upon release and reduces recidivism. However, excessive phone rates hamper and sometimes eliminate the ability of prisoners to stay in touch with their loved ones.

We need everyone affected by this issue, including prisoners' family members and attorneys, to sign on to the WA PPJ Campaign and tell us how they have been impacted by high prison and jail phone rates. This can be done by accessing the Campaign's website: **www.wappj.org**. Testimonials and video can be uploaded to the site, or people can call 1-877-410-4863 to record their comments. Or comments can be written and mailed to: HRDC, Attn: WA PPJ Campaign, P.O. Box 1151, Lake Worth, FL 33460. We also need billing records from prepaid accounts (2012 to current) for phone calls received from detention facilities, to demonstrate the actual rates charged to recipients of the calls. Billing records can be emailed to: cwilkinson@humanrightsdefensecenter.org.

Lastly, any donations to fund the campaign are both needed and appreciated; donations can be made at **www.prisonphonejustice.org**. Only with your support will we be able to end the abusively high costs of prison and jail phone calls in Washington State. Thank you for your support, and please tell others about the Washington Prison Phone Justice Campaign and encourage them to join!

# ICE Implements New Directive to Limit Solitary Confinement

Civil rights and immigration advocacy groups are watching closely to see the results of a change in federal policy governing the placement of immigrant detainees in solitary confinement, which was implemented one year following the release of a damning report on that issue.

Immediately after the policy was adopted by Immigration and Customs Enforcement (ICE) on September 4, 2013, the American Civil Liberties Union pledged to "closely monitor the implementation of the new directive," which the ACLU cautiously hailed as a step in the right direction toward ending segregation and solitary confinement for immigrant detainees.

"The new ICE directive sets a good example for the prison system writ large when it comes to monitoring the use of solitary confinement," Ruthie Epstein, an ACLU legislative policy analyst, said in a written statement.

"If strictly enforced throughout the ICE detention system – including at county jails and contract facilities – ICE's new policy could represent significant progress in curtailing this inhumane practice," she added, noting the directive "sets important limits on the use of solitary confinement. Solitary confinement in both immigration detention and the criminal justice system is cruel, expensive, and ineffective."

The policy change reflects a commitment by former Homeland Security Secretary Janet Napolitano to review ICE's segregation practices in the wake of a joint study by two human rights organizations that reported immigrant detainees were increasingly placed into solitary confinement in jails and detention centers simply because they were mentally ill, due to their sexual orientation or because they could not speak English.

The Heartland Alliance's National Immigrant Justice Center and Physicians for Human Rights stated in a September 2012 report that conditions for immigrant detainees placed in isolation not only endangered their health and safety, but also pressured them "to abandon their options for legal relief, their families, their communities, and often the only country they have ever known."

According to the report, the immigrant detainee population grew 85% between 2005 and 2012, as ICE annually imprisoned 400,000 detainees. The report cited the dramatic increase for creating the "fastest-growing incarceration system" in the nation, with nearly 250 state and local facilities – not including detention centers operated by ICE or private contractors – holding immigrant detainees alongside criminal offenders.

Traditionally, the purpose of immigration detention has been not to punish detainees for allegedly violating immigration laws, but to ensure their appearance at court hearings. Yet the report found an alarmingly high number of immigrants were placed in solitary confinement or 23-hour lockdown, where they were deprived of exercise, proper nutrition and human contact.

In a review of local jails that contract with ICE, the report found solitary confinement policies to be "inappropriately punitive," arbitrary and unjust. "This severe form of segregation, especially when it is used for long periods of time," the report stated, "is rarely necessary to achieve order in a jail or detention facility."

The study cited multiple examples of immigrant detainees who were placed in segregation or isolation solely because they belonged to "vulnerable populations," such as being gay, bisexual, transgender or mentally ill.

In southern California's Ventura County Jail, for example, guards segregated "obvious alternative lifestyle inmates." The Washoe County Jail in Nevada had a policy that explicitly stated detainees with "overt homosexual tendencies" were to be placed in administrative segregation, while a jail in Cobb County, Georgia called for the segregation of "gender challenged" prisoners who demonstrate "past or current ... passive-aggressive behavior."

In other facilities, guards justified using segregation and solitary confinement to "discriminate against non-English-speaking immigrants," the report found. Failure to speak English "when able," or watching Spanish channels on television, could lead to 23-hour lockdown at the Nobles County Jail in Minnesota, where English is the "primary" language "to ensure the safety and security of the facility."

The report also found that many jails punished immigrant detainees for violating trivial rules, such as putting their feet on tables or singing loudly. Detainees at the Stewart Detention Center in Georgia stated they were placed in segregation because they complained about the quality of the drinking water. Two detainees in York County, Pennsylvania – who each had cellmates serving criminal sentences – said they were segregated because they didn't notice that their identification wristbands had come off.

A victim of domestic violence who was detained for almost a year at the McHenry County Correctional Facility in Illinois while her visa application was pending was placed in disciplinary segregation on separate occasions for having an extra blanket, bra and pair of socks; for placing a shampoo bottle on her windowsill; and for having newspaper articles in her cell.

And in the Washoe County Jail, detainees must work to avoid isolation, according to the facility's policy manual. Commissary, library access and visitation are privileges that have to be "earned" by working at the facility, the manual states. Refusing to work results in "lockdown and failure to earn any privileges."

The National Immigrant Justice Center and Physicians for Human Rights report also found that solitary confinement was sometimes applied to immigrant detainees "in lieu of mental health treatment." Qualified mental health staff is "rarely on-site" at immigration detention centers, despite "extremely high rates of anxiety, depression, and PTSD (Post Traumatic Stress Disorder) symptoms among detainees."

The report further noted that while detainees already struggle to understand why they've been incarcerated for allegedly violating immigration laws, "the further deprivation of liberty inherent in segregation and solitary confinement might be reasonably expected to compound the psychological stress of detention."

The report called on ICE to end the use of segregation and solitary confinement in immigration detention centers by not contracting with jails or jail-like facilities, and by "placing vulnerable individuals in alternatives to detention (ATD) programs" or releasing them on humanitarian parole. The report also called on Congress to reduce funding for immigration detention and instead enact "binding civil detention standards so that facilities that detain immigrants can be held legally accountable

for improper use of segregation and solitary confinement."

As a result of the firestorm of media coverage generated by the report, a year later ICE announced a new policy that jails and detention centers are required to follow when holding immigrant detainees in solitary confinement.

"Placement of detainees in segregated housing is a serious step that requires careful consideration of alternatives," the policy states. "Placement in segregation should occur only when necessary and in compliance with applicable detention standards." Additionally, "placement in administrative segregation due to a special vulnerability should be used only as a last resort and when no other viable housing options exist."

In issuing the new directive, ICE pledged to "ensure the safety, health and welfare of detainees in segregated housing in its immigration detention facilities," and to quickly review cases involving detainees in vulnerable groups who are held in solitary "for over 14 days" or placed in segregation "for any length of time in the case of detainees for whom heightened concerns exist based on known special vulnerabilities and other factors related to the detainee's health or the risk of victimization."

Those vulnerable groups include detainees with mental illnesses and severe medical conditions or disabilities, pregnant or nursing women, the elderly, and anyone who might be susceptible to harm due to their sexual orientation, gender identity or because they have been victims of sexual assault.

The National Immigrant Justice Center and Physicians for Human Rights faulted the new ICE policy, however, for not eliminating entirely the use of extended solitary confinement, nor allowing independent, third-party oversight of the policy's implementation and enforcement.

The U.S. Senate also acted in the aftermath of the report, in the form of an amendment to an immigration reform bill that placed further restrictions on the use of segregation and solitary confinement for immigrant detainees. The bill, S.744, passed the Senate but the U.S. House of Representatives has failed to act on the legislation. 

Sources: "*Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention," Heartland Alliance and Physicians for Human Rights (Sept. 2012); www.immigrantjustice.org; www.aclu.org; ICE policy directive 11065.1; www.solitarywatch.com*

# Corcoran Sun

Full Color Prison Yard Monthly
News ♦ Entertainment ♦ Resources

**3 Month Special Subscription**
**$5 or 20 FCS Stamps**

NOW 20 PAGES

Expanded full color format with exciting episodes of thrilling novels and sexy pics. Many how-to articles on writing, art, music and health. Filled with entertainment: puzzles, trivia, jokes, poetry... Submit your writing, art, poetry etc. See your submission, name and contact info in print.

Special 6-Issue Subscription ($10 or 40 FCS stamps)
Special Year Subscription ($20 or 80 FCS stamps)
NEW Books/Sheets/Strips ONLY No singles on special please

**Freebird Publishers**
Box 541, North Dighton, MA 02764
www.FreebirdPublishers.com
Diane@FreebirdPublishers.com










**Texas Families for Justice Rally**
RSVP at www.tifa.org

The Texas Families for Justice Rally is a grassroots effort led by people, most with imprisoned loved ones, organized to bring attention to a broken criminal justice system.

It is only with your support we will be successful. Please mail this notice to your family members.

Friday, November 7th
12 - 3PM
South Steps of the State Capitol
Austin, Texas

Brought to you by TIFA, Texas Voices & TxCure. Questions? Call 512-371-0900 or email tifa@tifa.org

# "Ban the Box" Movement Spreads Nationwide

## by Joe Watson

PRISONER ADVOCACY GROUPS ARE HAILing recent successes in "Ban the Box" campaigns to remove questions related to criminal records from employment applications, and say they hope to expand the movement even further as momentum grows to help ex-offenders find jobs.

San Francisco became the first city in the nation to adopt a Ban the Box policy that includes private employers and affordable housing, when Mayor Ed Lee signed the Fair Chance Ordinance on March 4, 2014. The law bars private companies with more than 20 employees, contractors that hold city contracts worth more than $5,000 and any residential building that has received city funding from asking about a potential applicant's criminal history prior to conducting a job interview or reviewing a housing application.

"Ban the Box" is the catchphrase coined by All of Us or None, a San Francisco-based advocacy organization composed of formerly-incarcerated people and their families, founded in 2003. It refers to the question on job applications, usually accompanied by a check-box, that asks whether an applicant has a criminal history.

Employers can still ask about convictions later in the hiring process and deny job offers based on criminal records, but removing the question from job applications allows ex-prisoners to get their foot in the employment door. During subsequent interviews they can explain their criminal history, how they have changed and why they should be hired.

Under San Francisco's new law, employers are also required to consider whether a job applicant's conviction is relevant to the position they are seeking, how long ago the conviction occurred and any evidence the applicant can provide of rehabilitation.

