1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Prison Legal News,                    No. CV-15-02245-PHX-ROS

10            Plaintiff,                  **ORDER**

11  v.

12  Charles L Ryan, et al.,

13            Defendants.

14

15        Prison Legal News ("PLN") publishes books and magazines about the criminal

16  justice system and issues involving prisoners, including a monthly journal eponymously

17  titled *Prison Legal News*.    Prisoners in the custody of the Arizona Department of

18  Corrections ("ADC") subscribe to publications by PLN.    Since 2014, some of these

19  publications have been excluded and/or redacted pursuant to ADC's policy prohibiting

20  sexually explicit material.    PLN brought claims against Defendants—officers and

21  employees of ADC—under 42 U.S.C. § 1983, alleging violations of the First and

22  Fourteenth Amendments.

23        The parties cross-moved for summary judgment.    (Docs. 233, 235.)    For the

24  following reasons, Defendants' Motion for Summary Judgment (Doc. 233) is granted in

25  part and denied in part.  PLN's Motion for Summary Judgment (Doc. 235) is granted in

26  part and denied in part.[1]

27

28  ---
[1] The parties' request for oral argument is denied because the issues have been fully briefed
and oral argument will not aid the Court's decision.

# BACKGROUND

## I.    The Parties

Plaintiff Prison Legal News ("PLN") is a project of the Human Rights Defense Center.[2] (Doc. 236 at 3.)  For over 27 years, PLN has published and distributed books and magazines about the criminal justice system and issues impacting prisoners, including *Prison Legal News*—a monthly journal of corrections news and analysis—and the book *The Celling of America: An Inside Look at the U.S. Prison Industry* ("*Celling*").  (Doc. 236 at 3.)  PLN's publications contain information on "prison operations and conditions, legal updates on prison litigation, prisoner health and safety, and prisoners' rights."  (Doc. 236 at 3.)   PLN's stated purpose is to "disseminate legal information on issues affecting prisoners and their loved ones on the outside and to educate prisoners and the public about the destructive nature of racism, sexism, and the economic and social costs of prisons to society."  (Doc. 236 at 3–4.)  *Prison Legal News* has been distributed to prisoners in over 3,000 correctional facilities in the nation, including prisons within the correctional systems of the Arizona Department of Corrections ("ADC").   (Doc. 236 at 3.)   There are approximately 133 subscribers to *Prison Legal News* at ADC facilities.[3]  (Doc. 236 at 4.)

Defendants are officers and employees of ADC, sued in their official and individual capacities.[4]  Defendant Charles L. Ryan ("Ryan") was ADC's Director during the relevant time period.  Ryan signed and executed each version of the department order challenged by PLN.  (Doc. 236 at 20.)  Defendant Jeff Hood ("Hood") was ADC's Deputy Director during the relevant time period.   (Doc. 236 at 21.)   Defendant Gail Rittenhouse ("Rittenhouse") was ADC's Division Director for Support Services from May 2012 until March 17, 2017.  (Doc. 234-1 at 40.)  She was the immediate supervisor of Defendant James Riggs ("Riggs"), Quality Assurance Coordinator of the Office of Publication Review ("OPR") from July 2012 until May 2016.  (Docs. 218-1 at 23; 234-1 at 15; 241 at

---

[2] Unless otherwise noted, factual statements included in the Court's summary are undisputed.
[3] The number of subscribers fluctuates depending on length of incarceration and other factors concerning release from prison.  (Doc. 236 at 4.)
[4] Defendant Guzman is sued in her official capacity only.

31.)  Defendant Olson was an OPR employee from 2013 until his retirement in May 2016. During his time with OPR, Olson had "primary responsibility" over OPR duties—which included conducting reviews of incoming publications—while Riggs supervised and helped him.  (Doc. 218-1 at 27.)  Defendant Jamie Guzman ("Guzman") assumed Olson's position after his retirement.  (Doc. 218-1 at 28.)

## II.    *ADC's 2010 Publication Review Policy*

Before 2010, ADC allowed inmates to "receive virtually any type of sexually-related photographs, magazines and writings, including those depicting nudity, as long as it did not involved depictions of people in uniform or disrespect people in uniform."  (Doc. 234-1 at 6.)  After complaints from staff about sexual harassment, ADC decided in 2010 to regulate sexually explicit material entering the prison through Department Order ("DO") 914 ("2010 Policy").  (Docs. 234-1 at 6–7; 234-2 at 2.)  DO 914.07–1.1 provided: "In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material.  For the purpose of this Departmental Order, sexually explicit material is defined as publications that feature nudity and/or the publication is promoted based on such depictions and/or the intent of the publication is sexual arousal or gratification."  (Doc. 234-2 at 14.)  DO 914.07 provided a non-exhaustive list of prohibited publications, including publications that depict sexual intercourse, sadomasochistic abuse, and masturbation.  (Doc. 234-2 at 14.)  Since the regulations were adopted in 2010, "staff has reported that they generally feel more comfortable, especially female staff, because they are not exposed to unwanted images and text of graphic, explicit sexual content."  (Doc. 234-2 at 7.)

DO 914 also set forth the procedures for receipt, screening, and delivery of publications sent to ADC inmates.  ADC operates ten prison complexes, with each complex made up of anywhere between three and nine housing units.  Each housing unit consists of anywhere between 200 and 2000 inmates.  (Doc. 234-1 at 17.)    ADC mail is delivered from the post office and processed at each of the complexes.  (Doc. 234-1 at 17.)  Each

complex receives "hundreds of magazines and publications a week." (Doc. 234-1 at 17.) At the complex level, mail is opened for contraband inspection and publication review. (Doc. 234-1 at 8.) Complex-level staff reviews the publication and checks a statewide database to see if the publication has already been excluded by another complex. (Doc. 234-1 at 8.) If complex-level staff is unclear or unsure about whether a publication should be excluded, they often consult OPR. (Doc. 234-1 at 8.)