"San Francisco now has the distinguished honor of being the first legislative body in the country to protect its citizens from discrimination based on their conviction history in both private employment and affordable housing," wrote attorney Noah Frigault, with the San Francisco Human Rights Commission.

In passing the ordinance, the city's Board of Supervisors demonstrated its determination to deal with what it saw as a worsening issue. "In San Francisco, as across the country, individuals are often plagued by old or minor arrest or conviction records.... The problems presented by employers and housing providers who use a person's criminal history to deny that person employment or housing opportunities are growing rather than diminishing," the Board stated.

The Fair Chance Ordinance came on the heels of a law signed by California Governor Jerry Brown that prohibits taxpayer-funded public employers in the state from rejecting prospective job-seekers who have criminal records without first considering the applicants' qualifications for the position.

Effective July 1, 2014, California Assembly Bill 218 requires more than 6,000 local and regional public agencies – all local governments in the state – to remove the check-box question on job applications that asks "Have you ever been convicted of a felony?" The National Employment Law Project (NELP), an advocacy group for low-wage workers, estimates that about 7 million people in California have an arrest or conviction record.

"The Legislature finds and declares," states the bill, written by Assemblyman Roger Dickinson, "that reducing barriers to employment for people who have previously offended, and decreasing unemployment in communities with concentrated numbers of people who have previously offended, are matters of statewide concern."

Exempting public safety jobs, such as law enforcement officers, AB 218 also requires government agencies to delay criminal background checks until after determining that an applicant meets the job qualification requirements.

"The problem of people with criminal records is at a critical point," said Michelle Rodriguez, a staff attorney with NELP. "We have huge numbers of people who can't get work and at the same time more and more people who have gone through the criminal justice system."

Having AB 218 signed into law "was really huge for us, an extremely important victory," stated Dorsey Nunn, director of the San Francisco-based Legal Services for Prisoners with Children, and co-founder of All of Us or None. "At issue is the question of 'how do formerly incarcerated people get back into society?' For someone who is a former prisoner, the law has said it is okay to be three-quarters of a human being once you've been convicted of a crime. We're asking for equal access. For fairness."

Rodriguez hopes the Ban the Box movement will grow through the rest of 2014 and beyond. "This issue has really resonated with so many groups on the ground across a wide spectrum – it's absolutely magnetic," she said.

"This year, we'll focus on what else we can do to build on the momentum," Rodriquez added. "How can we rope in private employers in California, and identify other opportunities? Unions, for instance, were a huge part of this effort, and there are a lot of other criminal justice workforce-related issues they can be helpful with."

AB 218 codifies an executive order establishing the new hiring practices that was first issued by former Governor Arnold Schwarzenegger in 2010. According to NELP, 13 states and almost 70 cities and counties have enacted similar legislation as of September 2014, including Hawaii, which adopted the first Ban the Box law 16 years ago. [See: *PLN*, Sept. 2011, p.32].

In May 2013, Minnesota Governor Mark Dayton signed into law a statute prohibiting private as well as public employers from asking about job-seekers' criminal records until the first interview. The state of Maryland adopted similar legislation in May 2013, and the governor of Illinois, Pat Quinn, issued an executive order removing the question concerning background checks from applications for state employment.

Other states with Ban the Box statutes include Colorado, Connecticut, Delaware, Massachusetts, Nebraska, New Mexico and Rhode Island. Some states extend Ban the Box to private employers, while in others the law only applies to government agencies.

Most recently, New Jersey enacted the Opportunity to Compete Act on August 11, 2014, which will become effective in March 2015. The law applies to businesses with 15 or more employees, and places restrictions on when employers can ask about job applicants' criminal records, such as on job applications and during an initial interview. Employers that violate the law are subject to civil penalties.

Various versions of Ban the Box legislation were unsuccessfully introduced in 2013 and 2014 in ten other states, including Florida, Georgia, Louisiana, Michigan, New

Hampshire, North Carolina, Ohio, South Carolina, Virginia and Washington.

Cities that have enacted Ban the Box policies include Philadelphia, Baltimore, Seattle, Memphis, Cleveland, New York City, Minneapolis, Detroit, Boston, Chicago, New Orleans, Tampa, Newark, Portland and most recently Washington, D.C. in September 2014.

Advocates believe the Ban the Box movement can also prompt private companies to change their hiring practices with respect to ex-offenders. As examples they point to the nation's largest retailer, Wal-Mart, which removed questions about criminal history from initial job applications in 2010, and Minneapolis-based retailer Target, which adopted a Ban the Box policy effective January 2014.

"Target is finally doing the right thing by reforming its hiring policies so that qualified job applicants aren't automatically screened out simply because they have an arrest or conviction from the past," said NELP executive director Christine Owens. "Other large retailers around the nation need to follow suit, because their hiring policies send a strong message about whether they are committed to the communities that support their business."

According to the *Star Tribune*, Greta Bergstrom, communications director for TakeAction Minnesota, noted that Target had changed its hiring policy following "a 200-person public action in the lobby of Target's headquarters, a hundred individuals with past records filing job applications at Target and being rejected, a visit to Target's shareholder meeting and numerous meetings, e-mails and phone calls with Target executives."

"That's why they decided to make this change," she said.

Groups that advocate for former prisoners believe that eliminating questions about criminal records – or pushing background checks until later in the hiring process – are essential to helping people released from prisons and jails succeed in reintegrating into society, thereby reducing recidivism rates. Little research exists as to the results of implementing Ban the Box policies, though there are anecdotal examples of the positive effects.

"There are many employers who knowingly will not hire someone with a criminal record," noted Walter Boyd, executive director of St. Leonard's Ministries in Chicago, a re-entry program that provides released prisoners with free counseling, food, housing and classes.

Victor Gaskins, St. Leonard's program director, agreed. "You fill out that application, you get that box, and if you check it: 'Yes, I've been arrested, or incarcerated,' the person doing the hiring for the job, as soon as he sees that check, he throws [your application] in the garbage."

Advocates acknowledge that extending Ban the Box to other states and cities will take time, and caution against expecting too much too soon. "Our work isn't a sprint, it's a long haul fight," Dorsey Nunn admitted. "Limiting access to jobs and housing not only victimizes formerly incarcerated people, but also generations and generations of children and grandchildren. We don't have the luxury of stopping."

Currently, there are efforts to ban the federal government to Ban the Box on initial job applications for federal employment; the U.S. government has around 2.7 million employees, excluding the military – about 2% of the nation's workforce. President Obama has the authority to change federal hiring policies through an executive order.

*PLN* has previously reported on guidance issued to employers in 2012 by the Equal Employment Opportunity Commission in regard to job applicants with criminal records and criminal background checks. [See: *PLN*, Feb. 2014, p.40; June 2012, p.20].

In formal comments submitted to the EEOC, Prison Legal News wrote it is important to "remove barriers to reentry for ex-offenders, including barriers to employment.... [to ensure] that former prisoners do not face discrimination in the job market due solely to the fact of their criminal record alone when that record has no relationship to or bearing on the job position they are seeking."

Not everyone is in favor of Ban the Box policies, though. "A blanket ban-the-box policy doesn't make good business sense for small business," stated Elizabeth Milito with the National Federation of Independent Business, while Chambers of Commerce in some states have expressed concerns about liability risks for businesses that hire former prisoners.

Sources: *Sacramento Bee, www.bloomberg.com, www.cctv-america.com, www.cleveland.com, www.prisonerswithchildren.org, Daily Journal San Francisco, www.nelp.org, The New York Times, Star Tribune, www.pewstates.org, Wall Street Journal*

**WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD**

TENS OF THOUSANDS OF THE HOTTEST AND MOST SCANDALOUS BABES & DUDES FOUND ON THE PLANET. EACH CATALOG PAGE HAS 120 BEAUTIFUL GIRLS OR BOYS POSING JUST FOR YOU! ORDER ONE CATALOG PAGE FOR ONLY $4.50 OR FOR 10 U.S. FOREVER STAMPS WITH AN SASE ENCLOSED. WE WILL SEND YOU VOLUME ONE.  EACH ADDITIONAL VOLUME THE SAME PRICE! WE ARE MORE THAN HAPPY TO ANSWER E-MAIL INQUIRES HOWEVER, DUE TO MAILING COST AT $0.49 CENTS A LETTER, PLEASE ENCLOSE AN SASE WITH YOUR QUESTIONS, OTHERWISE NO REPLIES! WHAT ABOUT OUR PRICES AND POLICIES
COLOR PRINTS ON  4x6 GLOSSY PHOTO PAPER AS LOW AS $0.35 CENTS PER PRINT ON ORDERS OVER 500 SHIPPED ACCORDING TO POLICY:
25 PICTURES PER ENVELOPE EVERY 24 HOURS. S&H $2.00 PER ENVELOPE.
************************************************METHOD OF PAYMENT***********************************
U.S. POSTAL SERVICE MONEY ORDERS-STATE & FEDERAL CORRECTIONAL INSTITUTIONAL CHECKS PAYABLE ONLY TO: KRASNYA L.L.C.
OUR SEASONAL SPECIALS MEAN A KICKOFF OF SAVINGS!

**$24.95  S&H FREE**
FOR GRAB BAG OF 50 PHOTOS
FROM ALL OUR CATALOGS
SPECIFY RACE AND MAIN
AREA OF YOUR INTERESTS
WE WILL PICK SELECTION FOR YOU
BONUS 1 COLOR CATALOG PAGE OF
120 BABES (NUDE OR BOP-FRIENDLY)

FOR KRASNYA CLIENTS WHO WORK THE YARDS; HAVE WE GOT A GREAT OPPORTUNITY FOR YOU...