Under the 2010 Policy, if staff decided to exclude a sexually explicit publication sent to an inmate, ADC was required to notify the inmate. (Doc. 234-2 at 15.) The inmate could then request an appeal—or "second-level review"—to be conducted by OPR. (Doc. 234-2 at 15.) OPR's decision on appeal was final. (Doc. 234-2 at 15.) Some types of material—such as those that contained nudity and sexual behaviors/acts for artistic, medical, educational, or anthropological purposes—were sent to OPR to be "approved on an individualized basis." (Doc. 234-2 at 14.) In other words, OPR made the first-level decision to allow or exclude these publications. If an inmate wished to request second-level review, he was required to appeal OPR's decision to the Division Director or Director's designee. (Doc. 234-2 at 15.)

Notably, the 2010 Policy did not provide a process to give publishers notice and an opportunity to appeal exclusion decisions. (Doc. 234-1 at 19.)

### III. *2014 Exclusion and Redaction of* Prison Legal News *and* Celling

Under the 2010 Policy, four issues of *Prison Legal News* and the PLN-distributed book *Celling* were initially excluded. Prior to 2014, ADC routinely allowed the delivery of PLN publications, including over 90 different monthly issues of *Prison Legal News*. (Doc. 236 at 4.) In 2014, ADC excluded delivery of the following four issues of *Prison Legal News*: March 2014, April 2014, July 2014, and October 2014. These issues were excluded pursuant to ADC's prohibition of sexually explicit material.

The March 2014 issue was excluded because of an article titled "Ninth Circuit Holds Staff Sexual Abuse Presumed Coercive; State Bears Burden of Rebutting Presumption"; the April 2014 issue was excluded because of articles titled "Kitchen Supervisor Gets

Prison Time for Sexually Abusing Two Prisoners" and "Sexual Abuse by Oregon Jail Guard Nets Probation; Defense Attorney Blames Victim"; the July 2014 issue was excluded because of an article titled "New York Jail Guard Sentenced for Sexually Abusing Seven Prisoners"; the October 2014 issue was excluded because of an article titled "Tenth Circuit Holds 'Consensual' Sex Defeats Prisoners' Eighth Amendment Claim." (Doc. 236 at 4– 6.) OPR employee Defendant Olson participated in the review and exclusion of these four issues. (Doc. 250 at 13.)

When ADC initially excluded the 2014 issues, it did not provide PLN with notice or an opportunity to appeal the exclusion decisions. (Doc. 236 at 6.) PLN eventually learned of ADC's exclusion decisions from its inmate-subscribers and contacted ADC through counsel. OPR subsequently reversed its exclusion decisions with regard to the March 2014, April 2014, and July 2014 issues. (Doc. 234 at 8.) These issues were delivered to ADC subscribers in February and March 2015. (Doc. 236 at 4–5.) In September 2015, OPR redacted two paragraphs from the October 2014 issue and delivered the redacted issues to subscribers. (Doc. 236 at 6.) The parties dispute whether all ADC subscribers ultimately received their issues, as some subscribers may have been released in the interim and ADC may not have retained all issues. (Doc. 242 at 20.)

From at least February 22, 2011, ADC has also excluded from delivery the PLN-distributed book *Celling*, pursuant to the DO 914.08–1.1.1 prohibition against "[d]epictions or descriptions that incite, aid, or abet riots, work stoppages, or means of resistance." (Doc. 234-2 at 15.) In May 2015, ADC excluded *Celling* again because it had previously been excluded. (Doc. 236 at 6.) ADC did not provide PLN with any notice of its 2011 or 2015 decisions to exclude *Celling* or the opportunity to appeal the exclusion decisions. (Doc. 236 at 7.) PLN was not aware of ADC's exclusion of *Celling* until discovery in the present litigation. (Doc. 236 at 19.)

### IV.    March 2016 Policy Revision and Subsequent Exclusions

After the present lawsuit began in 2015, PLN amended its publication review policy in March 2016 ("2016 Policy"). The 2016 Policy required that publishers be given notice and an opportunity to appeal if their publications are excluded. (Doc. 234 at 4.)

ADC continued to exclude issues of *Prison Legal News* under the 2016 Policy. The March 2016 and April 2016 issues were initially excluded at the complex level and inmates appealed the decisions. (Doc. 236 at 7–8.) In May 2016, OPR reversed the initial exclusion decisions and allowed the two issues. (Doc. 236 at 7.) However, the two issues were delivered only to the inmates who had appealed the initial decisions, not to all inmate subscribers. (Doc. 236 at 17–18.) Although the 2016 Policy required that ADC give publishers notice and an opportunity to appeal, ADC did not give PLN notice and an opportunity to appeal when ADC initially decided to exclude the March 2016 and April 2016 issues. (Doc. 236 at 7.)

### V.    April 2017 Policy Revision and Subsequent Exclusions

In April 2017, PLN once again amended DO 914 ("2017 Policy"). The 2017 Policy is currently effective and includes substantive amendments to the prohibition of sexually explicit material.[5] (Doc. 236 at 12.) The Court examines the specific provisions in detail in the analysis section below.

In May 2017, OPR trained ADC mailroom staff on the 2017 Policy. This training included review of the newly amended provisions, as well as a sample of sexual content in the form of images and text. (Doc. 236 at 14.) As an example, OPR told staff that Dante's *Inferno* falls under a DO 914 exception for "well-known and widely recognized religious or literary work." (Doc. 236 at 12–13.) ADC followed up the training with an email informing mailroom staff of the following "bright-line, [u]nauthorized content": depictions or descriptions of statutory nudity; masturbation; self-touching photographs; sex toys; sexual contact with an unwilling participant and/or child; spread eagle photographs; sexual

---

[5] Although ADC has since implemented a 2018 policy, all relevant sections are identical to the 2017 policy. The Court follows the parties in addressing the 2017 Policy as the current policy.

representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy; statutory sadomasochistic abuse. (Doc. 236 at 15.)

Under the 2017 Policy, the April 2017, May 2017, and June 2017 issues were initially excluded due to sexually explicit content. OPR reviewed the content and allowed each issue to be delivered with redactions. (Doc. 236 at 8–9.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, all evidence must be construed in the light most favorable to the non-moving party.