MR. HUSTLE GRAB BAG BARGAIN DAY$
ONLY $0.25 CENTS PER BABE/PRINT
5 GRAB BAG MINIMUM PURCHASE REQUIRED
$2.00 SHIPPING AND HANDLING PER BAG
25 AWESOME BABES PER BAG AT ONLY $6.25
YOU MUST BUY AT LEAST 5 GRAB BAGS
THIS***GRAB BAG BARGAIN*** IS NOT GOING TO
BE OFFERED AGAIN THIS YEAR.
SO STOCK UP NOW!
AS YOU KNOW YOU GET AN ARRAY OF
25 GORGEOUS BABES
YOU CAN ONLY CHOOSE EITHER MALES OR
FEMALES,  ALL NUDES OR BOP SAFE
YOU MAY WANT TO SIT DOWN
FOR THIS BONUS BARGAIN!
OUR BABES CATALOGS SPECIAL OF THE DECADE
— 5 COLOR CATALOGS FOR   $6.00 ——
— 10 COLOR CATALOGS FOR  $12.00 ——
— 15 COLOR CATALOGS FOR  $18.00 ——
— 20 COLOR CATALOGS FOR  $24.00 ——
OUR CATALOGS SPECIAL AVAILABLE WHEN YOU
PURCHASE THE 5 GRAB BAG MINIMUM!
THIS PRICE INCLUDES FREE SHIPPING ON THE
CATALOGS BECAUSE OF SHIPPING TERMS ALL
CATALOGS SOLD IN MULTIPLES
OF 5 FOR $6.00 ONLY.
YOU CHOOSE EITHER MALE OR FEMALE CATA-
LOGS AND IF YOU WANT NUDE OR BOP SAFE!!

3 BRAND NEW FLAT BOOKS OF
20 U.S. FOREVER STAMPS
FOR GRAB BAG OF 45 PHOTOS
FROM ALL OUR CATALOGS. SPECIAFY RACE
AND MAIN AREA OF YOUR INTERESTS
WE WILL PICK SELECTION FOR YOU
BONUS 1 COLOR CATALOG PAGE OF 120 -
(BABES OR STUDS-NUDE OR BOP-FRIENDLY)
PLEASE INCLUDE 6 FOREVER STAMPS
WITH YOUR ORDER FOR S&H

KRASNYA BABES HAS SPRUNG SALE!
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST CLASS
STAMPS! 1 CATALOG PER CUSTOMER
PLEASE SPECIFY MALE OR FEMALE BABES
NUDE OR BOP-FRIENDLY

KRASNYA L.L.C. P.O.BOX 32082, BALTIMORE, MD 21282
EMAIL & CORRLINKS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM

# Pennsylvania Activists Arrested for Protesting Construction of New Prison Complex

Seven members of Decarcerate PA, a grassroots coalition working to end mass incarceration in Pennsylvania, were arrested while protesting the construction of a new two-prison complex in that state. The protest was to highlight the $400 million cost to build the facilities, which could be better spent on schools.

To make that point, the protestors set up 10 school-style desks with apples and notebooks across the entrance to the construction site for the prisons, which is on the grounds of SCI Graterford. They also set up a mock schoolhouse in what they said was the "first-ever act of civil disobedience to block prison construction in Pennsylvania."

The November 19, 2012 protest began at 6:40 AM. It was short-lived, as the protestors were arrested about an hour later after they ignored orders by the State Police to disperse. They were charged with defiant trespass, failure of disorderly persons to disperse upon official order and persistent disorderly conduct. Following arraignment, they were released on bail.

The seven protestors, all from Philadelphia, were Layne Mullett, 27; Jenna Peters-Golden, 27; Leana Cabral, 29; Erica Slaymaker, 23; Sean Damon, 35; David Fisher, 41; and Robin Markle, 26. Other protestors at the event were not arrested.

"Prisons do not make our communities safer," said Cabral. "Prisons break up families and ruin people's lives. Education, employment, housing and health care make communities safer, yet our governor prioritizes the construction of new prisons over these basic rights. I took part in this action because I believe powerful things happen when people come together and organize."

It was hoped the protest would bring public attention to the $400 million being spent to build the new prison complex, designated SCI Phoenix I and II, which will house approximately 4,100 prisoners and is expected to open in 2015.

The new prisons represent "an expansion of mass incarceration in Pennsylvania and a continuation of policies that lock people up instead of giving our communities the resources they need to thrive," Decarcerate PA wrote in a statement. "The money used to build these prisons is money that is being stolen from our schools, our healthcare, reentry programs, social services, and the environment."

"I believe that it will take more such actions by all those who understand that building more prisons is not the solution to addressing the issues in our communities and this society," said Hakim Ali, with Decarcerate PA and Reconstruction, Inc. "We will need everyone to stand up against oppression and let our voices be heard."

According to a December 5, 2013 article in the *Philadelphia City Paper*, the state's projected cost savings from opening SCI Phoenix and closing SCI Graterford were based on "an analysis, purportedly using data from 2007, that is superficial, unclearly sourced and woefully out of date."

"They're definitely misleading people about the costs of this prison expansion," stated Decarcerate PA member Owen Lyman-Schmidt. "We have to ask: If they're not building these prisons to save us money, as they claim, why are they building them?"

A Decarcerate PA spokesperson told *Prison Legal News* that the seven protestors who were arrested have not yet gone to trial or accepted plea bargains. They are represented by attorneys Michael Lee and Leo Mulvihill. ◼

Sources: *Norristown Patch, Journal Register, Philadelphia Inquirer, The Times Herald, www.decarceratepa.info, www.nbcphiladelphia.com, www.citypaper.net*

# New Mexico Guard Sues Over Termination for Medical Marijuana Use

A former New Mexico jail guard and veteran of the Iraq war is suing the county where he was employed after being fired for a positive drug test, even though he had a prescription to use medical marijuana to treat his Post Traumatic Stress Disorder (PTSD).

Augustine Stanley, 32, was terminated from his job as a lieutenant at the Metropolitan Detention Center (MDC) in Albuquerque after testing positive for marijuana in 2013. But his lawyer, who is representing him in a federal lawsuit against Bernalillo County, said he was prescribed medical marijuana for PTSD and has a legal medical marijuana card.

"It's demonstrative of a lot of people's cases," said Stanley's attorney, Paul Livingston. "And a lot of people work for the state or the county or the city and need to have or want to have a medical marijuana card."

Jail officials claimed it was a violation of MDC's anti-drug policy for an employee to use marijuana. They added that Stanley did not report any prescription medication prior to the drug test as required by policy.

However, Livingston said Stanley did not have to report his medical marijuana prescription because New Mexico state law recognizes the medical use of marijuana and protects the privacy of medical marijuana card holders.

"They guarantee him confidentiality, and what's ironic is then they give him a test that's designed to break that confidentiality to show that he is using marijuana and therefore can be fired, and that's what's wrong with this," Livingston said.

MDC officials argued that any drug use is inappropriate due to the safety sensitive environment at the jail. Guards need to be "100% aware" because life and death situations could happen very quickly, noted then-MDC Chief Ramon Rustin.

In response, Livingston contended that simply using medical marijuana does not automatically mean the user's judgment or abilities are impaired.

"They're not impaired in any way, the only thing that impairs them is the drug test that says they're impaired and the conclusion or the presumption that the government makes, which is that if you test positive for marijuana you must be impaired," he said.

In Stanley's termination letter, a jail official wrote that his "actions and conduct were inappropriate, unprofessional and inconsistent with your obligations as a

Bernalillo County employee."

MDC spokeswoman Nataura Powdrell insisted that Stanley was fired because he did not notify his supervisor about his use of a controlled substance, not due to the medical marijuana itself. "He's a lieutenant, and he understands the policy and should have informed his supervisor," she said.

The jail's policy states that "No employee shall ingest any controlled substance unless prescribed directly to them. When taking any prescribed medication ... [an] employee must notify their immediate supervisor when taking any prescribed medication that may impair their ability to perform the essential functions of their job or may cause the employee to be inattentive or drowsy."

Stanley countered that his work performance was not impaired because he smokes medical marijuana off duty and before bed; thus, he was not obligated to inform his supervisor what he was doing on his own time.

The case raises serious questions for other prison and jail guards, as well as police officers, fire fighters and federal, state, county and city employees who are authorized to use medical marijuana but must also undergo random drug testing.

"It seems that it is not appropriate under state law because the State of New Mexico has recognized the right of patients to use medical cannabis for various reasons, in consultation with their doctor and under their doctor's supervision," said attorney John McCall, who helped write New Mexico's medical marijuana statute. "People are going to have to consult with lawyers, unfortunately."

Stanley began working as a guard at MDC in 1999 and, after serving in the military, was promoted to sergeant in 2006 and then to lieutenant. He was a member of the jail's Corrections Emergency Response and Tactical Team, and said his record at the facility was unblemished.

"I served my country, and I served my county," Stanley stated. "But it feels like that meant nothing. It feels wrong."

His federal lawsuit, filed on June 13, 2014, remains pending. See: *Stanley v. County of Bernalillo*, U.S.D.C. (D. N.M.), Case No. 1:14-cv-00550-JB-KBM.

Sources: *www.kob.com, www.krqe.com, www.abqjournal.com*

### *Actual Innocence*

Explains how the innocent are convicted by faulty eyewitness testimonies, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$17.99 from PLN's Book Store!
See page 61 for more information.

**got pen pals?** *get some*

**PRISON INMATES ONLINE** #PLN AD
8033 W Sunset Blvd #7000
Los Angeles CA 90046

Send SASE to:                                    for free brochure.



*Stamps for* **CASH!**

*Great Goods will buy your stamps!*

**70%** of Face Value: Complete books, sheets or rolls of Forever Stamps and Global Forever Stamps

**65%** of Face Value: Complete books, sheets or rolls of 49-cent stamps

**60%** of Face Value: Complete books or sheets of high denomination stamps (higher than 49-cent)

**Payment sent within 24 hours of receipt.**



WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps.  • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

# GREAT GOODS

PO Box 2027, Bloomington IN 47402
greatgoods2027@gmail.com

STAMPS © USPS. ALL RIGHTS RESERVED.

# Fifth Circuit Declares SORNA Unconstitutional in Certain Cases, Reversed by Supreme Court

*by Matt Clarke*

The full Fifth Circuit Court of Appeals held in July 2012 that Congress did not have the power to enact criminal penalties for failing to register as a sex offender following an intrastate move, as applied to a defendant who had been unconditionally released from a federal prison sentence and military service prior to the enactment of the registration law. Thus, the Court declared the Sex Offender Registration and Notification Act (SORNA) and accompanying statutes and rules, 42 U.S.C. § 16913, 18 U.S.C. § 2250(a) and 28 C.F.R. § 72.3, unconstitutional under those narrow circumstances. The Supreme Court disagreed, however, and reversed the appellate ruling.

In 1999, Anthony James Kebodeaux, 21, was in the military when he was convicted of having sex with a fifteen-year-old girl and sentenced to three months in prison. After serving his sentence, he was no longer in the military; his release from both prison and military service was unconditional.

SORNA requires all federal sex offenders to register with state registration authorities within three days of moving. Texas law requires registration within seven days of moving. When Kebodeaux failed to register his move from San Antonio to El Paso within three days, he was charged, convicted and sentenced to 366 days in federal prison. He appealed.