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cty. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

## ANALYSIS

### I.  *Due Process*

#### a. *Individual Liability*

PLN alleges Defendants violated the Due Process Clause of the Fourteenth Amendment, via 42 U.S.C. § 1983, as a result of ADC's failure to provide PLN with notice and an opportunity to appeal when it excluded the four 2014 and two 2016 issues of *Prison Legal News*, and when it excluded *Celling* in 2011 and 2015. (Doc. 235 at 16.) In addition

to suing Defendants in their official capacities, PLN seeks damages from Defendants Ryan, Rittenhouse, Hood, Olson, and Riggs in their individual capacities. (Doc. 179 at 4–6.)

The Due Process Clause requires that when a correctional facility refuses to deliver mail to an inmate, it must provide both sender and prisoner with notice and an opportunity for appeal to an official other than the one who made the initial decision to exclude. *Procunier v. Martinez*, 416 U.S. 396, 418–19 (1974), *overruled on other grounds by Thornburgh v. Abbot*, 490 U.S. 401 (1989); *Krug v. Lutz*, 329 F.3d 692, 697–68 (9th Cir. 2003); *Prison Legal News v. Cook*, 238 F.3d 1145, 1152 (9th Cir. 2001). Defendants admit that PLN was not given notice and an opportunity to appeal when ADC initially excluded the four 2014 and two 2016 issues of *Prison Legal News*, and when it excluded *Celling* in 2011 and 2015. (Doc. 236 at 6–7.) As to the exclusion decisions made from 2011 until 2015, ADC did not have any policy requiring notice and an opportunity to appeal for publishers. In 2016, ADC implemented a new policy requiring publishers be given notice and an opportunity to appeal if their mail is excluded. But ADC employees, in contravention of the 2016 Policy, continued to exclude *Prison Legal News* in 2016 without providing PLN with notice and an opportunity to appeal. Because Defendants admit ADC deprived PLN of its right to due process, summary judgment is granted to PLN with regard to its due process claim against Defendants in their official capacities.

Next, the Court considers PLN's due process claim against Defendants in their individual capacities. "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation[.]" *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Defendants move for summary judgment to dismiss Defendants Ryan, Rittenhouse, Hood, and Riggs in their individual capacities on the basis that they did not personally participate in depriving PLN of its due process rights. (Doc. 233 at 9.) Of note, Defendants do not move to dismiss PLN's due process claim against Defendant Olson in his individual capacity and admit Olson personally participated in excluding the four 2014 issues without providing to PLN notice and an opportunity to appeal. (Doc. 233 at 13.)

Summary judgment is granted to PLN with regard to Olson's individual liability in excluding the four 2014 issues and two 2016 issues of *Prison Legal News*. During the relevant time period, Olson worked in OPR as a Quality Assurance Coordinator. (Doc. 218-1 at 28.) Defendants admit that Olson personally reviewed and "initially excluded the four 2014 *Prison Legal News* issues." (Doc. 233 at 13.) Further, in their Answer, Defendants admitted to PLN's allegation that "Olson participated in each act of censorship and failure to provide access alleged herein to have occurred before May 31, 2016, including by personally reviewing each issue." (Docs. 179 at 10; 181 at 10.) The March 2016 and April 2016 issues were reviewed prior to May 31, 2016; thus, Olson participated in their exclusion decisions. (Docs. 236 at 7.) When he participated in the exclusion decisions, Olson neither provided nor directed others to provide PLN with notice and an opportunity to appeal. (Doc. 236 at 22.) Defendants do not dispute that Olson's conduct caused PLN's deprivation of due process. As such, Olson is individually liable for the due process violations involving the 2014 and 2016 issues of *Prison Legal News*. *See Prison Legal News v. Babeu*, 933 F. Supp.2d 1188, 1210 (D. Ariz. 2013) (finding that county jail mailroom staff was personally liable for due process violation when they "discarded or returned PLN materials, and in doing so provided no opportunity to contest or appeal the non-deliverability decision").

The other individual defendants, however, did not personally review and exclude without notice any of PLN's publications.[6] PLN nevertheless argues they are individually liable because they advanced an unconstitutional policy that proximately caused PLN's harm. (Doc. 248 at 11.)

---

[6] PLN claims Hood and Riggs participated in the second appellate review of the October 2014 issue of *Prison Legal News* and decided to redact two paragraphs, which Defendants dispute. (Doc. 242 at 28.) Even assuming this is true, their alleged review was conducted after an inmate appealed the initial decision to exclude publications and after PLN's counsel communicated with ADC about the initial exclusion. Thus, the alleged participation by Hood and Riggs cannot serve as a basis for the due process violation of excluding a publication without affording the publisher notice and an opportunity to appeal. In any event, PLN does not base its argument on this stated fact. Moreover, Defendants admit Hood conducted second-level review of *Celling* in 2012 but argue the two-year statute of limitations bars any claims for damages. (Doc. 242 at 28.) PLN did not respond to this argument.

The Ninth Circuit has instructed that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any [constitutional] rights.'" *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) (citation omitted). In other words, a supervisor can meet the "personal participation" requirement by advancing an unconstitutional policy that caused the constitutional violation at issue.

In a previous case before the District of Arizona, PLN similarly argued that officials and employees of the Pinal County Jail were individually liable for violations related to exclusion of its publications. *Prison Legal News v. Babeu*, 933 F. Supp.2d 1188, 1210 (D. Ariz. 2013), *aff'd* 552 Fed. App'x 747 (9th Cir. 2014). The court found the Pinal County Jail had an unconstitutional mail policy that, among other things, failed to afford publishers with notice and an opportunity to appeal exclusion decisions. *Id.* at 1210. The court, however, declined to find that Sheriff Paul Babeu and Deputy Chief James Kimble were individually liable for PLN's due process injury. Although Sheriff Babeu and Deputy Kimble were the "ultimate policymakers," and Deputy Kimble was responsible "for jail policies, including the mailroom policy," the court found it significant that there was no evidence that either official "actually participated in the drafting of the mailroom policy." *Id.* at 1211. As such, the court concluded Sheriff Babeu and Deputy Kimble were responsible only in their official capacities. *Id.* Additionally, the court held there was a genuine dispute of material fact over whether the "command staff" at the jail could be individually liable because there was evidence suggesting they were "personally involved in the drafting of the policy." *Id.* at 1211. On the other hand, the command staff could not be individually liable for the First Amendment violations, which did not occur pursuant to written policy. *Id.* at 1208. Rather, the ground-level staff administered an unwritten policy banning certain publications. The court held that although the command staff was generally involved in policymaking and training, PLN did not produce "any evidence that

members of the command staff were the source of these practices," and did not show a "definite connection between the actions of the [command staff] and the injury suffered" by PLN. *Id.* at 1208.