A panel of the Fifth Circuit upheld his conviction but the *en banc* court reversed, finding that application of SORNA under those circumstances exceeded Congress' authority. The appellate court held that, "[a]bsent some jurisdictional hook not present here, Congress has no Article I power to require a former federal sex offender to register an intrastate change of address after he has served his sentence and has already been unconditionally released from prison."

In a lengthy opinion, the Fifth Circuit held that SORNA, as applied in this case, did not "rationally relate" or "reasonably adapt" to one of the powers of Congress set forth in the Constitution. The application of SORNA was novel and did not reasonably extend well-established laws; it also did not

properly account for state interests and was too sweeping, or at least too broad.

Noting that "[t]he Department of Justice cannot find a single authority, from more than two hundred years of precedent, for the proposition that it can reassert jurisdiction over someone it had long ago unconditionally released from custody just because he once committed a federal crime," the Court of Appeals held that Congress had no power to do so under the Necessary and Proper Clause of Article I of the Constitution.

Congress also lacked authority under the Commerce Clause, as an intrastate move by a federal sex offender did not affect interstate commerce. The panel opinion had held that a sex offender might drop off the radar by making an intrastate move prior to making an interstate move, but the Fifth Circuit noted that if the reasoning of the panel was adopted, "it would confer on the federal government plenary power to regulate all criminal activity," including those areas traditionally reserved to the states.

"Neither this court nor the Supreme Court, however, has ever extended Congress's 'police power' over those who use the channels of interstate commerce to punish those who are not presently using them, but might do so," the Court of Appeals wrote.

Therefore, the appellate court reversed Kebodeaux's conviction and ordered the dismissal of the charges against him, with the decision based in part on the fact that he had been released from federal prison prior to SORNA's enactment. See: *United States v. Kebodeaux*, 687 F.3d 232 (5th Cir. 2012).

The U.S. Supreme Court granted certiorari, then reversed the Fifth Circuit's ruling in a split decision in June 2013. The Court held "that the SORNA changes as applied to Kebodeaux fall within the scope [of] Congress' authority under the Military Regulation and Necessary and Proper Clauses," and remanded the case. Accordingly, after remand, the Court of Appeals affirmed Kebodeaux's conviction on August 13, 2013. See: *United States v. Kebodeaux*, 133 S.Ct. 2496 (2013). ◤

# California Prison Healthcare Costs Soar Under Federal Receiver

Creating a balance between adequate healthcare for prisoners at a reasonable and affordable cost for taxpayers is at the heart of a debate being argued in legislative offices and behind prison walls in California.

The federal receiver appointed to overhaul the state's prison healthcare says he has worked hard to reform a dysfunctional system that – at its worst in 2005 – claimed the life of one prisoner per week due to negligence, malfeasance or inadequate and substandard medical care. [See: *PLN*, March 2006, p.1].

State officials counter that the reforms have produced a "Cadillac" level of care that has caused medical costs to skyrocket, nearly doubling over the past decade. Statistics indicate, for example, that partly as a result of healthcare costs, California now spends more per year housing a state prisoner than it does

to educate a child in public school.

When a federal district court assumed oversight of the state's prison healthcare system and appointed a receiver in 2006 – initially Robert Sillen, who was replaced by J. Clark Kelso in 2008 – the court gave the receiver's office the authority to hire medical staff and set their pay levels. [See: *PLN*, July 2008, p.30]. Immediately after being appointed, the receiver set out to bring medical care in California prisons up to constitutional standards.

To cure the prison system's many problems, the receiver's office, known as California Correctional Health Care Services, hired hundreds of employees to fill longtime vacancies, increased salaries and created new positions at higher pay rates. The number of medical, mental health and dental workers in state prisons increased from 5,100 in 2005 to

12,200 in 2011.

"The problem that we had is that the receiver was not accountable to anybody," complained former state Senator George Runner. "So the receiver could just do or choose to spend whatever amount of money he thought was necessary to solve his problem, and unfortunately, now the state is stuck with that."

Runner neglected to mention that it was the state's decades-long failure to address problems related to deficient prison medical care, largely due to a lack of political will by the legislature in which he served, that led to the *Plata* and *Coleman* class-action lawsuits which in turn resulted in the appointment of the receiver and a federal court order to substantially reduce the state's prison population. [See: *PLN*, July 2011, p.1].

California spent $1.1 billion in fiscal year 2003-04 to provide medical care to the state prison population, which peaked at around 160,000. Under California's realignment initiative, which went into effect in 2011, the number of in-state prisoners has fallen to approximately 127,200. Yet the projected cost of prison healthcare in fiscal year 2013-14 was expected to top $2 billion – an 82.3% increase compared to a decade ago after adjusting for inflation.

In contrast, spending for each public school student in the state grew just 17.9% during the same time period.

"We incarcerate people in California at a rate higher than any other society in the world, including Russia and Iran," noted Michael Bien, an attorney who represents prisoners in the still-pending *Plata* and *Coleman* cases. "One of the things we have to pay for is healthcare. Doctors and nurses only [work] in these places if you pay them."

A survey of salaries for prison physicians found that only Texas has a base salary higher than California's. An analysis of 2011 California payroll data by the Associated Press indicated that of the top 100 highest-paid state employees outside the University of California system, 44 worked in state prisons.

The highest paid prison medical employees in 2013 included staff psychiatrist Rajababu Kurre, who earned $509,000; Hung V. Do, a chief physician and surgeon, who made $439,000; and physician and surgeon Dev Khatri, who received $431,000.

Since 2005, the average cost of prison healthcare in California has soared from $7,747 per prisoner annually to more than $18,000. Governor Jerry Brown has criticized Kelso's efforts to improve medical care in the state's prison system, calling it "Cadillac care." Kelso countered that prisons only provide "minimally necessary medical care." Of course, most prisoners would also likely dispute the notion that they receive Cadillac medical treatment; rather, it is more of a Chevy Cavalier level of care.

Kelso also pointed out that the state had failed to act in the wake of the expiration of a court order that increased prison healthcare workers' salaries. At that point, the state was free to collectively bargain with the union representing the employees.

Joyce Hayhoe, a spokeswoman for the receiver's office, added that contract medical service costs have dropped over the past several years and are now less than when the receiver was appointed. The state has reduced by half the cost of outside medical care at hospitals by having prison doctors provide more treatment, which also reduces transportation costs and the expense of having guards watch prisoners while they are hospitalized.

Although prison medical costs remain high, that is part of the cost of mass incarceration. When public officials enact laws and policies that put more people in prison for longer periods of time, higher costs – including medical expenses – are a predictable result. ▟

Sources: *Associated Press, www.montereycountyweekly.com, http://californiabudgetbites.org, www.sacbee.com*



NEW FRIENDS, HIGHER EDUCATION, AND EMPLOYMENT & HOUSING UPON RELEASE THROUGH WRITEAPRISONER.COM PROFILES

Contact WriteAPrisoner.com & Start Looking Forward To Mail Call!

AS SEEN ON CNN, 20/20, Fox News, Dr. Phil, O Magazine, E! True Hollywood, and hundreds more!

WriteAPrisoner.com... Simply the largest, highest ranked, & most visited website of its kind!*

• Pen-pal Profiles are affordably priced at $40 for the first year, $30 for renewing year
• Features a comprehensive search that allows viewers to find your profile by age, race, location, keywords, & more - 32 search options in all
• Your new friends can email their first message to you along with a photo
• Advertises non-stop on every major search engine with thousands of websites linking back to us
• Offers free Reintegration Profiles for inmates seeking employment and housing upon release and education during incarceration
• Translated into 51 languages & geared for international search engines
• Viewers can "subscribe" to your profile to be notified when your profile is updated, blog is added, artwork is posted, poetry is added, your release is near & much more
• Pen-pals have the option of helping you with a broad range of topics using WriteAPrisoner.com's free Self-Help Series

Get Started Today!
Friends & family can submit your entire 250 word profile, photo, and payment for you online by visiting www.writeaprisoner.com/post

WriteAPrisoner.com We'll see you at mail call!

Or for a FREE Brochure, Send a S.A.S.E. to:
WriteAPrisoner.com
PO Box 10- PLN
Edgewater, FL 32132 USA

Proud member of the Better Business Bureau of Central Florida & the Southeast Volusia Chamber of Commerce.
*Our website traffic can be independently verified at www.quantcast.com/writeaprisoner.com



STAND UP FOR YOUR PEOPLE

A book about Native American religious rights in prison. Non-fiction, 300 pg. E-book $4.25

Order Today
Only $14.95
3.99 s/h
SOFT COVER

Midnight Express Books
Box 69, Berryville, AR 72616
www.MidnightExpressBooks.com

http://standup4yourpeople.wordpress.com

## Probe Reveals Corruption at Pennsylvania Jail

A FORMER GUARD AT PENNSYLVANIA's Erie County Prison and his supervisor, who is also his wife, were accepted into a special diversion program for first-time offenders after being charged in connection with payroll tampering and missing ammunition. Another guard was demoted following an investigation into misconduct at the facility.

Sgt. Daniel S. Danowski, 41, and his supervisor and wife, Capt. Leslie L. Danowski, 40, were fired in October 2012 after being charged in a scheme that netted Daniel Danowski nearly $3,500 in pay he did not earn.

Jim Senyo, the deputy warden of safety and security at the Erie County Prison, was demoted and suspended without pay for five days for his involvement in a separate scheme in which Daniel Danowski sold over 400 rounds of prison ammunition to a former guard. Senyo's duties as deputy warden included overseeing the facility's armory, where the ammunition was stored.

The investigation uncovered a conspiracy between the Danowskis to falsify time-keeping records at the prison, resulting in $3,428 in payments to Daniel Danowski for work he never performed between February and July 2012.

Erie police charged Daniel Danowski with misdemeanor charges of theft by unlawful taking, receiving stolen property and criminal conspiracy to tamper with public records or information. Leslie Danowski was charged with one count of conspiracy to tamper with public records or information; she did not face charges related to the sale of the ammunition.

At a July 16, 2013 hearing, Erie County Judge Stephanie A. Domitrovich accepted the Danowskis' request to be placed in an Accelerated Rehabilitative Disposition program, which is reserved for non-violent, first-time offenders. If they successfully complete the program they can apply to have their records expunged; acceptance into the program did not require pleading guilty to the charges.