Here, PLN does not allege any of the individual defendants actually drafted the unconstitutional 2010 Policy. Rather, PLN points out that Ryan, pursuant to his authority as Director of ADC, signed and executed the 2010 Policy. (Doc. 248 at 11.) Unlike the policymakers in *Babeu*, Ryan—through his signature—personally authorized the execution of an unconstitutional policy. Even though PLN does not show that Ryan drafted the policy, there is no question that he personally participated in creating, promulgating, or implementing the 2010 Policy that deprived PLN of its constitutional rights. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) (citation omitted); *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Defendants argue that the 2010 Policy did not *require* officers to not give notice to publishers; rather, it required notice to inmates and was silent with regard to publishers. This argument is unpersuasive. A policy that required notice only to inmates, by implication, excluded the provision of notice to publishers. As such, Ryan is individually liable for the violations of PLN's right to due process under the unconstitutional 2010 Policy.

On the other hand, there is no evidence that Rittenhouse or Hood personally participated in creating, promulgating, or implementing the unconstitutional 2010 Policy. PLN argues both Rittenhouse and Hood were members of the Office of Primary Responsibility, which is charged with developing department orders. (Doc. 218-1 at 215.) However, aside from pointing to this general policymaking responsibility, PLN fails to show that Rittenhouse or Hood had any personal involvement in advancing the particular department order at issue. Without this evidence of a definite connection, Rittenhouse and Hood are not individually liable for the due process violations that occurred pursuant to the 2010 Policy.

PLN also argues the individual defendants—as supervisors—implemented and oversaw ADC staff's due process violations, including after the facially unconstitutional

2010 Policy was amended in 2016 to require notice and an opportunity to appeal for publishers. This argument fails because PLN does not produce "specific facts showing a definite connection" between the actions of any supervisors and PLN's injuries. *Babeu*, 933 F. Supp. 2d at 1208. Rittenhouse, as Division Director, supervised Quality Assurance at OPR, although the officer she supervised testified she did not do anything related to publication review. (Doc. 218-1 at 23.) Hood, as Deputy Director, was generally responsible for interpreting department orders and training OPR staff. (Doc. 236 at 21.) In deposition, Riggs testified about the training he received from Hood: "Not really training as far as how to review publications, just acclimating me to the department, to the mission and goals, to the duties of the position and what he expected out of me when we conducted our second-level reviews." (Doc. 218-1 at 23.) Riggs, as the Quality Assurance Coordinator, also oversaw the publication review process and was one of the officers that trained Olson on his duties. (Doc. 218-1 at 28.) Aside from conclusory statements that Defendants promulgated and implemented an unconstitutional policy, PLN has not identified specific evidence showing that any of the individual defendants personally directed staff to exclude publications without giving publishers notice, or to give notice to inmates only. *Babeu*, 933 F. Supp. 2d at 1208; *see also Benitez v. Hutchens*, No. SACV 12-550 AG(JC), 2016 WL 7477590, at *7 (C.D. Cal. Sept. 8, 2016) (finding defendant sheriff was not individually liable when plaintiff provided "no factual basis for inferring that it was *the defendant*, as an individual, who *personally* created, promulgated, implemented, or advanced, a particular policy").

Accordingly, only Ryan and Olson are individually liable for due process violations involving exclusions of PLN publications.

### b. Damages

Defendants move for summary judgment on the issue of damages for due process violations. On February 20, 2018, the last day of discovery, PLN disclosed four categories of damages for its due process claim: (1) Compensatory Damages; (2) Compensatory Damages: Frustration of Mission; (3) Compensatory Damages: Diversion of Resources;

and (4) Punitive Damages. (Doc. 234-4 at 8–10.) Defendants argue PLN should be precluded from submitting any evidence on damages because it failed to properly disclose damages in accordance with Rule 26(a). Fed. R. Civ. P. 26(a)(1)(A)(iii). Under Rule 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c).

First, with regard to compensatory damages generally, PLN disclosed damages in the amount of $1,000 per violation for approximately 400 copies—based on past settlements—as a "reasonable estimate of the value of the constitutionally protected activity of publication of each of Plaintiff's publications suppressed by Defendants." (Doc. 234-4 at 8.) PLN stated in its disclosure: "Plaintiff is unable to compute the exact number of instances of the censorship of its speech without further discovery and investigation, and Plaintiff's assessment of damages to date is currently impeded by Defendants' refusal to provide meaningful discovery." (Doc. 234-4 at 8.) As this disclosure was made on the last day of discovery, PLN's statements concerning additional discovery are perplexing. Furthermore, PLN's "estimate of the value of the constitutionally protected activity of publication" is speculative and involves the "abstract weighing of constitutional rights." *Babeu*, 933 F. Supp. 2d at 1212 (rejecting damages theory based on the lost opportunity to communicate). PLN shall not be allowed to seek damages based on this theory.

Second, PLN seeks compensatory damages for frustration of mission, which includes the anticipated time and expense spent on notifying prisoners of ADC policy changes and any declaratory judgment or injunction issued by this Court, a publicity campaign to educate the public about ADC policy changes, and testing and monitoring of ADC's mail practices for compliance with orders of this Court for five years. (Doc. 234-4 at 9.) To support this theory, PLN's disclosures included the names of staff members, their hourly rates, and the estimated hours of work they will perform. (Doc. 234-4 at 9.) Because this damages theory involves estimates of anticipated future work—to be done

after this Court issues any declaratory judgment or injunction—PLN's disclosures are adequate here.