The investigation into misconduct at the prison also revealed that Leslie Danowski had signed off on the improper use of compensatory time for Capt. Jason Beasom.

Beasom "was paid as if he was at work, but he wasn't there," said Sue Ellen Pasquale, the county's accounting manager. He was ordered to repay the time, which amounted to $3,811, and also suspended – the seventh suspension at the prison since January 2012.

Erie County Chief Executive Barry Grossman promised reforms. "My administration will not tolerate the misconduct of a few individuals," he said. "It is unfortunate that the behavior of a few overshadows the hard work and dedication of so many of our dedicated prison employees."

Former deputy warden Al Copeland, a "highly respected" 32-year veteran at the facility, was named to fill Senyo's position pending a merit selection committee's decision on a permanent replacement.

The committee may also conduct an independent review of the prison's operations. One proposal under consideration was to create the position of inventory coordinator, whose duties would include keeping track of ammunition, county-issued prisoner clothing and other supplies. The position would have an annual salary of $40,584.

However, Erie County Controller Mary Schaaf, who was involved in the payroll tampering and missing ammunition investigations, opposed the idea as a waste of taxpayer money. "What we really need are honest employees doing their jobs," she said. ▟

Sources: *Erie Times-News, www.goerie.com, www.contracostatimes.com*

## Nebraska DOC Obstructing Efforts to Modify Prisoners' Child Support Payments

E XCESSIVE ENFORCEMENT OF CHILD support obligations is not only detrimental to incarcerated parents, according to advocates in Nebraska, but also risks increasing recidivism and hindering familial relationships.

Legal Aid of Nebraska, led by managing attorney Muirne Heaney, has attempted to help prisoners modify their child support payments by offering forms and clinics on how to navigate that process. But the state's Department of Correctional Services has obstructed those efforts by prohibiting prisoners from receiving the forms provided by Heaney, saying they haven't been approved by a state attorney.

"Nobody is advocating [incarcerated parents] should be freed of their responsibility," Heaney said. "What I am advocating is that we make [child support] a collectable judgment."

At the end of 2011, Nebraska prisoners – over 4,000 men and women – owed back child support and interest of about $86 million; close to 700 had monthly child support obligations of at least $400. Many had owed back child support before they were incarcerated.

The debts are despite the enactment of a 2007 state law that made imprisonment an involuntary, rather than voluntary, circumstance with respect to child support payments once a prisoner has been incarcerated at least six months. As a result of that law, prisoners are able to apply for modification of their child support obligations while incarcerated.

Mel Beckman, editor of the *Nebraska Criminal Justice Review*, said he doubted that state prison officials are informing prisoners they can seek modifications, which is why Heaney offered to provide the forms and conduct the clinics.

Heaney noted that reentry is made more difficult when ex-offenders have high child support debts upon release. When and if they find jobs, they're usually low-paying positions – not including garnishment for monthly child support payments and back payments.

"It seems counter-productive to me," Heaney observed.

Byron Van Patten, child support administrator for Nebraska's Department of Health and Human Services, said it's not the state's intent to leave prisoners and ex-offenders destitute. HHS supervisors visit prisons to answer questions before prisoners are released so they are aware of their child support responsibilities.

But Heaney argued that if the state makes it hard for ex-offenders to live due to high child support debts that accrued during their incarceration, they will be incentivized to make money in other ways – including through illegal activities.

She added that non-custodial parents

are sometimes ashamed of their inability to support their kids, so they simply stay away from them. As a result, those children are more likely to get into trouble, abuse drugs and alcohol, and drop out of school.

"I used to be a prosecutor," Heaney said. "I am not in favor of people committing crimes. But I am in favor of practicality. And if we want these people to return to society, and be contributing members of society, it behooves us to not erect barriers to that."

The child support modification forms that Heaney produced are still not allowed in state prisons. Legal Aid of Nebraska, which receives funding from Legal Services Corporation (LCS), a publicly-funded non-profit, cannot directly represent prisoners due to restrictions placed on LCS by Congress in 1996. ◪

Source: *Omaha Journal–Star*

# New York District Attorney Admits Lying About Acting in Porn Movies

**A**N UPSTATE NEW YORK DISTRICT attorney who lied when questioned during his re-election campaign about being an actor in pornographic movies during the 1970s will not quit, despite public calls for his resignation and at least one expert's view that he may have violated New York State Bar Association rules.

Democratic incumbent Mark D. Suben was re-elected in 2012 as district attorney for Cortland County, near Syracuse. During the campaign he was asked whether he had acted in adult films in the 1970s, and he denied having done so.

Suben accused his Republican opponent, Keith Dayton, of spreading false rumors in a smear campaign to discredit him.

However, WSTM-TV reported on November 17, 2012 that Suben had in fact acted in pornographic movies under his real name and the pseudonym Gus Thomas. An anonymous YouTube video compared images of Suben and Thomas, and presented other evidence.

Suben then decided to come clean.

"Recently, materials have circulated alleging that I was involved in the adult film industry about 40 years ago in New York. Those allegations are true," Suben admitted in a news conference ten days after the election. "I was an actor in adult films for a short period in the early '70s. I was also an actor in other venues including off-Broadway, soap operas, and commercial advertisements."

The post-election admission led to calls for Suben's resignation, and legal expert Jonathan Turley said an "act of dishonesty used to secure a legal position" may constitute misconduct under New York State Bar Association rules.

Suben's spokeswoman, Aimee Milks, said he would not resign. "I think the situation is really irrelevant to the campaign," she said. "His record as the DA for the last four years speaks for itself."

In November 2013 it was reported that Keith Dayton's brother, Kevin, was the person who had uncovered Suben's porn acting past, contacted the media and posted the YouTube video. Kevin Dayton said he did not reveal Suben's past out of any allegiance to his brother, as they had been estranged for many years, nor did he have a vendetta against Suben.

"He's always seemed like a good guy to me," Kevin Dayton said. "Even now, I don't necessarily think he should've resigned." He indicated the issue was hearing a public official blatantly lie.

"It was like Ronald Reagan saying, 'I wasn't in Bedtime for Bonzo,'" Kevin noted. "It was annoying that someone would lie so bluntly and run for public office."

Keith Dayton said he had no control over his brother's actions and, in any case, was unconcerned with Suben's participation in porn movies. "I think the more important part is the lying," he stated, adding he plans to run for DA again in 2016.

"It's ancient history to me," Suben said of the controversy over his appearance in adult films. "It's of no significance in my life. The issue is long since gone. It's a thing that's over, that's quite completely over as far as I can determine." ◪

Sources: *Huffington Post, Syracuse Post–Standard, www.cnycentral.com*

---



**Disciplinary Self-Help Litigation Manual, Second Edition,** by Dan Manville

By the co-author of the *Prisoners' Self-Help Litigation Manual,* this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court.

*Available in November 2014 from Prison Legal News Publishing.* **$49.95,** *shipping included*

- - -

**Order by mail, phone or on-line.**

By: ❏ check   ❏ new postage stamps   ❏ credit card   ❏ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Prison Legal News • PO Box 1151, Lake Worth, FL 33460
Tel. 561-360-2523 • www.prisonlegalnews.org**

# Investigation Uncovers Lost Graves at Former Florida Juvenile Facility

*by David M. Reutter*

An anthropological team from the University of South Florida investigating the grounds of the now-closed Florida Industrial School for Boys (FISB), a juvenile detention facility in Marianna, has identified the remains of three youths buried in a cemetery on the property and continues to exhume other bodies discovered at the site.

In all, the team found 55 graves – 24 of which were outside the boundaries of the marked cemetery – at the facility, which was formerly called the Arthur G. Dozier School for Boys. Researchers believe another cemetery for black youths is also located on the property.

The FISB came under scrutiny in 2008 after a group of men publicized stories about physical and sexual abuse they had endured while held at the facility as juveniles. They called themselves the "White House Boys," after a small white building where the most serious abuses occurred. Some said they were made to lie down on a bed and severely beaten with leather straps by school officials. [See: *PLN*, March 2009, p.22].

"I came out of there in shock, and when they hit you, you went down a foot into the bed, and so hard, I couldn't believe," said Robert Straley, who was taken to the "White House" the first day he arrived at FISB in the 1960s. "I didn't know what they were hitting you with."

The White House Boys alleged that some juveniles at the facility who went missing were killed by staff members, and their bodies buried on the property.

Former Governor Charlie Crist ordered an investigation after the stories of abuse were made public. In 2009, the Florida Department of Law Enforcement (FDLE) issued a report that accounted for 31 graves with rusted metal crosses in a cemetery on the grounds of the facility. However, the report concluded that investigators could not substantiate or disprove the claims of abuse because too much time had passed.

Straley called the report a whitewash. "All they did was try to do their best to discredit us," he said. "They focused on that instead of focusing on an investigation."

The anthropological research team used ground-penetrating radar to find 31 graves in the marked cemetery plus an additional 24 graves during a four-month excavation in 2013. Some of the grave sites were under roads or in the woods, far from the cemetery.

"We found burials within the current marked cemetery, and then we found burials that extend beyond that," said Dr. Erin Kimmerle. "These are children who came here and died, for one reason or another, and have just been lost in the woods."

As for juveniles who reportedly went missing from the facility, "For the majority, there's no record of what happened to them. So, they may be buried here, they may have been shipped to their families. But we don't know," stated Dr. Kimmerle, who is seeking approval from the Department of Juvenile Justice to locate another cemetery on the property containing the remains of black youths, which existed separately due to racial segregation at the time.

In August 2014, researchers announced that DNA and other tests were used to identify the first body exhumed from the facility's cemetery as George Owen Smith, who was 14 when he disappeared from FISB in 1940. The tests did not reveal how he died.

School officials told Smith's family that he had run away and died from pneumonia while hiding under a house. His family came to get his body.

"They said that the body was so decomposed, you wouldn't be able to identify him.... they took him straight out to the school [cemetery]," said his sister, Ovell Smith Krell, 83. One of the other boys at FISB, however, had told the family a different story.

"He said, 'My brother was running out across a field, an open field, and there were three men shooting at him with rifles,'" Ovell stated. "I believe to this day that they shot my brother that night, and I think they probably killed him and brought him back to the school to bury him."

Ovell hopes to give her brother a proper burial. "I would take him and put him down with my mom and dad in their cemetery," she said. "I hope I get that chance." Families

of the boys buried at FISB must seek an exhumation order in state court to obtain their remains.

In September 2014, the university team announced the identities of two more bodies buried at the facility: Thomas Varnadoe, 13, and Earl Wilson, 12.