Third, PLN seeks compensatory damages for diversion of resources, on the ground that "Defendants' unconstitutional policy and practices have caused PLN to divert time and resources to investigate the extent and nature of Defendants' mail policy and censorship practices." (Doc. 234-4 at 9.) PLN again disclosed the names of staff, their hourly rates, and estimated hours based on past cases. It also stated it would "supplement this disclosure if and when Defendants provide meaningful discovery." (Doc. 234-4 at 10.) PLN disclosed no additional records or supporting documents showing expenses spent on their own investigation, despite discovery being complete and always having access to its own records. As a result, Defendants were harmed by PLN's inadequate disclosure and PLN shall not receive damages based on this theory.

Fourth, PLN seeks punitive damages. Nothing in the record suggests Defendants were "motivated by evil motive or intent," or "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see Babeu*, 933 F. Supp. 2d at 1214. Summary judgment is granted to Defendants on the issue of punitive damages.

Finally, PLN is entitled to mandatory nominal damages for constitutional violations.

## II.     *First Amendment*

PLN alleges Defendants violated its First Amendment rights because ADC's policy prohibiting sexually explicit material is unconstitutional both on its face and as applied to PLN. Publishers who wish to send subscriptions to inmates have a "legitimate First Amendment interest in access to prisoners." *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2011) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989)). The First Amendment prohibits unreasonable restrictions on publishers' right to communicate with prisoners. *Cook*, 238 F.3d at 1149. In *Turner v. Safley*, the Supreme Court identified four factors to be considered in evaluating the constitutionality of a prison regulation. 490 U.S. 401, 409 (1989). The Ninth Circuit has summarized the factors as follows:

> (1) [W]hether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an "exaggerated response" to the jail's concerns.

*Mauro v. Arpaio*, 188 F.3d 1054, 1058–59 (9th Cir. 1999) (citation omitted).  The first factor—rational connection—must be met to uphold any regulation.  "[I]f a regulation is not rationally related to a legitimate and neutral governmental objective, a court need not reach the remaining three factors." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005).  As the Ninth Circuit has instructed, the *Turner* analysis "applies equally to facial and 'as applied' challenges." *Bahrampour v. Lambert*, 366 F.3d 969, 975 (9th Cir. 2004) (citation omitted).  In considering these factors, the Court gives deference to the prison authorities, in recognition of the principle that prison authorities are better equipped to deal with prison administration. *Turner*, 482 U.S. at 84–85 (1987) (citation omitted).

### a. Facial Challenge

PLN's First Amendment facial challenges concern three versions of DO 914 that deal with sexually explicit material: the 2010 Policy, 2016 Policy, and 2017 Policy.  On summary judgment, Defendants argue that only the 2017 Policy—the policy that is currently effective—presents a live issue for the Court to decide.  The two prior versions, according to Defendants, are moot because they no longer exist.  (Doc. 233 at 14–15.)

The Court agrees.  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (citations omitted).  Voluntary cessation of the challenged conduct does not necessarily moot a claim, "unless the party challenging mootness can show that the 'allegedly wrongful behavior could not reasonably be expected to occur.'" *Rosemere Neighborhood Ass'n v. U.S. Environmental Protection Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (citation omitted).  In the event of government policy change, voluntary cessation by "government officials has been treated with more solicitude

by the courts than similar action by private parties" because courts presume the government acts in good faith. *Am. Cargo Transport, Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) (citation omitted) ("The government's change of policy presents a special circumstance in the world of mootness. Of course there is always the possibility of bad faith and a change of heart. But, unlike in the case of a private party, we presume the government is acting in good faith.").

In *Roy v. State*, for example, the prisoner plaintiff brought a First Amendment claim challenging ADC's policy that "permitted prisoners to possess only seven religious items." No. CV-03-2150-PHX-SRB, 2006 WL 120328, at *1 (D. Ariz. Jan. 13, 2006). While litigation was pending, ADC modified its policy, eliminating the seven-item limit and permitting inmates to possess as many religious items as can fit in a designated box. *Id.* The District of Arizona held that the plaintiff's First Amendment challenge to the seven-item limit was moot, concluding "any suggestion that [ADC] will revert to the old policy once the threat of litigation has been removed is but a 'speculative contingency.'"[7] *Id.* at *6. Similarly, PLN here seeks only declaratory and injunctive relief as to policies that no longer exist. The 2010 and 2016 Policies were superseded by the 2017 Policy, which is discussed below. As in *Roy*, the Court is persuaded that ADC will not revert back to its old policies when the threat of litigation is removed. Thus, PLN's facial challenges to the 2010 and 2016 Policies are moot.

Next, the Court turns to the currently effective 2017 Policy. Its regulations prohibiting sexually explicit material provide in relevant part:

- 914.07–1.1: "In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order." (Doc. 234-2 at 62.)

---

[7] On the other hand, the court allowed the aspect of plaintiff's claim that involved the "allegedly wrongful denial of the particular seven items that Plaintiff requested," concluding "[t]hat Plaintiff may now be permitted to possess additional items beyond those seven already denied to him has no effect on whether the original seven items were properly denied to him." *Roy*, 2006 WL 120328, at *5–6.

- 914.07–1.2.2: "Prohibited publications included, but are not limited to . . . Publications that depict any of the following acts and behaviors in either visual, audio, or written form: Physical contact by another person with a person's unclothed genitals, pubic area, buttocks or, if such person is a female breast; Sadomasochistic abuse; Sexual intercourse, vaginal or anal, fellatio, cunnilingus, bestiality or sodomy; Masturbation, excretory functions, and lewd exhibition of the genitals; Incestuous sexual activity; Sexual activity involving an unwilling participant, or a participant who is the subject of coercion, or any sexual activity involving children." (Doc. 234-2 at 62.)

- 914.07–1.2.17 prohibits: "Content in publications, photographs, drawings, or in any type of image or text, that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy." (Doc. 234-2 at 63.)

- "Sexually explicit material" is defined as: "Any publication . . . which pictorially or textually depicts nudity of either gender, or homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion." (Doc. 234-2 at 69.)

In addition to the prohibited content listed above, the 2017 Policy contains several exceptions:

- 914.07–1.19: "Publications that contain nudity and/or descriptions of sexual behaviors/acts, or violent acts, shall not be withheld if such unauthorized content is within a publication commonly considered to constitute a well-known and widely recognized religious work (such as the Bible, the Koran, the Book of Mormon) or literary work (such as Shakespeare). (Doc. 234-2 at 61–62.)