School officials had reported that Varnadoe died in 1934, allegedly from pneumonia, while Wilson was beaten to death in 1944 while confined in a small cottage on the property known as the "sweat box." Four other boys were eventually convicted in Wilson's death.

Thomas Varnadoe's brother, Richard, was five years old when Thomas was sent to FISB for stealing a typewriter. Richard Varnadoe, now 85, provided researchers with the DNA that allowed them to identify his brother's remains.

"We got the report that he died from pneumonia. We didn't believe that in a minute," he said. "It's been really bad in a way and really good in a way. It's almost unbelievable to go back 80 years," Varnadoe added. "I'm elated."

The FDLE's 2009 report said many of the graves at the former juvenile facility contained victims of a 1914 fire, while other boys had died during a 1918 flu outbreak. The FDLE blamed poorly-kept school records for being unable to determine what happened to the other youths who died. The report concluded that two boys were killed by fellow students and another was shot by a deputy sheriff while trying to escape.

Five hundred boys were housed at FISB during its peak in the 1960s. Most had been sent to the facility for minor offenses such as running away from home, skipping school and petty theft.

In 1968, then-Florida Governor Claude R. Kirk, Jr. visited the facility. He discovered cramped sleeping quarters, buckets used as toilets, no heat in the winter, leaks in the ceilings and holes in the walls.

"If one of your kids were kept in such circumstances," Kirk said at the time, "you'd be up there with rifles." ◣

Sources: *CNN, http://staugustine.com, www.wtsp.com, Associated Press*



### The Habeas Citebook: Ineffective Assistance of Counsel
**Brandon Sample**
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

$49.95

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



### Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition
**Jon Marc Taylor**
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

$49.95

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



### Prisoners' Self-Help Litigation Manual, 4th Edition
**John Boston & Dan Manville**
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

$45.95

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook, Ineffective Assistance of Counsel $49.95
☐ Prisoners' Guerrilla Guide to Correspondence Programs 3rd edition $49.95
☐ Prisoners' Self-Help Litigation Manual 4th edition $45.95

**Shipping included in all prices**

*Order by mail, phone, or on-line.*   Amount enclosed _____
By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order
Name _____
DOC/BOP Number _____
Institution/Agency _____
Address _____
City _____ State ___ ZIP ___

PUBLISHED BY

**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 1151 • Lake Worth, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

# News in Brief

**Alaska**: On January 12, 2014, twenty-year-old detainee Jairus Nelson slipped under a garage door at the Dillingham jail and fled wearing nothing but his underwear. He ran into some nearby woods and later attempted to jump into several passing cars to evade officers. Unfortunately for Nelson, after several unsuccessful attempts to find a ride to freedom, he tried to enter the car of off-duty policeman Dan Decker. Decker recognized the escapee and held him until other officers arrived. Nelson was returned to the jail, given a new set of clothes and charged with felony escape.

**Arizona**: Anthony James Marotta resigned from his job as a guard at ASPC Perryville after he was allegedly caught receiving oral sex from a female prisoner in the back of a transport vehicle. Another prisoner was driving the vehicle when she witnessed the incident in the rearview mirror; she reported it to prison authorities, and Marotta was arrested on December 31, 2013. He admitted to the sex act and to an earlier incident of sexual misconduct.

**Arizona**: A prisoner being held on death row at the Eyman complex was found dead in his cell on January 27, 2014. According to the Pinal County Medical Examiner's Office, Gregory Dickens, 48, committed suicide. Dickens had been sentenced to death after he and an accomplice robbed and murdered a couple at a rest stop near Yuma in 1991.

**Australia**: Convicted drug dealer Dino Joseph Antonio Diano was mistakenly released on parole two years early and a warrant was issued for his arrest. He appealed the decision after being returned to prison, but on March 5, 2014 the Western Australia Court of Appeal ruled that his earliest release date was in May 2015. Prior to his drug conviction Diano had been a prominent businessman in Alice Springs, and hosted Prince Charles and Princess Diana at his home during their 1983 tour of Australia.

**California**: On January 24, 2014, a former Marine who operated a Pasadena youth boot camp was sentenced to four years and four months in state prison and will be required to register as a sex offender. Kelvin Bernard McFarland, 43, who preferred to be called "Sgt. Mac," pleaded no contest to multiple charges stemming from two cases of sexual assault involving three 14-year-old girls. McFarland's offenses included sexual assault, kidnapping, extortion, child abuse, false imprisonment, unlawful use of a badge, sexual penetration by a foreign object, oral copulation of a person under 16, lewd act on a child and unlawful sexual intercourse.

**California**: Christina Marie Lugo, 31, a Fresno County Superior Court clerk, was arrested on December 31, 2013 and released on bond the same day for allegedly helping jail prisoner Ricky Modesto attempt to intimidate a witness in a 2012 assault case. After Modesto bonded out on felony battery charges, he failed to appear for a court hearing; a warrant was issued and he was subsequently arrested in November 2012. Fresno County sheriff's spokesman Chris Curtice said Lugo then tried to arrange communications between Modesto and three other co-conspirators, all gang members, to intimidate a witness. Lugo and two of the co-conspirators were charged with conspiracy to dissuade a victim and the third was charged with being a felon in possession of a firearm.

**Florida**: Reports from the Turner Guilford Knight Correctional Center described a brawl between two prison guards on January 13, 2014 that injured a female officer who attempted to break up the fight. The internal reports, obtained by Miami-Dade TV affiliate NBC 6, said a guard identified as "R.W." became angry when asked to replace an item on a prisoner's meal tray. He first pushed the female guard, then began to physically assault another male officer, "K.A." The reports further indicated that R.W. may have been under the influence of alcohol at the time of the incident.

**Florida**: In the aftermath of the jailhouse beating of prisoner Jody Holland in May 2013, the former commander of the DeSoto County Jail was sentenced on February 10, 2014 to three years' probation and community service. Raymond Kuglar pleaded guilty to lying to an FBI agent in an attempt to cover up the attack. Four jail guards, Cpl. Steven Rizza and deputies Vincent Carlucci, Jonathan Mause and Ashley Cross, were fired for their roles in the beating and engaging in a conspiracy to conceal the incident. Mause and Cross face pending charges, while Carlucci has been convicted.

**Georgia**: Zel Tirrell Mitchell, 43, a former DeKalb County jail guard, was indicted on February 27, 2014 for having sexual contact with a prisoner in exchange for food and contraband. The prisoner stated he was not forced into the encounter. Mitchell had been fired following an internal investigation; he was charged with violation of oath and sexual assault by persons with supervisory or disciplinary authority. An additional charge of indecent exposure was dropped. [See: *PLN*, Oct. 2013, p.56].

**Greece**: On January 9, 2014, U.S. State Department spokeswoman Jen Psaki told reporters that the United States was concerned about the escape of Greek prisoner Christodoulos Xiros, 56, who was serving six life sentences for acting as a hitman for the revolutionary group known as November 17. "We call on the Greek government to locate Xiros and return him to prison," Psaki said. November 17 was responsible for the deaths of 23 people, including a CIA station chief, prior to disbanding in 2002; it is still included on the State Department's list of terrorist organizations. Xiros escaped while on an eight-day New Years furlough from prison. The furlough program is now under review.

**Idaho**: Seanjay Wright, 36, worked as an Ada County jail guard for two years before being arrested on January 1, 2014 on two felony counts of sexual contact with a prisoner. He was booked into the same jail where he was employed after an investigation by the Boise Police Department found evidence that he had sex with a female prisoner on two occasions. Ada County Sheriff Gary Raney said Wright had "violated the trust of the community and let down the other 650 men and women working for the Sheriff's Office who take great pride in their ethical conduct."

**Illinois**: On January 23, 2014, Sean McGilvery, a heroin dealer who catered to St. Clair County judges, was sentenced to 10 years in prison. One of his regular customers, former judge Michael Cook, was arrested last year in an investigation that included the cocaine-related death of a fellow judge at Cook's hunting cabin. Cook pleaded guilty to federal weapons and heroin charges. On March 28, 2014, a U.S. District Court rejected Cook's plea deal of 18 months in prison and instead

sentenced the disgraced judge to 24 months' incarceration.

**Indiana**: Prison officials dispatched to a security tower at the Miami Correctional Facility on December 23, 2013 found 56-year-old guard Zane E. Rasmussen dead of an apparent heart attack. Indiana DOC public information officer Ann Hubbard said it was believed that Rasmussen had nitroglycerin pills on hand, but was unable to reach them before he died. He was alone in the tower, and officials first suspected a problem when he failed to make an hourly welfare check call as required by prison policy.

**Kansas**: On January 22, 2014, Melinda Trusty, 47, pleaded no contest to having sex with a prisoner in a clinic restroom at the Lansing Correctional Facility. The former guard came under suspicion when prison officials noticed that prisoner Nathan M. Cunningham had been receiving letters that appeared to be written by an employee. In an interview, Trusty admitted to having sex with Cunningham, who had been assigned as a clinic worker. She was sentenced on March 19, 2014 to three years' probation.

**Libya**: Approximately 90 prisoners escaped from Mager Prison in southern Zliten on February 15, 2014. Prison guards are suspected of collusion in the escape, the latest in a series of jailbreaks over the past year in which at least 1,700 prisoners have absconded with a low rate of recapture. In July 2013, 1,200 prisoners broke out from Benghazi's Kuwaifiya Prison during a riot. Mass escapes have also occurred at the Bawabat Al-Jibs, Ajdabiya and Sebha prisons.

**Louisiana**: On January 6, 2014, a deputy at the Tangipahoa Parish jail was arrested before he could carry out a plan to smuggle contraband into the facility. Patrick Collins, 58, admitted to bringing in the contraband with intent to sell it to prisoners, according to Sheriff Daniel Edwards. Packages containing tobacco and marijuana were found in Collins' work space. He was charged with a single count of malfeasance in office, two counts of introduction of contraband into a penal institution and possession of Schedule 1 narcotics with intent to distribute.

**Michigan**: Rather than face frigid temperatures outdoors, investigators with the MDOC Absconder Recovery Unit stayed behind their desks and focused on cold cases to pass the time. Their investigation led them to the whereabouts of 60-year-old Judy Lynn Hayman, who had walked away from the Detroit House of Corrections in April 1977 – 36 years earlier. On February 17, 2014, acting on a tip from Michigan authorities, police officers in San Diego, California were able to locate Hayman and take her into custody. The investigators' victory turned to embarrassment, however, when Hayman, who had legally changed her name to Jamie Lewis, produced court documents that proved her sentence had been suspended in 1982.