- 914.07–1.18: "A legal publication that contains unauthorized content that is either (a) directly quoted from a trial or appellate court's decision, opinion, or order, or (b) otherwise taken from a court case, government publication, or news wire service (such as the Associated Press), shall not be withheld if the unauthorized content is reasonably necessary to understand the fundamental legal issue or legal principle of the legal publication. (Doc. 234-2 at 61.)

ADC's policy prohibiting sexually explicit material violates the First Amendment on its face. Under the first factor of the *Turner* test, there is no rational connection between ADC's policy and a legitimate government interest. This factor contains three questions: (1) whether the government objective is legitimate; (2) whether the policy is neutral; and (3) whether the policy is "rationally related" to the government objective. *Mauro*, 188 F.3d at 1059. Defendants state the purpose of ADC's prohibition of sexually explicit publications is to "assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers." (Doc. 233 at 17.) There is no question these are legitimate penological interests. *Mauro*, 188 F.3d at 1059. ADC's policy is also "neutral" under *Turner*, because it furthers "an important or substantial governmental interest unrelated to the suppression of expression." *Id.* (citation omitted).

However, ADC's policy fails on the rational connection prong. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90. The standard for rational connection is low: "The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendant might reasonably have thought that the policy would advance its interests." *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999). Overbreadth can "cast doubt upon the purported legitimate interest at stake." *Jolly v. Snyder*, No. 00-041, 2003 WL 1697539, at*3 n.2 (D. Del. Mar. 22, 2003); *see also Couch v. Jabe*, 737 F. Supp. 2d 561, 565–66 (W.D. Va., 2010).

ADC's policy prohibiting sexually explicit material is not rationally related to its stated goals of rehabilitation, reduction of sexual harassment, and prison security. ADC defines "sexually explicit material" as "[a]ny publication [that] pictorially or textually depicts nudity of either gender, or homosexual, heterosexual, or auto-erotic sex acts[.]" (Doc. 234-2 at 69.) Under this definition, any depiction of sex can qualify as "sexually explicit." Thus, this definition on its face includes all sexually related material and

effectively reads "explicit" out of the policy. Read in conjunction with other provisions, ADC prohibits written or visual depictions of "[s]exual intercourse," and "[s]exual activity involving an unwilling participant," among others. (Doc. 234-2 at 62.) The policy goes even further and prohibits content that "may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal."[8] (Doc. 234-2 at 63.) Defendants have also provided staff with a list of "bright-line, unauthorized content" which includes, among others, depictions or descriptions of statutory nudity, masturbation, sexual representations of inmates, and sexual contact with an unwilling participant and/or child. (Doc. 236 at 15.)

A policy that prohibits all written and visual depictions of sex, and even prohibits content that *may* cause or encourage sexual arousal, is facially overbroad. While Defendants insist the policy prohibits sexual material only if it is explicit, they ignore ADC's own sweeping definition of "sexually explicit material." Indeed, under this policy, ADC has excluded and/or redacted "material far beyond what is needed to further [its] purported goals." *Jolly v. Snyder*, No. C.A. 00-041-JJF, 2003 WL 1697539, at *3 n.2 (D. Del. Mar. 22, 2003). Prohibited and/or redacted material include articles about the persecution of the Yazidi people by ISIS, articles about the Me Too movement, Maya Angelou's *I Know Why the Caged Bird Sings*, a *New Yorker* book review of a scholarly biography of Sigmund Freud, a Mayo Clinic newsletter that contained a medical illustration of a hernia, and self-portraits by former President George W. Bush. (Doc. 218 at 12; 218-5 at 2, 26, 34; 218-6 at 5, 8; 219 at 48.) Given the literal reading of ADC's policy, these examples properly qualify as prohibited material. No reasonable trier of fact would conclude that such broad censorship is rationally related to furthering ADC's penological interests. *See, e.g.*, *Aiello v. Litscher*, 104 F. Supp. 2d 1068 (W.D. Wisconsin 2000) (denying defendant's motion for summary judgment where, under regulations that prohibited depictions of human sexual behavior, defendant excluded mainstream articles

---

[8] ADC's Person Most Knowledgeable ("PMK") testified ADC relies on its staff to exercise "common sense and good judgment" when deciding whether to exclude matereial. However, such a standardless instruction is easily susceptible to arbitrary enforcement.

and books about sex and various works of art); *Couch*, 737 F. Supp. 2d at 567–68 (declaring as unconstitutional a prison policy—which prohibited "explicit . . . descriptions of sexual acts"—as irrational when it excluded various books describing rape, sex, sexual abuse, prostitution, etc.).

Defendants' reliance on *Mauro v. Arpaio* is misplaced.[9]  188 F.3d 1054 (9th Cir. 1999).  In *Mauro*, the Ninth Circuit upheld a Maricopa County jail policy prohibiting "sexually explicit materials," defined as "materials that show frontal nudity" including "personal photographs, drawings, and magazines and pictorials." *Id.* at 1057.  Unlike ADC here, which defines "sexually explicit materials" to include any text or image depicting sex, the Maricopa County jail defined "sexually explicit materials" narrowly to include only images and emphasized that inmates were allowed access to "sexually explicit articles." *Id.* at 1061.  Moreover, the Ninth Circuit concluded "[t]here is nothing vague about this policy" because it established a "bright-line rule [that] not only limits the discretion available to jail employees, but also ensures consistency in the exclusion of materials." *Id.* at 1060–61 n.5.  By contrast, ADC instructs its staff to exercise "good judgment and common sense"—with no specific guidelines—to determine whether a publication, for instance, "*may* . . . cause or encourage sexual excitement or arousal" in prisoners.  (Docs. 234-2 at 63 (emphasis added); 218-1 at 87.)

For these reasons, ADC's current policy prohibiting sexually explicit material is unconstitutional on its face.