**Nebraska**: A 15-year-old jailed on an armed robbery charge attacked and strangled Scotts Bluff County Detention Center guard Amanda Baker, 24, on February 14, 2014, killing her. The juvenile, Dylan Cardeilhac, was charged as an adult with first-degree murder; however, prosecutors later amended the charge to first-degree murder during the commission of a robbery. The state alleges that Cardeilhac killed Baker as he was trying to steal her keys during an escape attempt. Baker's family has since filed a wrongful death claim against Scotts Bluff County. In May 2014, Cardeilhac was sentenced to 8 to 15 years on the original armed robbery charge.

**Nevada**: An elaborate scheme was uncovered at the Washoe County Jail that involved stolen identities and fraudulent commissary accounts. KOLO TV reported on February 4, 2014 that stolen credit card information was used by outsiders to place money on prisoners' accounts, then the funds were given to the prisoners upon their release. Detectives described the fraud as "using the jail as an ATM." As part of the scheme, at least two people were purposely arrested so they could cash out the stolen funds after leaving the jail.

**New Jersey**: On February 28, 2014, six pretrial detainees prevailed in a court action requiring the Middlesex County jail to provide computer equipment necessary to view evidence in their cases. Prisoners at the North Brunswick facility did not have access to CD, DVD or flash drive readers, and Superior Court Judge Bradley Ferencz ordered jail officials to "address the issue, kicking or screaming or not." "E-discovery is here," Ferencz told county counsel Benjamin Leibowitz, ruling that the jail had violated prisoners' constitutional

# 12 FREE ISSUES!

**FREE!**

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription! Quarterly drawing **WINS $100! (Void in New York)** (Last Quarter's winner from **Airway Heights, WA.**) TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

## Inmate Magazine Service Inc.

## News In Brief (cont.)

rights by preventing them from viewing all the evidence against them. The detainees were represented by the public defender's office.

**New Mexico**: Albuquerque Metropolitan Detention Center guard Elijah Chavez was suspended with pay in February 2014 following the release of video footage that showed him repeatedly punching prisoner Mark Palacios. Chavez stated in a report that he felt he was in "survival mode" at the time of the assault. He was not charged with any crime, but Palacios, who was also pepper sprayed, was charged with battery on a peace officer. Bernalillo County Sheriff's Office representatives said it was likely that the deputy who charged Palacios with battery did not watch the video.

**New York**: A love triangle involving three New York jail guards ended in a bloody confrontation on a Queens street corner on January 10, 2014. Jeffrey Ragland died after being shot by his romantic rival, Oniel Linton. The shooting occurred when Linton saw Ragland violently strike the men's paramour, Salees Sales. Linton ran to the scene of the assault and knocked Ragland to the ground, then drew his

weapon and shot him twice. Linton claimed Ragland was in the process of pulling a gun on him when he opened fire. Ragland, who had recently retired from the New York City Department of Correction, was carrying a Glock 17. No charges were filed against Linton.

**Ohio**: On January 27, 2014, Cuyahoga County jail guard Tim Thomas was sentenced to six months in jail for accepting a bribe from a prisoner in the form of $2,000 in cash and a used car valued at $500. Thomas pleaded guilty to bribery and falsification for his role in delaying the transfer of a jail prisoner to state custody; he will serve his time in protective custody.

**Oklahoma**: A prisoner at the GEO Group-operated Lawton Correctional Facility made several calls to 911 on a contraband cell phone before being found unconscious on the floor of his cell. Christopher Glass, 33, was taken to a hospital where he was pronounced dead on January 30, 2014. Investigators said Glass' body had bruises and scrapes, but an autopsy report released on April 14, 2014 determined his death was caused by a methamphetamine overdose.

**Oregon**: On January 27, 2014, *The Oregonian* reported details of a prisoner's creative but unsuccessful plot to escape

from the Snake River Correctional Institution. Michael J. Norwood crafted a dummy using peanut butter and his own hair, then posed the makeshift mannequin in his bunk with headphones and reading glasses to conceal his absence from his cell. Norwood had also fashioned a rope from rolls of dental floss, which he intended to use to scale security fences; however, he was captured in a prison recreation yard after being missing for only half an hour.

**Philippines**: A mass jailbreak occurred at the Leyte provincial jail in the town of Palo on January 30, 2014. Nearly 200 prisoners escaped around dawn, but most were recaptured within hours. It was unclear how the mass break-out occurred, though it was very clear why: Prisoners told investigators they escaped due to hunger from limited food and squalid conditions at the facility. They also complained of slow prosecutions in their cases. Each year dozens of escapes occur in the Philippines due to the dilapidated condition of the prisons and lax security.

**Puerto Rico**: Former prison guard Bernis Gonzalez Miranda, 27, received a 67.5-year prison sentence on January 28, 2014 for his role in providing armed security for drug dealers; he was one of 89 law enforcement officers and 44 other

## PLN Classifieds

**Best 2014 Cite Book Available**
Barkanresearch.com has "Colossal Book of Criminal Citations" just $19.95. 2500+ cites & more. View sample content and order today!

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare Manuscripts for Self-Publishing Reasonable Rates! Accept all Genres! P.O. Box 938, Norwalk, CT 06852

**BB vo. 6 Naughty Celebs $12.00**
Full Color Cat, 1000 options
Non-nude – Huge variety
Celebs in the freakiest poses
Send 30 stmps or $12.00 MO
To: On Demand Inmate Services
PO BOX 81-PLN, Chelt, PA 19012
US Female Pen pal list $22 M/O

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how to receive Voices.Con monthly, send SASE to: PO Box 361, King City, CA 93930. On the web at: VoicesDotCon.org; Email: Publisher@VoicesDotCon.org

**A DEGREE/ORDINATION FROM PRISON**
Correspondence Courses via mail
INT'L CHRISTIAN COLLEGE&SEMINARY
PO BOX 530212, Debary, FL 32753-0212
Associates thru PhD credit for
Life Experience *ACCREDITED*
Tuition as Low as $19.95 a month
Send SASE for a Free Evaluation

**FREE PULP-FICTION CATALOG**
Send $3.99 USD for S&H
This is a 136-page catalog with 1650+ story/novel entries
Detective, Mystery, Air, Western Horror, Action, Science Fiction+
Jaguar Books, 6881 Stanton Ave #F, Buena Park, CA 90621

**INMATE ALERT**
FREE NON-NUDE SEXY PORNO STARS AND MODELS CATALOG.
SEND SASE TO:
TOTAL ACCESS SERVICES, PO BOX 31764, CAPITOL HEIGHTS, MD 20731

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet & People Searches, Amazon Books, Erotic Photos & Stories, PenPals, Special Requests and Much More.
Send SASE to: Elite Paralegal & Prisoner Services, PO Box 1717, Appleton, WI 54912

**You've tried the rest; now put us**
to the test. Quicker turn around (no waiting 4 weeks for your order like with other services) lower prices. We are DFL Research Services, 2851 Chloe Drive, Converse, TX 78109
Send for information today

people arrested in an FBI undercover investigation called Operation Guard Shack. According to court testimony, Gonzalez Miranda received $2,000 each time he participated in a drug transaction. He was convicted of three counts of conspiring to possess with attempt to distribute more than 5 kilos of cocaine, plus three counts of possession of a firearm in furtherance of a drug transaction.

**Tennessee**: The Tennessee Bureau of Investigation confirmed on January 10, 2014 that Grainger County jailer Jacob Scott Layel, the son of the county's sheriff, was one of five former jail employees indicted on various misconduct charges following the escape of three prisoners from the facility in November 2013. The TBI conducted the investigation to identify security and operational flaws at the jail because the escape had gone unnoticed for several days. Sheriff Scott Layel, a chief deputy and one of the indicted employees were also named as defendants in an unrelated lawsuit filed by three female prisoners who said they were repeatedly raped at the jail.

**Texas**: On December 3, 2013, U.S. District Court Judge Andrew S. Hanen said corruption in the Cameron County legal system and judiciary was so pervasive that most people probably wouldn't believe it. On that same day, former Texas state district judge Abel C. Limas surrendered to U.S. Marshals to begin serving a six-year federal prison term for accepting bribes to render favorable rulings in civil cases. Criminal charges against 12 defendants, all members of the Cameron County legal community, were brought after Limas' misconduct was discovered. All but one were convicted.

**Texas**: Travis County District Attorney Rosemary Lehmberg will keep her job despite a drunk driving arrest, some bad behavior while in jail and a civil case intended to force her from office. [See: *PLN*, Sept. 2013, p.56]. On December 11, 2013, Judge David Peeples ruled after three days of testimony that he would not remove Lehmberg as the top felony prosecutor in Travis County. Testimony during the hearing described Lehmberg's drinking habits and medical conditions, but was not enough to convince Peeples to relieve her of her duties. The ruling ended months of speculation as to the future of Lehmberg's role in Texas' criminal justice system. On July 15, 2014, a lawsuit was filed against Lehmberg by a former state prosecutor who claimed he was fired for requesting an investigation into her actions.

**Texas**: On November 3, 2013, 37-year-old Sarah Tibbetts, an insulin-dependent diabetic, collapsed and died at the Irving jail. Following an investigation into her death, on January 24, 2014 two jail supervisors were fired, two guards were reprimanded and two other employees received counseling. Tibbetts' mother, who lives in California, was contacted by jail officials on November 2, 2013 and asked to bring insulin to Texas. She told them it was impossible for her to travel to the jail, but warned that her daughter would die without insulin. Sarah Tibbetts had been incarcerated at the jail previously but was taken to a hospital for treatment during prior stays at the facility.

**United Kingdom**: Five guards at HM Prison Parc in South Wales denied wrongdoing in an alleged drug smuggling conspiracy, and, soon afterward, a court case against them fell apart when prisoners at the

**Assistants Online**
562 S Hwy 123 Bypass #232
Seguin, TX 78155-9752
Lit.submissions/typing/copies
Gifts/books/email acct/searches

**MIDNIGHT EXPRESS BOOKS**
THE PREFERRED & ONLY FULL TIME
company helping inmate authors
publish books for 10+ years.
PO Box 69, Dept PLN,
Berryville, AR 72616
Midnightexpressbooks.com
Corrlinks: MEBooks1@yahoo.com

**FREEDOM WRITER**
Honest, professional, yet
affordable document production
specializing in writs and parole
packets. All other legal documents
also welcome. Send SASE to:
PO Box 821031
Dallas, TX  75231

**Education Behind Bars Newsletter**
Free electronic newsletter
for prisoners via CorrLinks.
Add news@prisonlawblog.com
to subscribe. The content
is curated specifically
for prisoners.