---

[9] Further, Defendants cite *Thornburgh v. Abbott*, which is easily distinguishable.  In *Thornburgh*, the Court upheld a regulation under which "no publication may be excluded unless the warden himself makes the determination that it is 'detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity.'"  490 U.S. at 416.  Defendants argue ADC's 2017 Policy contains similar language prohibiting content that is detrimental to security.  (Doc. 250 at 27.)  The 2017 Policy, however, prohibits "sexually explicit material *or* content that is detrimental to the safe, secure, and orderly operation of the facility[.]"  (Doc. 234-2 at 62 (emphasis added).)  Read alongside the other provisions of 914.07, which include various prohibitions unrelated to sex, § 1.1 on its face prohibits publications that are either sexually explicit or detrimental to security.  It does not require that all sexually explicit materials additionally be deemed detrimental to security, as the regulation did in *Thornburgh*.

- 20 -

### b. As Applied Challenge

PLN challenges ADC's exclusion of material from the following publications: the March 2014, April 2014, July 2014, October 2014, April 2017, May 2017, and June 2017 issues of *Prison Legal News*, as well as the 2011 and 2015 exclusions of *Celling*. (Doc. 179 at 26.)

Of those, the March 2014, April 2014, and July 2014 issues were eventually delivered without redaction to inmate subscribers. Defendants argue PLN's as-applied challenge concerning these three issues are moot. Defendants are correct. ADC delivered these issues in full to prisoners—after further review by OPR—and there is no indication in the record that ADC is likely to reverse its decisions on these publications. PLN argues declaratory relief is necessary because "the articles for which those three issues were censored nonetheless continue to violate the ADC mail policy's prohibition on sexual content." (Doc. 248 at 23.) This is actually an argument in support of a facial challenge to ADC's current policy, which the Court addresses above.

Next, the Court evaluates PLN's as-applied challenges to ADC's exclusion of material from the October 2014, April 2017, May 2017, and June 2017 issues of *Prison Legal News*.[10] While the same *Turner* test applies to as-applied challenges, the first *Turner* factor requires the Court to examine "whether applying the regulation to that speech—whatever its value—was rationally related to the legitimate penological interest asserted by the prison." *Hargis v. Foster*, 312 F.3d 404, 410 (9th Cir. 2002). Here, the Court considers whether PLN's materials "in fact implicated legitimate security concerns," as well as concerns about sexual harassment and rehabilitation, and whether application of DO 914 to the publications was rationally connected to these concerns. *Id.*

The October 2014 issue was initially excluded and eventually redacted because of an article titled "Tenth Circuit Holds 'Consensual' Sex Defeats Prisoners' Eighth Amendment Claim." (Doc. 236 at 5–6.) The article discussed a Tenth Circuit case

---

[10] The October 2014 issue was excluded under the 2010 Policy but the others were excluded under the current policy.

involving sex between a prisoner and guards. The redacted language quoted directly from the Tenth Circuit opinion and described the facts underlying the case:

> "I look forward to fucking you," [prisoner] Graham wrote [to guard Jefferies] in one note. "Damn, just the thought of that gets my nipples hard. I'm such a nympho!" She also flashed her breasts at Jefferies "for the hell of it" . . . . [H]er fantasy was to 'be with two men at the same time. . . . [Guard Mendez] asked who she would like him to bring. She said, 'Bring Jefferies.'" Graham then agreed to allow Mendez to see her naked when he came by her cell . . . . She "was wearing just her T-shirt. Mendez took it off and Ms. Graham kissed Jefferies . . . it was then 'back and forth' between the two men, and both had their hands on her. Jefferies began to have intercourse with Ms. Graham while she simultaneously performed oral sex on Mendez. The two men then switched positions[.]" (Doc. 235 at 21–22; 220-2 at 98.)

The April 2017 issue was initially excluded and eventually redacted because of an article titled "Site of Gruesome Prison Riot Becomes New Mexico Tourist Attraction." This article was redacted pursuant to several provisions of 914.07, including provisions that are unrelated to sexually explicit material.[11] PLN points out that the only redacted language concerning sex is the following sentence: "A dozen guards were taken hostage during the incident; some were beaten and raped." (Doc. 218-2 at 4.) The Court considers this redaction only, and not the other redactions made pursuant to provisions unrelated to sexually explicit material.

Several articles were partially redacted in the May and June 2017 issues.[12] As an example, a May 2017 article titled "Vigilantes Assault, Rob and Murder Registered Sex Offenders" discussed various cases involving vigilante attacks on sex offenders. ADC redacted the following description of a sexual assault: "Cruz had been charged with sodomy with a minor; he allegedly had sex with the girl after she passed out drunk on his couch." (Doc. 218-2 at 21.) Additionally, a June 2017 article titled "Rich Defendant Rapes Child, Receives Probation," discussed the light sentence given to a defendant who had

---

[11] For example, ADC also cited § 1.2.3, which prohibits "[d]epictions or descriptions that incite, aid, or abet riots, work stoppages, means of resistance, or any other behaviors that may be detrimental to the safe, secure, and orderly operation of the prison." (Doc. 234-2 at 62.)

[12] As noted above, the Court makes no conclusions about language redacted pursuant to provisions of 914.07 that are unrelated to sex.

admitted to molesting his three-year-old daughter. The defendant's ex-wife filed a civil suit, described by the following redacted language: "In the suit she accused Richards of digitally penetrating his daughter while masturbating." (Doc. 218-2 at 6.)

Having reviewed the articles at issue, the Court concludes ADC's application of its regulations prohibiting sexually explicit material to *Prison Legal News* was not rationally related to its legitimate penological goals. *See Prison Legal News v. Stolle*, 319 F. Supp. 3d 830, 842–46 (E.D. Va. 2015). No reasonable factfinder would find that the excluded language in *Prison Legal News* implicated ADC's concerns about prison security, sexual harassment, and rehabilitation. The textual depictions of sex in *Prison Legal News* are informative and educational in nature—some are direct quotes from court opinions. As PLN correctly points out, these descriptions of facts are essential to understanding legal matters, especially ones that involve sexual harassment and/or assault in prison.