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games.  We Sell Photos of Sexy
Women, Gifts for Loved Ones,
Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**Prisonerinmatefamilyservice.com**
Send a SASE for a free catalog;
PO Box 1852, Pismo Beach, CA 93448
We buy stamps — $7.50 a book;
Single stamps .25 cents; Amazon
Orders, copies of photos/artwork
And SO much more!
FamilyInmateSev@aol.com

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**\*\*Bottle Thoughts Gift Store\*\***
Show someone you are thinking of
them by sending a Special Gift
Send SASE for FREE Brochure
PO Box 110752, Carrollton, TX 75011
Corrlinks: sales@bottlethoughts.com
Contact us 1-877-705-0425
FREE Shipping on All Gift Orders

**Celebrity Photos For Sale:**
Send self-addressed stamped
envelope for lists. Name stars
you would like to order photos of
Photos are Non-Nude.
Photoworld-PLN
PO Box 401016
Las Vegas, NV 89140

**Great Goods has Moved!**
Please send all stamp orders
and information requests to:
Great Goods, PO Box 2027,
Bloomington, IN, 47402.
greatgoods2027@gmail.com.
See our ad for updated rates.
Thank you for your business!

**News In Brief (cont.)**

facility refused to testify. A sixth defendant, Philip Finselbach, pleaded guilty to involvement in the conspiracy, which according to anonymous sources involved smuggling cell phones, marijuana and heroin. On January 16, 2014, a judge declined to sentence Finselbach, who said he had feared for the safety of himself and his family if he did not participate in the scheme. HM Prison Parc is run by a private company, G4S.

**Washington**: On January 31, 2014, the *Christian Science Monitor* reported that in an effort to reduce food disposal costs and enrich a gardening program that provides vegetables for the prison's kitchen and local food banks, the Monroe Correctional Complex has turned to vermiculture – the breeding and raising of earthworms. The program began with 200 red wigglers and has grown to a "wormery" which currently holds 5 million of the invertebrates. The worms can process 10,000 pounds of food scraps per month and the byproducts – worm manure and "worm tea" – are used as a rich fertilizer on several acres of gardens at the facility.

**Wisconsin**: In a Grant County courtroom on January 20, 2014, former parole officer Sherry Buswell pleaded no contest to 21 felonies related to stealing money from parolees and depositing it into her personal bank account. She faced more than 70 years in prison, but was sentenced in March 2014 to 18 months and over $8,000 in restitution. Buswell was also required to write a letter of apology to each of her victims. The thefts were discovered after a co-worker reviewed several of her cases and became suspicious due to "numerous inconsistencies."

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Centurion Ministries

Works to exonerate the wrongfully convicted, in both cases involving DNA evidence and those that do not. Centurion only takes 1-2 new cases a year involving actual innocence. They do not consider accidental death or self-defense murder cases, he said/she said rape cases, or child abuse or child sex abuse cases unless there is physical evidence. All case inquiries must be from the prisoner involved, in writing. Contact: Centurion Ministries, 221 Witherspoon Street, Princeton, NJ 08542 (609) 921-0334. www.centurionministries.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: JDI, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### Prison Activist Resource Center

PARC is a prison abolitionist group committed to exposing and challenging all forms of institutionalized racism, sexism, able-ism, heterosexism and classism, specifically within the Prison Industrial Complex. PARC produces a free resource directory for prisoners, and supports activists working to expose and end the abuses of the Prison Industrial Complex and mass incarceration. Contact: PARC, P.O. Box 70447, Oakland, CA 94612 (510) 893-4648. www.prisonactivist.org

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book orders OVER $50** (effective 8-1-2014 until further notice). $6.00 S/H applies to all other book orders.

SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!
1. SIX (6) FREE ISSUES FOR 54 TOTAL! OR
2. PRISON PROFITEERS (A $24.95 VALUE!) OR
3. THE HABEAS CITEBOOK (A $49.95 VALUE!)

**Prison Profiteers**, edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. 1063

**The Habeas Citebook: Ineffective Assistance of Counsel**, by Brandon Sample, PLN Publishing, 200 pages. **$49.95**. This is PLN's second published book, written by federal prisoner Brandon Sample, which covers ineffective assistance of counsel issues in federal habeas petitions. Includes hundreds of case citations! 1078

**Prison Nation: The Warehousing of America's Poor**, edited by Tara Herivel and Paul Wright, 332 pages. **$35.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. 1041

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. 1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada**, updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95**. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college courses by mail. 1071

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format. 1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc. 1039

**The Merriam-Webster Dictionary, New Edition**, 939 pages. **$8.95**. This paperback dictionary is a handy reference for the most common English words, with more than 65,000 entries. 2015

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 110 pages. **$19.99**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. 1046

**Legal Research: How to Find and Understand the Law**, by Stephen Elias and Susan Levinkind, 568 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. 1059

**Deposition Handbook**, by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed. 1054

**Criminal Law in a Nutshell**, by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**. Provides an overview of criminal law, including punishment, specific crimes, defenses & burden of proof. 1086

SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!
1. FOUR (4) FREE ISSUES FOR 40 TOTAL! OR
2. PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. 1060

**Spanish-English/English-Spanish Dictionary**, 2nd ed., Random House. **$15.95**. Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage. 1034a

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. 1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right**, updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. **$17.99**. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct. 1030

**All Alone in the World: Children of the Incarcerated**, by Nell Bernstein, 303 pages. **$19.95**. Award-winning journalist Nell Bernstein takes an intimate look at the effects incarceration has on imprisoned parents and their children. 2016

**Everyday Letters for Busy People**, by Debra Hart May, 287 pages. **$21.99**. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters. 1048

**Roget's Thesaurus**, 717 pages. **$8.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. 1045

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95**. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. 1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95**. In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners. 1073

**With Liberty for Some: 500 Years of Imprisonment in America**, by Scott Christianson, Northeastern University Press, 372 pages. **$18.95**. The best overall history of the U.S. prison system from 1492 through the 20th century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years. 1026

**Complete GED Preparation**, by Steck-Vaughn, 922 pages. **$24.99**. This useful handbook contains over 2,000 GED-style questions to thoroughly prepare students for taking the GED test. It offers complete coverage of the revised GED test with new testing information, instructions and a practice test. 1099

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

**Hepatitis and Liver Disease: What You Need to Know**, by Melissa Palmer, MD, 457 pages. **$19.99**. Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.   1031

**Arrested: What to Do When Your Loved One's in Jail**, by Wes Denham, 240 pages. **$16.95**. Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.   1084

**Prisoners' Self-Help Litigation Manual**, updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!   1077

**How to Win Your Personal Injury Claim**, by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.   1075

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits**, by Lewis Laska, 336 pages. **$39.95**. Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners.   1079

**Advanced Criminal Procedure in a Nutshell**, by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**. This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication.   1090

**Our Bodies, Ourselves**, by The Boston Women's Health Book Collective, 944 pages. **$26.00**. This book about women's health and sexuality has been called "America's best-selling book on all aspects of women's health," and is a great resource for women of all ages.   1082

**Arrest-Proof Yourself**, by Dale Carson and Wes Denham, 288 pages. **$14.95**. This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.   1083

**Nolo's Plain-English Law Dictionary**, by Gerald N. Hill and Kathleen T. Hill, 496 pages. **$29.99**. Find terms you can use to understand and access the law. Contains 3,800 easy-to-read definitions for common (and not so common) legal terms.   3001

**Criminal Procedure: Constitutional Limitations**, by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**. Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure.   1085

**Win Your Lawsuit: Sue in CA Superior Court without a Lawyer**, by Judge Roderic Duncan, 445 pages (4th edition 2010). **$39.99**. This plain-English guide shows you how to prepare a complaint, file and serve papers, participate in settlement negotiations, present a case and much more. The 4th edition has been revised to reflect recent court procedures and includes updated forms.   2014

*Coming Soon!* **Disciplinary Self-Help Litigation Manual**, by Daniel Manville. By the co-author of the *Prisoners' Self-Help Litigation Manual*, this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court. Published by Prison Legal News Publishing, this title should be available by Nov. 15, 2014.

---

## Subscription Rates

|  | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** (Attorneys, agencies, libraries) | $90 | $180 | $270 | $360 |

## Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 61

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 61

(All subscription rates and bonus offers are valid as of 8-1-2014)

Purchase with Visa, MasterCard, AmEx or Discover by phone: **561-360-2523**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 1151
Lake Worth, FL 33460

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, **no single stamps**) or pre-stamped envelopes, *if allowed by institutional policies.*

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News**                  **$ Amount**

6 month subscription (prisoners only) - $18   _____

1 yr subscription (12 issues)   _____

2 yr subscription (2 bonus issues for 26 total!)   _____

3 yr sub (*write below which FREE book you want*)   _____
  or 4 bonus issues for 40 issues total!

4 yr sub (*write below which FREE book you want*)   _____
  or 6 bonus issues for 54 issues total!

Single back issue or sample copy of **PLN** - $5.00 each   _____

**Books Orders**   (No S/H charge on 3 & 4-year subscription free books OR book orders OVER $50!)   **Qty.**

_____   ____   _____
_____   ____   _____
_____   ____   _____
_____   ____   _____

Add **$6.00** S/H to **BOOK ORDERS** under $50   _____
(PLN subs *do not count* towards $50 for free S/H for book orders)

FL residents ONLY add 6% to Total <u>Book</u> Cost   _____

<u>**TOTAL Amount Enclosed:**</u>   _____

* *NO REFUNDS on PLN subscription or book orders after orders have been placed.* *
* *We are not responsible for incorrect addresses or address changes after orders have been placed.* *

# PRISONLEGALNEWS.org

## Dedicated to Protecting Human Rights

>>FREE Data Search

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!**

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org

# Great Self-Help Book Deals
## From Prison Legal News!



### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer

**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**Phone: 561-360-2523**
**www.prisonlegalnews.org**


The Criminal Law Handbook
$39.99


Represent Yourself in Court
$39.99


Legal Research
$49.99


Nolo's Deposition Handbook
$34.99


**NOLO**
**YOUR LEGAL COMPANION**



**Prison Legal News**
PO Box 1151
Lake Worth FL 33460

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

## Subscription Renewal

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2015 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 10/2014** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