Furthermore, ADC's exclusion decisions concerning *Prison Legal News* were arbitrary and inconsistent, supporting a finding of irrationality. As mentioned above, ADC initially excluded additional issues of *Prison Legal News*, but ultimately allowed them in their entirety upon reconsideration—thus implicitly conceding they did not threaten ADC's penological interests.[13] The Court can discern no meaningful difference between the allowed text and redacted text—either in factual content or writing style. Below are examples of text from *Prison Legal News* that ADC allowed to be delivered:

- In reporting a Ninth Circuit case that was factually similar to the Tenth Circuit case described above, ADC allowed the following text concerning sexual encounters between a prisoner and guard: "Shortly thereafter, Martin entered Wood's cell and 'cupped her hand on [his] groin . . . enough to excite [him]." Wood pushed her away and said "you need to back off on this. . . . After Wood ended the relationship, Martin again entered his cell and 'grabbed ahold of [his] penis and started to stroke it.'" (Doc. 220 at 74.)

- ADC allowed in full an article titled "Kitchen Supervisor Gets Prison Time for Sexually Abusing Two Prisoners," which described the abuse:

---

[13] Defendants also admit that prisoners have access to a number of sexually explicit books in the prison library but provide no explanation as to why sexual text in *Prison Legal News* threatens penological interests but sexual text in books do not.

"E.D. was heard asking Evans and J.I. if they were 'ready to suck some dick.' Evans locked the door, and the trio then had mutual fellatio on top of some food sacks. . . . Evans exacerbated the relationship when he became 'aggressive physically,' according to E.D., asking him to take off his shirt and then proceeding to play with his nipples. . . . E.D. estimated that Evans performed oral sex on him 15–20 times. Once, E.D. alleged, Evans brought K-Y gel and placed a condom on him, and the men briefly engaged in anal sex before E.D. had a change of heart." (Doc. 220-1 at 21.)

Having reviewed and compared the different issues of *Prison Legal News*, the Court is persuaded no reasonable factfinder would conclude "the redacted text is significantly more graphic and explicit than the much more generic descriptions in the [allowed] publications," as Defendants argue. (Doc. 250 at 18–19.) As such, PLN acted unconstitutionally in censoring the October 2014, April 2017, May 2017, and June 2017 issues of *Prison Legal News*.

Finally, neither party briefed the constitutionality of ADC's exclusion of *Celling* or provided the Court with passages of *Celling* that led to its exclusion.[14] The Court therefore makes no ruling on PLN's as-applied challenge with regard to *Celling*.

Accordingly,

**IT IS ORDERED** Defendants' Motion for Summary Judgment (Doc. 233) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** PLN's Motion for Summary Judgment (Doc. 235) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** no later than March 22, 2019, the parties shall each file a statement, of no more than three pages, containing the proposed language for final injunctive relief regarding the claims on which PLN has prevailed.

---

[14] Defendants make no mention of *Celling* in their argument concerning PLN's as-applied challenges. PLN, although it briefly discusses *Celling* in its argument, does not apply the *Turner* test in full and does not argue why its exclusion is constitutional. (Doc. 235 at 21.) Further, *Celling* was apparently excluded pursuant to a prohibition of materials that may incite riots, which has nothing to do with sexually explicit materials and was not briefed by the parties.

**IT IS FURTHER ORDERED** Defendants' Motion to Strike (Doc. 253) is **DENIED** as moot.

**IT IS FURTHER ORDERED** PLN's Motion to Strike (Doc. 254) is **DENIED** as moot.

**IT IS FURTHER ORDERED** Defendants' Motion to Strike (Doc. 257) is **DENIED** as moot.

This matter is ready for trial. Accordingly, the Court enters the following orders.

**IT IS ORDERED** all Motions in Limine are due **August 29, 2019**. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order, if not already filed, is due September 27, 2019.

**IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and submit **NO MORE THAN FIVE PROPOSED QUESTIONS EACH** to be added to the standard Juror Questionnaire with the Court's approval no later than September 10, 2019. Each proposed question shall stand alone and shall not contain sub-parts.

**IT IS FURTHER ORDERED** the parties shall submit a Joint Statement of the Case, of no more than a few short sentences for the Juror Questionnaire, no later than September 13, 2019.

**IT IS FURTHER ORDERED** the parties shall submit a second Joint Statement of the Case, of no more than two short paragraphs to be read to the jury, no later than September 27, 2019.

**IT IS FURTHER ORDERED** no later than September 27, 2019, the parties shall file and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury Instructions in compliance with the procedures available on the Court's website,

including but not limited to: 1) a *joint* set of proposed jury instructions where the parties' instructions agree; 2) a separate set of instructions (one for each party) where the parties do not agree; and 3) legal authority supporting all proposed instructions whether the parties agree or not. Where the parties do not agree, the opposing party shall clearly state its objection to the proposed instruction and the proposing party shall clearly state its response.

**IT IS FURTHER ORDERED** the parties will jointly file a proposed form of verdict, or if the parties do not agree, they may separately file proposed forms of verdict no later than September 25, 2019.

**IT IS FURTHER ORDERED** no later than September 25, 2019, the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony.

**IT IS FURTHER ORDERED** a final pretrial conference is set for __October 18, 2019 at 2:00 PM__, at which time the Court will review Juror Questionnaires. The parties shall meet and confer prior to this date regarding the Juror Questionnaires and email to the Courtroom Deputy no later than noon on October 17, 2019 a list of any jurors they agree should be stricken for cause, along with any objections to jurors they do not agree should be stricken for cause. **The parties shall not file this list.** The Court will rule on any disputed jurors at the final pretrial conference.

**The parties will be supplied a disk containing the questionnaires approximately one week prior to the final pretrial conference. Counsel shall bring a copy of the questionnaires to the conference for review. Counsel are required to return the disk to the Courtroom Deputy and destroy all copies of the questionnaires no later than the last day of trial.**

1   **IT IS FURTHER ORDERED** trial to the jury is set for **<u>October 24, 2019 at 8:30</u>**

2 **<u>AM</u>**.  Estimated length of trial is two days.

3   **IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures

4 found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders,

5 Forms & Procedures for Hon. Roslyn O. Silver.

6    Dated this 8th day of March, 2019.

         Honorable Roslyn O. Silver
         Senior United States District Judge